No. _____

---

# In the United States Court of Appeals for the Federal Circuit

IN RE: CHARTER COMMUNICATIONS, INC.,

*Petitioner.*

On Petition for a Writ of Mandamus to the
United States District Court for the Eastern District of Texas
Case No. 22-CV-0125
Hon. Rodney Gilstrap, United States District Judge

## NON-CONFIDENTIAL APPENDIX IN SUPPORT OF PETITION FOR A WRIT OF MANDAMUS

Daniel L. Reisner
Elizabeth Long
Melissa Brown
**Arnold & Porter Kaye Scholer LLP**
250 West 55th Street
New York, New York 10019
Tel.: (212) 836-8000
Fax: (212) 836-8689

*Attorneys for Petitioner
Charter Communications, Inc.*

June 16, 2023

# TABLE OF CONTENTS FOR NON-CONFIDENTIAL APPENDIX

## CONFIDENTIAL MATERIAL OMITTED

In the non-confidential version of the Appendix, confidential material or information relating to Petitioner's business practices and other commercially sensitive information has been redacted or omitted in its entirety. That material or information was designated as Confidential or Highly Confidential and filed with redactions or under seal pursuant to the parties' Stipulated Protective Order, So-Ordered by the district court on August 10, 2022. (*See* Case No. 2:22-CV-0125, Dkt. 36). Specifically, the following pages contain redactions or are entirely omitted on the basis that they reflect Petitioner's business practices and other commercially sensitive information: Appx8, Appx10, Appx 17, Appx353-356, Appx358-359, Appx364, Appx367, Appx379-395, Appx399-414, Appx420-454, Appx461, Appx464-472, Appx474, Appx482, Appx484, Appx487, Appx496-562, Appx565-570, Appx562-722, Appx736-737, Appx742, Appx747, Appx786-791, Appx801, Appx805-806.

The highlighting included at pages Appx496-729 appear exactly as those pages were filed to the public docket before the district court.

## INDEX

| DATE | DESCRIPTION | PAGE |
|------|-------------|------|
| August 10, 2022 | Stipulated Protective Order, So Ordered by Judge Rodney Gilstrap (Dkt. 36) | i-xv |
| May 3, 2023 | Memorandum Opinion and Order Denying Defendant's Motion to Dismiss for Improper Venue (Dkt. 98-1 - Public Version) | Appx1 |
| April 27, 2022 | Original Complaint for Patent Infringement (Dkt. 1) | Appx21 |
|  | Civil Cover Sheet (Dkt. 1-1) | Appx40 |
|  | Ex. A to Complaint (Dkt. 1-2) | Appx41 |
|  | Ex. B to Complaint (Dkt. 1-3) | Appx49 |
|  | Ex. C to Complaint (Dkt. 1-4) | Appx65 |

| | Ex. D to Complaint (Dkt. 1-5) | Appx78 |
|---|---|---|
| | Ex. E to Complaint (Dkt. 1-6) | Appx98 |
| | Ex. F to Complaint (Dkt. 1-7) | Appx112 |
| | Ex. G to Complaint (Dkt. 1-8) | Appx127 |
| | Ex. H to Complaint (Dkt. 1-9) | Appx132 |
| | Ex. I to Complaint (Dkt. 1-10) | Appx138 |
| | Ex. J to Complaint (Dkt. 1-11) | Appx145 |
| | Ex. K to Complaint (Dkt. 1-12) | Appx148 |
| | Ex. L to Complaint (Dkt. 1-13) | Appx153 |
| January 10, 2023 | Second Amended Complaint for Patent Infringement (Dkt. 53) | Appx158 |
| | Ex. A to Second Amended Complaint (Dkt. 53-1) | Appx185 |
| | Ex. B to Second Amended Complaint (Dkt. 53-2) | Appx193 |
| | Ex. C to Second Amended Complaint (Dkt. 53-3) | Appx209 |
| | Ex. D to Second Amended Complaint (Dkt. 53-4) | Appx222 |
| | Ex. E to Second Amended Complaint (Dkt. 53-5) | Appx242 |
| | Ex. F to Second Amended Complaint (Dkt. 53-6) | Appx256 |
| | Ex. G to Second Amended Complaint (Dkt. 53-7) | Appx271 |
| | Ex. H to Second Amended Complaint (Dkt. 53-8) | Appx276 |
| | Ex. I to Second Amended Complaint (Dkt. 53-9) | Appx282 |
| | Ex. J to Second Amended Complaint (Dkt. 53-10) | Appx289 |
| | Ex. K to Second Amended Complaint (Dkt. 53-11) | Appx292 |
| | Ex. L to Second Amended Complaint (Dkt. 53-12) | Appx297 |

| | | |
|---|---|---|
| | Ex. M to Second Amended Complaint (Dkt. 53-13) | Appx302 |
| | Ex. N to Second Amended Complaint (Dkt. 53-14) | Appx341 |
| January 30, 2023 | Defendant's Motion to Dismiss the Second Amended Complaint for Improper Venue (Dkt. 62 - Public Version) | Appx344 |
| | Declaration of Melissa A. Brown in Support of Defendant's Motion to Dismiss (Dkt. 62-2 - Public Version) | Appx371 |
| | Exhibit 1 to Motion to Dismiss (Dkt. 62-3 - Public Version) | Appx375 |
| | Exhibit 2 to Motion to Dismiss (Dkt. 62-4 - Public Version) (Filed Under Seal) | Appx379 |
| | Exhibit 3 to Motion to Dismiss (Dkt. 62-5 - Public Version) | Appx396 |
| | Exhibit 4 to Motion to Dismiss (Dkt. 62-6 - Public Version) (Filed Under Seal) | Appx399 |
| | Exhibit 5 to Motion to Dismiss (Dkt. 62-7 - Public Version) | Appx415 |
| | Exhibit 6 to Motion to Dismiss (Dkt. 62-8 - Public Version) | Appx417 |
| | Exhibit 7 to Motion to Dismiss (Dkt. 62-9 - Public Version) (Filed Under Seal) | Appx420 |
| | Exhibit 8 to Motion to Dismiss (Dkt. 62-9 - Public Version) (Filed Under Seal) | Appx424 |
| | Exhibit 9 to Motion to Dismiss (Dkt. 62-9 - Public Version) (Filed Under Seal) | Appx440 |
| | Exhibit 10 to Motion to Dismiss (Dkt. 62-9 - Public Version) (Filed Under Seal) | Appx448 |

|  | Exhibit 11 to Motion to Dismiss<br>(Dkt. 62-9 - Public Version) (Filed Under Seal) | Appx451 |
|---|---|---|
|  | Exhibit 12 to Motion to Dismiss<br>(Dkt. 62-9 - Public Version) (Filed Under Seal) | Appx453 |
| Feb. 21, 2023 | Plaintiff's Opposition to Motion to Dismiss for Improper Venue<br>(Dkt. 70 - Public Version) | Appx455 |
|  | Declaration of Matthew Blair In Support of Plaintiff's Opposition<br>(Dkt. 70-1 - Public Version) | Appx491 |
|  | Exhibit A to Plaintiff's Opposition<br>(Dkt. 70-2 - Public Version) (Filed Under Seal) | Appx496 |
|  | Exhibit B to Plaintiff's Opposition<br>(Dkt. 70-2 - Public Version) (Filed Under Seal) | Appx517 |
|  | Exhibit C to Plaintiff's Opposition<br>(Dkt. 70-2 - Public Version) (Filed Under Seal) | Appx533 |
|  | Exhibit D to Plaintiff's Opposition<br>(Dkt. 70-2 - Public Version) (Filed Under Seal) | Appx549 |
|  | Exhibit E to Plaintiff's Opposition<br>(Dkt. 70-2 - Public Version) (Filed Under Seal) | Appx557 |
|  | Exhibit F to Plaintiff's Opposition<br>(Dkt. 70-3 - Public Version) | Appx563 |
|  | Exhibit G to Plaintiff's Opposition<br>(Dkt. 70-4 - Public Version) (Filed Under Seal) | Appx565 |
|  | Exhibit H to Plaintiff's Opposition<br>(Dkt. 70-4 - Public Version) (Filed Under Seal) | Appx567 |
|  | Exhibit I to Plaintiff's Opposition<br>(Dkt. 70-5 - Public Version) | Appx571 |
|  | Exhibit J to Plaintiff's Opposition | Appx574 |

| | | |
|---|---|---|
| | (Dkt. 70-6 - Public Version) | |
| | Exhibit K to Plaintiff's Opposition (Dkt. 70-7 - Public Version) | Appx577 |
| | Exhibit L to Plaintiff's Opposition (Dkt. 70-8 - Public Version) | Appx585 |
| | Exhibit M to Plaintiff's Opposition (Dkt. 70-9 - Public Version) | Appx593 |
| | Exhibit N to Plaintiff's Opposition (Dkt. 70-10 - Public Version) | Appx597 |
| | Exhibit O to Plaintiff's Opposition (Dkt. 70-11 - Public Version) | Appx600 |
| | Exhibit P to Plaintiff's Opposition (Dkt. 70-12 - Public Version) | Appx604 |
| | Exhibit Q to Plaintiff's Opposition (Dkt. 70-13 - Public Version) | Appx607 |
| | Exhibit R to Plaintiff's Opposition (Dkt. 70-14 - Public Version) | Appx617 |
| | Exhibit S to Plaintiff's Opposition (Dkt. 70-15 - Public Version) | Appx618 |
| | Exhibit T to Plaintiff's Opposition (Dkt. 70-16 - Public Version) | Appx620 |
| | Exhibit U to Plaintiff's Opposition (Dkt. 70-17 - Public Version) | Appx622 |
| | Exhibit V to Plaintiff's Opposition (Dkt. 70-18 - Public Version) | Appx624 |
| | Exhibit W to Plaintiff's Opposition (Dkt. 70-19 - Public Version) | Appx635 |
| | Exhibit X to Plaintiff's Opposition | Appx648 |

| | | |
|---|---|---|
| | (Dkt. 70-20 - Public Version) | |
| | Exhibit Y to Plaintiff's Opposition (Dkt. 70-21 - Public Version) (Under Seal) | Appx652 |
| | Exhibit Z to Plaintiff's Opposition (Dkt. 70-21 - Public Version) (Under Seal) | Appx658 |
| | Exhibit AA to Plaintiff's Opposition (Dkt. 70-21 - Public Version) (Under Seal) | Appx671 |
| | Exhibit AB to Plaintiff's Opposition (Dkt. 70-21 - Public Version) (Under Seal) | Appx694 |
| | Exhibit AC to Plaintiff's Opposition (Dkt. 70-22 - Public Version) | Appx723 |
| March 9, 2023 | Defendant's Reply in Further Support of its Motion to Dismiss for Improper Venue (Dkt. 79 - Public Version) | Appx730 |
| March 9, 2023 | Declaration of Melissa A. Brown in Further Support of Defendant's Motion to Dismiss for Improper Venue (Dkt. 79-1 - Public Version) | Appx746 |
| March 9, 2023 | Exhibit 13 to Defendant's Reply Brief (Dkt. 79-2 - Public Version) | Appx749 |
| March 9, 2023 | Exhibit 14 to Defendant's Reply Brief (Dkt. 79-3 - Public Version) (Under Seal) | Appx786 |
| March 6, 2023 | Plaintiff's Supplement to its Opposition to Motion to Dismiss for Improper Venue (Dkt. 76 - Public Version) | Appx792 |
| March 23, 2023 | Defendant's Sur-Reply in Further Opposition to Motion to Dismiss for Improper Venue (Dkt. 83 - Public Version) | Appx796 |
| N/A | District Court Docket Sheet, as of June 12, 2023 | Appx810 |

### UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

|  |  |
|---|---|
| ENTROPIC COMMUNICATIONS, LLC, | |
| *Plaintiff*, | |
| v. | Case No. 2:22-cv-00125-JRG |
| CHARTER COMMUNICATIONS, INC.; Spectrum Advanced Services, LLC; and Spectrum Management Holding Company, LLC, | |
| *Defendants*. | |

### STIPULATED PROTECTIVE ORDER

Plaintiff Entropic Communications, LLC ("Entropic" or "Plaintiff") and Defendants Charter Communications, Inc., Spectrum Advanced Services, LLC, and Spectrum Management Holding Company, LLC (collectively "Charter" or "Defendants") hereafter referred to individually as a "Party" and collectively as "the Parties" to the "Action," believe that certain information that is or will be encompassed by discovery demands by the Parties involves the production or disclosure of trade secrets, confidential business information, or other proprietary information;

WHEREAS, the Parties seek a protective order limiting disclosure thereof in accordance with Federal Rule of Civil Procedure 26(c):

THEREFORE, it is hereby stipulated among the Parties and ORDERED that:

1. Each Party may designate as confidential for protection under this Order, in whole or in part, any document, information or material that constitutes or includes, in whole or in part, confidential or proprietary information or trade secrets of the Party or a Third Party to whom the Party reasonably believes it owes an obligation of confidentiality with respect to such

# APPXi

document, information or material ("Protected Material").  Protected Material shall be designated by the Party producing it by affixing a legend or stamp on such document, information or material as follows: "CONFIDENTIAL."  The word "CONFIDENTIAL" shall be placed clearly on each page of the Protected Material (except deposition and hearing transcripts) for which such protection is sought.  For deposition and hearing transcripts, the word "CONFIDENTIAL" shall be placed on the cover page of the transcript (if not already present on the cover page of the transcript when received from the court reporter) by each attorney receiving a copy of the transcript after that attorney receives notice  of  the designation of some or all of that transcript as "CONFIDENTIAL."

2.     Any document produced under Patent Rules 2-2, 3-2, and/or 3-4 before issuance of this Order with the designation "Confidential" or "Confidential - Outside Attorneys' Eyes Only" shall receive the same treatment as if designated "RESTRICTED - ATTORNEYS' EYES ONLY" under this Order, unless and until such document is redesignated to have a different classification under this Order.

3.     With respect to documents, information or material designated "CONFIDENTIAL, "RESTRICTED - ATTORNEYS' EYES ONLY," or "RESTRICTED CONFIDENTIAL SOURCE CODE" ("DESIGNATED MATERIAL"),[1] subject to the provisions herein and unless otherwise stated, this Order governs, without limitation: (a) all documents, electronically stored information, and/or things as defined by the Federal Rules of Civil Procedure; (b) all pretrial, hearing or deposition testimony, or documents marked as exhibits

---

[1] The term DESIGNATED MATERIAL is used throughout this Protective Order to refer to the class of materials designated as "CONFIDENTIAL," "RESTRICTED - ATTORNEYS' EYES ONLY," or "RESTRICTED CONFIDENTIAL SOURCE CODE," both individually and collectively.

**APPXii**

or for identification in depositions and hearings; (c) pretrial pleadings, exhibits to pleadings and other court filings; (d) affidavits; and (e) stipulations.  All copies, reproductions, extracts, digests and complete or partial summaries prepared from any DESIGNATED MATERIALS shall also be considered DESIGNATED MATERIAL and treated as such under this Order.

4.    A designation of Protected Material (i.e., "CONFIDENTIAL," "RESTRICTED - ATTORNEYS' EYES ONLY," or "RESTRICTED CONFIDENTIAL SOURCE CODE") may be made at any time.   Inadvertent or unintentional production of documents, information or material that has not been designated as DESIGNATED MATERIAL shall not be deemed a waiver in whole or in part of a claim for confidential treatment.  Any party that inadvertently or unintentionally produces Protected Material without designating it as DESIGNATED MATERIAL may request destruction of that Protected Material by notifying the recipient(s), as soon as reasonably possible after the producing Party becomes aware of the inadvertent or unintentional disclosure, and providing replacement Protected Material that is properly designated.  The recipient(s) shall then destroy all copies of the inadvertently or unintentionally produced Protected Materials and any documents, information or material derived from or based thereon.

5.    "CONFIDENTIAL" documents, information and material may be disclosed only to the following persons, except upon receipt of the prior written consent of the designating party, upon order of the Court, or as set forth in paragraph 12 herein:

(a)    outside counsel of record in this Action for the Parties;

(b)    employees of such counsel assigned to and reasonably necessary to assist such counsel in the litigation of this Action;

(c)    in-house counsel for the Parties who either have responsibility for making decisions

**APPXiii**

dealing directly with the litigation of this Action, or who are assisting outside counsel in the litigation of this Action;

(d)   up to and including three (3) designated representatives of each of the Parties to the extent reasonably necessary for the litigation of this Action, except that either party may in good faith request the other party's consent to designate one or more additional representatives, the other party shall not unreasonably withhold such consent, and the requesting party may seek leave of Court to designate such additional representative(s) if the requesting party believes the other party has unreasonably withheld such consent;

(e)   outside consultants or experts (*i.e.*, not existing employees or affiliates of a Party or an affiliate of a Party) retained for the purpose of this litigation, provided that:  (1) such consultants or experts are not presently employed by the Parties hereto for purposes other than this Action; (2) before access is given, the consultant or expert has completed the Undertaking attached as Exhibit A hereto and the same is served upon the producing Party with a current curriculum vitae of the consultant or expert at least ten (10) days before access to the Protected Material is to be given to that consultant or Undertaking to object to and notify the receiving Party in writing that it objects to disclosure of Protected Material to the consultant or expert.  The Parties agree to promptly confer and use good faith to resolve any such objection.  If the Parties are unable to resolve any objection, the objecting Party may file a motion with the Court within fifteen (15) days of the notice, or within such other time as the Parties may agree, seeking a protective order with respect to the proposed disclosure. The objecting Party shall have the burden of proving the need for a protective order. No disclosure shall occur until all such objections are resolved by agreement or Court order;

(f)   independent litigation support services, including persons working for or as court reporters, graphics or design services, jury or trial consulting services, and photocopy, document imaging, and database services retained by counsel and reasonably necessary to assist counsel with the litigation of this Action; and

(g)   the Court and its personnel.

6.   A Party shall designate documents, information or material as "CONFIDENTIAL" only upon a good faith belief that the documents, information or material contains confidential or proprietary information or trade secrets of the Party or a Third Party to whom the Party reasonably believes it owes an obligation of confidentiality with respect to such documents, information or material.

7.   Documents, information or material produced pursuant to any discovery request in this

4

**APPXiv**

Action, including but not limited to Protected Material designated as DESIGNATED

MATERIAL, shall be used by the Parties only in the litigation of this Action and shall not

be used for any other purpose.  Any person or entity who obtains access to DESIGNATED

MATERIAL or the contents thereof pursuant to this Order shall not make any copies,

duplicates, extracts, summaries or descriptions of such DESIGNATED MATERIAL or any

portion thereof except as may be reasonably necessary in the litigation of this Action.  Any

such copies, duplicates, extracts, summaries or descriptions shall be classified

DESIGNATED MATERIALS and subject to all of the terms and conditions of this Order.

8.    To the extent a producing Party believes that certain Protected Material qualifying to be

designated CONFIDENTIAL is so sensitive that its dissemination deserves even further

limitation, the producing Party may designate such Protected Material "RESTRICTED --

ATTORNEYS' EYES ONLY," or to the extent such Protected Material includes computer

source code and/or live data (that is, data as it exists residing in a database or databases)

("Source Code Material"), the producing Party may designate such Protected Material as

"RESTRICTED CONFIDENTIAL SOURCE CODE."

9.    For Protected Material designated RESTRICTED -- ATTORNEYS' EYES ONLY,

access to, and disclosure of, such Protected Material shall be limited to individuals listed

in paragraphs 5(a-c) and (e-g); provided, however, that access by in-house counsel

pursuant to paragraph 5(c) be limited to in-house counsel who exercise no competitive

decision-making authority on behalf of the client.

10.    For Protected Material designated RESTRICTED CONFIDENTIAL SOURCE CODE,

the following additional restrictions apply:

(a)    Access to a Party's Source Code Material shall be provided only on "stand-alone"
        computer(s) (that is, the computer may not be linked to any network, including a

**APPXv**

local area network ("LAN"), an intranet or the Internet).    The stand-alone computer(s) may be connected to (i) a printer, or (ii) a device capable of temporarily storing electronic copies solely for the limited purposes permitted pursuant to paragraphs 10 (h and k) below.  Additionally, except as provided in paragraph 10(k) below, the stand-alone computer(s) may only be located at the offices of the producing Party's outside counsel;

(b)    The receiving Party shall make reasonable efforts to restrict its requests for such access to the stand-along computer(s) to normal business hours, which for purposes of this paragraph shall be 8:00 a.m. through 6:00 p.m.  However, upon reasonable notice from the receiving party, the producing Party shall make reasonable efforts to accommodate the receiving Party's request for access to the stand-alone computer(s) outside of normal business hours.  The Parties agree to cooperate in good faith such that maintaining the producing Party's Source Code Material at the offices of its outside counsel shall not unreasonably hinder the receiving Party's ability to efficiently and effectively conduct the prosecution or defense of this Action;

(c)    The producing Party shall provide the receiving Party with information explaining how to start, log on to, and operate the stand-alone computer(s) in order to access the produced Source Code Material on the stand-alone computer(s);

(d)    The producing Party will produce Source Code Material in computer searchable format on the stand-alone computer(s) as described above;

(e)    Access to Protected Material designated RESTRICTED CONFIDENTIAL - SOURCE CODE shall be limited to outside counsel and up to three (3) outside consultants or experts[2] (*i.e.*, not existing employees or affiliates of a Party or an affiliate of a Party) retained for the purpose of this litigation and approved to access such Protected Materials pursuant to paragraph 5(e) above.  A receiving Party may include excerpts of Source Code Material in a pleading, exhibit, expert report, discovery document, deposition transcript, other Court document, provided that the Source Code Documents are appropriately marked under this Order, restricted to those who are entitled to have access to them as specified herein, and, if filed with the Court, filed under seal in accordance with the Court's rules, procedures and orders;

(f)    To the extent portions of Source Code Material are quoted in a Source Code Document, either (1) the entire Source Code Document will be stamped and treated as RESTRICTED CONFIDENTIAL SOURCE CODE or (2) those pages containing quoted Source Code Material will be separately stamped and treated as

---

[2] For the purposes of this paragraph, an outside consultant or expert is defined to include the outside consultant's or expert's direct reports and other support personnel, such that the disclosure to a consultant or expert who employs others within his or her firm to help in his or her analysis shall count as a disclosure to a single consultant or expert.

**APPXvi**

RESTRICTED CONFIDENTIAL SOURCE CODE;

(g)    Except as set forth in paragraph 10(k) below, no electronic copies of Source Code Material shall be made without prior written consent of the producing Party, except as necessary to create documents which, pursuant to the Court's rules, procedures and order, must be filed or served electronically;

(h)    The receiving Party shall be permitted to make a reasonable number of printouts and photocopies of Source Code Material, all of which shall be designated and clearly labeled "RESTRICTED CONFIDENTIAL SOURCE CODE," and the receiving Party shall maintain a log of all such files that are printed or photocopied;

(i)    Should such printouts or photocopies be transferred back to electronic media, such media shall be labeled "RESTRICTED CONFIDENTIAL SOURCE CODE" and shall continue to be treated as such;

(j)    If the receiving Party's outside counsel, consultants, or experts obtain printouts or photocopies of Source Code Material, the receiving Party shall ensure that such outside counsel, consultants, or experts keep the printouts or photocopies in a secured locked area in the offices of such outside counsel, consultants, or expert. The receiving Party may also temporarily keep the printouts or photocopies at: (i) the Court for any proceedings(s) relating to the Source Code Material, for the dates associated with the proceeding(s); (ii) the sites where any deposition(s) relating to the Source Code Material are taken, for the dates associated with the deposition(s); and (iii) any intermediate location reasonably necessary to transport the printouts or photocopies (*e.g.*, a hotel prior to a Court proceeding or deposition); and

(k)    A producing Party's Source Code Material may only be transported by the receiving Party at the direction of a person authorized under paragraph 10(e) above to another person authorized under paragraph 10(e) above, on paper or removable electronic media (*e.g.*, a DVD, CD-ROM, or flash memory "stick") via hand carry, Federal Express or other similarly reliable courier.  Source Code Material may not be transported or transmitted electronically over a network of any kind, including a LAN, an intranet, or the Internet.  Source Code Material may only be transported electronically for the purpose of Court proceeding(s) or deposition(s) as set forth in paragraph 10(j) above and is at all times subject to the transport restrictions set forth herein. But, for those purposes only, the Source Code Materials may be loaded onto a stand-alone computer.

11.    Any attorney representing a Party, whether in-house or outside counsel, and any person associated with a Party and permitted to receive the other Party's Protected Material that is designated RESTRICTED -- ATTORNEYS' EYES ONLY and/or

7

**APPXvii**

RESTRICTED CONFIDENTIAL SOURCE CODE (collectively "HIGHLY SENSITIVE MATERIAL"), who obtains, receives, has access to, or otherwise learns, in whole or in part, the other Party's HIGHLY SENSITIVE MATERIAL under this Order shall not prepare, prosecute, supervise, or assist in the preparation or prosecution of any patent application pertaining to the field of the invention of the patents-in-suit on behalf of the receiving Party or its acquirer, successor, predecessor, or other affiliate during the pendency of this Action and for one year after its conclusion, including any appeals.  To ensure compliance with the purpose of this provision, each Party shall create an "Ethical Wall" between those persons with access to HIGHLY SENSITIVE MATERIAL and any individuals who, on behalf of the Party or its acquirer, successor, predecessor, or other affiliate, prepare, prosecute, supervise or assist in the preparation or prosecution of any patent application pertaining to the field of invention of the patent-in-suit.

12.    Nothing in this Order shall require production of documents, information or other material that a Party contends is protected from disclosure by the attorney-client privilege, the work product doctrine, or other privilege, doctrine, or immunity.  If documents, information or other material subject to a claim of attorney-client privilege, work product doctrine, or other privilege, doctrine, or immunity is inadvertently or unintentionally produced, such production shall in no way prejudice or otherwise constitute a waiver of, or estoppel as to, any such privilege, doctrine, or immunity.  Any Party that inadvertently or unintentionally produces documents, information or other material it reasonably believes are protected under the attorney-client privilege, work product doctrine, or other privilege, doctrine, or immunity may obtain the return of such documents, information or other material by promptly notifying the recipient(s) and providing a privilege log for the inadvertently or

**APPXviii**

unintentionally produced documents, information or other material.  The recipient(s) shall gather and return all copies of such documents, information or other material to the producing Party, except for any pages containing privileged or otherwise protected markings by the recipient(s), which pages shall instead be destroyed and certified as such to the producing Party.

13.    There shall be no disclosure of any DESIGNATED MATERIAL by any person authorized to have access thereto to any person who is not authorized for such access under this Order. The Parties are hereby ORDERED to safeguard all such documents, information and material to protect against disclosure to any unauthorized persons or entities.

14.    Nothing contained herein shall be construed to prejudice any Party's right to use any DESIGNATED MATERIAL in taking testimony at any deposition or hearing provided that the DESIGNATED MATERIAL is only disclosed to a person(s) who is: (i) eligible to have access to the DESIGNATED MATERIAL by virtue of his or her employment with the designating party, (ii) identified in the DESIGNATED MATERIAL as an author, addressee, or copy recipient of such information, (iii) although not identified as an author, addressee, or copy recipient of such DESIGNATED MATERIAL, has, in the ordinary course of business, seen such DESIGNATED MATERIAL, (iv) a current or former officer, director or employee of the producing Party or a current or former officer, director or employee of a company affiliated with the producing Party; (v) counsel for a Party, including outside counsel and in-house counsel (subject to paragraph 9 of this Order); (vi) an independent contractor, consultant, and/or expert retained for the purpose of this litigation; (vii) court reporters and videographers; (viii) the Court; or (ix) other persons entitled hereunder to access to DESIGNATED MATERIAL. DESIGNATED MATERIAL shall not be disclosed

APPXix

to any other persons unless prior authorization is obtained from counsel representing the producing Party or from the Court.

15. Parties may, at the deposition or hearing or within thirty (30) days after receipt of a deposition or hearing transcript, designate the deposition or hearing transcript or any portion thereof as "CONFIDENTIAL," "RESTRICTED - ATTORNEY' EYES ONLY," or "RESTRICTED CONFIDENTIAL SOURCE CODE" pursuant to this Order. Access to the deposition or hearing transcript so designated shall be limited in accordance with the terms of this Order.  Until expiration of the 30-day period, the entire deposition or hearing transcript shall be treated as confidential.

16. Any DESIGNATED MATERIAL that is filed with the Court shall be filed under seal and shall remain under seal until further order of the Court.  The filing party shall be responsible for informing the Clerk of the Court that the filing should be sealed and for placing the legend "FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER" above the caption and conspicuously on each page of the filing.  Exhibits to a filing shall conform to the labeling requirements set forth in this Order.  If a pretrial pleading filed with the Court, or an exhibit thereto, discloses or relies on confidential documents, information or material, such confidential portions shall be redacted to the extent necessary and the pleading or exhibit filed publicly with the Court.

17. The Order applies to pretrial discovery.  Nothing in this Order shall be deemed to prevent the Parties from introducing any DESIGNATED MATERIAL into evidence at the trial of this Action, or from using any information contained in DESIGNATED MATERIAL at the trial of this Action, subject to any pretrial order issued by this Court.

18. A Party may request in writing to the other Party that the designation given to any

**APPXx**

DESIGNATED MATERIAL be modified or withdrawn.  If the designating Party does not agree to redesignation within ten (10) days of receipt of the written request, the requesting Party may apply to the Court for relief.  Upon any such application to the Court, the burden shall be on the designating Party to show why its classification is proper.  Such application shall be treated procedurally as a motion to compel pursuant to Federal Rules of Civil Procedure 37, subject to the Rule's provisions relating to sanctions.   In making such application, the requirements of the Federal Rules of Civil Procedure and the Local Rules of the Court shall be met.   Pending the Court's determination of the application, the designation of the designating Party shall be maintained.

19.    Each outside consultant or expert to whom DESIGNATED MATERIAL is disclosed in accordance with the terms of this Order shall be advised by counsel of the terms of this Order, shall be informed that he or she is subject to the terms and conditions of this Order, and shall sign an acknowledgment that he or she has received a copy of, has read, and has agreed to be bound by this Order.  A copy of the acknowledgment form is attached as Appendix A.

20.    To the extent that any discovery is taken of persons who are not Parties to this Action ("Third Parties") and in the event that such Third Parties contended the discovery sought involves trade secrets, confidential business information, or other proprietary information, then such Third Parties may agree to be bound by this Order.

21.    To the extent that discovery or testimony is taken of Third Parties, the Third Parties may designate as "CONFIDENTIAL" or "RESTRICTED -- ATTORNEYS' EYES ONLY" any documents, information or other material, in whole or in part, produced or give by such documents, information or other material, in whole or in part, produced or give by

APPXxi

such Third Parties.  The Third Parties shall have ten (10) days after production of such documents, information or other materials to make such a designation.  Until that time period lapses or until such a designation has been made, whichever occurs sooner, all documents, information or other material so produced or given shall be treated as "CONFIDENTIAL" in accordance with this Order.

22.    Within thirty (30) days of final termination of this Action, including any appeals, all DESIGNATED MATERIAL, including all copies, duplicates, abstracts, indexes, summaries, descriptions, and excerpts or extracts thereof (excluding excerpts or extracts incorporated into any privileged memoranda of the Parties and materials which have been admitted into evidence in this Action), shall at the producing Party's election either be returned to the producing Party or be destroyed.  The receiving Party shall verify the return or destruction by affidavit furnished to the producing Party, upon the producing Party's request.

23.    The failure to designate documents, information or material in accordance with this Order and the failure to object to a designation at a given time shall not preclude the filing of a motion at a later date seeking to impose such designation or challenging the propriety thereof.   The entry of this Order and/or the production of documents, information and material hereunder shall in no way constitute a waiver of any objection to the furnishing thereof, all such objections being hereby preserved.

24.    Any Party knowing or believing that any other party is in violation of or intends to violate this Order and has raised the question of violation or potential violation with the opposing party and has been unable to resolve the matter by agreement may move the Court for such relief as may be appropriate in the circumstances.  Pending disposition of the motion by the Court, the Party alleged to be in violation of or intending to violate this Order shall

**APPXxii**

discontinue the performance of and/or shall not undertake the further performance of any action alleged to constitute a violation of this Order.

25.    Production of DESIGNATED MATERIAL by each of the Parties shall not be deemed a publication of the documents, information and material (or the contents thereof) produced so as to void or make voidable whatever claim the Parties may have as to the proprietary and confidential nature of the documents, information or other material or its contents.

26.    Nothing in this Order shall be construed to effect an abrogation, waiver or limitation of any kind on the rights of each of the Parties to assert any applicable discovery or trial privilege.

27.    Each of the Parties shall also retain the right to file a motion with the Court (a) to modify this Order to allow disclosure of DESIGNATED MATERIAL to additional persons or entities if reasonably necessary to prepare and present this Action and (b) to apply for additional protection of DESIGNATED MATERIAL.

**So ORDERED and SIGNED this 10th day of August, 2022.**

RODNEY  GILSTRAP
UNITED STATES DISTRICT JUDGE

**APPXxiii**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

ENTROPIC COMMUNICATIONS, LLC,

     Plaintiff,

     v.

CHARTER COMMUNICATIONS, INC.;
SPECTRUM ADVANCED SERVICES,
LLC; AND SPECTRUM MANAGEMENT
HOLDING COMPANY, LLC,

     Defendants.

Case No. 2:22-cv-00125-JRG

JURY TRIAL DEMANDED

**APPENDIX A**
**UNDERTAKING OF EXPERTS OR CONSULTANTS REGARDING**
**PROTECTIVE ORDER**

I, _____, declare that:

1.    My address is _____.

     My current employer is _____.

     My current occupation is _____.

2.    I have received a copy of the Protective Order in this action.  I have carefully read and understand the provisions of the Protective Order.

3.    I will comply with all of the provisions of the Protective Order.  I will hold in confidence, will not disclose to anyone not qualified under the Protective Order, and will use only for purposes of this action any information designated as "CONFIDENTIAL," "RESTRICTED -- ATTORNEYS' EYES ONLY," or "RESTRICTED CONFIDENTIAL SOURCE CODE" that is disclosed to me.

4.    Promptly upon termination of these actions, I will return all documents and things

1

**APPXxiv**

designated as  "CONFIDENTIAL," "RESTRICTED -- ATTORNEYS' EYES ONLY,"

or "RESTRICTED CONFIDENTIAL SOURCE CODE" that came into my possession,

and all documents and things that I have prepared relating thereto, to the outside counsel

for the party by whom I am employed.

5.      I hereby submit to the jurisdiction of this Court for the purpose of enforcement of the

Protective Order in this action.

I declare under penalty of perjury that the foregoing is true and correct.

Signature _____

Date _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

**APPXxv**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**



| | | |
|---|---|---|
| ENTROPIC COMMUNICATIONS, LLC, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | CIVIL ACTION NO.  2:22-CV-00125-JRG |
| | § | |
| CHARTER COMMUNICATIONS, INC., | § | |
| | § | |
| *Defendant.* | § | |

## MEMORANDUM OPINION AND ORDER

**I.    INTROUDCTION**

Before the Court is Defendant Charter Communications, Inc.'s ("Charter") Motion to Dismiss the Second Amended Complaint for Improper Venue Pursuant to Fed. R. Civ. P. 12(b)(3) ("Motion"). (Dkt. No. 61.) For the reasons set forth herein, the Court finds that it should be and hereby is **DENIED**.

**II.    BACKGROUND**

**A.    Procedural History**

Plaintiff Entropic Communications, LLC ("Entropic") filed its original complaint on April 27, 2022, alleging infringement of various patents. (Dkt. No. 1.) On July 22, 2022, the parties filed a Joint Motion requesting limited and expedited venue discovery, which the Court granted. (Dkt. Nos. 24, 25.) Entropic filed the operative complaint, the Second Amended Complaint, on January 10, 2023 (Dkt. No. 53.) Venue discovery has now concluded and Charter's Motion to Dismiss the Second Amended Complaint for Improper Venue is now before the Court. (Dkt. No. 61.)

**B.    The Parties**

*i)    Entropic*

**APPX1**

Plaintiff Entropic is a Delaware limited liability company with an office in Plano, Texas. (Dkt. No. 53 at ¶ 2.)

ii)   *Charter and Its Subsidiaries*

Defendant Charter is a Delaware corporation with its principal place of business in Stamford, Connecticut. (Dkt. No. 53 at ¶ 3.) Charter is a large enterprise that spans a multitude of subsidiaries that it owns manages, two of which are particularly relevant here. (*See* Dkt. No. 68 at 6.) The first, Spectrum Gulf Coast, LLC ("SGC"), owns the physical properties in the District that are discussed below. (Dkt. No. 61 at 1–2.) The second, Charter Communications, LLC ("CC LLC") employs all individuals who work for all of the subsidiaries owned and managed by Charter. (Dkt. No. 61 at 4.) Charter itself does not have any employees, though it clearly has officers that act for it. (*Id.*)

Significantly, all 200+ subsidiaries, including the two mentioned above, have complete overlap of officers and directors with Charter. (Dkt. No. 68 at 11. *See* Dkt. No. 68-2 at 69:15–17 (69:15–17 (Q: "Do any of them have officers who are not officers of [Charter]?" A: "No.").) Charter's corporate representative testified that Charter simply copies the same officer list for every new entity that is created, save for a few irrelevant exceptions. (Dkt. No. 68 at 11. *See* Dkt. No. 68-2 at 42:4–12.)

**III.   LEGAL STANDARD**

Venue is controlled by 28 U.S.C. § 1400(b) in actions for patent infringement. Pursuant thereto, "[a]ny civil action for patent infringement may be brought in the judicial district where the defendant resides, or where the defendant has committed acts of infringement and has a regular and established place of business." Under the residency requirement, the Supreme Court held that "a domestic corporation 'resides' only in its State of incorporation for purposes of the patent venue

**APPX2**

statute." *TC Heartland LLC v. Kraft Foods Grp. Brands LLC*, 137 S. Ct. 1514, 1517 (2017).

Entropic does not contend that Charter resides in this District. Rather, Entropic contends that venue is proper because Charter has committed acts of infringement and has a regular and established place of business in this District. (*See, e.g.*, Dkt. No. 68 at 18–29.) Under Section 1400(b), a "regular and established place of business" must be (1) "a physical place in the district"; (2) "regular and established"; and (3) "the place of the defendant." *In re Cray*, 871 F.3d 1355, 1360 (Fed. Cir. 2017). The Federal Circuit set forth a number of considerations relevant to determining if a regular and established place of business is "of the defendant." *Id.* Those considerations include whether the defendant owns or leases the place, exercises other attributes of possession or control over the place, conditions employment on an employee's continued residence in the district, stores materials at a place in the district so that they can be distributed or sold from that place, advertises a place for its business or represents that it has a place of business in the district. *Id.* at 1363–67. A court may also consider the nature and activity of the alleged place of business of the defendant in the district in comparison with that of other places of business of the defendant in other venues. *Id.* These enumerated considerations are not exhaustive but rather illustrative of the types of information relevant for determining whether a physical place is "of the defendant." *Id.* at 1363.

## IV.   ANALYSIS

### A.   Acts of Infringement

In a footnote to its opening brief, Charter denies that it has committed acts of infringement in this District "because it does not own, lease, or distribute the Accused Cable Modem Products and does because it does not provide the Accused Services." (Dkt. No. 61 at 12, n. 9.)

Entropic responds by arguing that it was only required to allege infringement to satisfy this

portion of §1400(b). (Dkt. No. 68 at 18.) Moreover, it argues that it has alleged that Charter is accused of indirect infringement. (*Id.*)

The Court finds that Entropic has satisfied the "acts of infringement" portion of § 1400(b). Entropic has alleged acts of infringement, direct and indirect, which is sufficient. *Seven Networks, LLC v. Google LLC*, 315 F. Supp. 3d 933, 942 (E.D. Tex. July 19, 2018) ("Where a complaint alleges infringement, the allegations satisfy the 'acts of infringement' requirement of § 1400(b) although the allegations may be contested.") (quoting *Symbology Innovations, LLC v. Lego Sys., Inc.*, 282 F. Supp. 3d 916, 928 (E.D. Va. 2017)).

**B.    Regular and Established Place of Business**

*i)    Physical Place in the District*

To satisfy this element, Entropic must show that Charter has a "physical place in the district" *In re Cray*, 871 F.3d at 1360. A "place" must be a "physical, geographical location in the district from which the business of the defendant is carried out." *Id.* at 1362. The Second Amended Complaint identifies at least four physical locations in this District: 1414 Summit Avenue, Plano, Texas 75074; 700 Alma Drive, Plano, Texas 75075; 2100 N. Dallas Parkway, Plano, Texas 75075; and 4255-A Dowlen Road, Beaumont, Texas 77706. (*See* Dkt. No. 53 at ¶¶ 16–17). Thus, the only question is whether "the business of [Charter] is carried out" at these locations. *Cray*, 871 F.3d at 1362.

Charter argues that another subsidiary, SGC, operates these stores to provide services to customers. (Dkt. No. 61 at 13.) Charter also argues that it does not directly own or control any physical place in the District and thus this element cannot be satisfied. (*Id.*)

Entropic responds by arguing that these locations do, in fact, carry out the business of Charter. (Dkt. No. 68 at 21.) Entropic points out that each of the above locations displays the

4

**APPX4**

"Spectrum" logo, which is the same logo that appears on the face of Charter's customer service agreements used nationwide. (*Id.*) Entropic then analogizes to *Entropic Communications, LLC v. DirecTV, LLC*, No. 2:22-cv-75, Dkt. No. 109 at 7 (E.D. Tex. Oct. 24, 2022). There, the retail stores in the District bore the Dish name and provided Dish-branded products and services even though the stores were leased and operated by a subsidiary. *Id.* at 7. Relying on this, this Court concluded that the first *Cray* factor was satisfied.

In reply, Charter argues that *DirecTV* is distinguishable from this case because there the "DirecTV" brand was used at the locations, whereas here the evidence shows use of the "Spectrum" brand, and not any "Charter"-specific brand. *Cf. DirecTV* at 7–8. (Dkt. No. 75 at 7.)

In its sur-reply, Entropic argues that Charter is "Spectrum," and "Spectrum" is Charter, so *DirecTV* is on point. (Dkt. No. 80 at 2–3.)

The Court is persuaded that Charter is Spectrum, and Spectrum is Charter. Below is a relevant admission Charter's 2022 SEC 10-K statement:

> We are a leading broadband connectivity company and cable operator serving more than 32 million customers in 41 states through our **Spectrum** brand. Over an advanced high-capacity, two-way telecommunications network, we offer a full range of state-of-the-art residential and business services including **Spectrum** Internet®, TV, Mobile and Voice. For small and medium-sized companies, **Spectrum** Business® delivers the same suite of broadband products and services coupled with special features and applications to enhance productivity, while for larger businesses and government entities, **Spectrum** EnterpriseTM provides highly customized, fiber-based solution. **Spectrum** Reach® delivers tailored advertising and production for the modern media landscape. We also distribute award-winning news coverage and sports programming to our customers through **Spectrum** Networks.

https://www.sec.gov/ix?doc=/Archives/edgar/data/1091667/000109166723000024/chtr-20221231.htm (emphasis supplied). The 10-K statement makes clear that Spectrum is just a brand name or trade name, and it is Charter who is actually operating the business. Moreover, Charter's Spectrum labeled invoices tell customers to send their payments to "Charter Communications."

https://www.spectrum.net/support/manage-account/understanding-your-statement-bill/.        This

helps support the conclusion that "Spectrum" is Charter.

    The Court finds that *DirecTV* is on point. *DirecTV*, No. 2:22-cv-75, Dkt. No. 109 at 7 (E.D.

Tex. Oct. 24, 2022). There, the retail stores in the District bore the Dish name and provided Dish-

branded products and services even though the stores were leased and operated by a subsidiary.

So too here, Charter operates stores and provides services in this District under the its brand name,

Spectrum. *See DirecTV, LLC*, No. 2:22-cv-75, Dkt. No. 109 at 7 (E.D. Tex. Oct. 24, 2022). The

fact that the name of the corporate entity (Charter) behind the brand name (Spectrum) is not the

same as the name as the brand is irrelevant because the two names represent the one and same

entity. Charter cannot escape venue by operating under a trade name when it is clear that Charter

is the entity engaged in the challenged conduct which forms the basis of Plaintiff's suit. The retail

stores in this District are thus "physical, geographical location[s] in the district from which the

business of the [Charter] is carried out." *Cray*, 871 F.3d at 1362.

        *ii)    Regular and Established Place of Business*

    Under the second *Cray* factor, a "regular and established place of business" requires "the

regular, physical presence of an employee or other agent of the defendant conducting the

defendant's business at the alleged 'place of business.'" *In re Google*, 949 F.3d 1338, 1345 (Fed.

Cir. 2020). The Federal Circuit reiterated that "the essential elements of agency are (1) the

principal's right to direct or control the agent's actions; (2) the manifestation of consent by the

principal to the agent that the agent shall act on his behalf; and (3) the consent by the agent to act."

*In re Volkswagen Grp. of Am.*, 28 F.4th 1203, 1208–09 (Fed. Cir. 2022) (quotations omitted). "The

power to give interim instructions distinguishes principals in agency relationships from those who

contract to receive services provided by persons who are not agents." *In re Google*, 949 F.3d at

1345–46 (quoting Restatement (Third) of Agency § 1.01 cmt. f(1)).

Charter argues that it does not have any employees at all, and therefore does not have any employees who regularly conduct business in the District.[1] (Dkt. No. 61 at 14.) Moreover, it argues that it does not have any agents employed in the district. (*Id.*) Charter also argues that it has no control over any subsidiary's operations through the LLC agreements and that it is nothing more than a typical manager of its subsidiaries. (*Id.*) Further, Charter contends that it does not maintain or operate the Spectrum-branded stores and does not participate in the hiring or firing of employees. (*Id.*) Finally, Charter argues that the only way these activities can be imputed to Charter is if the corporate veil is pierced. (*Id.* at 15.)

In response, Entropic argues that Charter has the right to direct or control the employees' actions (the first element of agency). Entropic cites to *AGIS*, where this Court found third-party CTDI to be Google's agent for venue purposes based on the fact that Google "directs and controls CTDI's actions" within the established place of business. *AGIS Software Development LLC v. Google LLC*, 2:19-cv-361, 2022 WL 1511757 at *4 (E.D. Tex. May 12, 2022). In that case, Google and CTDI had an agreement that allowed Google to: set physical specifications for a secured area; restrict the area to Google's products and services and limited access to CTDI employees authorized to work on Google's products; move the secured area; and provided instructions for services that CTDI was required to perform for Google customers. *See id.* at *5. CTDI was not an affiliate of Google, and its agreement expressly disclaimed an agency relationship. *Id.* at *8. The similarities between Google and Charter vis-á-vis CTDI are readily apparent.

Further, Entropic again cites to *DirecTV*, where this Court found this element was satisfied because "DISH holds the locations [in the District] out as its own. *Entropic Communications, LLC*

---

[1] This assertion is in stark contrast with evidence from Charter's own website that states it is a company with over 93,000 employees. (*See* Dkt. No. 68 at 24.)

CONFIDENTIAL MATERIAL OMITTED

*v. DirecTV, LLC*, No. 2:22-cv-75, Dkt. No. 109 at 9 (E.D. Tex. Oct. 24, 2022)) There, the Court noted that the Dish logo appears on vans and other property stored at that location. *Id.* at 10. Entropic argues that in this case the Spectrum logo appears on vans and the buildings themselves at the locations in questions. (Dkt. No. 68 at 23.)

Further still, Entropic argues that Charter has the right to direct or control the employee's actions as the manager of CC, LLC and SGC. (*Id.*) Charter's corporate representative testified that employees are provided to Spectrum stores ███████████████████████ (*Id.*; Dkt. No. 68-2 at 85:10–18.) ██████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████ (*Id.*) Also, Charter's corporate documents span numerous subsidiaries but are ultimately headed by Charter officers. (Dkt. No. 68 at 24, 12–13.) Charter's corporate representative testified that these Charter officers can direct the work of the employees in their respective departments, which they also represent on their biographies as Charter officers. (*Id.* at 24, 12–13.)

Entropic also argues that Charter has publicly manifested that the employees act on the company's behalf (thus satisfying the second element of agency). (*Id.* at 24.) Charter's website and annual shareholder report both characterize Charter as a company with over 93,000 employees. (*Id.*) Moreover, it uses its website to promote Charter/Spectrum jobs around the country, including within the District. (*Id.*) When Charter announced its new headquarters in another state, it stated that it has "1,700 employees" now working there, even though all are actually employed by Charter Communications, LLC. (*Id.*)

Entropic notes that Charter has acknowledged these workers as its own employees/agents

**APPX8**

in federal court filings (even though all employees are technically employed by CC LLC). (*Id.* at 24–25 (citing *Montes v. Charter Communications, Inc.*, No. 7:21-cv-489, Dkt. No 10 at 1, 2 (S.D. Tex. Feb. 2, 2022) ("Ms. Trevino, an employee of Charter"); *Montes v. Charter Communications, Inc.*, No. 7:21-cv-489, Dkt. No 1 at ¶ 12 (S.D. Tex. Dec. 12, 2021) (Charter stating that Anderson, a manager did not owe an individual duty "as Charter's agent")).)

Regarding the third element of agency, Entropic argues that Spectrum employees have consented to act as the agents of Charter. (Dkt. No. 68 at 25.) All applicants apply through the single Charter website. (*Id.*) Moreover, employees are required to sign an arbitration agreement which states that it applies to all disputes "whether made against Charter, or any of its subsidiaries, parent, or affiliated entities." (*Id.*) Charter's corporate representative, when asked at deposition if employees were aware of the distinction between various Charter entities, testified that "[he] would suspect most of them are not." (*Id.*) Indeed, many employees represent on LinkedIn that they work for Charter even though Charter now says they instead work for a subsidiary. (*Id.* at 25–26.) Further, Charter's website claims the employees as its own: "[o]ur diverse, highly skilled employees are our greatest resource . . . ." (*Id.*)

In reply, Charter argues that nothing in the record suggests that the relationship between Charter and its subsidiaries is anything more than a typical parent-subsidiary relationship, and that this is insufficient to establish agency by itself. (Dkt. No. 75 at 8.) Charter also argues that Entropic does not cite any authority for the proposition that acknowledging the existence of employees who support the Spectrum brand is a manifestation of consent for CC LLC employees to act on Charter's behalf. (*Id.* at 9.) Finally, Charter argues that Entropic does not explain how Spectrum employees consented to act as the agents of Charter or how Charter consented to have them act on its behalf. (*Id.*) Charter does not appear to dispute that the employees that work at the physical

9

**APPX9**

CONFIDENTIAL MATERIAL OMITTED

Charter locations in this District carry out its business, it only disputes whether their activities can be attributed to Charter as agents of the company.

The Court finds that Entropic has fairly shown that the locations in the District are "regular and established place[s] of business" with "the regular, physical presence of an employee or other agent of the defendant conducting the defendant's business at the alleged 'place of business.'" *In re Google*, 949 F.3d at 1345. Specifically, the Court finds that the CC LLC employees, including those staffed at the locations in the District, are agents of Charter.

Charter has the right to direct or control the employee's actions as the manager of Charter Communications, LLC and Spectrum Gulf Coast. Charter's corporate representative testified that employees are provided to Spectrum stores ████████████████████████ (Dkt. No. 68 at 23.) ██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

████████████████████████ (*Id.*) The management agreement thus gives Charter the ability to materially control the employees of CC LLC. Further, Charter's corporate representative testified that these Charter officers can direct the work of the employees in their respective departments. (*Id.* at 24, 12–13.)

Charter is correct that a mere corporate relationship is not sufficient to show an agency relationship, but here there is much more than a mere corporate relationship. *See, e.g.*, *E. Texas Med. Ctr. Reg'l Healthcare Sys. v. Slack*, 916 F. Supp. 2d 719, 722 (E.D. Tex. 2013) (Gilstrap, J.) (rejecting agency relationship "based merely on" a "corporate relationship"). As described above, Charter has the right to control the actions of the agents working at the locations in this District. The fact that Charter has not improperly managed its subsidiaries does not have any bearing

whether Charter has the right to control the CC LLC employees. In the worst case scenario, even if Charter's officers did not participate in the hiring and firing of any employee, such has no bearing on whether they have the ***right*** to do so. At most, Charter can point to testimony from its corporate representative saying that he is "he is uncertain what 'authority [the department heads] have as officers of [Charter].'" (Dkt. No. 75 at 3 (brackets in original omitted).) However, based on all the other facts outlined above, the Court is persuaded that Charter has the right to control the agents working at the locations in this District.

The Court finds that the second element of agency is also satisfied: Charter manifested that the employees act on the company's behalf. Charter uses its website to promote Charter/Spectrum jobs around the country, including within this District. (Dkt. No. 68 at 24.) Moreover, its website and annual shareholder report both characterize Charter as a company with over 93,000 employees. (*Id.*) Further, when Charter announced its new headquarters in another state, it represented that it had "1,700 employees" working there, even though all were actually employed by CC LLC. (*Id.*) Further, Charter has also acknowledged workers as its own employees/agents in federal court filings. (*Id.* at 24–25.) By claiming the CC LLC employees as its own, Charter manifests its consent for the employees of CC LLC to act on its behalf.

Lastly, the Court finds that the CC LLC employees have consented to act as the agents of Charter. They apply through the single Charter website. (*Id.* at 25.) Employees are required to sign an arbitration agreement which states that it applies to all disputes "whether made against Charter, or any of its subsidiaries, parent, or affiliated entities." (*Id.*) Moreover, Charter's corporate representative, when asked if employees were aware of the distinction between various Charter entities, said that "[he] would suspect most of them are not." (*Id.*) Indeed, many employees represent on LinkedIn that they work for Charter even though it now says they instead work for

CC LLC, a subsidiary. (*Id.* at 25–26.) These facts all demonstrate that the CC LLC employees believe they are acting on behalf of Charter, and thus have consented to acting on Charter's behalf.

As stated above, the Court finds *DirecTV* to be on point. Ultimately, the Court is persuaded that Charter is Spectrum and Spectrum is Charter. As in *DirecTV*, Defendant placed their brand or trade name on the building, and on trucks parked at these locations. *See DirecTV*, No. 2:22-cv-75, Dkt. No. 109 at 9–10 (E.D. Tex. Oct. 24, 2022). Since Charter holds the locations in this District out as its own, there is therefore no need to pierce the corporate veil. *See id.*

Since the Court finds that the CC LLC employees are agents of Charter, and there is no dispute that the employees that work at the physical Charter locations in the District carry out Charter's business, the second *Cray* factor is satisfied.

### iii)    The Place of the Defendant

Under the third *Cray* factor, "'the regular and established place of business' must be 'the place of the defendant.'" *In re Cray*, 871 F.3d at 1363. To be a place of the defendant, "the defendant must establish or ratify the place of business." *Id.*

The parties disagree on whether ratification is a form of imputation, such that the requirements for imputation must be satisfied in order for Entropic to show that Charter has ratified certain locations. Specifically, the parties disagree on whether "corporate separateness" must be shown for Entropic to succeed under a ratification theory. (*See* Dkt. No. 75 at 1–2; Dkt. No. 80 at 4.) Charter maintains that corporate separateness must be shown. (Dkt. No. 75 at 1–2). Meanwhile Entropic maintains that ratification is a separate theory, such that corporate separateness does not have to be shown. (Dkt. No. 80 at 4.) Indeed, the Federal Circuit has held that "[a] threshold inquiry when determining whether the place of business of one company can be imputed to another, related company is whether they have maintained corporate separateness. If corporate separateness has

not been maintained, the place of business of one corporation may be imputed to the other for venue purposes." *Andra Grp., LP v. Victoria's Secret Stores, L.L.C.*, 6 F.4th 1283, 1289 (Fed. Cir. 2021). However, this same case makes clear that ratification and corporate separateness are distinct theories, such that corporate separateness need not be shown in order to show ratification. *Id.* ("Andra does not argue that the Defendants have not maintained corporate separateness. Andra contends that each of the Non-Store Defendants has ratified the retail stores as its own based on the criteria outlined in *In re Cray* … ."); *id.* at 1289–90 (analyzing *In re Cray* factors to determine whether defendants ratified the locations in question, not addressing corporate separateness). Further, the Federal Circuit has squarely addressed this in *Celgene*: "Of course, it might be that a parent corporation might specifically ratify a subsidiary's place of business, even if the two do maintain corporate separateness." *Celgene Corp. v. Mylan Pharms. Inc.*, 17 F.4th 1111, 1127 (Fed. Cir. 2021). This makes clear that corporate separateness need not be shown for Plaintiff to succeed on a ratification theory.

a)     Ratification

Charter argues that the locations in this District are not "of [Charter]." Charter says it does not own or lease any property in the District and its own name is not associated with any properties within the District. (Dkt. No. 61 at 16.) Charter argues it does not have any employees in Texas; does not conduct any commercial business with the public; and does not make, manufacture, or sell any product anywhere. (*Id.* at 17.) It claims it Charter does not maintain or operate the physical locations identified in the District, and it argues that the use of a common or generic name, Spectrum, cannot support venue under the patent statute where corporate formalities between related companies remain intact. (*Id.*) *Bd. Of Regents v. Medtronic PLC.*, No. 17-CV-0942, 2018 WL 4179080, at *2 (W.D. Tex. July 19, 2018).

In response, Entropic relies upon and analogizes these facts to *DirecTV*. (Dkt. No. 68 at 26–27.) In finding that the third *Cray* factor was satisfied under a ratification theory, this Court reasoned in *DirecTV* that customers could use the main Dish website to find Dish service packages and authorized retailers available within the district; that prospective employees could find Dish job listings for positions in the district; and that Dish's website prominently advertised Dish's "nationwide availability." *See*, No. 2:22-cv-75, Dkt. No. 109 at 10 (E.D. Tex. Oct. 24, 2022). Here, Charter holds itself out as a company that provides internet and television services across 41 states. (Dkt. No. 68 at 27, 14–15.) It also advertises retail locations, service packages, and job listings through a nationwide website. (*Id.* at 27, 15–16.) Further, Charter itself actually negotiated and signed the leases for the Spectrum Stores in this District. (*Id.* at 28, 8–9.)

Entropic further contends that the Management Agreement gives Charter wide latitude to manage virtually every aspect of the Charter business, including personnel, operations, and engineering; maintenance and plant upgrades; compliance with regulations; negotiating advertising time; and marketing, sales, and promotions. (*Id.* at 28.) Importantly, the officers between Charter and the officers of the subsidiaries are the same. One such officer said that the existence of the subsidiaries is a "mere formality." (*Id.* at 29, 7, 11.)

Entropic distinguishes *Bd. of Regents v. Medtronic PLC* because the court there held that the mere appearance of a "Medtronic" sign was insufficient to support venue against the parent company. No. 17-CV-0942, 2018 WL 4179080 at*2 (W.D. Tex. July 19, 2018). Here, Charter has directly represented to the public that Charter itself is the entity that offers broadband services under the Spectrum name. (Dkt. No. 68 at 27–28.)



Dkt. No. 68-13 at 4.

In reply, Charter argues that all job listings are under the Spectrum name, not Charter, which distinguishes this case from *DirecTV*. (Dkt. No. 75 at 10.)

The Court finds that Charter has ratified the locations in this District as its own. *DirecTV* is on point. In *DirecTV*, the Defendant advertised service packages and locations in the District via its national website. *DirecTV*, No. 2:22-cv-75, Dkt. No. 109 at 10 (E.D. Tex. Oct. 24, 2022). Indeed, it "advertise[d] its 'nationwide availability' prominently on its website." *Id.* Moreover, Dish listed job postings for locations in the District on this same website. *Id.* Here, Charter holds itself out as a company that provides internet and television services across 41 states. (Dkt. No. 68 at 27, 14–15.) Further, it advertises retail locations, service packages, and job listings through a nationwide website. (*Id.* at 27, 15–16.) The fact that the nationwide website is under the brand or trade name "Spectrum" rather than "Charter" is irrelevant because these two names denote the same singular entity. Moreover, the present case presents facts that go further than those in *DirecTV* in that Charter actually negotiated and signed the leases for Spectrum Stores in this District. (*Id.* at 28, 8–9.)

*Medtronic*, as Entropic argues, is inapposite. There, the mere appearance of a "Medtronic" sign was insufficient to support venue against the parent company. No. 17-CV-0942, 2018 WL 4179080 at *2 (W.D. Tex. July 19, 2018). Here, Charter has directly represented to the public that Charter itself is the entity that offers broadband services under the Spectrum brand name. The fact that Charter undertakes certain activities under the "Spectrum" name is irrelevant because, as the Court has found, Charter is Spectrum and Spectrum is Charter.

Finally, the Court finds that multiple *Cray* factors support a finding that venue is proper in this District. Charter has signed the lease agreement for SGC. (Dkt. No. 68 at 28, 8–9.) *In re Cray*, 871 F.3d at 1363 ("Relevant considerations include whether the defendant owns or leases the place."). The Management Agreement gives it wide latitude to manage virtually every aspect of the Charter business. (Dkt. No. 68 at 28.) *In re Cray*, 871 F.3d at 1363 ("Relevant considerations include whether the defendant … exercises other attributes of possession or control over the place."). Charter advertises its locations, service packages, and job listings in this District on its website. (Dkt. No. 68 at 27.) *In re Cray*, 871 F.3d at 1363 ("Marketing or advertisements may also be relevant.").

As a result, the Court finds that Charter has ratified the locations in this District, such that they are "of the [D]efendant." *In re Cray*, 871 F.3d at 1363.

b)    Lack of Corporate Separateness

As an alternative to the evidence of ratification discussed above, the Court now turns to the concept of imputation. For a regular and established place of business of a subsidiary to be imputed to a parent, the corporations must lack formal corporate separateness:

> "[W]hen separate, but closely related, corporations are involved ... the rule is
> similar to that applied for purposes of service of process. So long as a formal
> separation of the entities is preserved, the courts ordinarily will not treat the place
> of business of one corporation as the place of business of the other. On the other

**CONFIDENTIAL MATERIAL OMITTED**

hand, if the corporations disregard their separateness and act as a single enterprise, they may be treated as one for purposes of venue."

*Soverain IP, LLC v. AT&T, Inc.*, No. 217CV00293RWSRSP, 2017 WL 5126158, at *1 (E.D. Tex. Oct. 31, 2017), *report and recommendation adopted*, No. 2:17-CV-00293-RWS, 2017 WL 6452802 (E.D. Tex. Dec. 18, 2017).

Here, Charter argues that (1) Entropic's principal basis for disregarding the corporate separateness of the subsidiaries is the fact that Charter is the manager, and this is insufficient to overcome corporate separateness, (2) Entropic must establish corporate separateness to pursue an alter-ego theory, (3) that the subsidiaries have not failed to follow corporate formalities. (Dkt. No. 61 at 17–19.)

Entropic responds that Charter operates as a single enterprise. Charter holds its property in one subsidiary, but staffs it with employees from another. (Dkt. No. 68 at 1–2, 4.) All of Charter's employees belong to a single subsidiary, CC LLC. (*Id.* at 4.) Moreover, all 200+ subsidiaries have complete commonality of officers with each other and their parent Charter. (*See id.* at 11.) Moreover, Charter is the manager of each subsidiary. (Dkt. No. 68 at 6–7.) The operating agreements between Charter and its subsidiaries (direct and indirect) are not negotiated. (Dkt. No. 68 at 7.) Charter's corporate representative testified that:



(Dkt. No. 68-2 at 45:25--46:10 (emphasis supplied).) Charter signs the contracts for all of its subsidiaries, including the real property leases. (Dkt. No. 68 at 2, 8 9.) Moreover, Charter's corporate representative, who is the Deputy General Counsel in charge of forming and managing

**APPX17**

entities, testified that he did not distinguish between or treat any differently the different entities in carrying out his role. (Dkt. No. 68 at 11; Dkt. No. 68-2 at 30:6–11.) Charter's officers lead enterprise-wide departments which span numerous subsidiaries. (Dkt. No. 68 at 12–13.) Notably, the subsidiaries do not hold corporate meetings or maintain their own records. (Dkt. No. 68 at 13–14.)

Finally, Entropic argues that Charter holds itself out to the public and the federal government as being one enterprise. (Dkt. No. 68 at 14–18.) The very first sentence of Charter's 10-K annual report states, "[w]e are a leading broadband connectivity company and cable operator serving more than 32 million customers in 41 states through our Spectrum brand." (Dkt. No. 68 at 14; Dkt. No. 68-12 at 1.) Charter's website proclaims that "Charter Communications, Inc. (NASDAQ:CHTR) is a leading broadband connectivity company and cable operator serving more than 32 million customers in 41 states through its Spectrum brand." (Dkt. No. 68 at 15; Dkt. No. 68-13 at 1.) Charter uses the "Spectrum" brand across its entire enterprise. (Dkt. No. 68 at 15; Dkt. No. 68-3 at 95:12–14 ("The Spectrum brand is used for all customer-facing functions in all retail stores in all service.").) Charter uses one website for consumers and to post job openings enterprise-wide. (Dkt. No. 68 at 15–16.) Charter has previously represented to the FCC, the ITC, and other Article III courts that it is one enterprise. (Dkt. No. 68 at 16–18.)

Charter argues that this evidence is insufficient because it never exercised improper control over its subsidiaries, the entities do not carry out business in Charter's name, and the entities followed corporate formalities. (Dkt. No. 75 at 2–4). Again, the Court disagrees.

The Court finds Entropic's arguments persuasive and holds as a matter of fact finding that the subsidiary corporations under Charter "disregard their separateness [from Charter] and act as a single enterprise." Thus, the activities of its subsidiaries (including those that operate the

locations in this District) may be properly imputed to Charter.

As noted, Charter unabashedly holds itself out to the world as a single enterprise. It has said this to the federal government in various filings, and it proclaims this to the world through its marketing. (Dkt. No. 68 at 14, 16–18; Dkt. No. 68-12 at 1; Dkt. No. 68-13 at 1.)  Moreover, Charter's corporate representative admitted upon deposition that the lines between the different corporations are simply "legal formalities." (Dkt. No. 68-2 at 45:25–46:10.) The internal structure of Charter further confirms this. It staffs its employees throughout the enterprise even though only one subsidiary technically employs them. (Dkt. No. 68 at 12–13.) To facilitate this, Charter signs all contracts and documents on behalf of its subsidiaries. (*Id.* at 2, 8–9.)

Charter misspeaks when it says it must to exercise improper control over its subsidiaries for it to act as a single enterprise. (Dkt. No. 75 at 2–4.) The appropriate inquiry is whether Charter and its subsidiaries "act as a single enterprise." *Soverain IP, LLC*, 2017 WL 5126158, at *1.

As outlined above, the Court finds as a factual finding that Charter and its subsidiaries, including SGC, "act as a single enterprise" so the actions of its subsidiaries are properly imputed to Charter. Accordingly, the Court also finds that the locations in this District are "of the defendant" under a lack of corporate separateness theory.

## V.    CONCLUSION

For all the foregoing reasons, the Court finds that the Motion should be and hereby is **DENIED**. The parties are directed to jointly prepare a redacted version of this Order for public viewing and to file the same on the Court's docket as an attachment to a Notice of Redaction withing five (5) business days of this Order.

**So ORDERED and SIGNED this 3rd day of May, 2023.**

_____

RODNEY  GILSTRAP
UNITED STATES DISTRICT JUDGE

## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

| | |
|---|---|
| ENTROPIC COMMUNICATIONS, LLC, <br><br> Plaintiff, <br><br> v. <br><br> CHARTER COMMUNICATIONS, INC.; SPECTRUM ADVANCED SERVICES, LLC; AND SPECTRUM MANAGEMENT HOLDING COMPANY, LLC, <br><br> Defendants. | Case No. 2:22-cv-125 <br><br><br> **JURY TRIAL DEMANDED** |

## ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff, Entropic Communications, LLC ("Entropic"), files this complaint for patent infringement against Charter Communications, Inc., Spectrum Advanced Services, LLC, and Spectrum Management Holding Company, LLC (collectively "Charter") and in support thereof alleges and avers as follows:

## NATURE OF THE ACTION

1.      This is a civil action arising under the patent laws of the United States, 35 U.S.C. § 1 *et seq.*, including specifically 35 U.S.C. § 271, based on Charter's infringement of U.S. Patent Nos. 8,223,775 (the "'775 Patent"), 8,284,690 (the "'690 Patent"), 8,792,008 (the "'008 Patent"), 9,210,362 (the "'362 Patent"), 9,825,826 (the "'826 Patent"), and 10,135,682 (the "'682 Patent") (collectively "the Patents-in-Suit").

## THE PARTIES

2.      Entropic is a Delaware limited liability company with an office at 7150 Preston Rd., Suite 300 Plano, Texas 75024.

-1-

**APPX21**

3.      On information and belief, Defendant Charter Communications, Inc. is a corporation established under the laws of the State of Delaware, with a principal place of business at 1400 Atlantic St., Stamford, CT 06901.

4.      Charter Communications, Inc. has a registered agent in Texas, Corporation Service Company d/b/a CSC - Lawyers Incorporating Service Company, located at 211 East 7th Street, Suite 620, Austin, Texas 78701.

5.      On information and belief, Defendant Spectrum Advanced Services, LLC is a limited liability company established under the laws of the State of Delaware, with a principal place of business at 12405 Powerscourt Drive, St. Louis, MO 63131.

6.      On information and belief, Defendant Spectrum Management Holding Company, LLC is a limited liability company established under the laws of the State of Delaware, with a principal place of business at 12405 Powerscourt Drive, St. Louis, MO 63131.

7.      On information and belief, Charter owns or leases, and maintains and operates several stores in this district.

8.      On information and belief, in each of those stores, Charter owns and stores equipment such as modems and set top boxes ("STBs") and demonstrates services provided via those products to Charter customers.

9.      On information and belief, Charter employs personnel that install, service, repair and/or replace equipment, as appropriate, in this district.

**JURISDICTION AND VENUE**

10.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a) because the claims herein arise under the patent laws of the United States, 35 U.S.C. § 1 et seq., including 35 U.S.C. § 271.

11.    This Court has personal jurisdiction over Charter in this action because Charter has committed acts of infringement within the State of Texas and within this district through, for example, the provision of cable television and internet services ("Accused Services") via the lease, sale, and/or distribution of cable modems and STBs both online and from Spectrum stores in this District. For example, Charter has and continues to lease, sell, and/or distribute the Arris SB6183 cable modem, Spectrum PC20 (e.g. the Spectrum EU2251) cable modem, and products that operate in a similar manner ("Accused Cable Modem Products"), as well as Spectrum 100-series STBs, Spectrum 200-series STBs, Spectrum 101-series STBs, Spectrum 201-series STBs, Spectrum 110-series STBs, Spectrum 210-series STBs, the Arris DCX3600 STB, and products that operate in a similar manner ("Accused Set Top Products"). Further, there is general personal jurisdiction over Charter in this Judicial District, given Charter's intentional direction of its advertising efforts to potential customers here in the form of robocalls that Charter makes to such potential customers.

12.    The Accused Cable Modem Products, Accused Set Top Products, and Accused Services are available for subscription online from the Charter website.

13.    The Accused Services are available for subscription from various physical stores, including those at 700 Alma Dr., Plano Texas 75075, 2100 N. Dallas Pkwy, Plano, Texas 75075, and 4255-A Dowlen Rd., Beaumont, Texas 77706.

14.    The devices, including the Accused Cable Modem Products and Accused Set Top Products, provided by Charter to supply the Accused Services are provided to customers in this district and may be obtained by customers from physical locations in this district, including those at 700 Alma Dr., Plano Texas 75075, 2100 N. Dallas Pkwy, Plano, Texas 75075, and 4255-A Dowlen Rd., Beaumont, Texas 77706.

15.     Venue is proper in this district pursuant to 28 U.S.C. § 1400(b). Venue is proper because Charter has committed and continues to commit acts of patent infringement in this district, including making, using, offering to sell, and/or selling Accused Services, Accused Cable Modem Products, and Accused Set Top Products in this district, and/or importing Accused Services, Accused Set Top Products, and Accused Cable Modem Products into this district, including by Internet sales and sales via retail and wholesale stores, and/or committing at least a portion of any other infringements alleged herein in this district.

16.     Charter has regular and established places of business in this district, including at least at 1414 Summit Ave., Plano, Texas 75074:



(https://www.google.com/maps/place/1414+Summit+Ave,+Plano,+TX+75074/@33.0094166,-96.691439,3a,75y,150.17h,90t/data=!3m7!1e1!3m5!1seMJAIjYK9mlgeFGO3-opTg!2e0!6shttps:%2F%2Fstreetviewpixels-pa.googleapis.com%2Fv1%2Fthumbnail%3Fpanoid%3DeMJAIjYK9mlgeFGO3-opTg%26cb_client%3Dsearch.gws-prod.gps%26w%3D86%26h%3D86%26yaw%3D150.1734%26pitch%3D0%26thumbfov%3D100!7i16384!8i8192!4m9!1m2!2m1!1s1414+Summit+Ave,+Plano,+TX+75074+and+2344+Rutland+Dr.+Austin,+TX+78758!3m5!1s0x864c193c2e57c475:0x9e396bd707e242d3!8m2!3d33.0089

APPX24

809!4d-

96.6911307!15sCkYxNDE0IFN1bW1pdCBBdmUsIFBsYW5vLCBUWCA3NTA3NCBhbmQg

MjM0NCBSdXRsYW5kIERyLiBBdXN0aW4sIFRYYIDc4NzU4kgERY29tcG91bmRfYnpbGGR

pbmc)

      17.    Charter, through its related entity, Spectrum Advanced Services, LLC, has retail stores in the district, including storefronts located at 700 Alma Dr., Plano Texas 75075, 2100 N. Dallas Pkwy, Plano, Texas 75075, and 4255-A Dowlen Rd., Beaumont, Texas 77706, among others.



(https://www.google.com/maps/place/700+Alma+Dr,+Plano,+TX+75075/@33.009285,-96.7156924,3a,75y,79.47h,78.1t/data=!3m6!1e1!3m4!1sV4Kgs33OEPn0OTPugr40sw!2e0!7i16 384!8i8192!4m5!3m4!1s0x864c18dd73ceae97:0x243da1c3797f6336!8m2!3d33.0097073!4d-96.7151173)



(https://www.google.com/maps/place/Spectrum+Store/@33.0290298,-

96.8264017,3a,75y,278.05h,90t/data=!3m7!1e1!3m5!1sChdq99YtQUVhIguvPSaS_w!2e0!6shtt

ps:%2F%2Fstreetviewpixels-

pa.googleapis.com%2Fv1%2Fthumbnail%3Fpanoid%3DChdq99YtQUVhIguvPSaS_w%26cb_cl

ient%3Dmaps_sv.tactile.gps%26w%3D224%26h%3D298%26yaw%3D278.04987%26pitch%3

D0%26thumbfov%3D100!7i16384!8i8192!4m14!1m6!3m5!1s0x864c23070b47ed93:0xd9df492

87ca0c559!2sSpectrum+Store!8m2!3d33.0290441!4d-

96.8265123!3m6!1s0x864c23070b47ed93:0xd9df49287ca0c559!8m2!3d33.0290441!4d-

96.8265123!14m1!1BCgIgARICCAI)



(https://www.google.com/maps/place/Spectrum/@30.122185,-

94.1625943,3a,75y,90t/data=!3m8!1e2!3m6!1sAF1QipO5TahIK2i_6g7gm0X27L1OJ53yEjMyu

bkMbPiA!2e10!3e12!6shttps:%2F%2Flh5.googleusercontent.com%2Fp%2FAF1QipO5TahIK2i

_6g7gm0X27L1OJ53yEjMyubkMbPiA%3Dw203-h270-k-

no!7i3120!8i4160!4m14!1m6!3m5!1s0x863ecad62b4ceadb:0x88f010bf14187660!2sSpectrum!8

m2!3d30.1221793!4d-

94.1625942!3m6!1s0x863ecad62b4ceadb:0x88f010bf14187660!8m2!3d30.1221793!4d-

94.1625942!14m1!1BCgIgAQ)

18.     Charter targets its advertisements to residents of this district.

19.     Charter continues to conduct business in this judicial district, including one or more

acts of making, selling, using, importing and/or offering for sale Accused Products or providing

the Accused Services to Charter's customers in this District.

**THE PATENTS-IN-SUIT**

20.     On July 17, 2012, U.S. Patent No. 8,223,775, entitled "Architecture for a Flexible

and High-Performance Gateway Cable Modem," was duly and legally issued by the United States

-7-

**APPX27**

Patent and Trademark Office.  A true and accurate copy of the '775 Patent is attached hereto as Exhibit A.

21.    On October 9, 2012, U.S. Patent No. 8,284,690, entitled "Receiver Determined Probe," was duly and legally issued by the United States Patent and Trademark Office.  A true and accurate copy of the '690 Patent is attached hereto as Exhibit B.

22.    On July 29, 2014, U.S. Patent No. 8,792,008, entitled "Method and Apparatus for Spectrum Monitoring," was duly and legally issued by the United States Patent and Trademark Office.  A true and accurate copy of the '008 Patent is attached hereto as Exhibit C.

23.    On December 8, 2015, U.S. Patent No. 9,210,362, entitled "Wideband Tuner Architecture," was duly and legally issued by the United States Patent and Trademark Office.  A true and accurate copy of the '362 Patent is attached hereto as Exhibit D.

24.    On November 21, 2017, U.S. Patent No. 9,825,826 entitled "Method and Apparatus for Spectrum Monitoring," was duly and legally issued by the United States Patent and Trademark Office.  A true and accurate copy of the '826 Patent is attached hereto as Exhibit E.

25.    On November 20, 2018, U.S. Patent No. 10,135,682, entitled "Method and System for Service Group Management in a Cable Network," was duly and legally issued by the United States Patent and Trademark Office.  A true and accurate copy of the '682 Patent is attached hereto as Exhibit F.

26.    Entropic is the owner by assignment of all rights, title, and interest in the Patents-in-Suit.

**ENTROPIC'S LEGACY AS A CABLE INNOVATOR**

27.    Entropic Communications Inc., the predecessor-in-interest to Entropic, was founded in San Diego, California in 2001 by Dr. Anton Monk, Itzhak Gurantz, Ladd El Wardani and others.  Entropic Communications Inc. was instrumental in the development of the Multimedia

-8-

**APPX28**

over Coax Alliance ("MoCA") standard, Direct Broadcast Satellite ("DBS") Outdoor Unit ("ODU") single wire technology, and System-on-Chip ("SoC") solutions for set-top boxes ("STBs") in the home television and home video markets.

28.     Dr. Monk received his Bachelor of Science degree and Doctorate in Electrical Engineering from the University of California San Diego and a Master of Science in Electrical Engineering from the California Institute of Technology.

29.     Under the guidance of Dr. Monk, Entropic Communications Inc. grew to an eventual public listing on the NASDAQ in 2007. After the public listing, the company acquired RF Magic, Inc. in 2007, a company specializing in DBS ODU technology and related hardware.

30.     Additional growth between 2007 and 2015 bolstered the technical expertise of Entropic Communications Inc., including signal acquisition, stacking, filtering, processing, and distribution for STBs and cable modems.

31.     For years, Entropic Communications Inc. pioneered cutting edge SoC technologies, as well as television and internet related services. This technology simplified the installation required to support wideband reception of multiple channels for demodulation, improved home internet performance, and enabled more efficient and responsive troubleshooting and upstream signal management for cable providers. These innovations represented significant advances in the field, simplified the implementation of those advances, and reduced expenses for providers and customers alike.

32.     In 2015, MaxLinear, Inc.—a leading provider of radio-frequency (RF), analog, digital, and mixed-signal semiconductor solutions—acquired Entropic Communications Inc. and the pioneering intellectual property developed by Dr. Monk and his team.

33.     The Patents-in-Suit are the result of years of research and development in satellite and cable technology. These innovations are utilized by Charter to provide enhanced and expanded

**APPX29**

services to customers, which in turn has increased revenues for Charter while at the same time reducing the costs.

## **FIRST CAUSE OF ACTION**

### **(Infringement of the '775 Patent)**

34.     Entropic incorporates by reference and realleges each and every allegation of Paragraphs 1 through 33 as if set forth herein.

35.     Entropic owns all substantial rights, interest, and title in and to the '775 Patent, including the sole and exclusive right to prosecute this action and enforce the '775 Patent against infringers, and to collect damages for all relevant times.

36.     The '775 Patent generally describes a partitioned cable modem that performs cable modem functions and data and home networking functions. Functionally partitioning a cable modem to perform cable modem functions and data and home networking functions enables a cable modem to incorporate a variety of enhanced functions.

37.     The Accused Cable Modem Products remain the property of Charter even when deployed at the property of a customer.

38.     The Accused Cable Modem Products and Accused Services operate in a manner controlled and intended by Charter.

39.     Charter directly infringes the '775 Patent by using, importing, selling, and/or offering for sale the Accused Cable Modem Products (for example, the Spectrum PC20 and Arris SB6183) and/or the Accused Services (for example, utilizing cable modem functions).

40.     As set forth in the attached non-limiting claim chart (Exhibit G), Charter has directly infringed and is infringing at least Claim 18 of the '775 Patent by using, importing, selling, and/or offering for sale the Accused Cable Modem Products.

41.    Additionally, the use of the Accused Cable Modem Products by Charter to, for example, demonstrate products in brick-and-mortar stores in Plano, Texas and Beaumont, Texas or to, for example, test those products, constitute acts of direct infringement of at least Claim 18 of the '775 Patent.

42.    Entropic has been damaged as a result of the infringing conduct alleged above. Charter is liable to Entropic in an amount that compensates Entropic for Charter's infringement, which by law cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

43.    Entropic has complied with 35 U.S.C. § 287 with respect to the '775 Patent.

**<u>SECOND CAUSE OF ACTION</u>**

**(Infringement of the '690 Patent)**

44.    Entropic incorporates by reference and realleges each and every allegation of Paragraphs 1 through 43 as if set forth herein.

45.    Entropic owns all substantial rights, interest, and title in and to the '690 Patent, including the sole and exclusive right to prosecute this action and enforce the '690 Patent against infringers, and to collect damages for all relevant times.

46.    The '690 Patent generally describes the process of generating probe transmissions in response to a request from a receiving node of a network, wherein the probe request specifies a plurality of parameters that specify content payload of the probe transmission, and a second node to receive the probe transmission, which enhances flexibility and therefore, improves the receiving node's ability to efficiently recognize the precise form of the transmitted probe.

47.    The Accused Cable Modem Products remain the property of Charter even when deployed at the property of a customer.

-11-

**APPX31**

48.    The Accused Cable Modem Products and Accused Services operate in a manner controlled and intended by Charter.

49.    Charter directly infringes the '690 Patent by using, importing, selling, and/or offering for sale the Accused Cable Modem Products (for example, the Spectrum PC20 and Arris SB6183) and/or the Accused Services (for example, probing for cable modem parameters).

50.    As set forth in the attached non-limiting claim chart (Exhibit H), Charter has directly infringed and is infringing at least the method of Claims 7, 8, 15, and 16 of the '690 Patent by using, selling, and/or offering for sale the Accused Services.

51.    Additionally, the use of the Accused Services by Charter to, for example, demonstrate products in brick-and-mortar stores in Plano, Texas and Beaumont, Texas or to, for example, test those products, constitute acts of direct infringement of at least Claims 7, 8, 15, and 16 of the '690 Patent.

52.    Entropic has been damaged as a result of the infringing conduct alleged above. Charter is liable to Entropic in an amount that compensates Entropic for Charter's infringement, which by law cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

53.    Entropic has complied with 35 U.S.C. § 287 with respect to the '690 Patent.

### **THIRD CAUSE OF ACTION**

### **(Infringement of the '008 Patent)**

54.    Entropic incorporates by reference and realleges each and every allegation of Paragraphs 1 through 53 as if set forth herein.

55.    Entropic owns all substantial rights, interest, and title in and to the '008 Patent, including the sole and exclusive right to prosecute this action and enforce the '008 Patent against infringers, and to collect damages for all relevant times.

56.     The '008 Patent generally describes a system that receives a signal having a range of frequencies, digitizes the received signal, and reports certain signal characteristics to the source of the received signal.

57.     The Accused Set Top Products remain the property of Charter even when deployed at the property of a customer.

58.     The Accused Set Top Products and Accused Services operate in a manner controlled and intended by Charter.

59.     Charter directly infringes the '008 Patent by using, importing, selling, and/or offering for sale the Accused Set Top Products (for example, the Spectrum 210) and/or the Accused Services (for example, monitoring signals generated by the Accused Set Top Products).

60.     As set forth in the attached non-limiting claim chart (Exhibit I), Charter has directly infringed and is infringing at least Claim 1 of the '008 Patent by using, importing, selling, and/or offering for sale the Accused Set Top Products.

61.     Additionally, the use of the Accused Set Top Products by Charter to, for example, demonstrate products in brick-and-mortar stores in Plano, Texas and Beaumont, Texas or to, for example, test those products, constitute acts of direct infringement of at least Claim 1 of the '008 Patent.

62.     Entropic has been damaged as a result of the infringing conduct alleged above. Charter is liable to Entropic in an amount that compensates Entropic for Charter's infringement, which by law cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

63.     Entropic has complied with 35 U.S.C. § 287 with respect to the '008 Patent.

## FOURTH CAUSE OF ACTION

### (Infringement of the '362 Patent)

-13-

APPX33

64.    Entropic incorporates by reference and realleges each and every allegation of Paragraphs 1 through 63 as if set forth herein.

65.    Entropic owns all substantial rights, interest, and title in and to the '362 Patent, including the sole and exclusive right to prosecute this action and enforce the '362 Patent against infringers, and to collect damages for all relevant times.

66.    The '362 Patent generally describes a wideband receiver system that down converts a plurality of frequencies including desired television channels and undesired television channels, digitizes frequencies, selects desired television channels from the frequencies, and outputs the selected television channels to a demodulator as a digital data stream.

67.    The Accused Set Top Products remain the property of Charter even when deployed at the property of a customer.

68.    The Accused Services operate in a manner controlled and intended by Charter.

69.    Charter directly infringes the '362 Patent by using, importing, selling, and/or offering for sale the Accused Set Top Products (for example, the Spectrum 210) and/or the Accused Services (for example, down converting, digitizing, and selecting desired television channels from frequencies).

70.    As set forth in the attached non-limiting claim chart (Exhibit J), Charter has directly infringed and is infringing at least Claim 11 of the '362 Patent by using, selling, and/or offering for sale the Accused Services.

71.    Additionally, the use of the Accused Services by Charter to, for example, demonstrate products in brick-and-mortar stores in Plano, Texas and Beaumont, Texas or to, for example, test those products, constitute acts of direct infringement of at least Claim 11 of the '362 Patent.

-14-

**APPX34**

72.     Entropic has been damaged as a result of the infringing conduct alleged above. Charter is liable to Entropic in an amount that compensates Entropic for Charter's infringement, which by law cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

73.     Entropic has complied with 35 U.S.C. § 287 with respect to the '362 Patent.

### FIFTH CAUSE OF ACTION

### (Infringement of the '826 Patent)

74.     Entropic incorporates by reference and realleges each and every allegation of Paragraphs 1 through 73 as if set forth herein.

75.     Entropic owns all substantial rights, interest, and title in and to the '826 Patent, including the sole and exclusive right to prosecute this action and enforce the '826 Patent against infringers, and to collect damages for all relevant times.

76.     The '826 Patent generally describes a system that receives a signal having a range of frequencies, digitizes the received signal, and reports certain signal characteristics to the source of the received signal.

77.     The Accused Set Top Products remain the property of Charter even when deployed at the property of a customer.

78.     The Accused Services operate in a manner controlled and intended by Charter.

79.     Charter directly infringes the '826 Patent by using, importing, selling, and/or offering for sale the Accused Set Top Products (for example, the Spectrum 210) and/or the Accused Services (for example, monitoring signals generated by the Accused Set Top Products).

80.     As set forth in the attached non-limiting claim chart (Exhibit K), Charter has directly infringed and is infringing at least Claim 1 of the '826 Patent by using, selling, and/or offering for sale the Accused Services.

-15-

**APPX35**

81.     Additionally, the use of the Accused Services by Charter to, for example, demonstrate products in brick-and-mortar stores in Plano, Texas and Beaumont, Texas or to, for example, test those products, constitute acts of direct infringement of at least Claim 1 of the '826 Patent.

82.     Entropic has been damaged as a result of the infringing conduct alleged above. Charter is liable to Entropic in an amount that compensates Entropic for Charter's infringement, which by law cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

83.     Entropic has complied with 35 U.S.C. § 287 with respect to the '826 Patent.

### SIXTH CAUSE OF ACTION

**(Infringement of the '682 Patent)**

84.     Entropic incorporates by reference and realleges each and every allegation of Paragraphs 1 through 83 as if set forth herein.

85.     Entropic owns all substantial rights, interest, and title in and to the '682 Patent, including the sole and exclusive right to prosecute this action and enforce the '682 Patent against infringers, and to collect damages for all relevant times.

86.     The '682 Patent generally describes a method performed by a cable modem termination system, the method including determining a corresponding signal-to-noise-ratio ("SNR") related metric, assigning cable modems to service groups based on a respective corresponding SNR-related metric, generating a composite SNR-related metric based on a worst-case SNR profile, selecting a physical layer communication parameter to be used for communicating with a service group based on a composite SNR-related metric, and communicating with cable modems in the service group using the selected physical layer communication parameter.

-16-

**APPX36**

87.     The Accused Cable Modem Products remain the property of Charter even when deployed at the property of a customer.

88.     The Accused Services operate in a manner controlled and intended by Charter.

89.     Charter directly infringes the '682 Patent by using, selling, and/or offering for sale the Accused Services, which utilize cable modem termination systems that communicate with the Accused Cable Modem Products (for example, the Spectrum PC20 and Arris SB6183).

90.     As set forth in the attached non-limiting claim chart (Exhibit L), Charter has directly infringed and is infringing at least Claim 14 of the '682 Patent by using, selling, and/or offering for sale the Accused Services.

91.     Additionally, the use of the Accused Services by Charter to, for example, demonstrate products in brick-and-mortar stores in Plano, Texas and Beaumont, Texas or to, for example, test those products, constitute acts of direct infringement of at least Claim 1 of the '682 Patent.

92.     Entropic has been damaged as a result of the infringing conduct alleged above. Charter is liable to Entropic in an amount that compensates Entropic for Charter's infringement, which by law cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

93.     Entropic has complied with 35 U.S.C. § 287 with respect to the '682 Patent.

**<u>JURY DEMAND</u>**

Entropic hereby requests a trial by jury on all issues so triable by right.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Entropic requests that:

A.     The Court find that Charter has directly infringed the Patents-in-Suit and hold Charter liable for such infringement;

-17-

**APPX37**

B.      The Court award damages pursuant to 35 U.S.C. § 284 adequate to compensate Entropic for Charter's past infringement of the Patents-in-Suit, including both pre- and post-judgment interest and costs as fixed by the Court;

C.      The Court declare that this is an exceptional case entitling Entropic to its reasonable attorneys' fees under 35 U.S.C. § 285; and

D.      The Court award such other relief as the Court may deem just and proper.

Dated: April 27, 2022                       Respectfully submitted,

 /s/ James Shimota by permission Wesley Hill
James Shimota (*pro hac vice* forthcoming)
Jason Engel (*pro hac vice* forthcoming)
George Summerfield (*pro hac vice* forthcoming)
**K&L GATES LLP**
70 W. Madison Street, Suite 3300
Chicago, IL 60602
Tel.: (312) 372-1121
Fax: (312) 827-8000
jim.shimota@klgates.com
jason.engel@klgates.com
george.summerfield@klgates.com

Brian Bozzo (*pro hac vice* forthcoming)
**K&L GATES LLP**
210 Sixth Ave.
Pittsburgh, PA 15222
Tel.: (412) 355-6500
Fax: (412) 355-6501
brian.bozzo@klgates.com

Wesley Hill
Texas Bar No. 24032294
**WARD, SMITH & HILL, PLLC**

**APPX38**

1507 Bill Owens Pkwy
Longview, TX 75604
Tel:  (903) 757-6400
Fax  (903) 757-2323
wh@wsfirm.com

**ATTORNEYS FOR PLAINTIFF**
**ENTROPIC COMMUNICATIONS, LLC**

-19-

**APPX39**

JS 44 (Rev. 04/21)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

ENTROPIC COMMUNICATIONS, LLC

**DEFENDANTS**

CHARTER COMMUNICATIONS, INC., ET AL

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant _____
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Wesley Hill, WARD, SMITH & HILL, PLLC, 1507 Bill Owens Parkway, Longview, Texas 75604, (903) 757-6400

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1  U.S. Government Plaintiff
- [X] 3  Federal Question *(U.S. Government Not a Party)*
- [ ] 2  U.S. Government Defendant
- [ ] 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | [ ] 625 Drug Related Seizure of Property 21 USC 881 | [ ] 422 Appeal 28 USC 158 | [ ] 375 False Claims Act |
| [ ] 120 Marine | [ ] 310 Airplane | [ ] 365 Personal Injury - Product Liability | [ ] 690 Other | [ ] 423 Withdrawal 28 USC 157 | [ ] 376 Qui Tam (31 USC 3729(a)) |
| [ ] 130 Miller Act | [ ] 315 Airplane Product Liability | [ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | [ ] 400 State Reapportionment |
| [ ] 140 Negotiable Instrument | [ ] 320 Assault, Libel & Slander | | | **INTELLECTUAL PROPERTY RIGHTS** | [ ] 410 Antitrust |
| [ ] 150 Recovery of Overpayment & Enforcement of Judgment | [ ] 330 Federal Employers' Liability | | | [ ] 820 Copyrights | [ ] 430 Banks and Banking |
| [ ] 151 Medicare Act | [ ] 340 Marine | [ ] 368 Asbestos Personal Injury Product Liability | | [X] 830 Patent | [ ] 450 Commerce |
| [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans) | [ ] 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | [ ] 835 Patent - Abbreviated New Drug Application | [ ] 460 Deportation |
| [ ] 153 Recovery of Overpayment of Veteran's Benefits | [ ] 350 Motor Vehicle | [ ] 370 Other Fraud | [ ] 710 Fair Labor Standards Act | [ ] 840 Trademark | [ ] 470 Racketeer Influenced and Corrupt Organizations |
| [ ] 160 Stockholders' Suits | [ ] 355 Motor Vehicle Product Liability | [ ] 371 Truth in Lending | [ ] 720 Labor/Management Relations | [ ] 880 Defend Trade Secrets Act of 2016 | [ ] 480 Consumer Credit (15 USC 1681 or 1692) |
| [ ] 190 Other Contract | [ ] 360 Other Personal Injury | [ ] 380 Other Personal Property Damage | [ ] 740 Railway Labor Act | **SOCIAL SECURITY** | [ ] 485 Telephone Consumer Protection Act |
| [ ] 195 Contract Product Liability | [ ] 362 Personal Injury - Medical Malpractice | [ ] 385 Property Damage Product Liability | [ ] 751 Family and Medical Leave Act | [ ] 861 HIA (1395ff) | [ ] 490 Cable/Sat TV |
| [ ] 196 Franchise | | | [ ] 790 Other Labor Litigation | [ ] 862 Black Lung (923) | [ ] 850 Securities/Commodities/ Exchange |
| | | | [ ] 791 Employee Retirement Income Security Act | [ ] 863 DIWC/DIWW (405(g)) | [ ] 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | [ ] 864 SSID Title XVI | [ ] 891 Agricultural Acts |
| [ ] 210 Land Condemnation | [ ] 440 Other Civil Rights | **Habeas Corpus:** | | [ ] 865 RSI (405(g)) | [ ] 893 Environmental Matters |
| [ ] 220 Foreclosure | [ ] 441 Voting | [ ] 463 Alien Detainee | | **FEDERAL TAX SUITS** | [ ] 895 Freedom of Information Act |
| [ ] 230 Rent Lease & Ejectment | [ ] 442 Employment | [ ] 510 Motions to Vacate Sentence | | [ ] 870 Taxes (U.S. Plaintiff or Defendant) | [ ] 896 Arbitration |
| [ ] 240 Torts to Land | [ ] 443 Housing/ Accommodations | [ ] 530 General | | [ ] 871 IRS—Third Party 26 USC 7609 | [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| [ ] 245 Tort Product Liability | [ ] 445 Amer. w/Disabilities - Employment | [ ] 535 Death Penalty | **IMMIGRATION** | | [ ] 950 Constitutionality of State Statutes |
| [ ] 290 All Other Real Property | [ ] 446 Amer. w/Disabilities - Other | **Other:** | [ ] 462 Naturalization Application | | |
| | [ ] 448 Education | [ ] 540 Mandamus & Other | [ ] 465 Other Immigration Actions | | |
| | | [ ] 550 Civil Rights | | | |
| | | [ ] 555 Prison Condition | | | |
| | | [ ] 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- [X] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
35 U.S.C. §§ 1 et seq
Brief description of cause:
Patent Infringement

## VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND:   [X] Yes   [ ] No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*

JUDGE _____     DOCKET NUMBER _____

DATE
4/27/2022

SIGNATURE OF ATTORNEY OF RECORD
/s/ James Shimota (by permission Wesley Hill)

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

# APPX40

# EXHIBIT A

US008223775B2

## (12) United States Patent
### Li et al.

(10) Patent No.: **US 8,223,775 B2**
(45) Date of Patent:     **Jul. 17, 2012**

(54) **ARCHITECTURE FOR A FLEXIBLE AND HIGH-PERFORMANCE GATEWAY CABLE MODEM**

(75) Inventors: **Gordon Y. Li**, San Diego, CA (US); **Yoav Hebron**, San Diego, CA (US)

(73) Assignee: **Entropic Communications, Inc.**

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 2220 days.

(21) Appl. No.: **10/675,566**

(22) Filed: **Sep. 30, 2003**

(65) **Prior Publication Data**
US 2005/0071492 A1     Mar. 31, 2005

(51) **Int. Cl.**
*H04L 12/46*     (2006.01)
(52) **U.S. Cl.** ...................................... **370/401**; 709/249
(58) **Field of Classification Search** .................. 709/249
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,944,706 B2 * | 9/2005 | Schain et al. | ............... 709/250 |
| 2001/0039600 A1 * | 11/2001 | Brooks et al. | ............... 710/126 |
| 2006/0080650 A1 * | 4/2006 | Winters et al. | ............... 717/168 |

* cited by examiner

*Primary Examiner* — Patrice Winder
(74) *Attorney, Agent, or Firm* — James Sze; Duane Morris LLP

(57) **ABSTRACT**

A cable modem system and architecture. A cable modem engine performs all cable modem functions, and a data networking engine performs all data and home networking functions. The cable modem engine is completely partitioned from the data networking engine. DOCSIS and VoIP functionality is implemented in the cable modem engine. The VoIP functionality may be in accordance with the Packet-Cable specification. The data networking functionality provided by the data networking engine may be in accordance with the CableHome specification.

**20 Claims, 2 Drawing Sheets**



**U.S. Patent**    Jul. 17, 2012    Sheet 1 of 2    US 8,223,775 B2



*Figure 1*

Case 2:22-cv-00125-JRG   Document 1-2   Filed 04/27/22   Page 4 of 8 PageID #:  24

**U.S. Patent**        Jul. 17, 2012        Sheet 2 of 2        US 8,223,775 B2



*Figure 2*

APPX44

US 8,223,775 B2

**1**

## ARCHITECTURE FOR A FLEXIBLE AND HIGH-PERFORMANCE GATEWAY CABLE MODEM

### FIELD OF THE INVENTION

The present invention relates to cable modems and, in particular, relates to a cable modem system having a functionally partitioned and flexible architecture.

### BACKGROUND OF THE INVENTION

The future gateway cable modem (CM) will provide a wide range of data networking and VoIP services, as exemplified by the requirements for initiatives such as CableHome and PacketCable. The major challenge in designing such a gateway cable modem is integration of these services with the basic cable modem functionality in an efficient and cost-effective. Several objectives need to be met:

Functional Partitioning. The gateway cable modem will incorporate a variety of functions beyond the traditional cable modem, including IP routing, network address translation (NAT)/firewall, virtual private network (VPN), web server and VoIP. These functions need to utilize DOCSIS (Data Over Cable Service Interface Specification) services (link-layer transport and QoS) for wide area network (WAN) access. Partitioning these functions along with other cable modem functions among different computational agents is an essential issue in designing a gateway cable modem.

Flexiblity. The architecture of the gateway cable modem should be flexible enough to allow independent software development and field-upgrade of gateway value-added services and basic DOCSIS cable modem services. From a development standpoint, the architecture should facilitate different software-partnering models, including all in-house, software components licensing, and OEM vendor-differentiating design. From a multiple system operator (MSO) perspective, it is highly desirable to be able to independently provision, maintain and upgrade revenue-producing gateway services and basic broadband access services.

Performance. The gateway cable modem should be able to support a large number of simultaneous data application sessions originated from/terminated on multiple CPE (customer provided equipment) devices. VoIP applications must not be adversely impacted by any concurrent data applications, and the data path for voice packets must be optimized to minimize delay and jitter.

Cost. The gateway cable modem chip should have a small incremental hardware cost/functional increase relative to stand-alone cable modem chips.

Software Re-Use. It should be possible to carry over existing cable modem software to the new gateway cable modem without major changes. The existing software running on network processors should be easily portable to run on the gateway platform without major adaptation.

The present invention provides a gateway cable modem architecture that meets all of these objectives.

### SUMMARY OF THE INVENTION

The present invention provides a gateway cable modem system and architecture that meets the above objectives and provides a highly flexible, high performance system capable of handling multiple cable modem voice, data and networking services.

One embodiment of the invention is a cable modem system comprising a data networking engine that performs data net-

**2**

working functions and a cable modem engine that performs all other cable modem functions, wherein the cable modem engine is completely partitioned from the data networking engine.

Another embodiment of the invention is a cable modem architecture. The architecture includes a cable modem engine having a DOCSIS PHY layer with a hardware transmitter and receiver, a DOCSIS MAC processor that implements realtime critical MAC functions for both upstream and downstream communications, and a DOCSIS controller implementing VoIP functionality. The architecture also includes a data networking engine implementing all data networking processing and home networking applications. The data networking engine is completely decoupled from the cable modem engine. In one implementation, the VoIP functionality provided by the cable modem is in accordance with the PacketCable specification and the data networking functionality provided by the data networking engine is in accordance with the CableHome specification.

Another embodiment of the invention is a method for providing a flexible and partitioned cable modem gateway. Data and home networking functionality is provided by a data networking engine, and DOCSIS and VoIP functionality is provided by a cable modem engine. The data networking engine is partitioned from the cable modem engine so that the data and home networking functionality is completely decoupled from the DOCSIS and VoIP functionality.

Other systems, methods, features and advantages of the invention will be or will become apparent to one with skill in the art upon examination of the following figures and detailed description. It is intended that all such additional systems, methods, features and advantages be included within this description, be within the scope of the invention, and be protected by the accompanying claims.

### BRIEF DESCRIPTION OF THE DRAWINGS

The components in the figures are not necessarily to scale, emphasis instead being placed upon illustrating the principles of the invention. In the figures, like reference numerals designate corresponding parts throughout the different views.

FIG. 1 is a block diagram of a gateway cable modem architecture according to the present invention.

FIG. 2 is a functional block diagram implementing the cable modem architecture of FIG. 1.

### DETAILED DESCRIPTION OF THE INVENTION

FIG. 1 illustrates a cable modem system architecture **100** according to the present invention. System **100** comprises three major subsystems: cable modem engine **110**; data networking engine **120**; and advanced crypto engine **130**. The functional sub-components of these three-subsystems are illustrated in greater detail in FIG. **2**.

Cable modem engine **110** implements the entire DOCSIS cable modem functionality and is further divided into three functional blocks: DOCSIS PHY layer **112**; DOCSIS MAC processor **114** and DOCSIS controller **116**. DOCSIS PHY layer **112** comprises a hardware transmitter and receiver. In one implementation, it is for a DOCSIS 2.0-compliant PHY. As seen in FIG. **1**, DOCSIS PHY layer **112** receives downstream data, transmits upstream data and receives and transmits voice data from/to an external source. In one implementation, the external source is a HFC (hybrid fiber coax) cable employing both fiber optic and coaxial cable as an effective means for delivering combined data, video, voice, CATV and other communications.

US 8,223,775 B2

**3**

Processor **114** implements real-time critical MAC functions for both upstream (US) and downstream (DS) communications. These functions include US and DS synchronization, DS MAC address filtering, DS protocol filtering, US and DS PHS, concatenation, fragmentation, MAP processing, US transmission scheduling, as well as DOCSIS link-layer DES encryption and decryption. Processor **114** receives downstream data from, provides upstream data to and exchanges voice data in both directions with DOCSIS PHY **112**. It also receives upstream data from, and exchanges voice data in both directions with, controller **116**. To increase downstream throughput, all processing of DS PDU (protocol data unit) packets is done within processor **114** without involving controller **116**. After being processed, DS PDU packets are forwarded by processor **114** directly to data networking engine **120** along path **118**, bypassing controller **116**. In one implementation, processor **114** is an ARM9TDMI-based RISC processor. In FIG. **2**, processor **114** is represented by MAC DS block **152** and MAC US block **154**.

Controller **116** receives US PDU packets from data networking engine **120**. As previously described, DS PDU packets are forwarded by processor **114** to data networking engine **120** without involvement of controller **116**. In one implementation, controller **116** is an ARM940-based RISC processor. Controller **116** implements the following DOCSIS (blocks **200-212**) functions: MAC management message (MMM) processing (ranging, registration, UCD, UCC, DCC, DCI, UP-DIS, DSx and BPI+) (functional block **200** of FIG. **2**), IGMP, MAC address learning, classification, US protocol filtering (functional block **202** of FIG. **2** and CM IP stack and software downloading. Functional block **204** carries out cable modem IP/UDP functions, functional block **206** carries out SNMP, DHCP, TFTP and TOD functionality and functional block **208** is responsible for cable modem provisioning. Controller **116** also includes a data network engine driver **210** in communication with data network engine **120** and cable MAC driver **212**.

In addition, in order to minimize the latency and jitter of voice packets, controller **116** also implements all Packet-Cable functionality. In FIG. **2**, PacketCable functionality is represented by functional blocks **220-228**. These Packet-Cable functions include provisioning (block **220**), security and signaling. Functional blocks **222** (voice DSP driver), **224** (streamlined IP/UDP/RTP with classification; PHS, IP/LLC filtering) and **226** (voice MAC driver) interface with external voice DSP **119**. Additionally MGCP and RTCP functions are provided by functional block **228**.

Data networking engine **120** is responsible for all data networking processing including advanced multi-port bridging/routing with NAT/firewall and VPN (block **250**) and home networking applications (CableHome, Web Server, etc.) (block **252**). In one implementation, the entire embedded portal services (PS) functionality of the CableHome specification is contained within data networking engine **120**, with the CableHome functionality being completely decoupled from the PacketCable and DOCSIS functionality provided by cable modem engine **110**. As a result of the virtual decoupling from cable modem engine **110**, data networking engine **120** can be independently software-upgraded without impacting the functionality of cable modem engine **110** (and vice versa).

As seen in FIG. **1**, data networking engine is capable of additional CPE functionality such as Ethernet, USB and other LAN I/F communications (802.11, Bluetooth, Powerline, etc.), with appropriate CPE drivers **254**, **256**, **258** being provided to support such communications. Additionally, cable

**4**

modem engine driver **260** communicates with cable modem engine **110** and functional block **262** provides SNMP, DHCP, TFTP and TOD functionality.

Advanced crypto engine **130** provides hardware support for crypto functions. These include common crypto functions required by the baseline DOCSIS link-layer security, Packet-Cable voice security and data-networking security (e.g. VPN). These functions include DES/3DES, AES and HMAC-MD5/SH-1.

The architecture of gateway cable modem **100** addresses the objectives set forth in the "Background" section above as follows:

Functional Partitioning. Cable modem **100** completely partitions data networking functions (advanced bridging/routing, NAT/firewall, VPN, web server and CableHome applications) from DOCSIS cable modem functionality. This is accomplished by localizing data networking functions in the data networking engine processor and localizing cable modem functions in the cable modem engine processor. Additionally, PacketCable VoIP functionality (embedded MTA) is implemented within cable modem engine **110** to address the facts that embedded MTA is closely coupled with cable modem MAC services and that the latency and jitter of voice packets needs to be minimized.

Flexibility. Since the data networking and cable modem functions are decoupled and implemented in different processors **110** and **120**, independent software upgrading and maintenance of these functions is feasible. From a development standpoint, the architecture can facilitate different software-partnering models, such as complete in-house development, software-components licensing and OEM vendor-differentiating design. In particular, data networking engine **120** provides third parties and OEMs with a dedicated computational platform to develop advanced services outside of the baseline cable modem and VoIP/PacketCable services, minimizing their support dependency on the cable modem provider. Moreover, the software architecture within cable modem engine **110** is designed in a modular way so that the Packet-Cable E-MTA can be implemented with minimum impact on the cable modem.

Performance. System **100** is able to support a large number of simultaneous data-application sessions originated from/terminated on multiple CPE devices. Its performance is enhanced by the pipe-lining nature of system **100**: the processing-intensive functions of the data networking and data networking are rationally distributed among three different processors: DOCSIS MAC processor **114** (ARM #2); DOCSIS controller **116** (ARM #1); and data networking engine **120** (ARM #3), according to their orders in the packet flow. To further boost downstream throughput, the downstream PDU packets are directly forwarded from the DOCSIS MAC processor **114** to the data networking engine **120** without going through DOCSIS controller **116**. This is made possible by exploiting the asymmetric nature of the DOCSIS US/DS **152** and **154**. In addition, the data path for voice packets is laid entirely within cable modem engine **110** and is optimized to reduce delay and jitter.

Cost. A chip implementing cable modem system **100** will have only a small incremental hardware cost/functional increase over current stand-alone cable modem chips. The major cost difference relative to current chips is the addition of another ARM940-type processor to the chip.

Software Re-Use. Existing cable modem software may be carried over to system **100** without major or drastic changes. Existing software running on PCD network processors may be easily ported to run on data networking engine **120** without major adaptation.

**APPX46**

US 8,223,775 B2

**5**

While various embodiments of the invention have been described, it will be apparent to those of ordinary skill in the art that many more embodiments and implementations are possible that are within the scope of this invention.

What is claimed is:

**1**. A cable modem system comprising:

a data networking engine implemented in a first circuit that includes at least one processor, the data networking engine programmed with software that when executed by the at least one processor of the first circuit causes the data networking engine to perform home networking functions including interfacing with customer provided equipment, wherein the at least one processor is a RISC processor;

a cable modem engine implemented in a second circuit that includes at least one processor, the second circuit being separate from the first circuit, the cable modem engine including a DOCSIS PHY layer, a DOCSIS controller, and a DOCSIS controller and programmed with software that when executed by the at least one processor of the second circuit causes the cable modem engine to perform cable modem functions other than the home networking functions performed by the data networking engine, the cable modem functions including interfacing with cable media, the cable modem engine configured to enable upgrades to its software in a manner that is independent of upgrades to the software of the data networking engine; and

a data bus that connects the data networking engine to the cable modem engine, wherein the cable modem functions performed by the cable modem engine are completely partitioned from the home networking functions performed by the data networking engine;

wherein the DOCSIS MAC processor is configured to process downstream PDU packets and forward the processed packets directly to the data networking engine without the involvement of the DOCSIS controller in order to boost downstream throughput.

**2**. A cable modem system as claimed in claim **1**, wherein all DOCSIS functions are localized in the cable modem engine.

**3**. A cable modem system as claimed in claim **2**, wherein VoIP functionality is embedded in the cable modem engine.

**4**. A cable modem system as claimed in claim **1**, and further comprising an advanced crypto engine configured to perform all crypto functions for both the data networking engine and the cable modem engine, the advanced crypto engine being separate from both the data networking engine and the cable modem engine.

**5**. A cable modem system as claimed in claim **1**, wherein the DOCSIS PHY layer includes a hardware transmitter and receiver.

**6**. A cable modem system as claimed in claim **1**, wherein all VoIP functionality is implemented in the DOCSIS controller.

**7**. A cable modem system as claimed in claim **6**, wherein the VoIP functionality is in conformance with the Packet-Cable specification.

**8**. A cable modem system as claimed in claim **1**, wherein the data networking engine is configured to perform all data networking processing including advanced multi-port bridging routing with NAT/firewall and VPN, and home networking applications.

**9**. A cable modem system as claimed in claim **8**, wherein the data networking engine comprises the entire embedded portal services functionality of the CableHome specification.

**10**. A cable modem system as claimed in claim **1**, wherein with regard to the cable modem engine:

the DOCSIS PHY layer includes a transmitter and receiver;

**6**

the DOCSIS MAC processor is configured to implement real-time MAC functions for both upstream and downstream communications; and

the DOCSIS controller is configured to implement VoIP functionality; and wherein the data networking engine includes a RISC processor configured to implement a majority of data networking processing and home networking applications decoupled from the implementation of the MAC functions and the VoIP functionality of the cable modem engine.

**11**. A cable modem system as claimed in claim **10**, wherein the DOCSIS controller is configured to provide VoIP functionality in accordance with the PacketCable specification, wherein the data networking engine is configured to provide the embedded portal services functionality of the CableHome specification, and wherein the CableHome functionality provided by the data networking engine is completely decoupled from the PacketCable and DOCSIS functionality provided by the cable modem engine.

**12**. A cable modem system as claimed in claim **11**, wherein the DOCSIS MAC processor is an ARM9TDMI-based RISC processor, and wherein the DOCSIS controller is an ARM940-based RISC processor.

**13**. A cable modem system as claimed in claim **1**, wherein the data networking engine includes consumer provided equipment drivers including a USB driver and an Ethernet driver and the data networking engine is configured to provide the embedded portal services functionality of the CableHome specification, wherein the DOCSIS controller is configured to provide VoIP functionality in accordance with the PacketCable specification, and wherein the CableHome functionality provided by the data networking engine is completely decoupled from the PacketCable and DOCSIS functionality provided by the cable modem engine.

**14**. A method of cable modem operation comprising:

executing, via at least one processor of a first circuit that implements a data networking engine, first software that causes the data networking engine to perform home networking functions including interfacing with customer provided equipment, wherein the at least one processor is a RISC processor;

executing, via one or more processors of a second circuit that implements a cable modem engine programmed with second software, the second software to cause the cable modem engine to perform cable modem functions other than the home networking functions performed by the data networking engine, the cable modem functions including interfacing with cable media, the cable modem engine configured to enable upgrades to its software in a manner that is independent of upgrades to the software of the data networking engine, wherein the second circuit is separate from the first circuit, and wherein the cable modem engine includes a DOCSIS PHY layer, a DOCSIS controller and a DOCSIS controller;

connecting, via a data bus, the data networking engine to the cable modem engine, wherein the cable modem functions performed by the cable modem engine are completely partitioned from the home networking functions performed by the data networking engine;

processing, via the DOCSIS MAC processor, downstream PDU packets and forwarding the processed packets directly to the data networking engine without the involvement of the DOCSIS controller in order to boost downstream throughput.

**15**. A method of cable modem operation as claimed in claim **14**, further comprising:

**APPX47**

US 8,223,775 B2

**7**

providing a flexible and partitioned cable modem gateway comprising:

providing data and home networking functionality in the data networking engine;

providing DOCSIS and VoIP functionality in the cable modem engine; and

partitioning the data networking engine from the cable modem engine so that the data and home networking functionality is completely decoupled from the DOCSIS and VoIP functionality.

**16**. A method as claimed in claim **14**, further comprising:

providing VoIP functionality in accordance with the PacketCable specification in the DOCSIS controller; and

providing the embedded portal services functionality of the CableHome specification in the data networking engine;

wherein the CableHome functionality provided by the data networking engine is completely decoupled from the PacketCable and DOCSIS functionality provided by the cable modem engine.

**17**. A method as claimed in claim **14**, further comprising:

providing the embedded portal services functionality of the CableHome specification in the data networking engine; and

providing VoIP functionality in accordance with the PacketCable specification in the DOCSIS controller;

wherein the data networking engine includes consumer provided equipment drivers including a USB driver and an Ethernet driver; and

wherein the CableHome functionality provided by the data networking engine is completely decoupled from the PacketCable and DOCSIS functionality provided by the cable modem engine.

**18**. A cable modem system comprising:

a data networking engine implemented in a first circuit that includes at least one processor, the data networking engine programmed with software that when executed

**8**

by the at least one processor of the first circuit causes the data networking engine to perform home networking functions including interfacing with customer provided equipment;

a cable modem engine implemented in a second circuit that includes at least one processor, the second circuit being separate from the first circuit, the cable modem engine programmed with software that when executed by the at least one processor of the second circuit causes the cable modem engine to perform cable modem functions other than the home networking functions performed by the data networking engine, the cable modem functions including interfacing with cable media, and the cable modem engine configured to enable upgrades to its software in a manner that is independent of upgrades to the software of the data networking engine, the cable modem engine including a DOCSIS controller and a DOCSIS MAC processor, the DOCSIS MAC processor configured to process downstream PDU packets and forward the processed packets directly to the data networking engine without the involvement of the DOCSIS controller in order to boost downstream throughput; and

a data bus that connects the data networking engine to the cable modem engine, wherein the cable modem functions performed by the cable modem engine are completely partitioned from the home networking functions performed by the data networking engine.

**19**. A cable modem system as claimed in claim **18**, wherein all DOCSIS functions are localized in the cable modem engine.

**20**. The cable modem system as claimed in claim **18** wherein the DOCSIS MAC processor is configured to implement real-time MAC functions for both upstream and downstream communications.

\*   \*   \*   \*   \*

# EXHIBIT B

US008284690B2

(12) **United States Patent**
Barr

(10) **Patent No.:**     **US 8,284,690 B2**
(45) **Date of Patent:**          **Oct. 9, 2012**

(54) **RECEIVER DETERMINED PROBE**

(75) Inventor: **David Barr**, San Jose, CA (US)

(73) Assignee: **Entropic Communications, Inc.**, San Diego, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 253 days.

(21) Appl. No.: **12/635,649**

(22) Filed: **Dec. 10, 2009**

(65) **Prior Publication Data**

US 2010/0150016 A1     Jun. 17, 2010

**Related U.S. Application Data**

(60) Provisional application No. 61/122,687, filed on Dec. 15, 2008, provisional application No. 61/179,454, filed on May 19, 2009.

(51) **Int. Cl.**
*G06F 11/00*     (2006.01)
*G06F 15/173*     (2006.01)

(52) **U.S. Cl.** ......................................... **370/252**; 709/224

(58) **Field of Classification Search** ........................ None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 7,124,199 B2 * | 10/2006 | Miller et al. | .................. 709/238 |
| 2007/0183383 A1 * | 8/2007 | Bitran et al. | .................. 370/338 |
| 2008/0117833 A1 * | 5/2008 | Borran et al. | .................. 370/252 |

* cited by examiner

*Primary Examiner* — Clemence Han
(74) *Attorney, Agent, or Firm* — Bruce W. Greenhaus; Daniel Yannuzzi; Michael Febbo

(57)          **ABSTRACT**

According to various embodiments of the disclosed method and apparatus, nodes on a network are programmed to generate a probe transmission in response to a request from the node that will be receiving the probe. The receiving node may generate a probe request that specifies a plurality of parameters, such as a modulation profile for the probe; the payload content of the probe; the number of times to transmit the probe; a number of symbols for the payload of the probe; a preamble type for the probe; a cyclic-prefix length for the payload of the probe; a transmit power for the probe; and a transmit power scaling factor for the payload of the probe.

**24 Claims, 6 Drawing Sheets**



**U.S. Patent** Oct. 9, 2012 Sheet 1 of 6 US 8,284,690 B2



*Fig. 1*

**U.S. Patent**      Oct. 9, 2012      Sheet 2 of 6      US 8,284,690 B2



*Fig. 2*

Case 2:22-cv-00125-JRG  Document 1-3  Filed 04/27/22  Page 5 of 16 PageID #:  33

**U.S. Patent**          Oct. 9, 2012          Sheet 3 of 6          US 8,284,690 B2



*Fig. 3*

Case 2:22-cv-00125-JRG   Document 1-3   Filed 04/27/22   Page 6 of 16 PageID #:  34

**U.S. Patent**      Oct. 9, 2012      Sheet 4 of 6      US 8,284,690 B2



*Fig. 4*

**U.S. Patent**       Oct. 9, 2012       Sheet 5 of 6              US 8,284,690 B2



*Fig. 5*

**U.S. Patent**        Oct. 9, 2012        Sheet 6 of 6            US 8,284,690 B2



*Fig. 6*

US 8,284,690 B2

**1**

**RECEIVER DETERMINED PROBE**

CROSS-REFERENCE TO RELATED APPLICATIONS

This application claims the benefit of U.S. Provisional Applications No. 61/122,687, filed Dec. 15, 2008, and No. 61/179,454, filed May 19, 2009, each of which is herein incorporated by reference.

TECHNICAL FIELD

The presently disclosed method and apparatus relates generally to communication networks, and more particularly, some embodiments relate to channel assessment probes.

DESCRIPTION OF THE RELATED ART

A home network may include multiple types of subscriber equipment configured to deliver subscriber services throughout the home. These subscriber services include delivering multimedia content, such as streaming audio and video, through the home network to subscriber equipment, where it is presented to a user. As the number of available subscriber services has increased and they become more popular, the number of devices being connected within each home network has also increased. The increase in the number of services and devices increases the complexity of coordinating communication between the network nodes as each node may experience different access conditions along its portion of the network.

This increase in complexity, further increases the likelihood that network problems may develop. When problems with subscriber services develop, subscriber service content providers are typically required to diagnosis the source of the network problem. Often, this requires sending a technician to the physical location of the home network to personally assess the network and diagnose the problem. Accordingly, as the number of homes with subscriber services incorporated into their home networks increases, so does the amount of resources a service provider must devote to technical support and network maintenance.

In many instances in which a network is established, it is helpful to characterize the communication channel over which data is to be sent between nodes of the network. It should be noted that for the purposes of this disclosure, a "channel" is the communication link between a first node of a network and a second node of a network in one particular direction. Therefore, there is a first channel from a first node **1** to a second node **2** and a second unique channel from the second node **2** to the first node **1**. In some instances, probes are sent between nodes of the network in order to allow a receiving node on the network to determine some of the characteristics of the channel between the receiving node and the transmitting node. These probes are typically well defined. Accordingly, the receiving node knows before reception what reference signal was transmitted. By comparing the reference probe with the actual received probe, the receiver can determine some of the characteristics of the channel between the transmitting and receiving node. However, requiring the transmitting node to send a predetermined probe reduces the amount flexibility of the characterization process. Nonetheless, this reduction in the flexibility must be suffered because it is critical to the process that the receiving node knows the precise form of the transmitted probe.

BRIEF SUMMARY

According to various embodiments of the disclosed method and apparatus, nodes on a network (also referred to as

**2**

network devices) are programmed to generate a probe transmission in response to a request from the nodes that will be receiving the probe. The receiving node may generate a probe request that specifies a plurality of parameters to be used in such a "receiver determined" probe to generate a probe having the "form" specified by these parameters. Accordingly, the probe request specifies a plurality of parameters associated with the generation and transmission of a probe, including the content of a payload of the probe. In one embodiment, the parameters further include: the modulation profile for the probe; the payload content of the probe; the number of times to transmit the probe; the number of symbols for the payload of the probe; the preamble type for the probe; the cyclic-prefix length for the payload of the probe; the transmit power for the probe; and the transmit power scaling factor for the payload of the probe. Accordingly, the probe that is transmitted in response to the probe request will have a form dictated by the parameters specified in the probe request.

In various embodiments, these receiver determined probes may be used in a variety of applications. For example, the probes may be used to reach or discover hidden nodes; in networks employing orthogonal frequency division multiple access (OFDMA), the probes may be used for OFDMA subchannel assessment; or in networks accessible by content providers, the probes may be used for off-site network diagnosis.

An embodiment of the disclosed method comprises: a) receiving in a first node, a probe request specifying a plurality of parameters associated with the generation and transmission of a probe, including the content of a payload of the probe; and b) transmitting from the first node to a second node the probe having a form dictated by the parameters specified by the probe request.

In a further embodiment of the method and apparatus, at least one of the probe parameters indicates: a) a modulation profile for the probe; b) the payload content of the probe; c) the number of times to transmit the probe; d) the number of symbols for the payload of the probe; e) the preamble type for the probe; f) the cyclic-prefix length for the payload of the probe; g) the transmit power for the probe; and h) the transmit power scaling factor for the payload of the probe.

Other features and aspects of the disclosed method and apparatus will become apparent from the following detailed description, taken in conjunction with the accompanying drawings, which illustrate, by way of example, the features in accordance with embodiments of the disclosed method and apparatus. The summary is not intended to limit the scope of the claimed invention, which is defined solely by the claims attached hereto.

BRIEF DESCRIPTION OF THE DRAWINGS

The disclosed method and apparatus, in accordance with one or more various embodiments, is described in detail with reference to the following figures. The drawings are provided for purposes of illustration only and merely depict either typical embodiments or examples of particular embodiments. These drawings are provided to facilitate the reader's understanding of the disclosed method and apparatus and shall not be considered limiting of the breadth, scope, or applicability of the claimed invention. It should be noted that for clarity and ease of illustration these drawings are not necessarily made to scale.

FIG. **1** illustrates an example of one environment in which some embodiments of the disclosed method and apparatus may be implemented.

US 8,284,690 B2

**3**

FIG. **2** illustrates an example of one embodiment of a network topology of the disclosed method and apparatus.

FIG. **3** illustrates a transmitter module that may be employed in some embodiments of the disclosed method and apparatus to generate PHY packets.

FIG. **4** illustrates a method of operation according to an embodiment of the disclosed method and apparatus.

FIG. **5** illustrates examples of parameters that may be modified or determined for generating a probe request according to an embodiment of the disclosed method and apparatus.

FIG. **6** illustrates an example computing module that may be used in implementing various features of embodiments of the disclosed method and apparatus.

The figures are not intended to be exhaustive or to limit the claimed invention to the precise form disclosed. It should be understood that the disclosed method and apparatus can be practiced with modification and alteration, and that the claimed invention should be limited only by the claims and the equivalents thereof.

DETAILED DESCRIPTION

Before describing the disclosed method and apparatus in detail, it is useful to describe an example of an environment in which the disclosed method and apparatus can be implemented. The network of FIG. **1** will be described for this purpose. A wired communications medium **100** is shown. In some embodiments, the wired communications medium might be a coaxial cable system, a power line system, a fiber optic cable system, an Ethernet cable system, or other similar communications medium. Alternatively, the communications medium might be a wireless transmission system. In the illustrated embodiment, the communications medium **100** is preinstalled coaxial cabling within a residence **101**.

The network comprises a plurality of network nodes **102, 103, 104, 105, 106** in communication according to a communications protocol. For example, the communications protocol might comprise a networking standard, such as the Multimedia over Coax Alliance (MoCA) standard. In the illustrated embodiment, the communications protocol specifies a packet based communications system. In this embodiment, physical layer (PHY) packets comprise preambles and payloads. A PHY preamble is typically inserted at the beginning of each packet to assist receivers in detecting and acquiring the physical layer parameters to properly receive and decode the packet. The communications protocol may have a plurality of pre-defined PHY preambles to use with different types of network communications. For example, one type of preamble may be used when transmitting in a diversity mode (a communication mode in which little is known about the communication channel). Another type of preamble may be used when transmitting a media access plan (MAP) message. Another type of preamble may comprise a specified subset of subcarrier frequencies. Other types of packets may use other types of preambles.

A PHY payload is used to transmit the data content of the packet. In some cases, the PHY payload has a predetermined format. For example, in a MoCA network, network maintenance messages and MAP messages each have a format that is determined by the MoCA protocol. In other cases, the PHY payload may have undetermined format. For example, the PHY payload of a media streaming transmission might comprise an embedded Ethernet packet or a portion thereof.

In some embodiments, activity on the network is controlled by a network coordinator (NC) node. In one such embodiment, one of the nodes is selected to perform the functions of

**4**

the NC based upon a process defined by the communications protocol. In networks employing an NC, the NC schedules network communications between network nodes using a MAP message. The MAP is sent as a packet. Such MAP packets are sent on a regular basis. MAPs are generated in response to reservation requests by the nodes of the network. The NC's MAP message may precisely schedule probe transmissions. The NC also performs admission procedures when a new node requests admission to the network.

Nodes described herein can be associated with a variety of devices. For example, in a system deployed in a residence **101**, a node may be a network communications module associated with one of the computers **109** or **110**. Such nodes allow the computers **109, 110** to communicate on the communications medium **100**. Alternatively, a node may be a module associated with a television **111** to allow the television to receive and display media streamed from the internet, or from one or more other network nodes. A node might also be associated with a speaker or other media playing devices **103** that plays music. A node might also be associated with a module configured to interface with an internet or cable service provider **112**, for example to provide Internet access, digital video recording capabilities, media streaming functions, or network management services to the residence **101**.

In many embodiments, network probes are used to perform various channel assessment or network maintenance procedures. For example, in a wired network, network node mobility may be fairly low and new nodes joining the network may be a relatively rare occurrence. In contrast to highly dynamic networks, such as wireless networks, wired networks are more stable, i.e., the channel conditions do not change frequently. In stable networks probing can be used to profile the channel conditions without introducing unacceptable network overhead. However, even with more dynamic networks, network probes can be used to diagnose problems. For example, a probe can replicate a potential problem, reach or discover a distant or previously undetected node on the network, or assist with network admissions procedures.

In some embodiments, network communications use orthogonal frequency division multiplexing (OFDM). In OFDM, a communications channel comprises a plurality of orthogonal subcarrier frequencies. In one embodiment, transmissions are modulated onto these subcarriers using quadrature amplitude modulation (QAM), where symbols are modulated onto the subcarrier by modifying the amplitude of an in-phase and independently modifying the amplitude of a quadrature portion of the subcarrier transmission. Each OFDM symbol is formed from the collection of all of the QAM symbols modulated onto each of the used subcarriers in the same time slot. In some embodiments, each subcarrier is modulated with the same modulation scheme. For example, an OFDM symbol may comprise a plurality of subcarriers each modulated with 4-QAM. In another embodiment, transmissions on different subcarriers may utilize different QAM schemes. For example, a first subcarrier may be modulated using 2-QAM (otherwise known as binary phase shift keying (BPSK)), a second subcarrier may be modulated using 64-QAM, and so on. In yet another embodiment, different transmission types may utilize different types of OFDM symbols. For example, during network admissions processes, transmissions may utilize OFDM symbols where each subcarrier is modulated with 2-QAM, and once the network node has been admitted to the network, it may utilize an adaptable bitloading profile for its OFDM symbols.

In some embodiments, OFDMA may be employed to allow multiple nodes to have simultaneous access to the channel. In OFDMA, disjoint subsets of subcarriers, referred to as sub-

**APPX58**

US 8,284,690 B2

5

channels, are assigned to the nodes participating in the OFDMA communications. In some embodiments employing NCs, OFDMA is used for the communications between the non-NC nodes and the NC. In these embodiments, the NC may partition the channel into sub-channels and assign these sub-channels to the participating network nodes. In a particular embodiment, the sub-channels are configured such that the bitloading on each sub-channel is the same. In this embodiment, because different subcarriers may accommodate different modulation schemes, the sub-channels may not all have the same number of subcarriers. However, in other embodiments, different sub-channel bitloading and partitioning schemes may be employed.

FIG. 2 illustrates a full mesh topology between four example nodes. In some embodiments, network conditions may vary according to the particular channel, and even according to the direction of the channel. For example, network conditions for the channel from node 1 to node 2 can differ from the conditions for the channel from node 2 to node 1. These can each be different from the conditions of the channel from node 2 to node 3, and so on. Accordingly, different modulation schemes may be employed for each channel. In one embodiment, probes are used during a network profiling period to determine the modulation schemes to be used for the different links. For example, node 1 may transmit a probe request to each of nodes 2, 3, and 4 specifying a bitloading per subcarrier and a raw data sequence to be used in transmitting the probe. Each of nodes 2, 3, and 4 would then generate the probe with the requested bitloading and raw data sequence and transmit the probe to node 1. By analyzing this return probe and repeating the process if necessary, node 1 can develop bitloading profiles for use on the subcarriers used to communicate with each of nodes 2, 3, and 4.

In one embodiment employing OFDMA, a receiving node sends a probe request that indicates which sub-carriers are to be used to send a probe from a particular transmitting node and the bitloading profiles applied across those sub-carriers. For example, in one embodiment, node 1 may be an NC, and may receive reservation requests from nodes 2, 3, and 4 simultaneously using OFDMA. If node 1 were to establish a potential sub-channel with node 2, node 1 can transmit a probe request specifying a bitloading profile in which the subcarriers that are not in the potential sub-channel are left untransmitted. Accordingly, the bitloading profile would indicate modulating only the subcarriers that are in the potential sub-channel. In this case, the probe generated by node 2 in response to the probe request from node 1 would emulate an OFDMA transmission from node 2 to node 1. Node 1 could then use the information derived from the probe in its OFDMA sub-channel allocation procedure.

In another embodiment, node 1 could transmit one or more probe requests that request probes to be transmitted by some or all of the OFDMA participant nodes simultaneously on the subcarriers assigned to be used by each OFDMA participant node.

FIG. 3 illustrates a transmitter module 150 used within a node, such as the nodes 102, 103, 104, 105, 106 shown in FIG. 1. The transmitter module 150 generates PHY packets in accordance with one embodiment of the disclosed method and apparatus. The module 150 has a frequency domain payload 160 and/or a time domain payload 161. A subcarrier mapper 163 maps the payload 161 to a plurality of assigned subcarriers according to a predetermined bitloading profile for the channel (or sub-channel in the case of an OFDMA transmission). The transmitter module 150 uses a frequency domain preamble generator module 162 to insert a frequency

6

domain PHY preamble before the frequency domain payload 160. Accordingly, a preamble specified in the frequency domain may be "prepended" to the payload after the subcarrier mapper 163. The combined signal is then modulated onto the OFDM symbol by a modulator module 164. The modulated signal is then filtered and upconverted to the channel's predetermined radio frequencies by the filter 165 and an RF upconverter 166.

When the transmitting module 150 is generating a time domain packet, the frequency domain modulation is not necessary. However, in one embodiment the frequency domain modulation is used even when generating a time domain packet. A time domain payload 161 having a time domain preamble generated by a time domain preamble generator module 167 is filtered and RF upconverted for transmission on the channel.

FIG. 4 illustrates a method of operation according to an embodiment of the disclosed method and apparatus. In block 200, one or more nodes transmit a probe request specifying probe parameters to one or more nodes that will be transmitting the eventual probe(s) having a form that is dictated by the specified parameters. In one embodiment, the probe is transmitted by a single node and received by a single node (point-to-point) or received by several nodes (point-to-multipoint, such as multicast or broadcast). In another embodiment, the probe is simultaneously transmitted by multiple nodes and received by a single node (multipoint-to-point, such as OFDMA). In other OFMDA embodiments, multiple nodes might share the communications channel for multi-point to multi-point communications. In such a case, multiple nodes can transmit probe requests, and multiple nodes can receive probes, all simultaneously.

In block 201, the probe transmitter or transmitters receive the probe request or requests. In one embodiment, the probe request specifies a plurality of parameters for the probe that will dictate the form of the probe to be transmitted. These parameters are discussed in more detail below with respect to FIG. 5. In block 202, the probe transmitter uses the specified probe parameters to generate a probe having a form that complies with the specified parameters. In block 203, the probe transmitter transmits the generated probe to the probe requester at a specified time. Alternatively, the probe transmitter can transmit the probe to any other probe base upon one of the parameters of the probe request or based upon information that previously existed within the transmitting node. In some embodiments, the requested probe may exceed certain capabilities of the transmitter.

In one embodiment, the probe transmitter's RMS error (signal fidelity) requirements may be relaxed if the requested probe specifies a power output that exceeds the transmitting node's nominal total output power. As another example, the probe transmitter may have restrictions on how many time domain probes it is allowed to send, and will send a time domain probe only if the probe transmitter determines that the time domain probe will not negatively impact other network operations.

In block 204, the requesting node receives the probe generated according to its earlier probe request. The received probe may then be used in further processing in block 205. In one embodiment, the received probe may be used in channel analysis to determine a bitloading table, FEC and other communication parameters for OFDM or OFDMA signals for future transmissions from the probe transmitter. In another embodiment, post reception processing might comprise generating a report from the probe and transmitting this probe report to the requesting node or to a designated entity. For example, the probe report could contain bitloading, FEC and

**APPX59**

US 8,284,690 B2

7

other communication parameters to be used subsequently by the transmitting node when communicating to the receiving node. In another example, the probe report could be conveyed to an offsite network administrator for remote management purposes. For example, the parameters of the requested probe can be determined by an off-site network administrator, and conveyed to a probe requestor. The resulting probe, post-processing, and probe report can be used to assist in diagnosing a network problem possibly involving the probe requester or the probe transmitter. In one such case, a probe report is sent to the network administrator.

In other embodiments, the probe request might be transmitted by a different node than the probe receiver. For example, in FIG. **2**, node **2** might generate a probe request for node **3** to generate and transmit a specified probe to node **1**. In some embodiments, this is used to determine how communications between node **3** and node **1** could impact communications between node **2** and node **4**. This might occur, for example, in an OFDMA system in which a sub-channel between node **1** and node **3** and a second sub-channel between node **2** and node **3** are active at the same time. In another embodiment, an NC can generate a probe request for a probe to be transmitted between two other nodes with an instruction that a probe report be transmitted to the NC. This might be used by an off-site network manager that can communicate with only some of the network nodes, but suspects that communications between other network nodes may be causing a network problem.

FIG. **5** illustrates examples of parameters that may be modified or determined for generating a probe request according to an embodiment of the disclosed method and apparatus. A probe request may specify a bitloading profile or constellation profile to be used in the probe (block **260**). For example, in OFDM networks, the bitloading profile or constellation profile may specify which QAM constellations to use for which channel subcarriers. In some embodiments, the specified bitloading profile may specify a QAM constellation or QAM scheme to use for each subcarrier. In other embodiments, the bitloading profile specifies QAM schemes for only a subset of the available subcarriers and the probe generating node will not transmit the remaining subcarriers.

In various embodiments, the bitloading profile includes indications to leave certain subcarriers untransmitted. For example, in one embodiment, in which the network conforms to an industry standard established by MoCA, 100 MHz/512 versions of MoCA's Type II Frequency Domain Tone Probes can be accommodated without the need to specifically define the probes in the MoCA specification. This could be accomplished in part by generating a probe request for a probe having two modulated subcarriers, while specifying that the remaining subcarriers of the probe be untransmitted. As another example, an OFDMA transmission from a single node could be emulated by instructing the node to transmit a probe in which only subcarriers belonging to a certain sub-channel are transmitted, while leaving the remaining subcarriers untransmitted. Additionally, simultaneous OFDMA transmissions may occur in response to probe requests to multiple nodes. In one embodiment, each of the multiple probe requests is sent to one of a plurality of nodes. Each probe request specifies a bitloading profile specific to the particular probe-transmitting node, such that the simultaneously transmitted probes from the multiple nodes comprise an OFDMA transmission to the requesting node.

In accordance with the embodiment shown in FIG. **5**, in block **261**, the probe request specifies a raw data sequence for the probe (or for just the probe's payload). In some embodiments, a network communications protocol specifies that

8

various techniques, such as data-scrambling, bin-scrambling, forward error correction, or encryption be used in network communications. In some such embodiments, these techniques are specified in the probe request. In alternative embodiments, these techniques are used in the specified data sequence for simplicity.

In block **262**, the probe request specifies a number of symbols for the probe payload length. In one embodiment, the number of symbols and the raw data sequence will be determined such that the serialized bit stream corresponding to the raw data sequence fully occupies the requested number of symbols using the requested bitloading profile. Additionally, in embodiments using OFDM communications, or other embodiments with multi-path channel characteristics, a cyclic prefix length may be specified. In some embodiments, the cyclic prefix length may be the same for each symbol of the specified number of symbols. In other embodiments, the cyclic prefix length may be assigned in a symbol specific manner or may otherwise vary between symbols of the probe.

In block **264**, a probe request further specifies a preamble type to use in the probe. As discussed above, some networks operate according to protocols that specify a variety of available packet preambles. These packet preambles can be used for packet identification or can contain information useful in receiving and decoding the packet's payload. In some embodiments, different preambles may be utilized according to channel conditions, such as a long and robust preamble when the channel conditions are unknown, or a short and efficient preamble when the channel conditions are known to be good. In some embodiments using OFDMA transmissions, a preamble type may be used in which each simultaneous transmitter contributes a portion of the composite preamble corresponding to the particular subcarriers assigned to each participating transmitter. In some embodiments, nodes may be restricted from using certain preamble types. For example, in a network utilizing MAP packets, a MAP packet preamble may be specified, and nodes may be restricted from requesting that a probe utilize a MAP packet preamble. This can serve to reduce the likelihood that a probe might adversely affect the operation of other nodes not involved in the probing procedure. In other embodiments, the type of preamble available is not restricted, or the restriction can be overcome in certain circumstances. For example, diagnostic probe requests could be unrestricted in terms of the available preambles while network maintenance or assessment or channel assessment probe requests could be restricted in terms of their available preambles. Additionally, in some embodiments, only certain probe parameters can be requested under certain conditions. For example, in an OFDMA network, the network protocol may specify that a particular OFDMA preamble be used in all OFDMA transmissions. Therefore, if a probe request specifies an OFDMA probe, then the probe request will specify that the particular OFDMA preamble be used in the OFDMA probe. In another embodiment, the probe request also specifies that the same subcarriers remain untransmitted in the preamble as in the OFDMA packet payload. In another embodiment, the probe transmitting node may perform this operation automatically.

In the embodiment of FIG. **5**, block **265** indicates that a probe request specifies a transmit power setting for the probe. In some embodiments, the network protocol may establish a range of transmit power settings that are available for various transmissions. In a particular embodiment, a range of transmit power (attenuation) settings is between 0 and 30 dB for normal transmissions, and between −12 dB (corresponding to amplification) to 45 dB for OFDMA transmissions, or transmissions with an OFDMA specifying preamble. In some

US 8,284,690 B2

9

embodiments, a node conforms to these predetermined settings in generating probe requests. In other embodiments, the different settings available for different transmission types may be exploited to generate particular probes. For example, a probe request could request an amplified non-OFDMA probe in order to reach or identify a distant or hidden node.

In block 266, a probe request further specifies a power scaling factor for the payload relative to the preamble. In embodiments employing this scaling factor, probe payloads can be transmitted with different power characteristics than the probe preambles. In one particular embodiment, the scale factor varies from 0 to 17 dB of amplification in the payload relative to the preamble. This might be used in a variety of different requested probes. For example, 100 MHz/512-subcarrier versions of MoCA's Type II Frequency Domain Tone Probes can be emulated, in part, by applying an appropriate payload scale factor. For example, a probe request may specify a payload that modulates only a single subcarrier with the maximum available payload scaling factor (amplification) in order to reach or identify a distant or hidden node. In another example, a payload scale factor may be requested which produces a probe transmission which exceeds the transmitting node's nominal total output power, in order to reach or identify a distant or hidden node. Alternatively, the probe request may specify an OFDMA emulating probe in which the payload is modulated on a set of subcarriers that comprises a potential sub-channel for OFDMA communications. The scaling factor can be determined such that the payload is transmitted at the power level of a normal OFDMA sub-channel, even though the preamble does not specify that the communication is an OFDMA sub-channel. In one embodiment, such probes might be used to assess a channel and thus allow an NC to pre-determine which OFDMA sub-channels should be used if a node leaves or joins the network. For example, an NC could establish four potential sub-channels for a network having these current nodes. This would avoid overhead if a fourth node were to join the network. In some embodiments, packet power restrictions may impact what scaling factors are available in terms of the specified transmit power setting. In a particular embodiment, the payload symbol scaling factor minus the transmit power (attenuation) setting is restricted to less than or equal to 12 dB.

In block 267, a probe request specifies the number of times the generated probe should be transmitted. For example, a probe request may specify that the generated probe be repeated to allow improved channel assessment or to diagnosis a particular network issue. In one embodiment, the amount of delay between repetitions is specified. In further embodiments, the probe request may specify that certain probe parameters vary in subsequent transmissions. For example, the probe request may specify that the transmitter transmit three subsequent probes with equivalent parameters except for an increasing power transmit setting. In some embodiments, this is used to avoid repetitious probe requests.

In some alternative embodiments, the probe requests specify time-domain probes. For example, a probe request may specify a time domain probe to generate a square wave or other easily analyzed signal for channel estimate purposes. In some embodiments, factors similar to those employed in the embodiments described with respect to FIG. 5 may be employed in a time domain probe request, except that the bitloading profile and raw data bit-sequence are replaced with a time series for the transmitted probe. In some embodiments, the allowed time domain sequences are restricted, for example to prevent a mal-formed packet from disrupting other network communications. In other embodiments, probe transmitters are programmed to evaluate a received time-

10

domain probe request to determine if the corresponding time-domain probe would disrupt the network.

In various embodiments, allowing a probe receiving node to specify the parameters for a probe from the probe transmitting node allows various features to be implemented. Furthermore, in some embodiments, networks implementing these embodiments may simplify their shared communications standards. For example, a network standard may forgo specifying particular assessment probes and allow a receiving node to determine its own assessment probe. In one embodiment, the receiving node may utilize this ability to specify the characteristics of an error vector measurement (EVM) probe or echo profile probe (EPP). Furthermore, this may simplify the shared communications standard by allowing proprietary aspects of the probe signal processing to be confined to particular receivers. Allowing the receiving node to specify the characteristics of the probe also supports future extensibility (e.g., new probe signals could be supported by older transmitters). In addition to allowing a network to improve its functioning, this may also allow legacy nodes to better interoperate with nodes operating according to future standards. For example, if an improved EVM probe type were developed for a future network, nodes implementing this embodiment will be capable of transmitting the improved probe, even if they themselves are not able to process these probes and are restricted to using a legacy EVM probe. Additionally, some nodes may be capable of downloading or receiving new probe types from outside entities. In networks implementing an embodiment of the disclosed method and apparatus, these new probes may be uploaded to the capable nodes, which can then request the updated probes to be transmitted from nodes that would not otherwise have the upgraded capabilities.

As used herein, the term module might describe a given unit of functionality that can be performed in accordance with one or more embodiments of the disclosed method and apparatus. As used herein, a module might be implemented utilizing any form of hardware, software, or a combination thereof. For example, one or more processors, controllers, ASICs, PLAs, PALs, CPLDs, FPGAs, logical components, software routines or other mechanisms might be implemented to make up a module. In implementation, the various modules described herein might be implemented as discrete modules or the functions and features described can be shared in part or in total among one or more modules. In other words, as would be apparent to one of ordinary skill in the art after reading this description, the various features and functionality described herein may be implemented in any given application and can be implemented in one or more separate or shared modules in various combinations and permutations. Even though various features or elements of functionality may be individually described or claimed as separate modules, one of ordinary skill in the art will understand that these features and functionality can be shared among one or more common software and hardware elements, and such description shall not require or imply that separate hardware or software components are used to implement such features or functionality.

Where components or modules of the disclosed method and apparatus are implemented in whole or in part using software, in one embodiment, these software elements can be implemented to operate with a computing or processing module capable of carrying out the functionality described with respect thereto. One such example computing module is shown in FIG. 6. Various embodiments are described in terms of this example-computing module 300. After reading this description, it will become apparent to a person skilled in the relevant art how to implement the disclosed method and apparatus using other computing modules or architectures.

US 8,284,690 B2

**11**

Referring now to FIG. **6**, computing module **300** may represent, for example, computing or processing capabilities found within desktop, laptop and notebook computers; hand-held computing devices (PDA's, smart phones, cell phones, palmtops, etc.); mainframes, supercomputers, workstations or servers; or any other type of special-purpose or general-purpose computing devices as may be desirable or appropriate for a given application or environment. Computing module **300** might also represent computing capabilities embedded within or otherwise available to a given device. For example, a computing module **300** might be found in electronic devices such as, for example, digital cameras, navigation systems, cellular telephones, portable computing devices, modems, routers, wireless access points (WAPs), terminals and other electronic devices that might include some form of processing capability.

Computing module **300** might include, for example, one or more processors, controllers, control modules, or other processing devices, such as a processor **304**. Processor **304** might be implemented using a general-purpose or special-purpose processing engine such as, for example, a microprocessor, controller, or other control logic. In the illustrated example, processor **304** is connected to a bus **302**, although any communication medium can be used to facilitate interaction with other components of computing module **300** or to communicate externally.

Computing module **300** might also include one or more memory modules, simply referred to herein as main memory **308**. For example, preferably random access memory (RAM) or other dynamic memory, might be used for storing information and instructions to be executed by processor **304**. Main memory **308** might also be used for storing temporary variables or other intermediate information during execution of instructions to be executed by processor **304**. Computing module **300** might likewise include a read only memory ("ROM") or other static storage device coupled to bus **302** for storing static information and instructions for processor **304**.

The computing module **300** might also include one or more various forms of information storage mechanism **310**, which might include, for example, a media drive **312** and a storage unit interface **320**. The media drive **312** might include a drive or other mechanism to support fixed or removable storage media **314**. For example, a hard disk drive, a floppy disk drive, a magnetic tape drive, an optical disk drive, a CD or DVD drive (R or RW), or other removable or fixed media drive might be provided. Accordingly, storage media **314** might include, for example, a hard disk, a floppy disk, magnetic tape, cartridge, optical disk, a CD or DVD, or other fixed or removable medium that is read by, written to or accessed by media drive **312**. As these examples illustrate, the storage media **314** can include a computer usable storage medium having stored therein computer software or data.

In alternative embodiments, information storage mechanism **310** might include other similar instrumentalities for allowing computer programs or other instructions or data to be loaded into computing module **300**. Such instrumentalities might include, for example, a fixed or removable storage unit **322** and an interface **320**. Examples of such storage units **322** and interfaces **320** can include a program cartridge and cartridge interface, a removable memory (for example, a flash memory or other removable memory module) and memory slot, a PCMCIA slot and card, and other fixed or removable storage units **322** and interfaces **320** that allow software and data to be transferred from the storage unit **322** to computing module **300**.

Computing module **300** might also include a communications interface **324**. Communications interface **324** might be

**12**

used to allow software and data to be transferred between computing module **300** and external devices. Examples of communications interface **324** might include a modem or softmodem, a network interface (such as an Ethernet, network interface card, WiMedia, IEEE 802.XX or other interface), a communications port (such as for example, a USB port, IR port, RS232 port Bluetooth® interface, or other port), or other communications interface. Software and data transferred via communications interface **324** might typically be carried on signals, which can be electronic, electromagnetic (which includes optical) or other signals capable of being exchanged by a given communications interface **324**. These signals might be provided to communications interface **324** via a channel **328**. This channel **328** might carry signals and might be implemented using a wired or wireless communication medium. Some examples of a channel might include a MoCA channel over coaxial cable, phone line, power line, a cellular link, an RF link, an optical link, a network interface, a local or wide area network, and other wired or wireless communications channels.

In this document, the terms "computer program medium" and "computer usable medium" are used to generally refer to media such as, for example, memory **308**, storage unit **320**, media **314**, and channel **328**. These and other various forms of computer program media or computer usable media may be involved in carrying one or more sequences of one or more instructions to a processing device for execution. Such instructions embodied on the medium, are generally referred to as "computer program code" or a "computer program product" (which may be grouped in the form of computer programs or other groupings). When executed, such instructions might enable the computing module **300** to perform features or functions of the disclosed method and apparatus as discussed herein.

While various embodiments of the disclosed method and apparatus have been described above, it should be understood that they have been presented by way of example only, and not of limitation. Likewise, the various diagrams may depict an example architectural or other configuration for the disclosed method and apparatus, which is done to aid in understanding the features and functionality that can be included in the disclosed method and apparatus. The claimed invention is not restricted to the illustrated example architectures or configurations, but the desired features can be implemented using a variety of alternative architectures and configurations. Indeed, it will be apparent to one of skill in the art how alternative functional, logical or physical partitioning and configurations can be implemented to implement the desired features of the disclosed method and apparatus. Also, a multitude of different constituent module names other than those depicted herein can be applied to the various partitions. Additionally, with regard to flow diagrams, operational descriptions and method claims, the order in which the blocks are presented herein shall not mandate that various embodiments be implemented to perform the recited functionality in the same order unless the context dictates otherwise.

Although the disclosed method and apparatus is described above in terms of various exemplary embodiments and implementations, it should be understood that the various features, aspects and functionality described in one or more of the individual embodiments are not limited in their applicability to the particular embodiment with which they are described, but instead can be applied, alone or in various combinations, to one or more of the other embodiments of the disclosed method and apparatus, whether or not such embodiments are described and whether or not such features are presented as being a part of a described embodiment. Thus, the breadth and

US 8,284,690 B2

13

scope of the claimed invention should not be limited by any of the above-described embodiments which are presented as mere examples for illustration only.

Terms and phrases used in this document, and variations thereof, unless otherwise expressly stated, should be construed as open ended as opposed to limiting. As examples of the foregoing: the term "including" should be read as meaning "including, without limitation" or the like; the term "example" is used to provide exemplary instances of the item in discussion, not an exhaustive or limiting list thereof; the terms "a" or "an" should be read as meaning "at least one," "one or more" or the like; and adjectives such as "conventional," "traditional," "normal," "standard," "known" and terms of similar meaning should not be construed as limiting the item described to a given time period or to an item available as of a given time, but instead should be read to encompass conventional, traditional, normal, or standard technologies that may be available or known now or at any time in the future. Likewise, where this document refers to technologies that would be apparent or known to one of ordinary skill in the art, such technologies encompass those apparent or known to the skilled artisan now or at any time in the future.

The presence of broadening words and phrases such as "one or more," "at least," "but not limited to" or other like phrases in some instances shall not be read to mean that the narrower case is intended or required in instances where such broadening phrases may be absent. The use of the term "module" does not imply that the components or functionality described or claimed as part of the module are all configured in a common package. Indeed, any or all of the various components of a module, whether control logic or other components, can be combined in a single package or separately maintained and can further be distributed in multiple groupings or packages or across multiple locations.

Additionally, the various embodiments set forth herein are described in terms of exemplary block diagrams, flow charts and other illustrations. As will become apparent to one of ordinary skill in the art after reading this document, the illustrated embodiments and their various alternatives can be implemented without confinement to the illustrated examples. For example, block diagrams and their accompanying description should not be construed as mandating a particular architecture or configuration.

The invention claimed is:

1. A method comprising:
   a) receiving in a first node, a probe request specifying a first plurality of parameters associated with the generation and transmission of a probe, wherein the first plurality of parameters at least specify content payload of the probe and a second node;
   b) determining a second plurality of parameters associated with generation and transmission of the probe;
   c) generating the probe in accordance with the first plurality of parameters and the second plurality of parameters, wherein the probe has a form dictated by the first plurality of parameters; and
   d) transmitting the probe from the first node to the second node.

2. The method of claim 1, further including using within the first node, at least one of the probe parameters to determine a modulation profile for the probe.

3. The method of claim 1, wherein at least one of the probe parameters indicates:
   a) a modulation profile for the probe;
   b) the number of times to transmit the probe;
   c) a number of symbols for the payload of the probe;
   d) a preamble type for the probe;

14

   e) a cyclic-prefix length for the payload of the probe;
   f) a transmit power for the probe; and
   g) a transmit power scaling factor for the payload of the probe.

4. The method of claim 3, wherein the probe request identifies a hidden node.

5. The method of claim 3, wherein the modulation profile for the probe emulates an orthogonal frequency division multiple access (OFDMA) transmission.

6. The method of claim 1, wherein the probe request is generated by the second node.

7. The method of claim 1, wherein the probe request requests a probe that assists in diagnosing a network problem.

8. The method of claim 7, wherein the probe request is generated by a network operator and uploaded to the second node.

9. A method comprising:
   a) a first node transmitting a probe request to a second node, the probe request specifying a first plurality of probe parameters for a physical layer probe, the first plurality of probe parameters comprising a form for the probe including a modulation profile for the probe;
   b) the first node receiving the probe from the second node, wherein the probe is generated in accordance with the first plurality of parameters and in accordance with a second plurality of parameters determined by the second node.

10. The method of claim 9, wherein the probe request is configured such that the probe emulates an OFDMA transmission.

11. The method of claim 9, further comprising:
   a) the first node transmitting a second probe request to a third node;
   b) and the first node receiving a second probe from the third node, wherein the second probe is generated according to the second probe request; and
   wherein the first probe and second probe are transmitted simultaneously using OFDMA.

12. The method of claim 9, wherein the probe parameters further comprises:
   a) an indication of the number of times to transmit the probe;
   b) a number of symbols for the payload of the probe; a preamble type for the probe;
   c) a cyclic-prefix length for the payload of the probe; a transmit power for the probe; and
   d) a transmit power scaling factor for the payload of the probe.

13. The method of claim 12, wherein the probe request is configured such that the probe identifies a hidden node.

14. The method of claim 9, wherein the probe request is transmitted at a specific time.

15. The method of claim 9, wherein the probe request is configured to diagnose a network problem.

16. The method of claim 15, wherein the probe request is generated by a network operator and uploaded to the first node.

17. A system, comprising:
   a) a first node on a communications network, the first node comprising a first processor and a first computer executable program code embodied on a first a computer readable medium, the first computer executable program code configured to transmit a probe request to a second node, on the communications network, the probe request specifying a first plurality of probe parameters for a physical layer probe, wherein the first plurality of probe

APPX63

US 8,284,690 B2

**15**

parameters comprising at least a payload content for the probe and a modulation profile for the probe; and

b) the second node on the communications network, the second node comprising a second processor and a second computer executable program code embodied on a second computer readable medium, the second executable program code configured to:

receive the probe request;

determine a second plurality of parameters associated with generation and transmission of the probe;

generate the probe in accordance with the first plurality of parameters and the second plurality of parameters, wherein the probe has a form dictated by the first plurality of parameters; and

transmit the probe to the first node.

**18**. The system of claim **17**, wherein the probe request is configured such that the probe emulates an OFDMA transmission.

**19**. The system of claim **17**, wherein the first executable program code is further configured to transmit a second probe request to a third node on the communications network, the second probe request specifying a third first plurality of probe parameters for a second physical layer probe, the third plurality of probe parameters comprising a second payload content for the second probe and a second modulation profile for the probe, the second probe request further specifying a different second plurality of parameters associated with the generation and transmission of the second probe; and

further comprising the third node on the communications network, the third node comprising a third processor and

**16**

a third computer executable program code embodied on a third computer readable medium, the third executable program code configured to receive the second probe request, generate the second probe according to the received probe request, and transmit the second probe to the first node on the communications network; and wherein the first probe and second probe are transmitted simultaneously using OFDMA.

**20**. The system of claim **17**, wherein the probe parameters further comprises:

a) an indication of the number of times to transmit the probe;

b) a number of symbols for the payload of the probe;

c) a preamble type for the probe;

d) a cyclic-prefix length for the payload of the probe;

e) a transmit power for the probe; and

f) a transmit power scaling factor for the payload of the probe.

**21**. The system of claim **20**, wherein the probe request is configured such that the probe identifies a hidden node.

**22**. The system of claim **17**, wherein the probe request is generated by the first node.

**23**. The system of claim **17**, wherein the probe request is configured to diagnose a network problem.

**24**. The system of claim **23**, wherein the probe request is generated by a network operator and uploaded to the first node.

*   *   *   *   *

**APPX64**

# EXHIBIT C

US008792008B2

(12) **United States Patent**
Gallagher et al.

(10) Patent No.: **US 8,792,008 B2**
(45) **Date of Patent:** **Jul. 29, 2014**

(54) **METHOD AND APPARATUS FOR SPECTRUM MONITORING**

(75) Inventors: **Timothy Gallagher**, Encinitas, CA (US); **Patrick Tierney**, Solana Beach, CA (US); **Jun Huang**, San Diego, CA (US)

(73) Assignee: **MaxLinear, Inc.**, Carlsbad, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 52 days.

(21) Appl. No.: **13/607,916**

(22) Filed: **Sep. 10, 2012**

(65) **Prior Publication Data**
US 2013/0063608 A1     Mar. 14, 2013

**Related U.S. Application Data**

(60) Provisional application No. 61/532,098, filed on Sep. 8, 2011.

(51) Int. Cl.
| | |
|---|---|
| *H04N 17/00* | (2006.01) |
| *H04L 12/66* | (2006.01) |
| *H04L 12/26* | (2006.01) |
| *H04B 17/00* | (2006.01) |

(52) U.S. Cl.
CPC ................. *H04L 12/66* (2013.01); *H04L 43/08* (2013.01); *H04N 17/00* (2013.01); *H04B 17/0042* (2013.01)
USPC ........................................................ **348/192**

(58) **Field of Classification Search**
USPC .......................... 348/192, 725, 572, 731, 729; 455/234.1, 136, 138, 234.2; 375/349, 375/350, 316
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,038,435 A * | 3/2000 | Zhang | 455/234.1 |
| 6,813,320 B1 * | 11/2004 | Claxton et al. | 375/316 |
| 7,197,685 B2 * | 3/2007 | Limberg | 714/756 |
| 8,588,339 B2 * | 11/2013 | Birru et al. | 375/316 |
| 8,611,483 B2 * | 12/2013 | Zhu et al. | 375/349 |
| 2010/0105332 A1 * | 4/2010 | McHenry et al. | 455/62 |
| 2012/0163518 A1 * | 6/2012 | Reddy et al. | 375/350 |

* cited by examiner

*Primary Examiner* — Paulos M Natnael

(74) *Attorney, Agent, or Firm* — McAndrews, Held & Malloy, Ltd.

(57) **ABSTRACT**

A system, such as a satellite reception assembly or customer premises gateway, may comprise an analog-to-digital converter operable to digitize a signal spanning an entire television spectrum (e.g., cable television spectrum or satellite television spectrum) comprising a plurality of television channels. The system may comprise a signal monitor operable to analyze a signal to determine a characteristic of the signal. The system may comprise a data processor operable to process a television channel to recover content carried on the television channel. The system may comprise a channelizer operable to select first and second portions of the signal, and concurrently output the first portion to the signal monitor and the second portion to the data processor.

**18 Claims, 7 Drawing Sheets**





Case 2:22-cv-00125-JRG   Document 1-4   Filed 04/27/22   Page 3 of 13 PageID #:  47

**U.S. Patent**          Jul. 29, 2014          Sheet 1 of 7          US 8,792,008 B2



FIG. 1A

Case 2:22-cv-00125-JRG   Document 1-4   Filed 04/27/22   Page 4 of 13 PageID #:  48



FIG. 1B

**U.S. Patent**          Jul. 29, 2014          Sheet 3 of 7          US 8,792,008 B2



FIG. 1C

Case 2:22-cv-00125-JRG   Document 1-4   Filed 04/27/22   Page 6 of 13 PageID #:  50

**U.S. Patent**          Jul. 29, 2014          Sheet 4 of 7          US 8,792,008 B2



**FIG. 2A**

Case 2:22-cv-00125-JRG   Document 1-4   Filed 04/27/22   Page 7 of 13 PageID #: 51

**U.S. Patent**       Jul. 29, 2014       Sheet 5 of 7       US 8,792,008 B2



FIG. 2B

Case 2:22-cv-00125-JRG   Document 1-4   Filed 04/27/22   Page 8 of 13 PageID #:  52

**U.S. Patent**          Jul. 29, 2014          Sheet 6 of 7          US 8,792,008 B2



FIG. 3

**U.S. Patent**        Jul. 29, 2014        Sheet 7 of 7        US 8,792,008 B2



FIG. 4

US 8,792,008 B2

**1**

## METHOD AND APPARATUS FOR SPECTRUM MONITORING

### PRIORITY CLAIM

This patent application makes reference to, claims priority to and claims benefit from U.S. Provisional Patent Application Ser. No. 61/532,098 entitled "Method and Apparatus for Spectrum Monitoring" and filed on Sep. 8, 2011.

The above application is hereby incorporated herein by reference in its entirety.

### INCORPORATION BY REFERENCE

This patent application also makes reference to:
U.S. patent application Ser. No. 13/336,451 entitled "Method and Apparatus for Broadband Data Conversion" and filed on Dec. 23, 2011; and
U.S. patent application Ser. No. 13/485,003 entitled "Multi-layer Time-Interleaved Analog-to-Digital Converter (ADC)" and filed on May 31, 2012; and
U.S. patent application Ser. No. 13/588,769 entitled "Multi-Standard Coverage Map Generation" and filed on Aug. 17, 2012.

Each of the above stated applications is hereby incorporated herein by reference in its entirety.

### FIELD OF THE INVENTION

Certain embodiments of the invention relate to signal processing. More specifically, certain embodiments of the invention relate to a method and system for spectrum monitoring.

### BACKGROUND OF THE INVENTION

Network-based services can become unacceptable if network parameters fall outside of those for which receivers in the network were designed. For example, in a cable television system there are specifications for the number of channels on the plant, the types of channels, the signal levels of those channels and the impairments that can be on the plant that would affect the performance of the receiver. If some or all of these parameters deviate outside acceptable bounds, the user may experience unacceptable performance. Conventional methods and apparatuses for monitoring network parameters are too costly and impractical for use in customer-premises equipment (CPE).

Further limitations and disadvantages of conventional and traditional approaches will become apparent to one of skill in the art, through comparison of such systems with some aspects of the present invention as set forth in the remainder of the present application with reference to the drawings.

### BRIEF SUMMARY OF THE INVENTION

A system and/or method is provided for spectrum monitoring, substantially as shown in and/or described in connection with at least one of the figures, as set forth more completely in the claims.

These and other advantages, aspects and novel features of the present invention, as well as details of an illustrated embodiment thereof, will be more fully understood from the following description and drawings.

### BRIEF DESCRIPTION OF SEVERAL VIEWS OF THE DRAWINGS

FIG. **1A** depicts an example cable system in accordance with an example embodiment of the invention.

**2**

FIG. **1B** depicts an example receiver operable to perform spectrum monitoring in accordance with an example embodiment of the invention.

FIG. **1C** depicts an example satellite system in accordance with an example embodiment of the invention.

FIG. **2A** depicts an example RF front-end of a receiver operable to perform spectrum monitoring in accordance with an example embodiment of the invention.

FIG. **2B** depicts another example RF front-end of a receiver operable to perform spectrum monitoring in accordance with an example embodiment of the invention.

FIG. **3** depicts an example channelizer which may be utilized for performing spectrum monitoring in accordance with an example embodiment of the invention.

FIG. **4** is a flow chart illustrating example steps for spectrum monitoring in accordance with an example embodiment of the invention.

### DETAILED DESCRIPTION OF THE INVENTION

As utilized herein the terms "circuits" and "circuitry" refer to physical electronic components (i.e. hardware) and any software and/or firmware ("code") which may configure the hardware, be executed by the hardware, and or otherwise be associated with the hardware. As utilized herein, "and/or" means any one or more of the items in the list joined by "and/or". For example, "x and/or y" means any element of the three-element set $\{(x), (y), (x, y)\}$. Similarly, "x, y, and/or z" means any element of the seven-element set $\{(x), (y), (z), (x, y), (x, z), (y, z), (x, y, z)\}$. As utilized herein, the terms "block" and "module" refer to functions than can be implemented in hardware, software, firmware, or any combination of one or more thereof.

FIG. **1A** depicts an example communication system in accordance with an example embodiment of the invention. Shown in FIG. **1** is a terrestrial television antenna **102**, a satellite dish **104**, an Internet Protocol (IP) network **106**, a headend **108**, a wide area network (e.g., hybrid fiber-coaxial (HFC) network) **118**, a gateways **120a** and **120b**, end systems **126a** and **126b** (e.g., computers), and end systems **128a** and **128b**. The headend **108** comprises a switch **110**, a video modulator **112**, a cable modem termination system (CMTS) **114**, and a splitter/combiner **116**.

For downstream traffic, the headend **108** may receive television signals via the antenna **102** and the satellite dish **104**, and may receive data via the IP network **106**. The switch **110** may convey the television signals to the video modulator **112** and the data to the CMTS **114**. The video modulator **112** may modulate the received television signals onto a carrier. The CMTS **114** may modulate the received data onto a carrier. The splitter/combiner **116** may combine the outputs of the video modulator **112** and the CMTS **114** resulting in a frequency division multiplexed (FDM) signal comprising one or more television channels and/or one or more DOCSIS channels. The FDM signal may be onto the wide area network (WAN) **118** for distribution to customer premise equipment (CPE). Each of the gateways **120a** and **120b** may comprise a receive module **150** operable to process the received FDM signal as described below.

In an example embodiment, each of the gateways **120a** and **120b** may be operable to transmit, via a module **152**, messages to the CMTS **114**. For such upstream data, the gateways **120a** and **120b** may modulate messages (e.g., network management/maintenance messages) onto one or more carriers for transmission via the WAN **118**. The splitter/combiner **116** may then convey the message to the CMTS **114**. The CMTS **114** may process the messages and, in an example embodi-

US 8,792,008 B2

3

ment, adjust transmission parameters (e.g., modulation parameters, transmit power, frequency offsets, etc.) and/or perform other maintenance/management based on the received messages.

FIG. 1B depicts an example receiver operable to perform spectrum monitoring in accordance with an example embodiment of the invention. Shown in FIG. 1B is a receiver circuit 100 comprising an RF receive front-end module 158, a channelizer module 102, a monitoring module 154, and a data processing module 156.

The RF receive front-end 158 may be operable to process a received RF signal S to generate a digital signal D. The signal S may be the result of a plurality of television and/or DOCSIS channels being frequency division multiplexed into a single signal. The signal S may occupy a frequency band from $F_{lo}$ to $F_{hi}$. The RF front-end 158 may, for example, amplify, down-convert, filter, and/or digitize the received signal S to generate the digital signal D. Example embodiments of the RF front-end are depicted in FIGS. 2A and 2B.

The channelizer 102 may be operable to select J+1 bands (represented as $C_1$-$C_{J+1}$) of the signal S and output each of the selected bands to the monitoring module 154 and/or the data processing module 156, where J is an integer greater than 1. An example embodiment of the channelizer 102 is depicted in FIG. 3. Each band $C_j$ may, for example, correspond to the frequency band of one or more television channels. For example, each band $C_j$ may be an integer multiple of 6 MHz (U.S.) or 8 MHz (EU).

In an example embodiment, the channelizer 102 may be implemented entirely in the digital domain and the channelization may be achieved via one or more digital filtering algorithms and/or other digital signal processing algorithms.

The monitoring module 154 may be operable to analyze the band $C_{J+1}$ that it receives from the channelizer 102 to measure/determine characteristics such as, for example, signal power level vs. frequency, delay vs. frequency, phase shift vs. frequency, type and/or amount of modulation, code rate, interference levels, signal to noise ratio, a transfer function of the channel of over which the signal was received, an impulse response of the channel over which the signal was received, and/or any other characteristic that may help assess characteristics of the channel over which the signal was received, assess characteristics of the transmitter that sent the signal and/or any otherwise be pertinent to performance of the communication system. The monitoring module may also be operable to generate one or more control signals 160 for configuring the channelizer 102 and/or for configuring the RF front-end 158. Additionally or alternatively, the control signal(s) 160 output by the monitoring module 154 may control the transmission of network management/maintenance messages by the device 150. Such message may comprise, for example, network status updates indicating whether one or more communication parameters of one or more received television or DOCSIS channels are outside acceptable bounds, and/or conveying measured/determined characteristics back to a source of the received signal (e.g., back to a cable headend). In an example embodiment, the monitoring module 174 may be operable to demodulate signals for measuring one or more characteristics such as signal-to-noise ratio, code rate.

The data processing module 156 may be operable to process the bands $C_1$-$C_J$ conveyed to it by the channelizer 102 to recover data present in one or more television channels present in those bands of the signal S. The data processing module 156 may, for example, perform synchronization, equalization, and decoding. The data processing module 156 may output processed data (e.g., MPEG transport stream

4

packets and/or Internet Protocol packets) to end systems 126, perhaps via an interface such as an HDMI interface and/or an Ethernet interface (not shown). The data processing module 156 may also be operable to generate one or more control signals 162 for configuring the channelizer 102 and/or the receive front-end 158.

The parallel arrangement of the monitoring module 154 and data processing module 156 may enable determination of signal and/or channel characteristics without having to interrupt service to user equipment 126 and 128.

In an example embodiment, the signal S may be a cable television signal with $F_{lo}$≈55 MHz, $F_{hi}$≈1002 MHz. In an example embodiment, the signal S may be a MoCA signal with with $F_{lo}$≈1150 MHz and $F_{hi}$≈2100 MHz. These numbers are purely for illustration and not intended to be limiting.

In an example embodiment, the signal S may be a satellite television signal such as may be at the input of a LNB, at the output of a LNB, or at the input of a indoor unit (e.g., set top box). In such an embodiment, the front-end 158, channelizer 152, data processing module 156, and/or monitoring module 154 may reside in the indoor unit (e.g., set-top box), outdoor unit (e.g., satellite dish or accompanying components), and/or may be distributed among the indoor unit and outdoor unit of a satellite installation residing at a customer premises. An example of such an embodiment is shown in FIG. 1C.

In operation of such an example embodiment, the signal S may be amplified, possibly downconverted, and digitized by the RF front-end 158 to generate the signal D. The channelizer 102 may then select J bands of the signal D for output to the data processing module 156. Each of the selected bands $C_1$-$C_J$ may, for example, comprise one or more of the cable television channels and/or one or more of the DOCSIS channels that make up the signal S. The data processing module 156 may provide one or more control signals to determine which portion of the signal D is selected for each of the bands $C_1$-$C_J$. The selection may be based, for example, on which television channels are being consumed by end systems 128 and/or whether DOCSIS data is being consumed by end systems 126. The channelizer 102 may also select one band, represented as band $C_{J+1}$, to be output to the monitoring module 154. Band $C_{J+1}$ may comprise any portion or portions (including the entire bandwidth from $F_{lo}$ to $F_{hi}$) of the signal D. Which portion of the signal S is selected as band $C_{J+1}$ may, for example, be configured by the monitoring module 154. The data processing module 156 may process one or more of bands $C_1$-$C_J$ to recover data on one or more channels (e.g., television and/or DOCSIS channels) present in those bands while the monitoring module 154 may concurrently process band $C_{J+1}$ to measure/determine characteristics of all or a portion of the signal S between $f_{lo}$ and $f_{hi}$.

FIG. 1C depicts an example satellite system in accordance with an example embodiment of the invention. Shown in FIG. 1C is a satellite dish assembly 172, and a gateway 196. The subassembly 174 comprises a feed horn 182, an LNB 194, the front-end 158, the channelizer 152, the monitoring module 154, and the data processing module 156. The various modules of the subassembly 174 may reside in one or more housings, on one or more printed circuit boards, and/or one or more integrated circuits (e.g., one or more silicon dice). In another example embodiment, the monitoring module 154 and/or the data processing module 156 may reside in the gateway 196.

In the example embodiment depicted, the satellite dish assembly 172 comprises a parabolic reflector 176 and a subassembly 174 mounted (e.g., bolted or welded) to a support structure 178 which, in turn, comprises a boom 190 and attaches (e.g., via bolts) to the premises 180 (e.g., to the roof).

APPX75

US 8,792,008 B2

**5**

In another example embodiment, all or a portion of the modules **152**, **154**, and/or **156** may be mounted to the premises **180** separate from the satellite dish (e.g., connected via wired and/or wireless connections), but may still be part of the "outdoor unit."

The gateway **196** may receive data from the satellite dish assembly **172** (via cable(s) **184**). The gateway and may transmit data onto and receive data from the WAN **192** (via broadband connection **188**). The gateway **196** may transmit data to and receive data from user equipment **128** and **126** (via one or more connections **186**).

FIG. **2A** depicts an example RF front-end of a receiver operable to perform spectrum monitoring in accordance with an example embodiment of the invention. The RF front-end **158A** shown in FIG. **2A** comprises a variable gain amplifier **202**, and receive chains **204₁**-**204_L**, where L is an integer greater than or equal to 1. Each receive chains **204₁** may comprise an amplifier **210₁**, a mixer module **212₁**, a filter module **214₁**, and an analog-to-digital converter (ADC) module **216₁**, where 1 is an integer between 1 and L.

Each amplifier **210₁** may be operable to amplify a band **1** of the signal S. Each mixer **212₁** may be operable to mix a band **1** of the signal S with a local oscillator signal (not shown) to downconvert the band **1** to a lower frequency. Each filter module **214₁** may be operable to bandpass filter the band **1** to remove/attenuate frequencies outside band **1**. Each ADC **216** may be operable to convert the band **1** of the analog signal S to a corresponding digital representation. Operation of the RF front-end **158** and/or processing of signals generated by the front-end **158**, may, for example, be as described in U.S. patent application Ser. No. 13/336,451 entitled "Method and Apparatus for Broadband Data Conversion" which is incorporated by reference herein, as set forth above.

In an example embodiment, the front-end **158A** may reside in a cable gateway such as the cable gateway **120** described above. In an example embodiment, the front-end **158A** may reside in satellite gateway/set-top box and/or in an outdoor unit of a satellite reception assembly (e.g., collocated on-chip or on-PCB with a satellite low-noise block downconverter (LNB)).

FIG. **2B** depicts another example RF front-end of a receiver operable to perform spectrum monitoring in accordance with an example embodiment of the invention. The RF front-end **158B** shown in FIG. **2B** comprises a variable gain amplifier **252**, a filter **254**, and an ADC **256**. Functions performed by the RF front-end **158B** may be referred to as "full-spectrum capture" (or "FSC").

In the front-end **158B**, the entire bandwidth, from $F_{lo}$ to $F_{hi}$, of signal S may be amplified by the amplifier **252** to generate S'. The amplified signal S' may be then filtered by the filter **254** to remove undesired signals outside of $F_{lo}$ to $F_{hi}$ and generate signal S''. The signal S'', from $F_{lo}$ to $F_{hi}$, may then be digitized by the ADC **256** to generate signal D. In an example embodiment, the ADC may be as described in U.S. patent application Ser. No. 13/485,003 entitled "Multi-layer Time-Interleaved Analog-to-Digital Converter (ADC)," which is incorporated by reference herein, as set forth above.

In an example embodiment, the ADC **256** may be capable of digitizing a signal S wherein $F_{lo}$ to $F_{hi}$ is 1 GHz or higher. Accordingly, for cable television/DOCSIS, the ADC **256** may be operable to digitize the entire cable downstream (e.g., from ~55 MHz to ~1002 MHz). Similarly, for satellite television, the ADC **256** may be operable to digitize the received signal at the input of the LNB, and/or the downconverted signal (e.g., from ~1 GHz to ~2 GHz) at the output by an LNB.

FIG. **3** depicts an example channelizer which may be utilized for performing spectrum monitoring in accordance with

**6**

an example embodiment of the invention. Band selection filters **302₁**-**302_J** of the channelizer **102** may each process the signal D to recover a corresponding one of the J selected bands of the signal D, and output the band on a corresponding one of the ports **304₁** to **304_J**. A band selection filter **302_{j+1}** of the channelizer **102** may process the signal D to recover band from the signal D, and output band $C_{J+1}$ on the port **304_{j+1}**. Which band or bands are selected by the filter **302_{j+1}** may be configured based on one or more control signals input to the channelizer **102**. For example, the value of a parameter k may determine the center frequency of the portion of signal D that is to be selected as by the filter **302_{j+1}**, and the value of Δ may determine the bandwidth of the portion of this signal D that is selected as band $C_{J+1}$ for output on the port **304_{j+1}**. In this manner, all of the signal D between $F_{lo}$ and $F_{hi}$ or any portion or portions of the signal D, may be selected for output on the port **304_{j+1}**.

FIG. **4** is a flow chart illustrating example steps for spectrum monitoring in accordance with an example embodiment of the invention. After start step **402**, in step **404**, the receiver circuit **100** may receive a frequency-division multiplexed (FDM) signal comprising one or more channels (e.g., satellite television channels, cable television channels, and/or DOCSIS channels) occupying a frequency band between $F_{lo}$ and $F_{hi}$. In step **406**, the received FDM signal is digitized across the full band from $F_{lo}$ to $F_{hi}$. In step **408**, the digitized signal is channelized into one or more bands. In step **410**, a first one or more of the bands are conveyed to a data processing module. In step **412** a second one or more of the bands are output to a monitoring module. In step **414**, the data processing module processes one or more of the first one or more bands to recover data on those bands while the monitoring module concurrently processes the second one or more bands to determine characteristics of all or a portion of the frequency band from $F_{lo}$ to $F_{hi}$.

Other embodiments of the invention may provide a non-transitory computer readable medium and/or storage medium, and/or a non-transitory machine readable medium and/or storage medium, having stored thereon, a machine code and/or a computer program having at least one code section executable by a machine and/or a computer, thereby causing the machine and/or the computer to perform the steps as described herein for spectrum monitoring

Accordingly, the present invention may be realized in hardware, software, or a combination of hardware and software. The present invention may be realized in a centralized fashion in at least one computing system, or in a distributed fashion where different elements are spread across several interconnected computing systems. Any kind of computing system or other apparatus adapted for carrying out the methods described herein is suited. A typical combination of hardware and software may be a general-purpose computing system with a program or other code that, when being loaded and executed, controls the computing system such that it carries out the methods described herein. Another typical implementation may comprise an application specific integrated circuit or chip.

The present invention may also be embedded in a computer program product, which comprises all the features enabling the implementation of the methods described herein, and which when loaded in a computer system is able to carry out these methods. Computer program in the present context means any expression, in any language, code or notation, of a set of instructions intended to cause a system having an information processing capability to perform a particular function either directly or after either or both of the following: a)

US 8,792,008 B2

7                                                               8

conversion to another language, code or notation; b) repro-
duction in a different material form.

While the present invention has been described with refer-
ence to certain embodiments, it will be understood by those
skilled in the art that various changes may be made and
equivalents may be substituted without departing from the
scope of the present invention. In addition, many modifica-
tions may be made to adapt a particular situation or material
to the teachings of the present invention without departing
from its scope. Therefore, it is intended that the present inven-
tion not be limited to the particular embodiment disclosed,
but that the present invention will include all embodiments
falling within the scope of the appended claims.

What is claimed is:

**1**. A system comprising:
an analog-to-digital converter operable to digitize a
received signal spanning an entire television spectrum
comprising a plurality of television channels, said digi-
tization resulting in a digitized signal;
a signal monitor operable to:
analyze said digitized signal to determine a characteris-
tic of said digitized signal; and
report said determined characteristic to a source of said
received signal;
a data processor operable to process a television channel to
recover content carried on the television channel; and
a channelizer operable to:
select a first portion of said digitized signal;
select a second portion of said digitized signal; and
concurrently output said first portion of said digitized
signal to said signal monitor and said second portion
of said digitized signal to said data processor.

**2**. The system of claim **1**, wherein said first portion of said
digitized signal spans said entire television spectrum.

**3**. A method comprising:
performing by one or more circuits:
receiving a signal having a bandwidth that spans from a
first frequency, $F_{lo}$, to a second frequency, $F_{hi}$,
wherein said signal carries a plurality of channels;
digitizing said received signal from $F_{lo}$ to $F_{hi}$ to generate
a digitized signal;
selecting a first portion of said digitized signal;
selecting a second portion of said digitized signal; and
concurrently outputting said selected first portion and
said selected second portion, wherein:
said selected first portion is output to a signal analyzer
which analyzes said selected first portion to deter-
mine one or more characteristics of the received
signal, and which reports said determined one or
more characteristics to a source of said received
signal; and
said selected second portion is output to a data pro-
cessor for recovery of data carried on one or more
of said plurality of channels.

**4**. The method of claim **3**, wherein said first portion com-
prises all of said received signal from $F_{lo}$ to $F_{hi}$.

**5**. The method of claim **3**, wherein said one or more char-
acteristics is one of: signal power vs. frequency, phase vs.
frequency, signal-to-noise ratio, peak-to-average ratio, noise
levels, bit error rate, and symbol error rate.

**6**. The method of claim **3**, wherein:
said received signal is a cable television signal; and
said plurality of channels comprises a plurality of televi-
sion channels.

**7**. The method of claim **3**, wherein:
said received signal is a satellite television signal output by
a low noise block downconverter; and
said plurality of channels comprises a plurality of televi-
sion channels.

**8**. The method of claim **7**, wherein said one or more circuits
reside in a customer premises satellite reception assembly.

**9**. The method of claim **3**, wherein said one or more circuits
reside in a customer premises gateway.

**10**. The method of claim **3**, wherein a bandwidth and/or
center frequency of said selected first portion is configurable
during operation of said one or more circuits.

**11**. A system comprising:
one or more circuits that are operable to:
receive a signal having a bandwidth that spans from a
first frequency, $F_{lo}$, to a second frequency, $F_{hi}$,
wherein said signal carries a plurality of channels;
digitize said received signal from $F_{lo}$ to $F_{hi}$ to generate a
digitized signal;
select a first portion of said digitized signal;
select a second portion of said digitized signal; and
concurrently output said selected first portion and said
selected second portion, wherein:
said selected first portion is output to a signal analyzer
that is operable to analyze said first portion to deter-
mine one or more characteristics of said first por-
tion, and that is operable to report said determined
one or more characteristics to a source of said
received signal; and
said selected second portion is output to a data pro-
cessor for recovery of data carried on one or more
of said plurality of channels.

**12**. The system of claim **11**, wherein said first portion
comprises all of said received signal from $F_{lo}$ to $F_{hi}$.

**13**. The system of claim **11**, wherein said one or more
characteristics is one of: signal power vs. frequency, phase vs.
frequency, signal-to-noise ratio, peak-to-average ratio, noise
levels, bit error rate, and symbol error rate.

**14**. The system of claim **11**, wherein:
said received signal is a cable television signal; and
said plurality of channels comprises a plurality of televi-
sion channels.

**15**. The system of claim **11**, wherein:
said received signal is a satellite television signal output by
a low noise block downconverter; and
said plurality of channels comprises a plurality of televi-
sion channels.

**16**. The system of claim **15**, wherein said one or more
circuits reside in a customer premises satellite reception
assembly.

**17**. The system of claim **11**, wherein said one or more
circuits reside in a customer premises gateway.

**18**. The system of claim **11**, wherein a bandwidth and/or
center frequency of said selected first portion is configurable
during operation of said one or more circuits.

\* \* \* \* \*

# EXHIBIT D

US009210362B2

(12) **United States Patent**     (10) **Patent No.:**   **US 9,210,362 B2**
Reddy et al.     (45) **Date of Patent:**   ***Dec. 8, 2015**

(54) **WIDEBAND TUNER ARCHITECTURE**

(71) Applicant: **MaxLinear, Inc.**, Carlsbad, CA (US)

(72) Inventors: **Madhukar Reddy**, Carlsbad, CA (US); **Curtis Ling**, Carlsbad, CA (US); **Tim Gallagher**, Carlsbad, CA (US)

(73) Assignee: **MaxLinear, Inc.**, Carlsbad, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **14/614,543**

(22) Filed: **Feb. 5, 2015**

(65) **Prior Publication Data**

US 2015/0156535 A1   Jun. 4, 2015

**Related U.S. Application Data**

(63) Continuation of application No. 13/962,871, filed on Aug. 8, 2013, which is a continuation of application No. 12/762,900, filed on Apr. 19, 2010, now Pat. No. 8,526,898.

(60) Provisional application No. 61/170,526, filed on Apr. 17, 2009.

(51) **Int. Cl.**
    *H04B 1/16*     (2006.01)
    *H04N 5/50*     (2006.01)
    *H04B 1/00*     (2006.01)

(52) **U.S. Cl.**
    CPC ............... *H04N 5/50* (2013.01); *H04B 1/0014* (2013.01); *H04N 21/4263* (2013.01); *H04N 21/4383* (2013.01); *H04N 21/454* (2013.01); *H04N 21/6193* (2013.01)

(Continued)

(58) **Field of Classification Search**
    USPC ......... 455/131, 140, 207, 214, 313, 315, 323, 455/324, 325, 334
    See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,280,636 A * 1/1994 Kelley et al. .................. 455/131
6,906,498 B2 6/2005 Breuch et al.

(Continued)

FOREIGN PATENT DOCUMENTS

EP     2087623 A2   8/2009

OTHER PUBLICATIONS

Jeffrey A. Weldon, et al. A 1.75-GHz Highly Integrated Narrow-Band CMOS Transmitter With Harmonic-Rejection Mixers, IEEE Journal of Solid-State Circuits, Dec. 2001, pp. 2003-2015, vol. 36, No. 12, Seattle, Washington.

*Primary Examiner* — Blane J Jackson
(74) *Attorney, Agent, or Firm* — McAndrews, Held & Malloy, Ltd.

(57) **ABSTRACT**

A wideband receiver system comprises a mixer module, a wideband analog-to-digital converter (ADC) module, and digital circuitry. The mixer module is configured to downconvert a plurality of frequencies that comprises a plurality of desired television channels and a plurality of undesired television channels. The wideband ADC module is configured to digitize the swatch of frequencies comprising the plurality of desired television channels and the plurality of undesired television channels. The digital circuitry is configured to select the desired plurality of television channels from the digitized plurality of frequencies, and output the selected plurality of television channels to a demodulator as a digital datastream.

**20 Claims, 10 Drawing Sheets**



**US 9,210,362 B2**

Page 2

---

(51) **Int. Cl.**
    *H04N 21/426*    (2011.01)
    *H04N 21/438*    (2011.01)
    *H04N 21/454*    (2011.01)
    *H04N 21/61*    (2011.01)

(56)         **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 6,992,855 B2 | 1/2006 | Ehrlich |
| 7,095,454 B2 | 8/2006 | Waight et al. |
| 7,167,694 B2 | 1/2007 | Khoini-Poorfard et al. |
| 7,362,178 B2 | 4/2008 | Montemayor et al. |
| 7,373,125 B2 | 5/2008 | Godambe et al. |

| | | | |
|---|---|---|---|
| 7,421,259 B2 | 9/2008 | Gomez et al. | |
| 7,599,673 B2 * | 10/2009 | Maxim et al. | 455/179.1 |
| 8,285,240 B2 | 10/2012 | Seendripu et al. | |
| 8,300,681 B2 | 10/2012 | Petrovic et al. | |
| 8,374,568 B2 | 2/2013 | Seendripu et al. | |
| 8,374,569 B2 | 2/2013 | Seendripu et al. | |
| 8,374,570 B2 | 2/2013 | Seendripu et al. | |
| 8,526,898 B2 * | 9/2013 | Reddy et al. | 455/207 |
| 8,577,319 B2 | 11/2013 | Ling et al. | |
| 8,666,350 B2 | 3/2014 | Vauhkonen | |
| 8,909,187 B2 | 12/2014 | Seendripu et al. | |
| 9,059,672 B2 | 6/2015 | Ling et al. | |
| 2005/0040909 A1 | 2/2005 | Waight et al. | |
| 2007/0042742 A1 | 2/2007 | Kim et al. | |
| 2007/0111661 A1 | 5/2007 | Bargroff et al. | |

* cited by examiner

Case 2:22-cv-00125-JRG   Document 1-5   Filed 04/27/22   Page 4 of 20 PageID #:  61

**U.S. Patent**    Dec. 8, 2015    Sheet 1 of 10    US 9,210,362 B2



FIG. 1
(Prior Art)

Case 2:22-cv-00125-JRG   Document 1-5   Filed 04/27/22   Page 5 of 20 PageID #:  62



FIG. 2

Case 2:22-cv-00125-JRG   Document 1-5   Filed 04/27/22   Page 6 of 20 PageID #:  63

**U.S. Patent**       Dec. 8, 2015       Sheet 3 of 10       US 9,210,362 B2



FIG. 3

APPX83

Case 2:22-cv-00125-JRG   Document 1-5   Filed 04/27/22   Page 7 of 20 PageID #: 64

**U.S. Patent**      Dec. 8, 2015      Sheet 4 of 10      US 9,210,362 B2



FIG. 4

**U.S. Patent**　　　Dec. 8, 2015　　　Sheet 5 of 10　　　US 9,210,362 B2



FIG. 5

Case 2:22-cv-00125-JRG   Document 1-5   Filed 04/27/22   Page 9 of 20 PageID #: 66



FIG. 6

Case 2:22-cv-00125-JRG   Document 1-5   Filed 04/27/22   Page 10 of 20 PageID #: 67



FIG. 7

Case 2:22-cv-00125-JRG   Document 1-5   Filed 04/27/22   Page 11 of 20 PageID #: 68

**U.S. Patent**          Dec. 8, 2015          Sheet 8 of 10          US 9,210,362 B2



FIG. 8

Case 2:22-cv-00125-JRG   Document 1-5   Filed 04/27/22   Page 12 of 20 PageID #: 69

**U.S. Patent**          Dec. 8, 2015          Sheet 9 of 10          US 9,210,362 B2



FIG. 9

Case 2:22-cv-00125-JRG   Document 1-5   Filed 04/27/22   Page 13 of 20 PageID #:  70

**U.S. Patent**     Dec. 8, 2015     Sheet 10 of 10     US 9,210,362 B2



FIG. 10

APPX90

US 9,210,362 B2

1

## WIDEBAND TUNER ARCHITECTURE

### PRIORITY CLAIM

This application is a continuation of U.S. patent application. Ser. No. 13/962,871 filed on Aug. 8, 2013, which is a continuation of U.S. patent application Ser. No. 12/762,900 filed on Apr. 19, 2010 (now U.S. Pat. No. 8,526,898), which claims the benefit of priority to U.S. provisional application 61/170,526 filed Apr. 17, 2009. Each of the above referenced documents is hereby incorporated by reference in its entirety.

### BACKGROUND

This invention relates to wideband receiver systems and methods having a wideband receiver that is capable of receiving multiple radio frequency channels located in a broad radio frequency spectrum. In particular, the invention relates to wideband receiver systems that are capable of receiving multiple television channels that extend over multiple non-contiguous portions of the broad frequency spectrum and grouping them into a contiguous, or substantially-contiguous, frequency spectrum.

Receivers used to down-convert and selectively filter TV channels are referred to as tuners, and tuners designed to concurrently receive several TV channels are referred to as wideband tuners. Existing tuners for these applications down-convert a swath of channels to an intermediate frequency, which are then sent to a demodulator. Because the swath of channels is not contiguous, this swath includes the desired channels as well as undesired channels. The demodulator employs a high-speed data converter to capture this swath of desired and undesired channels in the digital domain and subsequently filters out the desired channels.

In general, television channels broadcasted over the air or over cable networks are distributed across a broad frequency spectrum. That is, the channel frequencies may not be adjacent to each other. In certain applications such as DVR and picture-in-picture, the receiver system may have to concurrently receive several desired channels that may or may not be contiguous. The wideband receiver requirement poses a trade-off to the system to limit either the dynamic range of the wideband tuner or reduce the bandwidth covered by the tuner so that fewer channels may be received and processed by the demodulator.

FIG. 1 shows a conventional wideband tuner 100. Tuner 100 may be a direct conversion tuner and includes a low noise amplifier LNA1 having an input terminal coupled to a radio frequency (RF) input signal 102 and an output terminal coupled to a mixer M1. The RF signal may include one or more television channels receiving from a cable network via an RF connector or wirelessly via an antenna. The RF input signal may include the VHF and UHF television channels in a terrestrial television broadcasting system and the CATV channels in cable networks. In order to receive all broadcasted channels present in the RF input signal, LNA1 must necessarily have a wide tuning range, high linearity, and low noise. Mixer M1 is coupled to a synthesizer S1 that can generate an oscillator frequency located around the center of the RF signal. Mixer M1 frequency down-converts the received RF input signal to a more convenient intermediate frequency (IF) band. Tuner 100 includes an amplifier V1 having a programmable gain for amplifying the IF signal, which is then band-pass filtered by a filter F1 before outputting to a demodulator.

In general, the RF signal includes multiple desired channels that are located in non-contiguous portions of a radio frequency spectrum. As shown in FIG. 1, the swath of chan-

2

nels 110 occupies a bandwidth BW1 120 at an RF center frequency $f_{rfc}$ 130. Synthesizer S1 may be tuned to a frequency around the center frequency $f_{rfc}$ 130 for mixing channels 110 to an intermediate frequency $f_{ifc}$ 160, the frequency down-mixed channels 140 are amplified by amplifier V1 and then filtered by F1 to produce a swath of channels 170 centered around frequency $f_{ifc}$ 160. In an exemplary application shown in FIG. 1, bandwidth BW1 contains 10 channels. In the case where channels are TV channels that are spaced at either 6 MHz or 8 MHz in most parts of the world, bandwidth BW1 120 would span from 60-80 MHz, i.e., the down-converted bandwidth at the intermediate frequency would require a bandwidth equal to at least BW1, or at least 80 MHz when such architecture is used. It is noted that in other applications where the desired RF channels are located in the low band such as channels numbers 2 to 6 (VHF in the terrestrial TV broadcast or CATV) and in the high band such as channels numbers 14 to 83 of the UHF TV broadcast or channel numbers 63-158 of the CATV's ultra band, the bandwidth BW1 can be 800 MHz or higher. This wide bandwidth of 800 MHz would require a very expensive digital processing circuitry such as very high-speed analog to digital conversion and high-speed processor in the demodulator.

It is desirable to have wideband receiver systems that can increase the dynamic range without requiring expensive data conversion, filtering and channel selection at the demodulator.

### BRIEF SUMMARY

An embodiment of the present invention includes a wideband receiver system that is configured to concurrently receive multiple radio frequency (RF) channels including a number of desired channels that are located in non-contiguous portions of a frequency spectrum and group the desired channels in a contiguous or substantially-contiguous frequency band at an intermediate frequency spectrum, where the term "substantially-contiguous" includes spacing the desired channels close to each other (e.g. as a fraction of the total system bandwidth, or relative to a channel bandwidth) but with a spacing that can be variable to accommodate the needs of overall system. The term "contiguous" heretofore encompasses "substantially-contiguous." The term "spacing" is referred to as the frequency difference between adjacent channels. The system includes a wideband receiver having a complex mixer module for down-shifting the multiple RF channels and transforming them to an in-phase signal and a quadrature signal in the baseband or low intermediate frequency (IF) band. The system further includes a wideband analog-to-digital converter module that digitizes the in-phase and quadrature signals. The digital in-phase and quadrature signals are provided to a digital frontend module that contains a bank of complex mixers that frequency-shift the number of desired channels to a baseband where the desired channels are individually filtered.

The digital frontend module may also include a decimator module that decimates the desired RF channels by a factor M before demodulating them to a digital data stream.

In certain embodiments of the present invention, the wideband receiver system additionally includes an up-converter module having multiple complex up-mixers, each of the complex up-mixers is configured to frequency up-shift each one of the desired RF channels to a sub-portion of an IF spectrum, wherein all sub-portions of the desired channels are adjacent to each another and form a contiguous frequency band in the IF spectrum. The act of frequency shifting the desired channels to the IF spectrum allows the wideband receiver system

US 9,210,362 B2

**3**

to directly interface with commercially available demodulators. Allowing the spacing of the desired channels in the contiguous spectrum to be variable allows a system to optimize placement of these desired channels for the purposes of avoiding sensitive portions of the spectrum which may either be vulnerable to spurious signals and interference; or which may generate interference directly or as a harmonic product, to other systems.

In another embodiment of the present invention, a multi-tuner receiver system having two or more tuners is provided to receive multiple desired RF channels that extend over several non-contiguous sub-portions of a broad frequency spectrum and group them into a contiguous frequency spectrum. The multi-tuner system includes at least a first tuner that processes a first sub-portion of the broad frequency spectrum into a first in-phase signal and a first quadrature signal and a second tuner that processes a second sub-portion of the broad frequency spectrum into a second in-phase signal and a second quadrature signal. The multi-tuner receiver system further includes a first analog-to-digital converter module that digitizes the first in-phase and quadrature signals and a second analog-to-digital converter module that digitizes the second in-phase and quadrature signals. In addition, the multi-tuner system includes a first digital frontend module having a first number of complex mixers corresponding to a first number of the desired RF channels located in the first sub-portion of the broad frequency spectrum and a second digital frontend module having a second number of complex mixers corresponding to a second number of the desired RF channels located in the second sub-portion of the broad frequency spectrum. The first digital frontend module frequency shifts the first number of the desired RF channels to a first plurality of baseband signals and the second digital frontend module frequency shifts the second number of the desired RF channels to a second plurality of baseband signals.

The multi-tuner system further includes a first up-converter module having a plurality of N complex mixers, wherein N is an integer value equal to the number of desired channel. The first up-converter module frequency up-shifts the first plurality of the baseband signals to a first portion of an intermediate frequency. In addition, the multi-tuner system includes a second up-converter module that frequency up-shifts the second plurality of the baseband signals to a second portion of an intermediate frequency. The first and the second portions of the intermediate frequency are non-overlapping and located adjacent to each other to form a contiguous intermediate frequency (IF) band. The multi-tuner system further includes a digital-to-analog converter that converts the contiguous IF band to an analog waveform signal.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a schematic block diagram of a conventional wideband tuner;

FIG. **2** is a schematic block diagram of a wideband receiver system according to an embodiment of the present invention;

FIG. **3** is a simplified circuit diagram of a complex down-mixer according to an embodiment of the present invention;

FIG. **4** is a simplified schematic block diagram of a wide-band receiver system according to another embodiment of the present invention;

FIG. **5** is a simplified circuit diagram of a complex up-mixer according to an embodiment of the present invention;

FIG. **6** is a simplified schematic block diagram of a wide-band multi-tuner receiver system according to an embodiment of the present invention;

**4**

FIG. **7** is a block diagram illustrating an exemplary digital front end according to an embodiment of the present invention in more detail;

FIG. **8** is a block diagram illustrating an exemplary tiled up-converter module according to an embodiment of the present invention in more detail;

FIG. **9** is a simplified block diagram of a wideband multi-tuner receiver system **900** according to an embodiment of the present invention; and

FIG. **10** is a simplified block diagram of a wideband multi-tuner receiver system **1000** according to another embodiment of the present invention.

DETAILED DESCRIPTION

FIG. **2** is a schematic block diagram of a wideband receiver system **200** according to an embodiment of the present invention. Wideband receiver system **200** includes a radio front end **210** and a digital front end **230**. Radio front end **210** may be a single very wide-band tuner that captures the desired swath of channels located in non-contiguous portions of the spectrum having a frequency bandwidth BW1 **120**. In this example, the number of available channels in BW1 **120** is assumed to be 10 with each channel occupying an 8 MHz bandwidth for a total of 80 MHz. Radio front end **210** is shown as including a low noise amplifier LNA **202** having an input terminal configured to receive an RF input signal **102**. In the example shown, RF signal **102** includes four desired RF channels having the respective carrier frequency $f_{rf1}$, $f_{rf2}$, $f_{rf3}$, and $f_{rf4}$ that are located in non-contiguous portions of the wide frequency spectrum BW1. It is understood, however, that spectrum BW1 **120** may have any other number of desired frequencies that are not contiguous. LNA **202** has a very low noise figure and very high linearity and a wide tuning range (i.e., very high IIP2 and IIP3 intercept points) to maximize a signal-to-noise-and distortion ratio (SNDR) at the amplifier output. LNA **202** may have a programmable gain to amplify RF signal **102** to adequate voltage levels for mixers M1 **211** and M2 **221**.

Mixers M1 **211** and M2 **221** may be conventional mixers formed using, for example, differential Gilbert cells. Each of the mixers **211** and **221** multiplies (mixes) an amplified RF signal **203** with a respective first oscillator frequency signal **205** and a second oscillator frequency signal **207** to generate an in-phase signal **212** and a quadrature signal **222** that have a phase shift of 90° degree between them. Mixers **211** and **221** are identical so that the amplitude of the in-phase signal **212** and quadrature signal **222** are the same. The first and second oscillator frequencies **205** and **207** are identical and have a 90° degree phase shift generated through a 90° degree phase shifter P1 **206**. Synthesizer S1 may be a single local oscillator operable to generate the oscillator frequency **205** for converting the receive RF signal **102** to a zero-IF or low-IF band. Synthesizer S1 can be a coarse (large step) phase locked loop. Synthesizer S1 can also be programmable to cover the wide-band frequency of the analog and digital terrestrial broadcast and/or the cable television system. The RF signal **102** may have relatively uniform signal strength in a cable network. However, its signal strength may extend in several orders of magnitude in a terrestrial broadcast system, thus, LNA **202** and/or mixers M1 **211**, M2 **221** are required to have a relatively high dynamic range to handle the large variations in the signal strength.

In-phase signal **212** and quadrature signal **222** are further amplified and filtered by respective amplifiers V1 **213**, V2 **223** and filters F1 **215**, F2 **225** to generate a filtered in-phase signal **216** and a filtered quadrature signal **226**. Filters F1 **215**

US 9,210,362 B2

| 5 | 6 |

and F2 **225** may be passive or active low-pass filters to filter out any unwanted frequency components of the signals **214** and **224** before digitizing them for further processing in digital front end **230**. It is understood that the in-phase path **216** and the quadrature path **226** must have the same amplitude spectrum and maintain a fixed phase relationship, i.e., amplifiers V1 **213**, V2 **223** and filters F1 **215**, F2 **225** must be substantially identical. Because the two paths **216** and **226** are in quadrature, the spectral components from both positive and negative frequencies can be overlaid so that the bandwidth (cutoff frequency) of filters F1 **215** and F2 **225** can be one half of the BW1 bandwidth **120**.

Analog-to-digital converters ADC1 **218** and ADC2 **228** are high-speed (i.e., high sampling rate) converters to maximize the dynamic range. In an exemplary application, radio front end **210** operates as a nominal zero-IF down-mixer so that signals **216** and **226** have a nominal bandwidth **290** equal to one half of the RF signal bandwidth BW1 thanks to the complex down-mixer architecture. In other embodiment, radio front end **210** operates as a low-IF down-mixer so that the nominal bandwidth **290** of signals **216** and **226** is greater than one half of the bandwidth BW1. In practice, the sampling rate of ADC1 **218** and ADC2 **228** is chosen to be higher than the Nyquist sampling requirement, i.e., the filtered analog quadrature signals **216** and **226** may be over-sampled in order to reduce or avoid aliasing of undesired signals into the digitized I and Q signals.

ADC1 **218** generates a digital signal I **232** that is a digital representation of the analog filtered signal **216**; ADC2 **228** generates a digital signal Q **242** that is a digital representation of the analog filtered signal **226**. Digital signals I **232** and Q **242** are then applied to a bank of N complex mixers **250**, wherein N is an integer value corresponding to the number of desired RF channels located in the non-contiguous portions of the frequency spectrum BW1. It is understood that the number N can be any integer value. In one embodiment, N can be equal to the number of all available channels that exist in the licensed frequency spectrum to provide system flexibility. In other embodiments, N can be equal to the number of all receivable channels within a geographic area. In yet another embodiment, N can be an integer value less than the number of receivable channels with the geographic area to reduce system costs. In the exemplary embodiment shown in FIG. 2, the number of desired channels is 4. That is, each of the 4 complex mixers **250** mixes in-phase and quadrature signals **232** and **242** with an associated frequency to generate a corresponding baseband, which is then individually filtered, decimated and provided to an associated demodulator.

Each of the N complex mixers **250** receives the digital signals I **232** and Q **242** from ADCs **218** and **228** to extract a different one of the desired channels and frequency-shifts the extracted signals to the baseband frequency. Each of the frequency shifted desired channels **252** is filtered by an associated filter module (identified as **260**a to **260**n). In an embodiment, each of the filtered signals **260**a to **260**n may be sent directly to an associated demodulator (identified as **270**a to **270**n) for extracting the original information transmitted in the associated desired channel. In another embodiment, each of the filtered signals **262**a to **262**n is further decimated before providing to a demodulator, as shown in FIG. 2. This approach provides several advantages over conventional described in more detail below.

FIG. 3 is a simplified circuit diagram of one of the signal paths **272**a to **272**n of digital front end **230** shown in FIG. 2 according to an embodiment of the present invention. In an embodiment, digital signal I **232** may be further filtered by a filter **311** to obtain a filtered signal **312**. Similarly, digital signal Q **242** may be further filtered by a filter **321** to obtain a

filtered signal **322**. Thus, digital signals **312** and **322** only contain low-frequency components with undesired high-frequency components being eliminated by respective filters **311** and **321**. It is noted that filtered signals **312** and **322** are interposed between the respective ADCs **218**, **228** and the bank of N complex mixers **250**.

Mixer **300**, which represents one of the N complex mixers **250**, includes four multipliers **313**, **315**, **323**, and **325**. Multipliers **313** and **315** multiply the filtered signal **312** with respective $\cos(\omega_{ci}t)$ and $\sin(\omega_{ci}t)$ signals and generate respective products **314** and **316**. Similarly, multipliers **323** and **325** multiply the filtered Q signal **322** with respective $\cos(\omega_{ci}t)$ and $\sin(\omega_{ci}t)$ signals and generate respective products **324** and **326**. An adder **317** sums the products **314** and **326** to generate a frequency-shifted signal I **318**. An adder **327** sums the products **324** and **316** to generate a frequency-shifted signal Q **328**. Basically, complex mixer **300** causes a frequency shift of the filtered components **312** and **322** to respective baseband signals **318** and **328** in the digital domain according to the operation:

$$Y(t){=}X(t){\bullet}e^{-j\omega_{ci}t} \qquad (1)$$

or taken the Fourier transform, we obtain:

$$Y(\omega){=}X(\omega{-}\omega_c) \qquad (2)$$

Multipliers **313**, **315**, **323**, and **325** are identical digital multipliers. In an embodiment, a numerically controlled oscillator with quadrature output generates the $\cos(\omega_{ci}t)$ and $\sin(\omega_{ci}t)$ signals. Numerically controlled oscillators (NCO) can be implemented using a phase accumulator and a look-up table. NCOs are known to those of skill in the art and will not be described herein. The frequency $\omega_{ci}$ is so chosen that each one of the desired channels embedded in the digital signals I **232** and Q **242** will be downshifted to the baseband. In the given example shown in FIG. 2, the bank of N complex mixers will have four complex mixers, each one of the N (i.e., four) complex mixers is coupled to an individual NCO having a distinct frequency $\omega_{ci}$ so that when mixing the filtered digital I and Q signals **312** and **322** with that frequency, each one of the complex mixers will generate the signals I (**318**) and Q (**328**) of a corresponding one of the desired channels at the baseband.

In an embodiment, baseband signals **318** and **328** are further individually filtered by respective filters **330** and **340** that are identified as one of the filters **260**a-n in FIG. 2. Filters **330** and **340** may be band-pass or low-pass filters having a narrow bandwidth equal to the bandwidth of a desired channel. In certain embodiments, filters **330** and **340** can be analog passive or active low-pass or complex band-pass filters such as polyphase filters. In another embodiment, filters **330** and **340** can be digital low-pass filters, such as finite impulse response (FIR) filters to eliminate high frequency components that may be aliased back to the baseband signals Ii (**332**) and Qi (**342**) when decimated by subsequent decimator **350**.

The reduced sampling rate of the N desired baseband channels will be sent as a serial or parallel digital data stream to a demodulator using a serial or parallel data interface according to commonly known methods, as shown in FIG. 2. This approach provides several advantages over conventional tuner architectures. First, it eliminates the need of expensive data conversion, filtering and channel selection on the demodulator side. Second, it removes undesired channels from the signal path at an early stage, thus relieves the large dynamic range requirement in the demodulator.

FIG. 4 shows a simplified schematic block diagram of a wideband receiver system **400** according to another embodiment of the present invention. Wideband receiver system **400**

US 9,210,362 B2

7

includes a radio front end **410**, a digital front end **430**, a tiled up-conversion module **450**, and a summing digital-to-analog converter module DAC **470**. Radio front end **410** includes a low noise amplifier LNA1 that receives an RF input signal **102** and provides an amplified RF signal **403** to mixers M1 **411** and M2 **421**. Mixer M1 **411** is coupled to an oscillator frequency **405** of a synthesizer S1 whereas mixer M2 **421** is coupled with the oscillator frequency **405** via a phase shifter P1 **406** that generates a 90° degree phase-shift to the oscillator frequency **405**. Mixers M1 **411** and M2 **421** generate respective in-phase signal **412** and quadrature signal **422** that are further amplified by respective amplifiers V1 **413** and V2 **423**. The amplified in-phase and quadrature signals **414**, **424** are then filtered by filters F1 **415** and F2 **425** to eliminate undesired frequency components that would be aliased back to the in-phase and quadrature signals when digitally sampled by subsequent analog-to-digital converters ADC1 **418** and ADC2 **428**. Digital signals I **422** and Q **442** at the input of digital front end **430** are digital representations of the filtered analog in-phase and quadrature signals **416**, **426** before the ADCs. Digital front end **430** include a bank of N complex mixers **432** comprising **432***a* to **432***n* identical mixers, where N is an integer value corresponding to the number of the desired channels located in non-contiguous portions of the frequency spectrum. Each of the N complex mixers **432***a* to **432***n* frequency down-converts signals I **432** and Q **442** to an associated baseband. Each of the frequency down-converted I and Q signals are coupled to respective low-pass, band-pass, or decimating filters **434**. In this regard, the radio front end **410** and digital front end **430** are similar to respective radio front end **210** and digital front end **230** of FIG. 2 that have been described in detail above.

In an alternative embodiment of the present invention, the N filtered and decimated channels **438***a* to **438***n* (where indices a to n correspond to the associated number of desired channels) are not provided to a demodulator for demodulation. Instead, the N filtered and decimated channels **438***a* to **438***n* are further frequency up-converted to an intermediate frequency (IF) spectrum. In order to achieve that, the N filtered and decimated channels are coupled to a tiled up-conversion module **450** that includes a bank of N complex up-mixers, where N is an integer value correspond to the number of desired received channels. The N complex up-mixers include identical digital mixers **452***a* to **452***n* that will be described further in detail below with reference to FIG. 5. The N up-shifted channels are then filtered by a subsequent bank of channel filters **454** that, in an embodiment, comprises N individual finite impulse response (FIR) filters. The N filtered channels are then digitally combined and converted to the analog domain by a summing digital-to-analog converter module DAC **470**. The N up-shifted channels are adjacent to each other and form a contiguous or substantially-contiguous set of channels **475** in the IF spectrum centered around $f_{if}$ as illustrated in FIG. **4**. In an embodiment, the spectra of the mixed products are spaced in such a way so as to avoid overlap with known frequency bands containing potential or actual interferers. In another embodiment, the spectra of the mixed products are spaced in such a way so as to avoid overlap with frequency bands that might introduce interference to other systems. In general, because the bandwidth $BW_2$ is substantially lower than $BW_1$, the IF frequency $f_{if}$ can be set proportionally lower, e.g., typically about 16 MHz to accommodate the spectrum of BW2 of up to 32 MHz (corresponding to the total bandwidth of the four desired channels, each having a bandwidth of 8 MHz in this example).

The up-conversion approach of FIG. **4** provides several advantages over conventional tuner architectures. First, it

8

allows the demodulator to operate the data converter at a lower data rate and with lower resolution (fewer bits) due to the fact that the contiguous channels have a narrower bandwidth. Second, the up-conversion approach provides full compatibility with existing demodulators that require an analog IF signal. Third, it removes undesired channels from the signal path at an early stage, thus relieves the requirement of a high dynamic range requirement of the demodulator's analog-to-digital converter and the demodulator itself.

FIG. **5** shows a simplified exemplary circuit diagram of a complex up-mixer **500** according to an embodiment of the present invention. Up-mixer **500** is one of the N complex up-mixers **452***a* to **452***n* in tiled up-conversion module **450** shown in FIG. **4**. Up-mixer **500** includes filter **510** and **520** configured to eliminate unwanted frequency components present in respective input signals I **501** and Q **502**. Filtered signals **512** and **522** are provided to up-mixers UMI **515** and UMQ **525** that multiply the filtered signals **512** and **522** with respective $\cos(\omega_x t)$ and $\sin(\omega_x t)$. The products **516** and **526** are summed in an adder **530** to generate an IF signal **532** according to the following equation:

$$IF(t)=I(t)*\cos(\omega_x t)+Q(t)*\sin(\omega_x t) \qquad (3)$$

Up-mixers UMI **515** and UMQ **525** are identical multipliers that multiply the respective filtered signal **512** and **522** with a cosine function **505** and a sine function **506** that can be generated from a NCO using a digital phase accumulator and a look-up table.

As described above, TV channels are grouped into multiple frequency bands in North America. For example, channels 2 through 6 are grouped in VHF-low band (aka band 1 in Europe), channels 7 through 13 in VHF-high band (band III), and channels 14 through 69 in UHF band (bands IV and V). In order to receive such a wide frequency spectrum, the low noise amplifier and mixer must have very low noise, wide tuning range and high linearity as described above in the wideband receiver systems **200** and **400**. However, a wideband receiver having a single tuner with high sensitivity may have a high power consumption. For certain applications, it may be advantageous to use multiple tuners that are optimized for a given frequency band, such as a dedicated tuner for the low VHF band, another dedicated tuner for the high VHF band and the UHF band, and yet other dedicated tuners for receiving the digital video broadcasting (DVB) via satellite (DVB-S), via cable (DVB-C), or terrestrial digital video broadcasting (DVB-T). The multi-tuner approach may also be advantageously applied to cable networks that carry TV programs on an 88 MHz to 860 MHz according to the Data Over Cable Service Interface Specification (DOCSIS) protocol.

FIG. **6** shows a simplified schematic block diagram of a wideband multi-tuner receiver system **600** according to an embodiment of the present invention. In an embodiment, multi-tuner system **600** includes low noise amplifier A1 **602** for receiving an RF input signal **601**. Amplifier A1 **602** is coupled to at least a tuner1 **610** and a tuner2 **720**. In another embodiment, multi-tuner system **600** may not include amplifier **602** so that RF input signal **601** can be received directly at each tuner **610** and **720**.

Tuner1 **610** includes an amplifying filter AF1 **613** that filters and amplifies a first portion BWtuner1 **604** of a broad frequency spectrum **608** that contains a first plurality of RF channels **606** including desired channels **607** having respective channel frequencies $f_{c,i1}$ and $f_{c,i2}$. The first portion of the broad frequency spectrum BWtuner1 **604** is then frequency down-converted to a low-IF or zero-IF in-phase signal I1 **612** and a quadrature signal Q1 **622** through respective mixer M1

US 9,210,362 B2

9

**611** and M2 **621**. Signals I1 **612** and Q1 **622** are further amplified and low-pass filtered before applying to respective analog-to-digital converters ADC1 **618** and ADC2 **628** that convert analog signals Ia1 **616** and Qa1 **626** to respective digital in-phase signal Id1 **631** and digital quadrature signal Qd1 **641**. Because tuner1 **610** only covers a portion BWtuner1 **604** of the entire frequency spectrum **608** having fewer channels, the ADC1 **618** and ADC2 **628** can be slower-speed analog-to-digital converters with a large number of bits, i.e., large dynamic range.

Digital signals Id1 **631** and Qd1 **641** are then provided to a digital front end DFE **630** that includes a first bank of N complex mixers **632** and channel and decimating filters **634**. The first bank of N complex filters **632** has N identical complex mixers, where N is an integer value equal to the number of desired channels located in the first portion BWtuner1 **604** of the broad frequency spectrum **608**. In an embodiment, each one of the first bank of N complex mixers includes four digital mixers that multiply digital stream Id1 **631** and Qd1 **641** with respective digitized cosine function and sine function to generate the sum and difference frequency components, as shown in FIG. **3**. The digitized cosine and sine frequency, i.e., the mixer frequency is so chosen so that when mixing signals Id1 **631** and Qd1 **641** will move them to a baseband or a low-IF band. In an embodiment, channel and decimating filters have similar structures as filters **330** and **340** and demodulator **350** as shown in FIG. **3**. That is, channel and decimating filters include digital low-pass filters **330** and **340** that eliminates unwanted high frequency components of the baseband signals I and Q prior to applying them to a decimator **350** (FIG. **3**) that reduces the sample frequency without any loss of information since Id1 **631** and Qd1 **641** are sampled at a much higher frequency by the respective ADC1 **618** and ADC2 **628**.

The decimated channels are then provided to an up-converter module **650** that includes a bank of N up-mixers. The bank of N up-mixers includes N identical up-mixers whose structure is shown in FIG. **5**. In an embodiment, N is an integer value equal to the number of desired channels present in BWtuner1 **604**. Each one of the up-mixer frequency-shifts the baseband signals I and Q of each one of the desired channels to an appropriate portion of the intermediate frequency band according to Equation (3). In other words, the bank of N up-mixers is "frequency multiplexing" the desired channels onto a first portion **682** of an IF band **686**.

Similarly, tuner2 **720** includes an amplifying filter AF2 **713** that is configured to receive a second portion BWtuner2 **704** of the broad frequency spectrum **608**. The second portion **704** contains a second plurality of RF channels **706** including a second number of desired channels. In the exemplary illustration of FIG. **6**, the second portion **704** has a frequency bandwidth of BWtuner2 that contains desired channels **707** having respective channel frequencies $f_{cr3}$ and $f_{cr4}$. Tuner2 **720** includes elements such as mixers M3 **711**, M4 **721**, amplifiers V3 **714**, V4 **724**, filters F3 **715**, F4 **725** and analog-to-digital converters ADC3 **731** and ADC4 **741** that are substantially the same as the like-named elements of the signal path of tuner1 **610**. Thus, redundant description is omitted herein.

Digital in-phase signal Id2 **731** and digital quadrature signal Qd2 **741** are then provided to digital front end **740**. Digital front end **740** includes a bank of L complex filters, where L is an integer value equal to the number of desired channels in the second portion BWtuner2 **704** of the broad frequency spectrum **608**. Each one of the bank of L complex filters is a digital complex mixer configured to transform the signals Id2 **731** and Qd2 **741** to baseband signals that are further filtered by individual digital low-pass filters such as FIR filters before

10

decimated by a subsequent decimator. The elements of digital front end **740** are substantially similar to those described in digital front end **630**. Thus, redundant description is omitted herein.

The decimated baseband I and Q channels are further provided to a subsequent up-conversion module **760** that performs a function substantially similar to that of the up-conversion module **650** already described above. The outputs of up-conversion module **650** and **760** can be tiled to generate a contiguous set of IF frequencies **682**, **684** centered at $f_{if}$ **686**. In an embodiment, the outputs of up-conversion module **650** and **760** are digitally summed and converted to an analog signal by summing DAC **670**. In another embodiment, the up-conversion modules **650** and **760** and the digital summing function **672** can be performed using an inverse discrete Fourier transform or an inverse Fast Fourier transform operation.

The multi-tuner architecture provides the flexibility that multiple commercially available tuners can be used without the need of designing a wideband tuner. For example, a tuner designed for a terrestrial broadcast digital TV can be used together with a tuner dedicated to receiving a cable signal and/or a tuner for receiving a satellite broadcast signal. The multi-tuner receiver system provides an additional advantage that other tuners can be added quickly to the system to accommodate any future applications. Additionally, the multi-tuner architecture allows the use of slower speed (i.e., lower cost) analog-to-digital converters with a larger number of bits for achieving large dynamic range.

FIG. **7** shows a block diagram of an exemplary digital front end of the invention in more detail. In an embodiment, in-phase signal Id2 **731** and quadrature signal Qd2 **741** at the output of respective ADC converters **718** and **728** are provided to each of the L complex mixers **732** comprising mixers **732**A to **732**L. A more detailed description of each of L complex mixers is shown in FIG. **3**. Mixer **732**A multiplies Id2 **731** and Qd2 **741** with a cosine signal and a sine signal that are generated from an NCO1 and produces an I-**732**A signal and a Q-**732**A signal that are further individually filtered by an FIR filter before decimating. The bank of L complex mixers corresponds to the block **732** in FIG. **6**; and the set of FIR filters and decimator corresponds to the block **734** in FIG. **6**. Each decimated pair of I-**732**i/M in the baseband, where the index "i" is from A to L, is further provided to a subsequent up-mixer for frequency-shifting to an intermediate frequency as shown in FIG. **8**.

FIG. **8** shows an exemplary embodiment of a bank of L complex up-mixers according to the present invention. Each decimated pair of complex signals I-**732**i/M and Q-**732**i/M is provided to an associated complex up-mixer, whose frequency is so chosen that when mixing with the pair of complex signals I-**732**i/M and Q-**732**i/M will generate an associated channel at a predetermined sub-portion of the intermediate frequency band **686** (FIG. **6**). A more detailed schematic block of one of the L up-mixers is described above together with FIG. **5**.

FIG. **9** is a simplified block diagram of a wideband multi-tuner receiver system **900** according to an embodiment of the present invention. In an embodiment, system **900** includes a crossbar switch **910** having at least an input terminal **912** configured to receive signals from an analog-to-digital converter (ADC) **912** and an input terminal **922** configured to receive signals from an ADC **922**. Crossbar switch **910** also includes an output terminal **924** that is coupled to a digital front end **930**. In an embodiment, input terminals **912** and **922** of crossbar switch **910** have P inputs, where P is an integer value that is equal to the total number of desired channels received by tuner1 **610** and tuner2 **720**. Output terminal **924**

US 9,210,362 B2

**11**

of crossbar switch **910** have Q outputs, where Q is an integer value that is equal to the total number of desired channels received by tuned **610** and tuner2 **720**.

In an embodiment, digital front end **930** may include a bank of R complex mixers that frequency shifts the received channels to a baseband. Digital front end **930** may combine digital front end **630** and **740** shown in FIG. **6**. Similarly, a tiled up-conversion module **950** may include up-converter modules **650** and **760** of FIG. **6**.

System **900** further includes a summing DAC that operates similarly as summing DAC **470** and **670** that have been described in detail in relation with respective FIG. **4** and FIG. **6** above. Thus, redundant description is omitted herein.

FIG. **10** is a simplified block diagram of a wideband multi-tuner receiver system **1000** according to another embodiment of the present invention. System **1000** includes at least tuner1 **610** coupled with digital front end **630** through an analog-to-digital converter **620** and tuner2 **720** coupled with digital front end **740** through an analog-to-digital converter **730**. System **1000** further includes a crossbar switch **1010** that is interposed between digital front ends **630**, **740** and up-conversion modules **650**, **760**. Crossbar switch **1010** includes an input terminal **1012** having S inputs coupled with DFE **630** and an input terminal **1022** having T inputs coupled with DFE **740**. In an embodiment, S is an integer value equal to the number of desired channels processed in DFE **630** and T is an integer value equal to the number of desired channels processed in DFE **740**. Crossbar switch **1010** further includes an output terminal **1024** having U outputs coupled with up-converter module **650** and an output terminal **1024** having V outputs coupled with up-converter module **760**. In an embodiment, the total number of the outputs U and V is equal to the sum of the inputs S and T. Thus, crossbar switch **1010** allows the routing of any channel from either DFE **630** or DFE **740** to up-converters **650** or **760**. It is understood that system **1000** is not as flexible as system **900** because DFE **630** and DFE **740** are already pre-assigned to respective tuner1 (**610**) and tuner2 (**720**). However, this pre-assigned arrangement allows a simpler implementation of crossbar switch **1010** that operates at lower speeds.

While several embodiments in accordance with the present invention have been described, it is to be understood that the above description is intended to be illustrative and not restrictive. Many embodiments will be apparent to those of skill in the art upon reviewing the above description. The scope of the invention should, therefore, be determined not with reference to the above description, but instead should be determined with reference to the appended claims along with their full scope of equivalents.

What is claimed is:

**1**. A wideband receiver system comprising:
a mixer module configured to downconvert a plurality of frequencies that comprises a plurality of desired television channels and a plurality of undesired television channels;
a wideband analog-to-digital converter (ADC) module configured to digitize said plurality of frequencies comprising said plurality of desired television channels and said plurality of undesired television channels;
digital circuitry configured to:
    select said plurality of desired television channels from said digitized plurality of frequencies; and
    output said selected plurality of television channels to a demodulator as a digital datastream.

**2**. The wideband receiver system of claim **1**, wherein said output of said digital datastream is via a serial interface.

**12**

**3**. The wideband receiver system of claim **1**, wherein said output of said digital datastream is via a parallel interface.

**4**. The wideband receiver system of claim **1**, wherein said mixer module comprises a first mixer configured to generate an in-phase signal and a second mixer configured to generate a quadrature signal.

**5**. The wideband receiver system of claim **1**, wherein said wideband analog-to-digital converter comprises:
a first ADC configured to generate a digital in-phase signal; and
a second ADC configured to generate a digital quadrature signal.

**6**. The wideband receiver system of claim **5**, wherein said digital circuitry comprises a plurality of complex mixers configured to frequency shift said selected plurality of desired television channels.

**7**. The wideband receiver system of claim **6**, wherein:
prior to said frequency shift, said selected plurality of desired television channels occupy non-contiguous portions of a frequency spectrum; and
after said frequency shift, said selected plurality of desired television channels occupy a contiguous frequency spectrum.

**8**. The wideband receiver system of claim **1**, wherein said digital circuitry comprises a plurality of channel filters configured to perform said selection of said plurality of desired television channels.

**9**. The wideband receiver system of claim **8**, wherein each one of said plurality of channel filters is a finite impulse response filter.

**10**. The wideband receiver system of claim **1**, wherein said digital circuitry comprises a decimator circuit configured to decimate one or more of said selected plurality of television channels prior to said output of said selected plurality of desired television channels.

**11**. A method comprising:
in a wideband receiver system:
    downconverting, by a mixer module of said wideband receiver system, a plurality of frequencies that comprises a plurality of desired television channels and a plurality of undesired television channels;
    digitizing, by a wideband analog-to-digital converter (ADC) module of said wideband receiver system, said plurality of frequencies comprising said plurality of desired television channels and said plurality of undesired television channels;
    selecting, by digital circuitry of said wideband receiver system, said plurality of desired television channels from said digitized plurality of frequencies; and
    outputting, by said digital circuitry of said wideband receiver system, said selected plurality of television channels to a demodulator as a digital datastream.

**12**. The method of claim **11**, comprising outputting, by said digital circuitry of said wideband receiver system, said digital datastream via a serial interface.

**13**. The method of claim **11**, comprising outputting, by said digital circuitry of said wideband receiver system, said digital datastream via a parallel interface.

**14**. The method of claim **11**, comprising:
generating, by a first mixer of said mixer module, an in-phase signal; and
generating, by a second mixer of said mixer module, a quadrature signal.

**15**. The method of claim **11**, comprising:
generating, via a first ADC of said wideband analog-to-digital converter, a digital in-phase signal; and

US 9,210,362 B2

**13**

generating, via a second ADC of said wideband analog-to-digital converter, a digital quadrature signal.

**16**. The method of claim **15**, comprising frequency shifting said selected plurality of desired television channels via a plurality of complex mixers of said digital circuitry.

**17**. The method of claim **16**, wherein:

prior to said frequency shifting, said selected plurality of desired television channels occupy non-contiguous portions of a frequency spectrum; and

after said frequency shifting, said selected plurality of desired television channels occupy a contiguous frequency spectrum.

**18**. The method of claim **11**, wherein said digital circuitry comprises a plurality of channel filters configured to perform said selecting.

**19**. The method of claim **18**, wherein each one of said plurality of channel filters is a finite impulse response filter.

**20**. The method of claim **11**, comprising decimating, by said digital circuitry, one or more of said selected plurality of desired television channels prior to said outputting of said selected plurality of television channels.

**14**

\*    \*    \*    \*    \*

# Exhibit E

US009825826B2

(12) **United States Patent**
Gallagher et al.

(10) Patent No.: **US 9,825,826 B2**
(45) Date of Patent: ***Nov. 21, 2017**

(54) **METHOD AND APPARATUS FOR SPECTRUM MONITORING**

(71) Applicant: **MaxLinear, Inc.**, Carlsbad, CA (US)

(72) Inventors: **Timothy Gallagher**, Encinitas, CA (US); **Patrick Tierney**, Solana Beach, CA (US); **Jun Huang**, San Diego, CA (US)

(73) Assignee: **Maxlinear, Inc.**, Carlsbad, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **14/948,947**

(22) Filed: **Nov. 23, 2015**

(65) **Prior Publication Data**

US 2016/0087865 A1      Mar. 24, 2016

**Related U.S. Application Data**

(63) Continuation of application No. 14/341,880, filed on Jul. 28, 2014, now Pat. No. 9,203,653, which is a continuation of application No. 13/607,916, filed on Sep. 10, 2012, now Pat. No. 8,792,008.

(60) Provisional application No. 61/532,098, filed on Sep. 8, 2011.

(51) **Int. Cl.**
| | |
|---|---|
| *H04N 17/00* | (2006.01) |
| *H04L 12/26* | (2006.01) |
| *H04L 12/66* | (2006.01) |
| *H04B 17/309* | (2015.01) |

(52) **U.S. Cl.**
CPC .......... *H04L 43/08* (2013.01); *H04B 17/309* (2015.01); *H04L 12/66* (2013.01); *H04N 17/00* (2013.01)

(58) **Field of Classification Search**
CPC ................................................. H04N 17/00
USPC ...................................... 348/192, 193, 180
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,038,435 A | 3/2000 | Zhang | |
| 7,162,731 B2 * | 1/2007 | Reidhead | .................. H04L 1/24 348/180 |
| 7,418,240 B2 * | 8/2008 | Hsu | ...................... H04L 1/0003 370/252 |

(Continued)

*Primary Examiner* — Paulos M Natnael
(74) *Attorney, Agent, or Firm* — McAndrews, Held & Malloy, Ltd.

(57) **ABSTRACT**

A receiver is configured to be coupled to a television and data service provider headend via a hybrid fiber coaxial (HFC) network. The receiver comprises front-end circuitry operable to receive a signal that carries a plurality of television and/or data channels, and digitize the received signal to generate a digitized signal. The receiver comprises channelizer circuitry operable to select a first portion of the digitized signal, and select a second portion of the digitized signal. The receiver comprises processing circuitry operable to process the selected second portion of the digitized signal to recover information carried in the plurality of channels. The receiver comprises monitoring circuitry operable to analyze the selected first portion of the digitized signal to measure a characteristic of the received signal; and control the transmission of network management messages back to the headend based on the measured characteristic of the received signal.

**18 Claims, 7 Drawing Sheets**



## US 9,825,826 B2

Page 2

(56)            **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 8,161,388 | B2 * | 4/2012 | Rodriguez | G06F 3/14 |
| | | | | 348/125 |
| 8,611,483 | B2 * | 12/2013 | Zhu | H04L 7/0334 |
| | | | | 341/122 |
| 8,792,008 | B2 * | 7/2014 | Gallagher | H04L 43/08 |
| | | | | 348/192 |
| 9,026,118 | B2 * | 5/2015 | Ling | H04W 72/044 |
| | | | | 370/316 |
| 9,203,653 | B2 * | 12/2015 | Gallagher | H04L 43/08 |
| 9,320,019 | B2 * | 4/2016 | Gallagher | H04W 72/04 |
| 9,332,214 | B2 * | 5/2016 | Ideura | H04N 5/775 |
| 2005/0152557 | A1 * | 7/2005 | Sasaki | H04S 7/302 |
| | | | | 381/58 |
| 2010/0171659 | A1 * | 7/2010 | Waters | H04B 17/24 |
| | | | | 342/357.74 |
| 2011/0235758 | A1 * | 9/2011 | Khoini-Poorfard | H03G 3/001 |
| | | | | 375/345 |
| 2012/0163290 | A1 | 6/2012 | Krafft et al. | |

* cited by examiner

Case 2:22-cv-00125-JRG   Document 1-6   Filed 04/27/22   Page 4 of 14 PageID #:  81

**U.S. Patent**     Nov. 21, 2017     Sheet 1 of 7     US 9,825,826 B2



FIG. 1A

Case 2:22-cv-00125-JRG   Document 1-6   Filed 04/27/22   Page 5 of 14 PageID #: 82

**U.S. Patent**          Nov. 21, 2017          Sheet 2 of 7          US 9,825,826 B2



FIG. 1B

Case 2:22-cv-00125-JRG   Document 1-6   Filed 04/27/22   Page 6 of 14 PageID #:  83

**U.S. Patent**    Nov. 21, 2017    Sheet 3 of 7    US 9,825,826 B2



**FIG. 1C**



FIG. 2A

Case 2:22-cv-00125-JRG   Document 1-6   Filed 04/27/22   Page 8 of 14 PageID #:  85

**U.S. Patent**      Nov. 21, 2017      Sheet 5 of 7      US 9,825,826 B2



FIG. 2B

**U.S. Patent**     Nov. 21, 2017     Sheet 6 of 7     US 9,825,826 B2



FIG. 3



FIG. 4

US 9,825,826 B2

**1**

# METHOD AND APPARATUS FOR SPECTRUM MONITORING

## PRIORITY CLAIM

This patent application is a continuation of U.S. patent application Ser. No. 14/341,880 filed on Jul. 28, 2014 now patented as U.S. Pat. No. 9,203,653, which is a continuation of U.S. patent application Ser. No. 13/607,916 filed on Sep. 10, 2012 now patented as U.S. Pat. No. 8,792,008, which also makes reference to, claims priority to and claims benefit from U.S. Provisional Patent Application Ser. No. 61/532, 098 filed on Sep. 8, 2011. Each of the above referenced documents is hereby incorporated herein by reference in its entirety.

## INCORPORATION BY REFERENCE

This patent application also makes reference to:

U.S. patent application Ser. No. 13/336,451 titled "Method and Apparatus for Broadband Data Conversion," filed on Dec. 23, 2011, and published as U.S. Patent Application Publication No. 2012/0163518;

U.S. patent application Ser. No. 13/485,003 titled "Multi-layer Time-Interleaved Analog-to-Digital Converter (ADC)," filed on May 31, 2012 and now patented as U.S. Pat. No. 8,611,483; and

U.S. patent application Ser. No. 13/588,769 titled "Multi-Standard Coverage Map Generation," filed on Aug. 17, 2012, and now patented as U.S. Pat. No. 9,026,118.

Each of the above referenced documents applications is hereby incorporated herein by reference in its entirety.

## FIELD OF THE INVENTION

Certain embodiments of the invention relate to signal processing. More specifically, certain embodiments of the invention relate to a method and system for spectrum monitoring.

## BACKGROUND OF THE INVENTION

Network-based services can become unacceptable if network parameters fall outside of those for which receivers in the network were designed. For example, in a cable television system there are specifications for the number of channels on the plant, the types of channels, the signal levels of those channels and the impairments that can be on the plant that would affect the performance of the receiver. If some or all of these parameters deviate outside acceptable bounds, the user may experience unacceptable performance. Conventional methods and apparatuses for monitoring network parameters are too costly and impractical for use in customer-premises equipment (CPE).

Further limitations and disadvantages of conventional and traditional approaches will become apparent to one of skill in the art, through comparison of such systems with some aspects of the present invention as set forth in the remainder of the present application with reference to the drawings.

## BRIEF SUMMARY OF THE INVENTION

A system and/or method is provided for spectrum monitoring, substantially as shown in and/or described in connection with at least one of the figures, as set forth more completely in the claims.

**2**

These and other advantages, aspects and novel features of the present invention, as well as details of an illustrated embodiment thereof, will be more fully understood from the following description and drawings.

## BRIEF DESCRIPTION OF SEVERAL VIEWS OF THE DRAWINGS

FIG. 1A depicts an example cable system in accordance with an example embodiment of the invention.

FIG. 1B depicts an example receiver operable to perform spectrum monitoring in accordance with an example embodiment of the invention.

FIG. 1C depicts an example satellite system in accordance with an example embodiment of the invention.

FIG. 2A depicts an example RF front-end of a receiver operable to perform spectrum monitoring in accordance with an example embodiment of the invention.

FIG. 2B depicts another example RF front-end of a receiver operable to perform spectrum monitoring in accordance with an example embodiment of the invention.

FIG. 3 depicts an example channelizer which may be utilized for performing spectrum monitoring in accordance with an example embodiment of the invention.

FIG. 4 is a flow chart illustrating example steps for spectrum monitoring in accordance with an example embodiment of the invention.

## DETAILED DESCRIPTION OF THE INVENTION

As utilized herein the terms "circuits" and "circuitry" refer to physical electronic components (i.e. hardware) and any software and/or firmware ("code") which may configure the hardware, be executed by the hardware, and/or otherwise be associated with the hardware. As utilized herein, "and/or" means any one or more of the items in the list joined by "and/or". For example, "x and/or y" means any element of the three-element set $\{ (x), (y), (x, y) \}$. Similarly, "x, y, and/or z" means any element of the seven-element set $\{(x), (y), (z), (x, y), (x, z), (y, z), (x, y, z)\}$. As utilized herein, the terms "block" and "module" refer to functions than can be implemented in hardware, software, firmware, or any combination of one or more thereof.

FIG. 1A depicts an example communication system in accordance with an example embodiment of the invention. Shown in FIG. 1 is a terrestrial television antenna 102, a satellite dish 104, an Internet Protocol (IP) network 106, a headend 108, a wide area network (e.g., hybrid fiber-coaxial (HFC) network) 118, a gateways 120a and 120b, end systems 126a and 126b (e.g., computers), and end systems 128a and 128b. The headend 108 comprises a switch 110, a video modulator 112, a cable modem termination system (CMTS) 114, and a splitter/combiner 116.

For downstream traffic, the headend 108 may receive television signals via the antenna 102 and the satellite dish 104, and may receive data via the IP network 106. The switch 110 may convey the television signals to the video modulator 112 and the data to the CMTS 114. The video modulator 112 may modulate the received television signals onto a carrier. The CMTS 114 may modulate the received data onto a carrier. The splitter/combiner 116 may combine the outputs of the video modulator 112 and the CMTS 114 resulting in a frequency division multiplexed (FDM) signal comprising one or more television channels and/or one or more DOCSIS channels. The FDM signal may be onto the wide area network (WAN) 118 for distribution to customer

US 9,825,826 B2

**3**

premise equipment (CPE). Each of the gateways 120a and 120b may comprise a receive module 150 operable to process the received FDM signal as described below.

In an example embodiment, each of the gateways 120a and 120b may be operable to transmit, via a module 152, messages to the CMTS 114. For such upstream data, the gateways 120a and 120b may modulate messages (e.g., network management/maintenance messages) onto one or more carriers for transmission via the WAN 118. The splitter/combiner 116 may then convey the message to the CMTS 114. The CMTS 114 may process the messages and, in an example embodiment, adjust transmission parameters (e.g., modulation parameters, transmit power, frequency offsets, etc.) and/or perform other maintenance/management based on the received messages.

FIG. 1B depicts an example receiver operable to perform spectrum monitoring in accordance with an example embodiment of the invention. Shown in FIG. 1B is a receiver circuit 100 comprising an RF receive front-end module 158, a channelizer module 102, a monitoring module 154, and a data processing module 156.

The RF receive front-end 158 may be operable to process a received RF signal S to generate a digital signal D. The signal S may be the result of a plurality of television and/or DOCSIS channels being frequency division multiplexed into a single signal. The signal S may occupy a frequency band from $F_{lo}$ to $F_{hi}$. The RF front-end 158 may, for example, amplify, down-convert, filter, and/or digitize the received signal S to generate the digital signal D. Example embodiments of the RF front-end are depicted in FIGS. 2A and 2B.

The channelizer 102 may be operable to select J+1 bands (represented as $C_1$-$C_{J+1}$) of the signal S and output each of the selected bands to the monitoring module 154 and/or the data processing module 156, where J is an integer greater than 1. An example embodiment of the channelizer 102 is depicted in FIG. 3. Each band $C_j$ may, for example, correspond to the frequency band of one or more television channels. For example, each band $C_j$ may be an integer multiple of 6 MHz (U.S.) or 8 MHz (EU).

In an example embodiment, the channelizer 102 may be implemented entirely in the digital domain and the channelization may be achieved via one or more digital filtering algorithms and/or other digital signal processing algorithms.

The monitoring module 154 may be operable to analyze the band $C_{J+1}$ that it receives from the channelizer 102 to measure/determine characteristics such as, for example, signal power level vs. frequency, delay vs. frequency, phase shift vs. frequency, type and/or amount of modulation, code rate, interference levels, signal to noise ratio, a transfer function of the channel of over which the signal was received, an impulse response of the channel over which the signal was received, and/or any other characteristic that may help assess characteristics of the channel over which the signal was received, assess characteristics of the transmitter that sent the signal and/or any otherwise be pertinent to performance of the communication system. The monitoring module may also be operable to generate one or more control signals 160 for configuring the channelizer 102 and/or for configuring the RF front-end 158. Additionally or alternatively, the control signal(s) 160 output by the monitoring module 154 may control the transmission of network management/maintenance messages by the device 150. Such message may comprise, for example, network status updates indicating whether one or more communication parameters of one or more received television or DOCSIS channels are outside acceptable bounds, and/or conveying measured/

**4**

determined characteristics back to a source of the received signal (e.g., back to a cable headend), In an example embodiment, the monitoring module 174 may be operable to demodulate signals for measuring one or more characteristics such as signal-to-noise ratio, code rate.

The data processing module 156 may be operable to process the bands $C_1$-$C_J$ conveyed to it by the channelizer 102 to recover data present in one or more television channels present in those bands of the signal S. The data processing module 156 may, for example, perform synchronization, equalization, and decoding. The data processing module 156 may output processed data (e.g., MPEG transport stream packets and/or Internet Protocol packets) to end systems 126, perhaps via an interface such as an HDMI interface and/or an Ethernet interface (not shown). The data processing module 156 may also be operable to generate one or more control signals 162 for configuring the channelizer 102 and/or the receive front-end 158.

The parallel arrangement of the monitoring module 154 and data processing module 156 may enable determination of signal and/or channel characteristics without having to interrupt service to user equipment 126 and 128.

In an example embodiment, the signal S may be a cable television signal with $F_{lo}{≈}55$ MHz, $F_{hi}{≈}1002$ MHz. In an example embodiment, the signal S may be a MoCA signal with $F_{lo}{≈}1150$ MHz and $F_{hi}{≈}2100$ MHz. These numbers are purely for illustration and not intended to be limiting.

In an example embodiment, the signal S may be a satellite television signal such as may be at the input of a LNB, at the output of a LNB, or at the input of a indoor unit (e.g., set top box). In such an embodiment, the front-end, 158, channelizer 152, data processing module 156, and/or monitoring module 154 may reside in the indoor unit (e.g., set-top box), outdoor unit (e.g., satellite dish or accompanying components), and/or may be distributed among the indoor unit and outdoor unit of a satellite installation residing at a customer premises. An example of such an embodiment is shown in FIG. 1C.

In operation of such an example embodiment, the signal S may be amplified, possibly downconverted, and digitized by the RF front-end 158 to generate the signal D. The channelizer 102 may then select J bands of the signal D for output to the data processing module 156. Each of the selected bands $C_1$-$C_J$ may, for example, comprise one or more of the cable television channels and/or one or more of the DOCSIS channels that make up the signal S. The data processing module 156 may provide one or more control signals to determine which portion of the signal D is selected for each of the bands $C_1$-$C_J$. The selection may be based, for example, on which television channels are being consumed by end systems 128 and/or whether DOCSIS data is being consumed by end systems 126. The channelizer 102 may also select one band, represented as band $C_{J+1}$, to be output to the monitoring module 154. Band $C_{J+1}$ may comprise any portion or portions (including the entire bandwidth from $F_{lo}$ to $F_{hi}$) of the signal D. Which portion of the signal S is selected as band $C_{J+1}$ may, for example, be configured by the monitoring module 154. The data processing module 156 may process one or more of bands $C_1$-$C_J$ to recover data on one or more channels (e.g., television and/or DOCSIS channels) present in those bands while the monitoring module 154 may concurrently process band $C_{J+1}$ to measure/determine characteristics of all or a portion of the signal S between $f_{lo}$ and $f_{hi}$.

FIG. 1C depicts an example satellite system in accordance with an example embodiment of the invention. Shown in FIG. 1C is a satellite dish assembly 172, and a gateway 196.

US 9,825,826 B2

**5**

The subassembly **174** comprises a feed horn **182**, an LNB **194**, the front-end **158**, the channelizer **152**, the monitoring module **154**, and the data processing module **156**. The various modules of the subassembly **174** may reside in one or more housings, on one or more printed circuit boards, and/or one or more integrated circuits (e.g., one or more silicon dice). In another example embodiment, the monitoring module **154** and/or the data processing module **156** may reside in the gateway **196**.

In the example embodiment depicted, the satellite dish assembly **172** comprises a parabolic reflector **176** and a subassembly **174** mounted (e.g., bolted or welded) to a support structure **178** which, in turn, comprises a boom **190** and attaches (e.g., via bolts) to the premises **180** (e.g., to the roof). In another example embodiment, all or a portion of the modules **152**, **154**, and/or **156** may be mounted to the premises **180** separate from the satellite dish (e.g., connected via wired and/or wireless connections), but may still be part of the "outdoor unit."

The gateway **196** may receive data from the satellite dish assembly **172** (via cable(s) **184**). The gateway and may transmit data onto and receive data from the WAN **192** (via broadband connection **188**). The gateway **196** may transmit data to and receive data from user equipment **128** and **126** (via one or more connections **186**).

FIG. **2A** depicts an example RF front-end of a receiver operable to perform spectrum monitoring in accordance with an example embodiment of the invention. The RF front-end **158**A shown in FIG. **2A** comprises a variable gain amplifier **202**, and receive chains **204**$_1$-**204**$_L$, where L is an integer greater than or equal to 1. Each receive chain **204**$_1$ may comprise an amplifier module **210**$_1$, a mixer module **212**$_1$, a filter module **214**$_1$, and an analog-to-digital converter (ADC) module **216**$_1$ where 1 is an integer between 1 and L.

Each amplifier **210**$_1$ may be operable to amplify a band 1 of the signal S. Each mixer **212**$_1$ may be operable to mix a band 1 of the signal S with a local oscillator signal (not shown) to downconvert the band 1 to a lower frequency. Each filter module **214**$_1$ may be operable to bandpass filter the band 1 to remove/attenuate frequencies outside band 1. Each ADC **216** may be operable to convert the band 1 of the analog signal S to a corresponding digital representation. Operation of the RF front-end **158** and/or processing of signals generated by the front-end **158**, may, for example, be as described in U.S. patent application Ser. No. 13/336,451 entitled "Method and Apparatus for Broadband Data Conversion" which is incorporated by reference herein, as set forth above.

In an example embodiment, the front-end **158**A may reside in a cable gateway such as the cable gateway **120** described above. In an example embodiment, the front-end **158**A may reside in satellite gateway/set-top box and/or in an outdoor unit of a satellite reception assembly (e.g., collocated on-chip or on-PCB with a satellite low-noise block downconverter (LNB)).

FIG. **2B** depicts another example RF front-end of a receiver operable to perform spectrum monitoring in accordance with an example embodiment of the invention. The RF front-end **158**B shown in FIG. **2B** comprises a variable gain amplifier **252**, a filter **254**, and an ADC **256**. Functions performed by the RF front-end **158**B may be referred to as "full-spectrum capture" (or "FSC").

In the front-end **158**B, the entire bandwidth, from F$_{lo}$ to F$_{hi}$, of signal S may be amplified by the amplifier **252** to generate S'. The amplified signal S' may be then filtered by the filter **254** to remove undesired signals outside of F$_{lo}$ to F$_{hi}$ and generate S". The signal S", from F$_{lo}$ to F$_{hi}$,

**6**

may then be digitized by the ADC **256** to generate signal D. In an example embodiment, the ADC may be as described in U.S. patent application Ser. No. 13/485,003 entitled "Multi-layer Time-Interleaved Analog-to-Digital Converter (ADC)," which is incorporated by reference herein, as set forth above.

In an example embodiment, the ADC **256** may be capable of digitizing a signal S wherein F$_{lo}$ to F$_{hi}$ is 1 GHz or higher. Accordingly, for cable television/DOCSIS, the ADC **256** may be operable to digitize the entire cable downstream (e.g., from ~55 MHz to ~1002 MHz). Similarly, for satellite television, the ADC **256** may be operable to digitize the received signal at the input of the LNB, and/or the down-converted signal (e.g., from ~1 GHz to ~2 GHz) at the output by an LNB.

FIG. **3** depicts an example channelizer which may be utilized for performing spectrum monitoring in accordance with an example embodiment of the invention. Band selection filters **302**$_1$-**302**$_J$ of the channelizer **102** may each process the signal D to recover a corresponding one of the J selected bands of the signal D, and output the band on a corresponding one of the ports **304**$_1$ to **304**$_J$. A band selection filter **302**$_{J+1}$ of the channelizer **102** may process the signal D to recover band C$_{J+1}$ from the signal D, and output band C$_{J+1}$ on the port **304**$_{J+1}$. Which band or bands are selected by the filter **302**$_{J+1}$ may be configured based on one or more control signals input to the channelizer **102**. For example, the value of a parameter k may determine the center frequency of the portion of signal D that is to be selected as C$_{J+1}$ by the filter **302**$_{J+1}$, and the value of Δ may determine the bandwidth of the portion of this signal D that is selected as band C$_{J+1}$ for output on the port **304**$_{J+1}$. In this manner, all of the signal D between F$_{lo}$ and F$_{hi}$ or any portion or portions of the signal D, may be selected for output on the port **304**$_{J+1}$.

FIG. **4** is a flow chart illustrating example steps for spectrum monitoring in accordance with an example embodiment of the invention. After start step **402**, in step **404**, the receiver circuit **100** may receive a frequency division multiplexed (FDM) signal comprising one or more channels (e.g., satellite television channels, cable television channels, and/or DOCSIS channels) occupying a frequency band between F$_{lo}$ and F$_{hi}$. In step **406**, the received FDM signal is digitized across the full band from F$_{lo}$ to F$_{hi}$. In step **408**, the digitized signal is channelized into one or more bands. In step **410**, a first one or more of the bands are conveyed to a data processing module. In step **412** a second one or more of the bands are output to a monitoring module. In step **414**, the data processing module processes one or more of the first one or more bands to recover data on those bands while the monitoring module concurrently processes the second one or more bands to determine characteristics of all or a portion of the frequency band from F$_{lo}$ to F$_{hi}$.

Other embodiments of the invention may provide a non-transitory computer readable medium and/or storage medium, and/or a non-transitory machine readable medium and/or storage medium, having stored thereon, a machine code and/or a computer program having at least one code section executable by a machine and/or a computer, thereby causing the machine and/or computer to perform the steps as described herein for spectrum monitoring

Accordingly, the present invention may be realized in hardware, software, or a combination of hardware and software. The present invention may be realized in a centralized fashion in at least one computing system, or in a distributed fashion where different elements are spread across several interconnected computing systems. Any kind

**APPX110**

US 9,825,826 B2

7

of computing system or other apparatus adapted for carrying out the methods described herein is suited. A typical combination of hardware and software may be a general-purpose computing system with a program or other code that, when being loaded and executed, controls the computing system such that it carries out the methods described herein. Another typical implementation may comprise an application specific integrated circuit or chip.

The present invention may also be embedded in a computer program product, which comprises all the features enabling the implementation of the methods described herein, and which when loaded in a computer system is able to carry out these methods. Computer program in the present context means any expression, in any language, code or notation, of a set of instructions intended to cause a system having an information processing capability to perform a particular function either directly or after either or both of the following: a) conversion to another language, code or notation; b) reproduction in a different material form.

While the present invention has been described with reference to certain embodiments, it will be understood by those skilled in the art that various changes may be made and equivalents may be substituted without departing from the scope of the present invention. In addition, many modifications may be made to adapt a particular situation or material to the teachings of the present invention without departing from its scope. Therefore, it is intended that the present invention not be limited to the particular embodiment disclosed, but that the present invention will include all embodiments falling within the scope of the appended claims.

What is claimed is:

**1**. A method comprising:

performing by one or more circuits of a receiver coupled to a television and data service provider headend via a hybrid fiber coaxial (HFC) network:

receiving, via said HFC network, a signal that carries a plurality of channels, wherein said channels comprise one or both of television channels and data channels;

digitizing said received signal to generate a digitized signal;

selecting a first portion of said digitized signal;

selecting a second portion of said digitized signal;

processing said selected second portion of said digitized signal to recover information carried in said plurality of channels;

analyzing said selected first portion of said digitized signal to measure a characteristic of said received signal; and

controlling the transmission of network management messages back to said headend based on said measured characteristic of said received signal, wherein said measured characteristic is different than said network management messages.

**2**. The method of claim **1**, wherein said network management messages indicate whether a parameter is outside of acceptable bounds.

**3**. The method of claim **2**, wherein said parameter is a modulation parameter of said received signal.

8

**4**. The method of claim **2**, wherein said parameter is a transmit power of said received signal.

**5**. The method of claim **2**, wherein said parameter is a frequency offset of said received signal.

**6**. The method of claim **1**, wherein said characteristic is signal power vs. frequency.

**7**. The method of claim **1**, wherein said characteristics is signal phase vs. frequency.

**8**. The method of claim **1**, wherein said characteristic is one of: signal-to-noise ratio, peak-to-average ratio, noise levels, bit error rate, and symbol error rate.

**9**. The method of claim **1**, configuring, by said one or more circuits, a bandwidth and/or center frequency of said selected first portion of said digitized signal.

**10**. A system comprising:

a receiver configured to be coupled to a television and data service provider headend via a hybrid fiber coaxial (HFC) network, the receiver comprising:

front-end circuitry operable to:

receive a signal that carries a plurality of channels, wherein said channels comprise one or both of television channels and data channels; and

digitize said received signal to generate a digitized signal;

channelizer circuitry operable to:

select a first portion of said digitized signal; and

select a second portion of said digitized signal;

processing circuitry operable to process said selected second portion of said digitized signal to recover information carried in said plurality of channels;

monitoring circuitry operable to:

analyze said selected first portion of said digitized signal to measure a characteristic of said received signal; and

control the transmission of network management messages back to said headend based on said measured characteristic of said received signal, wherein said measured characteristic is different than said network management messages.

**11**. The system of claim **10**, wherein said network management messages indicate whether a parameter is outside of acceptable bounds.

**12**. The system of claim **11**, wherein said parameter is a modulation parameter of said received signal.

**13**. The system of claim **11**, wherein said parameter is a transmit power of said received signal.

**14**. The system of claim **11**, wherein said parameter is a frequency offset of said received signal.

**15**. The method of claim **1**, wherein said characteristic is signal power vs. frequency.

**16**. The method of claim **1**, wherein said characteristics is signal phase vs. frequency.

**17**. The system of claim **10**, wherein said characteristic is one of: signal-to-noise ratio, peak-to-average ratio, noise levels, bit error rate, and symbol error rate.

**18**. The system of claim **10**, comprising configuring, by said monitoring circuitry during operation of said one or more circuits, a bandwidth and/or center frequency of said selected first portion of said digitized signal.

\* \* \* \* \*

# EXHIBIT F

US010135682B2

(12) **United States Patent**
  Ling et al.

(10) Patent No.:  **US 10,135,682 B2**
(45) **Date of Patent:**  *Nov. 20, 2018

(54) **METHOD AND SYSTEM FOR SERVICE GROUP MANAGEMENT IN A CABLE NETWORK**

(71) Applicant: **Maxlinear, Inc.**, Carlsbad, CA (US)

(72) Inventors: **Curtis Ling**, Carlsbad, CA (US);
  **Sridhar Ramesh**, Carlsbad, CA (US);
  **Timothy Gallagher**, Carlsbad, CA (US)

(73) Assignee: **Maxlinear, Inc.**, Carlsbad, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

  This patent is subject to a terminal disclaimer.

(21) Appl. No.: **15/866,106**

(22) Filed: **Jan. 9, 2018**

(65) **Prior Publication Data**
  US 2018/0131567 A1  May 10, 2018

**Related U.S. Application Data**

(63) Continuation of application No. 15/434,673, filed on Feb. 16, 2017, now Pat. No. 9,866,438, which is a (Continued)

(51) **Int. Cl.**
  *H04L 12/24*  (2006.01)
  *H04L 1/00*  (2006.01)
  (Continued)

(52) **U.S. Cl.**
  CPC ....... *H04L 41/0823* (2013.01); *H04B 17/318* (2015.01); *H04L 1/0009* (2013.01);
  (Continued)

(58) **Field of Classification Search**
  CPC . H04L 12/2801; H04L 1/0009; H04L 1/0026; H04L 27/2601; H04L 41/0823; H04L 43/08; H04L 43/12
  See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,563,918 A  10/1996  Waldschmidt
6,275,483 B1  8/2001  Papasakellariou
  (Continued)

*Primary Examiner* — Dung B Huynh
(74) *Attorney, Agent, or Firm* — McAndrews, Held & Malloy, Ltd

(57)  **ABSTRACT**

A cable modem termination system (CMTS) may determine, for a plurality of cable modems served by the CMTS, a corresponding plurality of SNR-related metrics. The CMTS may assigning the modems among a plurality of service groups based on the SNR-related metrics. For any one of the modems, the CMTS may configure physical layer communication parameters to be used by the one of the modems based on a SNR-related metric of a service group to which the one of the modems is assigned. The physical layer communication parameters may include one or more of: transmit power, receive sensitivity, timeslot duration, modulation type, modulation order, forward error correction (FEC) type, and FEC code rate. The CMTS and the modems may communicate using orthogonal frequency division multiplexing (OFDM) over a plurality of subcarriers, and the physical layer communication parameters may be determined on a per-subcarrier basis.

**18 Claims, 7 Drawing Sheets**



302  CMTS sends probe to CMs

304  CMs determine SNR profile and report back to CMTS

306  CMTS assigns CMs to service groups based on SNR profiles

308  CMTS determines physical layer communication parameters per service group and per subcarrier based on composite SNR profiles of the service groups

310  Communications between CMTS and any particular CM use the per-subcarrier physical layer parameters of the service group to which the CM has been assigned

## US 10,135,682 B2

Page 2

**Related U.S. Application Data**

continuation of application No. 15/228,703, filed on Aug. 4, 2016, now Pat. No. 9,577,886, which is a continuation of application No. 13/948,444, filed on Jul. 23, 2013, now Pat. No. 9,419,858.

(60) Provisional application No. 61/674,742, filed on Jul. 23, 2012.

(51) **Int. Cl.**

| *H04B 17/318* | (2015.01) |
|---|---|
| *H04L 27/26* | (2006.01) |
| *H04L 12/28* | (2006.01) |
| *H04L 12/26* | (2006.01) |

(52) **U.S. Cl.**

CPC ........ *H04L 1/0026* (2013.01); *H04L 12/2801* (2013.01); *H04L 27/2601* (2013.01); *H04L 27/2602* (2013.01); *H04L 43/08* (2013.01); *H04L 43/12* (2013.01)

(56) **References Cited**

U.S. PATENT DOCUMENTS

| 6,421,327 B1 | 7/2002 | Lundby | |
|---|---|---|---|
| 6,560,225 B1 | 5/2003 | Czajkowski | |
| 6,757,522 B1 | 6/2004 | Naegeli | |
| 6,891,858 B1 | 5/2005 | Mahesh | |
| 6,898,755 B1 * | 5/2005 | Hou | H04L 1/0003 |
| | | | 370/282 |
| 7,761,049 B2 | 7/2010 | Zeng | |
| 8,488,514 B2 | 7/2013 | Cai | |
| 8,743,933 B2 * | 6/2014 | Prodan | H04L 5/1446 |
| | | | 375/219 |
| 9,025,954 B2 | 5/2015 | Fang | |
| 9,419,858 B2 * | 8/2016 | Ling | H04L 1/0026 |
| 9,577,886 B2 * | 2/2017 | Ling | H04L 1/0026 |
| 9,866,438 B2 * | 1/2018 | Ling | H04L 41/0823 |
| 2001/0055319 A1 * | 12/2001 | Quigley | H04J 3/1694 |
| | | | 370/480 |
| 2002/0062486 A1 | 5/2002 | Park | |
| 2002/0186459 A1 | 12/2002 | DeGrange, Jr. | |
| 2003/0002450 A1 | 1/2003 | Jalali | |
| 2003/0043732 A1 | 3/2003 | Walton | |
| 2003/0053419 A1 | 3/2003 | Kanazawa | |
| 2003/0177502 A1 | 9/2003 | Kolze | |
| 2003/0199283 A1 | 10/2003 | Busch | |
| 2003/0223481 A1 | 12/2003 | Jones | |
| 2003/0236071 A1 | 12/2003 | Ito | |
| 2004/0085976 A1 * | 5/2004 | Dale | H04B 7/18582 |
| | | | 370/411 |
| 2004/0218568 A1 | 11/2004 | Goodall | |
| 2005/0097617 A1 | 5/2005 | Currivan | |
| 2005/0122996 A1 | 6/2005 | Azenkot | |
| 2005/0135253 A1 | 6/2005 | Cai et al. | |
| 2005/0185824 A1 | 8/2005 | Chen | |
| 2005/0213579 A1 | 9/2005 | Iyer | |
| 2006/0008020 A1 | 1/2006 | Blankenship | |
| 2006/0067278 A1 * | 3/2006 | Li | H04B 1/707 |
| | | | 370/335 |
| 2006/0126505 A1 * | 6/2006 | Denney | H04J 3/1694 |
| | | | 370/229 |
| 2007/0098007 A1 | 5/2007 | Prodan | |
| 2007/0202904 A1 | 8/2007 | Cheng | |
| 2007/0253388 A1 | 11/2007 | Pietraski | |
| 2009/0016420 A1 | 1/2009 | Kwak | |
| 2009/0040942 A1 | 2/2009 | Yang | |
| 2009/0215403 A1 | 8/2009 | Currivan | |
| 2009/0219856 A1 * | 9/2009 | Richardson | H04W 72/044 |
| | | | 370/328 |
| 2010/0002575 A1 | 1/2010 | Eichinger | |
| 2010/0100919 A1 | 4/2010 | Hsue | |
| 2010/0154017 A1 * | 6/2010 | An | H04L 12/2801 |
| | | | 725/111 |
| 2010/0172316 A1 | 7/2010 | Hwang | |
| 2011/0051607 A1 | 3/2011 | Begen | |
| 2011/0188852 A1 | 8/2011 | Stodola | |
| 2011/0306380 A1 | 12/2011 | Zavadsky | |
| 2012/0269242 A1 | 10/2012 | Prodan | |
| 2013/0021931 A1 | 1/2013 | Kim | |
| 2013/0024753 A1 | 1/2013 | Masuda | |
| 2013/0100843 A1 | 4/2013 | Croak | |
| 2013/0107921 A1 | 5/2013 | Prodan | |
| 2013/0114480 A1 | 5/2013 | Chapman | |
| 2013/0170528 A1 * | 7/2013 | Pantelias | H04L 12/2801 |
| | | | 375/222 |
| 2013/0227373 A1 | 8/2013 | Shen | |
| 2013/0266310 A1 | 10/2013 | Fox | |
| 2014/0022926 A1 | 1/2014 | Ling | |
| 2014/0133330 A1 | 5/2014 | Chapman | |
| 2014/0169431 A1 | 6/2014 | Arambepola | |
| 2014/0286203 A1 | 9/2014 | Jindal | |
| 2014/0301237 A1 | 10/2014 | Yi | |
| 2015/0071161 A1 | 3/2015 | Salhab | |
| 2015/0288498 A1 | 10/2015 | Kliger | |

* cited by examiner

Case 2:22-cv-00125-JRG   Document 1-7   Filed 04/27/22   Page 4 of 15 PageID #:  95

**U.S. Patent**     Nov. 20, 2018     Sheet 1 of 7     US 10,135,682 B2



FIG. 1

Case 2:22-cv-00125-JRG   Document 1-7   Filed 04/27/22   Page 5 of 15 PageID #:  96

**U.S. Patent**    Nov. 20, 2018    Sheet 2 of 7    US 10,135,682 B2



FIG. 2A

Case 2:22-cv-00125-JRG   Document 1-7   Filed 04/27/22   Page 6 of 15 PageID #:  97

**U.S. Patent**     Nov. 20, 2018     Sheet 3 of 7     US 10,135,682 B2



FIG. 2B

Case 2:22-cv-00125-JRG   Document 1-7   Filed 04/27/22   Page 7 of 15 PageID #:  98



FIG. 2C

Case 2:22-cv-00125-JRG   Document 1-7   Filed 04/27/22   Page 8 of 15 PageID #:  99

**U.S. Patent**          Nov. 20, 2018          Sheet 5 of 7          US 10,135,682 B2



**FIG. 3A**



**FIG. 3B**

Case 2:22-cv-00125-JRG   Document 1-7   Filed 04/27/22   Page 9 of 15 PageID #:  100

**U.S. Patent**      Nov. 20, 2018      Sheet 6 of 7      US 10,135,682 B2



FIG. 4A

Case 2:22-cv-00125-JRG   Document 1-7   Filed 04/27/22   Page 10 of 15 PageID #:  101



FIG. 4B

US 10,135,682 B2

**1**

## METHOD AND SYSTEM FOR SERVICE GROUP MANAGEMENT IN A CABLE NETWORK

### PRIORITY CLAIM

This patent application is a continuation of U.S. patent application Ser. No. 15/434,673 filed on Feb. 16, 2017, which is a continuation of U.S. patent application Ser. No. 15/228,703 filed on Aug. 4, 2016, now U.S. Pat. No. 9,577,886, which is a continuation of U.S. patent application Ser. No. 13/948,444 filed on Jul. 23, 2013, now U.S. Pat. No. 9,419,858, which makes reference to, claims priority to and claims benefit from U.S. Provisional Patent Application Ser. No. 61/674,742 titled "Method and System for Service Group Management in a Cable Television Network" and filed on Jul. 23, 2012.

The entirety of each of the above-mentioned applications is hereby incorporated herein by reference.

### INCORPORATION BY REFERENCE

This application also makes reference to:
U.S. patent application Ser. No. 13/553,328 titled "Method and System for Client-Side Message Handling in a Low-Power Wide Area Network," and filed on Jul. 19, 2012;

U.S. patent application Ser. No. 13/485,034 titled "Method and System for Server-Side Message Handling in a Low-Power Wide Area Network," and filed on May 31, 2012;

U.S. patent application Ser. No. 13/553,175 titled "Method and System for a Low-Power Client in a Wide Area Network," and filed on Jul. 19, 2012;

U.S. patent application Ser. No. 13/553,195 titled "Method and System for Server-Side Handling of a Low-Power Client in a Wide Area Network," and filed on Jul. 19, 2012;

U.S. patent application Ser. No. 13/948,401 titled "Method and System for a High Capacity Cable Network," and filed on the same date as this application; and

U.S. patent application Ser. No. 13/948,417 titled "Method and System for Noise Suppression in a Cable Network," and filed on the same date as this application.

The entirety of each of the above-mentioned applications is hereby incorporated herein by reference.

### FIELD OF THE INVENTION

Certain embodiments of the invention relate to cable television networks. More specifically, certain embodiments of the invention relate to a method and system for service group management in a cable television network.

### BACKGROUND OF THE INVENTION

Convention cable television networks can be inefficient and have insufficient capacity. Further limitations and disadvantages of conventional and traditional approaches will become apparent to one of skill in the art, through comparison of such systems with some aspects of the present invention as set forth in the remainder of the present application with reference to the drawings.

### BRIEF SUMMARY OF THE INVENTION

A system and/or method is provided for service group management in a cable television network, substantially as

**2**

shown in and/or described in connection with at least one of the figures, as set forth more completely in the claims.

These and other advantages, aspects and novel features of the present invention, as well as details of an illustrated embodiment thereof, will be more fully understood from the following description and drawings.

### BRIEF DESCRIPTION OF SEVERAL VIEWS OF THE DRAWINGS

FIG. **1** is a diagram of an example cable/DOCSIS network.

FIG. **2A** depicts an example method of determining locations of CMs within the HFC network.

FIGS. **2B** and **2C** depict signal-to-noise ratio (SNR) versus frequency profiles for an example cable/DOCSIS network.

FIG. **3A** is a flowchart illustrating an example process for configuring a cable/DOCSIS HFC network based on measured performance metrics.

FIG. **3B** is a flowchart illustrating an example process for configuring a cable/DOCSIS HFC network based on location of CMs within the network.

FIGS. **4A** and **4B** illustrate the network of FIG. **1**, with different groupings of CMs based on one or both of: measured performance metric(s) and location within the HFC network.

### DETAILED DESCRIPTION OF THE INVENTION

As utilized herein the terms "circuits" and "circuitry" refer to physical electronic components (i.e. hardware) and any software and/or firmware ("code") which may configure the hardware, be executed by the hardware, and/or otherwise be associated with the hardware. As used herein, for example, a particular processor and memory may comprise a first "circuit" when executing a first one or more lines of code and may comprise a second "circuit" when executing a second one or more lines of code. As utilized herein, "and/or" means any one or more of the items in the list joined by "and/or". As an example, "x and/or y" means any element of the three-element set $\{(x), (y), (x, y)\}$. As another example, "x, y, and/or z" means any element of the seven-element set $\{(x), (y), (z), (x, y), (x, z), (y, z), (x, y, z)\}$. As utilized herein, the term "exemplary" means serving as a non-limiting example, instance, or illustration. As utilized herein, the terms "e.g.," and "for example" set off lists of one or more non-limiting examples, instances, or illustrations. As utilized herein, circuitry is "operable" to perform a function whenever the circuitry comprises the necessary hardware and code (if any is necessary) to perform the function, regardless of whether performance of the function is disabled, or not enabled, by some user-configurable setting.

FIG. **1** is a diagram of an example cable/DOCSIS network. The example network comprises a cable modem termination system (CMTS) **102**, a fiber node **104**, amplifiers $106_1$-$106_3$, a directional coupler **108**, splitters $110_1$-$110_3$, and cable modems (CMs) $112_1$-$112_5$.

The CMTS **102** may comprise circuitry operable to manage connections to the CMs $112_1$-$112_5$. This may include, for example: participating in ranging operations to determine physical layer parameters used for communications between the CMTS **102** and CMs $112_1$-$112_5$; forwarding of dynamic host configuration protocol (DHCP) messages between a DHCP server and the CMs $112_1$-$112_5$; forwarding of time of

US 10,135,682 B2

3

day messages between a time of day server and the CMs $112_1$-$112_5$; directing traffic between the CMs $112_1$-$112_5$ other network devices (e.g., Ethernet interfaces of the CMTS **102** may face the Internet, Optical RF interfaces of the CMTS **102** may face the CMs, and the CMTS may direct traffic between and among the Ethernet and Optical RF interfaces); and managing registration of the CMs $112_1$-$112_5$ to grant the cable modems network (e.g., Internet) access. The registration process for a CM $112_X$ (X between 1 and 5 for the example network of FIG. **1**) may comprise the CM **112** sending a registration request along with its configuration settings, and the CMTS **102** accepting or rejecting the cable modem based on the configuration settings. The registration process may additionally comprise an exchange of security keys, certificates, or other authentication information.

The fiber node **104** may comprise circuitry operable to convert between optical signals conveyed via the fiber optic cable **103** and electrical signals conveyed via coaxial cable **105**.

Each of the amplifiers $106_1$-$106_3$ may comprise a bidirectional amplifier which may amplify downstream signals and upstream signals, where downstream signals are input via upstream interface **107a** and output via downstream interface **107b**, and upstream signals are input via downstream interface **107b** and output via upstream interface **107a**. The amplifiers $106_1$, which amplifies signals along the main coaxial "trunk" may be referred to as a "trunk amplifier." The amplifiers **1062** and **1063** which amplify signals along "branches" split off from the trunk may be referred to as "branch" or "distribution" amplifiers.

The directional coupler **108** may comprise circuitry operable to direct downstream traffic incident on interface **109a** onto interfaces **109b** and **109c**, and to direct upstream traffic incident on interfaces **109b** and **109c** onto interface **109a**. The directional coupler **108** may be a passive device.

Each of the splitters $110_1$-$110_3$ may comprise circuitry operable to output signals incident on each of its interfaces onto each of its other interfaces. Each of the splitters $110_1$-$110_3$ may be a passive device.

Each of the cable modems (CMs) $112_1$-$112_5$ may comprise circuitry operable to communicate with, and be managed by, the CMTS **1102** in accordance with one or more standards (e.g., DOCSIS). Each of the CMs $112_1$-$112_5$ may reside at the premises of a cable subscriber.

The components (including, fiber optic cables, coaxial cables, amplifiers, directional couplers, splitters, and/or other devices) between the CMTS and the CMs may be referred to as a hybrid fiber coaxial (HFC) network. Any of the amplifiers, directional coupler, and splitters may be referred to generically as a coupling device.

FIG. 2A depicts an example method of determining locations of CMs within the HFC network. As shown in FIG. 2A, to determine one or more measured performance metric(s) (e.g., an SNR-related metric such as SNR at a particular frequency or SNR over a range of frequencies (an SNR profile), noise levels, strength of desired signals, and/or the like) for any particular CM $112_X$, the CMTS **102** may transmit, at time **1**, a message **202** that is destined (unicast, multicast, or broadcast) for the CM $112_X$ and that functions as a probe to enable determination of the metric(s) for the CM $112_X$. The message **202** may be sent on multiple channels spanning multiple frequencies. Similarly, where OFDM is used for communications between the CMTS **102** and the CM $112_X$, the message **202** may be transmitted on each subcarrier, or may be sent on a subset of subcarriers and

4

then interpolation may be used for determining the SNR of subcarriers on which the message **202** was not sent.

The message **202** may be transmitted with such encoding, modulation, and transmit power such that even a CM $112_X$ with a worst-case performance metric(s) can receive the message and accurately measure the metric(s). In this regard, FIG. 2B shows a SNR versus frequency graph for an example HFC network that uses eight channels/subcarriers. The line **222** in FIG. 2B represents a composite worst-case SNR profile for one or more CM(s) in the HFC network to which the message **202** is destined. For example, line **222** may be a SNR profile for a single CM $112_X$ to which the message **202** is to be unicast. As another example, the line **222** may be a composite worst-case SNR profile for a plurality of CMs **112** of a particular service group to which the message **202** is to be multicast. As another example, the line **222** may be a composite worst-case SNR profile for all CMs of an HFC network handled by the CMTS **102** to which the message **202** is to be broadcast. The message **202** may be transmitted such that the minimum SNR needed to receive and accurately measure the SNR profile is below the line **222** (e.g., SNR needed for receiving the message **202** may be the line **224**).

Upon receipt of the message **202**, a CM $112_X$ may measure, over the channels/subbands on which the message was sent, one or more metrics (e.g., SNR versus frequency profile) for the transmission **202**. The CM $112_X$ may then report the metrics(s) back to the CMTS **102** via a message **204**. In an example implementation, the message **202** may contain information about when and/or how the CM(s) are supposed to report their metric(s) (e.g., SNR profiles) back to the CMTS **102**. In this regard, the message **202** may contain information that is the same as and/or or analogous to what may be found in a MAP, UCD, and/or other MAC management message defined in a DOCSIS standard. Accordingly, the message **202** may have specified a format of the message **204** and that the message **204** is to be transmitted at time T+□.

Once the metric(s) of one or more CMs are known to the CMTS **102**, physical layer communication parameters to be used for communications between the CMTS **102** and the CMs **112** may be determined based on the metric(s). In this regard, physical layer communication parameters may be determined per-CM based on each CM's respective metric(s) (e.g., each CM's SNR profile), per-service-group based on a composite metric(s) of the CM(s) assigned to that service group (e.g., composite SNR profile for the CM(s) of that service group), per physical region of the HFC network based on a composite metric of the CMs located in that physical region (e.g., composite SNR profile for the CM(s) in that physical region), and/or the like. Furthermore, once the metric(s) of a CM $112_X$ is determined, the CMTS **102** may assign that CM $112_X$ to one or more service groups based on its metric(s), as, for example, described below with reference to FIG. 4A. Example physical layer parameters include: encoding parameters, modulation parameters, transmit power, receive sensitivity, timeslot duration, channel(s) or subcarrier(s) on which to listen, channel(s) or subcarrier(s) on which to transmit, and/or the like. Example encoding parameters include: type of forward error correction (FEC) to be used (e.g., Reed-Solomon, LDPC, etc.), FEC block size, FEC code rate, etc. Example modulation parameters include: type of modulation (e.g., frequency shift keying (FSK), phase shift keying (PSK), quadrature amplitude modulation (QAM), etc.), modulation depth, modulation order, etc.

US 10,135,682 B2

**5**

In an example implementation, the transmission of messages 202, the calculation of metrics, such as SNR profile, by the CM(s), the transmission 204, and subsequent configuration of physical layer parameters based on the metric(s) may take place in parallel with other operations performed during the registration/ranging process.

Referring now to FIG. 2C, there is again shown the line 222 which represents the applicable SNR profile (e.g., an individual SNR profile if configuring physical layer parameters per CM, a composite SNR profile for a service group if configuring physical layer parameters per service group, or a composite SNR profile for a particular physical region). Also shown is a line 226 corresponding to SNR utilization for communications with the CM(s) associated with the profile 222. Assuming the distance 228 is the minimum desired headroom, then the physical layer communication parameters resulting in line 226 are nearly optimal in the sense that there is minimal headroom on each of channels/subbands 1, 3, 4, 6, 7, 8, and only slightly more than minimal headroom on channels/subbands 2 and 5.

Physical layer parameters may be configured/coordinated using upstream and/or downstream MAP messages, upstream channel descriptors (UCDs), other MAC management messages defined in DOCSIS protocols, and/or purpose-specific messages tailored to configuring the parameters based on measured performance metrics such as SNR profiles as described in this disclosure.

FIG. 3A is a flowchart illustrating an example process for configuring a cable/DOCSIS HFC network based on SNR profiles. For clarity of illustration the process is described with reference to the network of FIG. 1 and the messages of FIG. 2A. The process begins with block 302 in which the CMTS 102 sends one or more probe messages 202 to the CMs 112₁-112₅. In block 304, each of the CMs 112₁-112₅ determines its respective SNR profile based on a received one of the messages 202, and reports the SNR profile back to the CMTS 102 in the form of a message 204. In block 306, the CMTS 102 assigns the CMs to service groups based on the SNR profiles.

In block 308, physical layer communication parameters are determined per service group and per channel/subcarrier. For example, for any particular service group, the modulation order and FEC code rate to be used on a particular subcarrier may be determined based on the worst case SNR for that subcarrier among the CMs in that particular service group. Thus, it can be seen that grouping CMs based on SNR profiles may enable configuring physical layer communications parameters to such that one or more communication parameters (throughput, reliability, etc.) is optimal, or near-optimal, for all of the CMs in the service group. For example, without such grouping by SNR profile, one CM in a particular service group may have substantially lower SNR on one or more channels/subcarriers. As a result, all CMs in that particular service group may be forced to use physical layer parameters supported by this "lowest common denominator" CM. This may result in a lot of wasted capacity for the remaining CMs.

To illustrate with a specific example: assume that CMs 112₁, 112₄, and 112₅ of FIG. 1 have sufficient SNR on channel z to support 64-QAM on channel z, but that CMs 112₂ and 112₃ only have sufficient SNR on channel z to support 16-QAM. If 112₁ is assigned to the same service group as 112₂ or 112₃, then 112₁ may be forced to use 16-QAM on channel z. Conversely, if 112₁, 112₄, and 112₅ are assigned to a first service group and 112₂ and 112₃ are assigned to a second service group, then the first service group consisting of 112₁, 112₄, and 112₅ can use 64-QAM

**6**

on channel z while the second service group consisting of 112₂ and 112₃ uses 16-QAM on channel z.

In block 310, communications between the CMTS 102 and any particular service group use the per-service-group and per-subcarrier/channel physical layer parameters determined in block 308.

FIG. 3B is a flowchart illustrating an example process for configuring a cable/DOCSIS HFC network based on location of CMs within the network. For clarity of illustration, and as a non-limiting example, the process is described with reference to the network of FIG. 1 and the messages of FIG. 2B. The process begins with block 322 in which the CMTS 102 determines a location of each of the CMs 112₁-112₅ in the network. Location of a CM 112ₓ may be characterized in a variety of ways including, for example: total distance of fiber and/or coaxial cable between the CMTS 102 and the CM 112ₓ, total attenuation between the CMTS 102 and the CM 112ₓ, which trunk amplifier(s) are upstream of the CM 112ₓ, how many coupling elements (amplifiers, splitters, directional couplers, etc.) are between the CMTS 102 and the CM 112ₓ, GPS coordinates, and street address. In block 324, the CMTS 102 assigns the CMs 112₁-112₅ to service groups based on their determined locations. Blocks 326 and 328 are substantially similar to blocks 308 and 310, respectively, of FIG. 3A.

The locations of the CMs 112₁-112₅ may be determined by, for example, transmitting sounding signals into the network. In order to characterize the channel with more precision, the channel sounding signal may be sent repeatedly over an interval of time and the CMs may average multiple measurements over the time interval until they can resolve identifying characteristics in the signal which indicate, for example, how many branch amplifiers and/or other coupling elements that the signal traveled through to reach the CM. In another example implementation, the CMTS may communicate with a server that stores subscriber information that associates the CMs with their geographic location (e.g., street address).

While FIGS. 3A and 3B depict SNR profiles and location as two separate bases on which to assign CMs to service groups, the two may be used in combination.

FIGS. 4A and 4B illustrate the network of FIG. 1, with different groupings of CMs based on one or both of: measured performance metric(s) and location within the HFC network.

In the example of FIG. 4A, CMs 112₁, 112₄, and 112₅ are assigned to service group 402 and CMs 112₂ and 112₃ are assigned to service group 404. The assignment of FIG. 4A may result from, for example, assigning CMs based on the number of coupling elements between the CMTS 102 and the CMs—four each for CMs 112₁, 112₄, and 112₅; five each for CMs 112₂ and 112₃. The number of coupling elements may be determined based on, for example, measured performance metrics (e.g., SNR profile) of the CMs and/or address or GPS information associated with the CMs. Alternatively, the assignment of FIG. 3A may result from, for example, assigning the CMs to service groups based directly on their respective measured performance metric(s) (e.g., the extra device in the path between CMTS 102 and CMs 112₂ and 112₃ may cause CMs 112₂ and 112₃ to have significantly poorer SNR).

In the example of FIG. 4B, CMs 112₁, 112₂, and 112₃ are assigned to service group 406 and CMs 112₄ and 112₅ are assigned to service group 408. The assignment of FIG. 4B may result from, for example, assigning CMs based on which trunk amplifiers are downstream of the CMs. Alternatively, the assignment of FIG. 3A may result from, for

US 10,135,682 B2

**7**

example, assigning the CMs to service groups based directly on their respective measured performance metric(s) (e.g., the distance between CMTS **102** and CMs **112₄** and **112₅** may be substantially greater than the distance between the CMTS **102** and the CMs **112₁**, **112₂**, and **112₃**, thus resulting in poorer SNR in CMs **112₄** and **112₅**).

Grouping CMs according to which trunk or distribution amplifiers are upstream of them may enable duty cycling power branch and/or distribution amplifiers. For example, when a CM in service group **406** is the talker, the upstream path through amplifier **106₂** may be disabled such that noise from group **408** does not interfere with transmissions from the talker of service group **406**. Grouping CMs according to which trunk or distribution amplifier(s) serve(s) them may enable using more efficient physical layer parameters. For example, where there is a relatively long distance of cable between amplifier **106₁** and **106₂** but relatively short distance of cable between amplifiers **106₁** and **106₂**, grouping the CMs by geography/distance to the CMTS may enable a lower transmit power to be used by the CMTS **102** when talking to service group **406** as compared to when talking to service group **408**.

Other embodiments of the invention may provide a non-transitory computer readable medium and/or storage medium, and/or a non-transitory machine readable medium and/or storage medium, having stored thereon, a machine code and/or a computer program having at least one code section executable by a machine and/or a computer, thereby causing the machine and/or computer to perform processes described.

Accordingly, the present invention may be realized in hardware, software, or a combination of hardware and software. The present invention may be realized in a centralized fashion in at least one computing system, or in a distributed fashion where different elements are spread across several interconnected computing systems. Any kind of computing system or other apparatus adapted for carrying out the methods described herein is suited. A typical combination of hardware and software may be a general-purpose computing system with a program or other code that, when being loaded and executed, controls the computing system such that it carries out the methods described herein. Another typical implementation may comprise an application specific integrated circuit or chip.

The present invention may also be embedded in a computer program product, which comprises all the features enabling the implementation of the methods described herein, and which when loaded in a computer system is able to carry out these methods. Computer program in the present context means any expression, in any language, code or notation, of a set of instructions intended to cause a system having an information processing capability to perform a particular function either directly or after either or both of the following: a) conversion to another language, code or notation; b) reproduction in a different material form.

While the present invention has been described with reference to certain embodiments, it will be understood by those skilled in the art that various changes may be made and equivalents may be substituted without departing from the scope of the present invention. In addition, many modifications may be made to adapt a particular situation or material to the teachings of the present invention without departing from its scope. Therefore, it is intended that the present invention not be limited to the particular embodiment disclosed, but that the present invention will include all embodiments falling within the scope of the appended claims.

**8**

What is claimed is:

**1**. A method comprising:

determining, by a cable modem termination system (CMTS), for each cable modem served by said CMTS, a corresponding signal-to-noise ratio (SNR) related metric;

assigning, by said CMTS, each cable modem among a plurality of service groups based on a respective corresponding SNR-related metric;

generating, by said CMTS for each one of said plurality of service groups, a composite SNR-related metric based at least in part on a worst-case SNR profile of said SNR-related metrics corresponding to said one of said plurality of service groups;

selecting, by said CMTS, one or more physical layer communication parameter to be used for communicating with said one of said plurality of service groups based on said composite SNR-related metric; and

communicating, by said CMTS, with one or more cable modems corresponding to said one of said plurality of service groups using said selected one or more physical layer communication parameter.

**2**. The method of claim **1**, wherein said one or more physical layer communication parameter includes one or more of: transmit power, receive sensitivity, timeslot duration, modulation type, modulation order, forward error correction (FEC) type, and FEC code rate.

**3**. The method of claim **1**, wherein said CMTS uses orthogonal frequency division multiplexing (OFDM) over a plurality of subcarriers for said communicating.

**4**. The method of claim **3**, comprising selecting, by said CMTS, said one or more physical layer communication parameter on a per-OFDM-subcarrier basis.

**5**. The method of claim **4**, wherein said one or more physical layer communication parameter includes one or both of: which of said OFDM subcarriers to use for transmission to said CMTS, and which of said OFDM subcarriers to use for reception of information from said CMTS.

**6**. The method of claim **1**, wherein:

said plurality of service groups comprises a first service group and a second service group;

said first service group has a first composite SNR versus frequency profile, said second service group has a second composite SNR versus frequency profile, and a particular cable modem has a particular SNR versus frequency profile; and

said assigning said each cable modem among said plurality of service groups comprises, for the particular cable modem:

assigning said particular cable modem to said first service group if said particular SNR versus frequency profile is more similar to said first composite SNR versus frequency profile than to said second composite SNR versus frequency profile; and

assigning said particular cable modem to said second service group if said particular SNR versus frequency profile is more similar to said second composite SNR versus frequency profile than to said first composite SNR versus frequency profile.

**7**. The method of claim **1**, comprising assigning said cable modems among said plurality of service groups based on respective distances between said CMTS and said cable modems.

**8**. The method of claim **1**, comprising assigning any particular one of said cable modems to one of said plurality

US 10,135,682 B2

**9**

of service groups based on which one or more of a plurality of branch amplifiers are upstream of said one of said plurality of cable modems.

9. The method of claim 1, wherein said determining said plurality of SNR-related metrics comprises:

transmitting a probe message to each cable modem, said probe message comprising instructions for measuring a metric and reporting said measured metric back to said CMTS; and

receiving a metric reporting message from each cable modem.

10. A system comprising:

circuitry for use in a cable modem termination system (CMTS), said circuitry comprising a network interface and a processor wherein:

said processor is configured to determine, for each cable modem served by said CMTS, a corresponding signal-to-noise ratio (SNR) related metric;

said processor is configured to assign each of said cable modems among a plurality of service groups based on a respective corresponding SNR-related metric;

said processor is configured to generate, for each one of said plurality of service groups, a composite SNR-related metric based at least in part on a worst-case SNR profile of said SNR-related metrics corresponding to said one of said plurality of service groups;

said processor is configured to select one or more physical layer communication parameter to be used for communicating with said one of said plurality of service groups based on said composite SNR-related metric; and

said network interface is configured to communicate with one or more cable modems corresponding to said one of said plurality of service groups using the one or more selected physical layer communication parameter.

11. The system of claim 10, wherein said one or more physical layer communication parameter includes one or more of: transmit power, receive sensitivity, timeslot duration, modulation type, modulation order, forward error correction (FEC) type, and FEC code rate.

12. The system of claim 10, wherein said network interface and said cable modems are configured to communicate using orthogonal frequency division multiplexing (OFDM) over a plurality of subcarriers.

13. The system of claim 12, wherein said network interface is configured such that at least one of said one or more

**10**

physical layer communication parameters are configurable on a per-OFDM-subcarrier basis.

14. The system of claim 12, wherein said one or more physical layer communication parameter includes one or both of: which of said OFDM subcarriers to use for transmission to said CMTS, and which of said OFDM subcarriers to use for reception of information from said CMTS.

15. The system of claim 10, wherein:

said plurality of service groups comprises a first service group and a second service group;

said first service group has a first composite SNR versus frequency profile, said second service group has a second composite SNR versus frequency profile, and a particular cable modem has a particular SNR versus frequency profile;

said assignment of said each cable modem among said plurality of service groups comprises, for the particular cable modem:

assignment of said particular cable modem to said first service group if said particular SNR versus frequency profile is more similar to said first composite SNR versus frequency profile than to said second composite SNR versus frequency profile; and

assignment of said particular cable modem to said second service group if said particular SNR versus frequency profile is more similar to said second composite SNR versus frequency profile than to said first composite SNR versus frequency profile.

16. The system of claim 10, wherein said processor is configured to assign said cable modems among said plurality of service groups based on respective distances between said CMTS and said cable modems.

17. The system of claim 10, wherein said processor is configured to assign each of said cable modems among said plurality of service groups based on one or more branch amplifier that serves said each of said cable modems.

18. The system of claim 10, wherein said determination of said plurality of SNR-related metrics comprises:

transmission, via said network interface, of a probe message to each cable modem, said probe message comprising instructions for measuring a metric and reporting said measured metric back to said CMTS; and

reception, via said network interface of said CMTS, of a metric reporting message from each cable modem.

\* \* \* \* \*

# EXHIBIT G

**Exhibit G**

Exemplary Chart for the '775 Patent
Infringement of U.S. Patent No. 8,223,775 by Spectrum Accused Services

| # | U.S. Patent No. 8,223,775 | Spectrum Accused Services |
|---|---|---|
| 18a | A cable modem system comprising: | The Accused Services are provided by the claimed cable modem system by utilizing, for example, at least one cable modem located at each subscriber location, including, for example, the Spectrum PC20 and Arris SB6183, and products that operate in a similar manner. By way of example, the Spectrum PC20 is charted herein. |
| 18b | a data networking engine implemented in a first circuit that includes at least one data processor, the data networking engine programmed with software that when executed by the at least one processor of the first circuit causes the data networking engine to perform home networking functions including interfacing with customer provided equipment; | The Spectrum PC20 includes a data networking engine implemented in a first circuit that includes at least one processor, the data networking engine programmed with software that when executed by the at least one processor of the first circuit causes the data networking engine to perform home networking functions including interfacing with customer provided equipment.

Specifically, the Spectrum PC20 includes a Broadcom BCM3390 SoC. |

Page 1 of 4

**Exhibit G**

| # | U.S. Patent No. 8,223,775 | Spectrum Accused Services |
|---|---|---|
| 18c | a cable modem engine implemented in a second circuit that includes at least | The Spectrum PC20, via the Broadcom BCM3390, has a dedicated cable modem CPU, a dedicated multi-threaded applications processor, and multiple hardware off-load engines. The multi-threaded applications processor implements a data networking engine. The data networking engine performs home networking functions including interfacing with customer provided equipment.<br><br><br><br>The Spectrum PC20 has a cable modem engine implemented in a second circuit that includes at least one processor, the second circuit being separate from the first circuit, the cable modem engine programmed with software that when executed by the at least one |

Page **2** of **4**

APPX129

Case 2:22-cv-00125-JRG   Document 1-8   Filed 04/27/22   Page 4 of 5 PageID #: 110

## Exhibit G

| # | U.S. Patent No. 8,223,775 | Spectrum Accused Services |
|---|---|---|
| | one processor, the second circuit being separate from the first circuit, the cable modem engine programmed with software that when executed by the at least one processor of the second circuit causes the cable modem engine to perform cable modem functions other than the home networking functions performed by the data networking engine, the cable modem functions including interfacing with cable media, and the cable modem engine configured to enable upgrades to its software in a manner that is independent of upgrades to the software of the data networking engine, the cable modem engine including a DOCSIS controller and a DOCSIS MAC processor, the DOCSIS MAC processor configured to process downstream PDU packets | processor of the second circuit causes the cable modem engine to perform cable modem functions other than the home networking functions performed by the data networking engine, the cable modem functions including interfacing with cable media, and the cable modem engine configured to enable upgrades to its software in a manner that is independent of upgrades to the software of the data networking engine, the cable modem engine including a DOCSIS controller and a DOCSIS MAC processor, the DOCSIS MAC processor configured to process downstream PDU packets and forward the processed packets directly to the data networking engine without the involvement of the DOCSIS controller in order to boost downstream throughput. Specifically, the Spectrum PC20 has a dedicated cable modem CPU, a dedicated multi-threaded applications processor, and multiple hardware off-load engines. The cable modem CPU provides a cable modem engine. The cable modem CPU is separate from the multi-threaded applications processor and the hardware off-load engines. Accordingly, upgrades to the cable modem engine are independent of upgrades to the data networking engine. The cable modem CPU implements the cable modem engine. Upon information and belief, the cable modem engine includes a DOCSIS controller and a DOCSIS MAC processor, the DOCSIS MAC processor configured to process downstream PDU packets and forward the processed packets directly to the data networking engine without the involvement of the DOCSIS controller in order to boost downstream throughput |

APPX130

Case 2:22-cv-00125-JRG   Document 1-8   Filed 04/27/22   Page 5 of 5 PageID #: 111

**Exhibit G**

| # | U.S. Patent No. 8,223,775 | Spectrum Accused Services |
|---|---|---|
| | and forward the processed packets directly to the data networking engine without the involvement of the DOCSIS controller in order to boost downstream throughput; and | |
| 18d | a data bus that connects the data networking engine to the cable modem engine, wherein the cable modem functions performed by the cable modem engine are completely partitioned from the home networking functions performed by the data networking engine. | The Spectrum PC20 has a data bus that connects the data networking engine to the cable modem engine, wherein the cable modem functions performed by the cable modem engine are completely partitioned from the home networking functions performed by the data networking engine. Specifically, the Spectrum PC20 has a dedicated cable modem CPU, a dedicated multi-threaded applications processor, and multiple hardware off-load engines. The multi-threaded applications processor provides the data networking engine and the cable modem CPU provides the cable modem engine. The cable modem CPU is separate from, the multi-threaded applications processor. Accordingly, the cable modem functions performed by the cable modem engine are completely partitioned from the home networking functions performed by the data networking engine. The cable modem CPU communicates with the multi-threaded applications processor using a data bus. Accordingly, the data bus connects the data networking engine and the cable modem engine. |
| 19 | A cable modem system as claimed in claim 18, wherein all DOCSIS functions are localized in the cable modem engine. | In the Spectrum PC20, all DOCSIS functions are localized in the cable modem engine. Specifically, the Spectrum PC20 includes a dedicated cable modem CPU, a dedicated multi-threaded applications processor, and multiple hardware off-load engines. The DOCSIS functions are localized in the cable modem CPU. |

Page **4** of **4**

APPX131

Case 2:22-cv-00125-JRG   Document 1-9   Filed 04/27/22   Page 1 of 6 PageID #:  112

# EXHIBIT H

Case 2:22-cv-00125-JRG   Document 1-9   Filed 04/27/22   Page 2 of 6 PageID #: 113

**Exhibit H**

Exemplary Chart for the '690 Patent
Infringement of U.S. Patent No. 8,284,690 by Spectrum Accused Services

| # | U.S. Patent No. 8,284,690 | Spectrum Accused Services |
|---|---|---|
| 1pre | A method comprising: | The Accused Services perform the claimed method utilizing, for example, including a Cable Modem Termination System ("CMTS") operated by Spectrum and at least one cable modem located at each subscriber location, including, for example, the Spectrum PC20, and products that operate in a similar manner. By way of example, the Spectrum PC20 is charted herein. |
| 1a | a) receiving in a first node, a probe request specifying a first plurality of parameters associated with the generation and transmission of a probe, wherein the first plurality of parameters at least specify content payload of the probe and a second node; | The Accused Services include receiving in a first node, a probe request specifying a first plurality of parameters associated with the generation and transmission of a probe, wherein the first plurality of parameters at least specify content payload of the probe and a second node.<br><br>Specifically, the Spectrum PC20 samples and digitizes the entire 1GHz downstream spectrum of a cable plant and includes remote diagnostics capabilities that provide real time, unobtrusive diagnostic and spectrum analysis capabilities. These remote diagnostic capabilities include measuring statistics of the downstream spectrum. The Spectrum PC20 provides an agent that receives requests querying the performance of the downstream spectrum from a second node. Upon information and belief, the requests include the first plurality of parameters that at least specify content payload of the probe and the second node. For example, in a deployed system, the first node may be a cable modem and the second node may be a CMTS. |
| 1b | b) determining a second plurality of parameters associated with | The Spectrum PC20 determines a second plurality of parameters associated with generation and transmission of the probe. |

Page 1 of 5

**APPX133**

Case 2:22-cv-00125-JRG   Document 1-9   Filed 04/27/22   Page 3 of 6 PageID #: 114

**Exhibit H**

| # | U.S. Patent No. 8,284,690 | Spectrum Accused Services |
|---|---|---|
| | generation and transmission of the probe; | Specifically, the Spectrum PC20 determines information responsive to the received request based on the measured statistics of the downstream spectrum. Upon information and belief, the information includes a second plurality of parameters associated with the generation and transmission of the probe. |
| 1c | c) generating the probe in accordance with the first plurality of parameters and the second plurality of parameters, wherein the probe has a form dictated by the first plurality of parameters; and | The Spectrum PC20 generates the probe in accordance with the first plurality of parameters and the second plurality of parameters, wherein the probe has a form dictated by the first plurality of parameters.<br><br>Specifically, the Spectrum PC20 generates a message responsive to the received request, the message indicating the responsive information and having a particular form determined by the request. |
| 1d | d) transmitting the probe from the first node to the second node. | The Spectrum PC20 transmits the probe from the first node to the second node.<br><br>Specifically, the Spectrum PC20 transmits the message to the second node using its agent. |
| 7 | The method of claim 1, wherein the probe request requests a probe that assists in diagnosing a network problem. | The probe request requests a probe that assists in diagnosing a network problem.<br><br>Specifically, the Spectrum PC20 includes remote diagnostics capabilities that provide real time, unobtrusive diagnostic and spectrum analysis capabilities related to diagnosing network problems. Upon information and belief, Spectrum utilizes these remote diagnostic capabilities to assist in diagnosing a network problem. |
| | | |

**APPX134**

**Exhibit H**

| # | U.S. Patent No. 8,284,690 | Spectrum Accused Services |
|---|---|---|
| 8 | The method of claim 7, wherein the probe request is generated by a network operator and uploaded to the second node. | The probe request is generated by a network operator and uploaded to the second node.<br><br>Specifically, a collector server operated by Spectrum provides the probe request to the second node. |
| 9pre | A method comprising: | The Accused Services perform the claimed method utilizing, for example, including a Cable Modem Termination System ("CMTS") operated by Spectrum and at least one cable modem located at each subscriber location, including, for example, the Spectrum PC20, and products that operate in a similar manner. By way of example, the Arris E6000 CMTS is charted herein. |
| 9a | a) a first node transmitting a probe request to a second node, the probe request specifying a first plurality of probe parameters for a physical layer probe, the first plurality of probe parameters comprising a form for the probe including a modulation profile for the probe; | The Spectrum Services include a first node transmitting a probe request to a second node, the probe request specifying a first plurality of probe parameters for a physical layer probe, the first plurality of probe parameters comprising a form for the probe including a modulation profile for the probe.<br><br>Specifically, the Arris E6000 provides a set of SNMP (Simple Network Management Protocol) variables supported by the Arris E6000 known collectively as the MIB (Management Information Base). The MIBs includes support for per modem/per upstream channel stats, RCC definitions, per MAC event handling, per modem event handling and counts, and per modem impairment reporting. The Arris E6000 transmits, to cable modems, requests specifying parameters as defined in the MIBs. The requests have a modulation profile. For example, in a deployed system, the first node may be at least a CMTS and the second node may be a cable modem. |

Page 3 of 5

**APPX135**

**Exhibit H**

| # | U.S. Patent No. 8,284,690 | Spectrum Accused Services |
|---|---|---|
| 9b | b) the first node receiving the probe from the second node, wherein the probe is generated in accordance with the first plurality of parameters and in accordance with a second plurality of parameters determined by the second node. | The Arris E6000 receives the probe from the second node, wherein the probe is generated in accordance with the first plurality of parameters and in accordance with a second plurality of parameters determined by the second node.

Specifically, the Arris E6000 receives, from the cable modems, messages responsive to the requests. The message includes data relevant to the request and generated based on the MIBs. |
| 11pre | The method of claim 9, further comprising: | See 9pre. |
| 11a | a) the first node transmitting a second probe request to a third node; | See 9a. |
| 11b | b) and the first node receiving a second probe from the third node, wherein the second probe is generated according to the second probe request; and | See 9b. |
| 11d | wherein the first probe and second probe are transmitted simultaneously using OFDMA. | The first probe and second probe are transmitted simultaneously using OFDMA. |
| 15 | The method of claim 9, wherein the probe request is configured to diagnose a network problem. | The probe request is configured to diagnose a network problem.

Upon information and belief, Spectrum utilizes these remote diagnostic capabilities to assist in diagnosing a network problem. For example, the MIBs may include support for per modem/per upstream channel stats, |

## Exhibit H

| # | U.S. Patent No. 8,284,690 | Spectrum Accused Services |
|---|---|---|
| | | RCC definitions, per MAC event handling, per modem event handling and counts, and per modem impairment reporting, which can be used to diagnose a network problem. |
| 16 | The method of claim 15, wherein the probe request is generated by a network operator and uploaded to the first node. | The probe request is generated by a network operator and uploaded to the first node.<br><br>Specifically, a collector server operated by Spectrum can provide the probe request to the first node. |

Page **5** of **5**

APPX137

# EXHIBIT I

**Exhibit I**

**Exemplary Chart for the '008 Patent**

**Infringement of U.S. Patent No. 8,792,008 by Spectrum Accused Services**

| # | U.S. Patent No. 8,792,008 | Spectrum Accused Services |
|---|---------------------------|---------------------------|
| 1a | 1. A system comprising: | The Accused Services are provided by the claimed system by utilizing, for example, the Accused Set Top Products, which include at least one set top box ("STB") located at each subscriber location, including, for example, the Spectrum 100-series STBs, Spectrum 200-series STBs, Spectrum 101-series STBs, Spectrum 201-series STBs, Spectrum 110-series STBs, Spectrum 210-series STBs, the Arris DCX3600 STB, and products that operate in a similar manner. By way of example, the Spectrum 210 (specifically the Spectrum 210-T) is charted herein. |
| 1b | an analog-to-digital converter operable to digitize a received signal spanning an entire television spectrum comprising a plurality of television channels, said digitization resulting in a digitized signal; | The Spectrum 210 has an analog-to-digital converter operable to digitize a received signal spanning an entire television spectrum comprising a plurality of television channels, said digitization resulting in a digitized signal.<br><br>Specifically, the Spectrum 210 has an analog to digital converter: |

**Exhibit I**

| | | |
|---|---|---|
| | The Spectrum 210 receives the entire 1GHz downstream spectrum of a Spectrum cable plant. The 1 GHz cable spectrum includes a plurality of television channels. The Spectrum 210 digitizes the entire received signal; the digitization results in a digitized signal. | |
| **1c** | a signal monitor operable to: | The Spectrum 210 has a signal monitor: |
| | | |

Page **2** of **6**

**Exhibit I**



| | | |
|---|---|---|
| **1d** | analyze said digitized signal to determine a characteristic of said digitized signal; and | The Spectrum 210 analyzes said digitized signal to determine a characteristic of said digitized signal.<br><br>Specifically, the Spectrum 210 includes remote diagnostics capabilities that provide real time, unobtrusive diagnostic and spectrum analysis capabilities. Upon information and belief, the Spectrum 210 analyzes, using the signal monitor, said digitized signal to determine a characteristic of said digitized signal. |
| **1e** | report said determined characteristic to a source of said received signal; | The Spectrum 210 reports said determined characteristic to a source of said received signal. |

Page **3** of **6**

APPX141

**Exhibit I**

| | | |
|---|---|---|
| **1f** | a data processor operable to process a television channel to recover content carried on the television channel; and | Specifically, the Spectrum 210 includes remote diagnostics capabilities that provide real time, unobtrusive diagnostic and spectrum analysis capabilities. Upon information and belief, the Spectrum 210 reports said determined characteristic to a source of said received signal.<br><br>The Spectrum 210 has a data processor operable to process a television channel to recover content carried on the television channel:<br><br> |
| **1g** | a channelizer operable to: | Specifically, in the Spectrum 210, each digitally tuned television channel is provided to a digital demodulator that outputs a transport stream for use in broadcast services.<br><br>The Spectrum 210 has a channelizer: |

Page **4** of **6**

**Exhibit I**



| | | |
|---|---|---|
| **1h** | select a first portion of said digit-ized signal; | The Spectrum 210 selects a first portion of said digitized signal.<br><br>Specifically, the Spectrum 210 includes advanced signal processing techniques that can be used to digitally tune multiple channels simultaneously, including selecting a first portion of said digitized signal. |
| **1i** | select a second portion of said digitized signal; and | The Spectrum 210 selects a second portion of said digitized signal.<br><br>Specifically, the Spectrum 210 includes advanced signal processing techniques that can be used to digitally tune multiple channels simultaneously, including selecting a second portion of said digitized signal. |

Page **5 of 6**

**APPX143**

**Exhibit I**

| | | |
|---|---|---|
| 1j | concurrently output said first portion of said digitized signal to said signal monitor and said second portion of said digitized signal to said data processor. | The Spectrum 210 concurrently outputs said first portion of said digitized signal to said signal monitor and said second portion of said digitized signal to said data processor.<br><br>Specifically, the Spectrum 210 includes remote diagnostics capabilities that provide real time, unobtrusive diagnostic and spectrum analysis capabilities without affecting user service on any downstream channels. As described above, the first portion of said digitized signal is output to said signal monitor and said second portion of said digitized signal is output to said data processor. Accordingly, the Spectrum 210 concurrently outputs said first portion of said digitized signal to said signal monitor and said second portion of said digitized signal to said data processor. |
| 2 | 2. The system of claim 1, wherein said first portion of said digitized signal spans said entire television spectrum. | See 1h. |

**APPX144**

# EXHIBIT J

**Exhibit J**

**Exemplary Chart for the '362 Patent**

**Infringement of U.S. Patent No. 9,210,362 by Spectrum Accused Services**

| # | U.S. Patent No. 9,210,362 | Spectrum Accused Services |
|---|---|---|
| 11a | A method comprising: | The Accused Services perform the claimed method utilizing, for example, the Accused Set Top Products, which include at least one set top box ("STB") located at each sub-scriber location, including, for example, the Spectrum 100-series STBs, Spectrum 200-series STBs, Spectrum 101-series STBs, Spectrum 201-series STBs, Spectrum 110-series STBs, Spectrum 210-series STBs, the Arris DCX3600 STB, and products that operate in a similar manner. By way of example, the Spectrum 210 (specifically the Spectrum 210-T) is charted herein. |
| 11b | in a wideband receiver system: | The Spectrum 210 is a wideband receiver system. |
| 11c | downconverting, by a mixer module of said wideband receiver system, a plurality of frequencies that comprises a plurality of desired television channels and a plurality of undesired television channels; | The Spectrum 210 downconverts, by a mixer module of said wideband receiver system, a plurality of frequencies that comprises a plurality of desired television channels and a plurality of undesired television channels.

Specifically, the Spectrum 210 includes advanced signal processing techniques, including a mixer, that can be used to downconvert a plurality of frequencies that comprises a plurality of desired television channels and a plurality of undesired television channels. |
| 11d | digitizing, by a wideband analog-to-digital converter (ADC) module of said wideband receiver system, said plurality of frequencies comprising said plurality of desired television channels and said plurality of undesired television channels; | The Spectrum 210 digitizes, by a wideband analog-to-digital converter (ADC) module of said wideband receiver system, said plurality of frequencies comprising said plurality of desired television channels and said plurality of undesired television channels.

Specifically, the Spectrum 210 digitizes the entire 1GHz downstream spectrum of a Spectrum cable plant. The 1 GHz cable spectrum includes a plurality of desired and undesired television channels. |

**Exhibit J**

| | | |
|---|---|---|
| **11e** | selecting, by digital circuitry of said wideband receiver system, said plurality of desired television channels from said digitized plurality of frequencies; and | The Spectrum 210s select, by digital circuitry of said wideband receiver system, said plurality of desired television channels from said digitized plurality of frequencies as described below:<br><br>Specifically, the Spectrum 210 includes advanced signal processing techniques that can be used to digitally tune multiple channels simultaneously, including to select the plurality of desired television channels from the digitized plurality of frequencies. |
| **11f** | outputting, by said digital circuitry of said wideband receiver system, said selected plurality of television channels to a demodulator as a digital datastream. | The Spectrum 110 and Spectrum 210 output, by said digital circuitry of said wideband receiver system, said selected plurality of television channels to a demodulator as a digital datastream.<br><br>Specifically, in the Spectrum 210, the digitally tuned and selected plurality of desired television channels are then fed into a digital demodulator that outputs a transport stream for use in broadcast services. |

Page 2 of 2

APPX147

# EXHIBIT K

**Exhibit K**

**Exemplary Chart for the '826 Patent**
**Infringement of U.S. Patent No. 9,825,826 by Spectrum Accused Services**

| # | U.S. Patent No. 9,825,826 | Spectrum Accused Services |
|---|---|---|
| 1a | A method comprising: | The Accused Services perform the claimed method utilizing, for example, the Accused Set Top Products, which include at least one set top box ("STB") located at each subscriber location, including, for example, the Spectrum 100-series STBs, Spectrum 200-series STBs, Spectrum 101-series STBs, Spectrum 201-series STBs, Spectrum 110-series STBs, Spectrum 210-series STBs, the Arris DCX3600 STB, and products that operate in a similar manner. By way of example, the Spectrum 210 (specifically the Spectrum 210-T) is charted herein. |
| 1b | performing by one or more circuits of a receiver coupled to a television and data service provider headend via a hybrid fiber coaxial (HFC) network: | The Spectrum 210 includes one or more circuits of a receiver coupled to a television and data service provider headend via a hybrid fiber coaxial (HFC) network, that perform the claimed steps, as described below: |

Page 1 of 4

**APPX149**

**Exhibit K**

| # | U.S. Patent No. 9,825,826 | Spectrum Accused Services |
|---|---|---|
| 1c | receiving, via said HFC network, a signal that carries a plurality of channels, wherein said channels comprise one or both of television channels and data channels; | The Spectrum 210 receives, via said HFC network, a signal that carries a plurality of channels, wherein said channels comprise one or both of television channels and data channels.<br><br>Specifically, the Spectrum 210 receives the entire 1GHz downstream spectrum of a Spectrum cable plant. The 1 GHz cable spectrum includes a plurality of data and television channels. |
| 1d | digitizing said received signal to generate a digitized signal; | The Spectrum 210 digitizes said received signal to generate a digitized signal.<br><br>Specifically, the Spectrum 210 digitizes the entire 1GHz downstream spectrum it receives to generate a digitized signal. |

BCM3384 SoC
HDMI Connector
Coaxial Connector

Page **2** of **4**

APPX150

**Exhibit K**

| # | U.S. Patent No. 9,825,826 | Spectrum Accused Services |
|---|---|---|
| 1e | selecting a first portion of said digitized signal; | The Spectrum 210 selects a first portion of said digitized signal.<br><br>Specifically, the Spectrum 210 includes advanced signal processing techniques that can be used to digitally tune multiple channels simultaneously, including to select a first portion of said digitized signal. |
| 1f | selecting a second portion of said digitized signal; | The Spectrum 210 selects a second portion of said digitized signal.<br><br>Specifically, the Spectrum 210 includes advanced signal processing techniques that can be used to digitally tune multiple channels simultaneously, including to select a second portion of said digitized signal. |
| 1g | processing said selected second portion of said digitized signal to recover information carried in said plurality of channels; | The Spectrum 210 process said selected second portion of said digitized signal to recover information carried in said plurality of channels.<br><br>Specifically, in the Spectrum 210, each digitally tuned channel then feeds the signal into a digital demodulator that outputs a transport stream for use in data or broadcast services. |
| 1h | analyzing said selected first portion of said digitized signal to measure a characteristic of said received signal; and | The Spectrum 210 analyzes said selected first portion of said digitized signal to measure a characteristic of said received signal.<br><br>Specifically, the Spectrum 210 includes remote diagnostics capabilities that provide real time, unobtrusive diagnostic and spectrum analysis capabilities. Upon information and belief, the Spectrum 210 includes a signal analyzer that analyzes said selected first portion to determine one or more characteristics of the received signal. |
| 1i | controlling the transmission of network management messages back to said headend based on said measured characteristic of said received signal, | The Spectrum 210 controls the transmission of network management messages back to said headend based on said measured characteristic of said received signal, wherein said measured characteristic is different than said network management messages.<br><br>Specifically, the Spectrum 210 includes remote diagnostics capabilities that provide real time, unobtrusive diagnostic and spectrum analysis capabilities. Upon information and belief, the |

APPX151

**Exhibit K**

| # | U.S. Patent No. 9,825,826 | Spectrum Accused Services |
|---|---|---|
| | wherein said measured characteristic is different than said network management messages. | Spectrum 210 controls the transmission of network management messages back to said headend based on said measured characteristic of said received signal. Upon information and belief, said measured characteristic is different than said network management messages |

Page **4** of 4

**APPX152**

# EXHIBIT L

**Exhibit L**

Exemplary Chart for the '682 Patent
Infringement of U.S. Patent No. 10,135,682 by Spectrum Accused Services

| # | U.S. Patent No. 10,135,682 | Spectrum Accused Services |
|---|---|---|
| 1a | A method comprising: | The Accused Services perform the claimed method utilizing, for example, including a Cable Modem Termination System ("CMTS") operated by Spectrum and at least one cable modem located at each subscriber location, including, for example, the Spectrum PC20, and products that operate in a similar manner. By way of example, the Arris E6000 CMTS is charted herein. |
| 1b | determining, by a cable modem termination system (CMTS), for each cable modem served by said CMTS, a corresponding signal-to-noise ratio (SNR) related metric; | The Arris E6000 CMTS determines, for each cable modem served by said CMTS, a corresponding signal-to-noise ratio (SNR) related metric.<br><br>Spectrum started using Arris CMTS's as early as 2014, including the E6000, Arris' CMTS that added video edge QAM components and became a fully integrated Converged Cable Access Platform. The E6000's capabilities are described, for example, in the E6000 Manual.<br><br>Spectrum continues to use CMTSs like the E6000 to send and receive packets to downstream cable modems over the Internet. For the purposes of this analysis, the PC20 will be assessed. However, Spectrum's services are compatible with a variety of cable modems for consumers to utilize in conjunction with their services.<br><br>Cable modems, such as the PC20, include chips capable of receiving and transmitting performance data to the CMTS, such as Broadcom's BCM3390 system-on-a-chip ("SoC") |

**APPX154**

**Exhibit L**

| # | U.S. Patent No. 10,135,682 | Spectrum Accused Services |
|---|---|---|
| | |  Accordingly, cable modems, such as the PC20, are capable of bidirectional communications with upstream CMTSs, such as the E6000.

Spectrum utilizes its CMTSs to determine a corresponding signal-to-noise ratio (SNR) related metric for each cable modem served by said CMTS. For example, according to the E6000 user manual, the CMTS utilizes a powerful spectral analysis engine built into every upstream receiver to gather detailed information about upstream channel noise. |

Page **2** of **4**

APPX155

**Exhibit L**

| # | U.S. Patent No. 10,135,682 | Spectrum Accused Services |
|---|---|---|
| 1c | assigning, by said CMTS, each cable modem among a plurality of service groups based on a respective corresponding SNR-related metric; | A service group includes one or more modems. The Arris E6000 CMTS assigns each cable modem among a plurality of service groups based on a respective corresponding SNR-related metric.<br><br>Specifically, the Arris E6000 CMTS utilizes a process of profiling downstream modems. |
| 1d | generating, by said CMTS for each one of said plurality of service groups, a composite SNR-related metric based at least in part on a worst-case SNR profile of said SNR-related metrics corresponding to said one of said plurality of service groups; | The Arris E6000 CMTS generates, for each one of said plurality of service groups, a composite SNR-related metric based at least in part on a worst-case SNR profile of said SNR-related metrics corresponding to said one of said plurality of service groups.<br><br>Specifically, the Arris E6000 CMTS generates SNR-related metrics based on a worst-case SNR profile of each service group. For example, the Arris E6000 CMTS optimizes a modulation profile based on worst-case noise that is expected on the upstream channel and still achieve a reasonable level of performance. |
| 1e | selecting, by said CMTS, one or more physical layer communication parameter to be used for communicating with said one of said plurality of service groups based on said composite SNR-related metric; and | The Arris E6000 CMTS selects one or more physical layer communication parameter to be used for communicating with said one of said plurality of service groups based on said composite SNR-related metric.<br><br>Specifically, the Arris E6000 CMTS selects one or more physical layer communication parameters to be used for communicating, via a physical layer, with each service group of downstream modems. For example, the Arris E6000 CMTS selects one or more physical communication parameters that control modems in the various upstream channels, which have been configured via the modulation profiles. For example, when adding additional forward error correction to attempt to correct for upstream errors is no longer efficient, a lower modulation rate (e.g. a physical layer communication parameter) is applied to a particular service group. |

**APPX156**

## Exhibit L

| # | U.S. Patent No. 10,135,682 | Spectrum Accused Services |
|---|---|---|
| 1f | communicating, by said CMTS, with one or more cable modems corresponding to said one of said plurality of service groups using said selected one or more physical layer communication parameter. | The Arris E6000 CMTS communicates with one or more cable modems corresponding to said one of the plurality of service groups using the selected one or more physical layer communication parameter.<br><br>Specifically, Spectrum communicates, via its CMTSs (such as the Arris E6000 CMTS), messages that include parameters that control cable modems in one of said plurality of service groups in the various upstream channels. These communications utilize the selected one or more physical layer communication parameters. |

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | |
|---|---|
| ENTROPIC COMMUNICATIONS, LLC,<br><br>    Plaintiff,<br><br>    v.<br><br>CHARTER COMMUNICATIONS, INC.,<br><br>    Defendant. | Case No. 2:22-cv-00125-JRG<br><br>**DEMAND FOR JURY TRIAL** |

## SECOND AMENDED COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff, Entropic Communications, LLC ("Entropic"), files this Second Amended Complaint for patent infringement against Charter Communications, Inc. ("Charter") and in support thereof alleges and avers as follows:

## NATURE OF THE ACTION

1.      This is a civil action arising under the patent laws of the United States, 35 U.S.C. § 1 *et seq.*, including specifically 35 U.S.C. § 271, based on Charter's infringement of U.S. Patent Nos. 8,223,775 (the "'775 Patent"), 8,284,690 (the "'690 Patent"), 8,792,008 (the "'008 Patent"), 9,210,362 (the "'362 Patent"), 9,825,826 (the "'826 Patent"), and 10,135,682 (the "'682 Patent") (collectively "the Patents-in-Suit").

## THE PARTIES

2.      Entropic is a Delaware limited liability company with an office at 7150 Preston Rd., Suite 300 Plano, Texas 75024.

3.      On information and belief, Defendant Charter Communications, Inc. is a corporation established under the laws of the State of Delaware, with a principal place of business at 1400 Atlantic St., Stamford, CT 06901.

-1-

APPX158

4.       Charter Communications, Inc. has a registered agent in Texas, Corporation Service Company d/b/a CSC - Lawyers Incorporating Service Company, located at 211 East 7th Street, Suite 620, Austin, Texas 78701.

5.       According to its website, https://corporate.charter.com/about-charter, "Charter Communications, Inc. (NASDAQ:CHTR) is a leading broadband connectivity company and cable operator serving more than 32 million customers in 41 states through its Spectrum brand."

6.       Charter owns or leases, and maintains and operates several stores in this district by and through subsidiary limited liability companies that it manages and controls, including Spectrum Gulf Coast LLC, and negotiates and signs agreements on Spectrum Gulf Coast's behalf.

7.       In each of those stores, Charter owns and stores equipment such as modems and set top boxes ("STBs") and demonstrates services provided via those products to Charter customers by and through subsidiary limited liability companies that it manages and controls.

8.       Charter employs personnel that install, service, repair and/or replace equipment, as appropriate, in this district by and through subsidiary limited liability companies that it manages and controls.

9.       Charter is the corporate manager of its subsidiary LLCs that own or lease property in this district, that employ employees in this district, and that own, store, sell, demonstrate, and lease equipment in this district. Charter has the right to exercise near total control of each entity's operations through its LLC agreements with each entity.

## JURISDICTION AND VENUE

10.       This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a) because the claims herein arise under the patent laws of the United States, 35 U.S.C. § 1 et seq., including 35 U.S.C. § 271.

11.     This Court has personal jurisdiction over Charter in this action because Charter[1] has committed acts of infringement within the State of Texas and within this district through, for example, the provision of cable television and internet services ("Accused Services") via the lease, sale, and/or distribution of cable modems and STBs both online and from Spectrum stores in this District. For example, Charter has and continues to lease, sell, and/or distribute the Arris SB6183 cable modem, Spectrum PC20 (e.g. the Spectrum EU2251) cable modem, and products that operate in a similar manner ("Accused Cable Modem Products"), as well as Spectrum 100-series STBs, Spectrum 200-series STBs, Spectrum 101-series STBs, Spectrum 201-series STBs, Spectrum 110-series STBs, Spectrum 210-series STBs, the Arris DCX3600 STB, and products that operate in a similar manner ("Accused Set Top Products"). Further, there is general personal jurisdiction over Charter in this Judicial District, given Charter's intentional direction of its advertising efforts to potential customers here in the form of robocalls that Charter makes to such potential customers.

12.     The Accused Cable Modem Products, Accused Set Top Products, and Accused Services are available for subscription online from the Charter website.

13.     The Accused Services are available for subscription from various physical stores, including those at 700 Alma Dr., Plano, Texas 75075, 2100 N. Dallas Pkwy, Plano, Texas 75075, and 4255-A Dowlen Rd., Beaumont, Texas 77706.

14.     The devices, including the Accused Cable Modem Products and Accused Set Top Products, provided by Charter to supply the Accused Services are provided to customers in this district and may be obtained by customers from physical locations in this district, including those

---

[1] References to "Charter" include Charter's own actions and its actions by and through its subsidiary limited liability companies that it manages and controls, unless otherwise specified.

at 700 Alma Dr., Plano, Texas 75075, 2100 N. Dallas Pkwy, Plano, Texas 75075, and 4255-A Dowlen Rd., Beaumont, Texas 77706.

15.     Venue is proper in this district pursuant to 28 U.S.C. § 1400(b). Venue is proper because Charter has committed and continues to commit acts of patent infringement in this district, including making, using, offering to sell, and/or selling Accused Services, Accused Cable Modem Products, and Accused Set Top Products in this district, and/or importing Accused Services, Accused Set Top Products, and Accused Cable Modem Products into this district, including by Internet sales and sales via retail and wholesale stores, inducing others to commit acts of patent infringement in this district and/or committing at least a portion of any other infringements alleged herein in this district.

16.     Charter has regular and established places of business in this district, including at least at 1414 Summit Ave., Plano, Texas 75074:



(https://www.google.com/maps/place/1414+Summit+Ave,+Plano,+TX+75074/@33.0094166,-96.691439,3a,75y,150.17h,90t/data=!3m7!1e1!3m5!1seMJAIjYK9mlgeFGO3-opTg!2e0!6shttps:%2F%2Fstreetviewpixels-pa.googleapis.com%2Fv1%2Fthumbnail%3Fpanoid%3DeMJAIjYK9mlgeFGO3-

APPX161

opTg%26cb_client%3Dsearch.gws-

prod.gps%26w%3D86%26h%3D86%26yaw%3D150.1734%26pitch%3D0%26thumbfov%3D10

0!7i16384!8i8192!4m9!1m2!2m1!1s1414+Summit+Ave,+Plano,+TX+75074+and+2344+Rutlan

d+Dr.+Austin,+TX+78758!3m5!1s0x864c193c2e57c475:0x9e396bd707e242d3!8m2!3d33.0089

809!4d-

96.6911307!15sCkYxNDE0IFN1bW1pdCBBdmUsIFBsYW5vLCBUWWCA3NTA3NCBhbmQg

MjM0NCBSdXRsYW5kIERyLiBBdXN0aW4sIFRYIDc4NzU4kgERY29tcG91bmRfYnVpbGR

pbmc)

    17.    Charter has retail stores in the district, including storefronts located at 700 Alma

Dr., Plano, Texas 75075, 2100 N. Dallas Pkwy, Plano, Texas 75075, and 4255-A Dowlen Rd.,

Beaumont, Texas 77706, among others.



(https://www.google.com/maps/place/700+Alma+Dr,+Plano,+TX+75075/@33.009285,-

96.7156924,3a,75y,79.47h,78.1t/data=!3m6!1e1!3m4!1sV4Kgs33OEPn0OTPugr40sw!2e0!7i16

384!8i8192!4m5!3m4!1s0x864c18dd73ceae97:0x243da1c3797f6336!8m2!3d33.0097073!4d-

96.7151173)

APPX162



(https://www.google.com/maps/place/Spectrum+Store/@33.0290298,-

96.8264017,3a,75y,278.05h,90t/data=!3m7!1e1!3m5!1sChdq99YtQUVhIguvPSaS_w!2e0!6shtt

ps:%2F%2Fstreetviewpixels-

pa.googleapis.com%2Fv1%2Fthumbnail%3Fpanoid%3DChdq99YtQUVhIguvPSaS_w%26cb_cl

ient%3Dmaps_sv.tactile.gps%26w%3D224%26h%3D298%26yaw%3D278.04987%26pitch%3

D0%26thumbfov%3D100!7i16384!8i8192!4m14!1m6!3m5!1s0x864c23070b47ed93:0xd9df492

87ca0c559!2sSpectrum+Store!8m2!3d33.0290441!4d-

96.8265123!3m6!1s0x864c23070b47ed93:0xd9df49287ca0c559!8m2!3d33.0290441!4d-

96.8265123!14m1!1BCgIgARICCAI)



(https://www.google.com/maps/place/Spectrum/@30.122185,-

94.1625943,3a,75y,90t/data=!3m8!1e2!3m6!1sAF1QipO5TahIK2i_6g7gm0X27L1OJ53yEjMyu

bkMbPiA!2e10!3e12!6shttps:%2F%2Flh5.googleusercontent.com%2Fp%2FAF1QipO5TahIK2i

_6g7gm0X27L1OJ53yEjMyubkMbPiA%3Dw203-h270-k-

no!7i3120!8i4160!4m14!1m6!3m5!1s0x863ecad62b4ceadb:0x88f010bf14187660!2sSpectrum!8

m2!3d30.1221793!4d-

94.1625942!3m6!1s0x863ecad62b4ceadb:0x88f010bf14187660!8m2!3d30.1221793!4d-

94.1625942!14m1!1BCgIgAQ)

18.     Each of the above locations features the **Spectrum** logo. According to Charter's

website, https://corporate.charter.com/about-charter, this logo refers to "a suite of advanced

broadband services offered by Charter Communications, Inc."

19.     Charter targets its advertisements to residents of this district.

20.     Charter continues to conduct business in this judicial district, including one or more

acts of making, selling, using, importing and/or offering for sale Accused Products or providing

the Accused Services to Charter's customers in this District.

## THE PATENTS-IN-SUIT

21.    On July 17, 2012, U.S. Patent No. 8,223,775, entitled "Architecture for a Flexible and High-Performance Gateway Cable Modem," was duly and legally issued by the United States Patent and Trademark Office.  A true and accurate copy of the '775 Patent is attached hereto as Exhibit A.

22.    On October 9, 2012, U.S. Patent No. 8,284,690, entitled "Receiver Determined Probe," was duly and legally issued by the United States Patent and Trademark Office.  A true and accurate copy of the '690 Patent is attached hereto as Exhibit B.

23.    On July 29, 2014, U.S. Patent No. 8,792,008, entitled "Method and Apparatus for Spectrum Monitoring," was duly and legally issued by the United States Patent and Trademark Office.  A true and accurate copy of the '008 Patent is attached hereto as Exhibit C.

24.    On December 8, 2015, U.S. Patent No. 9,210,362, entitled "Wideband Tuner Architecture," was duly and legally issued by the United States Patent and Trademark Office.  A true and accurate copy of the '362 Patent is attached hereto as Exhibit D.

25.    On November 21, 2017, U.S. Patent No. 9,825,826, entitled "Method and Apparatus for Spectrum Monitoring," was duly and legally issued by the United States Patent and Trademark Office.  A true and accurate copy of the '826 Patent is attached hereto as Exhibit E.

26.    On November 20, 2018, U.S. Patent No. 10,135,682, entitled "Method and System for Service Group Management in a Cable Network," was duly and legally issued by the United States Patent and Trademark Office.  A true and accurate copy of the '682 Patent is attached hereto as Exhibit F.

27.    Entropic is the owner by assignment of all rights, title, and interest in the Patents-in-Suit.

## ENTROPIC'S LEGACY AS A CABLE INNOVATOR

-8-

APPX165

28. Entropic Communications Inc., the predecessor-in-interest to Entropic, was founded in San Diego, California in 2001 by Dr. Anton Monk, Itzhak Gurantz, Ladd El Wardani and others. Entropic Communications Inc. was instrumental in the development of the Multimedia over Coax Alliance ("MoCA") standard, Direct Broadcast Satellite ("DBS") Outdoor Unit ("ODU") single wire technology, and System-on-Chip ("SoC") solutions for set-top boxes ("STBs") in the home television and home video markets.

29. Dr. Monk received his Bachelor of Science degree and Doctorate in Electrical Engineering from the University of California San Diego and a Master of Science in Electrical Engineering from the California Institute of Technology.

30. Under the guidance of Dr. Monk, Entropic Communications Inc. grew to an eventual public listing on the NASDAQ in 2007. After the public listing, the company acquired RF Magic, Inc. in 2007, a company specializing in DBS ODU technology and related hardware.

31. Additional growth between 2007 and 2015 bolstered the technical expertise of Entropic Communications Inc., including signal acquisition, stacking, filtering, processing, and distribution for STBs and cable modems.

32. For years, Entropic Communications Inc. pioneered cutting edge SoC technologies, as well as television and internet related services. This technology simplified the installation required to support wideband reception of multiple channels for demodulation, improved home internet performance, and enabled more efficient and responsive troubleshooting and upstream signal management for cable providers. These innovations represented significant advances in the field, simplified the implementation of those advances, and reduced expenses for providers and customers alike.

APPX166

33.     In 2015, MaxLinear, Inc.—a leading provider of radio-frequency (RF), analog, digital, and mixed-signal semiconductor solutions—acquired Entropic Communications Inc. and the pioneering intellectual property developed by Dr. Monk and his team.

34.     The Patents-in-Suit are the result of years of research and development in satellite and cable technology. These innovations are utilized by Charter to provide enhanced and expanded services to customers, which in turn has increased revenues for Charter while at the same time reducing the costs.

## FIRST CAUSE OF ACTION

### (Infringement of the '775 Patent)

35.     Entropic incorporates by reference and realleges each and every allegation of Paragraphs 1 through 32 as if set forth herein.

36.     Entropic owns all substantial rights, interest, and title in and to the '775 Patent, including the sole and exclusive right to prosecute this action and enforce the '775 Patent against infringers, and to collect damages for all relevant times.

37.     The '775 Patent generally describes a partitioned cable modem that performs cable modem functions and data and home networking functions. Functionally partitioning a cable modem to perform cable modem functions and data and home networking functions enables a cable modem to incorporate a variety of enhanced functions.

38.     The Accused Cable Modem Products remain the property of Charter even when deployed at the property of a customer.

39.     The Accused Cable Modem Products and Accused Services operate in a manner controlled and intended by Charter. Charter directly infringes the '775 Patent by using, importing, selling, and/or offering for sale the Accused Cable Modem Products (for example, the Spectrum

PC20 and Arris SB6183) and/or the Accused Services (for example, utilizing cable modem functions).

40.     As set forth in the attached non-limiting claim chart (Exhibit G), Charter has directly infringed and is infringing at least Claims 18 and 19 of the '775 Patent by using, importing, selling, and/or offering for sale the Accused Cable Modem Products.

41.     Additionally, the use of the Accused Cable Modem Products by Charter to, for example, demonstrate products in brick-and-mortar stores in Plano, Texas and Beaumont, Texas or to, for example, test those products, constitute acts of direct infringement of at least Claims 18 and 19 of the '775 Patent.

42.     Charter has been aware that it infringes Claims 18 and 19 of the '775 Patent since at least April 27, 2022 upon the receipt of the letters attached as Exhibit M and Exhibit N, as well as the receipt of copies of the Original Complaint filed in this case on April 27, 2022 and served on May 3, 2022. Since obtaining knowledge of its infringing activities, Charter has failed to cease its infringing activities.

43.     Customers and subscribers of Charter infringe at least Claims 18 and 19 of the '775 Patent by using the claimed system, at least during the use of the Accused Cable Modem Products (for example, the Spectrum PC20 and Arris SB6183).

44.     Charter actively induces customers' direct infringement. For example, Charter actively induces infringement of at least Claims 18 and 19 of the '775 Patent by providing customers with specific instructions and/or assistance (including installation) regarding the purchase and use of the Accused Cable Modem Products in a manner that infringes the '775 Patent in accordance with the ordinary course of operation of the Accused Services. For at least the above-listed reasons, Charter aids, instructs, supports and otherwise acts with the intent to cause an end

APPX168

user to use the Accused Cable Modem Products in a manner that infringes at least Claims 18 and 19 of the '775 Patent.

45.    Additionally, Charter contributes to the customers' direct infringement. Charter provides apparatuses, namely the Spectrum PC20 and Arris SB6183 products, which are used by customers and directly infringe at least Claims 18 and 19 of the '775 Patent.

46.    The Accused Cable Modem Products have no substantial non-infringing uses. When an end user uses the Accused Cable Modem Products in combination with, for example, the Accused Services, the end user directly infringes at least Claims 18 and 19 of the '775 Patent.  The Accused Cable Modem Products are especially made or especially adapted for use in an infringement.

47.    Charter's inducement of, and contribution to, the direct infringement of at least Claims 18 and 19 of the '775 Patent is continuous and ongoing via the provision of the Accused Cable Modem Products, which perform the Accused Services.

48.    Charter's infringement of the '775 Patent is, has been, and continues to be willful, intentional, deliberate, and/or in conscious disregard for Entropic's rights under the patent.

49.    Entropic has been damaged as a result of the infringing conduct alleged above. Charter is liable to Entropic in an amount that compensates Entropic for Charter's infringement, which by law cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

50.    Entropic has complied with 35 U.S.C. § 287 with respect to the '775 Patent.

## SECOND CAUSE OF ACTION

### (Infringement of the '690 Patent)

51.    Entropic incorporates by reference and realleges each and every allegation of Paragraphs 1 through 48 as if set forth herein.

**APPX169**

52.     Entropic owns all substantial rights, interest, and title in and to the '690 Patent, including the sole and exclusive right to prosecute this action and enforce the '690 Patent against infringers, and to collect damages for all relevant times.

53.     The '690 Patent generally describes the process of generating probe transmissions in response to a request from a receiving node of a network, wherein the probe request specifies a plurality of parameters that specify content payload of the probe transmission, and a second node to receive the probe transmission, which enhances flexibility and therefore, improves the receiving node's ability to efficiently recognize the precise form of the transmitted probe. The Accused Cable Modem Products remain the property of Charter even when deployed at the property of a customer.

54.     The Accused Cable Modem Products and Accused Services operate in a manner controlled and intended by Charter.

55.     Charter directly infringes the '690 Patent by using, importing, selling, and/or offering for sale the Accused Cable Modem Products (for example, the Spectrum PC20 and Arris SB6183) and/or the Accused Services (for example, probing for cable modem parameters).

56.     As set forth in the attached non-limiting claim chart (Exhibit H), Charter has directly infringed and is infringing at least the method of Claims 7, 8, 11, 15, and 16 of the '690 Patent by using, selling, and/or offering for sale the Accused Services.

57.     Additionally, the use of the Accused Services by Charter to, for example, demonstrate products in brick-and-mortar stores in Plano, Texas and Beaumont, Texas or to, for example, test those products, constitute acts of direct infringement of at least Claims 7, 8, 15, and 16 of the '690 Patent.

58.     Charter has been aware that it infringes Claims 7, 8, 11, 15, and 16 of the '690 Patent since at least April 27, 2022 upon the receipt of the letters attached as Exhibit M and Exhibit

-13-

**APPX170**

N, as well as the receipt of copies of the Original Complaint filed in this case on April 27, 2022 and served on May 3, 2022. Since obtaining knowledge of its infringing activities, Charter has failed to cease its infringing activities.

59.     Customers and subscribers of Charter infringe at least Claims 7 and 8 of the '690 Patent by using the claimed method, at least during receipt of the Accused Services utilizing, for example, the Accused Cable Modem Products (for example, the Spectrum PC20 and Arris SB6183).

60.     Charter actively induces customers' direct infringement. For example, Charter actively induces infringement of at least Claims 7 and 8 of the '690 Patent by providing the Accused Cable Modem Products to Charter customers with specific instructions and/or assistance (including installation) regarding the use of the Accused Cable Modem Products in a manner that infringes the '690 Patent in accordance with the ordinary course of operation of the Accused Services. Charter provides the cable modem functions claimed by the '690 Patent via the Accused Services, which enable and induce its customers to directly infringe the claims. For at least the above-listed reasons, Charter aids, instructs, supports and otherwise acts with the intent to cause an end user to use the Accused Cable Modem Products in a manner that infringes at least Claims 7 and 8 of the '690 Patent.

61.     Additionally, Charter contributes to the customers' direct infringement. Charter provides apparatuses, namely the Spectrum PC20 and Arris SB6183 products, used by customers to perform at least Claims 7 and 8 of the '690 Patent.

62.     The Accused Cable Modem Products have no substantial non-infringing uses. When an end user uses the Accused Cable Modem Products in combination with, for example, the Accused Services, the end user directly infringes at least Claims 7 and 8 of the '690 Patent. The

Accused Cable Modem Products are especially made or especially adapted for use in an infringement.

63.     Charter's inducement of, and contribution to, the direct infringement of at least Claims 7 and 8 of the '690 Patent is continuous and ongoing via the provision of the Accused Services as well as technical assistance provided by Charter for equipment it provides to its customers in support of the provision of the Accused Services.

64.     Charter's infringement of the '690 Patent is, has been, and continues to be willful, intentional, deliberate, and/or in conscious disregard for Entropic's rights under the patent.

65.     Entropic has been damaged as a result of the infringing conduct alleged above. Charter is liable to Entropic in an amount that compensates Entropic for Charter's infringement, which by law cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

66.     Entropic has complied with 35 U.S.C. § 287 with respect to the '690 Patent.

**THIRD CAUSE OF ACTION**

**(Infringement of the '008 Patent)**

67.     Entropic incorporates by reference and realleges each and every allegation of Paragraphs 1 through 64 as if set forth herein.

68.     Entropic owns all substantial rights, interest, and title in and to the '008 Patent, including the sole and exclusive right to prosecute this action and enforce the '008 Patent against infringers, and to collect damages for all relevant times.

69.     The '008 Patent generally describes a system that receives a signal having a range of frequencies, digitizes the received signal, and reports certain signal characteristics to the source of the received signal.

**APPX172**

70.     The Accused Set Top Products remain the property of Charter even when deployed at the property of a customer.

71.     The Accused Set Top Products and Accused Services operate in a manner controlled and intended by Charter.

72.     Charter directly infringes the '008 Patent by using, importing, selling, and/or offering for sale the Accused Set Top Products (for example, the Spectrum 210) and/or the Accused Services (for example, monitoring signals generated by the Accused Set Top Products).

73.     As set forth in the attached non-limiting claim chart (Exhibit I), Charter has directly infringed and is infringing at least Claims 1 and 2 of the '008 Patent by using, importing, selling, and/or offering for sale the Accused Set Top Products.

74.     Additionally, the use of the Accused Set Top Products by Charter to, for example, demonstrate products in brick-and-mortar stores in Plano, Texas and Beaumont, Texas or to, for example, test those products, constitute acts of direct infringement of at least Claims 1 and 2 of the '008 Patent.

75.     Charter has been aware that it infringes Claims 1 and 2 of the '008 Patent since at least April 27, 2022 upon the receipt of the letters attached as Exhibit M and Exhibit N, as well as the receipt of copies of the Original Complaint filed in this case on April 27, 2022 and served on May 3, 2022. Since obtaining knowledge of its infringing activities, Charter has failed to cease its infringing activities.

76.     Customers and subscribers of Charter infringe at least Claims 1 and 2 of the '008 Patent by using the claimed system, at least during the use of the Accused Set Top Products (for example, the Spectrum 210).

77.     Charter actively induces customers' direct infringement. For example, Charter actively induces infringement of at least Claims 1 and 2 of the '008 Patent by providing customers

-16-

APPX173

with specific instructions and/or assistance (including installation) regarding the purchase and use of the Accused Set Top Products in a manner that infringes the '008 Patent in accordance with the ordinary course of operation of the Accused Services. For at least the above-listed reasons, Charter aids, instructs, supports and otherwise acts with the intent to cause an end user to use the Accused Set Top Products in a manner that infringes at least Claims 1 and 2 of the '008 Patent.

78.     Additionally, Charter contributes to the customers' direct infringement. Charter provides apparatuses, namely the Spectrum 210 product, used by customers to perform at least Claims 1 and 2 of the '008 Patent.

79.     The Accused Set Top Products have no substantial non-infringing uses. When an end user uses the Accused Set Top Products in combination with, for example, the Accused Services, the end user directly infringes at least Claims 1 and 2 of the '008 Patent. The Accused Cable Modem Products are especially made or especially adapted for use in an infringement.

80.     Charter's inducement of, and contribution to, the direct infringement of at least Claims 1 and 2 of the '008 Patent is continuous and ongoing via the provision of the Accused Services as well as technical assistance provided by Charter for equipment it provides to its customers in support of the provision of the Accused Services.

81.     Charter's infringement of the '008 Patent is, has been, and continues to be willful, intentional, deliberate, and/or in conscious disregard for Entropic's rights under the patent.

82.     Entropic has been damaged as a result of the infringing conduct alleged above. Charter is liable to Entropic in an amount that compensates Entropic for Charter's infringement, which by law cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

83.     Entropic has complied with 35 U.S.C. § 287 with respect to the '008 Patent.

**FOURTH CAUSE OF ACTION**

**APPX174**

**(Infringement of the '362 Patent)**

84.     Entropic incorporates by reference and realleges each and every allegation of Paragraphs 1 through 81 as if set forth herein.

85.     Entropic owns all substantial rights, interest, and title in and to the '362 Patent, including the sole and exclusive right to prosecute this action and enforce the '362 Patent against infringers, and to collect damages for all relevant times.

86.     The '362 Patent generally describes a wideband receiver system that down converts a plurality of frequencies including desired television channels and undesired television channels, digitizes frequencies, selects desired television channels from the frequencies, and outputs the selected television channels to a demodulator as a digital data stream.

87.     The Accused Set Top Products remain the property of Charter even when deployed at the property of a customer.

88.     The Accused Services operate in a manner controlled and intended by Charter.

89.     Charter directly infringes the '362 Patent by using, importing, selling, and/or offering for sale the Accused Set Top Products (for example, the Spectrum 210) and/or the Accused Services (for example, down converting, digitizing, and selecting desired television channels from frequencies).

90.     As set forth in the attached non-limiting claim chart (Exhibit J), Charter has directly infringed and is infringing at least Claim 11 of the '362 Patent by using, selling, and/or offering for sale the Accused Services.

91.     Additionally, the use of the Accused Services by Charter to, for example, demonstrate products in brick-and-mortar stores in Plano, Texas and Beaumont, Texas or to, for example, test those products, constitute acts of direct infringement of at least Claim 11 of the '362 Patent.

**APPX175**

92.     Charter has been aware that it infringes Claim 11 of the '362 Patent since at least April 27, 2022 upon the receipt of the letters attached as Exhibit M and Exhibit N, as well as the receipt of copies of the Original Complaint filed in this case on April 27, 2022 and served on May 3, 2022. Since obtaining knowledge of its infringing activities, Charter has failed to cease its infringing activities.

93.     Customers and subscribers of Charter infringe at least Claim 11 of the '362 Patent by using the claimed method, at least during receipt of the Accused Services utilizing, for example, the Accused Set Top Products (for example, the Spectrum 210).

94.     Charter actively induces customers' direct infringement. For example, Charter actively induces infringement of at least Claim 11 of the '362 Patent by providing the Accused Set Top Products to Charter customers with specific instructions and/or assistance (including installation) regarding the use of the Accused Set Top Products in a manner that infringes the '362 Patent in accordance with the ordinary course of operation of the Accused Services. Charter provides the television channel down-conversion, digitization, selection, and output functions claimed by the '362 Patent via the Accused Services, which enable and induce its customers to directly infringe the claim. For at least the above-listed reasons, Charter aids, instructs, supports and otherwise acts with the intent to cause an end user to use the Accused Set Top Products in a manner that infringes at least Claim 11 of the '362 Patent.

95.     Additionally, Charter contributes to the customers' direct infringement. Charter provides apparatuses, namely the Spectrum 210, used by customers to perform at least Claim 11 of the '362 Patent.

96.     The Accused Set Top Products have no substantial non-infringing uses. When an end user uses the Accused Set Top Products in combination with, for example, the Accused

-19-

**APPX176**

Services, the end user directly infringes at least Claim 11 of the '362 Patent. The Accused Cable Modem Products are especially made or especially adapted for use in an infringement.

97.　Charter's inducement of, and contribution to, the direct infringement of at least Claim 11 of the '362 Patent is continuous and ongoing via the provision of the Accused Services as well as technical assistance provided by Charter for equipment it provides to its customers in support of the provision of the Accused Services.

98.　Charter's infringement of the '362 Patent is, has been, and continues to be willful, intentional, deliberate, and/or in conscious disregard for Entropic's rights under the patent.

99.　Entropic has been damaged as a result of the infringing conduct alleged above. Charter is liable to Entropic in an amount that compensates Entropic for Charter's infringement, which by law cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

100.　Entropic has complied with 35 U.S.C. § 287 with respect to the '362 Patent.

## FIFTH CAUSE OF ACTION

### (Infringement of the '826 Patent)

101.　Entropic incorporates by reference and realleges each and every allegation of Paragraphs 1 through 98 as if set forth herein.

102.　Entropic owns all substantial rights, interest, and title in and to the '826 Patent, including the sole and exclusive right to prosecute this action and enforce the '826 Patent against infringers, and to collect damages for all relevant times.

103.　The '826 Patent generally describes a system that receives a signal having a range of frequencies, digitizes the received signal, and reports certain signal characteristics to the source of the received signal.

104.    The Accused Set Top Products remain the property of Charter even when deployed at the property of a customer.

105.    The Accused Services operate in a manner controlled and intended by Charter.

106.    Charter directly infringes the '826 Patent by using, importing, selling, and/or offering for sale the Accused Set Top Products (for example, the Spectrum 210) and/or the Accused Services (for example, monitoring signals generated by the Accused Set Top Products).

107.    As set forth in the attached non-limiting claim chart (Exhibit K), Charter has directly infringed and is infringing at least Claim 1 of the '826 Patent by using, selling, and/or offering for sale the Accused Services.

108.    Additionally, the use of the Accused Services by Charter to, for example, demonstrate products in brick-and-mortar stores in Plano, Texas and Beaumont, Texas or to, for example, test those products, constitute acts of direct infringement of at least Claim 1 of the '826 Patent.

109.    Charter has been aware that it infringes Claim 1 of the '826 Patent since at least April 27, 2022 upon the receipt of the letters attached as Exhibit M and Exhibit N, as well as the receipt of copies of the Original Complaint filed in this case on April 27, 2022 and served on May 3, 2022. Since obtaining knowledge of its infringing activities, Charter has failed to cease its infringing activities.

110.    Customers and subscribers of Charter infringe at least Claim 1 of the '826 Patent by using the claimed method, at least during the use of the Accused Set Top Products (for example, the Spectrum 210).

111.    Charter actively induces customers' direct infringement. For example, Charter actively induces infringement of at least Claim 1 of the '826 Patent by providing the Accused Set Top Products to Charter customers with specific instructions and/or assistance (including

-21-

APPX178

installation) regarding the use of the Accused Set Top Products in a manner that infringes the '826 Patent in accordance with the ordinary course of operation of the Accused Services. Charter provides the signals claimed by the '826 Patent via the Accused Services, which enable and induce its customers to directly infringe the claim. For at least the above-listed reasons, Charter aids, instructs, supports and otherwise acts with the intent to cause an end user to use the Accused Set Top Products in a manner that infringes at least Claim 1 of the '826 Patent.

112.     Additionally, Charter contributes to the customers' direct infringement. Charter provides apparatuses, namely the Spectrum 210, used by customers to perform at least Claim 1 of the '826 Patent.

113.     The Accused Set Top Products have no substantial non-infringing uses. When an end user uses the Accused Set Top Products in combination with, for example, the Accused Services, the end user directly infringes at least Claim 1 of the '826 Patent. Charter knew that the Accused Set Top Products were especially made for use in an infringing manner prior to the filing of this lawsuit.  The Accused Cable Modem Products are especially made or especially adapted for use in an infringement.

114.     Charter's inducement of, and contribution to, the direct infringement of at least Claim 1 of the '826 Patent is continuous and ongoing via the provision of the Accused Services as well as technical assistance provided by Charter for equipment it provides to its customers in support of the provision of the Accused Services.

115.     Charter's infringement of the '826 Patent is, has been, and continues to be willful, intentional, deliberate, and/or in conscious disregard for Entropic's rights under the patent.

116.     Entropic has been damaged as a result of the infringing conduct alleged above. Charter is liable to Entropic in an amount that compensates Entropic for Charter's infringement,

which by law cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

117.     Entropic has complied with 35 U.S.C. § 287 with respect to the '826 Patent.

<u>**SIXTH CAUSE OF ACTION**</u>

**(Infringement of the '682 Patent)**

118.     Entropic incorporates by reference and realleges each and every allegation of Paragraphs 1 through 115 as if set forth herein.

119.     Entropic owns all substantial rights, interest, and title in and to the '682 Patent, including the sole and exclusive right to prosecute this action and enforce the '682 Patent against infringers, and to collect damages for all relevant times.

120.     The '682 Patent generally describes a method performed by a cable modem termination system, the method including determining a corresponding signal-to-noise-ratio ("SNR") related metric, assigning cable modems to service groups based on a respective corresponding SNR-related metric, generating a composite SNR-related metric based on a worst-case SNR profile, selecting a physical layer communication parameter to be used for communicating with a service group based on a composite SNR-related metric, and communicating with cable modems in the service group using the selected physical layer communication parameter.

121.     The Accused Cable Modem Products remain the property of Charter even when deployed at the property of a customer.

122.     The Accused Services operate in a manner controlled and intended by Charter.

123.     Charter directly infringes the '682 Patent by using, selling, and/or offering for sale the Accused Services, which utilize cable modem termination systems that communicate with the Accused Cable Modem Products (for example, the Spectrum PC20 and Arris SB6183).

-23-

**APPX180**

124.    As set forth in the attached non-limiting claim chart (Exhibit L), Charter has directly infringed and is infringing at least Claim 14 of the '682 Patent by using, selling, and/or offering for sale the Accused Services.

125.    Additionally, the use of the Accused Services by Charter to, for example, demonstrate products in brick-and-mortar stores in Plano, Texas and Beaumont, Texas or to, for example, test those products, constitute acts of direct infringement of at least Claim 1 of the '682 Patent.

126.    Charter has been aware that it infringes Claim 1 of the '682 Patent since at least April 27, 2022 upon the receipt of the letters attached as Exhibit M and Exhibit N, as well as the receipt of copies of the Original Complaint filed in this case on April 27, 2022 and served on May 3, 2022. Since obtaining knowledge of its infringing activities, Charter has failed to cease its infringing activities. Charter's infringement of the '682 Patent is, has been, and continues to be willful, intentional, deliberate, and/or in conscious disregard for Entropic's rights under the patent.

127.    Entropic has been damaged as a result of the infringing conduct alleged above. Charter is liable to Entropic in an amount that compensates Entropic for Charter's infringement, which by law cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

128.    Entropic has complied with 35 U.S.C. § 287 with respect to the '682 Patent.

## JURY DEMAND

Entropic hereby requests a trial by jury on all issues so triable by right.

## PRAYER FOR RELIEF

WHEREFORE, Entropic requests that:

A.    The Court find that Charter has directly infringed the Patents-in-Suit and hold Charter liable for such infringement;

**APPX181**

B.     The Court find that Charter has indirectly infringed the Patents-in-Suit by inducing its customers to directly infringe the Patents-in-Suit and hold Charter liable for such infringement;

C.     The Court find that Charter has indirectly infringed the Patents-in-Suit by contributing to its customers direct infringement of the Patents-in-Suit and hold Charter liable for such infringement;

D.     The Court award damages pursuant to 35 U.S.C. § 284 adequate to compensate Entropic for Charter's past infringement of the Patents-in-Suit, including both pre- and post-judgment interest and costs as fixed by the Court;

E.     The Court increase the damages to be awarded to Entropic by three times the amount found by the jury or assessed by the Court;

F.     The Court declare that this is an exceptional case entitling Entropic to its reasonable attorneys' fees under 35 U.S.C. § 285; and

G.     The Court award such other relief as the Court may deem just and proper.

**APPX182**

Dated: January 10, 2023

Respectfully submitted,

 /s/ James Shimota by permission Wesley Hill
James Shimota – LEAD ATTORNEY
Jason Engel
George Summerfield
Devon Beane (*pro hac vice* forthcoming)
**K&L GATES LLP**
70 W. Madison Street, Suite 3300
Chicago, IL 60602
Jim.shimota@klgates.com
Jason.engel@klgates.com
George.summerfield@klgates.com
Devon.beane@klgates.com

Darlene Ghavimi
Matthew Blair
**K&L GATES LLP**
2801 Via Fortuna
Suite #650
Austin, Texas 78746
Darlene.ghavimi@klgates.com
Matthew.blair@klgates.com

Wesley Hill
Texas Bar No. 24032294
Andrea Fair
Texas Bar No. 24078488
**WARD, SMITH & HILL, PLLC**
1507 Bill Owens Pkwy
Longview, TX 75604
Tel:  (903) 757-6400
Fax  (903) 757-2323
wh@wsfirm.com
andrea@wsfirm.com

**ATTORNEYS FOR PLAINTIFF
ENTROPIC COMMUNICATIONS, LLC**

-26-

**APPX183**

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing document was filed electronically in compliance with Local Rule CV-5(a). Therefore, this document was served on all counsel who are deemed to have consented to electronic service on this tenth day of January, 2023.

*/s/ Wesley Hill*

**APPX184**

# EXHIBIT A

US008223775B2

(12) **United States Patent**
Li et al.

(10) Patent No.: **US 8,223,775 B2**
(45) Date of Patent: **Jul. 17, 2012**

(54) **ARCHITECTURE FOR A FLEXIBLE AND HIGH-PERFORMANCE GATEWAY CABLE MODEM**

(75) Inventors: **Gordon Y. Li**, San Diego, CA (US); **Yoav Hebron**, San Diego, CA (US)

(73) Assignee: **Entropic Communications, Inc.**

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 2220 days.

(21) Appl. No.: **10/675,566**

(22) Filed: **Sep. 30, 2003**

(65) **Prior Publication Data**
US 2005/0071492 A1    Mar. 31, 2005

(51) **Int. Cl.**
*H04L 12/46* (2006.01)
(52) **U.S. Cl.** ...................................... 370/401; 709/249
(58) **Field of Classification Search** ................... 709/249
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,944,706 B2 * | 9/2005 | Schain et al. | ................. 709/250 |
| 2001/0039600 A1 * | 11/2001 | Brooks et al. | ................. 710/126 |
| 2006/0080650 A1 * | 4/2006 | Winters et al. | ................. 717/168 |

* cited by examiner

*Primary Examiner* — Patrice Winder
(74) *Attorney, Agent, or Firm* — James Sze; Duane Morris LLP

(57)    **ABSTRACT**

A cable modem system and architecture. A cable modem engine performs all cable modem functions, and a data networking engine performs all data and home networking functions. The cable modem engine is completely partitioned from the data networking engine. DOCSIS and VoIP functionality is implemented in the cable modem engine. The VoIP functionality may be in accordance with the PacketCable specification. The data networking functionality provided by the data networking engine may be in accordance with the CableHome specification.

**20 Claims, 2 Drawing Sheets**





*Figure 1*



**Figure 2**

US 8,223,775 B2

**1**

# ARCHITECTURE FOR A FLEXIBLE AND HIGH-PERFORMANCE GATEWAY CABLE MODEM

## FIELD OF THE INVENTION

The present invention relates to cable modems and, in particular, relates to a cable modem system having a functionally partitioned and flexible architecture.

## BACKGROUND OF THE INVENTION

The future gateway cable modem (CM) will provide a wide range of data networking and VoIP services, as exemplified by the requirements for initiatives such as CableHome and PacketCable. The major challenge in designing such a gateway cable modem is integration of these services with the basic cable modem functionality in an efficient and cost-effective. Several objectives need to be met:

Functional Partitioning. The gateway cable modem will incorporate a variety of functions beyond the traditional cable modem, including IP routing, network address translation (NAT)/firewall, virtual private network (VPN), web server and VoIP. These functions need to utilize DOCSIS (Data Over Cable Service Interface Specification)services (link-layer transport and QoS) for wide area network (WAN) access. Partitioning these functions along with other cable modem functions among different computational agents is an essential issue in designing a gateway cable modem.

Flexiblity. The architecture of the gateway cable modem should be flexible enough to allow independent software development and field-upgrade of gateway value-added services and basic DOCSIS cable modem services. From a development standpoint, the architecture should facilitate different software-partnering models, including all in-house, software components licensing, and OEM vendor-differentiating design. From a multiple system operator (MSO) perspective, it is highly desirable to be able to independently provision, maintain and upgrade revenue-producing gateway services and basic broadband access services.

Performance. The gateway cable modem should be able to support a large number of simultaneous data application sessions originated from/terminated on multiple CPE (customer provided equipment) devices. VoIP applications must not be adversely impacted by any concurrent data applications, and the data path for voice packets must be optimized to minimize delay and jitter.

Cost. The gateway cable modem chip should have a small incremental hardware cost/functional increase relative to stand-alone cable modem chips.

Software Re-Use. It should be possible to carry over existing cable modem software to the new gateway cable modem without major changes. The existing software running on network processors should be easily portable to run on the gateway platform without major adaptation.

The present invention provides a gateway cable modem architecture that meets all of these objectives.

## SUMMARY OF THE INVENTION

The present invention provides a gateway cable modem system and architecture that meets the above objectives and provides a highly flexible, high performance system capable of handling multiple cable modem voice, data and networking services.

One embodiment of the invention is a cable modem system comprising a data networking engine that performs data net-

**2**

working functions and a cable modem engine that performs all other cable modem functions, wherein the cable modem engine is completely partitioned from the data networking engine.

Another embodiment of the invention is a cable modem architecture. The architecture includes a cable modem engine having a DOCSIS PHY layer with a hardware transmitter and receiver, a DOCSIS MAC processor that implements real-time critical MAC functions for both upstream and downstream communications, and a DOCSIS controller implementing VoIP functionality. The architecture also includes a data networking engine implementing all data networking processing and home networking applications. The data networking engine is completely decoupled from the cable modem engine. In one implementation, the VoIP functionality provided by the cable modem is in accordance with the PacketCable specification and the data networking functionality provided by the data networking engine is in accordance with the CableHome specification.

Another embodiment of the invention is a method for providing a flexible and partitioned cable modem gateway. Data and home networking functionality is provided by a data networking engine, and DOCSIS and VoIP functionality is provided by a cable modem engine. The data networking engine is partitioned from the cable modem engine so that the data and home networking functionality is completely decoupled from the DOCSIS and VoIP functionality.

Other systems, methods, features and advantages of the invention will be or will become apparent to one with skill in the art upon examination of the following figures and detailed description. It is intended that all such additional systems, methods, features and advantages be included within this description, be within the scope of the invention, and be protected by the accompanying claims.

## BRIEF DESCRIPTION OF THE DRAWINGS

The components in the figures are not necessarily to scale, emphasis instead being placed upon illustrating the principles of the invention. In the figures, like reference numerals designate corresponding parts throughout the different views.

FIG. 1 is a block diagram of a gateway cable modem architecture according to the present invention.

FIG. 2 is a functional block diagram implementing the cable modem architecture of FIG. 1.

## DETAILED DESCRIPTION OF THE INVENTION

FIG. 1 illustrates a cable modem system architecture **100** according to the present invention. System **100** comprises three major subsystems: cable modem engine **110**; data networking engine **120**; and advanced crypto engine **130**. The functional sub-components of these three-subsystems are illustrated in greater detail in FIG. **2**.

Cable modem engine **110** implements the entire DOCSIS cable modem functionality and is further divided into three functional blocks: DOCSIS PHY layer **112**; DOCSIS MAC processor **114** and DOCSIS controller **116**. DOCSIS PHY layer **112** comprises a hardware transmitter and receiver. In one implementation, it is for a DOCSIS 2.0-compliant PHY. As seen in FIG. **1**, DOCSIS PHY layer **112** receives downstream data, transmits upstream data and receives and transmits voice data from/to an external source. In one implementation, the external source is a HFC (hybrid fiber coax) cable employing both fiber optic and coaxial cable as an effective means for delivering combined data, video, voice, CATV and other communications.

US 8,223,775 B2

3

Processor **114** implements real-time critical MAC functions for both upstream (US) and downstream (DS) communications. These functions include US and DS synchronization, DS MAC address filtering, DS protocol filtering, US and DS PHS, concatenation, fragmentation, MAP processing, US transmission scheduling, as well as DOCSIS link-layer DES encryption and decryption. Processor **114** receives downstream data from, provides upstream data to and exchanges voice data in both directions with DOCSIS PHY **112**. It also receives upstream data from, and exchanges voice data in both directions with, controller **116**. To increase downstream throughput, all processing of DS PDU (protocol data unit) packets is done within processor **114** without involving controller **116**. After being processed, DS PDU packets are forwarded by processor **116** directly to data networking engine **120** along path **118**, bypassing controller **116**. In one implementation, processor **114** is an ARM9TDMI-based RISC processor. In FIG. **2**, processor **114** is represented by MAC DS block **152** and MAC US block **154**.

Controller **116** receives US PDU packets from data networking engine **120**. As previously described, DS PDU packets are forwarded by processor **114** to data networking engine **120** without involvement of controller **116**. In one implementation, controller **116** is an ARM940-based RISC processor. Controller **116** implements the following DOCSIS (blocks **200-212**) functions: MAC management message (MMM) processing (ranging, registration, UCD, UCC, DCC, DCI, UP-DIS, DSx and BPI+) (functional block **200** of FIG. **2**), IGMP, MAC address learning, classification, US protocol filtering (functional block **202** of FIG. **2**) and CM IP stack and software downloading. Functional block **204** carries out cable modem IP/UDP functions, functional block **206** carries out SNMP, DHCP, TFTP and TOD functionality and functional block **208** is responsible for cable modem provisioning. Controller **116** also includes a data network engine driver **210** in communication with data network engine **120** and cable MAC driver **212**.

In addition, in order to minimize the latency and jitter of voice packets, controller **116** also implements all Packet-Cable functionality. In FIG. **2**, PacketCable functionality is represented by functional blocks **220-228**. These Packet-Cable functions include provisioning (block **220**), security and signaling. Functional blocks **222** (voice DSP driver), **224** (streamlined IP/UDP/RTP with classification; PHS, and IP/LLC filtering) and **226** (voice MAC driver) interface with external voice DSP **119**. Additionally MGCP and RTCP functions are provided by functional block **228**.

Data networking engine **120** is responsible for all data networking processing including advanced multi-port bridging/routing with NAT/firewall and VPN (block **250**) and home networking applications (CableHome, Web Server, etc.) (block **252**). In one implementation, the entire embedded portal services (PS) functionality of the CableHome specification is contained within data networking engine **120**, with the CableHome functionality being completely decoupled from the PacketCable and DOCSIS functionality provided by cable modem engine **110**. As a result of the virtual de-coupling from cable modem engine **110**, data networking engine **120** can be independently software-upgraded without impacting the functionality of cable modem engine **110** (and vice versa).

As seen in FIG. **1**, data networking engine is capable of additional CPE functionality such as Ethernet, USB and other LAN I/F communications (802.11, Bluetooth, Powerline, etc.), with appropriate CPE drivers **254**, **256**, **258** being provided to support such communications. Additionally, cable

4

modem engine driver **260** communicates with cable modem engine **110** and functional block **262** provides SNMP, DHCP, TFTP and TOD functionality.

Advanced crypto engine **130** provides hardware support for crypto functions. These include common crypto functions required by the baseline DOCSIS link-layer security, Packet-Cable voice security and data-networking security (e.g. VPN). These functions include DES/3DES, AES and HMAC-MD5/SH-1.

The architecture of gateway cable modem **100** addresses the objectives set forth in the "Background" section above as follows:

Functional Partitioning. Cable modem **100** completely partitions data networking functions (advanced bridging/routing, NAT/firewall, VPN, web server and CableHome applications) from DOCSIS cable modem functionality. This is accomplished by localizing data networking functions in the data networking engine processor and localizing cable modem functions in the cable modem engine processor. Additionally, PacketCable VoIP functionality (embedded MTA) is implemented within cable modem engine **110** to address the facts that embedded MTA is closely coupled with cable modem MAC services and that the latency and jitter of voice packets needs to be minimized.

Flexibility. Since the data networking and cable modem functions are decoupled and implemented in different processors **110** and **120**, independent software upgrading and maintenance of these functions is feasible. From a development standpoint, the architecture can facilitate different software-partnering models, such as complete in-house development, software-components licensing and OEM vendor-differentiating design. In particular, data networking engine **120** provides third parties and OEMs with a dedicated computational platform to develop advanced services outside of the baseline cable modem and VoIP/PacketCable services, minimizing their support dependency on the cable modem provider. Moreover, the software architecture within cable modem engine **110** is designed in a modular way so that the Packet-Cable E-MTA can be implemented with minimum impact on the cable modem.

Performance. System **100** is able to support a large number of simultaneous data-application sessions originated from/terminated on multiple CPE devices. Its performance is enhanced by the pipe-lining nature of system **100**: the processing-intensive functions of the cable modem and data networking are rationally distributed among three different processors: DOCSIS MAC processor **114** (ARM #2); DOCSIS controller **116** (ARM #1); and data networking engine **120** (ARM #3), according to their orders in the packet flow. To further boost downstream throughput, the downstream PDU packets are directly forwarded from the DOCSIS MAC processor **114** to the data networking engine **120** without going through DOCSIS controller **116**. This is made possible by exploiting the asymmetric nature of the DOCSIS US/DS **152** and **154**. In addition, the data path for voice packets is laid entirely within cable modem engine **110** and is optimized to reduce delay and jitter.

Cost. A chip implementing cable modem system **100** will have only a small incremental hardware cost/functional increase over current stand-alone cable modem chips. The major cost difference relative to current chips is the addition of another ARM940-type processor to the chip.

Software Re-Use. Existing cable modem software may be carried over to system **100** without major or drastic changes. Existing software running on PCD network processors may be easily ported to run on data networking engine **120** without major adaptation.

APPX190

US 8,223,775 B2

5

While various embodiments of the invention have been described, it will be apparent to those of ordinary skill in the art that many more embodiments and implementations are possible that are within the scope of this invention.

What is claimed is:

**1**. A cable modem system comprising:

a data networking engine implemented in a first circuit that includes at least one processor, the data networking engine programmed with software that when executed by the at least one processor of the first circuit causes the data networking engine to perform home networking functions including interfacing with customer provided equipment, wherein the at least one processor is a RISC processor;

a cable modem engine implemented in a second circuit that includes at least one processor, the second circuit being separate from the first circuit, the cable modem engine including a DOCSIS PHY layer, a DOCSIS controller, and a DOCSIS controller and programmed with software that when executed by the at least one processor of the second circuit causes the cable modem engine to perform cable modem functions other than the home networking functions performed by the data networking engine, the cable modem functions including interfacing with cable media, the cable modem engine configured to enable upgrades to its software in a manner that is independent of upgrades to the software of the data networking engine; and

a data bus that connects the data networking engine to the cable modem engine, wherein the cable modem functions performed by the cable modem engine are completely partitioned from the home networking functions performed by the data networking engine;

wherein the DOCSIS MAC processor is configured to process downstream PDU packets and forward the processed packets directly to the data networking engine without the involvement of the DOCSIS controller in order to boost downstream throughput.

**2**. A cable modem system as claimed in claim **1**, wherein all DOCSIS functions are localized in the cable modem engine.

**3**. A cable modem system as claimed in claim **2**, wherein VoIP functionality is embedded in the cable modem engine.

**4**. A cable modem system as claimed in claim **1**, and further comprising an advanced crypto engine configured to perform all crypto functions for both the data networking engine and the cable modem engine, the advanced crypto engine being separate from both the data networking engine and the cable modem engine.

**5**. A cable modem system as claimed in claim **1**, wherein the DOCSIS PHY layer includes a hardware transmitter and receiver.

**6**. A cable modem system as claimed in claim **1**, wherein all VoIP functionality is implemented in the DOCSIS controller.

**7**. A cable modem system as claimed in claim **6**, wherein the VoIP functionality is in conformance with the Packet-Cable specification.

**8**. A cable modem system as claimed in claim **1**, wherein the data networking engine is configured to perform all data networking processing including advanced multi-port bridging routing with NAT/firewall and VPN, and home networking applications.

**9**. A cable modem system as claimed in claim **8**, wherein the data networking engine comprises the entire embedded portal services functionality of the CableHome specification.

**10**. A cable modem system as claimed in claim **1**, wherein with regard to the cable modem engine:

the DOCSIS PHY layer includes a transmitter and receiver;

6

the DOCSIS MAC processor is configured to implement real-time MAC functions for both upstream and downstream communications; and

the DOCSIS controller is configured to implement VoIP functionality; and wherein the data networking engine includes a RISC processor configured to implement a majority of data networking processing and home networking applications decoupled from the implementation of the MAC functions and the VoIP functionality of the cable modem engine.

**11**. A cable modem system as claimed in claim **10**, wherein the DOCSIS controller is configured to provide VoIP functionality in accordance with the PacketCable specification, wherein the data networking engine is configured to provide the embedded portal services functionality of the CableHome specification, and wherein the CableHome functionality provided by the data networking engine is completely decoupled from the PacketCable and DOCSIS functionality provided by the cable modem engine.

**12**. A cable modem system as claimed in claim **11**, wherein the DOCSIS MAC processor is an ARM9TDMI-based RISC processor, and wherein the DOCSIS controller is an ARM940-based RISC processor.

**13**. A cable modem system as claimed in claim **1**, wherein the data networking engine includes consumer provide equipment drivers including a USB driver and an Ethernet driver and the data networking engine is configured to provide the embedded portal services functionality of the CableHome specification, wherein the DOCSIS controller is configured to provide VoIP functionality in accordance with the Packet-Cable specification, and wherein the CableHome functionality provided by the data networking engine is completely decoupled from the PacketCable and DOCSIS functionality provided by the cable modem engine.

**14**. A method of cable modem operation comprising:

executing, via at least one processor of a first circuit that implements a data networking engine, first software that causes the data networking engine to perform home networking functions including interfacing with customer provided equipment, wherein the at least one processor is a RISC processor;

executing, via one or more processors of a second circuit that implements a cable modem engine programmed with second software, the second software to cause the cable modem engine to perform cable modem functions other than the home networking functions performed by the data networking engine, the cable modem functions including interfacing with cable media, the cable modem engine configured to enable upgrades to its software in a manner that is independent of upgrades to the software of the data networking engine, wherein the second circuit is separate from the first circuit, and wherein the cable modem engine includes a DOCSIS PHY layer, a DOCSIS controller and a DOCSIS controller;

connecting, via a data bus, the data networking engine to the cable modem engine, wherein the cable modem functions performed by the cable modem engine are completely partitioned from the home networking functions performed by the data networking engine;

processing, via the DOCSIS MAC processor, downstream PDU packets and forwarding the processed packets directly to the data networking engine without the involvement of the DOCSIS controller in order to boost downstream throughput.

**15**. A method of cable modem operation as claimed in claim **14**, further comprising:

**APPX191**

US 8,223,775 B2

7

providing a flexible and partitioned cable modem gateway comprising:

  providing data and home networking functionality in the data networking engine;

  providing DOCSIS and VoIP functionality in the cable modem engine; and

  partitioning the data networking engine from the cable modem engine so that the data and home networking functionality is completely decoupled from the DOCSIS and VoIP functionality.

16. A method as claimed in claim 14, further comprising:

  providing VoIP functionality in accordance with the PacketCable specification in the DOCSIS controller; and

  providing the embedded portal services functionality of the CableHome specification in the data networking engine;

  wherein the CableHome functionality provided by the data networking engine is completely decoupled from the PacketCable and DOCSIS functionality provided by the cable modem engine.

17. A method as claimed in claim 14, further comprising:

  providing the embedded portal services functionality of the CableHome specification in the data networking engine; and

  providing VoIP functionality in accordance with the PacketCable specification in the DOCSIS controller;

  wherein the data networking engine includes consumer provided equipment drivers including a USB driver and an Ethernet driver; and

  wherein the CableHome functionality provided by the data networking engine is completely decoupled from the PacketCable and DOCSIS functionality provided by the cable modem engine.

18. A cable modem system comprising:

  a data networking engine implemented in a first circuit that includes at least one processor, the data networking engine programmed with software that when executed

8

by the at least one processor of the first circuit causes the data networking engine to perform home networking functions including interfacing with customer provided equipment;

  a cable modem engine implemented in a second circuit that includes at least one processor, the second circuit being separate from the first circuit, the cable modem engine programmed with software that when executed by the at least one processor of the second circuit causes the cable modem engine to perform cable modem functions other than the home networking functions performed by the data networking engine, the cable modem functions including interfacing with cable media, and the cable modem engine configured to enable upgrades to its software in a manner that is independent of upgrades to the software of the data networking engine, the cable modem engine including a DOCSIS controller and a DOCSIS MAC processor, the DOCSIS MAC processor configured to process downstream PDU packets and forward the processed packets directly to the data networking engine without the involvement of the DOCSIS controller in order to boost downstream throughput; and

  a data bus that connects the data networking engine to the cable modem engine, wherein the cable modem functions performed by the cable modem engine are completely partitioned from the home networking functions performed by the data networking engine.

19. A cable modem system as claimed in claim 18, wherein all DOCSIS functions are localized in the cable modem engine.

20. The cable modem system as claimed in claim 18 wherein the DOCSIS MAC processor is configured to implement real-time MAC functions for both upstream and downstream communications.

* * * * *

# EXHIBIT B

US008284690B2

## (12) United States Patent
### Barr

(10) Patent No.: **US 8,284,690 B2**
(45) Date of Patent: **Oct. 9, 2012**

(54) **RECEIVER DETERMINED PROBE**

(75) Inventor: **David Barr**, San Jose, CA (US)

(73) Assignee: **Entropic Communications, Inc.**, San Diego, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 253 days.

(21) Appl. No.: **12/635,649**

(22) Filed: **Dec. 10, 2009**

(65) **Prior Publication Data**

US 2010/0150016 A1     Jun. 17, 2010

**Related U.S. Application Data**

(60) Provisional application No. 61/122,687, filed on Dec. 15, 2008, provisional application No. 61/179,454, filed on May 19, 2009.

(51) **Int. Cl.**
*G06F 11/00*     (2006.01)
*G06F 15/173*     (2006.01)

(52) **U.S. Cl.** ....................................... **370/252**; 709/224

(58) **Field of Classification Search** ........................ None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 7,124,199 B2 * | 10/2006 | Miller et al. | ................. 709/238 |
| 2007/0183383 A1 * | 8/2007 | Bitran et al. | ................. 370/338 |
| 2008/0117833 A1 * | 5/2008 | Borran et al. | ................. 370/252 |

* cited by examiner

*Primary Examiner* — Clemence Han
(74) *Attorney, Agent, or Firm* — Bruce W. Greenhaus; Daniel Yannuzzi; Michael Febbo

(57) **ABSTRACT**

According to various embodiments of the disclosed method and apparatus, nodes on a network are programmed to generate a probe transmission in response to a request from the node that will be receiving the probe. The receiving node may generate a probe request that specifies a plurality of parameters, such as a modulation profile for the probe; the payload content of the probe; the number of times to transmit the probe; a number of symbols for the payload of the probe; a preamble type for the probe; a cyclic-prefix length for the payload of the probe; a transmit power for the probe; and a transmit power scaling factor for the payload of the probe.

**24 Claims, 6 Drawing Sheets**





*Fig. 1*



*Fig. 2*



*Fig. 3*



*Fig. 4*

APPX198



*Fig. 5*

APPX199



*Fig. 6*

US 8,284,690 B2

**1**

RECEIVER DETERMINED PROBE

CROSS-REFERENCE TO RELATED
APPLICATIONS

This application claims the benefit of U.S. Provisional
Applications No. 61/122,687, filed Dec. 15, 2008, and No.
61/179,454, filed May 19, 2009, each of which is herein
incorporated by reference.

TECHNICAL FIELD

The presently disclosed method and apparatus relates gen-
erally to communication networks, and more particularly,
some embodiments relate to channel assessment probes.

DESCRIPTION OF THE RELATED ART

A home network may include multiple types of subscriber
equipment configured to deliver subscriber services through-
out the home. These subscriber services include delivering
multimedia content, such as streaming audio and video,
through the home network to subscriber equipment, where it
is presented to a user. As the number of available subscriber
services has increased and they become more popular, the
number of devices being connected within each home net-
work has also increased. The increase in the number of ser-
vices and devices increases the complexity of coordinating
communication between the network nodes as each node may
experience different access conditions along its portion of the
network.

This increase in complexity, further increases the likeli-
hood that network problems may develop. When problems
with subscriber services develop, subscriber service content
providers are typically required to diagnosis the source of the
network problem. Often, this requires sending a technician to
the physical location of the home network to personally
assess the network and diagnose the problem. Accordingly, as
the number of homes with subscriber services incorporated
into their home networks increases, so does the amount of
resources a service provider must devote to technical support
and network maintenance.

In many instances in which a network is established, it is
helpful to characterize the communication channel over
which data is to be sent between nodes of the network. It
should be noted that for the purposes of this disclosure, a
"channel" is the communication link between a first node of
a network and a second node of a network in one particular
direction. Therefore, there is a first channel from a first node
**1** to a second node **2** and a second unique channel from the
second node **2** to the first node **1**. In some instances, probes
are sent between nodes of the network in order to allow a
receiving node on the network to determine some of the
characteristics of the channel between the receiving node and
the transmitting node. These probes are typically well
defined. Accordingly, the receiving node knows before recep-
tion what reference signal was transmitted. By comparing the
reference probe with the actual received probe, the receiver
can determine some of the characteristics of the channel
between the transmitting and receiving node. However,
requiring the transmitting node to send a predetermined probe
reduces the amount flexibility of the characterization process.
Nonetheless, this reduction in the flexibility must be suffered
because it is critical to the process that the receiving node
knows the precise form of the transmitted probe.

BRIEF SUMMARY

According to various embodiments of the disclosed
method and apparatus, nodes on a network (also referred to as

**2**

network devices) are programmed to generate a probe trans-
mission in response to a request from the nodes that will be
receiving the probe. The receiving node may generate a probe
request that specifies a plurality of parameters to be used in
such a "receiver determined" probe to generate a probe hav-
ing the "form" specified by these parameters. Accordingly,
the probe request specifies a plurality of parameters associ-
ated with the generation and transmission of a probe, includ-
ing the content of a payload of the probe. In one embodiment,
the parameters further include: the modulation profile for the
probe; the payload content of the probe; the number of times
to transmit the probe; the number of symbols for the payload
of the probe; the preamble type for the probe; the cyclic-prefix
length for the payload of the probe; the transmit power for the
probe; and the transmit power scaling factor for the payload
of the probe. Accordingly, the probe that is transmitted in
response to the probe request will have a form dictated by the
parameters specified in the probe request.

In various embodiments, these receiver determined probes
may be used in a variety of applications. For example, the
probes may be used to reach or discover hidden nodes; in
networks employing orthogonal frequency division multiple
access (OFDMA), the probes may be used for OFDMA sub-
channel assessment; or in networks accessible by content
providers, the probes may be used for off-site network diag-
nosis.

An embodiment of the disclosed method comprises: a)
receiving in a first node, a probe request specifying a plurality
of parameters associated with the generation and transmis-
sion of a probe, including the content of a payload of the
probe; and b) transmitting from the first node to a second node
the probe having a form dictated by the parameters specified
by the probe request.

In a further embodiment of the method and apparatus, at
least one of the probe parameters indicates: a) a modulation
profile for the probe; b) the payload content of the probe; c)
the number of times to transmit the probe; d) the number of
symbols for the payload of the probe; e) the preamble type for
the probe; f) the cyclic-prefix length for the payload of the
probe; g) the transmit power for the probe; and h) the transmit
power scaling factor for the payload of the probe.

Other features and aspects of the disclosed method and
apparatus will become apparent from the following detailed
description, taken in conjunction with the accompanying
drawings, which illustrate, by way of example, the features in
accordance with embodiments of the disclosed method and
apparatus. The summary is not intended to limit the scope of
the claimed invention, which is defined solely by the claims
attached hereto.

BRIEF DESCRIPTION OF THE DRAWINGS

The disclosed method and apparatus, in accordance with
one or more various embodiments, is described in detail with
reference to the following figures. The drawings are provided
for purposes of illustration only and merely depict either
typical embodiments or examples of particular embodiments.
These drawings are provided to facilitate the reader's under-
standing of the disclosed method and apparatus and shall not
be considered limiting of the breadth, scope, or applicability
of the claimed invention. It should be noted that for clarity and
ease of illustration these drawings are not necessarily made to
scale.

FIG. **1** illustrates an example of one environment in which
some embodiments of the disclosed method and apparatus
may be implemented.

US 8,284,690 B2

FIG. **2** illustrates an example of one embodiment of a network topology of the disclosed method and apparatus.

FIG. **3** illustrates a transmitter module that may be employed in some embodiments of the disclosed method and apparatus to generate PHY packets.

FIG. **4** illustrates a method of operation according to an embodiment of the disclosed method and apparatus.

FIG. **5** illustrates examples of parameters that may be modified or determined for generating a probe request according to an embodiment of the disclosed method and apparatus.

FIG. **6** illustrates an example computing module that may be used in implementing various features of embodiments of the disclosed method and apparatus.

The figures are not intended to be exhaustive or to limit the claimed invention to the precise form disclosed. It should be understood that the disclosed method and apparatus can be practiced with modification and alteration, and that the claimed invention should be limited only by the claims and the equivalents thereof.

DETAILED DESCRIPTION

Before describing the disclosed method and apparatus in detail, it is useful to describe an example of an environment in which the disclosed method and apparatus can be implemented. The network of FIG. **1** will be described for this purpose. A wired communications medium **100** is shown. In some embodiments, the wired communications medium might be a coaxial cable system, a power line system, a fiber optic cable system, an Ethernet cable system, or other similar communications medium. Alternatively, the communications medium might be a wireless transmission system. In the illustrated embodiment, the communications medium **100** is preinstalled coaxial cabling deployed within a residence **101**.

The network comprises a plurality of network nodes **102**, **103**, **104**, **105**, **106** in communication according to a communications protocol. For example, the communications protocol might comprise a networking standard, such as the Multimedia over Coax Alliance (MoCA) standard. In the illustrated embodiment, the communications protocol specifies a packet based communications system. In this embodiment, physical layer (PHY) packets comprise preambles and payloads. A PHY preamble is typically inserted at the beginning of each packet to assist receivers in detecting and acquiring the physical layer parameters to properly receive and decode the packet. The communications protocol may have a plurality of pre-defined PHY preambles to use with different types of network communications. For example, one type of preamble may be used when transmitting in a diversity mode (a communication mode in which little is known about the communication channel). Another type of preamble may be used when transmitting a media access plan (MAP) message. Another type of preamble may comprise a specified subset of subcarrier frequencies. Other types of packets may use other types of preambles.

A PHY payload is used to transmit the data content of the packet. In some cases, the PHY payload has a predetermined format. For example, in a MoCA network, network maintenance messages and MAP messages each have a format that is determined by the MoCA protocol. In other cases, the PHY payload may have undetermined format. For example, the PHY payload of a media streaming transmission might comprise an embedded Ethernet packet or a portion thereof.

In some embodiments, activity on the network is controlled by a network coordinator (NC) node. In one such embodiment, one of the nodes is selected to perform the functions of the NC based upon a process defined by the communications protocol. In networks employing an NC, the NC schedules network communications between network nodes using a MAP message. The MAP is sent as a packet. Such MAP packets are sent on a regular basis. MAPs are generated in response to reservation requests by the nodes of the network. The NC's MAP message may precisely schedule probe transmissions. The NC also performs admission procedures when a new node requests admission to the network.

Nodes described herein can be associated with a variety of devices. For example, in a system deployed in a residence **101**, a node may be a network communications module associated with one of the computers **109** or **110**. Such nodes allow the computers **109**, **110** to communicate on the communications medium **100**. Alternatively, a node may be a module associated with a television **111** to allow the television to receive and display media streamed from the internet, or from one or more other network nodes. A node might also be associated with a speaker or other media playing devices **103** that plays music. A node might also be associated with a module configured to interface with an internet or cable service provider **112**, for example to provide Internet access, digital video recording capabilities, media streaming functions, or network management services to the residence **101**.

In many embodiments, network probes are used to perform various channel assessment or network maintenance procedures. For example, in a wired network, network node mobility may be fairly low and new nodes joining the network may be a relatively rare occurrence. In contrast to highly dynamic networks, such as wireless networks, wired networks are more stable, i.e., the channel conditions do not change frequently. In stable networks probing can be used to profile the channel conditions without introducing unacceptable network overhead. However, even with more dynamic networks, network probes can be used to diagnose problems. For example, a probe can replicate a potential problem, reach or discover a distant or previously undetected node on the network, or assist with network admissions procedures.

In some embodiments, network communications use orthogonal frequency division multiplexing (OFDM). In OFDM, a communications channel comprises a plurality of orthogonal subcarrier frequencies. In one embodiment, transmissions are modulated onto these subcarriers using quadrature amplitude modulation (QAM), where symbols are modulated onto the subcarrier by modifying the amplitude of an in-phase and independently modifying the amplitude of a quadrature portion of the subcarrier transmission. Each OFDM symbol is formed from the collection of all of the QAM symbols modulated onto each of the used subcarriers in the same time slot. In some embodiments, each subcarrier is modulated with the same modulation scheme. For example, an OFDM symbol may comprise a plurality of subcarriers each modulated with 4-QAM. In another embodiment, transmissions on different subcarriers may utilize different QAM schemes. For example, a first subcarrier may be modulated using 2-QAM (otherwise known as binary phase shift keying (BPSK)), a second subcarrier may be modulated using 64-QAM, and so on. In yet another embodiment, different transmission types may utilize different types of OFDM symbols. For example, during network admissions processes, transmissions may utilize OFDM symbols where each subcarrier is modulated with 2-QAM, and once the network node has been admitted to the network, it may utilize an adaptable bitloading profile for its OFDM symbols.

In some embodiments, OFDMA may be employed to allow multiple nodes to have simultaneous access to the channel. In OFDMA, disjoint subsets of subcarriers, referred to as sub-

US 8,284,690 B2

5                                                                 6

channels, are assigned to the nodes participating in the OFDMA communications. In some embodiments employing NCs, OFDMA is used for the communications between the non-NC nodes and the NC. In these embodiments, the NC may partition the channel into sub-channels and assign these sub-channels to the participating network nodes. In a particular embodiment, the sub-channels are configured such that the bitloading on each sub-channel is the same. In this embodiment, because different subcarriers may accommodate different modulation schemes, the sub-channels may not all have the same number of subcarriers. However, in other embodiments, different sub-channel bitloading and partitioning schemes may be employed.

FIG. 2 illustrates a full mesh topology between four example nodes. In some embodiments, network conditions may vary according to the particular channel, and even according to the direction of the channel. For example, network conditions for the channel from node 1 to node 2 can differ from the conditions for the channel from node 2 to node 1. These can each be different from the conditions of the channel from node 2 to node 3, and so on. Accordingly, different modulation schemes may be employed for each channel. In one embodiment, probes are used during a network profiling period to determine the modulation schemes to be used for the different links. For example, node 1 may transmit a probe request to each of nodes 2, 3, and 4 specifying a bitloading per subcarrier and a raw data sequence to be used in transmitting the probe. Each of nodes 2, 3, and 4 would then generate the probe with the requested bitloading and raw data sequence and transmit the probe to node 1. By analyzing this return probe and repeating the process if necessary, node 1 can develop bitloading profiles for use on the subcarriers used to communicate with each of nodes 2, 3, and 4.

In one embodiment employing OFDMA, a receiving node sends a probe request that indicates which sub-carriers are to be used to send a probe from a particular transmitting node and the bitloading profiles applied across those sub-carriers. For example, in one embodiment, node 1 may be an NC, and may receive reservation requests from nodes 2, 3, and 4 simultaneously using OFDMA. If node 1 were to establish a potential sub-channel with node 2, node 1 can transmit a probe request specifying a bitloading profile in which the subcarriers that are not in the potential sub-channel are left untransmitted. Accordingly, the bitloading profile would indicate modulating only the subcarriers that are in the potential sub-channel. In this case, the probe generated by node 2 in response to the probe request from node 1 would emulate an OFDMA transmission from node 2 to node 1. Node 1 could then use the information derived from the probe in its OFDMA sub-channel allocation procedure.

In another embodiment, node 1 could transmit one or more probe requests that request probes to be transmitted by some or all of the OFDMA participant nodes simultaneously on the subcarriers assigned to be used by each OFDMA participant node.

FIG. 3 illustrates a transmitter module 150 used within a node, such as the nodes 102, 103, 104, 105, 106 shown in FIG. 1. The transmitter module 150 generates PHY packets in accordance with one embodiment of the disclosed method and apparatus. The module 150 has a frequency domain payload 160 and/or a time domain payload 161. A subcarrier mapper 163 maps the payload 161 to a plurality of assigned subcarriers according to a predetermined bitloading profile for the channel (or sub-channel in the case of an OFDMA transmission). The transmitter module 150 uses a frequency domain preamble generator module 162 to insert a frequency

domain PHY preamble before the frequency domain payload 160. Accordingly, a preamble specified in the frequency domain may be "prepended" to the payload after the subcarrier mapper 163. The combined signal is then modulated onto the OFDM symbol by a modulator module 164. The modulated signal is then filtered and upconverted to the channel's predetermined radio frequencies by the filter 165 and an RF upconverter 166.

When the transmitting module 150 is generating a time domain packet, the frequency domain modulation is not necessary. However, in one embodiment the frequency domain modulation is used even when generating a time domain packet. A time domain payload 161 having a time domain preamble generated by a time domain preamble generator module 167 is filtered and RF upconverted for transmission on the channel.

FIG. 4 illustrates a method of operation according to an embodiment of the disclosed method and apparatus. In block 200, one or more nodes transmit a probe request specifying probe parameters to one or more nodes that will be transmitting the eventual probe(s) having a form that is dictated by the specified parameters. In one embodiment, the probe is transmitted by a single node and received by a single node (point-to-point) or received by several nodes (point-to-multipoint, such as multicast or broadcast). In another embodiment, the probe is simultaneously transmitted by multiple nodes and received by a single node (multipoint-to-point, such as OFDMA). In other OFMDA embodiments, multiple nodes might share the communications channel for multi-point to multi-point communications. In such a case, multiple nodes can transmit probe requests, and multiple nodes can receive probes, all simultaneously.

In block 201, the probe transmitter or transmitters receive the probe request or requests. In one embodiment, the probe request specifies a plurality of parameters for the probe that will dictate the form of the probe to be transmitted. These parameters are discussed in more detail below with respect to FIG. 5. In block 202, the probe transmitter uses the specified probe parameters to generate a probe having a form that complies with the specified parameters. In block 203, the probe transmitter transmits the generated probe to the probe requester at a specified time. Alternatively, the probe transmitter can transmit the probe to any other probe base upon one of the parameters of the probe request or based upon information that previously existed within the transmitting node. In some embodiments, the requested probe may exceed certain capabilities of the transmitter.

In one embodiment, the probe transmitter's RMS error (signal fidelity) requirements may be relaxed if the requested probe specifies a power output that exceeds the transmitting node's nominal total output power. As another example, the probe transmitter may have restrictions on how many time domain probes it is allowed to send, and will send a time domain probe only if the probe transmitter determines that the time domain probe will not negatively impact other network operations.

In block 204, the requesting node receives the probe generated according to its earlier probe request. The received probe may then be used in further processing in block 205. In one embodiment, the received probe may be used in channel analysis to determine a bitloading table, FEC and other communication parameters for OFDM or OFDMA signals for future transmissions from the probe transmitter. In another embodiment, post reception processing might comprise generating a report from the probe and transmitting this probe report to the requesting node or to a designated entity. For example, the probe report could contain bitloading, FEC and

US 8,284,690 B2

7                                                          8

other communication parameters to be used subsequently by the transmitting node when communicating to the receiving node. In another example, the probe report could be conveyed to an offsite network administrator for remote management purposes. For example, the parameters of the requested probe can be determined by an off-site network administrator, and conveyed to a probe requestor. The resulting probe, post-processing, and probe report can be used to assist in diagnosing a network problem possibly involving the probe requester or the probe transmitter. In one such case, a probe report is sent to the network administrator.

In other embodiments, the probe request might be transmitted by a different node than the probe receiver. For example, in FIG. 2, node 2 might generate a probe request for node 3 to generate and transmit a specified probe to node 1. In some embodiments, this is used to determine how communications between node 3 and node 1 could impact communications between node 2 and node 4. This might occur, for example, in an OFDMA system in which a sub-channel between node 1 and node 3 and a second sub-channel between node 2 and node 3 are active at the same time. In another embodiment, an NC can generate a probe request for a probe to be transmitted between two other nodes with an instruction that a probe report be transmitted to the NC. This might be used by an off-site network manager that can communicate with only some of the network nodes, but suspects that communications between other network nodes may be causing a network problem.

FIG. 5 illustrates examples of parameters that may be modified or determined for generating a probe request according to an embodiment of the disclosed method and apparatus. A probe request may specify a bitloading profile or constellation profile to be used in the probe (block 260). For example, in OFDM networks, the bitloading profile or constellation profile may specify which QAM constellations to use for which channel subcarriers. In some embodiments, the specified bitloading profile may specify a QAM constellation or QAM scheme to use for each subcarrier. In other embodiments, the bitloading profile specifies QAM schemes for only a subset of the available subcarriers and the probe generating node will not transmit the remaining subcarriers.

In various embodiments, the bitloading profile includes indications to leave certain subcarriers untransmitted. For example, in one embodiment, in which the network conforms to an industry standard established by MoCA, 100 MHz/512 versions of MoCA's Type II Frequency Domain Tone Probes can be accommodated without the need to specifically define the probes in the MoCA specification. This could be accomplished in part by generating a probe request for a probe having two modulated subcarriers, while specifying that the remaining subcarriers of the probe be untransmitted. As another example, an OFDMA transmission from a single node could be emulated by instructing the node to transmit a probe in which only subcarriers belonging to a certain sub-channel are transmitted, while leaving the remaining subcarriers untransmitted. Additionally, simultaneous OFDMA transmissions may occur in response to probe requests to multiple nodes. In one embodiment, each of the multiple probe requests is sent to one of a plurality of nodes. Each probe request specifies a bitloading profile specific to the particular probe-transmitting node, such that the simultaneously transmitted probes from the multiple nodes comprise an OFDMA transmission to the requesting node.

In accordance with the embodiment shown in FIG. 5, in block 261, the probe request specifies a raw data sequence for the probe (or for just the probe's payload). In some embodiments, a network communications protocol specifies that

various techniques, such as data-scrambling, bin-scrambling, forward error correction, or encryption be used in network communications. In some such embodiments, these techniques are specified in the probe request. In alternative embodiments, these techniques are not used in the specified data sequence for simplicity.

In block 262, a probe request specifies a number of symbols for the probe payload length. In one embodiment, the number of symbols and the raw data sequence will be determined such that the serialized bit stream corresponding to the raw data sequence fully occupies the requested number of symbols using the requested bitloading profile. Additionally, in embodiments using OFDM communications, or other embodiments with multi-path channel characteristics, a cyclic prefix length may be specified. In some embodiments, the cyclic prefix length may be the same for each symbol of the specified number of symbols. In other embodiments, the cyclic prefix length may be assigned in a symbol specific manner or may otherwise vary between symbols of the probe.

In block 264, a probe request further specifies a preamble type to use in the probe. As discussed above, some networks operate according to protocols that specify a variety of available packet preambles. These packet preambles can be used for packet identification or can contain information useful in receiving and decoding the packet's payload. In some embodiments, different preambles may be utilized according to channel conditions, such as a long and robust preamble when the channel conditions are unknown, or a short and efficient preamble when the channel conditions are known to be good. In some embodiments using OFDMA transmissions, a preamble type may be used in which each simultaneous transmitter contributes a portion of the composite preamble corresponding to the particular subcarriers assigned to each participating transmitter. In some embodiments, nodes may be restricted from using certain preamble types. For example, in a network utilizing MAP packets, a MAP packet preamble may be specified, and nodes may be restricted from requesting that a probe utilize a MAP packet preamble. This can serve to reduce the likelihood that a probe might adversely affect the operation of other nodes not involved in the probing procedure. In other embodiments, the type of preamble available is not restricted, or the restriction can be overcome in certain circumstances. For example, diagnostic probe requests could be unrestricted in terms of the available preambles while network maintenance or assessment or channel assessment probe requests could be restricted in terms of their available preambles. Additionally, in some embodiments, only certain probe parameters can be requested under certain conditions. For example, in an OFDMA network, the network protocol may specify that a particular OFDMA preamble be used in all OFDMA transmissions. Therefore, if a probe request specifies an OFDMA probe, then the probe request will specify that the particular OFDMA preamble be used in the OFDMA probe. In another embodiment, the probe request also specifies that the same subcarriers remain untransmitted in the preamble as in the OFDMA packet payload. In another embodiment, the probe transmitting node may perform this operation automatically.

In the embodiment of FIG. 5, block 265 indicates that a probe request specifies a transmit power setting for the probe. In some embodiments, the network protocol may establish a range of transmit power settings that are available for various transmissions. In a particular embodiment, a range of transmit power (attenuation) settings is between 0 and 30 dB for normal transmissions, and between −12 dB (corresponding to amplification) to 45 dB for OFDMA transmissions, or transmissions with an OFDMA specifying preamble. In some

US 8,284,690 B2

9

embodiments, a node conforms to these predetermined settings in generating probe requests. In other embodiments, the different settings available for different transmission types may be exploited to generate particular probes. For example, a probe request could request an amplified non-OFDMA probe in order to reach or identify a distant or hidden node.

In block 266, a probe request further specifies a power scaling factor for the payload relative to the preamble. In embodiments employing this scaling factor, probe payloads can be transmitted with different power characteristics than the probe preambles. In one particular embodiment, the scale factor varies from 0 to 17 dB of amplification in the payload relative to the preamble. This might be used in a variety of different requested probes. For example, 100 MHz/512-subcarrier versions of MoCA's Type II Frequency Domain Tone Probes can be emulated, in part, by applying an appropriate payload scale factor. For example, a probe request may specify a payload that modulates only a single subcarrier with the maximum available payload scaling factor (amplification) in order to reach or identify a distant or hidden node. In another example, a payload scale factor may be requested which produces a probe transmission which exceeds the transmitting node's nominal total output power, in order to reach or identify a distant or hidden node. Alternatively, the probe request may specify an OFDMA emulating probe in which the payload is modulated on a set of subcarriers that comprises a potential sub-channel for OFDMA communications. The scaling factor can be determined such that the payload is transmitted at the power level of a normal OFDMA sub-channel, even though the preamble does not specify that the communication is an OFDMA sub-channel. In one embodiment, such probes might be used to assess a channel and thus allow an NC to pre-determine which OFDMA sub-channels should be used if a node leaves or joins the network. For example, an NC could establish four potential sub-channels for a network having three current nodes. This would avoid overhead if a fourth node were to join the network. In some embodiments, packet power restrictions may impact what scaling factors are available in terms of the specified transmit power setting. In a particular embodiment, the payload symbol scaling factor minus the transmit power (attenuation) setting is restricted to less than or equal to 12 dB.

In block 267, a probe request specifies the number of times the generated probe should be transmitted. For example, a probe request may specify that the generated probe be repeated to allow improved channel assessment or to diagnosis a particular network issue. In one embodiment, the amount of delay between repetitions is specified. In further embodiments, the probe request may specify that certain probe parameters vary in subsequent transmissions. For example, the probe request may specify that the transmitter transmit three subsequent probes with equivalent parameters except for an increasing power transmit setting. In some embodiments, this is used to avoid repetitious probe requests.

In some alternative embodiments, the probe requests specify time-domain probes. For example, a probe request may specify a time domain probe to generate a square wave or other easily analyzed signal for channel estimate purposes. In some embodiments, factors similar to those employed in the embodiments described with respect to FIG. 5 may be employed in a time domain probe request, except that the bitloading profile and raw data bit-sequence are replaced with a time series for the transmitted probe. In some embodiments, the allowed time domain sequences are restricted, for example to prevent a mal-formed packet from disrupting other network communications. In other embodiments, probe transmitters are programmed to evaluate a received time-

10

domain probe request to determine if the corresponding time-domain probe would disrupt the network.

In various embodiments, allowing a probe receiving node to specify the parameters for a probe from the probe transmitting node allows various features to be implemented. Furthermore, in some embodiments, networks implementing these embodiments may simplify their shared communications standards. For example, a network standard may forgo specifying particular assessment probes and allow a receiving node to determine its own assessment probe. In one embodiment, the receiving node may utilize this ability to specify the characteristics of an error vector measurement (EVM) probe or echo profile probe (EPP). Furthermore, this may simplify the shared communications standard by allowing proprietary aspects of the probe signal processing to be confined to particular receivers. Allowing the receiving node to specify the characteristics of the probe also supports future extensibility (e.g., new probe signals could be supported by older transmitters). In addition to allowing a network to improve its functioning, this may also allow legacy nodes to better interoperate with nodes operating according to future standards. For example, if an improved EVM probe type were developed for a future network, nodes implementing this embodiment will be capable of transmitting the improved probe, even if they themselves are not able to process these probes and are restricted to using a legacy EVM probe. Additionally, some nodes may be capable of downloading or receiving new probe types from outside entities. In networks implementing an embodiment of the disclosed method and apparatus, these new probes may be uploaded to the capable nodes, which can then request the updated probes to be transmitted from nodes that would not otherwise have the upgraded capabilities.

As used herein, the term module might describe a given unit of functionality that can be performed in accordance with one or more embodiments of the disclosed method and apparatus. As used herein, a module might be implemented utilizing any form of hardware, software, or a combination thereof. For example, one or more processors, controllers, ASICs, PLAs, PALs, CPLDs, FPGAs, logical components, software routines or other mechanisms might be implemented to make up a module. In implementation, the various modules described herein might be implemented as discrete modules or the functions and features described can be shared in part or in total among one or more modules. In other words, as would be apparent to one of ordinary skill in the art after reading this description, the various features and functionality described herein may be implemented in any given application and can be implemented in one or more separate or shared modules in various combinations and permutations. Even though various features or elements of functionality may be individually described or claimed as separate modules, one of ordinary skill in the art will understand that these features and functionality can be shared among one or more common software and hardware elements, and such description shall not require or imply that separate hardware or software components are used to implement such features or functionality.

Where components or modules of the disclosed method and apparatus are implemented in whole or in part using software, in one embodiment, these software elements can be implemented to operate with a computing or processing module capable of carrying out the functionality described with respect thereto. One such example computing module is shown in FIG. 6. Various embodiments are described in terms of this example-computing module 300. After reading this description, it will become apparent to a person skilled in the relevant art how to implement the disclosed method and apparatus using other computing modules or architectures.

APPX205

US 8,284,690 B2

11

12

Referring now to FIG. **6**, computing module **300** may represent, for example, computing or processing capabilities found within desktop, laptop and notebook computers; hand-held computing devices (PDA's, smart phones, cell phones, palmtops, etc.); mainframes, supercomputers, workstations or servers; or any other type of special-purpose or general-purpose computing devices as may be desirable or appropriate for a given application or environment. Computing module **300** might also represent computing capabilities embedded within or otherwise available to a given device. For example, a computing module **300** might be found in electronic devices such as, for example, digital cameras, navigation systems, cellular telephones, portable computing devices, modems, routers, wireless access points (WAPs), terminals and other electronic devices that might include some form of processing capability.

Computing module **300** might include, for example, one or more processors, controllers, control modules, or other processing devices, such as a processor **304**. Processor **304** might be implemented using a general-purpose or special-purpose processing engine such as, for example, a microprocessor, controller, or other control logic. In the illustrated example, processor **304** is connected to a bus **302**, although any communication medium can be used to facilitate interaction with other components of computing module **300** or to communicate externally.

Computing module **300** might also include one or more memory modules, simply referred to herein as main memory **308**. For example, preferably random access memory (RAM) or other dynamic memory, might be used for storing information and instructions to be executed by processor **304**. Main memory **308** might also be used for storing temporary variables or other intermediate information during execution of instructions to be executed by processor **304**. Computing module **300** might likewise include a read only memory ("ROM") or other static storage device coupled to bus **302** for storing static information and instructions for processor **304**.

The computing module **300** might also include one or more various forms of information storage mechanism **310**, which might include, for example, a media drive **312** and a storage unit interface **320**. The media drive **312** might include a drive or other mechanism to support fixed or removable storage media **314**. For example, a hard disk drive, a floppy disk drive, a magnetic tape drive, an optical disk drive, a CD or DVD drive (R or RW), or other removable or fixed media drive might be provided. Accordingly, storage media **314** might include, for example, a hard disk, a floppy disk, magnetic tape, cartridge, optical disk, a CD or DVD, or other fixed or removable medium that is read by, written to or accessed by media drive **312**. As these examples illustrate, the storage media **314** can include a computer usable storage medium having stored therein computer software or data.

In alternative embodiments, information storage mechanism **310** might include other similar instrumentalities for allowing computer programs or other instructions or data to be loaded into computing module **300**. Such instrumentalities might include, for example, a fixed or removable storage unit **322** and an interface **320**. Examples of such storage units **322** and interfaces **320** can include a program cartridge and cartridge interface, a removable memory (for example, a flash memory or other removable memory module) and memory slot, a PCMCIA slot and card, and other fixed or removable storage units **322** and interfaces **320** that allow software and data to be transferred from the storage unit **322** to computing module **300**.

Computing module **300** might also include a communications interface **324**. Communications interface **324** might be used to allow software and data to be transferred between computing module **300** and external devices. Examples of communications interface **324** might include a modem or softmodem, a network interface (such as an Ethernet, network interface card, WiMedia, IEEE 802.XX or other interface), a communications port (such as for example, a USB port, IR port, RS232 port Bluetooth® interface, or other port), or other communications interface. Software and data transferred via communications interface **324** might typically be carried on signals, which can be electronic, electromagnetic (which includes optical) or other signals capable of being exchanged by a given communications interface **324**. These signals might be provided to communications interface **324** via a channel **328**. This channel **328** might carry signals and might be implemented using a wired or wireless communication medium. Some examples of a channel might include a MoCA channel over coaxial cable, phone line, power line, a cellular link, an RF link, an optical link, a network interface, a local or wide area network, and other wired or wireless communications channels.

In this document, the terms "computer program medium" and "computer usable medium" are used to generally refer to media such as, for example, memory **308**, storage unit **320**, media **314**, and channel **328**. These and other various forms of computer program media or computer usable media may be involved in carrying one or more sequences of one or more instructions to a processing device for execution. Such instructions embodied on the medium, are generally referred to as "computer program code" or a "computer program product" (which may be grouped in the form of computer programs or other groupings). When executed, such instructions might enable the computing module **300** to perform features or functions of the disclosed method and apparatus as discussed herein.

While various embodiments of the disclosed method and apparatus have been described above, it should be understood that they have been presented by way of example only, and not of limitation. Likewise, the various diagrams may depict an example architectural or other configuration for the disclosed method and apparatus, which is done to aid in understanding the features and functionality that can be included in the disclosed method and apparatus. The claimed invention is not restricted to the illustrated example architectures or configurations, but the desired features can be implemented using a variety of alternative architectures and configurations. Indeed, it will be apparent to one of skill in the art how alternative functional, logical or physical partitioning and configurations can be implemented to implement the desired features of the disclosed method and apparatus. Also, a multitude of different constituent module names other than those depicted herein can be applied to the various partitions. Additionally, with regard to flow diagrams, operational descriptions and method claims, the order in which the blocks are presented herein shall not mandate that various embodiments be implemented to perform the recited functionality in the same order unless the context dictates otherwise.

Although the disclosed method and apparatus is described above in terms of various exemplary embodiments and implementations, it should be understood that the various features, aspects and functionality described in one or more of the individual embodiments are not limited in their applicability to the particular embodiment with which they are described, but instead can be applied, alone or in various combinations, to one or more of the other embodiments of the disclosed method and apparatus, whether or not such embodiments are described and whether or not such features are presented as being a part of a described embodiment. Thus, the breadth and

APPX206

US 8,284,690 B2

13

scope of the claimed invention should not be limited by any of the above-described embodiments which are presented as mere examples for illustration only.

Terms and phrases used in this document, and variations thereof, unless otherwise expressly stated, should be construed as open ended as opposed to limiting. As examples of the foregoing: the term "including" should be read as meaning "including, without limitation" or the like; the term "example" is used to provide exemplary instances of the item in discussion, not an exhaustive or limiting list thereof; the terms "a" or "an" should be read as meaning "at least one," "one or more" or the like; and adjectives such as "conventional," "traditional," "normal," "standard," "known" and terms of similar meaning should not be construed as limiting the item described to a given time period or to an item available as of a given time, but instead should be read to encompass conventional, traditional, normal, or standard technologies that may be available or known now or at any time in the future. Likewise, where this document refers to technologies that would be apparent or known to one of ordinary skill in the art, such technologies encompass those apparent or known to the skilled artisan now or at any time in the future.

The presence of broadening words and phrases such as "one or more," "at least," "but not limited to" or other like phrases in some instances shall not be read to mean that the narrower case is intended or required in instances where such broadening phrases may be absent. The use of the term "module" does not imply that the components or functionality described or claimed as part of the module are all configured in a common package. Indeed, any or all of the various components of a module, whether control logic or other components, can be combined in a single package or separately maintained and can further be distributed in multiple groupings or packages or across multiple locations.

Additionally, the various embodiments set forth herein are described in terms of exemplary block diagrams, flow charts and other illustrations. As will become apparent to one of ordinary skill in the art after reading this document, the illustrated embodiments and their various alternatives can be implemented without confinement to the illustrated examples. For example, block diagrams and their accompanying description should not be construed as mandating a particular architecture or configuration.

The invention claimed is:

1. A method comprising:
a) receiving in a first node, a probe request specifying a first plurality of parameters associated with the generation and transmission of a probe, wherein the first plurality of parameters at least specify content payload of the probe and a second node;
b) determining a second plurality of parameters associated with generation and transmission of the probe;
c) generating the probe in accordance with the first plurality of parameters and the second plurality of parameters, wherein the probe has a form dictated by the first plurality of parameters; and
d) transmitting the probe from the first node to the second node.

2. The method of claim 1, further including using within the first node, at least one of the probe parameters to determine a modulation profile for the probe.

3. The method of claim 1, wherein at least one of the probe parameters indicates:
a) a modulation profile for the probe;
b) the number of times to transmit the probe;
c) a number of symbols for the payload of the probe;
d) a preamble type for the probe;

14

e) a cyclic-prefix length for the payload of the probe;
f) a transmit power for the probe; and
g) a transmit power scaling factor for the payload of the probe.

4. The method of claim 3, wherein the probe request identifies a hidden node.

5. The method of claim 3, wherein the modulation profile for the probe emulates an orthogonal frequency division multiple access (OFDMA) transmission.

6. The method of claim 1, wherein the probe request is generated by the second node.

7. The method of claim 1, wherein the probe request requests a probe that assists in diagnosing a network problem.

8. The method of claim 7, wherein the probe request is generated by a network operator and uploaded to the second node.

9. A method comprising:
a) a first node transmitting a probe request to a second node, the probe request specifying a first plurality of probe parameters for a physical layer probe, the first plurality of probe parameters comprising a form for the probe including a modulation profile for the probe;
b) the first node receiving the probe from the second node, wherein the probe is generated in accordance with the first plurality of parameters and in accordance with a second plurality of parameters determined by the second node.

10. The method of claim 9, wherein the probe request is configured such that the probe emulates an OFDMA transmission.

11. The method of claim 9, further comprising:
a) the first node transmitting a second probe request to a third node;
b) and the first node receiving a second probe from the third node, wherein the second probe is generated according to the second probe request; and
wherein the first probe and second probe are transmitted simultaneously using OFDMA.

12. The method of claim 9, wherein the probe parameters further comprises:
a) an indication of the number of times to transmit the probe;
b) a number of symbols for the payload of the probe; a preamble type for the probe;
c) a cyclic-prefix length for the payload of the probe; a transmit power for the probe; and
d) a transmit power scaling factor for the payload of the probe.

13. The method of claim 12, wherein the probe request is configured such that the probe identifies a hidden node.

14. The method of claim 9, wherein the probe request is transmitted at a specific time.

15. The method of claim 9, wherein the probe request is configured to diagnose a network problem.

16. The method of claim 15, wherein the probe request is generated by a network operator and uploaded to the first node.

17. A system, comprising:
a) a first node on a communications network, the first node comprising a first processor and a first computer executable program code embodied on a first a computer readable medium, the first computer executable program code configured to transmit a probe request to a second node, on the communications network, the probe request specifying a first plurality of probe parameters for a physical layer probe, wherein the first plurality of probe

**APPX207**

US 8,284,690 B2

15

parameters comprising at least a payload content for the probe and a modulation profile for the probe; and

b) the second node on the communications network, the second node comprising a second processor and a second computer executable program code embodied on a second computer readable medium, the second executable program code configured to:

receive the probe request;

determine a second plurality of parameters associated with generation and transmission of the probe;

generate the probe in accordance with the first plurality of parameters and the second plurality of parameters, wherein the probe has a form dictated by the first plurality of parameters; and

transmit the probe to the first node.

**18**. The system of claim **17**, wherein the probe request is configured such that the probe emulates an OFDMA transmission.

**19**. The system of claim **17**, wherein the first executable program code is further configured to transmit a second probe request to a third node on the communications network, the second probe request specifying a third first plurality of probe parameters for a second physical layer probe, the third plurality of probe parameters comprising a second payload content for the second probe and a second modulation profile for the probe, the second probe request further specifying a different second plurality of parameters associated with the generation and transmission of the second probe; and

further comprising the third node on the communications network, the third node comprising a third processor and

16

a third computer executable program code embodied on a third computer readable medium, the third executable program code configured to receive the second probe request, generate the second probe according to the received probe request, and transmit the second probe to the first node on the communications network; and wherein the first probe and second probe are transmitted simultaneously using OFDMA.

**20**. The system of claim **17**, wherein the probe parameters further comprises:

a) an indication of the number of times to transmit the probe;

b) a number of symbols for the payload of the probe;

c) a preamble type for the probe;

d) a cyclic-prefix length for the payload of the probe;

e) a transmit power for the probe; and

f) a transmit power scaling factor for the payload of the probe.

**21**. The system of claim **20**, wherein the probe request is configured such that the probe identifies a hidden node.

**22**. The system of claim **17**, wherein the probe request is generated by the first node.

**23**. The system of claim **17**, wherein the probe request is configured to diagnose a network problem.

**24**. The system of claim **23**, wherein the probe request is generated by a network operator and uploaded to the first node.

\* \* \* \* \*

# EXHIBIT C

US008792008B2

(12) **United States Patent**
Gallagher et al.

(10) **Patent No.:** **US 8,792,008 B2**
(45) **Date of Patent:** **Jul. 29, 2014**

(54) **METHOD AND APPARATUS FOR SPECTRUM MONITORING**

(75) Inventors: **Timothy Gallagher**, Encinitas, CA (US); **Patrick Tierney**, Solana Beach, CA (US); **Jun Huang**, San Diego, CA (US)

(73) Assignee: **MaxLinear, Inc.**, Carlsbad, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 52 days.

(21) Appl. No.: **13/607,916**

(22) Filed: **Sep. 10, 2012**

(65) **Prior Publication Data**
US 2013/0063608 A1     Mar. 14, 2013

**Related U.S. Application Data**

(60) Provisional application No. 61/532,098, filed on Sep. 8, 2011.

(51) **Int. Cl.**
| | |
|---|---|
| *H04N 17/00* | (2006.01) |
| *H04L 12/66* | (2006.01) |
| *H04L 12/26* | (2006.01) |
| *H04B 17/00* | (2006.01) |

(52) **U.S. Cl.**
CPC ................ *H04L 12/66* (2013.01); *H04L 43/08* (2013.01); *H04N 17/00* (2013.01); *H04B 17/0042* (2013.01)
USPC ........................................................ **348/192**

(58) **Field of Classification Search**
USPC ........................ 348/192, 725, 572, 731, 729; 455/234.1, 136, 138, 234.2; 375/349, 375/350, 316
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 6,038,435 | A  * | 3/2000 | Zhang ........................ | 455/234.1 |
| 6,813,320 | B1 * | 11/2004 | Claxton et al. .............. | 375/316 |
| 7,197,685 | B2 * | 3/2007 | Limberg ..................... | 714/756 |
| 8,588,339 | B2 * | 11/2013 | Birru et al. .................. | 375/316 |
| 8,611,483 | B2 * | 12/2013 | Zhu et al. .................... | 375/349 |
| 2010/0105332 | A1 * | 4/2010 | McHenry et al. ............ | 455/62 |
| 2012/0163518 | A1 * | 6/2012 | Reddy et al. ................ | 375/350 |

* cited by examiner

*Primary Examiner* — Paulos M Natnael

(74) *Attorney, Agent, or Firm* — McAndrews, Held & Malloy, Ltd.

(57) **ABSTRACT**

A system, such as a satellite reception assembly or customer premises gateway, may comprise an analog-to-digital converter operable to digitize a signal spanning an entire television spectrum (e.g., cable television spectrum or satellite television spectrum) comprising a plurality of television channels. The system may comprise a signal monitor operable to analyze a signal to determine a characteristic of the signal. The system may comprise a data processor operable to process a television channel to recover content carried on the television channel. The system may comprise a channelizer operable to select first and second portions of the signal, and concurrently output the first portion to the signal monitor and the second portion to the data processor.

**18 Claims, 7 Drawing Sheets**







FIG. 1A



FIG. 1B



**FIG. 1C**

APPX213



FIG. 2A




FIG. 2B



FIG. 3



402 — Start

404 — An FDM signal occupying the frequency band between $F_{lo}$ and $F_{hi}$ is received

406 — Received FDM is digitized signal across the entire band from $F_{lo}$ to $F_{hi}$

408 — The digitized signal is channelized

410 — A first one or more of the channels are conveyed to a data processing module

412 — A second one or more of the channels are conveyed to a monitoring module

414 — Data processing module processes the first one or more channels for consumption while the monitoring module concurrently processes the second one or more channels

**FIG. 4**

APPX217

US 8,792,008 B2

1

# METHOD AND APPARATUS FOR SPECTRUM MONITORING

## PRIORITY CLAIM

This patent application makes reference to, claims priority to and claims benefit from U.S. Provisional Patent Application Ser. No. 61/532,098 entitled "Method and Apparatus for Spectrum Monitoring" and filed on Sep. 8, 2011.

The above application is hereby incorporated herein by reference in its entirety.

## INCORPORATION BY REFERENCE

This patent application also makes reference to:

U.S. patent application Ser. No. 13/336,451 entitled "Method and Apparatus for Broadband Data Conversion" and filed on Dec. 23, 2011; and

U.S. patent application Ser. No. 13/485,003 entitled "Multi-layer Time-Interleaved Analog-to-Digital Converter (ADC)" and filed on May 31, 2012; and

U.S. patent application Ser. No. 13/588,769 entitled "Multi-Standard Coverage Map Generation" and filed on Aug. 17, 2012.

Each of the above stated applications is hereby incorporated herein by reference in its entirety.

## FIELD OF THE INVENTION

Certain embodiments of the invention relate to signal processing. More specifically, certain embodiments of the invention relate to a method and system for spectrum monitoring.

## BACKGROUND OF THE INVENTION

Network-based services can become unacceptable if network parameters fall outside of those for which receivers in the network were designed. For example, in a cable television system there are specifications for the number of channels on the plant, the types of channels, the signal levels of those channels and the impairments that can be on the plant that would affect the performance of the receiver. If some or all of these parameters deviate outside acceptable bounds, the user may experience unacceptable performance. Conventional methods and apparatuses for monitoring network parameters are too costly and impractical for use in customer-premises equipment (CPE).

Further limitations and disadvantages of conventional and traditional approaches will become apparent to one of skill in the art, through comparison of such systems with some aspects of the present invention as set forth in the remainder of the present application with reference to the drawings.

## BRIEF SUMMARY OF THE INVENTION

A system and/or method is provided for spectrum monitoring, substantially as shown in and/or described in connection with at least one of the figures, as set forth more completely in the claims.

These and other advantages, aspects and novel features of the present invention, as well as details of an illustrated embodiment thereof, will be more fully understood from the following description and drawings.

## BRIEF DESCRIPTION OF SEVERAL VIEWS OF THE DRAWINGS

FIG. 1A depicts an example cable system in accordance with an example embodiment of the invention.

2

FIG. 1B depicts an example receiver operable to perform spectrum monitoring in accordance with an example embodiment of the invention.

FIG. 1C depicts an example satellite system in accordance with an example embodiment of the invention.

FIG. 2A depicts an example RF front-end of a receiver operable to perform spectrum monitoring in accordance with an example embodiment of the invention.

FIG. 2B depicts another example RF front-end of a receiver operable to perform spectrum monitoring in accordance with an example embodiment of the invention.

FIG. 3 depicts an example channelizer which may be utilized for performing spectrum monitoring in accordance with an example embodiment of the invention.

FIG. 4 is a flow chart illustrating example steps for spectrum monitoring in accordance with an example embodiment of the invention.

## DETAILED DESCRIPTION OF THE INVENTION

As utilized herein the terms "circuits" and "circuitry" refer to physical electronic components (i.e. hardware) and any software and/or firmware ("code") which may configure the hardware, be executed by the hardware, and or otherwise be associated with the hardware. As utilized herein, "and/or" means any one or more of the items in the list joined by "and/or". For example, "x and/or y" means any element of the three-element set $\{(x), (y), (x, y)\}$. Similarly, "x, y, and/or z" means any element of the seven-element set $\{(x), (y), (z), (x, y), (x, z), (y, z), (x, y, z)\}$. As utilized herein, the terms "block" and "module" refer to functions than can be implemented in hardware, software, firmware, or any combination of one or more thereof.

FIG. 1A depicts an example communication system in accordance with an example embodiment of the invention. Shown in FIG. 1 is a terrestrial television antenna 102, a satellite dish 104, an Internet Protocol (IP) network 106, a headend 108, a wide area network (e.g., hybrid fiber-coaxial (HFC) network) 118, a gateways 120a and 120b, end systems 126a and 126b (e.g., computers), and end systems 128a and 128b. The headend 108 comprises a switch 110, a video modulator 112, a cable modem termination system (CMTS) 114, and a splitter/combiner 116.

For downstream traffic, the headend 108 may receive television signals via the antenna 102 and the satellite dish 104, and may receive data via the IP network 106. The switch 110 may convey the television signals to the video modulator 112 and the data to the CMTS 114. The video modulator 112 may modulate the received television signals onto a carrier. The CMTS 114 may modulate the received data onto a carrier. The splitter/combiner 116 may combine the outputs of the video modulator 112 and the CMTS 114 resulting in a frequency division multiplexed (FDM) signal comprising one or more television channels and/or one or more DOCSIS channels. The FDM signal may be onto the wide area network (WAN) 118 for distribution to customer premise equipment (CPE). Each of the gateways 120a and 120b may comprise a receive module 150 operable to process the received FDM signal as described below.

In an example embodiment, each of the gateways 120a and 120b may be operable to transmit, via a module 152, messages to the CMTS 114. For such upstream data, the gateways 120a and 120b may modulate messages (e.g., network management/maintenance messages) onto one or more carriers for transmission via the WAN 118. The splitter/combiner 116 may then convey the message to the CMTS 114. The CMTS 114 may process the messages and, in an example embodi-

US 8,792,008 B2

3

ment, adjust transmission parameters (e.g., modulation parameters, transmit power, frequency offsets, etc.) and/or perform other maintenance/management based on the received messages.

FIG. 1B depicts an example receiver operable to perform spectrum monitoring in accordance with an example embodiment of the invention. Shown in FIG. 1B is a receiver circuit **100** comprising an RF receive front-end module **158**, a channelizer module **102**, a monitoring module **154**, and a data processing module **156**.

The RF receive front-end **158** may be operable to process a received RF signal S to generate a digital signal D. The signal S may be the result of a plurality of television and/or DOCSIS channels being frequency division multiplexed into a single signal. The signal S may occupy a frequency band from $F_{lo}$ to $F_{hi}$. The RF front-end **158** may, for example, amplify, down-convert, filter, and/or digitize the received signal S to generate the digital signal D. Example embodiments of the RF front-end are depicted in FIGS. **2A** and **2B**.

The channelizer **102** may be operable to select J+1 bands (represented as $C_1$-$C_{J+1}$) of the signal S and output each of the selected bands to the monitoring module **154** and/or the data processing module **156**, where J is an integer greater than 1. An example embodiment of the channelizer **102** is depicted in FIG. **3**. Each band $C_j$ may, for example, correspond to the frequency band of one or more television channels. For example, each band $C_j$ may be an integer multiple of 6 MHz (U.S.) or 8 MHz (EU).

In an example embodiment, the channelizer **102** may be implemented entirely in the digital domain and the channelization may be achieved via one or more digital filtering algorithms and/or other digital signal processing algorithms.

The monitoring module **154** may be operable to analyze the band $C_{J+1}$ that it receives from the channelizer **102** to measure/determine characteristics such as, for example, signal power level vs. frequency, delay vs. frequency, phase shift vs. frequency, type and/or amount of modulation, code rate, interference levels, signal to noise ratio, a transfer function of the channel of over which the signal was received, an impulse response of the channel over which the signal was received, and/or any other characteristic that may help assess characteristics of the channel over which the signal was received, assess characteristics of the transmitter that sent the signal and/or any otherwise be pertinent to performance of the communication system. The monitoring module may also be operable to generate one or more control signals **160** for configuring the channelizer **102** and/or for configuring the RF front-end **158**. Additionally or alternatively, the control signal(s) **160** output by the monitoring module **154** may control the transmission of network management/maintenance messages by the device **150**. Such message may comprise, for example, network status updates indicating whether one or more communication parameters of one or more received television or DOCSIS channels are outside acceptable bounds, and/or conveying measured/determined characteristics back to a source of the received signal (e.g., back to a cable headend). In an example embodiment, the monitoring module **174** may be operable to demodulate signals for measuring one or more characteristics such as signal-to-noise ratio, code rate.

The data processing module **156** may be operable to process the bands $C_1$-$C_J$ conveyed to it by the channelizer **102** to recover data present in one or more television channels present in those bands of the signal S. The data processing module **156** may, for example, perform synchronization, equalization, and decoding. The data processing module **156** may output processed data (e.g., MPEG transport stream

4

packets and/or Internet Protocol packets) to end systems **126**, perhaps via an interface such as an HDMI interface and/or an Ethernet interface (not shown). The data processing module **156** may also be operable to generate one or more control signals **162** for configuring the channelizer **102** and/or the receive front-end **158**.

The parallel arrangement of the monitoring module **154** and data processing module **156** may enable determination of signal and/or channel characteristics without having to interrupt service to user equipment **126** and **128**.

In an example embodiment, the signal S may be a cable television signal with $F_{lo}$≈55 MHz, $F_{hi}$≈1002 MHz. In an example embodiment, the signal S may be a MoCA signal with with $F_{lo}$≈1150 MHz and $F_{hi}$≈2100 MHz. These numbers are purely for illustration and not intended to be limiting.

In an example embodiment, the signal S may be a satellite television signal such as may be at the input of a LNB, at the output of a LNB, or at the input of a indoor unit (e.g., set top box). In such an embodiment, the front-end **158**, channelizer **152**, data processing module **154**, and/or monitoring module **154** may reside in the indoor unit (e.g., set-top box), outdoor unit (e.g., satellite dish or accompanying components), and/or may be distributed among the indoor unit and outdoor unit of a satellite installation residing at a customer premises. An example of such an embodiment is shown in FIG. 1C.

In operation of such an example embodiment, the signal S may be amplified, possibly downconverted, and digitized by the RF front-end **158** to generate the signal D. The channelizer **102** may then select J bands of the signal D for output to the data processing module **156**. Each of the selected bands $C_1$-$C_J$ may, for example, comprise one or more of the cable television channels and/or one or more of the DOCSIS channels that make up the signal S. The data processing module **156** may provide one or more control signals to determine which portion of the signal D is selected for each of the bands $C_1$-$C_J$. The selection may be based, for example, on which television channels are being consumed by end systems **128** and/or whether DOCSIS data is being consumed by end systems **126**. The channelizer **102** may also select one band, represented as band $C_{J+1}$, to be output to the monitoring module **154**. Band $C_{J+1}$ may comprise any portion or portions (including the entire bandwidth from $F_{lo}$ to $F_{hi}$) of the signal D. Which portion of the signal S is selected as band $C_{J+1}$ may, for example, be configured by the monitoring module **154**. The data processing module **156** may process one or more of bands $C_1$-$C_J$ to recover data on one or more channels (e.g., television and/or DOCSIS channels) present in those bands while the monitoring module **154** may concurrently process band $C_{J+1}$ to measure/determine characteristics of all or a portion of the signal S between $f_{lo}$ and $f_{hi}$.

FIG. 1C depicts an example satellite system in accordance with an example embodiment of the invention. Shown in FIG. 1C is a satellite dish assembly **172**, and a gateway **196**. The subassembly **174** comprises a feed horn **182**, an LNB **184**, the front-end **158**, the channelizer **152**, the monitoring module **154**, and the data processing module **156**. The various modules of the subassembly **174** may reside in one or more housings, on one or more printed circuit boards, and/or one or more integrated circuits (e.g., one or more silicon dice). In another example embodiment, the monitoring module **154** and/or the data processing module **156** may reside in the gateway **196**.

In the example embodiment depicted, the satellite dish assembly **172** comprises a parabolic reflector **176** and a subassembly **174** mounted (e.g., bolted or welded) to a support structure **178** which, in turn, comprises a boom **190** and attaches (e.g., via bolts) to the premises **180** (e.g., to the roof).

US 8,792,008 B2

5

In another example embodiment, all or a portion of the modules **152**, **154**, and/or **156** may be mounted to the premises **180** separate from the satellite dish (e.g., connected via wired and/or wireless connections), but may still be part of the "outdoor unit."

The gateway **196** may receive data from the satellite dish assembly **172** (via cable(s) **184**). The gateway and may transmit data onto and receive data from the WAN **192** (via broadband connection **188**). The gateway **196** may transmit data to and receive data from user equipment **128** and **126** (via one or more connections **186**).

FIG. **2A** depicts an example RF front-end of a receiver operable to perform spectrum monitoring in accordance with an example embodiment of the invention. The RF front-end **158**A shown in FIG. **2A** comprises a variable gain amplifier **202**, and receive chains **204₁**-**204_L**, where L is an integer greater than or equal to 1. Each receive chains **204₁** may comprise an amplifier module **210₁**, a mixer module **212₁**, a filter module **214₁**, and an analog-to-digital converter (ADC) module **216₁**, where 1 is an integer between 1 and L.

Each amplifier **210₁** may be operable to amplify a band **1** of the signal S. Each mixer **212₁** may be operable to mix a band **1** of the signal S with a local oscillator signal (not shown) to downconvert the band **1** to a lower frequency. Each filter module **214₁** may be operable to bandpass filter the band **1** to remove/attenuate frequencies outside band **1**. Each ADC **216** may be operable to convert the band **1** of the analog signal S to a corresponding digital representation. Operation of the RF front-end **158** and/or processing of signals generated by the front-end **158**, may, for example, be as described in U.S. patent application Ser. No. 13/336,451 entitled "Method and Apparatus for Broadband Data Conversion" which is incorporated by reference herein, as set forth above.

In an example embodiment, the front-end **158**A may reside in a cable gateway such as the cable gateway **120** described above. In an example embodiment, the front-end **158**A may reside in satellite gateway/set-top box and/or in an outdoor unit of a satellite reception assembly (e.g., collocated on-chip or on-PCB with a satellite low-noise block downconverter (LNB)).

FIG. **2B** depicts another example RF front-end of a receiver operable to perform spectrum monitoring in accordance with an example embodiment of the invention. The RF front-end **158**B shown in FIG. **2B** comprises a variable gain amplifier **252**, a filter **254**, and an ADC **256**. Functions performed by the RF front-end **158**B may be referred to as "full-spectrum capture" (or "FSC").

In the front-end **158**B, the entire bandwidth, from $F_{lo}$ to $F_{hi}$, of signal S may be amplified by the amplifier **252** to generate S'. The amplified signal S' may be then filtered by the filter **254** to remove undesired signals outside of $F_{lo}$ to $F_{hi}$ and generate signal S". The signal S", from $F_{lo}$ to $F_{hi}$, may then be digitized by the ADC **256** to generate signal D. In an example embodiment, the ADC may be as described in U.S. patent application Ser. No. 13/485,003 entitled "Multi-layer Time-Interleaved Analog-to-Digital Converter (ADC)," which is incorporated by reference herein, as set forth above.

In an example embodiment, the ADC **256** may be capable of digitizing a signal S wherein $F_{lo}$ to $F_{hi}$ is 1 GHz or higher. Accordingly, for cable television/DOCSIS, the ADC **256** may be operable to digitize the entire cable downstream (e.g., from ~55 MHz to ~1002 MHz). Similarly, for satellite television, the ADC **256** may be operable to digitize the received signal at the input of the LNB, and/or the downconverted signal (e.g., from ~1 GHz to ~2 GHz) at the output by an LNB.

FIG. **3** depicts an example channelizer which may be utilized for performing spectrum monitoring in accordance with

6

an example embodiment of the invention. Band selection filters **302₁**-**302_J** of the channelizer **102** may each process the signal D to recover a corresponding one of the J selected bands of the signal D, and output the band on a corresponding one of the ports **304₁** to **304_J**. A band selection filter **302_{J+1}** of the channelizer **102** may process the signal D to recover band from the signal D, and output band $C_{J+1}$ on the port **304_{J+1}**. Which band or bands are selected by the filter **302_{J+1}** may be configured based on one or more control signals input to the channelizer **102**. For example, the value of a parameter k may determine the center frequency of the portion of signal D that is to be selected as by the filter **302_{J+1}**, and the value of Δ may determine the bandwidth of the portion of this signal D that is selected as band $C_{J+1}$ for output on the port **304_{J+1}**. In this manner, all of the signal D between in $F_{lo}$ and $F_{hi}$ and any portion or portions of the signal D, may be selected for output on the port **304_{J+1}**.

FIG. **4** is a flow chart illustrating example steps for spectrum monitoring in accordance with an example embodiment of the invention. After start step **402**, in step **404**, the receiver circuit **100** may receive a frequency division multiplexed (FDM) signal comprising one or more channels (e.g., satellite television channels, cable television channels, and/or DOCSIS channels) occupying a frequency band between $F_{lo}$ and $F_{hi}$. In step **406**, the received FDM signal is digitized across the full band from $F_{lo}$ to $F_{hi}$. In step **408**, the digitized signal is channelized into one or more bands. In step **410**, a first one or more of the bands are conveyed to a data processing module. In step **412** a second one or more of the bands are output to a monitoring module. In step **414**, the data processing module processes one or more of the first one or more bands to recover data on those bands while the monitoring module concurrently processes the second one or more bands to determine characteristics of all or a portion of the frequency band from $F_{lo}$ to $F_{hi}$.

Other embodiments of the invention may provide a non-transitory computer readable medium and/or storage medium, and/or a non-transitory machine readable medium and/or storage medium, having stored thereon, a machine code and/or a computer program having at least one code section executable by a machine and/or a computer, thereby causing the machine and/or computer to perform the steps as described herein for spectrum monitoring

Accordingly, the present invention may be realized in hardware, software, or a combination of hardware and software. The present invention may be realized in a centralized fashion in at least one computing system, or in a distributed fashion where different elements are spread across several interconnected computing systems. Any kind of computing system or other apparatus adapted for carrying out the methods described herein is suited. A typical combination of hardware and software may be a general-purpose computing system with a program or other code that, when being loaded and executed, controls the computing system such that it carries out the methods described herein. Another typical implementation may comprise an application specific integrated circuit or chip.

The present invention may also be embedded in a computer program product, which comprises all the features enabling the implementation of the methods described herein, and which when loaded in a computer system is able to carry out these methods. Computer program in the present context means any expression, in any language, code or notation, of a set of instructions intended to cause a system having an information processing capability to perform a particular function either directly or after either or both of the following: a)

7

conversion to another language, code or notation; b) reproduction in a different material form.

While the present invention has been described with reference to certain embodiments, it will be understood by those skilled in the art that various changes may be made and equivalents may be substituted without departing from the scope of the present invention. In addition, many modifications may be made to adapt a particular situation or material to the teachings of the present invention without departing from its scope. Therefore, it is intended that the present invention not be limited to the particular embodiment disclosed, but that the present invention will include all embodiments falling within the scope of the appended claims.

What is claimed is:

**1**. A system comprising:

an analog-to-digital converter operable to digitize a received signal spanning an entire television spectrum comprising a plurality of television channels, said digitization resulting in a digitized signal;

a signal monitor operable to:

analyze said digitized signal to determine a characteristic of said digitized signal; and

report said determined characteristic to a source of said received signal;

a data processor operable to process a television channel to recover content carried on the television channel; and

a channelizer operable to:

select a first portion of said digitized signal;

select a second portion of said digitized signal; and

concurrently output said first portion of said digitized signal to said signal monitor and said second portion of said digitized signal to said data processor.

**2**. The system of claim **1**, wherein said first portion of said digitized signal spans said entire television spectrum.

**3**. A method comprising:

performing by one or more circuits:

receiving a signal having a bandwidth that spans from a first frequency, $F_{lo}$, to a second frequency, $F_{hi}$, wherein said signal carries a plurality of channels;

digitizing said received signal from $F_{lo}$ to $F_{hi}$ to generate a digitized signal;

selecting a first portion of said digitized signal;

selecting a second portion of said digitized signal; and

concurrently outputting said selected first portion and said selected second portion, wherein:

said selected first portion is output to a signal analyzer which analyzes said selected first portion to determine one or more characteristics of the received signal, and which reports said determined one or more characteristics to a source of said received signal; and

said selected second portion is output to a data processor for recovery of data carried on one or more of said plurality of channels.

**4**. The method of claim **3**, wherein said first portion comprises all of said received signal from $F_{lo}$ to $F_{hi}$.

**5**. The method of claim **3**, wherein said one or more characteristics is one of: signal power vs. frequency, phase vs. frequency, signal-to-noise ratio, peak-to-average ratio, noise levels, bit error rate, and symbol error rate.

8

**6**. The method of claim **3**, wherein:

said received signal is a cable television signal; and

said plurality of channels comprises a plurality of television channels.

**7**. The method of claim **3**, wherein:

said received signal is a satellite television signal output by a low noise block downconverter; and

said plurality of channels comprises a plurality of television channels.

**8**. The method of claim **7**, wherein said one or more circuits reside in a customer premises satellite reception assembly.

**9**. The method of claim **3**, wherein said one or more circuits reside in a customer premises gateway.

**10**. The method of claim **3**, wherein a bandwidth and/or center frequency of said selected first portion is configurable during operation of said one or more circuits.

**11**. A system comprising:

one or more circuits that are operable to:

receive a signal having a bandwidth that spans from a first frequency, $F_{lo}$, to a second frequency, $F_{hi}$, wherein said signal carries a plurality of channels;

digitize said received signal from $F_{lo}$ to $F_{hi}$ to generate a digitized signal;

select a first portion of said digitized signal;

select a second portion of said digitized signal; and

concurrently output said selected first portion and said selected second portion, wherein:

said selected first portion is output to a signal analyzer that is operable to analyze said first portion to determine one or more characteristics of said first portion, and that is operable to report said determined one or more characteristics to a source of said received signal; and

said selected second portion is output to a data processor for recovery of data carried on one or more of said plurality of channels.

**12**. The system of claim **11**, wherein said first portion comprises all of said received signal from $F_{lo}$ to $F_{hi}$.

**13**. The system of claim **11**, wherein said one or more characteristics is one of: signal power vs. frequency, phase vs. frequency, signal-to-noise ratio, peak-to-average ratio, noise levels, bit error rate, and symbol error rate.

**14**. The system of claim **11**, wherein:

said received signal is a cable television signal; and

said plurality of channels comprises a plurality of television channels.

**15**. The system of claim **11**, wherein:

said received signal is a satellite television signal output by a low noise block downconverter; and

said plurality of channels comprises a plurality of television channels.

**16**. The system of claim **15**, wherein said one or more circuits reside in a customer premises satellite reception assembly.

**17**. The system of claim **11**, wherein said one or more circuits reside in a customer premises gateway.

**18**. The system of claim **11**, wherein a bandwidth and/or center frequency of said selected first portion is configurable during operation of said one or more circuits.

\* \* \* \* \*

# EXHIBIT D

US009210362B2

(12) **United States Patent**
Reddy et al.

(10) **Patent No.:** **US 9,210,362 B2**
(45) **Date of Patent:** **\*Dec. 8, 2015**

(54) **WIDEBAND TUNER ARCHITECTURE**

(71) Applicant: **MaxLinear, Inc.**, Carlsbad, CA (US)

(72) Inventors: **Madhukar Reddy**, Carlsbad, CA (US); **Curtis Ling**, Carlsbad, CA (US); **Tim Gallagher**, Carlsbad, CA (US)

(73) Assignee: **MaxLinear, Inc.**, Carlsbad, CA (US)

( \* ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **14/614,543**

(22) Filed: **Feb. 5, 2015**

(65) **Prior Publication Data**

US 2015/0156535 A1 Jun. 4, 2015

**Related U.S. Application Data**

(63) Continuation of application No. 13/962,871, filed on Aug. 8, 2013, which is a continuation of application No. 12/762,900, filed on Apr. 19, 2010, now Pat. No. 8,526,898.

(60) Provisional application No. 61/170,526, filed on Apr. 17, 2009.

(51) **Int. Cl.**
| | |
|---|---|
| *H04B 1/16* | (2006.01) |
| *H04N 5/50* | (2006.01) |
| *H04B 1/00* | (2006.01) |

(Continued)

(52) **U.S. Cl.**
CPC ............... *H04N 5/50* (2013.01); *H04B 1/0014* (2013.01); *H04N 21/4263* (2013.01); *H04N 21/4383* (2013.01); *H04N 21/454* (2013.01); *H04N 21/6193* (2013.01)

(58) **Field of Classification Search**
USPC ......... 455/131, 140, 207, 214, 313, 315, 323, 455/324, 325, 334
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,280,636 A \* | 1/1994 | Kelley et al. .................. | 455/131 |
| 6,906,498 B2 | 6/2005 | Breuch et al. | |

(Continued)

FOREIGN PATENT DOCUMENTS

EP       2087623 A2    8/2009

OTHER PUBLICATIONS

Jeffrey A. Weldon, et al. A 1.75-GHz Highly Integrated Narrow-Band CMOS Transmitter With Harmonic-Rejection Mixers, IEEE Journal of Solid-State Circuits, Dec. 2001, pp. 2003-2015, vol. 36, No. 12, Seattle, Washington.

*Primary Examiner* — Blane J Jackson
(74) *Attorney, Agent, or Firm* — McAndrews, Held & Malloy, Ltd.

(57) **ABSTRACT**

A wideband receiver system comprises a mixer module, a wideband analog-to-digital converter (ADC) module, and digital circuitry. The mixer module is configured to downconvert a plurality of frequencies that comprises a plurality of desired television channels and a plurality of undesired television channels. The wideband ADC module is configured to digitize the swath of frequencies comprising the plurality of desired television channels and the plurality of undesired television channels. The digital circuitry is configured to select the desired plurality of television channels from the digitized plurality of frequencies, and output the selected plurality of television channels to a demodulator as a digital datastream.

**20 Claims, 10 Drawing Sheets**



APPX223

## US 9,210,362 B2
Page 2

(51) **Int. Cl.**
| | |
|---|---|
| **H04N 21/426** | (2011.01) |
| **H04N 21/438** | (2011.01) |
| **H04N 21/454** | (2011.01) |
| **H04N 21/61** | (2011.01) |

(56) **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,992,855 | B2 | 1/2006 | Ehrlich |
| 7,095,454 | B2 | 8/2006 | Waight et al. |
| 7,167,694 | B2 | 1/2007 | Khoini-Poorfard et al. |
| 7,362,178 | B2 | 4/2008 | Montemayor et al. |
| 7,373,125 | B2 | 5/2008 | Godambe et al. |
| 7,421,259 | B2 | 9/2008 | Gomez et al. |
| 7,599,673 | B2 * | 10/2009 | Maxim et al. ............... 455/179.1 |
| 8,285,240 | B2 | 10/2012 | Seendripu et al. |
| 8,300,681 | B2 | 10/2012 | Petrovic et al. |
| 8,374,568 | B2 | 2/2013 | Seendripu et al. |
| 8,374,569 | B2 | 2/2013 | Seendripu et al. |
| 8,374,570 | B2 | 2/2013 | Seendripu et al. |
| 8,526,898 | B2 * | 9/2013 | Reddy et al. .................. 455/207 |
| 8,577,319 | B2 | 11/2013 | Ling et al. |
| 8,666,350 | B2 | 3/2014 | Vauhkonen |
| 8,909,187 | B2 | 12/2014 | Seendripu et al. |
| 9,059,672 | B2 | 6/2015 | Ling et al. |
| 2005/0040909 | A1 | 2/2005 | Waight et al. |
| 2007/0042742 | A1 | 2/2007 | Kim et al. |
| 2007/0111661 | A1 | 5/2007 | Bargroff et al. |

* cited by examiner



FIG. 1
(Prior Art)



FIG. 2



FIG. 3



FIG. 4



FIG. 5



FIG. 6



FIG. 7

APPX231



FIG. 8

APPX232

Case 2:22-cv-00233-JRG Document 53-2 Filed 06/16/2023 Page 05/16/2023 PageID #: 605



FIG. 9



FIG. 10

US 9,210,362 B2

1

**WIDEBAND TUNER ARCHITECTURE**

PRIORITY CLAIM

This application is a continuation of U.S. patent application Ser. No. 13/962,871 filed on Aug. 8, 2013, which is a continuation of U.S. patent application Ser. No. 12/762,900 filed on Apr. 19, 2010 (now U.S. Pat. No. 8,526,898), which claims the benefit of priority to U.S. provisional application 61/170,526 filed Apr. 17, 2009. Each of the above referenced documents is hereby incorporated by reference in its entirety.

BACKGROUND

This invention relates to wideband receiver systems and methods having a wideband receiver that is capable of receiving multiple radio frequency channels located in a broad radio frequency spectrum. In particular, the invention relates to wideband receiver systems that are capable of receiving multiple desired television channels that extend over multiple non-contiguous portions of the broad frequency spectrum and grouping them into a contiguous, or substantially-contiguous, frequency spectrum.

Receivers used to down-convert and selectively filter TV channels are referred to as tuners, and tuners designed to concurrently receive several TV channels are referred to as wideband tuners. Existing tuners for these applications down-convert a swath of channels to an intermediate frequency, which are then sent to a demodulator. Because the swath of channels is not contiguous, this swath includes the desired channels as well as undesired channels. The demodulator employs a high-speed data converter to capture this swath of desired and undesired channels in the digital domain and subsequently filters out the desired channels.

In general, television channels broadcasted over the air or over cable networks are distributed across a broad frequency spectrum. That is, the channel frequencies may not be adjacent to each other. In certain applications such as DVR and picture-in-picture, the receiver system may have to concurrently receive several desired channels that may or may not be contiguous. The wideband receiver requirement poses a trade-off to the system to limit either the dynamic range of the wideband tuner or reduce the bandwidth covered by the tuner so that fewer channels may be received and processed by the demodulator.

FIG. 1 shows a conventional wideband tuner 100. Tuner 100 may be a direct conversion tuner and includes a low noise amplifier LNA1 having an input terminal coupled to a radio frequency (RF) input signal 102 and an output terminal coupled to a mixer M1. The RF signal may include one or more television channels receiving from a cable network via an RF connector or wirelessly via an antenna. The RF input signal may include the VHF and UHF television channels in a terrestrial television broadcasting system or the CATV channels in cable networks. In order to receive all broadcasted channels present in the RF input signal, LNA1 must necessarily have a wide tuning range, high linearity, and low noise. Mixer M1 is coupled to a synthesizer S1 that can generate an oscillator frequency located around the center of the RF signal. Mixer M1 frequency down-converts the received RF input signal to a more convenient intermediate frequency (IF) band. Tuner 100 includes an amplifier V1 having a programmable gain for amplifying the IF signal, which is then bandpass filtered by a filter F1 before outputting to a demodulator.

In general, the RF signal includes multiple desired channels that are located in non-contiguous portions of a radio frequency spectrum. As shown in FIG. 1, the swath of chan-

2

nels 110 occupies a bandwidth BW1 120 at an RF center frequency $f_{rfc}$ 130. Synthesizer S1 may be tuned to a frequency around the center frequency $f_{rfc}$ 130 for mixing channels 110 to an intermediate frequency $f_{ifc}$ 160, the frequency down-mixed channels 140 are amplified by amplifier V1 and then filtered by F1 to produce a swath of channels 170 centered around frequency $f_{ifc}$ 160. In an exemplary application shown in FIG. 1, bandwidth BW1 contains 10 channels. In the case where channels are TV channels that are spaced at either 6 MHz or 8 MHz in most parts of the world, bandwidth BW1 120 would span from 60-80 MHz, i.e., the down-converted bandwidth at the intermediate frequency would require a bandwidth equal to at least BW1, or at least 80 MHz when such architecture is used. It is noted that in other applications where the desired RF channels are located in the low band such as channels numbers 2 to 6 (VHF in the terrestrial TV broadcast or CATV) and in the high band such as channels numbers 14 to 83 of the UHF TV broadcast or channel numbers 63-158 of the CATV's ultra band, the bandwidth BW1 can be 800 MHz or higher. This wide bandwidth of 800 MHz would require a very expensive digital processing circuitry such as very high-speed analog to digital conversion and high-speed processor in the demodulator.

It is desirable to have wideband receiver systems that can increase the dynamic range without requiring expensive data conversion, filtering and channel selection at the demodulator.

BRIEF SUMMARY

An embodiment of the present invention includes a wideband receiver system that is configured to concurrently receive multiple radio frequency (RF) channels including a number of desired channels that are located in non-contiguous portions of a frequency spectrum and group the desired channels in a contiguous or substantially-contiguous frequency band at an intermediate frequency spectrum, where the term "substantially-contiguous" includes spacing the desired channels close to each other (e.g. as a fraction of the total system bandwidth, or relative to a channel bandwidth) but with a spacing that can be variable to accommodate the needs of overall system. The term "contiguous" heretofore encompasses "substantially-contiguous." The term "spacing" is referred to as the frequency difference between adjacent channels. The system includes a wideband receiver having a complex mixer module for down-shifting the multiple RF channels and transforming them to an in-phase signal and a quadrature signal in the baseband or low intermediate frequency (IF) band. The system further includes a wideband analog-to-digital converter module that digitizes the in-phase and quadrature signals. The digital in-phase and quadrature signals are provided to a digital frontend module that contains a bank of complex mixers that frequency-shift the number of desired channels to a baseband where the desired channels are individually filtered.

The digital frontend module may also include a decimator module that decimates the desired RF channels by a factor M before demodulating them to a digital data stream.

In certain embodiments of the present invention, the wideband receiver system additionally includes an up-converter module having multiple complex up-mixers, each of the complex up-mixers is configured to frequency up-shift each one of the desired RF channels to a sub-portion of an IF spectrum, wherein all sub-portions of the desired channels are adjacent to each another and form a contiguous frequency band in the IF spectrum. The act of frequency shifting the desired channels to the IF spectrum allows the wideband receiver system

US 9,210,362 B2

3

to directly interface with commercially available demodulators. Allowing the spacing of the desired channels in the contiguous spectrum to be variable allows a system to optimize placement of these desired channels for the purposes of avoiding sensitive portions of the spectrum which may either be vulnerable to spurious signals and interference; or which may generate interference directly or as a harmonic product, to other systems.

In another embodiment of the present invention, a multi-tuner receiver system having two or more tuners is provided to receive multiple desired RF channels that extend over several non-contiguous sub-portions of a broad frequency spectrum and group them into a contiguous frequency spectrum. The multi-tuner system includes at least a first tuner that processes a first sub-portion of the broad frequency spectrum into a first in-phase signal and a first quadrature signal and a second tuner that processes a second sub-portion of the broad frequency spectrum into a second in-phase signal and a second quadrature signal. The multi-tuner receiver system further includes a first analog-to-digital converter module that digitizes the first in-phase and quadrature signals and a second analog-to-digital converter module that digitizes the second in-phase and quadrature signals. In addition, the multi-tuner system includes a first digital frontend module having a first number of complex mixers corresponding to a first number of the desired RF channels located in the first sub-portion of the broad frequency spectrum and a second digital frontend module having a second number of complex mixers corresponding to a second number of the desired RF channels located in the second sub-portion of the broad frequency spectrum. The first digital frontend module frequency shifts the first number of the desired RF channels to a first plurality of baseband signals and the second digital frontend module frequency shifts the second number of the desired RF channels to a second plurality of baseband signals.

The multi-tuner system further includes a first up-converter module having a plurality of N complex mixers, wherein N is an integer value equal to the number of desired channel. The first up-converter module frequency up-shifts the first plurality of the baseband signals to a first portion of an intermediate frequency. In addition, the multi-tuner system includes a second up-converter module that frequency up-shifts the second plurality of the baseband signals to a second portion of an intermediate frequency. The first and the second portions of the intermediate frequency are non-overlapping and located adjacent to each other to form a contiguous intermediate frequency (IF) band. The multi-tuner system further includes a digital-to-analog converter that converts the contiguous IF band to an analog waveform signal.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a schematic block diagram of a conventional wideband tuner;

FIG. 2 is a schematic block diagram of a wideband receiver system according to an embodiment of the present invention;

FIG. 3 is a simplified circuit diagram of a complex downmixer according to an embodiment of the present invention;

FIG. 4 is a simplified schematic block diagram of a wideband receiver system according to another embodiment of the present invention;

FIG. 5 is a simplified circuit diagram of a complex upmixer according to an embodiment of the present invention;

FIG. 6 is a simplified schematic block diagram of a wideband multi-tuner receiver system according to an embodiment of the present invention;

4

FIG. 7 is a block diagram illustrating an exemplary digital front end according to an embodiment of the present invention in more detail;

FIG. 8 is a block diagram illustrating an exemplary tiled up-converter module according to an embodiment of the present invention in more detail;

FIG. 9 is a simplified block diagram of a wideband multi-tuner receiver system 900 according to an embodiment of the present invention; and

FIG. 10 is a simplified block diagram of a wideband multi-tuner receiver system 1000 according to another embodiment of the present invention.

DETAILED DESCRIPTION

FIG. 2 is a schematic block diagram of a wideband receiver system 200 according to an embodiment of the present invention. Wideband receiver system 200 includes a radio front end 210 and a digital front end 230. Radio front end 210 may be a single very wide-band tuner receiver that captures the desired swath of channels located in non-contiguous portions of the spectrum having a frequency bandwidth BW1 120. In this example, the number of available channels in BW1 120 is assumed to be 10 with each channel occupying an 8 MHz bandwidth for a total of 80 MHz. Radio front end 210 is shown as including a low noise amplifier LNA 202 having an input terminal configured to receive an RF input signal 102. In the example shown, RF signal 102 includes four desired RF channels having the respective carrier frequency $f_{rf1}$, $f_{rf2}$, $f_{rf3}$, and $f_{rf4}$ that are located in non-contiguous portions of the wide frequency spectrum BW1. It is understood, however, that spectrum BW1 120 may have any other number of desired frequencies that are not contiguous. LNA 202 has a very low noise figure and very high linearity and a wide tuning range (i.e., very high IIP2 and IIP3 intercept points) to maximize a signal-to-noise-and distortion ratio (SNDR) at the amplifier output. LNA 202 may have a programmable gain to amplify RF signal 102 to adequate voltage levels for mixers M1 211 and M2 221.

Mixers M1 211 and M2 221 may be conventional mixers formed using, for example, differential Gilbert cells. Each of the mixers 211 and 221 multiplies (mixes) an amplified RF signal 203 with a respective first oscillator frequency signal 205 and a second oscillator frequency signal 207 to generate an in-phase signal 212 and a quadrature signal 222 that have a phase shift of 90° degree between them. Mixers 211 and 221 are identical so that the amplitude of the in-phase signal 212 and quadrature signal 222 are the same. The first and second oscillator frequencies 205 and 207 are identical and have a 90° degree phase shift generated through a 90° degree phase shifter P1 206. Synthesizer S1 may be a single local oscillator operable to generate the oscillator frequency 205 for converting the receive RF signal 102 to a zero-IF or low-IF band. Synthesizer S1 can be a coarse (large step) phase locked loop. Synthesizer S1 can also be programmable to cover the wideband frequency of the analog and digital terrestrial broadcast and/or the cable television system. The RF signal 102 may have relatively uniform signal strength in a cable network. However, its signal strength may extend in several orders of magnitude in a terrestrial broadcast system, thus, LNA 202 and/or mixers M1 211, M2 221 are required to have a relatively high dynamic range to handle the large variations in the signal strength.

In-phase signal 212 and quadrature signal 222 are further amplified and filtered by respective amplifiers V1 213, V2 223 and filters F1 215, F2 225 to generate a filtered in-phase signal 216 and a filtered quadrature signal 226. Filters F1 215

APPX236

US 9,210,362 B2

5

and F2 **225** may be passive or active low-pass filters to filter out any unwanted frequency components of the signals **214** and **224** before digitizing them for further processing in digital front end **230**. It is understood that the in-phase path **216** and the quadrature path **226** must have the same amplitude spectrum and maintain a fixed phase relationship, i.e., amplifiers V1 **213**, V2 **223** and filters F1 **215**, F2 **225** must be substantially identical. Because the two paths **216** and **226** are in quadrature, the spectral components from both positive and negative frequencies can be overlaid so that the bandwidth (cutoff frequency) of filters F1 **215** and F2 **225** can be one half of the BW1 bandwidth **120**.

Analog-to-digital converters ADC1 **218** and ADC2 **228** are high-speed (i.e., high sampling rate) converters to maximize the dynamic range. In an exemplary application, radio front end **210** operates as a nominal zero-IF down-mixer so that signals **216** and **226** have a nominal bandwidth **290** equal to one half of the RF signal bandwidth BW1 thanks to the complex down-mixer architecture. In other embodiment, radio front end **210** operates as a low-IF down-mixer so that the nominal bandwidth **290** of signals **216** and **226** is greater than one half of the bandwidth BW1. In practice, the sampling rate of ADC1 **218** and ADC2 **228** is chosen to be higher than the Nyquist sampling requirement, i.e., the filtered analog quadrature signals **216** and **226** may be over-sampled in order to reduce or avoid aliasing of undesired signals into the digitized I and Q signals.

ADC1 **218** generates a digital signal I **232** that is a digital representation of the analog filtered signal **216**; ADC2 **228** generates a digital signal Q **242** that is a digital representation of the analog filtered signal **226**. Digital signals I **232** and Q **242** are then applied to a bank of N complex mixers **250**, wherein N is an integer value corresponding to the number of desired RF channels located in the non-contiguous portions of the frequency spectrum BW1. It is understood that the number N can be any integer value. In one embodiment, N can be equal to the number of all available channels that exist in the licensed frequency spectrum to provide system flexibility. In other embodiments, N can be equal to the number of all receivable channels within a geographic area. In yet another embodiment, N can be an integer value less than the number of receivable channels with the geographic area to reduce system costs. In the exemplary embodiment shown in FIG. **2**, the number of desired channels is 4. That is, each of the 4 complex mixers **250** mixes in-phase and quadrature signals **232** and **242** with an associated frequency to generate a corresponding baseband, which is then individually filtered, decimated and provided to an associated demodulator.

Each of the N complex mixers **250** receives the digital signals I **232** and Q **242** from ADCs **218** and **228** to extract a different one of the desired channels and frequency-shifts the extracted signals to the baseband frequency. Each of the frequency shifted desired channels **252** is filtered by an associated filter module (identified as **260a** to **260n**). In an embodiment, each of the filtered signals **260a** to **260n** may be sent directly to an associated demodulator (identified as **270a** to **270n**) for extracting the original information transmitted in the associated desired channel. In another embodiment, each of the filtered signals **262a** to **262n** is further decimated before providing to a demodulator. A path of digital front end **230** is described in more detail below.

FIG. **3** is a simplified circuit diagram of one of the signal paths **272a** to **272n** of digital front end **230** shown in FIG. **2** according to an embodiment of the present invention. In an embodiment, digital signal I **232** may be further filtered by a filter **311** to obtain a filtered signal **312**. Similarly, digital signal Q **242** may be further filtered by a filter **321** to obtain a

6

filtered signal **322**. Thus, digital signals **312** and **322** only contain low-frequency components with undesired high-frequency components being eliminated by respective filters **311** and **321**. It is noted that filtered signals **312** and **322** are interposed between the respective ADCs **218**, **228** and the bank of N complex mixers **250**.

Mixer **300**, which represents one of the N complex mixers **250**, includes four multipliers **313**, **315**, **323**, and **325**. Multipliers **313** and **315** multiply the filtered signal **312** with respective $\cos(\omega_{ci}t)$ and $\sin(\omega_{ci}t)$ signals and generate respective products **314** and **316**. Similarly, multipliers **323** and **325** multiply the filtered Q signal **322** with respective $\cos(\omega_{ci}t)$ and $\sin(\omega_{ci}t)$ signals and generate respective products **324** and **326**. An adder **317** sums the products **314** and **324** to generate a frequency-shifted signal I **318**. An adder **327** sums the products **324** and **316** to generate a frequency-shifted signal Q **328**. Basically, complex mixer **300** causes a frequency shift of the filtered components **312** and **322** to respective baseband signals **318** and **328** in the digital domain according to the operation:

$$Y(t)=X(t)\cdot e^{-j\omega_c t} \qquad (1)$$

or taken the Fourier transform, we obtain:

$$Y(\omega)=X(\omega-\omega_c) \qquad (2)$$

Multipliers **313**, **315**, **323**, and **325** are identical digital multipliers. In an embodiment, a numerically controlled oscillator with quadrature output generates the $\cos(\omega_{ci}t)$ and $\sin(\omega_{ci}t)$ signals. Numerically controlled oscillators (NCO) can be implemented using a phase accumulator and a look-up table. NCOs are known to those of skill in the art and will not be described herein. The frequency $\omega_{ci}$ is so chosen that each one of the desired channels embedded in the digital signals I **232** and Q **242** will be downshifted to the baseband. In the given example shown in FIG. **2**, the bank of N complex mixers will have four complex mixers, each one of the N (i.e., four) complex mixers is coupled to an individual NCO having a distinct frequency $\omega_{ci}$ so that when mixing the filtered digital I and Q signals **312** and **322** with that frequency, each one of the complex mixers will generate the signals I (**318**) and Q (**328**) of a corresponding one of the desired channels at the baseband.

In an embodiment, baseband signals **318** and **328** are further individually filtered by respective filters **330** and **340** that are identified as one of the filters **260a-n** in FIG. **2**. Filters **330** and **340** may be band-pass or low-pass filters having a narrow bandwidth equal to the bandwidth of a desired channel. In certain embodiments, filters **330** and **340** can be analog passive or active low-pass or complex band-pass filters such as polyphase filters. In another embodiment, filters **330** and **340** can be digital low-pass filters, such as finite impulse response (FIR) filters to eliminate high frequency components that may be aliased back to the baseband signals Ii (**332**) and Qi (**342**) when decimated by subsequent decimator **350**.

The reduced sampling rate of the N desired baseband channels will be sent as a serial or parallel digital data stream to a demodulator using a serial or parallel data interface according to commonly known methods, as shown in FIG. **2**. This approach provides several advantages over conventional tuner architectures. First, it eliminates the need of expensive data conversion, filtering and channel selection on the demodulator side. Second, it removes undesired channels from the signal path at an early stage, thus relieves the large dynamic range requirement in the demodulator.

FIG. **4** shows a simplified schematic block diagram of a wideband receiver system **400** according to another embodiment of the present invention. Wideband receiver system **400**

APPX237

US 9,210,362 B2

7

includes a radio front end **410**, a digital front end **430**, a tiled up-conversion module **450**, and a summing digital-to-analog converter module DAC **470**. Radio front end **410** includes a low noise amplifier LNA1 that receives an RF input signal **102** and provides an amplified RF signal **403** to mixers M1 **411** and M2 **421**. Mixer M1 **411** is coupled to an oscillator frequency **405** of a synthesizer S1 whereas mixer M2 **421** is coupled with the oscillator frequency **405** via a phase shifter P1 **406** that generates a 90° degree phase-shift to the oscillator frequency **405**. Mixers M1 **411** and M2 **421** generate respective in-phase signal **412** and quadrature signal **422** that are further amplified by respective amplifiers V1 **413** and V2 **423**. The amplified in-phase and quadrature signals **414**, **424** are then filtered by filters F1 **415** and F2 **425** to eliminate undesired frequency components that would be aliased back to the in-phase and quadrature signals when digitally sampled by subsequent analog-to-digital converters ADC1 **418** and ADC2 **428**. Digital signals I **422** and Q **442** at the input of digital front end **430** are digital representations of the filtered analog in-phase and quadrature signals **416**, **426** before the ADCs. Digital front end **430** include a bank of N complex mixers **432** comprising **432**a to **432**n identical mixers, where N is an integer value corresponding to the number of the desired channels located in non-contiguous portions of the frequency spectrum. Each of the N complex mixers **432**a to **432**n frequency down-converts signals I **432** and Q **442** to an associated baseband. Each of the frequency down-converted I and Q signals are coupled to respective low-pass, band-pass, or decimating filters **434**. In this regard, the radio front end **410** and the digital front end **430** are similar to respective radio front end **210** and digital front end **230** of FIG. **2** that have been described in detail above.

In an alternative embodiment of the present invention, the N filtered and decimated channels **438**a to **438**n (where indices a to n correspond to the associated number of desired channels) are not provided to a demodulator for demodulation. Instead, the N filtered and decimated channels **438**a to **438**n are further frequency up-converted to an intermediate frequency (IF) spectrum. In order to achieve that, the N filtered and decimated channels are coupled to a tiled up-conversion module **450** that includes a bank of N complex up-mixers, where N is an integer value correspond to the number of desired received channels. The N complex up-mixers include identical digital mixers **452**a to **452**n that will be described further in detail below with reference to FIG. **5**. The N up-shifted channels are then filtered by a subsequent bank of channel filters **454** that, in an embodiment, comprises N individual finite impulse response (FIR) filters. The N filtered channels are then digitally combined and converted to the analog domain by a summing digital-to-analog converter module DAC **470**. The N up-shifted channels are adjacent to each other and form a contiguous or substantially-contiguous set of channels **475** in the IF spectrum centered around $f_{if}$ as illustrated in FIG. **4**. In an embodiment, the spectra of the mixed products are spaced in such a way so as to avoid overlap with known frequency bands containing potential or actual interferers. In another embodiment, the spectra of the mixed products are spaced in such a way so as to avoid overlap with frequency bands that might introduce interference to other systems. In general, because the bandwidth $BW_2$ is substantially lower than $BW_1$, the IF frequency $f_{if}$ can be set proportionally lower, e.g., typically about 16 MHz to accommodate the spectrum of BW2 of up to 32 MHz (corresponding to the total bandwidth of the four desired channels, each having a bandwidth of 8 MHz in this example).

The up-conversion approach of FIG. **4** provides several advantages over conventional tuner architectures. First, it

8

allows the demodulator to operate the data converter at a lower data rate and with lower resolution (fewer bits) due to the fact that the contiguous channels have a narrower bandwidth. Second, the up-conversion approach provides full compatibility with existing demodulators that require an analog IF signal. Third, it removes undesired channels from the signal path at an early stage, thus relieves the requirement of a high dynamic range requirement of the demodulator's analog-to-digital converter and the demodulator itself.

FIG. **5** shows a simplified exemplary circuit diagram of a complex up-mixer **500** according to an embodiment of the present invention. Up-mixer **500** is one of the N complex up-mixers **452**a to **452**n in tiled up-conversion module **450** shown in FIG. **4**. Up-mixer **500** includes filter **510** and **520** configured to eliminate unwanted frequency components present in respective input signals I **501** and Q **502**. Filtered signals **512** and **522** are provided to up-mixers UMI **515** and UMQ **525** that multiply the filtered signals **512** and **522** with respective $\cos(\omega_o t)$ and $\sin(\omega_o t)$. The products **516** and **526** are summed in an adder **530** to generate an IF signal **532** according to the following equation:

$$IF(t)=I(t)^*\cos(\omega_o t)+Q(t)^*\sin(\omega_o t) \qquad (3)$$

Up-mixers UMI **515** and UMQ **525** are identical digital multipliers that multiply the respective filtered signal **512** and **522** with a cosine function **505** and a sine function **506** that can be generated from a NCO using a digital phase accumulator and a look-up table.

As described above, TV channels are grouped into multiple frequency bands in North America. For example, channels 2 through 6 are grouped in VHF-low band (aka band I in Europe), channels 7 through 13 in VHF-high band (band III), and channels 14 through 69 in UHF band (bands IV and V). In order to receive such a wide frequency spectrum, the low noise amplifier and mixer must have very low noise, wide tuning range and high linearity as described above in the wideband receiver systems **200** and **400**. However, a wideband receiver having a single tuner with high sensitivity may have a high power consumption. For certain applications, it may be advantageous to use multiple tuners that are optimized for a given frequency band, such as a dedicated tuner for the low VHF band, another dedicated tuner for the high VHF band and the UHF band, and yet other dedicated tuners for receiving the digital video broadcasting (DVB) via satellite (DVB-S), via cable (DVB-C), or terrestrial digital video broadcasting (DVB-T). The multi-tuner approach may also be advantageously applied to cable networks that carry TV programs on an 88 MHz to 860 MHz according to the Data Over Cable Service Interface Specification (DOCSIS) protocol.

FIG. **6** shows a simplified schematic block diagram of a wideband multi-tuner receiver system **600** according to an embodiment of the present invention. In an embodiment, multi-tuner system **600** includes low noise amplifier A1 **602** for receiving an RF input signal **601**. Amplifier A1 **602** is coupled to at least a tuner1 **610** and a tuner2 **720**. In another embodiment, multi-tuner system **600** may not include amplifier **602** so that RF input signal **601** can be received directly at each tuner **610** and **720**.

Tuner1 **610** includes an amplifying filter AF1 **613** that filters and amplifies a first portion BWtuner1 **604** of a broad frequency spectrum **608** that contains a first plurality of RF channels **606** including desired channels **607** having respective channel frequencies $f_{r1}$ and $f_{r2}$. The first portion of the broad frequency spectrum BWtuner1 **604** is then frequency down-converted to a low-IF or zero-IF in-phase signal I1 **612** and a quadrature signal Q1 **622** through respective mixer M1

US 9,210,362 B2

**9**

611 and M2 **621**. Signals I1 **612** and Q1 **622** are further amplified and low-pass filtered before applying to respective analog-to-digital converters ADC1 **618** and ADC2 **628** that convert analog signals Ia1 **616** and Qa1 **626** to respective digital in-phase signal Id1 **631** and digital quadrature signal Qd1 **641**. Because tuner1 **610** only covers a portion BWtuner1 **604** of the entire frequency spectrum **608** having fewer channels, the ADC1 **618** and ADC2 **628** can be slower-speed analog-to-digital converters with a large number of bits, i.e., large dynamic range.

Digital signals Id1 **631** and Qd1 **641** are then provided to a digital front end DFE **630** that includes a first bank of N complex mixers **632** and channel and decimating filters **634**. The first bank of N complex filters **632** has N identical complex mixers, where N is an integer value equal to the number of desired channels located in the first portion BWtuner1 **604** of the broad frequency spectrum **608**. In an embodiment, each one of the first bank of N complex mixers includes four digital mixers that multiply digital stream Id1 **631** and Qd1 **641** with respective digitized cosine function and sine function to generate the sum and difference frequency components, as shown in FIG. **3**. The digitized cosine and sine frequency, i.e., the mixer frequency is so chosen so that when mixing signals Id1 **631** and Qd1 **641** will move them to a baseband or a low-IF band. In an embodiment, channel and decimating filters have similar structures as filters **330** and **340** and demodulator **350** as shown in FIG. **3**. That is, channel and decimating filters include digital low-pass filters **330** and **340** that eliminates unwanted high frequency components of the baseband signals I and Q prior to applying them to a decimator **350** (FIG. **3**) that reduces the sample frequency without any loss of information since Id1 **631** and Qd1 **641** are sampled at a much higher frequency by the respective ADC1 **618** and ADC2 **628**.

The decimated desired channels are then provided to an up-converter module **650** that includes a bank of N up-mixers. The bank of N up-mixers includes N identical up-mixers whose structure is shown in FIG. **5**. In an embodiment, N is an integer value equal to the number of desired channels present in BWtuner1 **604**. Each one of the up-mixers frequency-shifts the baseband signals I and Q of each one of the desired channels to an appropriate portion of the intermediate frequency band according to Equation (3). In other words, the bank of N up-mixers to "frequency multiplexing" the desired channels onto a first portion **682** of an IF band **686**.

Similarly, tuner2 **720** includes an amplifying filter AF2 **713** that is configured to receive a second portion BWtuner2 **704** of the broad frequency spectrum **608**. The second portion **704** contains a second plurality of RF channels **706** including a second number of desired channels. In the exemplary illustration of FIG. **6**, the second portion **704** has a frequency bandwidth of BWtuner2 that contains desired channels **707** having respective channel frequencies f_{rf3} and f_{rf4}. Tuner2 **720** includes elements such as mixers M3 **711**, M4 **721**, amplifiers V3 **714**, V4 **724**, filters F3 **715**, F4 **725** and analog-to-digital converters ADC3 **731** and ADC4 **741** that are substantially the same as the like-named elements of the signal path of tuner1 **610**. Thus, redundant description is omitted herein.

Digital in-phase signal Id2 **731** and digital quadrature signal Qd2 **741** are then provided to digital front end **740**. Digital front end **740** includes a bank of L complex filters, where L is an integer value equal to the number of desired channels in the second portion BWtuner2 **704** of the broad frequency spectrum **608**. Each one of the bank of L complex filters is a digital complex mixer configured to transform the signals Id2 **731** and Qd2 **741** to baseband signals that are further filtered by individual digital low-pass filters such as FIR filters before

**10**

decimated by a subsequent decimator. The elements of digital front end **740** are substantially similar to those described in digital front end **630**. Thus, redundant description is omitted herein.

The decimated baseband I and Q channels are further provided to a subsequent up-conversion module **760** that performs a function substantially similar to that of the up-conversion module **650** already described above. The outputs of up-conversion module **650** and **760** can be tiled to generate a contiguous set of IF frequencies **682**, **684** centered at f_{if} **686**. In an embodiment, the outputs of up-conversion module **650** and **760** are digitally summed and converted to an analog signal by summing DAC **670**. In another embodiment, the up-conversion modules **650** and **760** and the digital summing function **672** can be performed using an inverse discrete Fourier transform or an inverse Fast Fourier transform operation.

The multi-tuner architecture provides the flexibility that multiple commercially available tuners can be used without the need of designing a wideband tuner. For example, a tuner designed for a terrestrial broadcast digital TV can be used together with a tuner dedicated to receiving a cable signal and/or a tuner for receiving a satellite broadcast signal. The multi-tuner receiver system provides an additional advantage that other tuners can be added quickly to the system to accommodate any future applications. Additionally, the multi-tuner architecture allows the use of slower speed (i.e., lower cost) analog-to-digital converters with a larger number of bits for achieving large dynamic range.

FIG. **7** shows a block diagram of an exemplary digital front end of the invention in more detail. In an embodiment, in-phase signal Id2 **731** and quadrature signal Qd2 **741** at the output of respective ADC converters **718** and **728** are provided to each of the L complex mixers **732** comprising mixers **732**A to **732**L. A more detailed description of each of L complex mixers is shown in FIG. **3**. Mixer **732**A multiplies Id2 **731** and Qd2 **741** with a cosine signal and a sine signal that are generated from an NCO1 and produces an I-**732**A signal and a Q-**732**A signal that are further individually filtered by an FIR filter before decimating. The bank of L complex mixers corresponds to the block **732** in FIG. **6**; and the set of FIR filters and decimator corresponds to the block **734** in FIG. **6**. Each decimated pair of I-**732**i/M in the baseband, where the index "i" is from A to L, is further provided to a subsequent up-mixer for frequency-shifting to an intermediate frequency as shown in FIG. **8**.

FIG. **8** shows an exemplary embodiment of a bank of L complex up-mixers according to the present invention. Each decimated pair of complex signals I-**732**i/M and Q-**732**i/M is provided to an associated complex up-mixer, whose frequency is so chosen that when mixing with the pair of complex signals I-**732**i/M and Q-**732**i/M will generate an associated channel at a predetermined sub-portion of the intermediate frequency band **686** (FIG. **6**). A more detailed schematic block of one of the L up-mixers is described above together with FIG. **5**.

FIG. **9** is a simplified block diagram of a wideband multi-tuner receiver system **900** according to an embodiment of the present invention. In an embodiment, system **900** includes a crossbar switch **910** having at least an input terminal **912** configured to receive signals from an analog-to-digital converter (ADC) **912** and an input terminal **922** configured to receive signals from an ADC **922**. Crossbar switch **910** also includes an output terminal **924** that is coupled to a digital front end **930**. In an embodiment, input terminals **912** and **922** of crossbar switch **910** have P inputs, where P is an integer value that is equal to the total number of desired channels received by tuner1 **610** and tuner2 **720**. Output terminal **924**

US 9,210,362 B2

**11**

of crossbar switch **910** have Q outputs, where Q is an integer value that is equal to the total number of desired channels received by tuned **610** and tuner2 **720**.

In an embodiment, digital front end **930** may include a bank of R complex mixers that frequency shifts the received channels to a baseband. Digital front end **930** may combine digital front end **630** and **740** shown in FIG. **6**. Similarly, a tiled up-conversion module **950** may include up-converter modules **650** and **760** of FIG. **6**.

System **900** further includes a summing DAC that operates similarly as summing DAC **470** and **670** that have been described in detail in relation with respective FIG. **4** and FIG. **6** above. Thus, redundant description is omitted herein.

FIG. **10** is a simplified block diagram of a wideband multi-tuner receiver system **1000** according to another embodiment of the present invention. System **1000** includes at least tuner1 **610** coupled with digital front end **630** through an analog-to-digital converter **620** and tuner2 **720** coupled with digital front end **740** through an analog-to-digital converter **730**. System **1000** further includes a crossbar switch **1010** that is interposed between digital front ends **630**, **740** and up-conversion modules **650**, **760**. Crossbar switch **1010** includes an input terminal **1012** having S inputs coupled with DFE **630** and an input terminal **1022** having T inputs coupled with DFE **740**. In an embodiment, S is an integer value equal to the number of desired channels processed in DFE **630** and T is an integer value equal to the number of desired channels processed in DFE **740**. Crossbar switch **1010** further includes an output terminal **1024** having U outputs coupled with up-converter module **650** and an output terminal **1024** having V outputs coupled with up-converter module **760**. In an embodiment, the total number of the outputs U and V is equal to the sum of the inputs S and T. Thus, crossbar switch **1010** allows the routing of any channel from either DFE **630** or DFE **740** to up-converters **650** or **760**. It is understood that system **1000** is not as flexible as system **900** because DFE **630** and DFE **740** are already pre-assigned to respective tuner1 (**610**) and tuner2 (**720**). However, this pre-assigned arrangement allows a simpler implementation of crossbar switch **1010** that operates at lower speeds.

While several embodiments in accordance with the present invention have been described, it is to be understood that the above description is intended to be illustrative and not restrictive. Many embodiments will be apparent to those of skill in the art upon reviewing the above description. The scope of the invention should, therefore, be determined not with reference to the above description, but instead should be determined with reference to the appended claims along with their full scope of equivalents.

What is claimed is:

**1**. A wideband receiver system comprising:
a mixer module configured to downconvert a plurality of frequencies that comprises a plurality of desired television channels and a plurality of undesired television channels;
a wideband analog-to-digital converter (ADC) module configured to digitize said plurality of frequencies comprising said plurality of desired television channels and said plurality of undesired television channels;
digital circuitry configured to:
    select said plurality of desired television channels from said digitized plurality of frequencies; and
    output said selected plurality of television channels to a demodulator as a digital datastream.

**2**. The wideband receiver system of claim **1**, wherein said output of said digital datastream is via a serial interface.

**12**

**3**. The wideband receiver system of claim **1**, wherein said output of said digital datastream is via a parallel interface.

**4**. The wideband receiver system of claim **1**, wherein said mixer module comprises a first mixer configured to generate an in-phase signal and a second mixer configured to generate a quadrature signal.

**5**. The wideband receiver system of claim **1**, wherein said wideband analog-to-digital converter comprises:
a first ADC configured to generate a digital in-phase signal; and
a second ADC configured to generate a digital quadrature signal.

**6**. The wideband receiver system of claim **5**, wherein said digital circuitry comprises a plurality of complex mixers configured to frequency shift said selected plurality of desired television channels.

**7**. The wideband receiver system of claim **6**, wherein:
prior to said frequency shift, said selected plurality of desired television channels occupy non-contiguous portions of a frequency spectrum; and
after said frequency shift, said selected plurality of desired television channels occupy a contiguous frequency spectrum.

**8**. The wideband receiver system of claim **1**, wherein said digital circuitry comprises a plurality of channel filters configured to perform said selection of said plurality of desired television channels.

**9**. The wideband receiver system of claim **8**, wherein each one of said plurality of channel filters is a finite impulse response filter.

**10**. The wideband receiver system of claim **1**, wherein said digital circuitry comprises a decimator circuit configured to decimate one or more of said selected plurality of television channels prior to said output of said selected plurality of desired television channels.

**11**. A method comprising:
in a wideband receiver system:
    downconverting, by a mixer module of said wideband receiver system, a plurality of frequencies that comprises a plurality of desired television channels and a plurality of undesired television channels;
    digitizing, by a wideband analog-to-digital converter (ADC) module of said wideband receiver system, said plurality of frequencies comprising said plurality of desired television channels and said plurality of undesired television channels;
    selecting, by digital circuitry of said wideband receiver system, said plurality of desired television channels from said digitized plurality of frequencies; and
    outputting, by said digital circuitry of said wideband receiver system, said selected plurality of television channels to a demodulator as a digital datastream.

**12**. The method of claim **11**, comprising outputting, by said digital circuitry of said wideband receiver system, said digital datastream via a serial interface.

**13**. The method of claim **11**, comprising outputting, by said digital circuitry of said wideband receiver system, said digital datastream via a parallel interface.

**14**. The method of claim **11**, comprising:
generating, by a first mixer of said mixer module, an in-phase signal; and
generating, by a second mixer of said mixer module, a quadrature signal.

**15**. The method of claim **11**, comprising:
generating, via a first ADC of said wideband analog-to-digital converter, a digital in-phase signal; and

US 9,210,362 B2

13

generating, via a second ADC of said wideband analog-to-
    digital converter, a digital quadrature signal.

**16**. The method of claim **15**, comprising frequency shifting
said selected plurality of desired television channels via a
plurality of complex mixers of said digital circuitry.

**17**. The method of claim **16**, wherein:

prior to said frequency shifting, said selected plurality of
    desired television channels occupy non-contiguous por-
    tions of a frequency spectrum; and

after said frequency shifting, said selected plurality of
    desired television channels occupy a contiguous fre-
    quency spectrum.

**18**. The method of claim **11**, wherein said digital circuitry
comprises a plurality of channel filters configured to perform
said selecting.

**19**. The method of claim **18**, wherein each one of said
plurality of channel filters is a finite impulse response filter.

**20**. The method of claim **11**, comprising decimating, by
said digital circuitry, one or more of said selected plurality of
desired television channels prior to said outputting of said
selected plurality of television channels.

\* \* \* \* \*

14

# EXHIBIT E

US009825826B2

(12) **United States Patent**
Gallagher et al.

(10) **Patent No.:** **US 9,825,826 B2**
(45) **Date of Patent:** *Nov. 21, 2017

(54) **METHOD AND APPARATUS FOR SPECTRUM MONITORING**

(71) Applicant: **MaxLinear, Inc.**, Carlsbad, CA (US)

(72) Inventors: **Timothy Gallagher**, Encinitas, CA (US); **Patrick Tierney**, Solana Beach, CA (US); **Jun Huang**, San Diego, CA (US)

(73) Assignee: **Maxlinear, Inc.**, Carlsbad, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **14/948,947**

(22) Filed: **Nov. 23, 2015**

(65) **Prior Publication Data**

US 2016/0087865 A1 Mar. 24, 2016

**Related U.S. Application Data**

(63) Continuation of application No. 14/341,880, filed on Jul. 28, 2014, now Pat. No. 9,203,653, which is a continuation of application No. 13/607,916, filed on Sep. 10, 2012, now Pat. No. 8,792,008.

(60) Provisional application No. 61/532,098, filed on Sep. 8, 2011.

(51) **Int. Cl.**
| | | |
|---|---|---|
| *H04N 17/00* | (2006.01) | |
| *H04L 12/26* | (2006.01) | |
| *H04L 12/66* | (2006.01) | |
| *H04B 17/309* | (2015.01) | |

(52) **U.S. Cl.**
CPC ........... *H04L 43/08* (2013.01); *H04B 17/309* (2015.01); *H04L 12/66* (2013.01); *H04N 17/00* (2013.01)

(58) **Field of Classification Search**
CPC ...................................... H04N 17/00
USPC ......................... 348/192, 193, 180
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,038,435 A | 3/2000 | Zhang | |
| 7,162,731 B2 * | 1/2007 | Reidhead | H04L 1/24 |
| | | | 348/180 |
| 7,418,240 B2 * | 8/2008 | Hsu | H04L 1/0003 |
| | | | 370/252 |

(Continued)

*Primary Examiner* — Paulos M Natnael
(74) *Attorney, Agent, or Firm* — McAndrews, Held & Malloy, Ltd.

(57) **ABSTRACT**

A receiver is configured to be coupled to a television and data service provider headend via a hybrid fiber coaxial (HFC) network. The receiver comprises front-end circuitry operable to receive a signal that carries a plurality of television and/or data channels, and digitize the received signal to generate a digitized signal. The receiver comprises channelizer circuitry operable to select a first portion of the digitized signal, and select a second portion of the digitized signal. The receiver comprises processing circuitry operable to process the selected second portion of the digitized signal to recover information carried in the plurality of channels. The receiver comprises monitoring circuitry operable to analyze the selected first portion of the digitized signal to measure a characteristic of the received signal; and control the transmission of network management messages back to the headend based on the measured characteristic of the received signal.

**18 Claims, 7 Drawing Sheets**



(56)                    **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 8,161,388 B2 * | 4/2012 | Rodriguez | ............... | G06F 3/14 |
| | | | | 348/125 |
| 8,611,483 B2 * | 12/2013 | Zhu | ..................... | H04L 7/0334 |
| | | | | 341/122 |
| 8,792,008 B2 * | 7/2014 | Gallagher | ............. | H04L 43/08 |
| | | | | 348/192 |
| 9,026,118 B2 * | 5/2015 | Ling | .................. | H04W 72/044 |
| | | | | 370/316 |
| 9,203,653 B2 * | 12/2015 | Gallagher | ............. | H04L 43/08 |
| 9,320,019 B2 * | 4/2016 | Gallagher | ............. | H04W 72/04 |
| 9,332,214 B2 * | 5/2016 | Ideura | ................. | H04N 5/775 |
| 2005/0152557 A1 * | 7/2005 | Sasaki | .................... | H04S 7/302 |
| | | | | 381/58 |
| 2010/0171659 A1 * | 7/2010 | Waters | .................. | H04B 17/24 |
| | | | | 342/357.74 |
| 2011/0235758 A1 * | 9/2011 | Khoini-Poorfard | .... | H03G 3/001 |
| | | | | 375/345 |
| 2012/0163290 A1 | 6/2012 | Krafft et al. | | |

* cited by examiner



FIG. 1A



FIG. 1B



**FIG. 1C**



FIG. 2A



FIG. 2B



158B



FIG. 3



**FIG. 4**

US 9,825,826 B2

1

# METHOD AND APPARATUS FOR SPECTRUM MONITORING

## PRIORITY CLAIM

This patent application is a continuation of U.S. patent application Ser. No. 14/341,880 filed on Jul. 28, 2014 now patented as U.S. Pat. No. 9,203,653, which is a continuation of U.S. patent application Ser. No. 13/607,916 filed on Sep. 10, 2012 now patented as U.S. Pat. No. 8,792,008, which also makes reference to, claims priority to and claims benefit from U.S. Provisional Patent Application Ser. No. 61/532, 098 filed on Sep. 8, 2011. Each of the above referenced documents is hereby incorporated herein by reference in its entirety.

## INCORPORATION BY REFERENCE

This patent application also makes reference to:

U.S. patent application Ser. No. 13/336,451 titled "Method and Apparatus for Broadband Data Conversion," filed on Dec. 23, 2011, and published as U.S. Patent Application Publication No. 2012/0163518;

U.S. patent application Ser. No. 13/485,003 titled "Multi-layer Time-Interleaved Analog-to-Digital Converter (ADC)," filed on May 31, 2012 and now patented as U.S. Pat. No. 8,611,483; and

U.S. patent application Ser. No. 13/588,769 titled "Multi-Standard Coverage Map Generation," filed on Aug. 17, 2012, and now patented as U.S. Pat. No. 9,026,118.

Each of the above referenced documents applications is hereby incorporated herein by reference in its entirety.

## FIELD OF THE INVENTION

Certain embodiments of the invention relate to signal processing. More specifically, certain embodiments of the invention relate to a method and system for spectrum monitoring.

## BACKGROUND OF THE INVENTION

Network-based services can become unacceptable if network parameters fall outside of those for which receivers in the network were designed. For example, in a cable television system there are specifications for the number of channels on the plant, the types of channels, the signal levels of those channels and the impairments that can be on the plant that would affect the performance of the receiver. If some or all of these parameters deviate outside acceptable bounds, the user may experience unacceptable performance. Conventional methods and apparatuses for monitoring network parameters are too costly and impractical for use in customer-premises equipment (CPE).

Further limitations and disadvantages of conventional and traditional approaches will become apparent to one of skill in the art, through comparison of such systems with some aspects of the present invention as set forth in the remainder of the present application with reference to the drawings.

## BRIEF SUMMARY OF THE INVENTION

A system and/or method is provided for spectrum monitoring, substantially as shown in and/or described in connection with at least one of the figures, as set forth more completely in the claims.

2

These and other advantages, aspects and novel features of the present invention, as well as details of an illustrated embodiment thereof, will be more fully understood from the following description and drawings.

## BRIEF DESCRIPTION OF SEVERAL VIEWS OF THE DRAWINGS

FIG. 1A depicts an example cable system in accordance with an example embodiment of the invention.

FIG. 1B depicts an example receiver operable to perform spectrum monitoring in accordance with an example embodiment of the invention.

FIG. 1C depicts an example satellite system in accordance with an example embodiment of the invention.

FIG. 2A depicts an example RF front-end of a receiver operable to perform spectrum monitoring in accordance with an example embodiment of the invention.

FIG. 2B depicts another example RF front-end of a receiver operable to perform spectrum monitoring in accordance with an example embodiment of the invention.

FIG. 3 depicts an example channelizer which may be utilized for performing spectrum monitoring in accordance with an example embodiment of the invention.

FIG. 4 is a flow chart illustrating example steps for spectrum monitoring in accordance with an example embodiment of the invention.

## DETAILED DESCRIPTION OF THE INVENTION

As utilized herein the terms "circuits" and "circuitry" refer to physical electronic components (i.e. hardware) and any software and/or firmware ("code") which may configure the hardware, be executed by the hardware, and or otherwise be associated with the hardware. As utilized herein, "and/or" means any one or more of the items in the list joined by "and/or". For example, "x and/or y" means any element of the three-element set $\{(x), (y), (x, y)\}$. Similarly, "x, y, and/or z" means any element of the seven-element set $\{(x), (y), (z), (x, y), (x, z), (y, z), (y, z), (x, y, z)\}$. As utilized herein, the terms "block" and "module" refer to functions than can be implemented in hardware, software, firmware, or any combination of one or more thereof.

FIG. 1A depicts an example communication system in accordance with an example embodiment of the invention. Shown in FIG. 1 is a terrestrial television antenna 102, a satellite dish 104, an Internet Protocol (IP) network 106, a headend 108, a wide area network (e.g., hybrid fiber-coaxial (HFC) network) 118, a gateways 120a and 120b, end systems 126a and 126b (e.g., computers), and end systems 128a and 128b. The headend 108 comprises a switch 110, a video modulator 112, a cable modem termination system (CMTS) 114, and a splitter/combiner 116.

For downstream traffic, the headend 108 may receive television signals via the antenna 102 and the satellite dish 104, and may receive data via the IP network 106. The switch 110 may convey the television signals to the video modulator 112 and the data to the CMTS 114. The video modulator 112 may modulate the received television signals onto a carrier. The CMTS 114 may modulate the received data onto a carrier. The splitter/combiner 116 may combine the outputs of the video modulator 112 and the CMTS 114 resulting in a frequency division multiplexed (FDM) signal comprising one or more television channels and/or one or more DOCSIS channels. The FDM signal may be onto the wide area network (WAN) 118 for distribution to customer

US 9,825,826 B2

3

premise equipment (CPE). Each of the gateways 120a and 120b may comprise a receive module 150 operable to process the received FDM signal as described below.

In an example embodiment, each of the gateways 120a and 120b may be operable to transmit, via a module 152, messages to the CMTS 114. For such upstream data, the gateways 120a and 120b may modulate messages (e.g., network management/maintenance messages) onto one or more carriers for transmission via the WAN 118. The splitter/combiner 116 may then convey the message to the CMTS 114. The CMTS 114 may process the messages and, in an example embodiment, adjust transmission parameters (e.g., modulation parameters, transmit power, frequency offsets, etc.) and/or perform other maintenance/management based on the received messages.

FIG. 1B depicts an example receiver operable to perform spectrum monitoring in accordance with an example embodiment of the invention. Shown in FIG. 1B is a receiver circuit 100 comprising an RF receive front-end module 158, a channelizer module 102, a monitoring module 154, and a data processing module 156.

The RF receive front-end 158 may be operable to process a received RF signal S to generate a digital signal D. The signal S may be the result of a plurality of television and/or DOCSIS channels being frequency division multiplexed into a single signal. The signal S may occupy a frequency band from $F_{lo}$ to $F_{hi}$. The RF front-end 158 may, for example, amplify, down-convert, filter, and/or digitize the received signal S to generate the digital signal D. Example embodiments of the RF front-end are depicted in FIGS. 2A and 2B.

The channelizer 102 may be operable to select J+1 bands (represented as $C_1$-$C_{J+1}$) of the signal S and output each of the selected bands to the monitoring module 154 and/or the data processing module 156, where J is an integer greater than 1. An example embodiment of the channelizer 102 is depicted in FIG. 3. Each band $C_j$ may, for example, correspond to the frequency band of one or more television channels. For example, each band $C_j$ may be an integer multiple of 6 MHz (U.S.) or 8 MHz (EU).

In an example embodiment, the channelizer 102 may be implemented entirely in the digital domain and the channelization may be achieved via one or more digital filtering algorithms and/or other digital signal processing algorithms.

The monitoring module 154 may be operable to analyze the band $C_{J+1}$ that it receives from the channelizer 102 to measure/determine characteristics such as, for example, signal power level vs. frequency, delay vs. frequency, phase shift vs. frequency, type and/or amount of modulation, code rate, interference levels, signal to noise ratio, a transfer function of the channel of over which the signal was received, an impulse response of the channel over which the signal was received, and/or any other characteristic that may help assess characteristics of the channel over which the signal was received, assess characteristics of the transmitter that sent the signal and/or any otherwise be pertinent to performance of the communication system. The monitoring module may also be operable to generate one or more control signals 160 for configuring the channelizer 102 and/or for configuring the RF front-end 158. Additionally or alternatively, the control signal(s) 160 output by the monitoring module 154 may control the transmission of network management/maintenance messages by the device 150. Such message may comprise, for example, network status updates indicating whether one or more communication parameters of one or more received television or DOCSIS channels are outside acceptable bounds, and/or conveying measured/

4

determined characteristics back to a source of the received signal (e.g., back to a cable headend). In an example embodiment, the monitoring module 174 may be operable to demodulate signals for measuring one or more characteristics such as signal-to-noise ratio, code rate.

The data processing module 156 may be operable to process the bands $C_1$-$C_J$ conveyed to it by the channelizer 102 to recover data present in one or more television channels present in those bands of the signal S. The data processing module 156 may, for example, perform synchronization, equalization, and decoding. The data processing module 156 may output processed data (e.g., MPEG transport stream packets and/or Internet Protocol packets) to end systems 126, perhaps via an interface such as an HDMI interface and/or an Ethernet interface (not shown). The data processing module 156 may also be operable to generate one or more control signals 162 for configuring the channelizer 102 and/or the receive front-end 158.

The parallel arrangement of the monitoring module 154 and data processing module 156 may enable determination of signal and/or channel characteristics without having to interrupt service to user equipment 126 and 128.

In an example embodiment, the signal S may be a cable television signal with $F_{lo}$=55 MHz, $F_{hi}$=1002 MHz. In an example embodiment, the signal S may be a MoCA signal with $F_{lo}$=1150 MHz and $F_{hi}$=2100 MHz. These numbers are purely for illustration and not intended to be limiting.

In an example embodiment, the signal S may be a satellite television signal such as may be at the input of a LNB, at the output of a LNB, or at the input of an indoor unit (e.g., set top box). In such an embodiment, the front-end 158, channelizer 152, data processing module 154, and/or monitoring module 154 may reside in the indoor unit (e.g., set-top box), outdoor unit (e.g., satellite dish or accompanying components), and/or may be distributed among the indoor unit and outdoor unit of a satellite installation residing at a customer premises. An example of such an embodiment is shown in FIG. 1C.

In operation of such an example embodiment, the signal S may be amplified, possibly downconverted, and digitized by the RF front-end 158 to generate the signal D. The channelizer 102 may then select J bands of the signal D for output to the data processing module 156. Each of the selected bands $C_1$-$C_J$ may, for example, comprise one or more of the cable television channels and/or one or more of the DOCSIS channels that make up the signal S. The data processing module 156 may provide one or more control signals to determine which portion of the signal D is selected for each of the bands $C_1$-$C_J$. The selection may be based, for example, on which television channels are being consumed by end systems 128 and/or whether DOCSIS data is being consumed by end systems 126. The channelizer 102 may also select one band, represented as band $C_{J+1}$, to be output to the monitoring module 154. Band $C_{J+1}$ may comprise any portion or portions (including the entire bandwidth from $F_{lo}$ to $F_{hi}$) of the signal D. Which portion of the signal S is selected as band $C_{J+1}$ may, for example, be configured by the monitoring module 154. The data processing module 156 may process one or more of bands $C_1$-$C_J$ to recover data on one or more channels (e.g., television and/or DOCSIS channels) present in those bands while the monitoring module 154 may concurrently process band $C_{J+1}$ to measure/determine characteristics of all or a portion of the signal S between $f_{lo}$ and $f_{hi}$.

FIG. 1C depicts an example satellite system in accordance with an example embodiment of the invention. Shown in FIG. 1C is a satellite dish assembly 172, and a gateway 196.

5

6

The subassembly 174 comprises a feed horn 182, an LNB 194, the front-end 158, the channelizer 152, the monitoring module 154, and the data processing module 156. The various modules of the subassembly 174 may reside in one or more housings, on one or more printed circuit boards, and/or one or more integrated circuits (e.g., one or more silicon dice). In another example embodiment, the monitoring module 154 and/or the data processing module 156 may reside in the gateway 196.

In the example embodiment depicted, the satellite dish assembly 172 comprises a parabolic reflector 176 and a subassembly 174 mounted (e.g., bolted or welded) to a support structure 178 which, in turn, comprises a boom 190 and attaches (e.g., via bolts) to the premises 180 (e.g., to the roof). In another example embodiment, all or a portion of the modules 152, 154, and/or 156 may be mounted to the premises 180 separate from the satellite dish (e.g., connected via wired and/or wireless connections), but may still be part of the "outdoor unit."

The gateway 196 may receive data from the satellite dish assembly 172 (via cable(s) 184). The gateway and may transmit data onto and receive data from the WAN 192 (via broadband connection 188). The gateway 196 may transmit data to and receive data from user equipment 128 and 126 (via one or more connections 186).

FIG. 2A depicts an example RF front-end of a receiver operable to perform spectrum monitoring in accordance with an example embodiment of the invention. The RF front-end 158A shown in FIG. 2A comprises a variable gain amplifier 202, and receive chains $204_1$-$204_L$, where L is an integer greater than or equal to 1. Each receive chains $204_1$ may comprise an amplifier module $210_1$, a mixer module $212_1$, a filter module $214_1$, and an analog-to-digital converter (ADC) module $216_1$, where 1 is an integer between 1 and L.

Each amplifier $210_1$ may be operable to amplify a band 1 of the signal S. Each mixer $212_1$ may be operable to mix a band 1 of the signal S with a local oscillator signal (not shown) to downconvert the band 1 to a lower frequency. Each filter module $214_1$ may be operable to bandpass filter the band 1 to remove/attenuate frequencies outside band 1. Each ADC 216 may be operable to convert the band 1 of the analog signal S to a corresponding digital representation. Operation of the RF front-end 158 and/or processing of signals generated by the front-end 158, may, for example, be as described in U.S. patent application Ser. No. 13/336,451 entitled "Method and Apparatus for Broadband Data Conversion" which is incorporated by reference herein, as set forth above.

In an example embodiment, the front-end 158A may reside in a cable gateway such as the cable gateway 120 described above. In an example embodiment, the front-end 158A may reside in satellite gateway/set-top box and/or in an outdoor unit of a satellite reception assembly (e.g., collocated on-chip or on-PCB with a satellite low-noise block downconverter (LNB)).

FIG. 2B depicts another example RF front-end of a receiver operable to perform spectrum monitoring in accordance with an example embodiment of the invention. The RF front-end 158B shown in FIG. 2B comprises a variable gain amplifier 252, a filter 254, and an ADC 256. Functions performed by the RF front-end 158B may be referred to as "full-spectrum capture" (or "FSC").

In the front-end 158B, the entire bandwidth, from $F_{lo}$ to $F_{hi}$, of signal S may be amplified by the amplifier 252 to generate S'. The amplified signal S' may be then filtered by the filter 254 to remove undesired signals outside of $F_{lo}$ to $F_{hi}$ and generate signal S". The signal S", from $F_{lo}$ to $F_{hi}$,

may then be digitized by the ADC 256 to generate signal D. In an example embodiment, the ADC may be as described in U.S. patent application Ser. No. 13/485,003 entitled "Multi-layer Time-Interleaved Analog-to-Digital Converter (ADC)," which is incorporated by reference herein, as set forth above.

In an example embodiment, the ADC 256 may be capable of digitizing a signal S wherein $F_{lo}$ to $F_{hi}$ is 1 GHz or higher. Accordingly, for cable television/DOCSIS, the ADC 256 may be operable to digitize the entire cable downstream (e.g., from ~55 MHz to ~1002 MHz). Similarly, for satellite television, the ADC 256 may be operable to digitize the received signal at the input of the LNB, and/or the down-converted signal (e.g., from ~1 GHz to ~2 GHz) at the output by an LNB.

FIG. 3 depicts an example channelizer which may be utilized for performing spectrum monitoring in accordance with an example embodiment of the invention. Band selection filters $302_1$-$302_J$ of the channelizer 102 may each process the signal D to recover a corresponding one of the J selected bands of the signal D, and output the band on a corresponding one of the ports $304_1$ to $304_J$. A band selection filter $302_{J+1}$ of the channelizer 102 may process the signal D to recover band $C_{J+1}$ from the signal D, and output band $C_{J+1}$ on the port $304_{J+1}$. Which band or bands are selected by the filter $302_{J+1}$ may be configured based on one or more control signals input to the channelizer 102. For example, the value of a parameter k may determine the center frequency of the portion of signal D that is to be selected as $C_{J+1}$ by the filter $302_{J+1}$, and the value of $\Delta$ may determine the bandwidth of the portion of this signal D that is selected as band $C_{J+1}$ for output on the port $304_{J+1}$. In this manner, all of the signal D between $F_{lo}$ and $F_{hi}$ or any portion or portions of the signal D, may be selected for output on the port $304_{J+1}$.

FIG. 4 is a flow chart illustrating example steps for spectrum monitoring in accordance with an example embodiment of the invention. After start step 402, in step 404, the receiver circuit 100 may receive a frequency division multiplexed (FDM) signal comprising one or more channels (e.g., satellite television channels, cable television channels, and/or DOCSIS channels) occupying a frequency band between $F_{lo}$ and $F_{hi}$. In step 406, the received FDM signal is digitized across the full band from $F_{lo}$ to $F_{hi}$. In step 408, the digitized signal is channelized into one or more bands. In step 410, a first one or more of the bands are conveyed to a data processing module. In step 412 a second one or more of the bands are output to a monitoring module. In step 414, the data processing module processes one or more of the first one or more bands to recover data on those bands while the monitoring module concurrently processes the second one or more bands to determine characteristics of all or a portion of the frequency band from $F_{lo}$ to $F_{hi}$.

Other embodiments of the invention may provide a non-transitory computer readable medium and/or storage medium, and/or a non-transitory machine readable medium and/or storage medium, having stored thereon, a machine code and/or a computer program having at least one code section executable by a machine and/or a computer, thereby causing the machine and/or computer to perform the steps as described herein for spectrum monitoring.

Accordingly, the present invention may be realized in hardware, software, or a combination of hardware and software. The present invention may be realized in a centralized fashion in at least one computing system, or in a distributed fashion where different elements are spread across several interconnected computing systems. Any kind

US 9,825,826 B2

7

of computing system or other apparatus adapted for carrying out the methods described herein is suited. A typical combination of hardware and software may be a general-purpose computing system with a program or other code that, when being loaded and executed, controls the computing system such that it carries out the methods described herein. Another typical implementation may comprise an application specific integrated circuit or chip.

The present invention may also be embedded in a computer program product, which comprises all the features enabling the implementation of the methods described herein, and which when loaded in a computer system is able to carry out these methods. Computer program in the present context means any expression, in any language, code or notation, of a set of instructions intended to cause a system having an information processing capability to perform a particular function either directly or after either or both of the following: a) conversion to another language, code or notation; b) reproduction in a different material form.

While the present invention has been described with reference to certain embodiments, it will be understood by those skilled in the art that various changes may be made and equivalents may be substituted without departing from the scope of the present invention. In addition, many modifications may be made to adapt a particular situation or material to the teachings of the present invention without departing from its scope. Therefore, it is intended that the present invention not be limited to the particular embodiment disclosed, but that the present invention will include all embodiments falling within the scope of the appended claims.

What is claimed is:

1. A method comprising:
performing by one or more circuits of a receiver coupled to a television and data service provider headend via a hybrid fiber coaxial (HFC) network:
    receiving, via said HFC network, a signal that carries a plurality of channels, wherein said channels comprise one or both of television channels and data channels;
    digitizing said received signal to generate a digitized signal;
    selecting a first portion of said digitized signal;
    selecting a second portion of said digitized signal;
    processing said selected second portion of said digitized signal to recover information carried in said plurality of channels;
    analyzing said selected first portion of said digitized signal to measure a characteristic of said received signal; and
    controlling the transmission of network management messages back to said headend based on said measured characteristic of said received signal, wherein said measured characteristic is different than said network management messages.

2. The method of claim 1, wherein said network management messages indicate whether a parameter is outside of acceptable bounds.

3. The method of claim 2, wherein said parameter is modulation parameter of said received signal.

8

4. The method of claim 2, wherein said parameter is a transmit power of said received signal.

5. The method of claim 2, wherein said parameter is a frequency offset of said received signal.

6. The method of claim 1, wherein said characteristic is signal power vs. frequency.

7. The method of claim 1, wherein said characteristics is signal phase vs. frequency.

8. The method of claim 1, wherein said characteristic is one of: signal-to-noise ratio, peak-to-average ratio, noise levels, bit error rate, and symbol error rate.

9. The method of claim 1, configuring, by said one or more circuits, a bandwidth and/or center frequency of said selected first portion of said digitized signal.

10. A system comprising:
a receiver configured to be coupled to a television and data service provider headend via a hybrid fiber coaxial (HFC) network, the receiver comprising:
    front-end circuitry operable to:
        receive a signal that carries a plurality of channels, wherein said channels comprise one or both of television channels and data channels; and
        digitize said received signal to generate a digitized signal;
    channelizer circuitry operable to:
        select a first portion of said digitized signal; and
        select a second portion of said digitized signal;
    processing circuitry operable to process said selected second portion of said digitized signal to recover information carried in said plurality of channels;
    monitoring circuitry operable to:
        analyze said selected first portion of said digitized signal to measure a characteristic of said received signal; and
        control the transmission of network management messages back to said headend based on said measured characteristic of said received signal, wherein said measured characteristic is different than said network management messages.

11. The system of claim 10, wherein said network management messages indicate whether a parameter is outside of acceptable bounds.

12. The system of claim 11, wherein said parameter is a modulation parameter of said received signal.

13. The system of claim 11, wherein said parameter is a transmit power of said received signal.

14. The system of claim 11, wherein said parameter is a frequency offset of said received signal.

15. The method of claim 1, wherein said characteristic is signal power vs. frequency.

16. The method of claim 1, wherein said characteristics is signal phase vs. frequency.

17. The system of claim 10, wherein said characteristic is one of: signal-to-noise ratio, peak-to-average ratio, noise levels, bit error rate, and symbol error rate.

18. The system of claim 10, comprising configuring, by said monitoring circuitry during operation of said one or more circuits, a bandwidth and/or center frequency of said selected first portion of said digitized signal.

*   *   *   *   *

# EXHIBIT F

US010135682B2

(12) **United States Patent**
Ling et al.

(10) Patent No.: **US 10,135,682 B2**
(45) Date of Patent: ***Nov. 20, 2018**

(54) **METHOD AND SYSTEM FOR SERVICE GROUP MANAGEMENT IN A CABLE NETWORK**

(71) Applicant: **Maxlinear, Inc.**, Carlsbad, CA (US)

(72) Inventors: **Curtis Ling**, Carlsbad, CA (US);
**Sridhar Ramesh**, Carlsbad, CA (US);
**Timothy Gallagher**, Carlsbad, CA (US)

(73) Assignee: **Maxlinear, Inc.**, Carlsbad, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **15/866,106**

(22) Filed: **Jan. 9, 2018**

(65) **Prior Publication Data**
US 2018/0131567 A1      May 10, 2018

**Related U.S. Application Data**

(63) Continuation of application No. 15/434,673, filed on Feb. 16, 2017, now Pat. No. 9,866,438, which is a
(Continued)

(51) **Int. Cl.**
*H04L 12/24*       (2006.01)
*H04L 1/00*        (2006.01)
(Continued)

(52) **U.S. Cl.**
CPC ....... *H04L 41/0823* (2013.01); *H04B 17/318* (2015.01); *H04L 1/0009* (2013.01);
(Continued)

(58) **Field of Classification Search**
CPC . H04L 12/2801; H04L 1/0009; H04L 1/0026; H04L 27/2601; H04L 41/0823; H04L 43/08; H04L 43/12
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,563,918 A    10/1996  Waldschmidt
6,275,483 B1    8/2001  Papasakellariou
(Continued)

*Primary Examiner* — Dung B Huynh

(74) *Attorney, Agent, or Firm* — McAndrews, Held & Malloy, Ltd

(57)                **ABSTRACT**

A cable modem termination system (CMTS) may determine, for a plurality of cable modems served by the CMTS, a corresponding plurality of SNR-related metrics. The CMTS may assigning the modems among a plurality of service groups based on the SNR-related metrics. For any one of the modems, the CMTS may configure physical layer communication parameters to be used by the one of the modems based on a SNR-related metric of a service group to which the one of the modems is assigned. The physical layer communication parameters may include one or more of: transmit power, receive sensitivity, timeslot duration, modulation type, modulation order, forward error correction (FEC) type, and FEC code rate. The CMTS and the modems may communicate using orthogonal frequency division multiplexing (OFDM) over a plurality of subcarriers, and the physical layer communication parameters may be determined on a per-subcarrier basis.

**18 Claims, 7 Drawing Sheets**



302  CMTS sends probe to CMs

304  CMs determine SNR profile and report back to CMTS

306  CMTS assigns CMs to service groups based on SNR profiles

308  CMTS determines physical layer communication parameters per service group and per subcarrier based on composite SNR profiles of the service groups

310  Communications between CMTS and any particular CM use the per-subcarrier physical layer parameters of the service group to which the CM has been assigned

APPX257

**US 10,135,682 B2**

Page 2

### Related U.S. Application Data

continuation of application No. 15/228,703, filed on Aug. 4, 2016, now Pat. No. 9,577,886, which is a continuation of application No. 13/948,444, filed on Jul. 23, 2013, now Pat. No. 9,419,858.

(60) Provisional application No. 61/674,742, filed on Jul. 23, 2012.

(51) **Int. Cl.**
| | |
|---|---|
| *H04B 17/318* | (2015.01) |
| *H04L 27/26* | (2006.01) |
| *H04L 12/28* | (2006.01) |
| *H04L 12/26* | (2006.01) |

(52) **U.S. Cl.**
CPC ........ *H04L 1/0026* (2013.01); *H04L 12/2801* (2013.01); *H04L 27/2601* (2013.01); *H04L 27/2602* (2013.01); *H04L 43/08* (2013.01); *H04L 43/12* (2013.01)

(56) **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 6,421,327 | B1 | 7/2002 | Lundby | |
| 6,560,225 | B1 | 5/2003 | Czajkowski | |
| 6,757,522 | B1 | 6/2004 | Naegeli | |
| 6,891,858 | B1 | 5/2005 | Mahesh | |
| 6,898,755 | B1 * | 5/2005 | Hou | H04L 1/0003 |
| | | | | 370/282 |
| 7,761,049 | B2 | 7/2010 | Zeng | |
| 8,488,514 | B2 | 7/2013 | Cai | |
| 8,743,933 | B2 * | 6/2014 | Prodan | H04L 5/1446 |
| | | | | 375/219 |
| 9,025,954 | B2 | 5/2015 | Fang | |
| 9,419,858 | B2 * | 8/2016 | Ling | H04L 1/0026 |
| 9,577,886 | B2 * | 2/2017 | Ling | H04L 1/0026 |
| 9,866,438 | B2 * | 1/2018 | Ling | H04L 41/0823 |
| 2001/0055319 | A1 * | 12/2001 | Quigley | H04J 3/1694 |
| | | | | 370/480 |
| 2002/0062486 | A1 | 5/2002 | Park | |
| 2002/0186459 | A1 | 12/2002 | DeGrange, Jr. | |
| 2003/0002450 | A1 | 1/2003 | Jalali | |
| 2003/0043732 | A1 | 3/2003 | Walton | |
| 2003/0053419 | A1 | 3/2003 | Kanazawa | |
| 2003/0177502 | A1 | 9/2003 | Kolze | |
| 2003/0199283 | A1 | 10/2003 | Busch | |
| 2003/0223481 | A1 | 12/2003 | Jones | |
| 2003/0236071 | A1 | 12/2003 | Ito | |
| 2004/0085976 | A1 * | 5/2004 | Dale | H04B 7/18582 |
| | | | | 370/411 |
| 2004/0218568 | A1 | 11/2004 | Goodall | |
| 2005/0097617 | A1 | 5/2005 | Currivan | |
| 2005/0122996 | A1 | 6/2005 | Azenkot | |
| 2005/0135253 | A1 | 6/2005 | Cai et al. | |
| 2005/0185824 | A1 | 8/2005 | Chen | |
| 2005/0213579 | A1 | 9/2005 | Iyer | |
| 2006/0008020 | A1 | 1/2006 | Blankenship | |
| 2006/0067278 | A1 * | 3/2006 | Li | H04B 1/707 |
| | | | | 370/335 |
| 2006/0126505 | A1 * | 6/2006 | Denney | H04J 3/1694 |
| | | | | 370/229 |
| 2007/0098007 | A1 | 5/2007 | Prodan | |
| 2007/0202904 | A1 | 8/2007 | Cheng | |
| 2007/0253388 | A1 | 11/2007 | Pietraski | |
| 2009/0016420 | A1 | 1/2009 | Kwak | |
| 2009/0040942 | A1 | 2/2009 | Yang | |
| 2009/0215403 | A1 | 8/2009 | Currivan | |
| 2009/0219856 | A1 * | 9/2009 | Richardson | H04W 72/044 |
| | | | | 370/328 |
| 2010/0002575 | A1 | 1/2010 | Eichinger | |
| 2010/0100919 | A1 | 4/2010 | Hsue | |
| 2010/0154017 | A1 * | 6/2010 | An | H04L 12/2801 |
| | | | | 725/111 |
| 2010/0172316 | A1 | 7/2010 | Hwang | |
| 2011/0051607 | A1 | 3/2011 | Begen | |
| 2011/0188852 | A1 | 8/2011 | Stodola | |
| 2011/0306380 | A1 | 12/2011 | Zavadsky | |
| 2012/0269242 | A1 | 10/2012 | Prodan | |
| 2013/0021931 | A1 | 1/2013 | Kim | |
| 2013/0024753 | A1 | 1/2013 | Masuda | |
| 2013/0100843 | A1 | 4/2013 | Croak | |
| 2013/0107921 | A1 | 5/2013 | Prodan | |
| 2013/0114480 | A1 | 5/2013 | Chapman | |
| 2013/0170528 | A1 * | 7/2013 | Pantelias | H04L 12/2801 |
| | | | | 375/222 |
| 2013/0227373 | A1 | 8/2013 | Shen | |
| 2013/0266310 | A1 | 10/2013 | Fox | |
| 2014/0022926 | A1 | 1/2014 | Ling | |
| 2014/0133330 | A1 | 5/2014 | Chapman | |
| 2014/0169431 | A1 | 6/2014 | Arambepola | |
| 2014/0286203 | A1 | 9/2014 | Jindal | |
| 2014/0301237 | A1 | 10/2014 | Yi | |
| 2015/0071161 | A1 | 3/2015 | Salhab | |
| 2015/0288498 | A1 | 10/2015 | Kliger | |

* cited by examiner

**APPX258**



FIG. 1



FIG. 2A



FIG. 2B



FIG. 2C



302 CMTS sends probe to CMs

304 CMs determine SNR profile and report back to CMTS

306 CMTS assigns CMs to service groups based on SNR profiles

308 CMTS determines physical layer communication parameters per service group and per subcarrier based on composite SNR profiles of the service groups

310 Communications between CMTS and any particular CM use the per-subcarrier physical layer parameters of the service group to which the CM has been assigned

**FIG. 3A**



322 CMTS determines location of CMs within HFC network

324 CMTS assigns CMs to service groups based on locations

326 CMTS determines physical layer communication parameters per service group and per subcarrier based on locations of service groups

328 Communications between CMTS and any particular CM use the per-subcarrier physical layer parameters of the service group to which the CM has been assigned

**FIG. 3B**



FIG. 4A



FIG. 4B

US 10,135,682 B2

1

**METHOD AND SYSTEM FOR SERVICE GROUP MANAGEMENT IN A CABLE NETWORK**

PRIORITY CLAIM

This patent application is a continuation of U.S. patent application Ser. No. 15/434,673 filed on Feb. 16, 2017, which is a continuation of U.S. patent application Ser. No. 15/228,703 filed on Aug. 4, 2016, now U.S. Pat. No. 9,577,886, which is a continuation of U.S. patent application Ser. No. 13/948,444 filed on Jul. 23, 2013, now U.S. Pat. No. 9,419,858, which makes reference to, claims priority to and claims benefit from U.S. Provisional Application Ser. No. 61/674,742 titled "Method and System for Service Group Management in a Cable Television Network" and filed on Jul. 23, 2012.

The entirety of each of the above-mentioned applications is hereby incorporated herein by reference.

INCORPORATION BY REFERENCE

This application also makes reference to:

U.S. patent application Ser. No. 13/553,328 titled "Method and System for Client-Side Message Handling in a Low-Power Wide Area Network," and filed on Jul. 19, 2012;

U.S. patent application Ser. No. 13/485,034 titled "Method and System for Server-Side Message Handling in a Low-Power Wide Area Network," and filed on May 31, 2012;

U.S. patent application Ser. No. 13/553,175 titled "Method and System for a Low-Power Client in a Wide Area Network," and filed on Jul. 19, 2012;

U.S. patent application Ser. No. 13/553,195 titled "Method and System for Server-Side Handling of a Low-Power Client in a Wide Area Network," and filed on Jul. 19, 2012;

U.S. patent application Ser. No. 13/948,401 titled "Method and System for a High Capacity Cable Network," and filed on the same date as this application; and

U.S. patent application Ser. No. 13/948,417 titled "Method and System for Noise Suppression in a Cable Network," and filed on the same date as this application.

The entirety of each of the above-mentioned applications is hereby incorporated herein by reference.

FIELD OF THE INVENTION

Certain embodiments of the invention relate to cable television networks. More specifically, certain embodiments of the invention relate to a method and system for service group management in a cable television network.

BACKGROUND OF THE INVENTION

Convention cable television networks can be inefficient and have insufficient capacity. Further limitations and disadvantages of conventional and traditional approaches will become apparent to one of skill in the art, through comparison of such systems with some aspects of the present invention as set forth in the remainder of the present application with reference to the drawings.

BRIEF SUMMARY OF THE INVENTION

A system and/or method is provided for service group management in a cable television network, substantially as

2

shown in and/or described in connection with at least one of the figures, as set forth more completely in the claims.

These and other advantages, aspects and novel features of the present invention, as well as details of an illustrated embodiment thereof, will be more fully understood from the following description and drawings.

BRIEF DESCRIPTION OF SEVERAL VIEWS OF THE DRAWINGS

FIG. **1** is a diagram of an example cable/DOCSIS network.

FIG. **2**A depicts an example method of determining locations of CMs within the HFC network.

FIGS. **2**B and **2**C depict signal-to-noise ratio (SNR) versus frequency profiles for an example cable/DOCSIS network.

FIG. **3**A is a flowchart illustrating an example process for configuring a cable/DOCSIS HFC network based on measured performance metrics.

FIG. **3**B is a flowchart illustrating an example process for configuring a cable/DOCSIS HFC network based on location of CMs within the network.

FIGS. **4**A and **4**B illustrate the network of FIG. **1**, with different groupings of CMs based on one or both of: measured performance metric(s) and location within the HFC network.

DETAILED DESCRIPTION OF THE INVENTION

As utilized herein the terms "circuits" and "circuitry" refer to physical electronic components (i.e. hardware) and any software and/or firmware ("code") which may configure the hardware, be executed by the hardware, and or otherwise be associated with the hardware. As used herein, for example, a particular processor and memory may comprise a first "circuit" when executing a first one or more lines of code and may comprise a second "circuit" when executing a second one or more lines of code. As utilized herein, "and/or" means any one or more of the items in the list joined by "and/or". As an example, "x and/or y" means any element of the three-element set $\{(x), (y), (x, y)\}$. As another example, "x, y, and/or z" means any element of the seven-element set $\{(x), (y), (z), (x, y), (x, z), (y, z), (x, y, z)\}$. As utilized herein, the term "exemplary" means serving as a non-limiting example, instance, or illustration. As utilized herein, the terms "e.g.," and "for example" set off lists of one or more non-limiting examples, instances, or illustrations. As utilized herein, circuitry is "operable" to perform a function whenever the circuitry comprises the necessary hardware and code (if any is necessary) to perform the function, regardless of whether performance of the function is disabled, or not enabled, by some user-configurable setting.

FIG. **1** is a diagram of an example cable/DOCSIS network. The example network comprises a cable modem termination system (CMTS) **102**, a fiber node **104**, amplifiers **106₁-106₃**, a directional coupler **108**, splitters **110₁-110₃**, and cable modems (CMs) **112₁-112₅**.

The CMTS **102** may comprise circuitry operable to manage connections to the CMs **112₁-112₅**. This may include, for example: participating in ranging operations to determine physical layer parameters used for communications between the CMTS **102** and CMs **112₁-112₅**; forwarding of dynamic host configuration protocol (DHCP) messages between a DHCP server and the CMs **112₁-112₅**; forwarding of time of

US 10,135,682 B2

3

day messages between a time of day server and the CMs $112_1$-$112_5$; directing traffic between the CMs $112_1$-$112_5$ other network devices (e.g., Ethernet interfaces of the CMTS 102 may face the Internet, Optical RF interfaces of the CMTS 102 may face the CMs, and the CMTS may direct traffic between and among the Ethernet and Optical RF interfaces); and managing registration of the CMs $112_1$-$112_5$ to grant the cable modems network (e.g., Internet) access. The registration process for a CM $112_X$ (X between 1 and 5 for the example network of FIG. 1) may comprise the CM 112 sending a registration request along with its configuration settings, and the CMTS 102 accepting or rejecting the cable modem based on the configuration settings. The registration process may additionally comprise an exchange of security keys, certificates, or other authentication information.

The fiber node 104 may comprise circuitry operable to convert between optical signals conveyed via the fiber optic cable 103 and electrical signals conveyed via coaxial cable 105.

Each of the amplifiers $106_1$-$106_3$ may comprise a bidirectional amplifier which may amplify downstream signals and upstream signals, where downstream signals are input via upstream interface 107a and output via downstream interface 107b, and upstream signals are input via downstream interface 107b and output via upstream interface 107a. The amplifiers $106_1$, which amplifies signals along the main coaxial "trunk" may be referred to as a "trunk amplifier." The amplifiers 1062 and 1063 which amplify signals along "branches" split off from the trunk may be referred to as "branch" or "distribution" amplifiers.

The directional coupler 108 may comprise circuitry operable to direct downstream traffic incident on interface 109a onto interfaces 109b and 109c, and to direct upstream traffic incident on interfaces 109b and 109c onto interface 109a. The directional coupler 108 may be a passive device.

Each of the splitters $110_1$-$110_3$ may comprise circuitry operable to output signals incident on each of its interfaces onto each of its other interfaces. Each of the splitters $110_1$-$110_3$ may be a passive device.

Each of the cable modems (CMs) $112_1$-$112_5$ may comprise circuitry operable to communicate with, and be managed by, the CMTS 1102 in accordance with one or more standards (e.g., DOCSIS). Each of the CMs $112_1$-$112_5$ may reside at the premises of a cable subscriber.

The components (including, fiber optic cables, coaxial cables, amplifiers, directional couplers, splitters, and/or other devices) between the CMTS and the CMs may be referred to as a hybrid fiber coaxial (HFC) network. Any of the amplifiers, directional coupler, and splitters may be referred to generically as a coupling device.

FIG. 2A depicts an example method of determining locations of CMs within the HFC network. As shown in FIG. 2A, to determine one or more measured performance metric(s) (e.g., an SNR-related metric such as SNR at a particular frequency or SNR over a range of frequencies (an SNR profile), noise levels, strength of desired signals, and/or the like) for any particular CM $112_X$, the CMTS 102 may transmit, at time 1, a message 202 that is destined (unicast, multicast, or broadcast) for the CM $112_X$ and that functions as a probe to enable determination of the metric(s) for the CM $112_X$. The message 202 may be sent on multiple channels spanning multiple frequencies. Similarly, where OFDM is used for communications between the CMTS 102 and the CM $112_X$, the message 202 may be transmitted on each subcarrier, or may be sent on a subset of subcarriers and

4

then interpolation may be used for determining the SNR of subcarriers on which the message 202 was not sent.

The message 202 may be transmitted with such encoding, modulation, and transmit power such that even a CM $112_X$ with a worst-case performance metric(s) can receive the message and accurately measure the metric(s). In this regard, FIG. 2B shows a SNR versus frequency graph for an example HFC network that uses eight channels/subcarriers. The line 222 in FIG. 2B represents a composite worst-case SNR profile for one or more CM(s) in the HFC network to which the message 202 is destined. For example, line 222 may be a SNR profile for a single CM $112_X$ to which the message 202 is to be unicast. As another example, the line 222 may be a composite worst-case SNR profile for a plurality of CMs 112 of a particular service group to which the message 202 is to be multicast. As another example, the line 222 may be a composite worst-case SNR profile for all CMs of an HFC network handled by the CMTS 102 to which the message 202 is to be broadcast. The message 202 may be transmitted such that the minimum SNR needed to receive and accurately measure the SNR profile is below the line 222 (e.g., SNR needed for receiving the message 202 may be the line 224).

Upon receipt of the message 202, a CM $112_X$ may measure, over the channels/subbands on which the message was sent, one or more metrics (e.g., SNR versus frequency profile) for the transmission 202. The CM $112_X$ may then report the metrics(s) back to the CMTS 102 via a message 204. In an example implementation, the message 202 may contain information about when and/or how the CM(s) are supposed to report their metric(s) (e.g., SNR profiles) back to the CMTS 102. In this regard, the message 202 may contain information that is the same as and/or or analogous to what may be found in a MAP, UCD, and/or other MAC management message defined in a DOCSIS standard. Accordingly, the message 202 may have specified a format of the message 204 and that the message 204 is to be transmitted at time T+□.

Once the metric(s) of one or more CMs are known to the CMTS 102, physical layer communication parameters to be used for communications between the CMTS 102 and the CMs 112 may be determined based on the metric(s). In this regard, physical layer communication parameters may be determined per-CM based on each CM's respective metric(s) (e.g., each CM's SNR profile), per-service-group based on a composite metric(s) of the CM(s) assigned to that service group (e.g., composite SNR profile for the CM(s) of that service group), per physical region of the HFC network based on a composite metric of the CMs located in that physical region (e.g., composite SNR profile for the CM(s) in that physical region), and/or the like. Furthermore, once the metric(s) of a CM $112_X$ is determined, the CMTS 102 may assign that CM $112_X$ to one or more service groups based on its metric(s), as, for example, described below with reference to FIG. 4A. Example physical layer parameters include: encoding parameters, modulation parameters, transmit power, receive sensitivity, timeslot duration, channel(s) or subcarrier(s) on which to listen, channel(s) or subcarrier(s) on which to transmit, and/or the like. Example encoding parameters include: type of forward error correction (FEC) to be used (e.g., Reed-Solomon, LDPC, etc.), FEC block size, FEC code rate, etc. Example modulation parameters include: type of modulation (e.g., frequency shift keying (FSK), phase shift keying (PSK), quadrature amplitude modulation (QAM), etc.), modulation depth, modulation order, etc.

APPX267

US 10,135,682 B2

5

In an example implementation, the transmission of messages 202, the calculation of metrics, such as SNR profile, by the CM(s), the transmission 204, and subsequent configuration of physical layer parameters based on the metric(s) may take place in parallel with other operations performed during the registration/ranging process.

Referring now to FIG. 2C, there is again shown the line 222 which represents the applicable SNR profile (e.g., an individual SNR profile if configuring physical layer parameters per CM, a composite SNR profile for a service group if configuring physical layer parameters per service group, or a composite SNR profile for a particular physical region). Also shown is a line 226 corresponding to SNR utilization for communications with the CM(s) associated with the profile 222. Assuming the distance 228 is the minimum desired headroom, then the physical layer communication parameters resulting in line 226 are nearly optimal in the sense that there is minimal headroom on each of channels/subbands 1, 3, 4, 6, 7, 8, and only slightly more than minimal headroom on channels/subbands 2 and 5.

Physical layer parameters may be configured/coordinated using upstream and/or downstream MAP messages, upstream channel descriptors (UCDs), other MAC management messages defined in DOCSIS protocols, and/or purpose-specific messages tailored to configuring the parameters based on measured performance metrics such as SNR profiles as described in this disclosure.

FIG. 3A is a flowchart illustrating an example process for configuring a cable/DOCSIS HFC network based on SNR profiles. For clarity of illustration the process is described with reference to the network of FIG. 1 and the messages of FIG. 2A. The process begins with block 302 in which the CMTS 102 sends one or more probe messages 202 to the CMs $112_1$-$112_5$. In block 304, each of the CMs $112_1$-$112_5$ determines its respective SNR profile based on a received one of the messages 202, and reports the SNR profile back to the CMTS 102 in the form of a message 204. In block 306, the CMTS 102 assigns the CMs to service groups based on the SNR profiles.

In block 308, physical layer communication parameters are determined per service group and per channel/subcarrier. For example, for any particular service group, the modulation order and FEC code rate to be used on a particular subcarrier may be determined based on the worst case SNR for that subcarrier among the CMs in that particular service group. Thus, it can be seen that grouping CMs based on SNR profiles may enable configuring physical layer communications parameters to such that one or more communication parameters (throughput, reliability, etc.) is optimal, or near-optimal, for all of the CMs in the service group. For example, without such grouping by SNR profile, one CM in a particular service group may have substantially lower SNR on one or more channels/subcarriers. As a result, all CMs in that particular service group may be forced to use physical layer parameters supported by this "lowest common denominator" CM. This may result in a lot of wasted capacity for the remaining CMs.

To illustrate with a specific example: assume that CMs $112_1$, $112_4$, and $112_5$ of FIG. 1 have sufficient SNR on channel z to support 64-QAM on channel z, but that CMs $112_2$ and $112_3$ only have sufficient SNR on channel z to support 16-QAM. If $112_1$ is assigned to the same service group as $112_2$ or $112_3$, then $112_1$ may be forced to use 16-QAM on channel z. Conversely, if $112_1$, $112_4$, and $112_5$ are assigned to a first service group and $112_2$ and $112_3$ are assigned to a second service group, then the first service group consisting of $112_1$, $112_4$, and $112_5$ can use 64-QAM

6

on channel z while the second service group consisting of $112_2$ and $112_3$ uses 16-QAM on channel z.

In block 310, communications between the CMTS 102 and any particular service group use the per-service-group and per-subcarrier/channel physical layer parameters determined in block 308.

FIG. 3B is a flowchart illustrating an example process for configuring a cable/DOCSIS HFC network based on location of CMs within the network. For clarity of illustration, and as a non-limiting example, the process is described with reference to the network of FIG. 1 and the messages of FIG. 2B. The process begins with block 322 in which the CMTS 102 determines a location of each of the CMs $112_1$-$112_5$ in the network. Location of a CM $112_X$ may be characterized in a variety of ways including, for example: total distance of fiber and/or coaxial cable between the CMTS 102 and the CM $112_X$, total attenuation between the CMTS 102 and the CM $112_X$, which trunk amplifier(s) are upstream of the CM $112_X$, how many coupling elements (amplifiers, splitters, directional couplers, etc.) are between the CMTS 102 and the CM $112_X$, GPS coordinates, and street address. In block 324, the CMTS 102 assigns the CMs $112_1$-$112_5$ to service groups based on their determined locations. Blocks 326 and 328 are substantially similar to blocks 308 and 310, respectively, of FIG. 3A.

The locations of the CMs $112_1$-$112_5$ may be determined by, for example, transmitting sounding signals into the network. In order to characterize the channel with more precision, the channel sounding signal may be sent repeatedly over an interval of time and the CMs may average multiple measurements over the time interval until they can resolve identifying characteristics in the signal which indicate, for example, how many branch amplifiers and/or other coupling elements that the signal traveled through to reach the CM. In another example implementation, the CMTS may communicate with a server that stores subscriber information that associates the CMs with their geographic location (e.g., street address).

While FIGS. 3A and 3B depict SNR profiles and location as two separate bases on which to assign CMs to service groups, the two may be used in combination.

FIGS. 4A and 4B illustrate the network of FIG. 1, with different groupings of CMs based on one or both of: measured performance metric(s) and location within the HFC network.

In the example of FIG. 4A, CMs $112_1$, $112_4$, and $112_5$ are assigned to service group 402 and CMs $112_2$ and $112_3$ are assigned to service group 404. The assignment of FIG. 4A may result from, for example, assigning CMs based on the number of coupling elements between the CMTS 102 and the CMs—four each for CMs $112_1$, $112_4$, and $112_5$; five each for CMs $112_2$ and $112_3$. The number of coupling elements may be determined based on, for example, measured performance metrics (e.g., SNR profile) of the CMs and/or address or GPS information associated with the CMs. Alternatively, the assignment of FIG. 3A may result from, for example, assigning the CMs to service groups based directly on their respective measured performance metric(s) (e.g., the extra device in the path between CMTS 102 and CMs $112_2$ and $112_3$ may cause CMs $112_2$ and $112_3$ to have significantly poorer SNR).

In the example of FIG. 4B, CMs $112_1$, $112_2$, and $112_3$ are assigned to service group 406 and CMs $112_4$ and $112_5$ are assigned to service group 408. The assignment of FIG. 4B may result from, for example, assigning CMs based on which trunk amplifiers are downstream of the CMs. Alternatively, the assignment of FIG. 3A may result from, for

APPX268

US 10,135,682 B2

7

example, assigning the CMs to service groups based directly on their respective measured performance metric(s) (e.g., the distance between CMTS **102** and CMs **112₄** and **112₅** may be substantially greater than the distance between the CMTS **102** and the CMs **112₁**, **112₂**, and **112₃**, thus resulting in poorer SNR in CMs **112₄** and **112₅**).

Grouping CMs according to which trunk or distribution amplifiers are upstream of them may enable duty cycling power branch and/or distribution amplifiers. For example, when a CM in service group **406** is the talker, the upstream path through amplifier **106₂** may be disabled such that noise from group **408** does not interfere with transmissions from the talker of service group **406**. Grouping CMs according to which trunk or distribution amplifier(s) serve(s) them may enable using more efficient physical layer parameters. For example, where there is a relatively long distance of cable between amplifier **106₁** and **106₂** but relatively short distance of cable between amplifiers **106₁** and **106₃**, grouping the CMs by geography/distance to the CMTS may enable a lower transmit power to be used by the CMTS **102** when talking to service group **406** as compared to when talking to service group **408**.

Other embodiments of the invention may provide a non-transitory computer readable medium and/or storage medium, and/or a non-transitory machine readable medium and/or storage medium, having stored thereon, a machine code and/or a computer program having at least one code section executable by a machine and/or a computer, thereby causing the machine and/or computer to perform processes described.

Accordingly, the present invention may be realized in hardware, software, or a combination of hardware and software. The present invention may be realized in a centralized fashion in at least one computing system, or in a distributed fashion where different elements are spread across several interconnected computing systems. Any kind of computing system or other apparatus adapted for carrying out the methods described herein is suited. A typical combination of hardware and software may be a general-purpose computing system with a program or other code that, when being loaded and executed, controls the computing system such that it carries out the methods described herein. Another typical implementation may comprise an application specific integrated circuit or chip.

The present invention may also be embedded in a computer program product, which comprises all the features enabling the implementation of the methods described herein, and which when loaded in a computer system is able to carry out these methods. Computer program in the present context means any expression, in any language, code or notation, of a set of instructions intended to cause a system having an information processing capability to perform a particular function either directly or after either or both of the following: a) conversion to another language, code or notation; b) reproduction in a different material form.

While the present invention has been described with reference to certain embodiments, it will be understood by those skilled in the art that various changes may be made and equivalents may be substituted without departing from the scope of the present invention. In addition, many modifications may be made to adapt a particular situation or material to the teachings of the present invention without departing from its scope. Therefore, it is intended that the present invention not be limited to the particular embodiment disclosed, but that the present invention will include all embodiments falling within the scope of the appended claims.

8

What is claimed is:

**1**. A method comprising:

determining, by a cable modem termination system (CMTS), for each cable modem served by said CMTS, a corresponding signal-to-noise ratio (SNR) related metric;

assigning, by said CMTS, each cable modem among a plurality of service groups based on a respective corresponding SNR-related metric;

generating, by said CMTS for each one of said plurality of service groups, a composite SNR-related metric based at least in part on a worst-case SNR profile of said SNR-related metrics corresponding to said one of said plurality of service groups;

selecting, by said CMTS, one or more physical layer communication parameter to be used for communicating with said one of said plurality of service groups based on said composite SNR-related metric; and

communicating, by said CMTS, with one or more cable modems corresponding to said one of said plurality of service groups using said selected one or more physical layer communication parameter.

**2**. The method of claim **1**, wherein said one or more physical layer communication parameter includes one or more of: transmit power, receive sensitivity, timeslot duration, modulation type, modulation order, forward error correction (FEC) type, and FEC code rate.

**3**. The method of claim **1**, wherein said CMTS uses orthogonal frequency division multiplexing (OFDM) over a plurality of subcarriers for said communicating.

**4**. The method of claim **3**, comprising selecting, by said CMTS, said one or more physical layer communication parameter on a per-OFDM-subcarrier basis.

**5**. The method of claim **4**, wherein said one or more physical layer communication parameter includes one or both of: which of said OFDM subcarriers to use for transmission to said CMTS, and which of said OFDM subcarriers to use for reception of information from said CMTS.

**6**. The method of claim **1**, wherein:

said plurality of service groups comprises a first service group and a second service group;

said first service group has a first composite SNR versus frequency profile, said second service group has a second composite SNR versus frequency profile, and a particular cable modem has a particular SNR versus frequency profile; and

said assigning said each cable modem among said plurality of service groups comprises, for the particular cable modem:

assigning said particular cable modem to said first service group if said particular SNR versus frequency profile is more similar to said first composite SNR versus frequency profile than to said second composite SNR versus frequency profile; and

assigning said particular cable modem to said second service group if said particular SNR versus frequency profile is more similar to said second composite SNR versus frequency profile than to said first composite SNR versus frequency profile.

**7**. The method of claim **1**, comprising assigning said cable modems among said plurality of service groups based on respective distances between said CMTS and said cable modems.

**8**. The method of claim **1**, comprising assigning any particular one of said cable modems to one of said plurality

APPX269

US 10,135,682 B2

9

of service groups based on which one or more of a plurality of branch amplifiers are upstream of said one of said plurality of cable modems.

9. The method of claim 1, wherein said determining said plurality of SNR-related metrics comprises:

transmitting a probe message to each cable modem, said probe message comprising instructions for measuring a metric and reporting said measured metric back to said CMTS; and

receiving a metric reporting message from each cable modem.

10. A system comprising:

circuitry for use in a cable modem termination system (CMTS), said circuitry comprising a network interface and a processor wherein:

said processor is configured to determine, for each cable modem served by said CMTS, a corresponding signal-to-noise ratio (SNR) related metric;

said processor is configured to assign each of said cable modems among a plurality of service groups based on a respective corresponding SNR-related metric;

said processor is configured to generate, for each one of said plurality of service groups, a composite SNR-related metric based at least in part on a worst-case SNR profile of said SNR-related metrics corresponding to said one of said plurality of service groups;

said processor is configured to select one or more physical layer communication parameter to be used for communicating with said one of said plurality of service groups based on said composite SNR-related metric; and

said network interface is configured to communicate with one or more cable modems corresponding to said one of said plurality of service groups using the one or more selected physical layer communication parameter.

11. The system of claim 10, wherein said one or more physical layer communication parameter includes one or more of: transmit power, receive sensitivity, timeslot duration, modulation type, modulation order, forward error correction (FEC) type, and FEC code rate.

12. The system of claim 10, wherein said network interface and said cable modems are configured to communicate using orthogonal frequency division multiplexing (OFDM) over a plurality of subcarriers.

13. The system of claim 12, wherein said network interface is configured such that at least one of said one or more

10

physical layer communication parameters are configurable on a per-OFDM-subcarrier basis.

14. The system of claim 12, wherein said one or more physical layer communication parameter includes one or both of: which of said OFDM subcarriers to use for transmission to said CMTS, and which of said OFDM subcarriers to use for reception of information from said CMTS.

15. The system of claim 10, wherein:

said plurality of service groups comprises a first service group and a second service group;

said first service group has a first composite SNR versus frequency profile, said second service group has a second composite SNR versus frequency profile, and a particular cable modem has a particular SNR versus frequency profile;

said assignment of said each cable modem among said plurality of service groups comprises, for the particular cable modem:

assignment of said particular cable modem to said first service group if said particular SNR versus frequency profile is more similar to said first composite SNR versus frequency profile than to said second composite SNR versus frequency profile; and

assignment of said particular cable modem to said second service group if said particular SNR versus frequency profile is more similar to said second composite SNR versus frequency profile than to said first composite SNR versus frequency profile.

16. The system of claim 10, wherein said processor is configured to assign said cable modems among said plurality of service groups based on respective distances between said CMTS and said cable modems.

17. The system of claim 10, wherein said processor is configured to assign each of said cable modems among said plurality of service groups based on one or more branch amplifier that serves said each of said cable modems.

18. The system of claim 10, wherein said determination of said plurality of SNR-related metrics comprises:

transmission, via said network interface, of a probe message to each cable modem, said probe message comprising instructions for measuring a metric and reporting said measured metric back to said CMTS; and

reception, via said network interface of said CMTS, of a metric reporting message from each cable modem.

* * * * *

# EXHIBIT G

## Exhibit G

### Exemplary Chart for the '775 Patent
### Infringement of U.S. Patent No. 8,223,775 by Spectrum Accused Services

| # | U.S. Patent No. 8,223,775 | Spectrum Accused Services |
|---|---|---|
| 18a | A cable modem system comprising: | The Accused Services are provided by the claimed cable modem system by utilizing, for example, at least one cable modem located at each subscriber location, including, for example, the Spectrum PC20 and Arris SB6183, and products that operate in a similar manner. By way of example, the Spectrum PC20 is charted herein. |
| 18b | a data networking engine implemented in a first circuit that includes at least one processor, the data networking engine programmed with software that when executed by the at least one processor of the first circuit causes the data networking engine to perform home networking functions including interfacing with customer provided equipment; | The Spectrum PC20 includes a data networking engine implemented in a first circuit that includes at least one processor, the data networking engine programmed with software that when executed by the at least one processor of the first circuit causes the data networking engine to perform home networking functions including interfacing with customer provided equipment.<br><br>Specifically, the Spectrum PC20 includes a Broadcom BCM3390 SoC. |

Page 1 of 4

**APPX272**

Case 2:22-cv-00125-JRG   Document 53-7   Filed 01/10/23   Page 3 of 5 PageID #: 645

**Exhibit G**

| # | U.S. Patent No. 8,223,775 | Spectrum Accused Services |
|---|---|---|
| 18c | a cable modem engine implemented in a second circuit that includes at least |  The Spectrum PC20, via the Broadcom BCM3390, has a dedicated cable modem CPU, a dedicated multi-threaded applications processor, and multiple hardware off-load engines. The multi-threaded applications processor implements a data networking engine. The data networking engine performs home networking functions including interfacing with customer provided equipment. The Spectrum PC20 has a cable modem engine implemented in a second circuit that includes at least one processor, the second circuit being separate from the first circuit, the cable modem engine programmed with software that when executed by the at least one |

Page **2** of **4**

APPX273

## Exhibit G

| # | U.S. Patent No. 8,223,775 | Spectrum Accused Services |
|---|---|---|
| | one processor, the second circuit being separate from the first circuit, the cable modem engine programmed with software that when executed by the at least one processor of the second circuit causes the cable modem engine to perform cable modem functions other than the home networking functions performed by the data networking engine, the cable modem functions including interfacing with cable media, and the cable modem engine configured to enable upgrades to its software in a manner that is independent of upgrades to the software of the data networking engine, the cable modem engine including a DOCSIS controller and a DOCSIS MAC processor, the DOCSIS MAC processor configured to process downstream PDU packets | processor of the second circuit causes the cable modem engine to perform cable modem functions other than the home networking functions performed by the data networking engine, the cable modem functions including interfacing with cable media, and the cable modem engine configured to enable upgrades to its software in a manner that is independent of upgrades to the software of the data networking engine, the cable modem engine including a DOCSIS controller and a DOCSIS MAC processor, the DOCSIS MAC processor configured to process downstream PDU packets and forward the processed packets directly to the data networking engine without the involvement of the DOCSIS controller in order to boost downstream throughput.<br><br>Specifically, the Spectrum PC20 has a dedicated cable modem CPU, a dedicated multi-threaded applications processor, and multiple hardware off-load engines. The cable modem CPU provides a cable modem engine. The cable modem CPU is separate from the multi-threaded applications processor and the hardware off-load engines. Accordingly, upgrades to the cable modem engine are independent of upgrades to the data networking engine. The cable modem CPU implements the cable modem engine. Upon information and belief, the cable modem engine includes a DOCSIS controller and a DOCSIS MAC processor, the DOCSIS MAC processor configured to process downstream PDU packets and forward the processed packets directly to the data networking engine without the involvement of the DOCSIS controller in order to boost downstream throughput |

**APPX274**

**Exhibit G**

| # | U.S. Patent No. 8,223,775 | Spectrum Accused Services |
|---|---|---|
| | and forward the processed packets directly to the data networking engine without the involvement of the DOCSIS controller in order to boost downstream throughput; and | |
| 18d | a data bus that connects the data networking engine to the cable modem engine, wherein the cable modem functions performed by the cable modem engine are completely partitioned from the home networking functions performed by the data networking engine. | The Spectrum PC20 has a data bus that connects the data networking engine to the cable modem engine, wherein the cable modem functions performed by the cable modem engine are completely partitioned from the home networking functions performed by the data networking engine.

Specifically, the Spectrum PC20 has a dedicated cable modem CPU, a dedicated multi-threaded applications processor, and multiple hardware off-load engines. The multi-threaded applications processor provides the data networking engine and the cable modem CPU provides the cable modem engine. The cable modem CPU is separate from, the multi-threaded applications processor. Accordingly, the cable modem functions performed by the cable modem engine are completely partitioned from the home networking functions performed by the data networking engine. The cable modem CPU communicates with the multi-threaded applications processor using a data bus. Accordingly, the data bus connects the data networking engine and the cable modem engine. |
| 19 | A cable modem system as claimed in claim 18, wherein all DOCSIS functions are localized in the cable modem engine. | In the Spectrum PC20, all DOCSIS functions are localized in the cable modem engine.

Specifically, the Spectrum PC20 includes a dedicated cable modem CPU, a dedicated multi-threaded applications processor, and multiple hardware off-load engines. The DOCSIS functions are localized in the cable modem CPU. |

**APPX275**

# EXHIBIT H

Case 2:22-cv-00125-JRG   Document 53-8   Filed 01/10/23   Page 2 of 6 PageID #: 649

**Exhibit H**

**Exemplary Chart for the '690 Patent**

**Infringement of U.S. Patent No. 8,284,690 by Spectrum Accused Services**

| # | U.S. Patent No. 8,284,690 | Spectrum Accused Services |
|---|---|---|
| 1pre | A method comprising: | The Accused Services perform the claimed method utilizing, for example, including a Cable Modem Termination System ("CMTS") operated by Spectrum and at least one cable modem located at each subscriber location, including, for example, the Spectrum PC20, and products that operate in a similar manner. By way of example, the Spectrum PC20 is charted herein. |
| 1a | a) receiving in a first node, a probe request specifying a first plurality of parameters associated with the generation and transmission of a probe, wherein the first plurality of parameters at least specify content payload of the probe and a second node; | The Accused Services include receiving in a first node, a probe request specifying a first plurality of parameters associated with the generation and transmission of a probe, wherein the first plurality of parameters at least specify content payload of the probe and a second node.<br><br>Specifically, the Spectrum PC20 samples and digitizes the entire 1GHz downstream spectrum of a cable plant and includes remote diagnostics capabilities that provide real time, unobtrusive diagnostic and spectrum analysis capabilities. These remote diagnostic capabilities include measuring statistics of the downstream spectrum. The Spectrum PC20 provides an agent that receives requests querying the performance of the downstream spectrum from a second node. Upon information and belief, the requests include the first plurality of parameters that at least specify content payload of the probe and the second node. For example, in a deployed system, the first node may be a cable modem and the second node may be a CMTS. |
| 1b | b) determining a second plurality of parameters associated with | The Spectrum PC20 determines a second plurality of parameters associated with generation and transmission of the probe. |

## Exhibit H

| # | U.S. Patent No. 8,284,690 | Spectrum Accused Services |
|---|---|---|
| | generation and transmission of the probe; | Specifically, the Spectrum PC20 determines information responsive to the received request based on the measured statistics of the downstream spectrum. Upon information and belief, the information includes a second plurality of parameters associated with the generation and transmission of the probe. |
| 1c | c) generating the probe in accordance with the first plurality of parameters and the second plurality of parameters, wherein the probe has a form dictated by the first plurality of parameters; and | The Spectrum PC20 generates the probe in accordance with the first plurality of parameters and the second plurality of parameters, wherein the probe has a form dictated by the first plurality of parameters. Specifically, the Spectrum PC20 generates a message responsive to the received request, the message indicating the responsive information and having a particular form determined by the request. |
| 1d | d) transmitting the probe from the first node to the second node. | The Spectrum PC20 transmits the probe from the first node to the second node. Specifically, the Spectrum PC20 transmits the message to the second node using its agent. |
| | | |
| 7 | The method of claim 1, wherein the probe request requests a probe that assists in diagnosing a network problem. | The probe request requests a probe that assists in diagnosing a network problem. Specifically, the Spectrum PC20 includes remote diagnostics capabilities that provide real time, unobtrusive diagnostic and spectrum analysis capabilities related to diagnosing network problems. Upon information and belief, Spectrum utilizes these remote diagnostic capabilities to assist in diagnosing a network problem. |
| | | |

**APPX278**

## Exhibit H

| # | U.S. Patent No. 8,284,690 | Spectrum Accused Services |
|---|---|---|
| 8 | The method of claim 7, wherein the probe request is generated by a network operator and uploaded to the second node. | The probe request is generated by a network operator and uploaded to the second node.<br><br>Specifically, a collector server operated by Spectrum provides the probe request to the second node. |
| 9pre | A method comprising: | The Accused Services perform the claimed method utilizing, for example, including a Cable Modem Termination System ("CMTS") operated by Spectrum and at least one cable modem located at each subscriber location, including, for example, the Spectrum PC20, and products that operate in a similar manner. By way of example, the Arris E6000 CMTS is charted herein. |
| 9a | a) a first node transmitting a probe request to a second node, the probe request specifying a first plurality of probe parameters for a physical layer probe, the first plurality of probe parameters comprising a form for the probe including a modulation profile for the probe; | The Spectrum Services include a first node transmitting a probe request to a second node, the probe request specifying a first plurality of probe parameters for a physical layer probe, the first plurality of probe parameters comprising a form for the probe including a modulation profile for the probe.<br><br>Specifically, the Arris E6000 provides a set of SNMP (Simple Network Management Protocol) variables supported by the Arris E6000 known collectively as the MIB (Management Information Base). The MIBs includes support for per modem/per upstream channel stats, RCC definitions, per MAC event handling, per modem event handling and counts, and per modem impairment reporting. The Arris E6000 transmits, to cable modems, requests specifying parameters as defined in the MIBs. The requests have a modulation profile. For example, in a deployed system, the first node may be at least a CMTS and the second node may be a cable modem. |

Case 2:22-cv-00125-JRG   Document 53-8   Filed 01/10/23   Page 5 of 6 PageID #: 652

**Exhibit H**

| # | U.S. Patent No. 8,284,690 | Spectrum Accused Services |
|---|---|---|
| 9b | b) the first node receiving the probe from the second node, wherein the probe is generated in accordance with the first plurality of parameters and in accordance with a second plurality of parameters determined by the second node. | The Arris E6000 receives the probe from the second node, wherein the probe is generated in accordance with the first plurality of parameters and in accordance with a second plurality of parameters determined by the second node.<br><br>Specifically, the Arris E6000 receives, from the cable modems, messages responsive to the requests. The message includes data relevant to the request and generated based on the MIBs. |
| 11pre | The method of claim 9, further comprising: | See 9pre. |
| 11a | a) the first node transmitting a second probe request to a third node; | See 9a. |
| 11b | b) and the first node receiving a second probe from the third node, wherein the second probe is generated according to the second probe request; and | See 9b. |
| 11d | wherein the first probe and second probe are transmitted simultaneously using OFDMA. | The first probe and second probe are transmitted simultaneously using OFDMA. |
| 15 | The method of claim 9, wherein the probe request is configured to diagnose a network problem. | The probe request is configured to diagnose a network problem.<br><br>Upon information and belief, Spectrum utilizes these remote diagnostic capabilities to assist in diagnosing a network problem. For example, the MIBs may include support for per modem/per upstream channel stats, |

## Exhibit H

| # | U.S. Patent No. 8,284,690 | Spectrum Accused Services |
|---|---|---|
| | | RCC definitions, per MAC event handling, per modem event handling and counts, and per modem impairment reporting, which can be used to diagnose a network problem. |
| 16 | The method of claim 15, wherein the probe request is generated by a network operator and uploaded to the first node. | The probe request is generated by a network operator and uploaded to the first node.<br><br>Specifically, a collector server operated by Spectrum can provide the probe request to the first node. |

Page **5** of **5**

APPX281

# EXHIBIT I

**Exhibit I**

**Exemplary Chart for the '008 Patent**
**Infringement of U.S. Patent No. 8,792,008 by Spectrum Accused Services**

| # | U.S. Patent No. 8,792,008 | Spectrum Accused Services |
|---|---|---|
| 1a | 1. A system comprising: | The Accused Services are provided by the claimed system by utilizing, for example, the Accused Set Top Products, which include at least one set top box ("STB") located at each subscriber location, including, for example, the Spectrum 100-series STBs, Spectrum 200-series STBs, Spectrum 101-series STBs, Spectrum 201-series STBs, Spectrum 110-series STBs, Spectrum 210-series STBs, the Arris DCX3600 STB, and products that operate in a similar manner. By way of example, the Spectrum 210 (specifically the Spectrum 210-T) is charted herein. |
| 1b | an analog-to-digital converter operable to digitize a received signal spanning an entire television spectrum comprising a plurality of television channels, said digitization resulting in a digitized signal; | The Spectrum 210 has an analog-to-digital converter operable to digitize a received signal spanning an entire television spectrum comprising a plurality of television channels, said digitization resulting in a digitized signal.<br><br>Specifically, the Spectrum 210 has an analog to digital converter: |

APPX283

## Exhibit I

| | |
|---|---|
| 1c | a signal monitor operable to: |
| | The Spectrum 210 has a signal monitor: |
| | The Spectrum 210 receives the entire 1GHz downstream spectrum of a Spectrum cable plant. The 1 GHz cable spectrum includes a plurality of television channels. The Spectrum 210 digitizes the entire received signal; the digitization results in a digitized signal.  |

Page **2** of **6**

**APPX284**

**Exhibit I**

| | | |
|---|---|---|
| |  | |
| **1d** | analyze said digitized signal to determine a characteristic of said digitized signal; and | The Spectrum 210 analyzes said digitized signal to determine a characteristic of said digitized signal.<br><br>Specifically, the Spectrum 210 includes remote diagnostics capabilities that provide real time, unobtrusive diagnostic and spectrum analysis capabilities. Upon information and belief, the Spectrum 210 analyzes, using the signal monitor, said digitized signal to determine a characteristic of said digitized signal. |
| **1e** | report said determined characteristic to a source of said received signal; | The Spectrum 210 reports said determined characteristic to a source of said received signal. |

Page 3 of 6

APPX285

**Exhibit I**

| | | |
|---|---|---|
| **1f** | a data processor operable to process a television channel to recover content carried on the television channel; and | Specifically, the Spectrum 210 includes remote diagnostics capabilities that provide real time, unobtrusive diagnostic and spectrum analysis capabilities. Upon information and belief, the Spectrum 210 reports said determined characteristic to a source of said received signal.<br><br>The Spectrum 210 has a data processor operable to process a television channel to recover content carried on the television channel:<br><br> |
| **1g** | a channelizer operable to: | Specifically, in the Spectrum 210, each digitally tuned television channel is provided to a digital demodulator that outputs a transport stream for use in broadcast services.<br><br>The Spectrum 210 has a channelizer: |

Page **4** of **6**

APPX286

**Exhibit I**

| | | |
|---|---|---|
| **1h** | select a first portion of said digitized signal; |  The Spectrum 210 selects a first portion of said digitized signal.<br><br>Specifically, the Spectrum 210 includes advanced signal processing techniques that can be used to digitally tune multiple channels simultaneously, including selecting a first portion of said digitized signal. |
| **1i** | select a second portion of said digitized signal; and | The Spectrum 210 selects a second portion of said digitized signal.<br><br>Specifically, the Spectrum 210 includes advanced signal processing techniques that can be used to digitally tune multiple channels simultaneously, including selecting a second portion of said digitized signal. |

Page **5** of **6**

**Exhibit I**

| | | |
|---|---|---|
| 1j | concurrently output said first portion of said digitized signal to said signal monitor and said second portion of said digitized signal to said data processor. | The Spectrum 210 concurrently outputs said first portion of said digitized signal to said signal monitor and said second portion of said digitized signal to said data processor.<br><br>Specifically, the Spectrum 210 includes remote diagnostics capabilities that provide real time, unobtrusive diagnostic and spectrum analysis capabilities without affecting user service on any downstream channels. As described above, the first portion of said digitized signal is output to said signal monitor and said second portion of said digitized signal is output to said data processor. Accordingly, the Spectrum 210 concurrently outputs said first portion of said digitized signal to said signal monitor and said second portion of said digitized signal to said data processor. |
| 2 | 2. The system of claim 1, wherein said first portion of said digitized signal spans said entire television spectrum. | See 1h. |

**APPX288**

# EXHIBIT J

Case 2:22-cv-00125-JRG   Document 53-10   Filed 01/10/23   Page 2 of 3 PageID #: 662

**Exhibit J**

**Exemplary Chart for the '362 Patent**

**Infringement of U.S. Patent No. 9,210,362 by Spectrum Accused Services**

| # | U.S. Patent No. 9,210,362 | Spectrum Accused Services |
|---|---|---|
| 11a | A method comprising: | The Accused Services perform the claimed method utilizing, for example, the Accused Set Top Products, which include at least one set top box ("STB") located at each subscriber location, including, for example, the Spectrum 100-series STBs, Spectrum 200-series STBs, Spectrum 101-series STBs, Spectrum 201-series STBs, Spectrum 110-series STBs, Spectrum 210-series STBs, the Arris DCX3600 STB, and products that operate in a similar manner.  By way of example, the Spectrum 210 (specifically the Spectrum 210-T) is charted herein. |
| 11b | in a wideband receiver system: | The Spectrum 210 is a wideband receiver system. |
| 11c | downconverting, by a mixer module of said wideband receiver system, a plurality of frequencies that comprises a plurality of desired television channels and a plurality of undesired television channels; | The Spectrum 210 downconverts, by a mixer module of said wideband receiver system, a plurality of frequencies that comprises a plurality of desired television channels and a plurality of undesired television channels.<br><br>Specifically, the Spectrum 210 includes advanced signal processing techniques, including a mixer, that can be used to downconvert a plurality of frequencies that comprises a plurality of desired television channels and a plurality of undesired television channels. |
| 11d | digitizing, by a wideband analog-to-digital converter (ADC) module of said wideband receiver system, said plurality of frequencies comprising said plurality of desired television channels and said plurality of undesired television channels; | The Spectrum 210 digitizes, by a wideband analog-to-digital converter (ADC) module of said wideband receiver system, said plurality of frequencies comprising said plurality of desired television channels and said plurality of undesired television channels.<br><br>Specifically, the Spectrum 210 digitizes the entire 1GHz downstream spectrum of a Spectrum cable plant. The 1 GHz cable spectrum includes a plurality of desired and undesired television channels. |

Page 1 of 2

**APPX290**

## Exhibit J

| | | |
|---|---|---|
| 11e | selecting, by digital circuitry of said wideband receiver system, said plurality of desired televi-sion channels from said digitized plurality of frequencies; and | The Spectrum 210s select, by digital circuitry of said wideband receiver system, said plurality of desired television channels from said digitized plurality of frequencies as described below: <br><br> Specifically, the Spectrum 210 includes advanced signal processing techniques that can be used to digitally tune multiple channels simultaneously, including to select the plurality of desired television channels from the digitized plurality of frequencies. |
| 11f | outputting, by said digital circuitry of said wideband receiver system, said selected plurality of television channels to a demodulator as a digital datastream. | The Spectrum 110 and Spectrum 210 output, by said digital circuitry of said wideband receiver system, said selected plurality of television channels to a demodulator as a digital datastream. <br><br> Specifically, in the Spectrum 210, the digitally tuned and selected plurality of desired television channels are then fed into a digital demodulator that outputs a transport stream for use in broadcast services. |

APPX291

# EXHIBIT K

**Exhibit K**

**Exemplary Chart for the '826 Patent**
**Infringement of U.S. Patent No. 9,825,826 by Spectrum Accused Services**

| # | U.S. Patent No. 9,825,826 | Spectrum Accused Services |
|---|---|---|
| 1a | A method comprising: | The Accused Services perform the claimed method utilizing, for example, the Accused Set Top Products, which include at least one set top box ("STB") located at each subscriber location, including, for example, the Spectrum 100-series STBs, Spectrum 200-series STBs, Spectrum 101-series STBs, Spectrum 201-series STBs, Spectrum 110-series STBs, Spectrum 210-series STBs, the Arris DCX3600 STB, and products that operate in a similar manner. By way of example, the Spectrum 210 (specifically the Spectrum 210-T) is charted herein. |
| 1b | performing by one or more circuits of a receiver coupled to a television and data service provider headend via a hybrid fiber coaxial (HFC) network: | The Spectrum 210 includes one or more circuits of a receiver coupled to a television and data service provider headend via a hybrid fiber coaxial (HFC) network, that perform the claimed steps, as described below: |

Page 1 of 4

APPX293

Case 2:22-cv-00125-JRG   Document 53-11   Filed 01/10/23   Page 3 of 5 PageID #: 666

**Exhibit K**

| # | U.S. Patent No. 9,825,826 | Spectrum Accused Services |
|---|---|---|
| 1c | receiving, via said HFC network, a signal that carries a plurality of channels, wherein said channels comprise one or both of television channels and data channels; |  The Spectrum 210 receives, via said HFC network, a signal that carries a plurality of channels, wherein said channels comprise one or both of television channels and data channels.<br><br>Specifically, the Spectrum 210 receives the entire 1GHz downstream spectrum of a Spectrum cable plant. The 1 GHz cable spectrum includes a plurality of data and television channels. |
| 1d | digitizing said received signal to generate a digitized signal; | The Spectrum 210 digitizes said received signal to generate a digitized signal.<br><br>Specifically, the Spectrum 210 digitizes the entire 1GHz downstream spectrum it receives to generate a digitized signal. |

Image labels: BCM3384 SoC; HDMI Connector; Coaxial Connector

APPX294

**Exhibit K**

| # | U.S. Patent No. 9,825,826 | Spectrum Accused Services |
|---|---|---|
| 1e | selecting a first portion of said digitized signal; | The Spectrum 210 selects a first portion of said digitized signal.<br><br>Specifically, the Spectrum 210 includes advanced signal processing techniques that can be used to digitally tune multiple channels simultaneously, including to select a first portion of said digitized signal. |
| 1f | selecting a second portion of said digitized signal; | The Spectrum 210 selects a second portion of said digitized signal.<br><br>Specifically, the Spectrum 210 includes advanced signal processing techniques that can be used to digitally tune multiple channels simultaneously, including to select a second portion of said digitized signal. |
| 1g | processing said selected second portion of said digitized signal to recover information carried in said plurality of channels; | The Spectrum 210 process said selected second portion of said digitized signal to recover information carried in said plurality of channels.<br><br>Specifically, in the Spectrum 210, each digitally tuned channel then feeds the signal into a digital demodulator that outputs a transport stream for use in data or broadcast services. |
| 1h | analyzing said selected first portion of said digitized signal to measure a characteristic of said received signal; and | The Spectrum 210 analyzes said selected first portion of said digitized signal to measure a characteristic of said received signal.<br><br>Specifically, the Spectrum 210 includes remote diagnostics capabilities that provide real time, unobtrusive diagnostic and spectrum analysis capabilities. Upon information and belief, the Spectrum 210 includes a signal analyzer that analyzes said selected first portion to determine one or more characteristics of the received signal. |
| 1i | controlling the transmission of network management messages back to said headend based on said measured characteristic of said received signal, | The Spectrum 210 controls the transmission of network management messages back to said headend based on said measured characteristic of said received signal, wherein said measured characteristic is different than said network management messages.<br><br>Specifically, the Spectrum 210 includes remote diagnostics capabilities that provide real time, unobtrusive diagnostic and spectrum analysis capabilities. Upon information and belief, the |

**APPX295**

**Exhibit K**

| # | U.S. Patent No. 9,825,826 | Spectrum Accused Services |
|---|---|---|
| | wherein said measured characteristic is different than said network management messages. | Spectrum 210 controls the transmission of network management messages back to said headend based on said measured characteristic of said received signal. Upon information and belief, said measured characteristic is different than said network management messages |

APPX296

# EXHIBIT L

**Exhibit L**

**Exemplary Chart for the '682 Patent**
**Infringement of U.S. Patent No. 10,135,682 by Spectrum Accused Services**

| # | U.S. Patent No. 10,135,682 | Spectrum Accused Services |
|---|---|---|
| 1a | A method comprising: | The Accused Services perform the claimed method utilizing, for example, including a Cable Modem Termination System ("CMTS") operated by Spectrum and at least one cable modem located at each subscriber location, including, for example, the Spectrum PC20, and products that operate in a similar manner. By way of example, the Arris E6000 CMTS is charted herein. |
| 1b | determining, by a cable modem termination system (CMTS), for each cable modem served by said CMTS, a corresponding signal-to-noise ratio (SNR) related metric; | The Arris E6000 CMTS determines, for each cable modem served by said CMTS, a corresponding signal-to-noise ratio (SNR) related metric.<br><br>Spectrum started using Arris CMTS's as early as 2014, including the E6000, Arris' CMTS that added video edge QAM components and became a fully integrated Converged Cable Access Platform. The E6000's capabilities are described, for example, in the E6000 Manual.<br><br>Spectrum continues to use CMTSs like the E6000 to send and receive packets to downstream cable modems over the Internet. For the purposes of this analysis, the PC20 will be assessed. However, Spectrum's services are compatible with a variety of cable modems for consumers to utilize in conjunction with their services.<br><br>Cable modems, such as the PC20, include chips capable of receiving and transmitting performance data to the CMTS, such as Broadcom's BCM3390 system-on-a-chip ("SoC") |

Page 1 of 4

**APPX298**

Case 2:22-cv-00125-JRG   Document 53-12   Filed 01/10/23   Page 3 of 5 PageID #: 671

**Exhibit L**

| # | U.S. Patent No. 10,135,682 | Spectrum Accused Services |
|---|---|---|
| | |  Accordingly, cable modems, such as the PC20, are capable of bidirectional communications with upstream CMTSs, such as the E6000. Spectrum utilizes its CMTSs to determine a corresponding signal-to-noise ratio (SNR) related metric for each cable modem served by said CMTS. For example, according to the E6000 user manual, the CMTS utilizes a powerful spectral analysis engine built into every upstream receiver to gather detailed information about upstream channel noise. |

Page **2** of **4**

APPX299

## Exhibit L

| # | U.S. Patent No. 10,135,682 | Spectrum Accused Services |
|---|---|---|
| 1c | assigning, by said CMTS, each cable modem among a plurality of service groups based on a respective corresponding SNR-related metric; | A service group includes one or more modems. The Arris E6000 CMTS assigns each cable modem among a plurality of service groups based on a respective corresponding SNR-related metric.<br><br>Specifically, the Arris E6000 CMTS utilizes a process of profiling downstream modems. |
| 1d | generating, by said CMTS for each one of said plurality of service groups, a composite SNR-related metric based at least in part on a worst-case SNR profile of said SNR-related metrics corresponding to said one of said plurality of service groups; | The Arris E6000 CMTS generates, for each one of said plurality of service groups, a composite SNR-related metric based at least in part on a worst-case SNR profile of said SNR-related metrics corresponding to said one of said plurality of service groups.<br><br>Specifically, the Arris E6000 CMTS generates SNR-related metrics based on a worst-case SNR profile of each service group. For example, the Arris E6000 CMTS optimizes a modulation profile based on worst-case noise that is expected on the upstream channel and still achieve a reasonable level of performance. |
| 1e | selecting, by said CMTS, one or more physical layer communication parameter to be used for communicating with said one of said plurality of service groups based on said composite SNR-related metric; and | The Arris E6000 CMTS selects one or more physical layer communication parameter to be used for communicating with said one of said plurality of service groups based on said composite SNR-related metric.<br><br>Specifically, the Arris E6000 CMTS selects one or more physical layer communication parameters to be used for communicating, via a physical layer, with each service group of downstream modems. For example, the Arris E6000 CMTS selects one or more physical communication parameters that control modems in the various upstream channels, which have been configured via the modulation profiles. For example, when adding additional forward error correction to attempt to correct for upstream errors is no longer efficient, a lower modulation rate (e.g. a physical layer communication parameter) is applied to a particular service group. |

**APPX300**

Case 2:22-cv-00125-JRG   Document 53-12   Filed 01/10/23   Page 5 of 5 PageID #: 673

## Exhibit L

| # | U.S. Patent No. 10,135,682 | Spectrum Accused Services |
|---|---|---|
| 1f | communicating, by said CMTS, with one or more cable modems corresponding to said one of said plurality of service groups using said selected one or more physical layer communication parameter. | The Arris E6000 CMTS communicates with one or more cable modems corresponding to said one of the plurality of service groups using the selected one or more physical layer communication parameter.<br><br>Specifically, Spectrum communicates, via its CMTSs (such as the Arris E6000 CMTS), messages that include parameters that control cable modems in one of said plurality of service groups in the various upstream channels. These communications utilize the selected one or more physical layer communication parameters. |

APPX301

# Exhibit M

**K&L GATES**

April 27, 2022

James Shimota
Jim.shimota@klgates.com

T +1 312 807 4299
F +1 312 827 8000

Kirill Abramov
kirill.abramov@charter.com
Group Vice President and Associate General Counsel, Intellectual Property Law
Charter Communications, Inc.
400 Atlantic Street, 10th Floor
Stamford, CT 06901

Re:    **Entropic Communications LLC's Patents**

Dear Mr. Abramov:

I am outside legal counsel for Entropic Communications LLC ("Entropic").  Entropic's CEO, Boris Teksler, is writing to you directly.  In conjunction with his letter, Entropic has instructed me to write to you regarding Entropic's patent portfolio.

Entropic owns numerous patents as listed in Exhibit A attached hereto.  The portfolio represents a long and rich history of innovation.  You should evaluate this portfolio carefully, as Entropic is open to discussing appropriate licenses to the patents.

At present I draw your particular attention to six of these patents, selected because they are the subject of a lawsuit which will be filed today: U.S. Patent Nos. 8,223,775, 8,284,690, 8,792,008, 9,210,362, 9,825,826, and 10,135,682.  Your cable television services infringe certain claims of these patents, at least as set forth in the attached charts (Exhibits B to G).

We will forward to you a courtesy copy of the litigation complaint when it is filed.

As Entropic's CEO Mr. Teksler has written to you, Entropic remains willing to discuss a reasonable business resolution to this issue. Please contact him or myself at your convenience and we will be happy to discuss.

Very truly yours,

*James A. Shimota*

James Shimota

K&L GATES LLP
70 W. MADISON ST.  SUITE 3100  CHICAGO  IL 60602
T +1 312 807 4299  F +1 312 827 8000  klgates.com

**APPX303**

Exhibit A - Entropic Patents

6552738
7116712
7130576
7130576
7154957
7236757
7271640
7295518
7295623
7403752
7428238
7477871
7499397
7522875
7526264
7542411
7542715
7558551
7573822
7594249
7724639
7783958
7889759
7941091
7995459
8009725
8010070
8023912
8085802
8086170
8176181
8179920
8223775
8228910
8266265
8284690
8300681
8320566
8340125
8345798
8351368

**APPX304**

8352569
8363681
8411565
8416685
8418036
8427944
8466850
8468200
8472912
8483152
8498294
8526898
8548034
8548411
8553727
8566678
8587722
8588055
8588250
8593983
8611483
8621539
8631450
8634498
8638808
8677441
8681900
8688064
8699704
8711848
8725104
8750298
8767554
8767607
8787430
8788728
8792008
8792565
8797220
8799964
8824270
8831015
8861357

**APPX305**

8891544
8892026
8892225
8892926
8913626
8913635
8934590
8964903
8981977
8990864
9008077
9008571
9014649
9042433
9042851
9043855
9100088
9100622
9106554
9112803
9172993
9178765
9184872
9191461
9203535
9203653
9209957
9210062
9210362
9210363
9219557
9223382
9225426
9247274
9258621
9264074
9270401
9294297
9300468
9306595
9326090
9344262
9391822

**APPX306**

9407369
9413476
9413632
9414184
9419858
9432104
9436271
9461742
9484986
9509422
9549222
9559835
9560477
9565012
9565469
9571779
9571885
9577886
9621367
9647687
9647817
9668018
9680503
9692859
9693175
9712236
9749088
9755728
9780962
9787566
9794823
9800451
9806765
9813999
9819698
9819992
9825826
9838213
9853757
9853865
9860144
9866438
9871892

**APPX307**

9875196
9877062
9883260
9888294
9894426
9906508
9913082
9923652
9929871
9936262
9936417
9941986
9942598
9985777
9991906
9998270
10009189
10015000
10020820
10033484
10051406
10063436
10075333
10091133
10103776
10104083
10104572
10122543
10129048
10135682
10142256
10148480
10182274
10193645
10211936
10230515
10244283
10250724
10251043
10256898
10257566
10263801
10264432

**APPX308**

10270710
10271118
10271192
10284386
10284899
10285116
10292068
10298413
10313489
10313496
10313733
10324871
10356584
10356585
10374879
10432262
10432422
10439746
10439911
10454653
10469166
10491331
10498768
10574261
10575073
10594566
10594672
10659103
10659296
10715461
10756923
10771278
10812223
10848340
10862702
10965429
10972781
11121789
11133893
11139902
11153415

**APPX309**

# EXHIBIT B

**Exhibit B**

**Exemplary Chart for the '775 Patent**

**Infringement of U.S. Patent No. 8,223,775 by Spectrum Accused Services**

| # | U.S. Patent No. 8,223,775 | Spectrum Accused Services |
|---|---|---|
| 18a | A cable modem system comprising: | The Accused Services are provided by the claimed cable modem system by utilizing, for example, at least one cable modem located at each subscriber location, including, for example, the Spectrum PC20 and Arris SB6183, and products that operate in a similar manner. By way of example, the Spectrum PC20 is charted herein. |
| 18b | a data networking engine implemented in a first circuit that includes at least one processor, the data networking engine programmed with software that when executed by the at least one processor of the first circuit causes the data networking engine to perform home networking functions including interfacing with customer provided equipment; | The Spectrum PC20 includes a data networking engine implemented in a first circuit that includes at least one processor, the data networking engine programmed with software that when executed by the at least one processor of the first circuit causes the data networking engine to perform home networking functions including interfacing with customer provided equipment.<br><br>Specifically, the Spectrum PC20 includes a Broadcom BCM3390 SoC. |

Page 1 of 4

**APPX311**

**Exhibit B**

| # | U.S. Patent No. 8,223,775 | Spectrum Accused Services |
|---|---|---|
| **18c** | a cable modem engine implemented in a second circuit that includes at least | The Spectrum PC20, via the Broadcom BCM3390, has a dedicated cable modem CPU, a dedicated multi-threaded applications processor, and multiple hardware off-load engines. The multi-threaded applications processor implements a data networking engine. The data networking engine performs home networking functions including interfacing with customer provided equipment.<br><br>The Spectrum PC20 has a cable modem engine implemented in a second circuit that includes at least one processor, the second circuit being separate from the first circuit, the cable modem engine programmed with software that when executed by the at least one |

Page **2** of **4**

**APPX312**

## Exhibit B

| # | U.S. Patent No. 8,223,775 | Spectrum Accused Services |
|---|---|---|
| | one processor, the second circuit being separate from the first circuit, the cable modem engine programmed with software that when executed by the at least one processor of the second circuit causes the cable modem engine to perform cable modem functions other than the home networking functions performed by the data networking engine, the cable modem functions including interfacing with cable media, and the cable modem engine configured to enable upgrades to its software in a manner that is independent of upgrades to the software of the data networking engine, the cable modem engine including a DOCSIS controller and a DOCSIS MAC processor, the DOCSIS MAC processor configured to process downstream PDU packets | processor of the second circuit causes the cable modem engine to perform cable modem functions other than the home networking functions performed by the data networking engine, the cable modem functions including interfacing with cable media, and the cable modem engine configured to enable upgrades to its software in a manner that is independent of upgrades to the software of the data networking engine, the cable modem engine including a DOCSIS controller and a DOCSIS MAC processor, the DOCSIS MAC processor configured to process downstream PDU packets and forward the processed packets directly to the data networking engine without the involvement of the DOCSIS controller in order to boost downstream throughput.

Specifically, the Spectrum PC20 has a dedicated cable modem CPU, a dedicated multi-threaded applications processor, and multiple hardware off-load engines. The cable modem CPU provides a cable modem engine. The cable modem CPU is separate from the multi-threaded applications processor and the hardware off-load engines. Accordingly, upgrades to the cable modem engine are independent of upgrades to the data networking engine. The cable modem CPU implements the cable modem engine. Upon information and belief, the cable modem engine includes a DOCSIS controller and a DOCSIS MAC processor, the DOCSIS MAC processor configured to process downstream PDU packets and forward the processed packets directly to the data networking engine without the involvement of the DOCSIS controller in order to boost downstream throughput |

## Exhibit B

| # | U.S. Patent No. 8,223,775 | Spectrum Accused Services |
|---|---|---|
| | and forward the processed packets directly to the data networking engine without the involvement of the DOCSIS controller in order to boost downstream throughput; and | |
| 18d | a data bus that connects the data networking engine to the cable modem engine, wherein the cable modem functions performed by the cable modem engine are completely partitioned from the home networking functions performed by the data networking engine. | The Spectrum PC20 has a data bus that connects the data networking engine to the cable modem engine, wherein the cable modem functions performed by the cable modem engine are completely partitioned from the home networking functions performed by the data networking engine. Specifically, the Spectrum PC20 has a dedicated cable modem CPU, a dedicated multi-threaded applications processor, and multiple hardware off-load engines.  The multi-threaded applications processor provides the data networking engine and the cable modem CPU provides the cable modem engine.  The cable modem CPU is separate from, the multi-threaded applications processor. Accordingly, the cable modem functions performed by the cable modem engine are completely partitioned from the home networking functions performed by the data networking engine. The cable modem CPU communicates with the multi-threaded applications processor using a data bus. Accordingly, the data bus connects the data networking engine and the cable modem engine. |
| 19 | A cable modem system as claimed in claim 18, wherein all DOCSIS functions are localized in the cable modem engine. | In the Spectrum PC20, all DOCSIS functions are localized in the cable modem engine. Specifically, the Spectrum PC20 includes a dedicated cable modem CPU, a dedicated multi-threaded applications processor, and multiple hardware off-load engines.  The DOCSIS functions are localized in the cable modem CPU. |

**APPX314**

# EXHIBIT C

Case 2:22-cv-00125-JRG   Document 53-13   Filed 01/10/23   Page 15 of 39 PageID #: 688

**Exhibit C**

**Exemplary Chart for the '690 Patent**

**Infringement of U.S. Patent No. 8,284,690 by Spectrum Accused Services**

| # | U.S. Patent No. 8,284,690 | Spectrum Accused Services |
|---|---|---|
| **1pre** | A method comprising: | The Accused Services perform the claimed method utilizing, for example, including a Cable Modem Termination System ("CMTS") operated by Spectrum and at least one cable modem located at each subscriber location, including, for example, the Spectrum PC20, and products that operate in a similar manner. By way of example, the Spectrum PC20 is charted herein. |
| **1a** | a) receiving in a first node, a probe request specifying a first plurality of parameters associated with the generation and transmission of a probe, wherein the first plurality of parameters at least specify content payload of the probe and a second node; | The Accused Services include receiving in a first node, a probe request specifying a first plurality of parameters associated with the generation and transmission of a probe, wherein the first plurality of parameters at least specify content payload of the probe and a second node.

Specifically, the Spectrum PC20 samples and digitizes the entire 1GHz downstream spectrum of a cable plant and includes remote diagnostics capabilities that provide real time, unobtrusive diagnostic and spectrum analysis capabilities. These remote diagnostic capabilities include measuring statistics of the downstream spectrum. The Spectrum PC20 provides an agent that receives requests querying the performance of the downstream spectrum from a second node. Upon information and belief, the requests include the first plurality of parameters that at least specify content payload of the probe and the second node. For example, in a deployed system, the first node may be a cable modem and the second node may be a CMTS. |
| **1b** | b) determining a second plurality of parameters associated with | The Spectrum PC20 determines a second plurality of parameters associated with generation and transmission of the probe. |

APPX316

## Exhibit C

| # | U.S. Patent No. 8,284,690 | Spectrum Accused Services |
|---|---|---|
| | generation and transmission of the probe; | Specifically, the Spectrum PC20 determines information responsive to the received request based on the measured statistics of the downstream spectrum. Upon information and belief, the information includes a second plurality of parameters associated with the generation and transmission of the probe. |
| 1c | c) generating the probe in accordance with the first plurality of parameters and the second plurality of parameters, wherein the probe has a form dictated by the first plurality of parameters; and | The Spectrum PC20 generates the probe in accordance with the first plurality of parameters and the second plurality of parameters, wherein the probe has a form dictated by the first plurality of parameters.<br><br>Specifically, the Spectrum PC20 generates a message responsive to the received request, the message indicating the responsive information and having a particular form determined by the request. |
| 1d | d) transmitting the probe from the first node to the second node. | The Spectrum PC20 transmits the probe from the first node to the second node.<br><br>Specifically, the Spectrum PC20 transmits the message to the second node using its agent. |
| 7 | The method of claim 1, wherein the probe request requests a probe that assists in diagnosing a network problem. | The probe request requests a probe that assists in diagnosing a network problem.<br><br>Specifically, the Spectrum PC20 includes remote diagnostics capabilities that provide real time, unobtrusive diagnostic and spectrum analysis capabilities related to diagnosing network problems. Upon information and belief, Spectrum utilizes these remote diagnostic capabilities to assist in diagnosing a network problem. |
| | | |

APPX317

## Exhibit C

| # | U.S. Patent No. 8,284,690 | Spectrum Accused Services |
|---|---|---|
| 8 | The method of claim 7, wherein the probe request is generated by a network operator and uploaded to the second node. | The probe request is generated by a network operator and uploaded to the second node.<br><br>Specifically, a collector server operated by Spectrum provides the probe request to the second node. |
| 9pre | A method comprising: | The Accused Services perform the claimed method utilizing, for example, including a Cable Modem Termination System ("CMTS") operated by Spectrum and at least one cable modem located at each subscriber location, including, for example, the Spectrum PC20, and products that operate in a similar manner. By way of example, the Arris E6000 CMTS is charted herein. |
| 9a | a) a first node transmitting a probe request to a second node, the probe request specifying a first plurality of probe parameters for a physical layer probe, the first plurality of probe parameters comprising a form for the probe; | The Spectrum Services include a first node transmitting a probe request to a second node, the probe request specifying a first plurality of probe parameters for a physical layer probe, the first plurality of probe parameters comprising a form for the probe including a modulation profile for the probe.<br><br>Specifically, the Arris E6000 provides a set of SNMP (Simple Network Management Protocol) variables supported by the Arris E6000 known collectively as the MIB (Management Information Base). The MIBs includes support for per modem/per upstream channel stats, RCC definitions, per MAC event handling, per modem event handling and counts, and per modem impairment reporting. The Arris E6000 transmits, to cable modems, requests specifying parameters as defined in the MIBs. The requests have a modulation profile. For example, in a deployed system, the first node may be at least a CMTS and the second node may be a cable modem. |

**Exhibit C**

| # | U.S. Patent No. 8,284,690 | Spectrum Accused Services |
|---|---|---|
| 9b | b) the first node receiving the probe from the second node, wherein the probe is generated in accordance with the first plurality of parameters and in accordance with a second plurality of parameters determined by the second node. | The Arris E6000 receives the probe from the second node, wherein the probe is generated in accordance with the first plurality of parameters and in accordance with a second plurality of parameters determined by the second node.<br><br>Specifically, the Arris E6000 receives, from the cable modems, messages responsive to the requests. The message includes data relevant to the request and generated based on the MIBs. |
| 11pre | The method of claim 9, further comprising: | See 9pre. |
| 11a | a) the first node transmitting a second probe request to a third node; | See 9a. |
| 11b | b) and the first node receiving a second probe from the third node, wherein the second probe is generated according to the second probe request; and | See 9b. |
| 11d | wherein the first probe and second probe are transmitted simultaneously using OFDMA. | The first probe and second probe are transmitted simultaneously using OFDMA. |
| 15 | The method of claim 9, wherein the probe request is configured to diagnose a network problem. | The probe request is configured to diagnose a network problem.<br><br>Upon information and belief, Spectrum utilizes these remote diagnostic capabilities to assist in diagnosing a network problem. For example, the MIBs may include support for per modem/per upstream channel stats, |

## Exhibit C

| # | U.S. Patent No. 8,284,690 | Spectrum Accused Services |
|---|---|---|
| | | RCC definitions, per MAC event handling, per modem event handling and counts, and per modem impairment reporting, which can be used to diagnose a network problem. |
| 16 | The method of claim 15, wherein the probe request is generated by a network operator and uploaded to the first node. | The probe request is generated by a network operator and uploaded to the first node.<br><br>Specifically, a collector server operated by Spectrum can provide the probe request to the first node. |

Page **5** of **5**

APPX320

# EXHIBIT D

**Exhibit D**

**Exemplary Chart for the '008 Patent**
**Infringement of U.S. Patent No. 8,792,008 by Spectrum Accused Services**

| # | U.S. Patent No. 8,792,008 | Spectrum Accused Services |
|---|---|---|
| **1a** | 1. A system comprising: | The Accused Services are provided by the claimed system by utilizing, for example, the Accused Set Top Products, which include at least one set top box ("STB") located at each subscriber location, including, for example, the Spectrum 100-series STBs, Spectrum 200-series STBs, Spectrum 101-series STBs, Spectrum 201-series STBs, Spectrum 110-series STBs, Spectrum 210-series STBs, the Arris DCX3600 STB, and products that operate in a similar manner. By way of example, the Spectrum 210 (specifically the Spectrum 210-T) is charted herein. |
| **1b** | an analog-to-digital converter operable to digitize a received signal spanning an entire television spectrum comprising a plurality of television channels, said digitization resulting in a digitized signal; | The Spectrum 210 has an analog-to-digital converter operable to digitize a received signal spanning an entire television spectrum comprising a plurality of television channels, said digitization resulting in a digitized signal.

Specifically, the Spectrum 210 has an analog to digital converter: |

**APPX322**

Case 2:22-cv-00125-JRG    Document 53-13    Filed 01/10/23    Page 22 of 39 PageID #: 695

**Exhibit D**

| | | |
|---|---|---|
| | | |
| **1c** | a signal monitor operable to: |  The Spectrum 210 receives the entire 1GHz downstream spectrum of a Spectrum cable plant. The 1 GHz cable spectrum includes a plurality of television channels. The Spectrum 210 digitizes the entire received signal; the digitization results in a digitized signal.<br><br>The Spectrum 210 has a signal monitor: |

Page **2** of **6**

APPX323

**Exhibit D**



| | | |
|---|---|---|
| **1d** | analyze said digitized signal to determine a characteristic of said digitized signal; and | The Spectrum 210 analyzes said digitized signal to determine a characteristic of said digitized signal.<br><br>Specifically, the Spectrum 210 includes remote diagnostics capabilities that provide real time, unobtrusive diagnostic and spectrum analysis capabilities. Upon information and belief, the Spectrum 210 analyzes, using the signal monitor, said digitized signal to determine a characteristic of said digitized signal. |
| **1e** | report said determined characteristic to a source of said received signal; | The Spectrum 210 reports said determined characteristic to a source of said received signal. |

Page **3** of **6**

**Exhibit D**

| | | |
|---|---|---|
| **1f** | a data processor operable to process a television channel to recover content carried on the television channel; and | Specifically, the Spectrum 210 includes remote diagnostics capabilities that provide real time, unobtrusive diagnostic and spectrum analysis capabilities. Upon information and belief, the Spectrum 210 reports said determined characteristic to a source of said received signal.<br><br>The Spectrum 210 has a data processor operable to process a television channel to recover content carried on the television channel:<br><br> |
| **1g** | a channelizer operable to: | Specifically, in the Spectrum 210, each digitally tuned television channel is provided to a digital demodulator that outputs a transport stream for use in broadcast services.<br><br>The Spectrum 210 has a channelizer: |

Page **4** of **6**

APPX325

## Exhibit D



| | | |
|---|---|---|
| 1h | select a first portion of said digitized signal; | The Spectrum 210 selects a first portion of said digitized signal.<br><br>Specifically, the Spectrum 210 includes advanced signal processing techniques that can be used to digitally tune multiple channels simultaneously, including selecting a first portion of said digitized signal. |
| 1i | select a second portion of said digitized signal; and | The Spectrum 210 selects a second portion of said digitized signal.<br><br>Specifically, the Spectrum 210 includes advanced signal processing techniques that can be used to digitally tune multiple channels simultaneously, including selecting a second portion of said digitized signal. |

Page **5** of **6**

APPX326

**Exhibit D**

| 1j | concurrently output said first portion of said digitized signal to said signal monitor and said second portion of said digitized signal to said data processor. | The Spectrum 210 concurrently outputs said first portion of said digitized signal to said signal monitor and said second portion of said digitized signal to said data processor.<br><br>Specifically, the Spectrum 210 includes remote diagnostics capabilities that provide real time, unobtrusive diagnostic and spectrum analysis capabilities without affecting user service on any downstream channels. As described above, the first portion of said digitized signal is output to said signal monitor and said second portion of said digitized signal is output to said data processor. Accordingly, the Spectrum 210 concurrently outputs said first portion of said digitized signal to said signal monitor and said second portion of said digitized signal to said data processor. |
| 2 | 2. The system of claim 1, wherein said first portion of said digitized signal spans said entire television spectrum. | See 1h. |

**APPX327**

# EXHIBIT E

**Exhibit E**

**Exemplary Chart for the '362 Patent**

**Infringement of U.S. Patent No. 9,210,362 by Spectrum Accused Services**

| # | U.S. Patent No. 9,210,362 | Spectrum Accused Services |
|---|---|---|
| **11a** | A method comprising: | The Accused Services perform the claimed method utilizing, for example, the Accused Set Top Products, which include at least one set top box ("STB") located at each subscriber location, including, for example, the Spectrum 100-series STBs, Spectrum 200-series STBs, Spectrum 101-series STBs, Spectrum 201-series STBs, Spectrum 110-series STBs, Spectrum 210-series STBs, the Arris DCX3600 STB, and products that operate in a similar manner. By way of example, the Spectrum 210 (specifically the Spectrum 210-T) is charted herein. |
| **11b** | in a wideband receiver system: | The Spectrum 210 is a wideband receiver system. |
| **11c** | downconverting, by a mixer module of said wideband receiver system, a plurality of frequencies that comprises a plurality of desired television channels and a plurality of undesired television channels; | The Spectrum 210 downconverts, by a mixer module of said wideband receiver system, a plurality of frequencies that comprises a plurality of desired television channels and a plurality of undesired television channels.  Specifically, the Spectrum 210 includes advanced signal processing techniques, including a mixer, that can be used to downconvert a plurality of frequencies that comprises a plurality of desired television channels and a plurality of undesired television channels. |
| **11d** | digitizing, by a wideband analog-to-digital converter (ADC) module of said wideband receiver system, said plurality of frequencies comprising said plurality of desired television channels and said plurality of undesired television channels; | The Spectrum 210 digitizes, by a wideband analog-to-digital converter (ADC) module of said wideband receiver system, said plurality of frequencies comprising said plurality of desired television channels and said plurality of undesired television channels.  Specifically, the Spectrum 210 digitizes the entire 1GHz downstream spectrum of a Spectrum cable plant. The 1 GHz cable spectrum includes a plurality of desired and undesired television channels. |

## Exhibit E

| 11e | selecting, by digital circuitry of said wideband receiver system, said plurality of desired television channels from said digitized plurality of frequencies; and | The Spectrum 210s select, by digital circuitry of said wideband receiver system, said plurality of desired television channels from said digitized plurality of frequencies as described below:<br><br>Specifically, the Spectrum 210 includes advanced signal processing techniques that can be used to digitally tune multiple channels simultaneously, including to select the plurality of desired television channels from the digitized plurality of frequencies. |
| --- | --- | --- |
| 11f | outputting, by said digital circuitry of said wideband receiver system, said selected plurality of television channels to a demodulator as a digital datastream. | The Spectrum 110 and Spectrum 210 output, by said digital circuitry of said wideband receiver system, said selected plurality of television channels to a demodulator as a digital datastream.<br><br>Specifically, in the Spectrum 210, the digitally tuned and selected plurality of desired television channels are then fed into a digital demodulator that outputs a transport stream for use in broadcast services. |

**APPX330**

# EXHIBIT F

**Exhibit F**

**Exemplary Chart for the '826 Patent**
**Infringement of U.S. Patent No. 9,825,826 by Spectrum Accused Services**

| # | U.S. Patent No. 9,825,826 | Spectrum Accused Services |
|---|---|---|
| **1a** | A method comprising: | The Accused Services perform the claimed method utilizing, for example, the Accused Set Top Products, which include at least one set top box ("STB") located at each subscriber location, including, for example, the Spectrum 100-series STBs, Spectrum 200-series STBs, Spectrum 101-series STBs, Spectrum 201-series STBs, Spectrum 110-series STBs, Spectrum 210-series STBs, the Arris DCX3600 STB, and products that operate in a similar manner. By way of example, the Spectrum 210 (specifically the Spectrum 210-T) is charted herein. |
| **1b** | performing by one or more circuits of a receiver coupled to a television and data service provider headend via a hybrid fiber coaxial (HFC) network: | The Spectrum 210 includes one or more circuits of a receiver coupled to a television and data service provider headend via a hybrid fiber coaxial (HFC) network, that perform the claimed steps, as described below: |

Page 1 of 4

**APPX332**

**Exhibit F**

| # | U.S. Patent No. 9,825,826 | Spectrum Accused Services |
|---|---|---|
| 1c | receiving, via said HFC network, a signal that carries a plurality of channels, wherein said channels comprise one or both of television channels and data channels; | The Spectrum 210 receives, via said HFC network, a signal that carries a plurality of channels, wherein said channels comprise one or both of television channels and data channels.<br><br>Specifically, the Spectrum 210 receives the entire 1GHz downstream spectrum of a Spectrum cable plant. The 1 GHz cable spectrum includes a plurality of data and television channels.<br><br> |
| 1d | digitizing said received signal to generate a digitized signal; | The Spectrum 210 digitizes said received signal to generate a digitized signal.<br><br>Specifically, the Spectrum 210 digitizes the entire 1GHz downstream spectrum it receives to generate a digitized signal. |

Page 2 of 4

**APPX333**

**Exhibit F**

| # | U.S. Patent No. 9,825,826 | Spectrum Accused Services |
|---|---|---|
| 1e | selecting a first portion of said digitized signal; | The Spectrum 210 selects a first portion of said digitized signal.<br><br>Specifically, the Spectrum 210 includes advanced signal processing techniques that can be used to digitally tune multiple channels simultaneously, including to select a first portion of said digitized signal. |
| 1f | selecting a second portion of said digitized signal; | The Spectrum 210 selects a second portion of said digitized signal.<br><br>Specifically, the Spectrum 210 includes advanced signal processing techniques that can be used to digitally tune multiple channels simultaneously, including to select a second portion of said digitized signal. |
| 1g | processing said selected second portion of said digitized signal to recover information carried in said plurality of channels; | The Spectrum 210 process said selected second portion of said digitized signal to recover information carried in said plurality of channels.<br><br>Specifically, in the Spectrum 210, each digitally tuned channel then feeds the signal into a digital demodulator that outputs a transport stream for use in data or broadcast services. |
| 1h | analyzing said selected first portion of said digitized signal to measure a characteristic of said received signal; and | The Spectrum 210 analyzes said selected first portion of said digitized signal to measure a characteristic of said received signal.<br><br>Specifically, the Spectrum 210 includes remote diagnostics capabilities that provide real time, unobtrusive diagnostic and spectrum analysis capabilities. Upon information and belief, the Spectrum 210 includes a signal analyzer that analyzes said selected first portion to determine one or more characteristics of the received signal. |
| 1i | controlling the transmission of network management messages back to said headend based on said measured characteristic of said received signal, | The Spectrum 210 controls the transmission of network management messages back to said headend based on said measured characteristic of said received signal, wherein said measured characteristic is different than said network management messages.<br><br>Specifically, the Spectrum 210 includes remote diagnostics capabilities that provide real time, unobtrusive diagnostic and spectrum analysis capabilities. Upon information and belief, the |

**APPX334**

**Exhibit F**

| # | U.S. Patent No. 9,825,826 | Spectrum Accused Services |
|---|---|---|
| | wherein said measured characteristic is different than said network management messages. | Spectrum 210 controls the transmission of network management messages back to said headend based on said measured characteristic of said received signal. Upon information and belief, said measured characteristic is different than said network management messages |

Page **4** of **4**

**APPX335**

# EXHIBIT G

**Exhibit G**

**Exemplary Chart for the '682 Patent**

**Infringement of U.S. Patent No. 10,135,682 by Spectrum Accused Services**

| # | U.S. Patent No. 10,135,682 | Spectrum Accused Services |
|---|---|---|
| 1a | A method comprising: | The Accused Services perform the claimed method utilizing, for example, including a Cable Modem Termination System ("CMTS") operated by Spectrum and at least one cable modem located at each subscriber location, including, for example, the Spectrum PC20, and products that operate in a similar manner. By way of example, the Arris E6000 CMTS is charted herein. |
| 1b | determining, by a cable modem termination system (CMTS), for each cable modem served by said CMTS, a corresponding signal-to-noise ratio (SNR) related metric; | The Arris E6000 CMTS determines, for each cable modem served by said CMTS, a corresponding signal-to-noise ratio (SNR) related metric.

Spectrum started using Arris CMTS's as early as 2014, including the E6000, Arris' CMTS that added video edge QAM components and became a fully integrated Converged Cable Access Platform. The E6000's capabilities are described, for example, in the E6000 Manual.

Spectrum continues to use CMTSs like the E6000 to send and receive packets to downstream cable modems over the Internet. For the purposes of this analysis, the PC20 will be assessed. However, Spectrum's services are compatible with a variety of cable modems for consumers to utilize in conjunction with their services.

Cable modems, such as the PC20, include chips capable of receiving and transmitting performance data to the CMTS, such as Broadcom's BCM3390 system-on-a-chip ("SoC") |

Case 2:22-cv-00125-JRG   Document 53-13   Filed 01/10/23   Page 37 of 39 PageID #: 710

## Exhibit G

| # | U.S. Patent No. 10,135,682 | Spectrum Accused Services |
|---|---|---|
| | |  Accordingly, cable modems, such as the PC20, are capable of bidirectional communications with upstream CMTSs, such as the E6000.<br><br>Spectrum utilizes its CMTSs to determine a corresponding signal-to-noise ratio (SNR) related metric for each cable modem served by said CMTS. For example, according to the E6000 user manual, the CMTS utilizes a powerful spectral analysis engine built into every upstream receiver to gather detailed information about upstream channel noise. |

Page **2** of **4**

## Exhibit G

| # | U.S. Patent No. 10,135,682 | Spectrum Accused Services |
|---|---|---|
| 1c | assigning, by said CMTS, each cable modem among a plurality of service groups based on a respective corresponding SNR-related metric; | A service group includes one or more modems. The Arris E6000 CMTS assigns each cable modem among a plurality of service groups based on a respective corresponding SNR-related metric.<br><br>Specifically, the Arris E6000 CMTS utilizes a process of profiling downstream modems. |
| 1d | generating, by said CMTS for each one of said plurality of service groups, a composite SNR-related metric based at least in part on a worst-case SNR profile of said SNR-related metrics corresponding to said one of said plurality of service groups; | The Arris E6000 CMTS generates, for each one of said plurality of service groups, a composite SNR-related metric based at least in part on a worst-case SNR profile of said SNR-related metrics corresponding to said one of said plurality of service groups.<br><br>Specifically, the Arris E6000 CMTS generates SNR-related metrics based on a worst-case SNR profile of each service group. For example, the Arris E6000 CMTS optimizes a modulation profile based on worst-case noise that is expected on the upstream channel and still achieve a reasonable level of performance. |
| 1e | selecting, by said CMTS, one or more physical layer communication parameter to be used for communicating with said one of said plurality of service groups based on said composite SNR-related metric; and | The Arris E6000 CMTS selects one or more physical layer communication parameter to be used for communicating with said one of said plurality of service groups based on said composite SNR-related metric.<br><br>Specifically, the Arris E6000 CMTS selects one or more physical layer communication parameters to be used for communicating, via a physical layer, with each service group of downstream modems. For example, the Arris E6000 CMTS selects one or more physical communication parameters that control modems in the various upstream channels, which have been configured via the modulation profiles. For example, when adding additional forward error correction to attempt to correct for upstream errors is no longer efficient, a lower modulation rate (e.g. a physical layer communication parameter) is applied to a particular service group. |

Page 3 of 4

Case 2:22-cv-00125-JRG   Document 53-13   Filed 01/10/23   Page 39 of 39 PageID #: 712

**Exhibit G**

| # | U.S. Patent No. 10,135,682 | Spectrum Accused Services |
|---|---|---|
| 1f | communicating, by said CMTS, with one or more cable modems corresponding to said one of said plurality of service groups using said selected one or more physical layer communication parameter. | The Arris E6000 CMTS communicates with one or more cable modems corresponding to said one of the plurality of service groups using the selected one or more physical layer communication parameter.<br><br>Specifically, Spectrum communicates, via its CMTSs (such as the Arris E6000 CMTS), messages that include parameters that control cable modems in one of said plurality of service groups in the various upstream channels. These communications utilize the selected one or more physical layer communication parameters. |

Page **4** of **4**

APPX340

# EXHIBIT N



Kirill Abramov

kirill.abramov@charter.com

*Group Vice President and Associate General Counsel, Intellectual Property Law*

Charter Communications, Inc.

400 Atlantic Street, 10th Floor

Stamford, CT 06901

**Re:    Discussion to License the Patents of Entropic Communications LLC**

Dear Mr. Abramov:

My name is Boris Teksler, the CEO of Entropic Communications LLC ("Entropic"). Entropic owns a large portfolio of patents including foundational patents relating to cable television systems. These patents represent, in part, the cutting edge development of Anton Monk, Itzhak Gurantz, Ladd El Wardani and others relating to the processing of cable television signals. I have asked Entropic's legal counsel at K&L Gates LLP to provide you a complete list of the patents owned by Entropic.

Entropic is committed to protecting the legacy of the investment that these patents represent, in particular the technology that was developed and commercialized resulting from the research leading to its patents. At present, I draw your attention to six patents: U.S. Patent Nos. 8,223,775, 8,284,690, 8,792,008, 9,210,362, 9,825,826, and 10,135,682. These patents are the subject of a patent infringement action Entropic will file today.

Although Entropic has taken the step of formally filing litigation to protect its rights, I look forward to discussing with you other methods to resolve Charter's

unauthorized utilization of Entropic's patents. For the majority of my career, I have worked on behalf of large Fortune 100 companies, such as Hewlett-Packard and Apple, and more recently small companies at a different stage of their life cycle, such as Entropic, to implement creative and mutually agreeable solutions to intellectual property issues.

Please forward this letter to whomever else within the Charter family of companies may be relevant, and reach out to me whenever convenient to discuss. I look forward to it.

Very truly yours,

Boris Teksler

CEO of Entropic Communications, LLC

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

ENTROPIC COMMUNICATIONS, LLC,

      Plaintiff

        v.

CHARTER COMMUNICATIONS, INC.;
SPECTRUM ADVANCED SERVICES, LLC; AND
SPECTRUM MANAGEMENT HOLDING
COMPANY, LLC,

      Defendants.

Civil Action No. 2:22-cv-00125-JRG

**JURY TRIAL DEMANDED**

**DEFENDANT CHARTER COMMUNICATIONS, INC.'S
MOTION TO DISMISS THE SECOND AMENDED COMPLAINT FOR
IMPROPER VENUE PURSUANT TO FRCP 12(b)(3)**

███████████████████████

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION ...................................................................................1

II.   STATEMENT OF THE ISSUES...........................................................2

III.  STATEMENT OF THE FACTS .............................................................2

      A.    CCI Does Not Reside in Texas ..................................................2

      B.    CCI Does Not Have a Physical Presence in the District...........3

            1.    CCI Does Not Provide Any Services in Texas ...............3

            2.    The Spectrum Brand .......................................................4

            3.    CCI Does Not Have Any Employees in Texas...............4

            4.    CCI Does Not Own, Lease, Maintain, or Operate Property in Texas..........5

            5.    CCI Does Not Own or Lease Any Equipment in Texas ............................5

      C.    CCI Subsidiaries Perform Distinct Business Functions............6

      D.    CCI is the Manager of the Limited Liability Companies, Including SGC .............7

      E.    CCI Maintains Corporate Records Separate from the LLC Subsidiaries .............10

IV.   LEGAL STANDARD...........................................................................10

      A.    Entropic Has The Burden of Establishing Venue is Proper....................10

      B.    Venue in Patent Cases............................................................10

V.    ARGUMENT .......................................................................................11

      A.    Venue Is Improper As To CCI .................................................12

            1.    CCI Does Not Reside in this District.........................12

            2.    CCI Has No Regular and Established Place of Business in this District...12

                  (a)    CCI Has No Physical Place of Business in the District................13

                  (b)    CCI Has No Employees or Agents Conducting Business in the District...........................13

**APPX345**

(c)    CCI Has No Regular and Established Place of Business in the District............................................................................................16

B.    The Presence and Activities of SGC Cannot Be Imputed To CCI To Establish Venue ..............................................................................................................17

VI.    CONCLUSION...........................................................................................20

**APPX346**

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Ambraco, Inc. v. Bossclip B.V.*,
    570 F.3d 233 (5th Cir. 2009) ...............................................................11

*Andra Grp., LP v. Victoria's Secret Stores, LLC*,
    6 F.4th 1283 (Fed. Cir. 2021) ...............................................14, 15, 17, 19

*Bd. Of Regents v. Medtronic PLC.*,
    No. 17-CV-0942, 2018 WL 4179080 (W.D. Tex. July 19, 2018) ...........19

*Blue Spike, LLC v. Nook Dig., LLC*,
    No. 6:16-CV-1361-RWSJDL, 2017 WL 3263871 (E.D. Tex. July 28, 2017),
    *report and recommendation adopted sub nom. Blue Spike, LLC v. Caterpillar,
    Inc.*, 2017 WL 4129321 (E.D. Tex. Sept. 19, 2017).......................17, 19

*Cannon Mfg. Co. v. Cudahy Packing Co.*,
    267 U.S. 333 (1925).............................................................................19

*Celgene Corp. v. Mylan Pharm. Inc.*,
    17 F. 4th 1111 (Fed. Cir. 2021) ...........................................................17

*Hargrave v. Fibreboard Corp.*,
    710 F.2d 1154 (5th Cir. 1983) .............................................................18

*Home Ins. Co. v. Thomas Indus., Inc.*,
    896 F.2d 1352 (11th Cir. 1990) ...........................................................11

*In re Cordis Corp.*,
    769 F.2d 733 (Fed. Cir. 1985)..............................................................12

*In re Cray Inc.*,
    871 F.3d 1355 (Fed. Cir. 2017)...........................................10, 12, 13, 16

*In re Google*,
    949 F.3d 1338 (Fed. Cir. 2020)...........................................................13, 14

*In re Volkswagen Grp. of America, Inc.*,
    28 F.4th 1203 (Fed. Cir. 2022) ...........................................................15

*In re ZTE (USA) Inc.*,
    890 F.3d 1008 (Fed. Cir. 2018)............................................................10

*Interactive Toybox, LLC v. The Walt Disney Co.*,
    No. 17-CV-1137, 2018 WL 5284625 (W.D. Tex. Oct. 24, 2018)..........17

*IPVX Patent Holdings, Inc. v. Broadvox Holding Co., LLC*,
No. 6:11-CV-0575, 2012 WL 13012617 (E.D. Tex. Sept. 26, 2012)......................................18

*Jacoby Donner, P.C. v. Aristone Realty Cap., LLC*,
No. 17-CV-2206, 2020 WL 5095499 (E.D. Pa. Aug. 28, 2020) ...............................8

*Meyer v. Holley*,
537 U.S. 280 (2003)..........................................................................................14

*Nat'l Steel Car Ltd. v. The Greenbrier Cos., Inc.*,
No. 6:19-cv-00721-ADA, 2020 WL 42889388 (W.D. Tex. July 27, 2020)..........................17

*Optic153 LLC v. Thorlabs Inc.*,
No. 6:19-CV-00667, 2020 WL 3403076 (W.D. Tex. June 19, 2020) ....................................10

*Pia v. Supernova Media, Inc.*,
No. 09-CV-00840, 2014 WL 7261014 (D. Utah Dec. 18, 2014) ...............................8

*Pierce v. Shorty Small's of Branson Inc.*,
137 F.3d 1190 (10th Cir. 1998) ................................................................11

*Seven Networks, LLC v. Google LLC*,
315 F. Supp. 3d 933 (E.D. Tex. 2018)..............................................................12

*Sightline Payments, LLC v. Everi Holdings Inc.*,
No. 21-CV-1015, 2022 WL 2078215 (W.D. Tex. June 1, 2022) .............................17

*Soverain IP, LLC v. AT&T, Inc.*,
No. 2:17-CV-0293, 2017 WL 5126158, at *1 (E.D. Tex. Oct. 31, 2017)
("*Soverain IP I*") report and recommendation adopted 2017 WL 6452802
(E.D. Tex. Dec. 18, 2017)............................................................................2, 17, 19

*TC Heartland LLC v. Kraft Foods Grp. Brands LLC*,
581 U.S. 258 (2017).......................................................................................10, 11

*Ultravision Techs., LLC v. Eaton Corp. PLC*,
Case No. 2:19-CV-00290-JRG, 2019 WL 11250161 (E.D. Tex. Nov. 7, 2019)
(Gilstrap, J.) .............................................................................................1

## Statutes and Rules

28 U.S.C. § 1400(b) .................................................................................... *passim*

Del. Code Ann. tit. 6, § 18–101(12) ...................................................................8

Del. Code Ann. tit. 6, §§ 18–101, *et seq.* ...........................................................8

Del. Code Ann. tit. 6, § 18–402 ...................................................................8, 18

Fed. R. Civ. P. 12(b)(3)...............................................................................1, 2, 11, 20

Local Civil Rule CV-7(a)(1) ..................................................................................2

**Other Authorities**

Darla M. Fera, *Investment Management Compliance Guide*, ¶ 723 LIMITED
    LIABILITY COMPANIES, *available at* 2017 WL 11025924 ................................7

https://www.puc.texas.gov/industry/communications/business/sicfa/sicfa.aspx...........................3

Restatement (Third) of Agency § 1.01 ......................................................................14

**APPX349**

Defendant Charter Communications, Inc. ("CCI" or "Defendant") moves, pursuant to Rule 12(b)(3) of the Federal Rules of Civil Procedure, to dismiss Plaintiff Entropic Communications, LLC's ("Entropic") Second Amended Complaint ("SAC," Dkt. 53), which alleges CCI provides "cable television and internet services" that infringe its patents, for improper venue.[1]

## I.    INTRODUCTION

In the SAC, Entropic dropped two defendants from this action and added allegations that venue is proper in this district for CCI, the sole remaining defendant, because CCI, "through subsidiary limited liability companies that it manages and controls," (1) "owns or leases, and maintains and operates several stores in this district;" (2) "owns and stores equipment such as modems and set top boxes ('STBs') and demonstrates services provided via those products to [] customers;" and (3) "employs personnel that install, service, repair, and/or replace equipment." Dkt. 53 ¶¶ 6-9, 11 n.1.  However, venue-related discovery has confirmed that CCI is not incorporated in Texas, does not own or lease property in this district, offers no products or services, and has no employees here.

Recognizing that CCI has no presence in the district, Entropic apparently seeks to attribute the presence and actions of CCI's subsidiaries in this district to CCI under the theories of alter ego or agency.[2]  The SAC includes allegations and photographs depicting four addresses that prominently feature the "Spectrum" logo as places where CCI allegedly operates.  However, these sites are leased or owned, and maintained and operated, by one of CCI's separate and distinct subsidiaries, Spectrum Gulf Coast, LLC ("SGC"), which Entropic has never named as a defendant

---

[1] The filing of the SAC moots CCI's prior pending motion to dismiss Entropic's First Amended Complaint.  *See* Dkt. 18; *see Ultravision Techs., LLC v. Eaton Corp. PLC*, Case No. 2:19-CV-00290-JRG, 2019 WL 11250161, at *1 (E.D. Tex. Nov. 7, 2019) (Gilstrap, J.).

[2] "CCI's subsidiaries" refer to both its direct and indirect subsidiaries.

in this action.  To impute SGC's actions to CCI under an alter ego theory, Entropic must meet the "difficult standard" of establishing a "lack of formal corporate separateness."  *Soverain IP, LLC v. AT&T, Inc.*, No. 2:17-CV-0293, 2017 WL 5126158, at *1 (E.D. Tex. Oct. 31, 2017) ("*Soverain IP I*") *report and recommendation adopted* 2017 WL 6452802 (E.D. Tex. Dec. 18, 2017).  Entropic cannot meet that "difficult" standard because CCI maintains all corporate formalities as a parent and as a manager of its subsidiary LLCs, such as SGC.  Nor can Entropic demonstrate that CCI's subsidiaries or their employees are its agents of CCI because they are not controlled by CCI or authorized to act and do not act on CCI's behalf.  Thus, the activities of CCI's subsidiaries and/or managed LLCs cannot form the basis for venue.  Accordingly, the Court should dismiss this case pursuant to Rule 12(b)(3) for lack of venue.[3]

## II.    STATEMENT OF THE ISSUES

Pursuant to Local Civil Rule CV-7(a)(1), the issue to be decided by the Court in connection with this Motion is whether Entropic's Second Amended Complaint should be dismissed under Federal Rule 12(b)(3) for failure to establish proper venue.

## III.    STATEMENT OF THE FACTS

### A.    CCI Does Not Reside in Texas

CCI is not incorporated in Texas.  Dkt. 53 at ¶ 3.  It is a Delaware corporation with its principle place of business in Connecticut.  *Id.*; Ex. 1, Declaration of Jennifer A. Smith ("Smith Decl."), ¶ 5.

---

[3] Because CCI (like Entropic) is a Delaware corporation, Entropic could have filed its action Delaware.  28 U.S.C. § 1400(b).

B.     <u>CCI Does Not Have a Physical Presence in the District</u>

1.     *CCI Does Not Provide Any Services in Texas*

CCI is a holding company, not an operating company, and therefore does not provide any services, including the Accused Products and Services, in Texas.[4]  Ex. 2, Dec. 2, 2022 Deposition of Thomas Proost ("Proost Dep."), 57:13-15.  Nor is CCI licensed by the State of Texas to provide these services.  The Public Utility Commission of Texas requires "any entity that proposes to provide cable or video service anywhere in the State of Texas . . . to obtain a SICFA [State-Issued Certificate of Franchise Authority], unless they are currently providing cable or video service in a municipality that has an unexpired municipal franchise."[5]  CCI does not hold a SIFCA, but SGC does.  Ex 3., Declaration of Jeff Burdett ("Burdett Decl.") at ¶ 5.  SGC, which does provide such service in Texas, "is the only CCI subsidiary that is" licensed to do so.  *Id.*

The customer service documentation reflects this reality.  When a customer purchases an internet or video package, they accept certain terms and conditions specifying that "services will be provided by a number of different entities"; in Texas, customers receive those video and internet services from SGC.  Ex. 2, Proost Dep., 80:7-82:13, 86:13-87:19; Ex. 4, Dec. 13, 2022 Deposition of Daniel Boglioli ("Boglioli Dep."), 49:9-51:3, 65:9-68:2.  The terms and conditions for such services are not between the customer and CCI; and, the customers are treated as customers of the relevant entity that provides the specific services, such as SGC in Texas.  Ex. 2, Proost Dep., 63:1-15, 88:1-11; Ex. 4, Boglioli Dep., 49:4-50:24.

---

[4] The SAC defines the Accused Services as "the provision of cable television and internet services."  Dkt. 53 ¶ 11.  Accused Products refers to certain set top boxes and cable modems.  *Id*. ¶¶ 11-14.

[5] *See* https://www.puc.texas.gov/industry/communications/business/sicfa/sicfa.aspx.

**APPX352**

**CONFIDENTIAL MATERIAL OMITTED**

2.    *The Spectrum Brand*

Neither CCI, nor its subsidiaries, market any products or services under CCI's name.  Ex. 2, Proost Dep., 100:11-12 (testifying that the brand "fully transitioned" from Charter to Spectrum). CCI subsidiaries use the Spectrum brand "for all customer-facing functions in all retail stores" and any customer-facing employee uses a Spectrum signature block in email correspondence.  Ex. 4, Boglioli Dep., 95:7-16; *see also id.* at 55:17-19; Ex. 2, Proost Dep., 88:12-14 (testifying that customers receive bills under the Spectrum brand name).  Accordingly, CCI does not hold itself out to the public as having a presence in Texas or providing services there.

3.    *CCI Does Not Have Any Employees in Texas*

While CCI had some employees at one point in time, since at least 2020 CCI has not had any employees, including in the State of Texas.  Ex. 5, Declaration of Martin C. Armstrong ("Armstrong Decl.") at ¶ 4; Ex. 2, Proost Dep., 71:3-10, 73:20-74:11, 104:4-15; Ex. 4, Boglioli Dep., 42:4-43:2.  Rather, Charter Communications, LLC ("CC LLC"), a subsidiary of CCI, is the entity that employs all individuals who work for any of the subsidiary LLCs that provide various business functions in support of the Spectrum brand.  Ex. 2, Proost Dep., 71:3-10; Ex. 4, Boglioli Dep., 35:22-36:3. ███████████████████████████████████

████████████████████████████████████████████████████████

███████████.[6] Ex. 4, Boglioli Dep., 36:12-16; Ex. 2, Proost Dep., 72:7-21 (████████████

---

█████████████████████████████████████████████████████

████████████████████████████████████████ Ex. 2, Proost Dep., 71:14-21, 72:10-19; Ex. 4, Boglioli Dep., 69:19-70:10, 72:3-17. ███████████

██████ Ex. 2, Proost Dep., 71:14-72:6; Ex. 9, CCO LLC Agreement. █████

██████████ Ex. 4, Boglioli Dep., 72:3-74:8.

-4-

**APPX353**

**CONFIDENTIAL MATERIAL OMITTED**

███████████████████████████████████████ ); Ex. 4, Boglioli Dep.,

51:20-25 █████████████████████████████████████████████████████████

███████████████ ); *see also* Ex. 4, Boglioli Dep., 72:3-73:22, 75:12-76:14.  CCI does not

participate, nor is it consulted, in the hiring and firing of CC LLC employees.  Ex. 4, Boglioli Dep.,

42:1-44:9, 47:8-13, 48:2-24; Armstrong Decl. ¶ 5.

### 4.    *CCI Does Not Own, Lease, Maintain, or Operate Property in Texas*

CCI does not own, lease, maintain or operate property in Texas, including the four

properties identified in the SAC (the "SAC Properties").  Ex. 6, Declaration of Teresa Nelson

("Nelson Decl.") at ¶¶ 5, 8.  Instead, each location is owned or leased by SGC.  *Id.* ¶ 8.  As

explained above, CCI does not have any employees who work at those locations, nor does it

maintain or operate those stores.  Rather, ██████████████████████████████████████

█████████████████ .  Ex. 2, Proost Dep., 85:6-18; Ex. 4, Boglioli Dep., 55:20-56:5, 88:14-

21.

### 5.    *CCI Does Not Own or Lease Any Equipment in Texas*

As mentioned, CCI does not own or lease the Accused Products.  They are owned by

████████████████████ and leased by it to the various entities, such as SGC, for a fee pursuant

to lease agreements.  Ex. 4, Boglioli Dep., 54:13-55:5.  SGC then leases (or subleases) the products

to Spectrum customers for a fee.[7]  *Id.* at 55:7-14.  SGC, not CCI, is the entity that provides or ships

devices, such as cable modems and cable set box tops, to customers.  *Id.* at 54:4-9, 86:2-20; Ex. 7,

Sample Equipment Lease Agreement between SGC and Charter Distribution LLC.  Each operating

---

[7] ███████████████████████████████████████████████████████████
████████████████████ Ex. 4, Boglioli Dep, 55:20-56:12.

**APPX354**

**CONFIDENTIAL MATERIAL OMITTED**

entity, ███████████████████████, decides the needs of the operating unit, such as the amount of products or equipment to lease. Ex. 4, Boglioli Dep., 88:14-21.

      C.    <u>**CCI Subsidiaries Perform Distinct Business Functions**</u>

     As previously stated, CCI does not have any business operations of its own. Ex. 2, Proost Dep., 57:13-15. It is the ultimate corporate parent of numerous LLCs that each perform specific business functions in support of the Spectrum brand. Ex. 1, Smith Decl. ¶ 5; Ex. 2, Proost Dep., 37:16-24, 57:16-58:7. Each LLC operates pursuant to a delegation of authority policy, Ex. 2, Proost Dep., 58:8-16, and they act in accordance with their operative formation documents, including governing agreements, and pursuant to the pertinent Delaware statute governing LLCs, *see* Section III.D, *infra*.

     For example, there are different LLC subsidiaries that provide customers with cable or Voice over IP (or VoIP) services in particular geographic regions. Ex. 2, Proost Dep., at 57:16-58:7. When asked why certain LLC subsidiaries "exist," CCI's corporate representative responded:



**APPX355**

**CONFIDENTIAL MATERIAL OMITTED**



*Id.* at 67:16-69:8; *see also id.*, at 62:9-22 (explaining certain functions of an LLC subsidiary), 64:7-65:20 (same), 73:6-19 (explaining CC, LLC's function), 74:18-77:16 (explaining the function of additional LLC subsidiaries), 77:17-78:2 (explaining the function of the cable franchise subsidiaries, including SGC, in different geographic regions).

Likewise, advertising and marketing responsibilities span "multiple entities"; guidelines for the Spectrum brand is set at a corporate level, ▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 4, Boglioli Dep, 96:11-97:15. There are also regional marketing departments in each geographic sub-region ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮ *Id.* The regional marketing departments ▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮ *Id.* at 96:21-97:15.  These regional efforts ▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮ *Id.* at 97:16-18.

> **D.**  **CCI is the Manager of the Limited Liability Companies, Including SGC**

An LLC is "an unincorporated organization that is formed under state law by filing a certificate of formation or other required formation documentation."  Darla M. Fera, *Investment*

**APPX356**

*Management Compliance Guide*, ¶ 723 LIMITED LIABILITY COMPANIES, *available at* 2017 WL 11025924. Under the Delaware Limited Liability Company Act (the "LLC Act"), an LLC may be managed either by its members or by a non-member manager. Del. Code Ann. tit. 6, § 18–402. The members that form the LLC company designate who will manage the LLC through an LLC agreement. *Id.* If the operating agreement provides that a company is managed by a non-member, the "management of the limited liability company, to the extent so provided, shall be vested in the manager" chosen by the members. *Id.*; Del. Code Ann. tit. 6, § 18–101(12) (defining a "manager" as a person so designated in an LLC agreement). The latter scenario is often referred to as a "manager-managed" company, which is a "legally different business organization than a corporation, with a different management structure (manager-managed as opposed to a board of directors)." *Pia v. Supernova Media, Inc.*, No. 09-CV-00840, 2014 WL 7261014, at *3 (D. Utah Dec. 18, 2014) (analyzing Delaware law). Further, the LLC Act does not require any sort of annual or monthly member or manager meetings. *See* Del. Code Ann. tit. 6, §§ 18-101, *et seq.*; *Jacoby Donner, P.C. v. Aristone Realty Cap., LLC*, No. 17-CV-2206, 2020 WL 5095499, at *15 (E.D. Pa. Aug. 28, 2020) (observing "member meetings are not required by . . . the Delaware Limited Liability Company Act.").

Each of the relevant LLCs have been set up pursuant to, and in conformity with, the LLC Act. CCI has been appointed as a manager of different limited liability companies (through their respective members) that perform the separate business functions as discussed above. Ex. 2, Proost Dep., 59:3-6. For example, SGC is an LLC incorporated under the laws of Delaware and is a separate, indirect subsidiary of CCI. SGC provides internet and video (*i.e.*, cable) services under the Spectrum brand to customers in certain regions within the United States, including Texas. Ex. 2, Proost Dep., 40:4-22, 70:8-71:1, 79:13-80:5; Ex. 4, Boglioli Dep., 49:18-22. Consistent

**CONFIDENTIAL MATERIAL OMITTED**

with the LLC Act, Time Warner Cable Enterprises LLC, as the sole member of SGC, appointed

CCI as the manager of SGC pursuant to an Amended and Restated Limited Liability Company

Agreement.[8]  Ex. 8, Am. and Restated LLC Agreement of Time Warner Cable Texas LLC, dated

May 18, 2016 (the "SGC LLC Agreement").  The SGC LLC Agreement sets out the "governance"

of the LLC and includes the powers and limitations of CCI as a manager.  *Id.* § 4; Ex. 2, Proost

Dep., 59:3-17.

The SGC LLC Agreement provides that ██████████████████████████

████████████████████████████████████████████████████████

███████████████████████ CCI. Ex. 8, SGC LLC Agreement, § 4(a)(i).  Moreover,

the SGC LLC Agreement provides, among other things, ████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████████

Entropic does not allege that there has been any violation of the applicable Delaware LLC

Act or governing agreements in the formation or management of SGC (or any other LLC).

---

[8] The SGC LLC Agreement is between Texas Warner Cable Texas LLC ("TWCT") and Time
Warner Cable Enterprises LLC, as the sole member of TWCT. Ex. 8, SGC LLC Agreement.  SGC
was formerly TWCT. Ex. 10, Certificate of Amendment, dated Sept. 12, 2018; Ex. 11, Affidavit
of Constance C. Kovach, dated October 29, 2018.

**APPX358**

E.    **CCI Maintains Corporate Records Separate from the LLC Subsidiaries**

CCI's corporate records are maintained separate from its LLC subsidiaries, care is taken to

ensure that any actions taken by CCI are separate from those taken by its LLC subsidiaries, ██

████████████████████████████████████████████ Ex. 2, Proost Dep.,

37:16-38:22, 60:5-20; Ex. 4, Boglioli Dep, 34:5-37:8, 70:15-71:10, 72:3-73:22 (████████████

████████████████████████████████), 75:12-76:14, 83:4-12

(████████████████████████████████).

IV.    **LEGAL STANDARD**

A.    **Entropic Has The Burden of Establishing Venue is Proper**

Venue in patent cases is exclusively governed by Section 1400(b) of Title 28 of the United

States Code. *TC Heartland LLC v. Kraft Foods Grp. Brands LLC*, 581 U.S. 258, 267-69 (2017).

Federal Circuit law applies to matters unique to patent law, such as section 1400(b), while regional

Circuit law apply to questions not unique to patent law. *In re Cray Inc.*, 871 F.3d 1355, 1360 (Fed.

Cir. 2017); *In re ZTE (USA) Inc.*, 890 F.3d 1008, 1013 (Fed. Cir. 2018). Under Federal Circuit

law, a plaintiff bears the burden of establishing that venue in this district is proper. *In re ZTE*, 890

F.3d at 1013; *Optic153 LLC v. Thorlabs Inc.*, No. 6:19-CV-00667, 2020 WL 3403076, at *1 (W.D.

Tex. June 19, 2020).

B.    **Venue in Patent Cases**

The "requirement of venue [in patent cases] is specific and unambiguous; it is not one of

those vague principles which, in the interests of some overriding policy, is to be given liberal

construction," *Cray*, 871 F.3d at 1361 (citation omitted), and "it is important 'not to conflate

showings that may be sufficient for other purposes, *e.g.*, personal jurisdiction or the general venue

statute, with the necessary showing to establish proper venue in patent cases.'" *In re ZTE*, 890

F.3d at 1014 (quoting *Cray*, 871 F.3d at 1361). Accordingly, under Section 1400(b), venue is

proper either (1) in the district in which the defendant resides, or (2) where it has a regular and established place of business and has committed acts of infringement. 28 U.S.C. §1400(b). "[A] domestic corporation 'resides' only in its [s]tate of incorporation for purposes of the patent venue statute." *TC Heartland*, 581 U.S. at 262.

Facts relating to venue pled in the complaint are accepted as true "only to the extent that such facts are uncontroverted by [a] defendant's affidavit." *Pierce v. Shorty Small's of Branson Inc.,* 137 F.3d 1190, 1192 (10th Cir. 1998) (citing *Home Ins. Co. v. Thomas Indus., Inc.,* 896 F.2d 1352, 1355 (11th Cir. 1990)). A district court may look beyond the complaint when deciding a motion to dismiss based on improper venue. *Ambraco, Inc. v. Bossclip B.V.,* 570 F.3d 233, 238 (5th Cir. 2009) (stating that under Rule 12(b)(3) a court may look at evidence beyond the facts alleged in the complaint and its attachments).

## V.    ARGUMENT

CCI, the lone named defendant, is a holding company with no employees, no product or service offerings to customers, no real property interests in the district and no ownership of Accused Products. There is a subsidiary of CCI that does operate here, but Entropic chose not to sue that entity, and chose not to sue CCI in Delaware where it resides.

Instead, Entropic seeks to attribute the actions of SGC, CCI's subsidiary, to CCI under the guise of agency or alter ego theories without satisfying any of the elements necessary to proceed under those theories. The employees assigned to work in the SGC stores in the district are in no sense agents of CCI. They are not employed by CCI, not controlled by CCI, have no authority to act on CCI's behalf, and do not carry out the business of CCI. To overcome its utter failure to establish agency or alter ego, Entropic asks the Court to disregard the separate corporate forms merely because SGC, through its sole member, appointed CCI as its manager. Entropic's request, however, undermines the Delaware LLC Act, which explicitly contemplates and permits an LLC's

members to appoint a separate corporate manager.  Entropic has not uncovered any evidence to remotely suggest that CCI was improperly appointed to act as manager of SGC or that it fails to observe the corporate forms of its distinct subsidiaries.  Nor has Entropic asserted any allegations that SGC, or any other LLC, has not been properly established and separately maintained.  For these reasons, and as explained below, venue is improper in this district.

### A.    Venue Is Improper As To CCI

#### 1.    *CCI Does Not Reside in this District*

Entropic admits that CCI is not incorporated in Texas.  Dkt. 53, ¶ 3; Smith Decl. at ¶ 5.  Thus, to meet its burden in establishing that venue is proper, Entropic must show that CCI has a regular and established place of business and committed acts of infringement in this district.[9]  *See Cray*, 871 F. 3d at 1360.  For the reasons set forth below, Entropic cannot meet this burden.

#### 2.    *CCI Has No Regular and Established Place of Business in this District*

The "three general requirements relevant to the inquiry" of whether a defendant has a regular and established place of business are: "(1) there must be a physical place in the district; (2) it must be a regular and established place of business; and (3) it must be the place of the defendant.  If any statutory requirement is not satisfied, venue is improper under § 1400(b)."  *Cray*, 871 F.3d at 1360.  Entropic cannot satisfy any of these requirements because CCI has no regular and established place of business in the district.

---

[9] CCI denies that it has committed acts of infringement anywhere, including in this district, because it does not own, lease, or distribute the Accused Cable Modem Products and because it does not provide the Accused Services.  *See* Sections III.B.1 & 5, *supra*.  On this basis, venue is improper.  *See* Section 1400(b) (requiring acts of infringement and a regular and established place of business to establish venue).  However, because "[t]he issue of infringement is not reached on the merits in considering venue requirements," CCI focuses this motion on Entropic's failure to meet its burden to establish that CCI has a regular and established place of business in the district.  *See Seven Networks, LLC v. Google LLC*, 315 F. Supp. 3d 933, 942-43 & n.10 (E.D. Tex. 2018) (quoting *In re Cordis Corp.*, 769 F.2d 733, 737 (Fed. Cir. 1985)).

### (a)     CCI Has No Physical Place of Business in the District

The first *Cray* factor requires that there "must be a physical place in the district." 871 F.3d at 1362. A "place" must be a "physical, geographical location in the district from which the business of the defendant is carried out." *Id.*

CCI does not have any physical locations anywhere in Texas. Ex. 6, Nelson Decl., ¶ 5. SGC, not CCI, leases or owns the SAC Properties that are located within this District. Nelson Decl. at ¶¶ 5, 8. Almost every single property agreement concerning the SAC Properties and any other property in the district reflects the fact that SGC, not CCI, is the real property interest-holder.[10] Ex. 12, Chart Summarizing Properties in E.D. Tex. There is no evidence that CCI possesses or controls any physical space in the district. *In re Google*, 949 F.3d 1338, 1343 (Fed. Cir. 2020) (holding that the statute could be satisfied by any physical place that the defendant could "possess[ ] or control." (quoting *Cray*, 871 F.3d at 1363)). And SGC, not CCI, operates the Spectrum-branded stores to provide services to customers. Ex. 2, Proost Dep., 85:6-18; Ex. 4, Boglioli Dep., 51:14-52:7. For these reasons alone, venue is improper.

### (b)     CCI Has No Employees or Agents Conducting Business in the District

Under the second *Cray* factor, a "'place of business' generally requires an employee or agent of the defendant to be conducting business in that place." *In re Google*, 949 F.3d at 1344. Therefore, even if the properties Entropic identified in its SAC did belong to CCI (and they do not), Entropic must still establish that CCI has an employee or agent operating out of those properties. In the SAC, Entropic does not even allege that CCI has any such employees, only that

---

[10] SGC either owns or leases every property within this district, except for two properties that are owned or leased by different LLC subsidiaries. Ex. 12, Chart Summarizing Properties in E.D. Tex. CCI does not own or lease any property in this district.

-13-

"Charter employs personnel . . . *through subsidiary limited liability companies that it manages and controls*."  Dkt. 53 ¶ 8 (emphasis added).  Here, as explained above, CCI does not have any employees *at all* and therefore does not have any employees who regularly conduct business in the district.  Ex. 5, Armstrong Decl. at ¶ 4; Ex. 2, Proost Dep., 71:3-10, 73:20-74:11, 104:4-5; Ex. 4, Boglioli Dep., 42:4-43:2; *see also* Section III.B.3.

Entropic does not allege, nor could it, that SGC (or any employee allocated to SGC) is an agent of CCI.  An agency relationship is a "fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents to act."  *In re Google*, 949 F.3d at 1345 (quoting Restatement (Third) of Agency § 1.01).  The elements of agency are: "(1) the principal's 'right to direct or control' the agent's actions, (2) 'the manifestation of consent by [the principal] to [the agent] that the [agent] shall act on his behalf,' and (3) the 'consent by the [agent] to act.'"  *Id.* (quoting *Meyer v. Holley*, 537 U.S. 280, 286 (2003)).  Entropic cannot satisfy any of these elements.

As for the first element–control–the SAC contains allegations that CCI "has the right to exercise near total control of each entity's operations" through LLC agreements.  Dkt. 53 ¶ 9.  However, this alone cannot establish an agency relationship because nothing in the record suggests that the relationship between CCI and SGC is anything more than that between LLC manager and a managed LLC.  CCI itself does not maintain or operate the Spectrum-branded stores that are owned or leased by SGC in this district, Ex. 2, Proost Dep., 85:6-18, nor does CCI participate in the hiring and firing of employees working in the SGC-owned or -leased stores in the district, *id.* at 71:3-10, 73:20-74:11, 104:4-5; Ex. 4, Boglioli Dep., 42:4-43:2; Armstrong Decl., at ¶ 5; *see Andra Grp., LP v. Victoria's Secret Stores, LLC*, 6 F.4th 1283, 1288-899 (Fed. Cir. 2021).  Those

-14-

**APPX363**

activities are carried out by the employees allocated to the SAC Properties.  Ex. 4, Boglioli Dep., 42:4-44:9, 47:8-13, 48:2-24.  Such actions can only be attributed to CCI by virtue of its having been appointed manager of SGC and disregarding the corporate separation of these distinct entities; but Entropic fails to make any showing that would justify the extreme measure of piercing the corporate veil.  *See* Section V.B, *infra*.

Nor can Entropic satisfy the remaining two elements for showing that SGC is CCI's agent.  In addition to establishing that the principal controls the agent, Entropic must show "(2) the manifestation of consent by [the principal] to [the agent] that the [agent] shall act on his behalf, and (3) the consent by the [agent] to act."  *Andra Grp.*, 6 F.4th at 1288 (internal quotations omitted).  There is no support for any contention that CCI has manifested consent for SGC, or employees working at stores owned or leased by SGC, to act on CCI's behalf, and there is no evidence that any entity consented to act on CCI's behalf.  Entropic has not even attempted to allege or meet these elements to proceed under an agency theory.

While these facts alone are reason to reject any agency theory, there is more.  The SGC LLC Agreement does not contain any provision authorizing SGC to act as an agent *of CCI*.  Rather,

██████████████████████████████████████████████████

the exact opposite of what Entropic must show.  ████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████.  Ex. 8, SGC LLC Agreement, § 5(d)(vi).  Although not by itself dispositive, the Federal Circuit has held this evidence is "relevant" to determine whether one entity is another's agent.  *See In re Volkswagen Grp. of America, Inc.*, 28 F.4th 1203, 1212 (Fed. Cir.

2022) ("Our holding is further bolstered by—the relevant though not dispositive—consideration that the parties to the franchise agreements disclaim an agency relationship.")

Because CCI has no employees or agents in the district, Entropic cannot, for this additional reason, meet its burden to show that venue is proper.

### (c)    CCI Has No Regular and Established Place of Business in the District

When analyzing the third *Cray* factor, whether a "place of business" is "of the defendant," courts consider a number of non-exclusive factors, including "whether the defendant owns or leases the place, or exercises other attributes of possession or control over the place," "whether the defendant lists the alleged place of business on a website, or in a telephone or other directory; or places its name on a sign associated with or on the building itself." *Cray* at 1363-64.

None of these factors support venue in this case. Entropic cites to four properties located in this district to allege that "Charter has regular and established places of business in this district." Dkt. 53, ¶¶ 16-17. Yet, CCI does not own or lease any of the properties listed in the SAC. *See* Section III.B.4, *supra*. Entropic also contends that CCI "targets its advertisements" to this district, and suggests that the Spectrum logo displayed on the SAC Properties somehow establishes that CCI conducts business in this district. Dkt. 53 ¶¶ 18-20. However, the pertinent question is whether "the *defendant*," that is CCI, "places *its name* on a sign associated with or on the building itself." *Cray*, 871 F.3d at 1364 (emphasis added). Here, there are plainly no allegations nor any evidence that CCI's name is associated with any properties in this district or in Texas more broadly. The photographs included in the SAC show that the "Spectrum" brand name is prominently displayed on the SAC properties, not CCI or Charter. Dkt. 53, ¶¶ 16-17. As previously explained, the Spectrum brand is used "for all customer-facing functions in all retail stores" and there is no

**APPX365**

advertising or marketing of products under CCI's name.  Ex. 4, Boglioli Dep., 95:7-16; *see also id.* at 55:17-19; Ex. 2, Proost Dep., 88:12-14, 100:11-12.

Furthermore, CCI does not have any employees in Texas; does not conduct commercial business with the public; and does not make, manufacture, or sell any product anywhere, including in Texas.  *See* Section III.B, *supra*.  Indeed, CCI does not maintain or operate the physical locations identified in the district.  Ex. 2, Proost Dep., 85:6-18.  Thus, not a single factor supports Entropic's assertion of venue and its pleading should be dismissed for lack of venue for this reason as well.

### B.   The Presence and Activities of SGC Cannot Be Imputed To CCI To Establish Venue

Recognizing that CCI does not have any presence or business in this district, the SAC contains allegations suggesting that that the "regular and established place of business" of SGC, as well as any subsidiary of CCI, should be imputed to CCI for venue purposes.  Dkt. 53 ¶¶ 6-9, 11 n.1, 15-20.  CCI and a subsidiary LLC such as SGC, however, can only be considered a single entity for purposes of venue if that LLC is CCI's alter ego.  *Id.*  This is "a difficult standard to meet" and is rarely, if ever, satisfied in context of  Section 1400(b).[11]  *Soverain IP I*, 2017 WL 5126158, at *1; *see also Celgene Corp. v. Mylan Pharm. Inc.*, 17 F. 4th 1111, 1127 (Fed. Cir. 2021) (rejecting alter ego theory); *Andra Grp.*, 6 F.4th at 1290 (same); *Sightline Payments, LLC v. Everi Holdings Inc.*, No. 21-CV-1015, 2022 WL 2078215, *7 (W.D. Tex. June 1, 2022) (same); *Nat'l Steel Car Ltd. v. The Greenbrier Cos., Inc.*, No. 6:19-cv-00721-ADA, 2020 WL 42889388, at *3-5 (W.D. Tex. July 27, 2020) (same); *Interactive Toybox, LLC v. The Walt Disney Co.*, No. 17-CV-1137, 2018 WL 5284625, at *4 (W.D. Tex. Oct. 24, 2018) (same); *Blue Spike, LLC v. Nook Dig., LLC*, No. 6:16-CV-1361-RWSJDL, 2017 WL 3263871, at *3 (E.D. Tex. July 28, 2017),

---

[11] "Corporate separateness is an issue of regional-circuit law."  *Celgene Corp.*, 17 F.4th at 1125.

*report and recommendation adopted sub nom. Blue Spike, LLC v. Caterpillar, Inc.*, 2017 WL 4129321 (E.D. Tex. Sept. 19, 2017) (same); *IPVX Patent Holdings, Inc. v. Broadvox Holding Co., LLC*, No. 6:11-CV-0575, 2012 WL 13012617, at *3 (E.D. Tex. Sept. 26, 2012) (same).  Entropic has done nothing to meet this "difficult standard."

<u>First</u>, Entropic's principal basis for attempting to disregard the corporate separateness of CCI and SGC is the mere fact that the SGC LLC Agreement appoints CCI as its manager.  *See* Dkt. 53 ¶ 9; *id.* ¶¶ 6-8, 11 n.1 (alleging that references to "Charter" include "Charter's own actions and its actions by and through its subsidiary limited liability companies that it manages and controls").  The SGC LLC Agreement or any other agreement does not convert the actions of SGC into the actions of CCI.  The agreement and Delaware law are explicit and unequivocal: ███

███████████████████████████████████████████████ Ex. 8, SGC Agreement § 4(a)(i); Del. Code Ann. tit. 6, § 18-402.  Entropic does not allege, nor has discovery revealed, that CCI acted in violation, or beyond the scope of, its role as manager as provided in the SGC LLC Agreement or pursuant to the LLC Act.  *IPVX Patent Holdings*, 2012 WL 13012617, at *3 ("While [plaintiff] contends that [the parent-defendant] must control [its subsidiary-LLC that conducts business in this district] because" the parent-defendant manages "its subsidiary, there is no evidence that the control exerted by [the parent-defendant] is greater than that 'normally associated with common ownership and directorship.'" (citing *Hargrave v. Fibreboard Corp.*, 710 F.2d 1154, 1160-61 (5th Cir. 1983))).  Accordingly, Entropic cannot impute SGC's actions as a managed LLC to CCI, as a manager of the LLC, as a basis for venue.

<u>Second</u>, to the extent that Entropic alleges that CCI and its subsidiary LLCs are alter egos (separate and apart from any LLC agreement) such that "any 'regular and established place of business'" of SGC should be imputed to CCI, Entropic must establish that SGC and CCI "lack

formal corporate separateness." *Soverain IP I*, 2017 WL 5126158, at *1 (declining to impute the presence of a related company to another related company); *Andra Grp.*, 6 F.4th at 1289 ("A threshold inquiry when determining whether the place of business of one company can be imputed to another, related company is whether they have maintained corporate separateness." (citing *Cannon Mfg. Co. v. Cudahy Packing Co.*, 267 U.S. 333, 334-35 (1925))). When the entities "have maintained corporate separateness, the place of business of one corporation is not imputed to the other for venue purposes." *Andra Grp.*, 6 F.4th at 1289; *Blue Spike*, 2017 WL 3263871, at *3 ("[T]he mere existence of a wholly-owned subsidiary in a judicial district does not, by itself, suffice to establish venue over the subsidiary's parent corporation.").

Here, Entropic cannot show any lack of corporate separateness. The SAC does not contain *any* allegations suggesting that CCI, SGC, or any other subsidiary LLC, have failed to maintain corporate separateness or formalities. The fact is, CCI and its subsidiaries are distinct, separate entities that observe all required corporate formalities separating them from each other, including the maintenance of their own corporate books and records, meetings of shareholders (for CCI), identification of LLC members and appointment of directors and officers. Smith Decl. at ¶¶ 5, 7; *see* Sections III.C & D, *supra*. There has been nothing to suggest otherwise. Although the SAC contains allegations that Spectrum-branded stores within this district bare the "Spectrum" logo, which logo "refers to 'a suite of advanced broadband services offered by Charter Communications, Inc.,'" Dkt. 53 ¶¶ 5, 16-18, the "use of the common or generic name [Spectrum] on the exterior of [the subsidiary's building], as well as the press release announcing the business," cannot support venue under the patent statute, where the corporate formalities between related companies remain intact, such as here. *Bd. Of Regents v. Medtronic PLC.*, No. 17-CV-0942, 2018 WL 4179080, at *2 (W.D. Tex. July 19, 2018).

**APPX368**

Therefore, Entropic, cannot impute SGC's actions in this district to CCI.

**VI.    CONCLUSION**

Plaintiff's Second Amended Complaint should be dismissed for improper venue under Fed.

R. Civ. P. 12(b)(3).


Dated: January 30, 2023                    Respectfully submitted,

                                           */s/  Deron R. Dacus*
                                           Deron R. Dacus
                                           State Bar No. 00790553
                                           The Dacus Firm, P.C.
                                           821 ESE Loop 323, Suite 430
                                           Tyler, TX 75701
                                           Phone: (903) 705-1117
                                           Fax: (903) 581-2543
                                           Email: ddacus@dacusfirm.com

                                           Daniel L. Reisner
                                           David Benyacar
                                           Elizabeth Long
                                           Albert J. Boardman
                                           Melissa Brown
                                           Palak Mayani Parikh
                                           ARNOLD & PORTER KAYE SCHOLER LLP
                                           250 West 55th Street
                                           New York, New York, 10019-9710
                                           Telephone: (212) 836-8000
                                           Email: daniel.reisner@arnoldporter.com
                                           Email: david.benyacar@arnoldporter.com
                                           Email:  elizabeth.long@arnoldporter.com
                                           Email:  albert.boardman@arnoldporter.com
                                           Email:  melissa.brown@arnoldporter.com
                                           Email:  palak.mayani@arnoldporter.com

                                           ***Attorneys for Defendant***
                                           ***Charter Communications, Inc.***

**APPX369**

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the above and foregoing document has been served on all counsel of record via the Court's ECF system on January 30, 2023.

*/s/ Deron R. Dacus*
Deron R. Dacus

**CERTIFICATE OF AUTHORIZATION TO FILE UNDER SEAL**

Pursuant to Local Rule CV-5, the undersigned counsel hereby certifies that authorization for filing under seal has been previously granted by the Court in the Protective Order (Dkt. 36) entered in this case on August 10, 2022.

*/s/ Deron R. Dacus*
Deron R. Dacus

-21-

**APPX370**

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

ENTROPIC COMMUNICATIONS, LLC,

      Plaintiff

      v.

CHARTER COMMUNICATIONS, INC.;
SPECTRUM ADVANCED SERVICES,
LLC; AND SPECTRUM MANAGEMENT
HOLDING COMPANY, LLC,

      Defendants.

Civil Action No. 2:22-cv-00125-JRG

## DECLARATION OF MELISSA A. BROWN IN SUPPORT OF
## CHARTER COMMUNICATIONS, INC.'S MOTION TO DISMISS THE SECOND
## AMENDED COMPLAINT FOR IMPROPER VENUE PURSUANT TO FRCP 12(b)(3)

I, Melissa A. Brown, declare as follows:

1.     I am over 18 years of age and competent to make this declaration.  If called to testify as a witness, I could and would testify truthfully under oath to each of the statements in the declaration.  I make each statement below based on my personal knowledge or after investigation of the relevant information.

2.     I am an attorney at Arnold & Porter Kaye Scholer, LLP, counsel of record for Defendant, Charter Communications, Inc. ("Defendant" or "CCI").  I am licensed to practice law in the States of New York and New Jersey, and have been admitted *pro hac vice* to this Court.

3.     I make this Declaration based on my personal knowledge and in support of CCI's Motion to Dismiss the Second Amended Complaint for Improper Venue Pursuant to Federal Rule of Civil Procedure 12(b)(3).

4.     Attached hereto as **Exhibit 1** is a true and correct copy of the declaration of Jennifer A. Smith, dated July 7, 2022.

5.     Attached hereto as **Exhibit 2** is a true and correct copy of excerpts of the transcript from the deposition of Thomas Proost, taken December 2, 2022.

6.     Attached hereto as **Exhibit 3** is a is a is a true and correct copy of the declaration of Jeff Burdett, dated July 5, 2022.

7.     Attached hereto as **Exhibit 4** is a true and correct copy of excerpts of the transcript from the deposition of Daniel Boglioli, taken December 13, 2022.

8.     Attached hereto as **Exhibit 5** is a true and correct copy of the declaration of Martin C. Armstrong, dated July 6, 2022.

9.     Attached hereto as **Exhibit 6** is a true and correct copy of the declaration of Teresa Nelson, dated July 6, 2022.

1

**APPX372**

10.     Attached hereto as **Exhibit 7** is a true and correct copy of Equipment Lease Agreement between Spectrum Gulf Coast, LLC and Charter Distribution LLC.

11.     Attached hereto as **Exhibit 8** is a true and correct copy of the Amended and Restated LLC Agreement of Time Warner Cable Texas LLC, dated May 18, 2016.

12.     Attached hereto as **Exhibit 9** is a true and correct copy of the Second Amended and Restated Management Agreement of Charter Communications Operating, LLC, dated May 18, 2016.

13.     Attached hereto as **Exhibit 10** is a true and correct copy of the Certificate of Amendment, dated September 12, 2018, filed with the Delaware Secretary of State, reflecting a name change from Time Warner Cable Texas LLC to Spectrum Gulf Coast, LLC.

14.     Attached hereto as **Exhibit 11** is a true and correct copy of the affidavit of Constance C. Kovach, dated October 29, 2018.

15.     Attached hereto as **Exhibit 12** is a chart listing ownership or lease information for property in the Eastern District of Texas.


Executed on January 30, 2023 in New York, New York.


                                        */s/ Melissa A. Brown*
                                        Melissa A. Brown

-2-

**APPX373**

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the above and foregoing document has been served on all counsel of record via the Court's ECF system on January 30, 2023.


*/s/ Melissa A. Brown*
Melissa A. Brown


**CERTIFICATE OF AUTHORIZATION TO FILE UNDER SEAL**

Pursuant to Local Rule CV-5, the undersigned counsel hereby certifies that authorization for filing under seal has been previously granted by the Court in the Protective Order (Dkt. 36) entered in this case on August 10, 2022.


*/s/ Melissa A. Brown*
Melissa A. Brown

**APPX374**

# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

|  |  |
|---|---|
| ENTROPIC COMMUNICATIONS, LLC, <br><br> Plaintiff <br><br> v. <br><br> CHARTER COMMUNICATIONS, INC.; SPECTRUM ADVANCED SERVICES, LLC; AND SPECTRUM MANAGEMENT HOLDING COMPANY, LLC, <br><br> Defendants. | Civil Action No. 2:22-cv-00125-JRG |

<u>**DECLARATION OF JENNIFER A. SMITH**</u>

I, Jennifer A. Smith, declare as follows:

1.      I have personal knowledge of the matters set forth herein.

2.      I am VP, Associate General Counsel & Assistant Corporate Secretary at Charter Communications, LLC.

3.      I am informed that Entropic Communications, LLC ("Entropic") has filed suit against Charter Communications, Inc. ("CCI"), Spectrum Advanced Services, LLC ("SAS"); and Spectrum Management Holding Company, LLC ("SMHC").

4.      I am familiar with the organization of CCI and its subsidiaries and/or I have reviewed records kept by CCI, SAS and SMHC in the regular course of business in preparation for making this declaration.

5.      CCI is incorporated in Delaware and has its principal place of business in Stamford, Connecticut. CCI is the corporate parent (either directly or indirectly) of a number of different entities that carry on various businesses under the Spectrum brand. CCI is the parent of its

subsidiaries and provides corporate oversight to those entities, but CCI does not directly conduct any commercial business relations with the public. CCI does not directly make, manufacture, sell or offer for sale any product or service of any nature, including in Texas.

6.    I understand that Entropic has collectively referred to CCI, SAS, and SMHC as "Charter" in its amended complaint, and in paragraph 17 of its amended complaint, referred to SAS as a "related entity" of CCI.

7.    CCI observes all required corporate formalities separate from its subsidiaries, including SAS and SMHC. CCI regularly maintains its corporate records separate from those of its subsidiaries, including those referenced herein, and conducts meetings of its shareholders and directors separate from those these subsidiaries. Each of CCI's subsidiaries maintains its own corporate, partnership, or limited liability company status, identity, and structure.

8.    SAS is an indirect majority-owned subsidiary of CCI.  SAS is organized under the laws of the State of Delaware and registered with the Secretary of State of Texas as a Foreign Limited Liability Company.  SAS is registered in the state of Texas with a purpose of providing telecommunications services.  SAS does not provide internet or cable television/video services.

9.    SMHC is an indirect majority-owned subsidiary of CCI. SMHC is organized under the laws of the State of Delaware. SMHC is not registered to do business in Texas. SMHC does not directly conduct any commercial business relations with the public and does not directly make, manufacture, sell or offer for sale any product or service of any nature, including in Texas. SMHC holds certain assets and contracts which are used in connection with the business operations of its subsidiaries.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: July 7, 2022

Jennifer A. Smith

CONFIDENTIAL MATERIAL OMITTED

# Exhibit 2 to Defendant's Motion to Dismiss

# Dkt. 61-4 (Sealed Version)

# Dkt. 62-4 (Public Version)

# FILED UNDER SEAL

# (APPX379-395)

# EXHIBIT 3

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

ENTROPIC COMMUNICATIONS, LLC,

     Plaintiff

     v.

CHARTER COMMUNICATIONS, INC.;
SPECTRUM ADVANCED SERVICES,
LLC; AND SPECTRUM MANAGEMENT
HOLDING COMPANY, LLC,

     Defendants.

Civil Action No. 2:22-cv-00125-JRG

## DECLARATION OF JEFF BURDETT

I, Jeff Burdett, declare as follows:

1.     I have personal knowledge of the matters set forth herein.

2.     I am Senior Director, Government Affairs at Charter Communications, LLC.

3.     I am informed that Entropic Communications, LLC ("Entropic") has filed suit against Charter Communications, Inc. ("CCI"), Spectrum Advanced Services, LLC ("SAS") and Spectrum Management Holding Company, LLC ("SMHC").

4.     I am familiar with the organization of CCI and its subsidiaries and/or I have reviewed records kept by CCI, SAS, and SMHC in the regular course of business in preparation for making this declaration.

5.     Neither CCI, SAS, nor SMHC is a holder of a State-Issued Certificate of Franchise Authority ("SIFCA") issued by the Public Utility Commission of Texas. Spectrum Gulf Coast, LLC is the only CCI subsidiary that is a holder of a SICFA in Texas.

**APPX397**

I declare under penalty of perjury that the foregoing is true and correct.

Dated: July 5, 2022

Jeff Burdett

CONFIDENTIAL MATERIAL OMITTED

# Exhibit 4 to Defendant's Motion to Dismiss

# Dkt. 61-6 (Sealed Version)

# Dkt. 62-6 (Public Version)

# FILED UNDER SEAL

# (APPX399-414)

# EXHIBIT 5

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| ENTROPIC COMMUNICATIONS, LLC, <br><br> Plaintiff <br><br> v. <br><br> CHARTER COMMUNICATIONS, INC.; SPECTRUM ADVANCED SERVICES, LLC; AND SPECTRUM MANAGEMENT HOLDING COMPANY, LLC, <br><br> Defendants. | Civil Action No. 2:22-cv-00125-JRG |

## DECLARATION OF MARTIN C. ARMSTRONG

I, Martin C. Armstrong, declare as follows:

1.     I have personal knowledge of the matters set forth herein.

2.     I am Vice President, Payroll Shared Services at Charter Communications, LLC.

3.     I am informed that Entropic Communications, LLC has filed suit against Charter Communications, Inc. ("CCI"), Spectrum Advanced Services, LLC ("SAS"); and Spectrum Management Holding Company, LLC ("SMHC").

4.     Based upon my personal knowledge and/or a reasonable investigation, CCI, SAS, and SMHC do not have employees in the State of Texas.

5.     CCI, SAS and SMHC do not participate in the hiring and firing of the employees of their subsidiaries in Texas.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: July 6, 2022

Martin C. Armstrong

**APPX416**

# EXHIBIT 6

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

|  |  |
|---|---|
| ENTROPIC COMMUNICATIONS, LLC,<br><br>   Plaintiff<br><br>   v.<br><br>CHARTER COMMUNICATIONS, INC.;<br>SPECTRUM ADVANCED SERVICES,<br>LLC; AND SPECTRUM MANAGEMENT<br>HOLDING COMPANY, LLC,<br><br>   Defendants. | Civil Action No. 2:22-cv-00125-JRG |

**<u>DECLARATION OF TERESA NELSON</u>**

I, Teresa Nelson, declare as follows:

1.    I have personal knowledge of the matters set forth herein.

2.    I am Manager - Real Estate Property and Database Administration at Charter Communications, LLC.

3.    I am informed that Entropic Communications, LLC ("Entropic") has filed suit against Charter Communications, Inc. ("CCI"), Spectrum Advanced Services, LLC ("SAS"); and Spectrum Management Holding Company, LLC ("SMHC").

4.    I have access to property lease agreements entered into by CCI, SAS, SMHC and their affiliates, and have reviewed records, if any, kept by CCI, SAS, and SMHC in the regular course of business in preparation for making this declaration.

5.    Based upon a reasonable review of company records, CCI, SAS, and SMHC do not own or lease offices or facilities located in the State of Texas.

6.      I am informed that Entropic has asserted in paragraphs 13, 14, & 17 of its amended complaint that CCI, SAS, and SMHC provide "Accused Services", "Accused Cable Modem Products" and "Accused Set Top Products" at physical stores including 700 Alma Dr., Plano Texas 75075; 2100 N. Dallas Pkwy, Plano, Texas 75075; and 4255-A Dowlen Rd., Beaumont, Texas 77706.

7.      I am further informed that Entropic has asserted in paragraph 16 of its amended complaint that CCI, SAS, and/or SMHC have regular and established places of business in this district, including at 1414 Summit Ave., Plano, Texas 75074.

8.      Based upon my reasonable review of company records, neither CCI, SAS, nor SMHC own or lease any of the above properties.  The owner or lessee of each of the above properties is Spectrum Gulf Coast, LLC.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: July 6, 2022

_____

Teresa Nelson

**APPX419**

CONFIDENTIAL MATERIAL OMITTED

# Exhibit 7 to Defendant's Motion to Dismiss

# Dkt. 61-9 (Sealed Version)

# Dkt. 62-9 (Public Version)

# FILED UNDER SEAL

# (APPX420-423)

CONFIDENTIAL MATERIAL OMITTED

# Exhibit 8 to Defendant's Motion to Dismiss
# Dkt. 61-10 (Sealed Version)
# Dkt. 62-9 (Public Version)
# FILED UNDER SEAL

# (APPX424-439)

**CONFIDENTIAL MATERIAL OMITTED**

# Exhibit 9 to Defendant's Motion to Dismiss
# Dkt. 61-11 (Sealed Version)
# Dkt. 62-9 (Public Version)
# FILED UNDER SEAL

# (APPX440-447)

CONFIDENTIAL MATERIAL OMITTED

# Exhibit 10 to Defendant's Motion to Dismiss
# Dkt. 61-12 (Sealed Version)
# Dkt. 62-9 (Public Version)
# FILED UNDER SEAL

# (APPX448-450)

CONFIDENTIAL MATERIAL OMITTED

# Exhibit 11 to Defendant's Motion to Dismiss

# Dkt. 61-13 (Sealed Version)

# Dkt. 62-9 (Public Version)

# FILED UNDER SEAL

# (APPX451-452)

CONFIDENTIAL MATERIAL OMITTED

# Exhibit 12 to Defendant's Motion to Dismiss
# Dkt. 61-14 (Sealed Version)
# Dkt. 62-9 (Public Version)
# FILED UNDER SEAL

# (APPX453-454)

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

ENTROPIC COMMUNICATIONS, LLC,

      Plaintiff

      v.

CHARTER COMMUNICATIONS, INC.,

      Defendant.

Civil Action No. 2:22-cv-00125-JRG

**JURY TRIAL DEMANDED**

███████████████

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS
THE SECOND AMENDED COMPLAINT FOR IMPROPER VENUE
PURSUANT TO FRCP 12(b)(3)**

## TABLE OF CONTENTS

I.  INTRODUCTION ...................................................................................................1

II.  LEGAL BACKGROUND .......................................................................................3

III.  ARGUMENT ..........................................................................................................5

1.  The activities and employees of the subsidiaries are attributable to CCI ..............5

a.  The subsidiaries are controlled by CCI with no independent existence ......5

i.  The subsidiaries have no employees of their own ...........................5

ii.  CCI is the manager of each subsidiary ............................................6

iii.  As manager, CCI executed the lease agreements for Spectrum stores in the District, among other contracts...................................8

iv.  No individual subsidiary is a complete, functioning business, but rather each plays a discrete, dependent role within the Spectrum business controlled by CCI ..........................................................10

v.  The subsidiaries have no independent officers or directors...........11

vi.  CCI officers lead company-wide corporate departments, each of which spans numerous subsidiaries ...............................................12

vii.  The subsidiaries do not hold corporate meetings and do not maintain their own records...........................................................13

b.  CCI holds out to the public that Charter is one enterprise and that CCI provides the accused products and services...............................................14

i.  CCI tells investors and the public that it provides the accused products and services ...................................................................14

ii.  All Charter operations use the same Spectrum branding policies and conduct nationwide, across all subsidiaries ...........................15

iii.  All Charter entities use the same website to sell products and services, list store locations, and post job openings......................15

c.  CCI admits—indeed affirmatively represents—to the federal government the reality that Charter is one enterprise and that CCI provides the accused products and services ..................................................................16

i.  To the Federal Communications Commission, CCI emphasizes its control over the single operating enterprise...................................16

APPX456

|     |     |     | ii.  | To the International Trade Commission, CCI admits that it is part and parcel of a "broadband connectivity company and cable operator" ................................................................................17 |

|     |     |     | iii. | To other Article III Courts outside this District, Charter pleads that CCI provides cable and communications services........................17 |

|     | 2.  |     | Venue is proper over CCI in the Eastern District of Texas ................................18 |

|     |     | a.  | CCI has committed acts of infringement in the District ...........................18 |

|     |     | b.  | CCI has a regular and established place of business in the District..........19 |

|     |     |     | i.   | There are physical Charter/Spectrum locations in the District from which the business of CCI is carried out .......................................21 |

|     |     |     | ii.  | Charter's physical locations are regular and established places of business .......................................................................................22 |

|     |     |     | iii. | The physical locations are the places of CCI ...............................26 |

| IV. | CONCLUSION ..................................................................................................................29 |

# TABLE OF AUTHORITIES

**Cases** **Pages**

*AGIS Software Development LLC v. Google LLC*, 2:19-cv-361, 2022 WL 1511757 (E.D. Tex. May 12, 2022) ................................................................................................22–23, 27

*Andra Group, LP v. Victoria's Secret Stores, LLC*, 6 F.4th 1283 (Fed. Cir. 2021) .......................4

*Bd. Of Regents v. Medtronic PLC*, No. 17-cv-0942, 2018 WL 4179080 (W.D. Tex. July 19, 2018) ......................................................................................................................27

*Entropic Communications, LLC v. DirecTV, LLC*, 2:22-cv-75, Dkt. No. 109, Order (E.D. Tex. Oct. 24, 2022) ..................................................................3, 19–20, 22–24, 26, 28

*In re Cray*, 871 F.3d 1355 (Fed. Cir. 2017) ...............................................................4, 21–22, 26

*In re Google*, 949 F.3d 1338 (Fed. Cir. 2020) .............................................................................22

*Ramirez v. Charter Communications, Inc.*, 75 Cal. App. 5th 365 (2022) ....................................25

*Sightline Payments, LLC v. Everi Holdings Inc.*, No. 6:21-cv-1015, 2022 WL 2078215 (W.D. Tex. June 1, 2022)..................................................................................................4

*Seven Networks, LLC v. Google LLC*, 315 F. Supp. 3d 933 (E.D. Tex. July 19, 2018)...............19

**Statutes**

28 U.S.C. § 1400(b)(2) ..................................................................................................................3

**Other**

*Charter Communications, Inc. v. Bear Creek Techs., Inc.*, 1:11-cv-0722-GMS, Dkt. No. 1, Complaint for Declaratory Judgement (D. Del. Aug. 17, 2011) ............................18

*Charter Communications, Inc. v. Rockstar Consortium US LP*, 1:14-cv-00055, Dkt. No. 1, Complaint for Declaratory Judgment (D. Del. Jan. 17, 2014)............................1, 18

*Charter Communications, Inc. v. Rockstar Consortium US LP*, 1:14-cv-00055, Dkt. No. 69, Answering Brief in Opposition to Motion to Dismiss for Failure to State a Claim [Redacted Version] (D. Del. Jan. 17, 2014) .......................................18

*In the Matter of Certain Digital Set-Top Boxes and Systems and Services Including the Same*, No. 337-TA-1315, Response to the Amended Complaint (June 21, 2022)..................1, 17

*Montes v. Charter Communications, Inc.*, No. 7:21-cv-489, Dkt. No. 1, Notice of Removal (S.D. Tex. Dec. 20, 2021) ...............................................................................25

*Montes v. Charter Communications, Inc.*, No. 7:21-cv-489, Dkt. No. 8, MOTION TO COMPEL ARBITRATION AND DISMISS (S.D. Tex. Jan. 31, 2022)......................................................25

*Montes v. Charter Communications, Inc.*, No. 7:21-cv-489, Dkt. No. 10, AMENDED MOTION TO DISMISS (S.D. Tex. Feb. 2, 2022) ..............................................................................24–25

**APPX459**

**INTRODUCTION**

There is no dispute that there are dozens of "Spectrum"-branded Charter physical locations in the District, staffed by numerous employees—discovery even revealed that CCI itself negotiated and signed the lease agreements for these stores. And there is no dispute that Charter provides accused products and services to customers in the District. Finally, there *should* be no dispute that CCI—the publicly-traded controlling corporation of this enterprise—is a provider of these accused products and services. Historically, it has admitted so. In 2014, CCI affirmatively plead (as plaintiff in a declaratory judgment complaint) to the U.S. District Court in Delaware:

> [***CCI, the sole named Charter entity***, is] a provider of cable services in the United States, offering a variety of entertainment, information, and communications solutions to residential and commercial customers.[1]

Eight years later, nothing has changed. In June 2022 CCI admitted to the U.S. ITC:

> Charter admits that ***Charter Communications, Inc.*** (***together*** with its controlled subsidiaries) is a broadband connectivity company and cable operator that provides television and other services to subscribers under the Spectrum brand and provides such services on a variety of platforms, including through digital set-top boxes . . .[2]

These facts close the book on whether venue is proper over CCI. Nevertheless, in front of ***this*** Court, CCI has made—and now renews—a motion that venue is improper. What is going on?

Charter's strategy is to ask this Court to ignore the tangible reality of CCI's operation of the Charter enterprise, in favor of playing along with an elaborate fiction involving over 200 shell LLCs set up and entirely controlled by CCI. Legally, the Court has only one decision to make: should the activities and employees of CCI's subsidiaries be imputed to the controlling entity CCI, the publicly-traded face of Charter to the world? Under controlling law, the answer is yes because

---

[1] *Charter Communications, Inc. v. Rockstar Consortium US LP*, 1:14-cv-00055, Dkt. No. 1 ¶ 15 (D. Del. Jan. 17, 2014) (*emphasis added*).

[2] *In the Matter of Certain Digital Set-Top Boxes and Systems and Services Including the Same*, No. 337-TA-1315, Response to the Amended Complaint (June 21, 2022).

1

**APPX460**

**CONFIDENTIAL MATERIAL OMITTED**

(aside from the prior admissions) venue discovery has confirmed that in reality there is only one enterprise. CCI's subsidiaries have no independent existence—indeed, Charter's corporate representative ████████████████████████████████ Discovery has revealed:

- All 200+ subsidiaries are limited liability companies (LLCs) with CCI as the sole manager. CCI itself set up the LLCs, dictated the details of their formation and their operating agreements, and as manager CCI itself runs every detail of the entities' operations. *See infra* 6–8.

- None of the LLCs have their own employees, except a single LLC set up to hold all the employment relationships *for all of Charter*. Every single Charter employee (including the Spectrum brand), from the CEO to the technicians and retail workers, is placed in this LLC container. CCI itself then "allocates" employees to the various shells, thereby directing all the employees of the entire collection of entities. *See infra* 5–6. Moreover, CCI suspects its employees don't even know which entity they work for. *See infra* 25.

- CCI signs the contracts for its subsidiaries, including agreements for the sale and lease of the Accused Instrumentalities *as well as lease agreements for locations in this District*. *See infra* 8–9.

- The subsidiaries have no independent officers or directors. All the named officers and directors overlap with CCI. *See infra* 11.

- The subsidiaries do not hold corporate meetings and do not maintain any records of their own. All records that may exist are maintained by CCI. *See infra* 13–14.

- The internal organization of Charter ignores the LLC boundaries: CCI officers *lead enterprise-wide corporate departments*, each of which spans numerous subsidiaries. *See infra* 12–13.

In summary, no individual subsidiary is a complete, functioning business, and CCI has actual control and authority over the actions of its subsidiaries. There is only one Charter, controlled entirely by CCI. The artificial subsidiary lines that Charter extols here do not exist in the day-to-day operation of Charter's cable and internet services business.

Naturally, this reality of "One Charter" appears in CCI's interactions with the public and government:

- Everywhere except here, CCI *is* the "Spectrum"-branded enterprise. To investors and the SEC, in its annual 10-K, CCI introduces itself as: "We are a leading broadband connectivity company and cable operator serving more than 32 million customers in 41 states through our Spectrum brand." *See infra* 14.

- Ditto for its statements on the single national website spanning all territories, operated by CCI and branded as Spectrum. On the "About Charter" page of its website, CCI states "Charter Communications, Inc. (NASDAQ:CHTR) is a leading broadband connectivity company and cable operator serving more than 32 million customers in 41 states through its Spectrum brand." *See infra* 15.

- CCI represents to the general public, to its investors, and to the SEC that it has "93,700 employees"—not that it is merely a holding company with zero. *See infra* 15.

- When CCI finds it convenient in interactions with federal agencies, it reveals the single-entity nature of its operations—justifying to the FCC the switching and swapping of communications licenses among various shells as "pro forma" because CCI is the "ultimate controlling entity" of the business. *See infra* 16-17.

- As noted at the outset, when CCI has sought the relief of the Federal Courts in patent matters, it has characterized *itself* as a provider of cable television and internet services. *See infra* 17–18. And even last summer, CCI admitted to the ITC that it is the actual provider of services. *See infra* 17.

Taken together, the evidence is compelling that CCI's subsidiaries are not separate businesses, but instead are illusory lines sketched on top of the reality of CCI's nationwide enterprise. These contrived lines do not exist in CCI's day-to-day business, but are instead artifices CCI points to when it helps, and eschews when it hurts. The law recognizes that in such situations the tangible reality of the operating enterprise controls, not the paper boundaries. This Court has reached the same conclusion repeatedly, including very recently in *Entropic Communications, LLC v. DirecTV, LLC et al.*, No. 2:22-cv-75-JRG (E.D. Tex.). Under each of the two established legal tests—lack of separateness and ratification—venue over CCI is fully proper in this District without any piercing of the corporate veil, as Charter suggests is necessary.

## LEGAL BACKGROUND

Venue is proper in any district where the defendant has committed acts of infringement and has a regular and established place of business. *See* 28 U.S.C. § 1400(b)(2). Specifically, a

3

APPX462

"regular and established place of business" must be (1) "a physical place in the district;" (2) "regular and established;" and (3) "the place of the defendant." *In re Cray*, 871 F.3d 1355, 1360 (Fed. Cir. 2017). The Federal Circuit has set forth a number of considerations relevant to determining if a regular and established place of business is "of the defendant." *Id.* at 1363–64. Those considerations include whether the defendant owns or leases the place, exercises other attributes of possession or control over the place, conditions employment on an employee's continued residence in the district, stores materials at a place in the district so that they can be distributed or sold from that place, advertises a place for its business, or represents that it has a place of business in the district. *Id*. A court may also consider the nature and activity of the alleged place of business of the defendant in the district in comparison with that of other places of business of the defendant in other venues. *Id.* at 1364. These enumerated considerations are not exhaustive but rather illustrative of the types of information relevant for determining whether a physical place is "of the defendant." *See id*. at 1363–64.

In the case of affiliated entities, the place of business of one company can be imputed to another when the two have not maintained corporate separateness or when the defendant has ratified the location as its own. *See Andra Group, LP v. Victoria's Secret Stores, LLC*, 6 F.4th 1283, 1289 (Fed. Cir. 2021). The standard for establishing that two entities lack corporate separateness is "relaxed" when the theory is not used to impose liability, but merely to establish jurisdiction or venue. *See Sightline Payments, LLC v. Everi Holdings Inc.*, No. 6:21-cv-1015, 2022 WL 2078215 at *4 (W.D. Tex. June 1, 2022) (appeal filed June 28, 2022) (quoting *In re Commodity Exch., Inc.*, 213 F. Supp. 3d 631, 681 (S.D.N.Y. 2016)).

4

**APPX463**

**CONFIDENTIAL MATERIAL OMITTED**

## ARGUMENT

**1.  The activities and employees of the subsidiaries are attributable to CCI.**

There can be no dispute that this Court has venue over certain Charter entities. As Charter readily acknowledges, there are dozens of Spectrum stores in Texas, including numerous stores in this District. *See* Dkt. No. 61 at 13; *see also* Dkt. No. 61-14 (Exhibit 12 to Charter Motion). Charter also does not dispute that there are Charter/Spectrum employees conducting business in this District, *i.e.* by staffing those stores and responding to service and installation calls at customers' homes. *See* Dkt. No. 61 at 4–5. Charter also provides the allegedly infringing products and services to customers in this District. The only dispute before the Court is whether venue is proper against CCI—the public-facing, publicly-traded, controller and orchestrator of the enterprise.

### a.  The subsidiaries are controlled by CCI with no independent existence.

The details that follow were unearthed in discovery. CCI saw Entropic's opposition to the original version of the present motion before renewing and re-filing it. In the renewed version, CCI confesses some of the following points. It is notable that none of it was revealed to the Court in the original CCI motion.

#### i.  The subsidiaries have no employees of their own.

One subsidiary, Charter Communications, LLC, employs ***all*** personnel within the Charter business. *See* Exhibit A, Proost Dep. Tr., at 73:20–74:11. Neither CCI nor any of the remaining subsidiaries have employees of their own. *See id.* ████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

5

**APPX464**

**CONFIDENTIAL MATERIAL OMITTED**

████████████████████████████████████████████████████

████████████████████

   **ii. CCI is the manager of each subsidiary.**

   All of the Charter subsidiaries, direct and indirect, are limited liability companies (LLCs), and CCI is designated as the corporate manager of every last one of them. *See* Exhibit A, Proost Dep. Tr., at 56:23–57:12; *see also* Dkt. No. 61 at 7–9. This role is not, as Charter suggests, ceremonial or incidental. ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████ In addition to the individual operating agreements, CCI has also put in place a Management Agreement which specifies CCI's authority and duties as manager. *See* Exhibit D, Second Amended and Restated Management Agreement ("Management Agreement"). Indeed, ████████████████████████████████████

████████████████████████████████████████████████████

████

   As the manager and ultimate parent, CCI dictates the terms of each subsidiary's operations and existence, including writing and executing the formation documents. For example, this is the signature page of Spectrum Gulf Coast's operating agreement:

**APPX465**



Exhibit C, Spectrum Gulf Coast, LLC Operating Agreement, at 12. All internal Charter contracts that Charter has produced in venue discovery are the same, *i.e.* one person signs for all Charter entities. When asked whether this would be true of the operating and management agreements for all 200+ subsidiaries, █████████████████████████████████████████

Charter's corporate representative further confirmed that CCI dictates the terms of these agreements, according to how it wants each subsidiary to operate. When asked how the operating agreements are negotiated, he answered:



Exhibit A, Proost Dep. Tr., at 45:25–46:10; *see also* 49:13–16 █████████████████

█████████████████████████████████████████████████████

CONFIDENTIAL MATERIAL OMITTED

███████████████████████████ Note that even CCI's representative ████████████ ████████ the distinctions between entities that are played up so strongly to this Court are not in the vocabulary of CCI/Charter's own designated witness.

       **iii.    As manager, CCI executed the lease agreements for Spectrum stores in the District, among other contracts.**

CCI's control of its subsidiaries is so direct that CCI routinely executes contracts on their behalf. Most notably, the leases for Spectrum stores in the District, nominally held by Spectrum Gulf Coast, LLC, were actually negotiated and executed by CCI. As an example, below is the signature line on the lease for the Spectrum store in Beaumont, Texas:



Exhibit E, Beaumont Store Lease, at 34 (highlighting added for clarity). It is worth noting that this was intentional—████████████████████████████████████████ ██████████████████████████████████ and essentially every other Charter subsidiary, but chose to sign in his capacity as a CCI officer, not in his capacity as an officer of Spectrum Gulf Coast. This format is mirrored in nearly all of the property leases produced by Charter as part of venue discovery.

The same is also true of agreements relating to the Accused Instrumentalities, *e.g.,* CMTS, cable modem, and set-top box equipment used to deliver the Accused Services. For example,

APPX467

**CONFIDENTIAL MATERIAL OMITTED**

Charter Communications Operating, LLC entered into a Master Purchase Agreement ██████

██████████████████████████████████████████████████ *See* Exhibit Z. That

purchase agreement is signed by CCI, as manager of Charter Communications Operating, LLC.

*See id.* at 1.



Furthermore, within the Charter business, equipment is leased by ████████████

███ to the various operating subsidiaries pursuant to a Master Equipment Lease Agreement. *See*

Exhibit AA. Several dozen Charter entities are signatories to the lease agreement, but CCI—and

more specifically, the same senior vice president on behalf of CCI—signed on behalf of all of

them. *See id.* at 15–22.

Finally, CCI is listed as the custodian of nearly all the technical documents Charter has

produced in this case. This includes, for example, a "Request for Quote" document for one of the

accused set-top boxes (the Worldbox v2.0). *See* Exhibit AB. Charter has taken the position that

"CCI regularly maintains its corporate records separate from those of its subsidiaries." *See* Dkt.

No. 61-3, Declaration of Jennifer Smith, at ¶ 7. Although discovery has called this representation

into question (*see infra* 13), to the extent it is true, it confirms that the technical documents belong

to CCI. This further demonstrates CCI's control over the equipment that is used to deliver Charter's

cable services.

CONFIDENTIAL MATERIAL OMITTED

   iv.   **No individual subsidiary is a complete, functioning business, but rather each plays a discrete, dependent role within the Spectrum business controlled by CCI.**

No subsidiary operates an independently functioning business. Instead, each subsidiary plays a specific role in the overall national Spectrum business as designated and orchestrated by CCI. Charter's corporate representative testified that the overarching Management Agreement between CCI and the subsidiaries controls the relationship between the companies, ███████

████████████████████████████████████████████████████████████████

███████████████████ Exhibit A, Proost Dep. Tr., at 71:25–72:6.

For example, on paper Spectrum Gulf Coast operates retail stores and the "plant" in Texas (Charter's term for the equipment used to deliver television and internet services). *See* Exhibit A, Proost Dep. Tr., at 70:8–20, 85:6–18.[3] Spectrum Gulf Coast cannot service customers or operate its stores without Charter Communications, LLC's employees, which are allocated at the direction of CCI. *See* Exhibit A, Proost Dep. Tr., at 85:6–18. And, Charter Communications, LLC does not appear to have any operations or function aside from providing employees to the other subsidiaries.

Other services, such as VoIP and mobile, are provided by different subsidiaries but are sold out of the same stores leased by Spectrum Gulf Coast and operated by Charter Communications, LLC employees. *See* Exhibit A, Proost Dep. Tr., at 86:13–87:19. Equipment, including the accused set-top boxes and back-end CMTS equipment, ███████████████████ and then leased to the various subsidiaries.[4] *See* Exhibit B, Boglioli Dep. Tr., at 54:13–55:14, 78:22–79:6. But tellingly, no money ever changes hands between the entities! Instead, most of the dollars are

_____

[3] ████████████████████████████████████████████████████████

████████████████████████████████████████████

[4] ████████████████████████████████████████████████████████

██████████████████████████████████████

**APPX469**

CONFIDENTIAL MATERIAL OMITTED

kept within a single entity, ███████████████████████████████

█████████████████████ Exhibit A, Proost Dep. Tr., at 72:10–73:2. The divisions

are not reality, they are accounting devices.

Intellectual property rights are also nominally held by separate entities. Trademarks, for

example, including the Spectrum▸ brand under which Charter conducts business, are held by a single

entity, Charter Communications Holding Company, LLC. *See* Exhibit B, Boglioli Dep. Tr., at

93:11–21, 95:7–16; *see also* Exhibit F, Trademark Electronic Search System (TESS). There are so

many entities, with so many discrete pieces of the business, that Charter's corporate representative,

who is the Deputy General Counsel in charge of forming and managing the entities, did not know

each one or what they do. *See* Exhibit A, Proost Dep. Tr., at 27:24–28:7, 66:21–23, 76:2–16.

Indeed, he testified that, although he is an officer with all 200+ subsidiaries, he does not distinguish

between the different entities in his role:



Exhibit A, Proost Dep. Tr., at 30:6–11.

> **v.    The subsidiaries have no independent officers or directors.**

All 200+ subsidiaries have complete overlap of officers and directors with CCI. As

Charter's corporate representative testified, save for a few exceptions that are not relevant here,

Charter simply copies the same officer list for every new entity that gets created. *See* Exhibit A,

Proost Dep. Tr., at 42:4–12; *see also* 69:15–17 (███████████████████████

████████████████ ).

11
APPX470

**CONFIDENTIAL MATERIAL OMITTED**

>    **vi.    CCI officers lead company-wide corporate departments, each of
>    which spans numerous subsidiaries.**

The individual departments within the Charter business (e.g., Field Operations, Human Resources, Sales, etc.) are ***enterprise-wide*** and are headed by ***CCI's*** officers. *See* Exhibit G, CCI Officer List; *see also* Exhibit B, Boglioli Dep. Tr., at 100:4–8 (confirming accuracy). The entity lines dissolve when one examines the actual functioning enterprise.

For example, HR is a unified department slashing across the subsidiaries, headed by CCI itself. ███████████████████████████████████████████████████████ According to his company bio, as EVP of CCI he "is responsible for ***all human resources strategies, policies and practices for more than 93,000 employees***" and "oversees all aspects of HR including recruitment, training and development, HR operations including payroll, HR shared services and HR systems, as well as compensation and benefits." *See* Exhibit I (*emphasis added*). When it comes to HR and employee matters, there is "One Charter," and it is controlled by CCI.

So too with Field Operations. ██████████████████████████████████████ ██████████████████████, and his company bio states that he "oversees ***the entire Field Operations organization including Charter's 11 field regions operating across 41 states***; engineering and construction…; standards and compliance; and human resources for field operations." *See* Exhibit J (*emphasis added*). Again, the reality of One Charter controlled by CCI surfaces.

Discovery confirmed the enterprise-wide authority of these CCI executives. Charter's designated corporate witness confirmed that Mr. Marchand, Mr. Monaghan, and the other CCI department heads have the power to ***hire, fire, and direct the work*** of employees within their respective departments:

███████████████████████████████████████████████████████████
███████████████████████████████████████████████

**APPX471**

## CONFIDENTIAL MATERIAL OMITTED



The entity lines simply don't exist for the officers of CCI when they are performing day-to-day duties across the enterprise.

> **vii.** **The subsidiaries do not hold corporate meetings and do not maintain their own records.**

In a declaration submitted with Charter's motion to dismiss, Charter's VP Associate General Counsel states that "CCI **[1]** regularly maintains its corporate records separate from those of its subsidiaries, including those referenced herein, and **[2]** conducts meetings of its shareholders and directors separate from those these [*sic*] subsidiaries." Dkt. No. 61-3, Declaration of Jennifer Smith, at ¶ 7 (numeral labels added for clarity). Examine the sworn statements one at a time. First, item **[1]**: Seemingly contrary to the declaration, Charter in fact maintains all corporate records under a single management system for all subsidiaries. *See* Exhibit A, Proost Dep. Tr., at 38:23–39:11. Moreover, as noted above, CCI is listed as the custodian of nearly every technical document Charter has produced in this case. It is unclear how this can be, given CCI's stance that other entities are responsible for the Accused Instrumentalities. *See* Dkt. No. 61 at 5–6. In any event, separate maintenance appears to be a stretch for what is actually a unitary document management system.

Second, for item **[2]**: the corporate meetings are not really separate—discovery revealed that the subsidiaries hold no meetings at all! CCI—head of the whole enterprise—is the ***only*** Charter entity that conducts corporate meetings. *See* Exhibit A, Proost Dep. Tr., at 61:23–62:5

. Perhaps there are "simple explanations,"

but the point is that CCI's declaration, carefully crafted for this motion, should be given little weight compared to what CCI does and says everywhere else.

We now turn to what CCI says everywhere else, by first examining what CCI represents to the public and then what CCI represents to the government.

> **b.  CCI holds out to the public that Charter is one enterprise and that CCI provides the accused products and services**

>> **i.  CCI tells investors and the public that it provides the accused products and services.**

The very first sentence of ***CCI's*** 10-K annual report states, "[w]e are a leading broadband connectivity company and cable operator serving more than 32 million customers in 41 states through our Spectrum brand." Exhibit K at 1. CCI also tells its investors that it operates in Texas, stating "[w]e operate in geographically diverse areas which are managed centrally on a consolidated level." *Id.* at 3. This is then followed by a map of the company's "footprint":



*See id.*

**APPX473**

**CONFIDENTIAL MATERIAL OMITTED**

CCI makes the same representations on its website, https://corporate.charter.com/about-charter.[5] "Charter Communications, Inc. (NASDAQ:CHTR) is a leading broadband connectivity company and cable operator serving more than 32 million customers in 41 states through its Spectrum brand." Exhibit L, About Charter, at 1. Indeed, CCI represents that "Spectrum is a suite of advanced broadband services ***offered by Charter Communications, Inc.***" *Id.* at 4 (*emphasis added*). The same "About Charter" page also represents that Charter Communications, Inc. itself has 93,700 employees. *See id.* at 3.

### ii. All Charter operations use the same Spectrum branding policies and conduct nationwide, across all subsidiaries.

All Charter entities use the same "Spectrum" branding and operate as a single Spectrum business. *See* Exhibit B, Boglioli Dep. Tr., at 55:17–19 ("all our branding in our stores is the Spectrum brand"), 95:12–14 ("The Spectrum brand is used for all customer-facing functions in all retail stores in all service"); *see also* Dkt. No. 61 at 4. As addressed above, the Spectrum trademarks are all held by one Charter entity but used by every subsidiary. *See id.* at 93:11–21. Despite that, Charter Communications, Inc. tells the public that Spectrum is "its" brand. *See* Exhibit L at 4. In addition, ██████████████████████████████████████████ ████████. *See id.* at 52:16–25. CCI's marketing department also ████████████████████ ███████. *See id.* at 96:23–97:18.

### iii. All Charter entities use the same website to sell products and services, list store locations, and post job openings.

Once again, the reality of "One Charter" is confirmed by Charter's website. There is one public-facing website for consumers, www.spectrum.com.[6] Through that website, customers can

---

[5] The website includes a footer that reads "© 2022 Charter Communications Inc." *See* Exhibit L at 7.

[6] There's also a related "corporate.charter.com" website that is essentially an investor-focused website for all of Charter. It links directly to the Spectrum website, including the careers page of the Spectrum website.

**APPX474**

log on and sign up for services anywhere Spectrum offers it, find any Spectrum location, and apply for any posted Spectrum job anywhere in the country—from field technicians to retail to engineers to in-house counsel. There are no boundaries. Thus, the unitary website provides access to: (1) stores within this District, *see e.g.* Exhibit O[7] (Spectrum store location in Plano, TX offering "Spectrum Mobile, Video, Internet and Phone"); (2) products and services offered within this District, *see e.g.* Exhibit P[8] (showing offers for TV, internet, phone, and mobile services for an address in Frisco, TX); and (3) available jobs within this District, *see e.g.* Exhibit Q[9] (job posting for a retail sales specialist in Beaumont, TX).

### c.    CCI admits—indeed affirmatively represents—to the federal government the reality that Charter is one enterprise and that CCI provides the accused products and services.

#### i.    To the Federal Communications Commission, CCI emphasizes its control over the single operating enterprise.

When dealing with the Federal Communications Commission, it is advantageous to Charter to overlook the subsidiaries. It drastically simplifies shuffling FCC licenses. Thus, CCI tells the FCC not to worry about the subsidiaries because CCI controls the enterprise. In a recent application to transfer certain FCC licenses from one CCI subsidiary (Spectrum Northeast, LLC) to another (Spectrum NLP, LLC), Charter said the proposed assignment was:

> entirely *pro forma* in nature, as Charter [defined therein as CCI] is currently the ultimate controlling entity of the existing Licensees and will remain the ultimate controlling entity of Spectrum NLP, LLC after the restructuring occurs.

---

[7] Available at https://www.spectrum.com/locations/tx/plano/700-alma-dr

[8] Available at https://www.spectrum.com/address/localization?zip=75035&a=13286+Guerin+Dr&serviceVendorName=twc&v=ORG&omnitureId=4f8456d9-c71e-4429-95c0-92c76957a824

[9] Available at https://jobs.spectrum.com/job/beaumont/retail-sales-specialist-bilingual-spanish-18-00-per-hour-plus-commission-and-incentives/4673/39929994304

**APPX475**

Exhibits M & N, "Application for Fixed Satellite Service by Spectrum Northeast, LLC" and attachment thereto.[10] The application goes on to note that the assignment of the FCC licenses "will enable Charter [again, defined therein as CCI] to continue providing cable and other services under a simplified entity structure." *Id*.

> ii.     **To the International Trade Commission, CCI admits that it is part and parcel of a "broadband connectivity company and cable operator."**

In June 2022, Charter answered an ITC complaint, *In the Matter of Certain Digital Set-Top Boxes and Systems and Services Including the Same*, No. 337-TA-1315, Response to the Amended Complaint (June 21, 2022). Charter flatly admits the salient point:

> Charter admits that Charter Communications, Inc. (together with its controlled subsidiaries) is a broadband connectivity company and cable operator that provides television and other services to subscribers under the Spectrum brand and provides such services on a variety of platforms, including through digital set-top boxes . . .

*Id*. ¶ 20. Furthermore, "Charter"—defined as the full collection of entities including at its head CCI—sells or leases set-top boxes", ¶ 31, "charges subscribers for lost, damaged, and/or returned set-top boxes", ¶ 64, and "sells and provides Spectrum TV services in the United States and, in certain situations, provides set-top boxes in conjunction with this service", ¶ 66.[11]

> iii.    **To other Article III Courts outside this District, Charter pleads that CCI provides cable and communications services.**

Sometimes, Charter affirmatively seeks out the Article III Courts for help. When it does, CCI files the suit and names itself plaintiff. In such pleadings, CCI confirms that is the service provider. In 2014 for example, CCI—and not one of its operating subsidiaries—brought an action

---

[10] Source: https://fcc.report/IBFS/SES-ASG-20200522-00563, portion quoted at https://fcc.report/SES-ASG-20200522-00563/2362560.

[11] The other defined entities in the Answer were Charter Communications Operating, LLC, Charter Communications Holding Company, LLC, and Spectrum Management Holding Company, LLC. All of these are, on paper, employee-less "holding" companies like CCI and not direct operating subsidiaries. Yet there Charter admits the reality—all of these "holding" companies provide the goods and services accused.

**APPX476**

for declaratory judgment of patent non-infringement. CCI plead affirmatively that CCI is "a provider of cable services in the United States, offering a variety of entertainment, information, and communications solutions to residential and commercial customers." *See Charter Communications, Inc. v. Rockstar Consortium US LP*, 1:14-cv-00055, Dkt. No. 1 ¶ 15 (D. Del. Jan. 17, 2014).

Further down the docket, when fighting a motion to dismiss, CCI described itself as a "multiple-system operator[]" that "operate[s] . . . cable networks in compliance with common industry standards." *Id.*, Dkt. No. 69 at 1. CCI told the District of Delaware that it filed the declaratory judgment suit (as co-plaintiff with other cable operators) to resolve the controversy over "liability for infringement for their [plaintiffs'] use of identical Cisco and ARRIS equipment, provision of common services, and practice of the same industry standards." *Id*. at 4–5.

Likewise, in 2011 CCI pursued the same strategy and made the same allegations. In that DJ suit, CCI plead that it "is the nation's fifth largest cable communications company, and, through its operating subsidiaries, provides video, high speed data, and voice services to subscribers . . . ." *Charter Communications, Inc. v. Bear Creek Techs., Inc.*, 1:11-cv-0722-GMS, Dkt. No. 1 ¶ 1.

In summary, CCI has been somewhat duplicitous in dealing with the Article III Courts. When seeking their favor, CCI not only admits but affirmatively pleads that CCI is the enterprise. When seeking to dodge the present suit, CCI denies and disavows. The truth is that CCI *is* "a provider of cable services in the United States," exactly as it pleads in the *Rockstar* case.

### 2.  Venue is proper over CCI in the Eastern District of Texas.

#### a.  CCI has committed acts of infringement in this District

In its initial motion to dismiss (Dkt. No. 18), CCI did not dispute this element. In its renewed motion, CCI half-heartedly does, denying—in a footnote—that CCI commits acts of

infringement "because it does not own, lease, or distribute the Accused Cable Modem Products and because it does not provide the Accused Services." Dkt. No. 61 at n. 9.

CCI's argument as to this element fails immediately and automatically because it also stands accused of *indirect* infringement. The "acts of infringement required to support venue in a patent infringement action need not be acts of direct infringement, and venue does lie if the defendant only induced the infringement or contributed to the infringement in the forum." *Seven Networks, LLC v. Google LLC*, 315 F. Supp. 3d 933, 943 (E.D. Tex. July 19, 2018). Entropic has alleged that CCI induces infringement that occurs in the District, as well as alleging that CCI commits acts of direct infringement. *See* Dkt. No. 53 at ¶¶ 44, 60, 77, 94, 111; *Id*. at 942 ("Where a complaint alleges infringement, the allegations satisfy the 'acts of infringement' requirement of § 1400(b) although the allegations may be contested.") (quoting *Symbology Innovations, LLC v. Lego Sys., Inc.*, 282 F. Supp. 3d 916, 928 (E.D. Va. 2017)). Standing alone, that is the end of this element.

### b.  CCI has a regular and established place of business in the District.

CCI has regular and established places of business in this District, including the Spectrum stores and other locations from which its technicians are dispatched, all of which are staffed by Charter/Spectrum employees. This Court recently addressed this issue on similar facts in *Entropic Communications, LLC v. DirecTV, LLC et al.*, 2:22-cv-75-JRG. That opinion should be dispositive here.

In that case, the Dish defendants argued that physical stores leased and operated by their California subsidiary could not be considered the places of business of the ultimate parent company. This Court rejected that argument, finding no dispute that Dish-branded products and services are sold and delivered through Dish-branded retail outlets in the District. *Entropic Communications, LLC v. DirecTV, LLC*, 2:22-cv-75, Dkt. No. 109 at 7 (E.D. Tex. Oct. 24, 2022).

**APPX478**

The Court then cited various instances of overlap between Dish California and the named Dish defendants. For example, Dish California used the same logo, the same standard service agreement, the same headquarters, and shared overlapping leadership with the named defendants, and technicians employed by Dish California carried business cards identifying their employer as the parent company. *See id.* at 8, 9. Finally, the Court noted the various ways in which Dish "is purposefully holding itself out as providing products and services in California." *Id.* at 10. For example, from the main Dish website, a visitor could find Dish service packages, authorized retailers of Dish-branded products, and job listings for potential employment with Dish, all within the District. *See id*. Therefore, the California stores were both "regular and established" and were properly attributable to Dish. *See id.* at 10–11.

In this case, as addressed in further detail below, the Charter entities all use the same "Spectrum" branding, as well as the same public-facing website that promotes service packages, store locations, and employment positions within the District. Charter also uses the same service agreements nationwide and the subsidiaries share headquarters.[12] But when it comes to the relationship between CCI and the subsidiaries that supposedly operate its locations, the facts are even stronger. CCI exerts a degree of control over its subsidiaries that far exceeds the evidence presented in the *DirecTV* case.

---

[12] Charter Communications, Inc. was headquartered in St. Louis prior to June 2022 and then began moving their headquarters to a new complex in Stamford, Connecticut. *See* https://corporate.charter.com/newsroom/charter-officially-opens-corporate-headquarters-in-stamford-ct. Spectrum Gulf Coast, LLC's mailing address is listed as the St. Louis address, 12405 Powerscourt Drive, St. Louis, MO 63131, with the Texas Comptroller of Public Accounts. *See* Exhibit S. It does not appear to be registered to conduct business in Missouri, however. *See* Exhibit T (showing no results for "spectrum gulf coast" on the Missouri Secretary of State's business entity search website).

      **i.** **There are physical Charter/Spectrum locations in the District from which the business of CCI is carried out.**

To satisfy the first *Cray* factor, the place need only be a "physical, geographical location in the district from which the business of the defendant is carried out." *In re Cray*, 871 F.3d at 1360. Charter's motion nominally contests this element, but Charter's real gripe is with the second and third factors. This is because Charter readily admits that there are physical Charter locations in this District carrying out Spectrum business. *See* Dkt. No. 61 at 13; *see also* Dkt. No. 61-14 (Exhibit 12 to Charter Motion). Charter just believes these locations are not places of business "of" CCI, which is properly addressed under the other factors. As such, this factor should be undisputed.

Entropic's Second Amended Complaint identifies at least four such locations, including a facility at 1414 Summit Avenue, Plano, Texas 75074 ("Summit Ave. Facility"), as well as retail outlets located at 700 Alma Drive, Plano, Texas 75075 ("Alma Dr. Store"), 2100 N. Dallas Parkway, Plano, Texas 75075 ("Dallas Pkwy Store"), and 4255-A Dowlen Road, Beaumont, Texas 77706 ("Dowlen Rd. Store"). *See* Dkt. No. 53 at ¶¶ 16–17. Charter's website lists numerous other store locations in the District as well. https://www.spectrum.com/locations/tx.

There can be no doubt that these locations are used to carry out CCI's business of "offer[ing] a full range of state-of-the-art residential and business services including Spectrum Internet®, TV, Mobile and Voice." *See* Exhibit L at 1. Each location displays the Spectrum› logo. *See* Second Amended Complaint, Dkt. No. 53 at ¶¶ 16–17 (logo appearing on the face of each building); *see also* Exhibit U (logo appearing on service vans parked outside the Summit Ave. Facility). Notably, this is the same logo that appears on the face of Charter's customer service agreements used nationwide. *See e.g.* Exhibit V (Spectrum Residential Internet Services Agreement). And the physical stores offer the same Spectrum services that are offered on the main

Charter/Spectrum website and that CCI has touted publicly. *See* Exhibit B, Boglioli Dep. Tr., at 49:9–17; *see also* Exhibit P.

These are the same facts that were present in the *DirecTV* case. There, the Court found that retail stores in the district bore the Dish name and provided Dish-branded products and services, even though the stores were leased and operated by a subsidiary. *See Entropic Communications, LLC v. DirecTV, LLC*, No. 2:22-cv-75, Dkt. No. 109 at 7 (E.D. Tex. Oct. 24, 2022). The facts here are indistinguishable.

      **ii.   Charter's physical locations are regular and established places of business.**

The second *Cray* factor requires the place of business to be regular and established. "Regular" means "operat[ing] in a steady, uniform, orderly, and methodical manner." *In re Cray Inc.*, 871 F.3d at 1362. The Federal Circuit has also stated the need for "the regular, physical presence of an employee or other agent of the defendant conducting the defendant's business at the alleged place of business." *In re Google*, 949 F.3d 1338, 1345 (Fed. Cir. 2020). An agency relationship involves "(1) the principal's right to direct or control the agent's actions, (2) the manifestation of consent by the principal to the agent that the agent shall act on his behalf, and (3) the consent by the agent to act." *Id.* The Federal Circuit has also emphasized that "[t]he power to give interim instructions distinguishes principals in agency relationships from those who contract to receive services provided by persons who are not agents." *Id.* at 1345–46.

In *AGIS Software Development LLC v. Google LLC*, 2:19-cv-361, 2022 WL 1511757 (E.D. Tex. May 12, 2022), this Court found third party CTDI to be Google's agent for venue purposes, based on the fact that Google "directs and controls CTDI's actions" within the established place of business (a portion of a CTDI repair facility designated as the Google Secured Area). *See* 2022 WL 1511757 at *4. The agreement between Google and CTDI allowed Google to

set the physical specifications for its secured area; restricted that area to Google's products and services and limited access to CTDI employees authorized to work on Google's products; gave Google authority to move the secured area; and provided instructions for services that CTDI was required to perform for Google customers. *See id.* at *5. Notably, however, CTDI was not an affiliate of Google, and their agreement expressly disclaimed any agency relationship. *See id.* at *8.

Likewise, in the *DirecTV* case, this Court found this element satisfied based on the fact that "DISH holds the locations in CDCA out as its own." *See Entropic Communications, LLC v. DirecTV, LLC*, No. 2:22-cv-75, Dkt. No. 109 at 9 (E.D. Tex. Oct. 24, 2022). Specifically, the Court noted that the Dish logo appears on vans and other property stored at the locations in question. *See id.* at 10. As a result, there was "little real dispute that the locations at issue are 'physical places' within CDCA and that they are 'regular and established.'" *Id.*

Not only are the same facts present here (*see supra* 21 (noting that the Spectrum logo appears on vans and the buildings themselves at the locations in question)); there is even more compelling evidence that the Spectrum stores are "regular and established" and that the employees who operate these stores are agents of CCI.

First, CCI, as the manager of Charter Communications, LLC and Spectrum Gulf Coast, has the right to direct or control the employees' actions. ████████████████████████████
████████████████████████████████████████████████████
████████████████████████ This Management Agreement sets forth CCI's authority and duties as manager, including ████████████████████████████
████████████ as well as ████████████████████████████
████████████████████████████████████████████ *See* Exhibit D at ¶

2(b)(i)–(ii). In addition, Charter's corporate departments span numerous subsidiaries but are ultimately headed by CCI officers. *See supra* 12–13. Charter's corporate representative testified that these CCI officers can direct the work of the employees in their respective departments, which they also represent on their biographies as CCI officers. *See supra* at 12–13.

CCI has also manifested its consent that the employees act on the company's behalf, including by representing to the public that the employees work for CCI. This can be seen on CCI's website and in the company's annual shareholder report, both of which characterize CCI as a company with over 93,000 employees. *See* Exhibit L, About Charter, at 1; Exhibit W, 2021 Shareholder Report, at 9. It is also reflected in the fact that, just as in the *DirecTV* case, CCI uses its website to promote Charter/Spectrum job postings around the country, including within the District. *See supra* 15–16. Furthermore, because the employees, stores, vans, etc. all use the same Spectrum branding, there is no way for a customer to distinguish between the different subsidiaries. CCI even represented in the announcement of its new headquarters in Connecticut that it has "1,700 employees" now working there, even though all are actually employed by Charter Communications, LLC. *See* Exhibit X, Charter Officially Opens New State-of-the-Art Corporate Headquarters in Stamford, at 1.[13]

CCI has even acknowledged workers as its own employees/agents in federal court filings. One such case involved a wrongful death action, brought by the family of a former employee, against CCI and one of its managers. *Montes v. Charter Communications, Inc.*, No. 7:21-cv-489 (S.D. Tex.). CCI's amended motion to dismiss confirms that Ms. Trevino was "an employee of Charter," which it had earlier defined as Defendant Charter Communications, Inc. *See id.*, Dkt.

---

[13] Available at https://corporate.charter.com/newsroom/charter-officially-opens-corporate-headquarters-in-stamford-ct

APPX483

CONFIDENTIAL MATERIAL OMITTED

No. 10 at 1, 2. As for the manager, CCI described him as "Charter's agent." *See id.*, NOTICE OF REMOVAL, Dkt. No. 1 at ¶ 12 ("Plaintiff has failed to plead facts establishing that Anderson[14] was negligent or grossly negligent because, <u>as Charter's agent</u>, he did not owe Ms. Trevino an individual duty") (*emphasis added*).

Finally, the Spectrum employees also have consented to act as the agents of CCI. When people apply to work for Charter, they do so through the single Charter website. When they start work, ███████████████████████████████████████. *See* Exhibit Y. The Agreement does not specify which Charter entity is the counterparty but rather states that it applies to all disputes ███████████████████████████████████████

███████ Exhibit Y at ¶ B(2). Indeed, CCI has repeatedly invoked the agreement by moving to compel arbitration in various employment litigations. *See e.g. Ramirez v. Charter Communications, Inc.*, 75 Cal. App. 5th 365, 368 (2022) (affirming order denying CCI's motion to compel arbitration); *see also Montes v. Charter Communications, Inc.*, No. 7:21-cv-489, MOTION TO COMPEL ARBITRATION AND DISMISS, Dkt. No. 8 (S.D. Tex. Jan. 31, 2022).

When Charter's corporate representative was asked if employees were even aware of the distinction between the various Charter entities, he admitted ███████████████████████

███ *See* Exhibit A, Proost Dep. Tr., at 74:12–17. This appears accurate. Examples abound on LinkedIn of employees who represent that they work for "Charter Communications, Inc." even though CCI apparently disclaims them and says they instead work for a subsidiary. *See, e.g.*:

- https://www.linkedin.com/in/michael-hanrahan-3521751/;
- https://www.linkedin.com/in/lisa-domenick-520aba23/;
- https://www.linkedin.com/in/rose-ayuyu-morales-shrm-cp/;

---

[14] Defendant confirmed that Brian Anderson is employed by Charter Communications, LLC.

APPX484

- https://www.linkedin.com/in/arshanap/;

- https://www.linkedin.com/in/neilschworm/;

- https://www.linkedin.com/in/steven-widmer-9890ba8/;

- https://www.linkedin.com/in/jim-martin-7228854/.

And here's what CCI's website has to say: "[o]ur diverse, highly skilled employees are our greatest resource . . . ." Exhibit AC, Our Employees, at 1. In summary, CCI has given their employees no reason to believe they work for anyone but CCI. And those employees are delegated the power to carry out Charter's business.

CCI thus possesses actual authority as the manager of its subsidiaries and does in fact dictate the allocation of Spectrum employees to its various subsidiaries, while also controlling aspects of their work. Furthermore, CCI has represented to the world that, when a customer walks into a Spectrum store or has a Spectrum technician install equipment at their home, that customer is interacting with an employee/agent of Charter Communications, Inc. There is no dispute that these employees are regularly present at locations within the district, so there can be no doubt that these locations are "regular and established" as required by *Cray*.

### iii.    The physical locations are the places of CCI.

In the *DirecTV* case, this Court found that Dish had adopted and ratified the locations of its California subsidiary. The Court noted that customers could use the main Dish website to find Dish service packages and authorized retailers available within the district; prospective employees could find Dish job listings for positions in the district; and the site prominently advertised Dish's "nationwide availability." *See Entropic Communications, LLC v. DirecTV, LLC*, No. 2:22-cv-75, Dkt. No. 109 at 10 (E.D. Tex. Oct. 24, 2022). The Court concluded based on these facts that "DISH is purposefully holding itself out as providing products and services in California." *Id*.

All of these facts are present here, and then some. CCI holds itself out as a company that provides internet and television services across 41 states (*supra* 14–15), and it advertises retail locations, service packages, and job listings through a nationwide website (*supra* 15–16). Indeed, CCI says it is Spectrum. *See* Exhibit L, About Charter, at 1, 4. Any visitor to Charter's website or stores would have every reason to believe that the Spectrum-branded stores and Spectrum services are provided by CCI—because that's exactly what CCI tells the public.[15] *Compare with AGIS Software Development LLC v. Google LLC*, 2:19-cv-361, 2022 WL 1511757 at *9 (E.D. Tex. May 12, 2022) (finding Google had ratified the CTDI location as its own, based in part on how Google advertises to its customers that it is the provider of services at the CTDI facility and that "customers are not even aware of CTDI").

*Bd. Of Regents v. Medtronic PLC*, No. 17-CV-0942, 2018 WL 4179080 (W.D. Tex. July 19, 2018), is inapposite. There, the Court determined that the mere appearance of a generic "Medtronic" sign on a building was insufficient to support venue against the parent company Metronic, Inc. *See id.* at *2. In this case, however, CCI has directly represented to the public that **CCI** is the entity that offers broadband services under the Spectrum logo:

---

[15] CCI argues that it is somehow significant that the stores are branded "Spectrum" instead of "Charter Communications Inc." This argument is nonsensical and unsupported by law. Everywhere but here, CCI represents that Spectrum is its brand-name. The fact that Charter has chosen to do its entire business under a different name is immaterial because the same principle holds—CCI is placing its brand-name on stores and services nation-wide, declaring to the public that these stores and services are CCI's stores and services.



Exhibit L, About Charter, at 4 (red annotations added).

Furthermore, there is one additional fact that was not present in the *DirecTV* case and which should prove dispositive here: CCI actually negotiated and signed the property leases for Spectrum stores in this district. *See supra* 8–9. This is consistent with CCI's authority as manager, which includes ██████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ In fact, ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████████████

Finally, it bears repeating that CCI's officers are the same individuals who are in charge of the various subsidiaries. *See supra* 11. One of these officers even admitted that he does not distinguish between his roles at the different entities on a day-to-day basis, and he repeatedly ██████████████████████████████████████████████ *See supra* 7, 11. As such, CCI

is the entity that is ultimately in control of the activities of its subsidiaries, including the leasing and maintaining of Spectrum stores within the district. There can be no doubt that CCI is "purposely holding itself out as providing products and services" in the district, and the Court should find that it has ratified the Spectrum stores as its own.

## CONCLUSION

Charter asks this Court to hold that a nationwide corporate enterprise can avoid suit and compartmentalize its liability by setting up wholly-controlled shell LLCs with no employees and no independent operations. Such a holding could have far-reaching implications and upend patent venue (and perhaps liability as well), leaving venue choice in the hands of defendants through their choice of corporate structure. It could even allow a single enterprise of Charter's size, spanning "41 states," to force fragmentation of patent infringement litigation into a multitude of suits around the country by simply setting up LLCs with no real life of their own. This Court should reject that invitation.

The law sensibly rejects Charter's position—not by piercing the corporate veil as CCI posits, but by the existing legal tests of lack of separateness and ratification. This case law recognizes that corporate/LLC shells are not meant to be used as artifices to rig the rules of venue. Here, venue discovery has confirmed the fact pattern that law exists to address. Charter provides infringing products and services in the district from regular and established places of business. All the relevant acts are legally attributable to CCI. Entropic respectfully requests the Court find venue proper and deny Charter's motion to dismiss.

Dated: February 21, 2023

Respectfully submitted,

*/s/ James Shimota by permission Wesley Hill*
James Shimota - LEAD ATTORNEY
Jason Engel
George Summerfield
**K&L GATES LLP**
70 W. Madison Street, Suite 3300
Chicago, IL 60602
Jim.shimota@klgates.com
Jason.engel@klgates.com
George.summerfield@klgates.com

Nicholas F. Lenning
**K&L GATES LLP**
925 Fourth Avenue, Suite 2900
Seattle, WA 98104-1158
nicholas.lenning@klgates.com

Darlene Ghavimi
Matthew Blair
**K&L GATES LLP**
2801 Via Fortuna
Suite #650
Austin, Texas 78746
Darlene.ghavimi@klgates.com
Matthew.blair@klgates.com

Wesley Hill
Texas Bar No. 24032294
Andrea Fair
Texas Bar No. 24078488
**WARD, SMITH & HILL, PLLC**
1507 Bill Owens Pkwy
Longview, TX 75604
Tel: (903) 757-6400
wh@wsfirm.com
andrea@wsfirm.com

**ATTORNEYS FOR PLAINTIFF
ENTROPIC COMMUNICATIONS, LLC**

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing document was filed electronically in compliance with Local Rule CV-5(a) and served via email on all counsel of record on this twenty-first day of February, 2023.

*/s/ Wesley Hill*
Wesley Hill

**CERTIFICATE OF AUTHORIZATION TO FILE UNDER SEAL**

This is to certify that the above document should be filed under seal because it contains material designated by the parties as confidential pursuant to the Protective Order entered in this case (Dkt. 36).

*/s/ Wesley Hill*
Wesley Hill

**APPX490**

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

ENTROPIC COMMUNICATIONS, LLC,

      Plaintiff

      v.

CHARTER COMMUNICATIONS, INC.,

      Defendant.

Civil Action No. 2:22-cv-00125-JRG

**JURY TRIAL DEMANDED**

██████████████

**DECLARATION OF MATTHEW BLAIR IN SUPPORT OF ENTROPIC'S
OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE SECOND
AMENDED COMPLAINT FOR IMPROPER VENUE PURSUANT TO
FRCP 12(b)(3)**

I, Matthew Blair, declare as follows:

1.    I am over 18 years of age and competent to make this declaration. If called to testify as a witness, I could and would testify truthfully under oath to each of the statements in the declaration. I make each statement below based on my personal knowledge or after investigation of the relevant information.

2.    I am an attorney at K&L Gates, LLP, counsel of record for Plaintiff, Entropic Communications, LLC ("Plaintiff" or "Entropic"). I am licensed to practice law in the State of Texas.

3.    On January 30, 2023, Defendant Charter Communications, Inc. ("Charter") moved to dismiss the second amended complaint on the basis that venue is improper.

4.    I make this Declaration based on my personal knowledge and in support of Entropic's Opposition to Defendants' Motion to Dismiss the Second Amended Complaint for Improper Venue Pursuant to FRCP 12(b)(3).

5.    Attached as Exhibit A is an excerpted copy of the transcript of the deposition of Thomas Proost, corporate deponent for Charter.

6.    Attached as Exhibit B is an excerpted copy of the transcript of the deposition of Daniel Boglioli, corporate deponent for Charter.

7.    Attached as Exhibit C is a true and correct copy of the Amended and Restated Limited Liability Company Agreement of Time Warner Cable Texas LLC—which is now Spectrum Gulf Coast, LLC—produced by Charter in this litigation.

8.    Attached as Exhibit D is a true and correct copy of the Second Amended and Restated Management Agreement between Charter Communications Operating, LLC and Charter Communications, Inc., produced by Charter in this litigation.

**APPX492**

9.      Attached as Exhibit E is an excerpted copy of the lease agreement for a Spectrum store located in Beaumont, Texas, produced by Charter in this litigation.

10.     Attached as Exhibit F is a printout of the United States Patent and Trademark Office's Trademark Electronic Search System (TESS), showing the status of the word mark "SPECTRUM," accessed on December 29, 2022.

11.     Attached as Exhibit G is a true and correct copy of the officer/director list for Charter Communications, Inc., produced by Charter in this litigation.

12.     Attached as Exhibit H is a true and correct copy of the officer/director list for Spectrum Gulf Coast, LLC, produced by Charter in this litigation.

13.     Attached as Exhibit I is a printout of Charter's website, showing the company biography of Paul Marchand, available at https://corporate.charter.com/leadership/paul-marchand, accessed on January 3, 2023.

14.     Attached as Exhibit J is a printout of Charter's website, showing the company biography of Tom Monaghan, available at https://corporate.charter.com/leadership/tom-monaghan, accessed on January 3, 2023.

15.     Attached as Exhibit K is an excerpted copy of Charter Communications, Inc.'s Form 10-K Annual Report for the year ending December 31, 2020.

16.     Attached as Exhibit L is a printout of Charter's website available at https://corporate.charter.com/about-charter, accessed on November 28, 2022.

17.     Attached as Exhibit M is a true and correct copy of an Application for Fixed Satellite Service by Spectrum Northeast, LLC, available at https://fcc.report/IBFS/SES-ASG-20200522-00563, accessed on January 6, 2023.

18.     Attached as Exhibit N is a true and correct copy of a document identified as "Attachment Exhibits E and F" to the Application for Fixed Satellite Service (Exhibit M to this Declaration), available at https://fcc.report/IBFS/SES-ASG-20200522-00563/2362560, accessed on January 6, 2023.

19.     Attached as Exhibit O is a printout of Charter's website, available at https://www.spectrum.com/locations/tx/plano/700-alma-dr, accessed on December 29, 2022.

20.     Attached as Exhibit P is a printout of Charter's website, showing service packages available for the address 13286 Guerin Dr., Frisco, TX 75035, available at https://www.spectrum.com/address/localization?zip=75035&a=13286+Guerin+Dr&serviceVend orName=twc&v=ORG&omnitureId=4f8456d9-c71e-4429-95c0-92c76957a824, accessed on January 5, 2023.

21.     Attached as Exhibit Q is a printout of Charter's website, showing a job posting for a Retail Sales Specialist in Beaumont, Texas, available at https://jobs.spectrum.com/job/beaumont/retail-sales-specialist-bilingual-spanish-18-00-per-hour-plus-commission-and-incentives/4673/39929994304, accessed on November 30, 2022.

22.     Exhibit R is omitted.

23.     Attached as Exhibit S is a printout of the Texas Office of the Comptroller's website, showing the franchise tax account status of Spectrum Gulf Coast, LLC as of January 10, 2023.

24.     Attached as Exhibit T is a printout of the Missouri Secretary of State's business entity search website, showing the search results for "spectrum gulf coast" as of January 10, 2023.

25.     Attached as Exhibit U is a photograph taken outside a Spectrum facility located at 1414 Summit Avenue, Plano, Texas 75074.

**APPX494**

26.     Attached as Exhibit V is a true and correct copy of the Spectrum Residential Internet Services Agreement, produced by Charter in this litigation.

27.     Attached as Exhibit W is a true and correct copy of Charter Communications, Inc.'s 2021 annual shareholder report.

28.     Attached as Exhibit X is a printout of a press release entitled "Charter Officially Opens New State-of-the-Art Corporate Headquarters in Stamford," available at https://corporate.charter.com/newsroom/charter-officially-opens-corporate-headquarters-in-stamford-ct, accessed on January 10, 2023.

29.     Attached as Exhibit Y is a true and correct copy of Charter's Mutual Arbitration Agreement, produced by Charter in this litigation.

30.     Attached as Exhibit Z is a true and correct copy of a Master Purchase Agreement, produced by Charter in this litigation.

31.     Attached as Exhibit AA is a true and correct copy of a Master Equipment Lease Agreement, produced by Charter in this litigation.

32.     Attached as Exhibit AB is a true and correct copy of a Request for Quote document, produced by Charter in this litigation.

33.     Attached as Exhibit AC is a printout of Charter's website available at https://policy.charter.com/resource-hub/our-employees, accessed on February 19, 2023.


Executed on February 21, 2023 in Austin, Texas.

                                        */s/ Matthew Blair*
                                        Matthew Blair

4

**APPX495**

CONFIDENTIAL MATERIAL OMITTED

# Exhibit A to Plaintiff's Opposition to Defendant's Motion to Dismiss

# Dkt. 68-2 (Sealed Version)

# Dkt. 70-2 (Public Version)

# FILED UNDER SEAL

# (APPX496-516)

CONFIDENTIAL MATERIAL OMITTED

# Exhibit B to Plaintiff's Opposition to Defendant's Motion to Dismiss

# Dkt. 68-3 (Sealed Version)

# Dkt. 70-2 (Public Version)

# FILED UNDER SEAL

# (APPX517-532)

CONFIDENTIAL MATERIAL OMITTED

# Exhibit C to Plaintiff's Opposition to Defendant's Motion to Dismiss

# Dkt. 68-4 (Sealed Version)

# Dkt. 70-2 (Public Version)

# FILED UNDER SEAL

# (APPX533-548)

**CONFIDENTIAL MATERIAL OMITTED**

# Exhibit D to Plaintiff's Opposition to Defendant's Motion to Dismiss

# Dkt. 68-5 (Sealed Version)

# Dkt. 70-2 (Public Version)

# FILED UNDER SEAL

# (APPX549-556)

CONFIDENTIAL MATERIAL OMITTED

# Exhibit E to Plaintiff's Opposition to Defendant's Motion to Dismiss

# Dkt. 68-6 (Sealed Version)

# Dkt. 70-2 (Public Version)

# FILED UNDER SEAL

# (APPX557-562)

# EXHIBIT F



**United States Patent and Trademark Office**

Home | Site Index | Search | FAQ | Glossary | Contacts | eBusiness | eBiz alerts | News

Trademarks > **Trademark Electronic Search System (TESS)**

*TESS was last updated on Thu Dec 29 04:07:22 EST 2022*

| TESS Home | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP | PREV LIST | CURR LIST | NEXT LIST | FIRST DOC | PREV DOC | NEXT DOC | LAST DOC |

Logout    Please logout when you are done to release system resources allocated for you.

Start    List At:  _____  OR  Jump  to record: _____    **Record 8 out of 353**

| TSDR | ASSIGN Status | TTAB Status |   *( Use the "Back" button of the Internet Browser to return to TESS)*

# Spectrum ▶

| | |
|---|---|
| **Word Mark** | SPECTRUM |
| **Goods and Services** | IC 043. US 100 101. G & S: Arena services, namely, providing general purpose facilities for sports, concerts, conventions and exhibitions. FIRST USE: 20161031. FIRST USE IN COMMERCE: 20161031. |
| **Mark Drawing Code** | (3) DESIGN PLUS WORDS, LETTERS, AND/OR NUMBERS |
| **Design Search Code** | 24.15.04 - Arrowheads<br>24.15.25 - Other arrows |
| **Serial Number** | 97214735 |
| **Filing Date** | January 12, 2022 |
| **Current Basis** | 1A |
| **Original Filing Basis** | 1A |
| **Published for Opposition** | October 25, 2022 |
| **Owner** | (APPLICANT) Charter Communications Holding Company, LLC LIMITED LIABILITY COMPANY DELAWARE 12405 Powerscourt Drive St. Louis MISSOURI 63131 |
| **Attorney of Record** | Ester Martin |
| **Prior Registrations** | 4618730;5916316;6311602;AND OTHERS |
| **Description of Mark** | Color is not claimed as a feature of the mark. The mark consists of the stylized word SPECTRUM with a triangular arrow to the right of the term SPECTRUM. |
| **Type of Mark** | SERVICE MARK |
| **Register** | PRINCIPAL |
| **Live/Dead Indicator** | LIVE |

| TESS Home | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | Top | HELP | PREV LIST | CURR LIST | NEXT LIST | FIRST DOC | PREV DOC | NEXT DOC | LAST DOC |

| HOME | SITE INDEX | SEARCH | eBUSINESS | HELP | PRIVACY POLICY

**APPX564**

CONFIDENTIAL MATERIAL OMITTED

# Exhibit G to Plaintiff's Opposition to Defendant's Motion to Dismiss

# Dkt. 68-8 (Sealed Version)

# Dkt. 70-4 (Public Version)

# FILED UNDER SEAL

# (APPX565-566)

CONFIDENTIAL MATERIAL OMITTED

# Exhibit H to Plaintiff's Opposition to Defendant's Motion to Dismiss

# Dkt. 68-9 (Sealed Version)

# Dkt. 70-4 (Public Version)

# FILED UNDER SEAL

# (APPX567-570)

# EXHIBIT I

1/3/23, 10:30   Paul Marchand | Executive Vice President, Chief Human Resources Officer at Charter Communications

Case 2:22-cv-00125-JRG   Document 70-5   Filed 02/28/23   Page 2 of 3 PageID #: 1554

**Charter**
COMMUNICATIONS

< All Leadership

Prev | Next

▶ ▶ ▶ ▶ ▶ ▶



# Paul Marchand

EXECUTIVE VICE PRESIDENT, CHIEF HUMAN RESOURCES OFFICER

Paul Marchand joined Charter Communications as Executive Vice President, Chief Human Resources Officer in 2015. Mr. Marchand is responsible for all human resources strategies, policies and practices for more than 93,000 employees. He oversees all aspects of HR including recruitment, training and development, HR operations including payroll, HR shared services and HR systems, as well as compensation and benefits.

Mr. Marchand joined Charter from PepsiCo, most recently serving as Senior Vice President of Human Resources for the North America Beverages division. Earlier in his career he served in human resources roles at Merrill Lynch, JP Morgan and the May Department Stores.

He received a B.A. in advertising from Syracuse University and a master's degree in organizational psychology from Columbia University.

**Download Profile Image**



© 2023 Charter Communications Inc.

Terms of Service | Your Privacy Rights | California Consumer Privacy Rights | California Consumer Do Not Sell or Share My Personal Information

California Consumer Limit the Use of My Sensitive Personal Information | Site Map

If you are a customer with disability, please contact us. If you need assistance

APPX573

# EXHIBIT J

1/3/23, 10:38 AM     Case 2:22-cv-00125-JRG     Document 70-6     Filed 03/28/23     Page 2 of 3 PageID #: 1557
Tom Monaghan / Charter

SPECTRUM SITES ▾

# Charter
COMMUNICATIONS

< All Leadership                                                    Prev | Next

▶ ▶ ▶ ▶ ▶ ▶



# Tom Monaghan

**EXECUTIVE VICE PRESIDENT, FIELD OPERATIONS**

Tom Monaghan is Executive Vice President, Field Operations at Charter Communications. He oversees the entire Field Operations organization including Charter's 11 field regions operating across 41 states; engineering and construction, including Charter's previously announced $5 billion Rural Digital Opportunity Fund expansion; supply chain management; business planning; standards and compliance; and human resources for field operations.

Mr. Monaghan most recently served as SVP, field Operations and has held multiple operations roles at Charter since joining the company in 2014. He joined Charter from Cablevision (now Altice), where he served as vice president of field operations in the Cable and Communications Division. Prior to Cablevision he served as SVP, Operations at Net2000, and VP, Network Services at Teligent, Inc. He started his career as a field technician at Verizon in 1987 before being promoted to area operations manager.

He is a member of the Society of Cable Telecommunications Engineers (SCTE) and a graduate of Cable & Telecommunications Association for Marketing's (CTAM) Cable Executive Management program at Harvard Business School.

He received a B.S. in business management and economics from State University of New York (Empire State College).

[Download Profile Image]

Company ▾

Newsroom ▾

Investors ▾

Careers ▾

**APPX575**



**APPX576**

# EXHIBIT K

**UNITED STATES**

**SECURITIES AND EXCHANGE COMMISSION**

**Washington, D.C. 20549**

_____

# FORM 10-K

_____

*(Mark One)*

☒    ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended December 31, 2020

or

☐    TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

**For the Transition Period From            to**

**Commission File Number: 001-33664**



## Charter Communications, Inc.

*(Exact name of registrant as specified in its charter)*

| **Delaware** | | | | **84-1496755** |
|---|---|---|---|---|
| (State or other jurisdiction of incorporation or organization) | | | | (I.R.S. Employer Identification No.) |
| **400 Atlantic Street** | **Stamford** | **Connecticut** | | **06901** |
| (Address of Principal Executive Offices) | | | | (Zip Code) |

**(203) 905-7801**

(Registrant's telephone number, including area code)

**Securities registered pursuant to section 12(b) of the Act:**

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Class A Common Stock $.001 Par Value | CHTR | NASDAQ Global Select Market |

**Securities registered pursuant to section 12(g) of the Act: None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☒ No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrants have submitted electronically every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrants were required to submit and post such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See definition of "large accelerated filer," "accelerated filer," and "smaller reporting company" in Rule 12b-2 of the Exchange Act.:

Large accelerated filer ☒    Accelerated filer ☐    Non-accelerated filer ☐    Smaller reporting company ☐    Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). Yes ☐ No ☒

The aggregate market value of the registrant of outstanding Class A common stock held by non-affiliates of the registrant at June 30, 2020 was approximately $75.8 billion, computed based on the closing sale price as quoted on the NASDAQ Global Select Market on that date. For purposes of this calculation only, directors, executive officers and the principal controlling shareholders or entities controlled by such controlling shareholders of the registrant are deemed to be affiliates of the registrant.

There were 193,730,992 shares of Class A common stock outstanding as of December 31, 2020. There was 1 share of Class B common stock outstanding as of the same date.

**Documents Incorporated By Reference**

Information required by Part III is incorporated by reference from Registrant's proxy statement or an amendment to this Annual Report on Form 10-K to be filed no later than 120 days after the end of the Registrant's fiscal year ended December 31, 2020.



**CHARTER COMMUNICATIONS, INC.**
**FORM 10-K — FOR THE YEAR ENDED DECEMBER 31, 2020**

**TABLE OF CONTENTS**

| | | Page No. |
|---|---|---|
| **PART I** | | |
| Item 1 | Business | 1 |
| Item 1A | Risk Factors | 17 |
| Item 1B | Unresolved Staff Comments | 26 |
| Item 2 | Properties | 26 |
| Item 3 | Legal Proceedings | 26 |
| Item 4 | Mine Safety Disclosures | 26 |
| **PART II** | | |
| Item 5 | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 27 |
| Item 6 | Selected Financial Data | 28 |
| Item 7 | Management's Discussion and Analysis of Financial Condition and Results of Operations | 28 |
| Item 7A | Quantitative and Qualitative Disclosures About Market Risk | 45 |
| Item 8 | Financial Statements and Supplementary Data | 46 |
| Item 9 | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 46 |
| Item 9A | Controls and Procedures | 46 |
| Item 9B | Other Information | 47 |
| **PART III** | | |
| Item 10 | Directors, Executive Officers and Corporate Governance | 48 |
| Item 11 | Executive Compensation | 48 |
| Item 12 | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 48 |
| Item 13 | Certain Relationships and Related Transactions, and Director Independence | 48 |
| Item 14 | Principal Accounting Fees and Services | 48 |
| **PART IV** | | |
| Item 15 | Exhibits and Financial Statement Schedules | 49 |
| Signatures | | S-1 |
| Exhibit Index | | E-1 |

This annual report on Form 10-K is for the year ended December 31, 2020. The United States Securities and Exchange Commission ("SEC") allows us to "incorporate by reference" information that we file with the SEC, which means that we can disclose important information to you by referring you directly to those documents. Information incorporated by reference is considered to be part of this annual report. In addition, information that we file with the SEC in the future will automatically update and supersede information contained in this annual report. In this annual report, "Charter," "we," "us" and "our" refer to Charter Communications, Inc. and its subsidiaries.

**APPX579**

**CAUTIONARY STATEMENT REGARDING FORWARD-LOOKING STATEMENTS:**

This annual report includes forward-looking statements within the meaning of Section 27A of the Securities Act of 1933, as amended (the "Securities Act"), and Section 21E of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), regarding, among other things, our plans, strategies and prospects, both business and financial including, without limitation, the forward-looking statements set forth in Part I. Item 1. under the heading "Business" and in Part II. Item 7. under the heading "Management's Discussion and Analysis of Financial Condition and Results of Operations" in this annual report. Although we believe that our plans, intentions and expectations reflected in or suggested by these forward-looking statements are reasonable, we cannot assure you that we will achieve or realize these plans, intentions or expectations. Forward-looking statements are inherently subject to risks, uncertainties and assumptions, including, without limitation, the factors described in Part I. Item 1A. under "Risk Factors" and in Part II. Item 7. under the heading, "Management's Discussion and Analysis of Financial Condition and Results of Operations" in this annual report. Many of the forward-looking statements contained in this annual report may be identified by the use of forward-looking words such as "believe," "expect," "anticipate," "should," "planned," "will," "may," "intend," "estimated," "aim," "on track," "target," "opportunity," "tentative," "positioning," "designed," "create," "predict," "project," "initiatives," "seek," "would," "could," "continue," "ongoing," "upside," "increases," "focused on" and "potential," among others. Important factors that could cause actual results to differ materially from the forward-looking statements we make in this annual report are set forth in this annual report and in other reports or documents that we file from time to time with the SEC, and include, but are not limited to:

- our ability to sustain and grow revenues and cash flow from operations by offering Internet, video, voice, mobile, advertising and other services to residential and commercial customers, to adequately meet the customer experience demands in our service areas and to maintain and grow our customer base, particularly in the face of increasingly aggressive competition, the need for innovation and the related capital expenditures;
- the impact of competition from other market participants, including but not limited to incumbent telephone companies, direct broadcast satellite ("DBS") operators, wireless broadband and telephone providers, digital subscriber line ("DSL") providers, fiber to the home providers and providers of video content over broadband Internet connections;
- general business conditions, unemployment levels and the level of activity in the housing sector and economic uncertainty or downturn, including the impacts of the Novel Coronavirus ("COVID-19") pandemic to our customers, our vendors and local, state and federal governmental responses to the pandemic;
- our ability to obtain programming at reasonable prices or to raise prices to offset, in whole or in part, the effects of higher programming costs (including retransmission consents and distribution requirements);
- our ability to develop and deploy new products and technologies including mobile products and any other consumer services and service platforms;
- any events that disrupt our networks, information systems or properties and impair our operating activities or our reputation;
- the effects of governmental regulation on our business including costs, disruptions and possible limitations on operating flexibility related to, and our ability to comply with, regulatory conditions applicable to us;
- the ability to hire and retain key personnel;
- the availability and access, in general, of funds to meet our debt obligations prior to or when they become due and to fund our operations and necessary capital expenditures, either through (i) cash on hand, (ii) free cash flow, or (iii) access to the capital or credit markets; and
- our ability to comply with all covenants in our indentures and credit facilities, any violation of which, if not cured in a timely manner, could trigger a default of our other obligations under cross-default provisions.

All forward-looking statements attributable to us or any person acting on our behalf are expressly qualified in their entirety by this cautionary statement. We are under no duty or obligation to update any of the forward-looking statements after the date of this annual report.

**APPX580**

PART I

Item 1. *Business.*

**Introduction**

We are a leading broadband connectivity company and cable operator serving more than 31 million customers in 41 states through our Spectrum brand. Over an advanced high-capacity, two-way telecommunications network, we offer a full range of state-of-the-art residential and business services including Spectrum Internet, TV, Mobile and Voice. For small and medium-sized companies, Spectrum Business® delivers the same suite of broadband products and services coupled with special features and applications to enhance productivity, while for larger businesses and government entities, Spectrum Enterprise provides highly customized, fiber-based solutions. Spectrum Reach® delivers tailored advertising and production for the modern media landscape. We also distribute award-winning news coverage, sports and high-quality original programming to our customers through Spectrum Networks and Spectrum Originals.

Our network, which we own and operate, passes over 53 million households and small and medium businesses ("SMBs") across the United States. Our core strategy is to use our network to deliver high quality products at competitive prices, combined with outstanding customer service. This strategy, combined with simple, easy to understand pricing and packaging, is central to our goal of growing our customer base while selling more of our core connectivity services, which include both fixed and mobile Internet, video and voice services, to each individual customer. We execute this strategy by managing our operations in a consumer-friendly, efficient and cost-effective manner. Our operating strategy includes insourcing nearly all of our customer care and field operations workforces, which results in higher quality service delivery. While an insourced operating model can increase the field operations and customer care costs associated with individual service transactions, the higher quality nature of insourced labor service transactions significantly reduces the volume of service transactions per customer, more than offsetting the higher investment made in each insourced service transaction. As we reduce the number of service transactions and recurring costs per customer relationship, we continue to provide our customers with products and prices that we believe provide more value than what our competitors offer. The combination of offering high quality, competitively priced products and outstanding service, allows us to both increase the number of customers we serve over our fully deployed network, and to increase the number of products we sell to each customer. This combination also reduces the number of service transactions we perform per relationship, yielding higher customer satisfaction and lower customer churn, resulting in lower costs to acquire and serve customers and greater profitability.

We have enhanced our service operations to allow our customers to (1) more frequently interact with us through our customer website and My Spectrum application, online chat and social media, (2) have their services installed at the time and in the manner of their own choosing, including self-installation, and (3) receive a variety of video packages on an increasing number of connected devices including those owned by us and those owned by the customer. By offering our customers growing levels of choices in how they receive and install their services and how they interact with us, we are driving higher overall levels of customer satisfaction and reducing our operating costs and capital expenditures per customer relationship. Ultimately, our operating strategy enables us to offer high quality, competitively priced services profitably, while continuing to invest in new products and services.

The capability and functionality of our network continues to grow in a number of areas, especially with respect to wireless connectivity. Our Internet service offers consumers the ability to wirelessly connect to our network using WiFi technology. We estimate that approximately 400 million devices are wirelessly connected to our network through WiFi. In addition, we extend Internet connectivity to our customers beyond the home via our Spectrum Mobile product through our mobile virtual network operator ("MVNO") reseller agreement with Verizon Communications Inc. ("Verizon"). In 2020, we purchased 210 Citizens Broadband Radio Service ("CBRS") Priority Access Licenses ("PALs") within our footprint from the Federal Communications Commission ("FCC"). We intend to use the licenses along with unlicensed CBRS spectrum to build our own fifth generation ("5G") mobile network which we plan to use in combination with our MVNO and WiFi network to enhance our customer's experience and improve our cost structure.

Our principal executive offices are located at 400 Atlantic Street, Stamford, Connecticut 06901. Our telephone number is (203) 905-7801, and we have a website accessible at www.corporate.charter.com. Our Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q and Current Reports on Form 8-K, and all amendments thereto, are available on our website free of charge as soon as reasonably practicable after they have been filed. The information posted on our website is not incorporated into this annual report.

1

# APPX581

**Corporate Entity Structure**

The chart below sets forth our entity structure and that of our direct and indirect subsidiaries. The chart does not include all of our affiliates and subsidiaries and, in some cases, we have combined separate entities for presentation purposes. The equity ownership percentages shown below are approximations. Indebtedness amounts shown below are principal amounts as of December 31, 2020. See Note 9 to the accompanying consolidated financial statements contained in "Part II. Item 8. Financial Statements and Supplementary Data," which also includes the accreted values of the indebtedness described below.



**APPX582**

**Footprint**

We operate in geographically diverse areas which are managed centrally on a consolidated level. The map below highlights our footprint as of December 31, 2020.



**Products and Services**

We offer our customers subscription-based Internet services, video services, and mobile and voice services. Our services are offered to residential and commercial customers on a subscription basis, with prices and related charges based on the types of service selected, whether the services are sold as a "bundle" or on an individual basis, and based on the equipment necessary to receive our services. Bundled services are available to substantially all of our passings, and approximately 56% of our residential customers subscribe to a bundle of services including some combination of our Internet, video and/or voice products.

**APPX583**

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, Charter Communications, Inc. has duly caused this annual report to be signed on its behalf by the undersigned, thereunto duly authorized.

> CHARTER COMMUNICATIONS, INC.,
> Registrant
>
> By:      /s/ Thomas M. Rutledge
> _____
> Thomas M. Rutledge
> Chairman and Chief Executive Officer

Date: January 29, 2021

S-1

**APPX584**

# EXHIBIT L



SPECTRUM SITES ▾



COMPANY

# About Charter

‣ ‣ ‣ ‣ ‣
‣ ‣ ‣ ‣ ‣
‣ ‣ ‣ ‣ ‣

Charter Communications, Inc. (NASDAQ:CHTR) is a leading broadband connectivity company and cable operator serving more than 32 million customers in 41 states through its Spectrum brand. Over an advanced communications network, the company offers a full range of state-of-the-art residential and business services including Spectrum Internet®, TV, Mobile and Voice.

For small and medium-sized companies, Spectrum Business® delivers the same suite of broadband products and services coupled with special features and applications to enhance productivity, while for larger businesses and government entities, Spectrum Enterprise provides highly customized, fiber-based solutions. Spectrum Reach® delivers tailored advertising and production for the modern media landscape. The company also distributes award-winning news coverage, sports and high-quality original programming to its customers through Spectrum Networks and Spectrum Originals.

## This is Spectrum



This is Spectrum

APPX586

11/28/22, 4:13 PM About Charter Communications

# Charter Facts: By the Numbers



$51.7 Billion in Annual Revenue (2021)



**Nearly 500 Million**

IP Devices Connected to Our Network



**55 Million**

Homes Passed in 41 States




**32 Million**

Customer Relationships

**APPX587**





# 30.3 Million
### Broadband Internet Customers



# 15 Million
### Video Subscribers

# 9.2 Million
### Voice Subscribers

# 4.7 Million
### Mobile Lines

### Nearly **800,000**
### Miles of Network Infrastructure



**93,700**
Employees
(as of 12/31/2021)

**APPX588**

**30+**
Spectrum Networks Delivering
Local News and Sports

*Above data sourced from Q3 2022 unless noted



**Spectrum Residential**

Spectrum is a suite of advanced broadband services offered by Charter Communications, Inc. Spectrum provides a full range of services, including Spectrum TV®, Spectrum Internet®, Spectrum Voice® and Spectrum Mobile®.



**Spectrum Business**

Spectrum Business® provides small and medium-sized business organizations with scalable, and cost-effective broadband communications solutions, including Internet access, business telephone, and TV services. Catering to the unique broadband needs of business customers, Spectrum Business® offers competitively priced bundled products over its state-of-the-art, fiber-based network, helping businesses across a variety of industries maximize productivity while continuing to grow.

**APPX589**

Case: 23-136    Document: 2-2    Page: 486    Filed: 06/16/2023

11/28/22, 4:34 PM    Case 2:22-cv-00125-JRG    Document 70-8    Filed 02/29/23    Page 6 of 8 PageID #: 1572
About Us | Charter Communications



**Spectrum Enterprise**

Spectrum Enterprise is a national provider of scalable, fiber technology solutions serving many of America's largest businesses and communications service providers. The broad Spectrum Enterprise portfolio includes networking and managed services solutions: Internet access, Ethernet access and networks, Voice and TV solutions, Managed Application, Cloud Infrastructure and Managed Hosting Services. Our industry-leading team of experts work closely with clients to achieve greater business success by providing solutions designed to meet their evolving needs.



**Spectrum Reach**

Spectrum Reach®, the advertising sales and production services offered by Charter Communications, Inc., provides custom solutions for the modern media landscape. Operating in over 30 million households, nearly 100 DMAs, and 41 states, Spectrum Reach provides scalable advertising and marketing services utilizing national cable networks, internet advertising, and promotional events backed by marketing, research, and award-winning creative services. Driven by insightful research to understand consumer behavior, Spectrum Reach develops measurable, data-infused marketing solutions for businesses of all sizes.

APPX590



**Spectrum Networks**

Spectrum Networks is a series of 24/7 news and sports networks owned and operated by Charter Communications, Inc. Spectrum Networks carry distinct, comprehensive, and exclusive local programming on more than 30 networks across 12 states.



**Spectrum Originals**

Charter launched Spectrum Originals in 2019, a premier destination for high-quality original series available exclusively to Spectrum TV subscribers on-demand and ad-free. This free service launched with the Sony and Bruckheimer-produced drama "L.A.'s Finest," starring Gabrielle Union and Jessica Alba.

COMPANY

# Corporate Headquarters

Charter Communications Corporate Headquarters:
400 Washington Blvd.
Stamford, CT 06902

APPX591



For additional information, please contact us



APPX592

# EXHIBIT M

# Application for Fixed Satellite Service by Spectrum Northeast, LLC

## SES-ASG-20200522-00563 / SESASG2020052200563

FCC.report (https://fcc.report/) › IBFS (/IBFS/) ›
/ Spectrum Northeast, LLC (/company/Spectrum-Northeast-LLC) ›
/ SES-ASG (/IBFS/Filing-List/SES-ASG)
/ SESASG2020052200563 (/IBFS/SES-ASG-20200522-00563) [GOV] ↗ (/IBFS/SES-ASG-20200522-00563/GOV)

Applicant requests Commission authority for the pro forma assignment of the subject stations to Spectrum NLP, LLC. There will be no changes in station operations.

| | |
|---|---|
| Filing: SES | Satellite Earth Station |
| Filing: ASG | Assignment |
| Nature of Service | Fixed Satellite Service |
| Last Action | Grant of Authority |
| Last Action Date | 2020-06-19 |
| Status | Action Taken Public Notice |
| Status Date | 2020-06-24 |
| Date Filed | 2020-05-22 |
| Date Granted | 2020-06-19 |
| Adopted Date | 2020-06-23 |
| Released Date | 2020-06-23 |
| Action Taken Public Notice | 2020-06-24 |
| Red Light | N |
| Paper/Electronic | E |
| Environmental Impact | N |

| Applicant | Contact |
|---|---|
| Spectrum Northeast, LLC | None |
| 12405 Powerscourt Drive | SAME AS APPLICANT |
| Legal Dept | SAME AS APPLICANT |
| St. Louis, MO 63131 USA | , USA |
| 12405 Powerscourt Drive, Legal Dept, St. Louis, MO 63131 USA | |

**APPX594**



FROM

Spectrum Northeast, LLC
12405 Powerscourt Drive
Legal Dept
St. Louis, MO 63131 USA
12405 Powerscourt Drive, Legal Dept, St. Louis,
MO 63131 USA,

TO

Spectrum NLP, LLC
12405 Powerscourt Drive
Legal Dept
St. Louis, MO 63131 USA
LLC, 12405 Powerscourt Drive, Legal Dept, St.
Louis, MO 63131 USA,

## Files

| Description | Commentor | Type / Date |
|---|---|---|
| Grant PDFLICENSE.pdf (/IBFS/SES-ASG-20200522-00563/2455037) | IB-FCC | DECISION 2020-06-19 |

## Attachments

| Attachment | Type | Date |
|---|---|---|
| Attachment Exhibits E and F (/IBFS/SES-ASG-20200522-00563/2362560) | | |
| Attachment Application (/IBFS/SES-ASG-20200522-00563/2366561) | | |

Attachment HTML
(/IBFS/SES-ASG-20200522-
00563/2366594)

Attachment PDFLICENSE.pdf
(/IBFS/SES-ASG-20200522-
00563/2455037)

## Public Notices

| Service | Type | Report No | Date |
|---|---|---|---|
| Satellite Earth Station | Action Taken Public Notice | SES02279 (/IBFS/Public-Notices/2455205) | 2020-06-24 |

No License History
No Site Information [see Application Filing (/IBFS/SES-ASG-20200522-00563/2366594)]
No Site Antenna Info

© 2023 FCC.report
This site is not affiliated with or endorsed by the FCC

## APPX596

# EXHIBIT N

## DESCRIPTION OF TRANSACTION

The purpose of this application is to request Commission consent to the *pro forma* assignment of the licenses listed on the application. As part of an entity rationalization project, Charter Communications, Inc. ("Charter") is simplifying its existing entity structure and consolidating its portfolio of Spectrum Networks local news and regional sports networks. As such, FCC licenses currently held by various Charter operating subsidiaries will be assigned to Spectrum NLP, LLC. The license assignments requested to accomplish this entity rationalization are entirely *pro forma* in nature, as Charter is currently the ultimate controlling entity of the existing Licensees and will remain the ultimate controlling entity of Spectrum NLP, LLC after the restructuring occurs. (The attached diagram identifies current Charter Operating Entities/Licensees and the Spectrum NLP, LLC entity within the Charter organization.)

The proposed transaction is in the public interest, as it will enable Charter to continue providing cable and other services under a simplified entity structure.

**APPX598**

# CHARTER OWNERSHIP STRUCTURE



# EXHIBIT O



**APPX601**

# Manage Your Account From Anywhere



### Get the Highest-Rated Support App + Advanced Home WiFi

Personalize your WiFi network, make payments, get support and more. Use the app with Advanced Home WiFi to manage network access and get parental controls like scheduling specific devices.

- ✓ Set up a Spectrum WiFi Profile to access free out-of-home WiFi
- ✓ Enroll in Auto Pay and paperless billing for added convenience
- ✓ Troubleshoot your equipment and fix service-related issues
- ✓ Browse your current plan, add services and view current offers

 

Learn more about My Spectrum App

# Save with Spectrum One

Experience seamless connectivity across all your devices. With Spectrum One, get Spectrum Internet®, Advanced WiFi and an Unlimited Mobile line all for one incredible price.

**Internet + Advanced WiFi + Mobile**

**$49** 99/mo for 12 mos when bundled





---

**Offer Details**

Limited time offer; subject to change; valid to qualified residential customers who have not subscribed to any services within the previous 30 days and have no outstanding obligations to Charter. Services are subject to all applicable service terms and conditions, subject to change. Services not available in all areas. Restrictions apply. INTERNET & ADVANCED WIFI: Standard rates for Internet and Advanced WiFi apply after yr 1. Standard rates apply for Internet, WiFi, and Mobile if Mobile line is not activated within 30 days and maintained through the promo period. Equipment may be extra; installation and additional services are extra. 99.9% reliability based on Spectrum network availability; excludes outages caused by external events. See spectrum.com/reliability for details. Speed based on wired connection. Available Internet speeds may vary by address. SPECTRUM MOBILE: Service not available in all areas. Spectrum Internet and Auto Pay required. Other restrictions apply. Visit spectrum.com/mobile/plans for details. UNLIMITED: Standard rates apply after yr 1. Smartwatch does not qualify as a line. Reduced speeds after 20 GB of usage per line. UNLIMITED PLUS: Customer opt-in to Mobile Unlimited Plus will be required to pay additional $10 monthly rate for that service. Smartwatch does not qualify as a line. Reduced speeds after 30 GB of usage per line. To access 5G, 5G compatible phone and 5G service required. Not all 5G capable phones compatible with all 5G service. Speeds may vary. Visit spectrum.com/mobile/5g for details.

---

**Spectrum**

| COMPANY | SHOP | EXPLORE | HELP & SUPPORT |
|---|---|---|---|
| About Charter | Bundles & Promotions | Spectrum Apps | Contact Spectrum |
| Careers | Internet | Spectrum WiFi Access Points | Manage Account |
| Spectrum Enterprise Solutions | TV | Resource Center | Pay Your Bill |

**APPX602**

| | | | |
|---|---|---|---|
| Spectrum Reach | Home Phone | Test Your Internet Speed | Support |
| Spectrum Community Solutions | Mobile | Contract Buyout | Store Locator |
| Spectrum Business | Spectrum Internet Assist | Channel Lineup | Upgrade |
| Retailers | | Why Spectrum? | Move Your Services |
| | | Services In Your Area | Service Rates & Disclosures |
| | | Rural Broadband Expansion | Rural Carrier Call Completion |
| | | Affordable Connectivity Program | |

Terms of Service/Policies | Your Privacy Rights | Accessibility | California Privacy Policy | California Consumer Do Not Sell My Personal Information

Not all products, pricing, and services are available in all areas. Pricing and actual speeds may vary. Internet speeds based on wired connection. Restrictions apply.

©2022 Charter Communications. All rights reserved.

Chat With Us

APPX603

# EXHIBIT P

# Spectrum ▶

$0.00/mo ⌄
$0.00 initial order total

## Services

Need help with your order? Call 1-855-839-4246.

📍 13286 Guerin Dr, 75035

**SHOW ME OFFERS WITH:**

| TV ⊘ | Internet ⊘ | Home Phone ⊘ |

**Up to 500 Mbps**
## INTERNET ULTRA
- Turbocharged Internet with NO data caps
- Complete control over your Spectrum WiFi network with Advanced WiFi
🏷 Eligible for Spectrum One savings. See details

From
**$39**99/mo
for 24 mos
Plan details

**ADD OFFER**
Plan details

**Up to 1 Gbps**
## INTERNET GIG
- Our fastest Internet with NO data caps for ultimate performance
- Complete control over your Spectrum WiFi network with Advanced WiFi
🏷 Eligible for Spectrum One savings. See details

From
**$59**99/mo
for 24 mos
Plan details

**ADD OFFER**
Plan details

**125+ Channels / Up to 500 Mbps**
## TV SELECT + INTERNET ULTRA
- Boost Your Speed with Internet Ultra
- View channel lineup
🏷 Eligible for Spectrum One savings. See details

From
**$89**98/mo
for 24 mos
when bundled
Plan details

**ADD OFFER**
Plan details

**140+ Channels / Up to 500 Mbps**
## MI PLAN LATINO + INTERNET ULTRA
- Spanish and English language programming with thousands of On Demand choices.
- View channel lineup
🏷 Eligible for Spectrum One savings. See details

From
**$79**98/mo
for 24 mos
when bundled
Plan details

**APPX605**

ADD OFFER

Plan details

### 125+ Channels
## TV SELECT

From
$ **59** <sup>99</sup>/mo

for 12 mos

Plan details

- Get popular movies,sports and news with thousands of On Demand choices
- View  channel lineup

ADD OFFER

Plan details

### 140+ Channels
## MI PLAN LATINO

From
$ **39** <sup>99</sup>/mo

for 12 mos

Plan details

- 140+ channels  with FREE HD including 75+ Spanish channels
- FREE On Demand access
- Stream anywhere with the spectrum TV® app

ADD OFFER

Plan details

## Spectrum ▶

**1.855.839.4246**

Product and Offer Disclaimers | Your Privacy Rights | Policies | Contract Buyout Information | Ratecard | California Privacy Policy | California Consumer Do Not Sell or Share My Personal Information | California Consumer Limit the Use of My Sensitive Personal Information

Not all products, pricing and services are available in all areas. Pricing and actual speeds may vary. Internet speeds based on wired connection, Restrictions apply.
©2023 Charter Communications, Inc.

Chat With Us

✕

# EXHIBIT Q



## RETAIL SALES SPECIALIST (BILINGUAL SPANISH) - $18.00 PER HOUR, PLUS COMMISSION AND INCENTIVES!

Beaumont, Texas

APPLY NOW



JUMP TO

OVERVIEW

SUCCESS PROFILE

IN-DEPTH DETAILS

REWARDS

RESPONSIBILITIES

LOCATION

CONNECT WITH US

## Overview

Your personality connects you with people and our products and services connect them with each other. In Retail Sales, that's a winning combination! With more than 700 locations across the country and counting, we're making an impact in our customers' lives. If you have a passion for people and technology, our comprehensive training program will help you develop the skills you need to grow your sales career. Come grow with us!

**APPX608**



We asked Miguel :

Q How I became a leader at Spectrum?

More testimonials here!

Employee Q&A



We asked Monica:

What additional perks does Spectrum provide? (401K, Tuition Reimbursement, Discounted Internet/Cable/Voice)

More testimonials here!

Employee Q&A

## Success Profile

What makes a successful Spectrum Retail Sales Specialist? Check out the top traits we're looking for and see if you have the right mix.



**APPX609**

11/30/22, 2:49 PM    Retail Sales Specialist (Bilingual Spanish) $18.00 per hour plus commission and incentives - ECT5542



● Competitive      ● Organized
● Achiever      ● Results Driven
● Digitally Savvy      ● Communicator

| **Day in the Life** | How We Prepare You |
| --- | --- |

To help unlock your potential, we have a comprehensive training program to get you up to speed. Don't have sales experience? Our team will work with you in both the classroom and store to get you comfortable in your new role. If you have experience we will help you fine tune your skills so you can soar.

**EARN MORE, FASTER**

Our total compensation package creates opportunities for significant earnings. Our Sales Compensation Allowance Program provides minimum guarantee payouts during your first five months.

**COMPREHENSIVE TRAINING**

Work smarter, not harder. With Spectrum you will enjoy paid training on our winning sales techniques, products and services. Our five month learning journey involves:

- Virtual classroom training and self study activities

- Ongoing peer-to-peer, leadership mentoring, and skill practice in the Store environment.

- Ongoing product updates to keep you connected and help build your knowledge and skills

Our ongoing training helps you always be prepared and able to provide the best experience to your customers and maximize sales opportunities.

**CAREER ADVANCEMENT**

Looking for a great company with exciting growth opportunities? This is the place to be. Establish yourself as a successful Retail Sales Specialist, enjoy the many benefits we have to offer and plan for a long and rewarding career with Spectrum.



APPX610



## Rewards



**PAID TRAINING**



**SAVINGS & RETIREMENT**



## Responsibilities

**Date posted:** 11/16/2022
**Requisition Number:** 326946BR
**Business unit:** Marketing
**Location:** Beaumont, Texas
**Area of Interest:** Retail, Sales
**Position Type:** Full Time

**At A Glance:**

- Our specialists earn an hourly base pay of $18.00 along with lucrative commission and incentives for targeted hourly earnings of $22.50/hour or $46,800.00 annually. Top performers in this role are earning $58,000.00. You may also qualify for free internet, TV, and phone services (restrictions do apply).
- This role is a full-time, entry to mid-level retail sales role, focusing on wireless, TV, and internet products in the communications and entertainment technology space. Advancement potential and generous commission opportunities are available.
- Our Retail Sales Specialists are organized, digitally savvy communicators with a competitive spirit eager to learn and grow. A results-driven achiever comfortable in a busy retail sales environment. Wireless sales experience preferred.

***

**About Us**

Spectrum is America's fastest-growing TV, internet, and voice provider. Our organization is one filled with a diverse group of

**APPX611**

Spectrum is America's fastest-growing TV, internet, and voice provider. Our organization is one filled with a diverse group of hardworking people. They're committed to helping us grow, and we're committed to growing with them because making sure everyone reaches their full potential is a key part of our mission.

Our extensive training program, competitive base salary, and generous commission structure provides the foundation you need to be a successful salesperson. Meeting and exceeding sales goals while delivering service solutions to our customers - it's a win-win.

*** 

### It's all about learning and growing

Whether this is a new road for you or you are an experienced sales professional, the journey is all mapped out. With plenty of dedicated peer and leadership support, our fully paid training programs shape new Retail Sales Specialists into quick-thinking professionals. We can bring you up to speed on Spectrum's full line of products – and our competitors' products – in about a month, including telephone, data, wireless, and video services. As products are updated, so are you, so you can pass that knowledge on to your customers.

### With a deliberate path to success

We know that the best people to lead are those who have been down the same road before. Most of our managers started as Retail Sales Specialists themselves, proving that career advancement is a very real and achievable goal. Peer-to-peer mentoring and regular coaching sessions ensure you feel supported and have everything you need to succeed. Get started at a Fortune 100 company and see how far you can go.

### The benefits are clear.

On top of opportunities to advance your career and earn more, Spectrum offers comprehensive benefits, a market-leading retirement plan, and other programs to support you and your family at all stages of life.

**See all the ways we invest in you—at work and in life.**

### What are our expectations?

- Meet or exceed monthly sales goals, including wireless sales
- Ensure a great customer experience
- Educate and engage customers through product demonstrations
- Be a team player (because we spend way too much time together)
- Know your stuff - maintain strong knowledge of all TV, internet, and wireless products, pricing plans, promotions, and service features for Spectrum, as well as our competitors

### What's required to get started?

- Thrive in a fast-paced team environment
- Read, write and speak the English language to effectively communicate with employees, customers, and suppliers in person, on the phone, and by written communications
- Lifting up to 35 lbs.
- Standing for prolonged periods of time
- Wearing a required uniform
- High School Diploma or equivalent
- **Bilingual Spanish Preferred**

APPX612

**Preferred Experience**

- Sales Experience: 1 - 5 years
- Knowledge of latest technology and devices
- Commissioned sales experience
- Retail sales or wireless sales
- Valid driver's license

**Get to Know Us** Charter Communications is known in the United States by our Spectrum brands, including: Spectrum Internet®, TV, Mobile and Voice, Spectrum Networks, Spectrum Enterprise and Spectrum Reach. When you join us, you're joining a strong community of more than 93,000 individuals working together to serve more than 32 million customers in 41 states and keep them connected to what matters most. Watch this video to learn more.

**Who You Are Matters Here** We're committed to growing a workforce that reflects our communities, and providing equal opportunities for employment and advancement. EOE, including disability/vets. Learn about our inclusive culture.

**READ LESS** ❯



**SHARE THIS JOB**



**APPX613**

RECENTLY VIEWED                                      RELATED JOBS

**Retail Sales Specialist (Bilingual Spanish) - $18.00 per hour, plus commission and incentives!**
Beaumont, Texas



## Sign up for job alerts

Sign up to receive the latest career opportunities directly to your inbox. All fields marked with an asterisk (*) are required.

First Name *

Last Name *

Email *

Phone Number    Are you a member of the military community?

Are you a member of the military community?

Areas of interest

Enter a location and a category, and click "Add" to create your Job Alert.

Select category

Select location

ADD

Sales, Beaumont, Texas, United States  ✕      Retail, Beaumont, Texas, United States  ✕

Resume

Choose File   No file chosen

APPX614



**APPX615**

EEO Information - English (PDF) | Información EEO - Español (PDF) | FCC Notices | Your Privacy Rights |
Pay Transparency Provision | Accessibility | Spectrum.com | Site Map

Jobs by Category | Jobs by Location | Jobs by Business Unit

APPX616

# EXHIBIT R
# OMITTED

# EXHIBIT S





## Franchise Tax Account Status

As of : 01/10/2023 13:15:40

**This page is valid for most business transactions but is not sufficient for filings with the Secretary of State**

| | |
|---|---|
| **SPECTRUM GULF COAST, LLC** | |
| Texas Taxpayer Number | 32048202892 |
| Mailing Address | 12405 POWERSCOURT DR C/O INC TAX DEPT SAINT LOUIS, MO 63131-3673 |
| ❓ Right to Transact Business in Texas | ACTIVE |
| State of Formation | DE |
| Effective SOS Registration Date | 09/01/2012 |
| Texas SOS File Number | 0801609419 |
| Registered Agent Name | CORPORATION SERVICE COMPANY D/B/A CSC-LAWYERS INCO |
| Registered Office Street Address | 211 E. 7TH STREET SUITE 620 AUSTIN, TX 78701 |

**APPX619**

# EXHIBIT T



# John R. Ashcroft
## Missouri Secretary of State

# MISSOURI ONLINE BUSINESS FILING

| MY ACCOUNT | HOME | SEARCH | MISC INFO | UCC FILING | ❓ Help |

## Search for a Business Entity

Required Field *

Exact Match searches should include corporate designations (inc., llc, etc.) and punctuation.

We recommend you do not include these for other searches.

Search | Business Name ▾

### Search for a Business Entity

Business Name * | spectrum gulf coast

Includes names | Starting With ▾ | ☐ Only Active Corporations

**SEARCH**

### Search Results as of 1/10/2023 1:15 PM

Change page: |◀ ◀ ▶ ▶| | Page 1 of 1, items 0 to 0 of 0.

| Select | Business Name | Address | Charter No. | Type | Status | Created | Registered Agent Name |
|--------|---------------|---------|-------------|------|--------|---------|----------------------|
| No records to display. | | | | | | | |

Change page: |◀ ◀ ▶ ▶| | Page 1 of 1, items 0 to 0 of 0.

Hey there! I am an A.I. chatbot, let's talk.



# EXHIBIT U

Case 2:22-cv-00223-Z Document 70-2 Filed 08/16/23 Page 519 of 649 PageID #: 1605



**APPX623**

# EXHIBIT V

**Spectrum▸**

FIND BEST OFFERS

# Spectrum Residential Internet Services Agreement

THESE TERMS AND CONDITIONS OF SERVICE GOVERNING YOUR USE OF SPECTRUM INTERNET SERVICE INCLUDE A BINDING ARBITRATION PROVISION IN THE GENERAL TERMS AND CONDITIONS FOR SPECTRUM RESIDENTIAL SERVICES, WHICH INCLUDES A WAIVER OF CLASS ACTIONS AND PROVISIONS FOR OPTING OUT OF ARBITRATION.

Charter Communications Operating, LLC on behalf of itself and its affiliates and subsidiaries authorized to provide the services set forth herein ("Spectrum") will provide its Internet access service (the "Internet Service") to You ("Subscriber") in accordance with these terms and conditions, which terms and conditions incorporate and include the Acceptable Use Policy ("AUP"), the General Terms and Conditions for Spectrum Residential Services and the Spectrum Privacy Policy, as they may be changed from time to time (collectively, the "Terms of Service"), all of which may be found at www.spectrum.com/policies/terms-of-service.html, under "Terms of Service/Policies" and "Your Privacy Rights."

Subscriber's use of the Internet Service shall be deemed acknowledgment that Subscriber has read and agreed to the Terms of Service. Any user who does not agree to be bound by the Terms of Service should immediately stop their use of the Internet Service and notify Spectrum's Customer Service at 888-438-2427 to terminate the Internet Service. Terms that are initially capitalized but not defined, will have the defined meaning given to them in the other documents referenced above. The Terms of Service constitute a legal binding document.

Spectrum regularly updates and amends these Terms of Service. Subscriber should consult Spectrum's website at www.spectrum.com/policies/terms-of-service to be sure Subscriber remains in compliance.

1. Equipment: To use the Internet Service, Subscriber must meet minimum computer, device, in-home network and system requirements as identified by Spectrum.

a. Computer Equipment: The personal computer or device that Subscriber uses to access the Internet Service must meet minimum configuration standards. The minimum configuration standards may change, and Spectrum will make reasonable efforts to support previously acceptable

**APPX625**

CHARTER_ENTROPIC00047265

configurations; however, Spectrum is not obligated to continue to provide such support. Spectrum may supply equipment such as modems, gateways, routers, or wireless cards, at no charge or for a one time or reoccurring fees, to operate the Internet Service. Subscriber acknowledges that such equipment may require updates and/or changes to the software resident in the equipment, and that Subscriber may be required to perform such updates and/or changes. Notwithstanding, Subscriber hereby authorizes Spectrum to perform updates and/or changes, on-site or remotely from time to time as Spectrum deems necessary, in Spectrum's sole discretion.

b. Spectrum does not provide technical assistance for third party hardware or software, including but not limited to home networks or gaming systems. Any questions concerning third party hardware or software should be directed to the manufacturer of that product. Spectrum is not responsible for the operation or support, maintenance or repair of any equipment, software or services that Subscriber elects to use in connection with the Internet Service.

c. Subscriber will not connect any equipment, other than equipment authorized by Spectrum, to any cable modem outlet or port. Subscriber understands that failure to comply with this restriction may cause damage to the Spectrum network and subject Subscriber to liability for damages and/or criminal prosecution. Subscriber may not alter, modify or tamper with the Equipment or the Internet Service, or permit any other person, not authorized by Spectrum, to do the same.

2. Network Interface: When Spectrum installs the Internet Service, Subscriber will need a network interface card or adapter providing an Ethernet connection. Alternatively, subscriber may connect to a home networking device (commonly referred to as a router or gateway).

3. Cable Modem/Other Spectrum Equipment: Subscriber may obtain a cable modem from Spectrum or may purchase and use a cable modem purchased at retail from a third party, provided that such third party modem has been tested, certified and approved by Spectrum in accordance with our DOCSIS Modem Policy at www.spectrum.com/policies/docsis-modem-policy.html.

4. Software: At the time of installation of the Internet Service, Spectrum may provide Subscriber with common Spectrum or third party software (e.g., a browser and plug-ins) to enable and enhance the Internet Service. Spectrum does not support third party software. Any and all software provided by Spectrum is the property of Spectrum and/or its suppliers and licensors. Spectrum hereby grants Subscriber a nonexclusive, nontransferable license to install and use on Subscriber's computers, devices, and/or system(s) the software for use solely in connection with the Internet Service. Subscriber's license to use any software provided by Spectrum and its suppliers and licensors is contingent upon Subscriber's compliance with all use and other restrictions contained in the Terms of Service and the AUP. It is a material breach for Subscriber to copy, duplicate, reverse engineer or in any way modify, change, tamper with or interfere with any software provided to Subscriber by Spectrum. Upon any termination or expiration of the

**APPX626**

CHARTER_ENTROPIC00047266

Terms of Service or the disconnection of Subscriber's Internet Service, this license will terminate and Subscriber agrees to then destroy all copies of the software that were delivered to Subscriber (including by erasing and deleting the software from Subscriber's computer system). Subscriber hereby represents and warrants to Spectrum that Subscriber owns the operating system software and associated use/license rights thereto for the computers that are connected to the Spectrum network.

5. Security: Subscriber acknowledges and agrees that when using the Internet Service to access the Internet or any other online network or service, there are certain risks that may enable other Internet users to gain access to or use of Subscriber's equipment. Subscriber is responsible for taking and should take all appropriate security measures when using the Internet Service. Subscriber assumes sole responsibility for Subscriber's equipment used in conjunction with the Internet Service and for providing and configuring any "firewall" or security measures for use with the Internet Service to prevent damage from viruses, malware, or other similar malicious items and to prevent unauthorized access to the Internet Service, and Subscriber, not Spectrum, shall be solely responsible in any manner for the effectiveness of these blocking and filtering technologies. Spectrum does not warrant that others will be unable to gain access to Subscriber's computer(s) and/or data even if Subscriber utilizes blocking and filtering technologies, nor does Spectrum warrant that the data or files will be free from computer viruses or other harmful components. Spectrum has no responsibility and assumes no liability for the protections Subscriber may employ nor for any damages that may arise from accessing the Internet. Subscriber shall not permit or enable any use of Subscriber's account or account passwords by any person not a member of Subscriber's household. Subscriber is responsible for any misuse of the Internet Service that occurs through Subscriber's account whether by a member of Subscriber's household or unauthorized third party.

6. Additional Features, Functionality and Tools: Any additional service features, functionality and tools that Spectrum offers may be further subject to specific terms of use and subject to charges, change, or removal at any time by Spectrum.

7. Cookies: Subscriber may access Subscriber's Spectrum e-mail account and support website at spectrum.net, provided that Subscriber's browser is configured to accept cookies from www.spectrum.net.

8. Monitoring the Internet Service and Privacy: Spectrum takes the protection of our Subscribers' privacy seriously. Spectrum has no obligation to monitor content; however, Subscriber agrees that Spectrum has the right to monitor the Internet Service (including but not limited to, content and Subscriber equipment as it may affect the Internet Service from time to time) in accordance with the Terms of Service, the AUP, and

**APPX627** CHARTER_ENTROPIC00047267

Spectrum's Privacy Policy.

For content residing on Spectrum's servers, Spectrum reserves the right at all times and without notice to remove, restrict access to, or make unavailable, and to monitor, review, retain and/or disclose any content or other information in Spectrum's possession about or related to Subscriber, Subscriber's use of the Internet Service or otherwise as necessary to satisfy any applicable law, or otherwise to preserve the security of the System or Spectrum subscribers' information.

For more information on Spectrum's approach to Subscriber's privacy, please refer to the Spectrum Residential Subscriber Privacy Policy.

9. Rights Infringement: Subscriber will not use, or allow others to use, the Internet Service to send or receive, or otherwise use any information which infringes the patents, trademarks, copyrights, trade secrets or proprietary rights of any other person or entity. This includes, but is not limited to, digitization of music, movies, photographs or other copyrighted materials or software. Subscriber must obtain appropriate authorization from such other person or entity prior to sending, receiving or using such materials. Subscriber represents and warrants that Subscriber is and will be the author and copyright owner and/or an authorized licensee with respect to any hosted content, and Subscriber further represents and warrants that no hosted content violates or will violate the trademark, copyright, domain name or intellectual property rights of any third party. Spectrum assumes no responsibility, and Subscriber assumes all risks regarding the determination of whether material is in the public domain, or may otherwise be used for such purposes.

Spectrum is registered Digital Millennium Copyright Act of 1998 (DMCA). Under the DMCA, copyright owners have the right to notify Spectrum if they believe that a Spectrum customer has infringed the copyright owner's work(s). If Spectrum receives a notice from a copyright owner alleging that Subscriber has committed copyright infringement, Spectrum will notify Subscriber of the alleged infringement. Spectrum may determine that Subscriber is a repeat copyright infringer if Spectrum learns that Subscriber has engaged in online copyright infringement on more than one occasion. Spectrum reserves the right to suspend or terminate the accounts of repeat copyright infringers.

10. Termination: Spectrum shall have the right to terminate the Internet Service upon any violation of the Terms of Service. Spectrum will not be responsible for the return of data stored on Spectrum's servers, such as web and e-mail servers if Subscriber's account is suspended or terminated.

**APPX628**

CHARTER_ENTROPIC00047268

11. Disclaimer of Warranties and Limitation of Liability.

a. No Warranty: Subscriber agrees that Subscriber uses the Internet Service and any software and equipment supplied by Spectrum at Subscriber's sole risk. The Internet Service and Spectrum equipment are provided on an "as-is basis", if applicable, without warranties of any kind including without limitation any warranties of title, non-infringement, fitness for a particular purpose and merchantability. Spectrum does not warrant uninterrupted use of Internet Service. Spectrum does not warrant that the Internet Service will be error-free or free of any viruses, worms, spam, pop-up advertising, spyware, adware, denial of service attacks or other harmful components, even if countermeasures have been deployed. Spectrum does not warrant that any data or files Subscriber sends or receives via the Internet Service will be transmitted in uncorrupted form, within a reasonable time, or free from unauthorized access by others or that other users will be unable to gain access to Subscriber's computer. This includes, but is not limited to, incidents of file sharing, print sharing, or use of other means that enable Internet users to gain access to Subscriber's equipment or to monitor Subscriber's activity and conduct while using the Internet Service.

b. Anti-Spam Software: Subscriber acknowledges and understands that Spectrum utilizes anti-spam software and that such security technology is a feature of the Internet Service that may block incoming and outgoing electronic mail. Spectrum does not warrant that such feature will block all unwanted mail/spam or that all mail that is blocked constitutes unwanted mail/ spam. Consistent with other statements set forth in this section, Spectrum does not warrant that such feature will be error-free.

c. Security Software: In addition, in its sole discretion, Spectrum may make available to Subscriber security software, such as anti-virus software, firewall software, "pop-up" advertising blocking software, parental control software, and anti-spyware or anti-adware software for Subscriber's use on Subscriber's computer system in conjunction with the Internet Service. Any such security software provided by Spectrum to Subscriber is intended to provide only a minimal level of protection to Subscriber's computer system(s). Subscriber understands and agrees that Spectrum and its third party suppliers of any such security software do not guarantee its accuracy, efficacy or performance. Subscriber understands and agrees that Spectrum and its third party suppliers are not responsible for any damage to Subscriber's computer system(s) or the information stored on it that may result from the security software or its non-performance.

d. Third Party Sites: When Subscriber uses the Internet Service and/or accesses Spectrum web sites, Subscriber may encounter links allowing Subscriber to visit web sites operated or owned by third parties ("Third Party Site(s)"). Spectrum provides these links as a convenience and they are not under the control or ownership of Spectrum. The presence of a link to any Third Party Site is not an endorsement by Spectrum of the Third Party Site, an acknowledgment of any affiliation with its operators or owners, or a warranty of any type regarding any information or offer on the Third Party Site. Subscriber's use of any third party site is governed by the various legal agreements and policies posted at that web site.

e. Bandwidth.

**APPX629**

CHARTER_ENTROPIC00047269

i. Subscriber understands and agrees that Spectrum does not guarantee that any particular amount of bandwidth on the Spectrum network or that any speed or throughput of Subscriber's connection to the Spectrum network will be available to Subscriber. Subscriber understands and agrees that the speed of the Internet Service provided at Subscriber's site will vary depending upon a number of factors, including Subscriber's computer system(s) and associated equipment (e.g., Subscriber-sourced WiFi routers/access points, etc.), Internet traffic, and other factors such as system capacity limitations, governmental actions, events beyond Spectrum's control, and system failures, modifications, upgrades and repairs. Subscriber understands that Subscriber's wireless connections and use of wireless routers may be subject to greater fluctuations in speed and latency and may be adversely affected by interference, congestion, distance, and other outside factors.

ii. Subscriber understands that Spectrum may use various tools and techniques in order to efficiently manage its networks and to ensure compliance with Spectrum's AUP. Subscriber should reference Spectrum's AUP for additional details.

iii. Subscriber further understands and agrees that, to allocate bandwidth across all of its users, Spectrum may employ reasonable network management techniques as identified in Spectrum's AUP and Spectrum's Network Management Disclosure Statement.

iv. Subscriber's sole and exclusive remedies under the Terms of Service are as set forth in these Terms of Service. Because some States do not allow the exclusion or limitation of implied warranties, some of the above exclusions may not apply to Subscriber.

12. Limitation of Liability/Exclusive Remedy: Spectrum's entire liability and Subscriber's exclusive remedy with respect to the use of the Internet Service or its software and equipment, or any breach by Spectrum of any obligation Spectrum may have under these Terms of Service, shall be Subscriber's ability to terminate the Internet Service or to obtain the replacement or repair of any defective software or equipment provided by Spectrum to Subscriber. In addition, Spectrum shall not be liable for damages for failure to furnish, or the degradation or interruption of, any services, for any lost data or content, identify theft, for any TV, monitor or screen burn-in, monitor or screen wear, stuck pixels, phosphor burn, files or software damage, regardless of cause. Spectrum shall not be liable for damage to property or for injury to any person arising from the installation, maintenance or removal of equipment, software, wiring or the provision of the Internet Service.

13. Mailbox Deactivation: Subscriber agrees that Spectrum owns any and all mailboxes associated with the Internet Service and may reclaim such mailboxes at any time for any reason, after which any associated mailbox content (e.g., emails, attachments, etc.) will be destroyed. Spectrum may also limit the number of new email addresses available per account. Spectrum may also limit the number of emails that can be sent within a specific time period, and if Subscriber does not access a Spectrum mailbox for an extended period of time as determined by Spectrum from time to time, Spectrum may lock the mailbox and prohibit the mailbox from receiving new email messages and/or reclaim the

APPX630

CHARTER_ENTROPIC00047270

mailbox, including any sub-accounts associated with the mailbox. Subscriber understands that upon disconnecting from Spectrum's Internet service, Spectrum will suspend the account and delete the contents of the mailbox, if any, at that time.

14. Mail Storage: In no event will Spectrum be responsible for maintaining, and Spectrum will not guarantee storage of, such electronic mail for any period of time. Spectrum also reserves the right to enforce email storage limits.

15. Network Security and Management: Subscriber agrees that Spectrum may block traffic to and from any source, including, without limitation, the deletion of any electronic mail, as it deems necessary to secure its network and/or eliminate spam. Spectrum may take other actions, in its sole discretion, to manage or protect its network or to benefit the greatest number of its subscribers as identified in Spectrum's AUP. Spectrum may take these actions, with or without notice, in situations where Spectrum believes, in its sole discretion that Subscriber may harm the Spectrum network or disrupt the performance of the Internet Service for other users or where Subscriber is transmitting or is otherwise connected with what Spectrum considers in its sole discretion to be spam or other malicious code or software. Subscriber agrees that Spectrum is entitled to damages if Subscriber is transmitting or is otherwise connected with spam or other malicious code or software. Subscriber agrees Spectrum is entitled to actual damages, however, if actual damages cannot be reasonably calculated, Subscriber agrees to pay Spectrum liquidated damages of five dollars (U.S. $5.00) for each piece of spam or other malicious code or software transmitted from or otherwise connected with Subscriber's account.

16. Additional Terms for Spectrum WiFi: Spectrum WiFi supported by the Spectrum-provided wireless router ("Spectrum Router") is a service available to certain subscribers and provides wireless access to the Spectrum Internet Service within the Subscriber's residence ("Home Network") and beyond the Subscriber's residence, for which Subscriber may be charged a fee consistent with Spectrum's then-current practices. The Spectrum Managed Router comes programmed with certain default settings and configurations for the Home Network. Subscriber may modify the default settings and configurations on the Spectrum Managed Router although Spectrum recommends maintaining the default configuration and settings. Spectrum does not guarantee the security of the Spectrum Managed Router and Subscriber's connection to the Internet Service via the Home Network. Spectrum WiFi accessed beyond the Home Network may be subject to additional terms and conditions imposed by the respective third party whose network the Subscriber may access. Spectrum is not responsible for the speed or performance of the Internet Service to the extent accessed by Subscriber on a third party network. Subscriber understands and agrees that Subscriber is solely responsible for the security of their Home Network and must enable and use encryption in order to

**APPX631**

CHARTER_ENTROPIC00047271

access Spectrum-provided applications. Spectrum reserves the right to preconfigure the Spectrum Managed Router to distribute a wireless Internet access point (i.e. a Spectrum WiFi Hotspot) separate from the Home Network. Any use of bandwidth from such wireless access point by third parties will not be considered to be use by the Subscriber for any purpose. Subscriber shall have the right to disable such Spectrum WiFi Hotspot, and shall not be responsible for the security of the WiFi Hotspot. The Spectrum Managed Router will collect and maintain certain information regarding access to and use of the Home Network, which information shall include but not be limited to device identifiers, device name, device type, applications and protocols, connections, and traffic flows. Such information will be used by Spectrum to provide the Internet Service and support, as well as for Spectrum's internal business analytics regarding the use of the Internet Service. Subscriber acknowledges and agrees that Spectrum shall have access to the network name and password associated with the Spectrum Managed Router in order to provide support and diagnostic services. Spectrum reserves the right to modify the network name and password for the Spectrum Managed Router in order to safeguard Internet security, the security and privacy of Subscriber's information, where required by law, and/or for other good cause to provide, upgrade and maintain the Internet Service, and protect the network, other users of the Internet, or our subscribers. Subscriber acknowledges that the Spectrum Managed Router is Spectrum Equipment.

17. General Subscriber Responsibilities and Warranties: When Subscriber completes registration for the Internet Service, Subscriber must establish an identity by selecting a user name and password to be used by Subscriber to access the Internet Service. Subscriber is responsible for maintaining the confidentiality of their user name and password. Subscriber agrees that Subscriber is responsible for anyone using Subscriber's computer system, password or name or user name in connection with the Internet Service and for ensuring that anyone who does use the Internet Service through Subscriber's computer or access to the Internet Service, does so in accordance with the Terms of Service and the AUP. Subscriber agrees to take all reasonable measures necessary to ensure that the Internet Service is not used by another without Subscriber's consent.

18. Subscriber shall be responsible for procuring and installing patches, any and all anti-virus and firewall software/ hardware and operating system patches, up-dates, or supplements that may be necessary for (i) the protection and maximum functionality of Subscriber's computer and related equipment and (ii) the protection of Spectrum's network and other subscribers. For purposes of clarification, Spectrum hereby disclaims any and all responsibility and liability for any damages that may arise from Subscriber's failure to procure or install the aforementioned security software and /or hardware.

**APPX632**

CHARTER_ENTROPIC00047272

19. Amendment: Spectrum may, in its sole discretion, change, modify, add or remove portions of the Terms of Service at any time. Spectrum may notify Subscriber of any such changes by posting notice of such changes on Spectrum's website at www.spectrum.com/policies/terms-of-service.html, under "Terms of Service/Policies", or sending notice via electronic mail or U.S. postal mail. The Subscriber's continued use of the Internet Service following notice of such change, modification or amendment shall be deemed to be the Subscriber's acceptance of any such modification. If Subscriber does not agree to any modification of the Terms of Service, Subscriber must immediately cease using the Internet Service and notify Spectrum that Subscriber is terminating the Internet Service. In addition, the Terms of Service are subject to change in compliance with applicable law.

20. Entire Agreement: The Terms of Service shall be posted at www.spectrum.com, under "Terms of Service/Policies," and are the only terms and conditions that govern the Internet Service. No undertaking, representation or warranty made by any agent or representative of Spectrum in connection with the sale, installation, maintenance or removal of the Internet Service shall modify or amend the Terms of Service.

RETURN TO SPECTRUM POLICIES

COMPANY

SHOP

EXPLORE

HELP & SUPPORT

**APPX633**

CHARTER_ENTROPIC00047273

Terms of Service/Policies   Your Privacy Rights   Accessibility   California Privacy Policy   California Consumer Do Not Sell My Personal Information

Not all products, pricing, and services are available in all areas. Pricing and actual speeds may vary. Internet speeds based on wired connection. Restrictions apply.

©2022 Charter Communications. All rights reserved.

**APPX634**

CHARTER_ENTROPIC00047274

# EXHIBIT W



# CONNECTIVITY
YOU CAN
COUNT ON.

2021 ANNUAL REPORT





CHARTER COMMUNICATIONS            1

**APPX638**



# INVESTING
## IN TECHNOLOGY AND INFRASTRUCTURE.

From 2017-2021 alone, we've invested over $40 billion in infrastructure and technology. Our network, nearly 800,000 miles long, spanning 41 states, delivers 1 Gig speeds across our entire footprint. And, with our path to 10G in place, our network is poised to power the future. Our technology will revolutionize the way consumers manage their digital lives.

Case 2:22-cv-00125-JRG    Document 70-19    Filed 02/28/23    Page 6 of 13 PageID #: 1622



CHARTER COMMUNICATIONS    3

**APPX640**



SUPERIOR PRODUCTS
# EXCEPTIONAL VALUE

As a leading broadband connectivity company, we provide our customers with superior products that stay ahead of technology advances. We stand behind our full-range of state-of-the art residential, business and enterprise services with a commitment to quality and innovation to better serve each and every one of our customers.



## SPEED

We're providing access to more speed in more places coast to coast. That means 1 Gig speeds across our entire footprint along with starting speeds at 200 Mbps. Our fiber-powered network is built to combine Internet and Mobile to provide a better, and seamless, experience for our customers.

## SERVICE

With a U.S.-based workforce, over 93,000 strong, we work to ensure all of our customers have the support they need to get the most out of their Spectrum services including bilingual call centers and a new Disability Support Team launched in 2021.

## SECURITY

Advanced Home WiFi provides more control over a customer's wireless network than ever before. It's now available to nearly all Spectrum Internet® customers, delivering security, reliability and the fastest speeds to every corner of the home.

## VALUE

Our strength is founded on saving customers money while providing faster speeds to meet growing data consumption demand. We consistently deliver a better customer experience based on speed, security and reliability.

CHARTER COMMUNICATIONS          5



## DEAR SHAREHOLDERS:

We continued to execute well in 2021, with strong customer and financial growth.

For the full year 2021, we added 940,000 new customer relationships and over 1.2 million net new Internet customers. We also grew our mobile lines by 1.2 million in 2021, despite an operating environment that remains unusual. The market effects of COVID-19 have not yet passed and market churn remains historically low, which has muted selling and disconnect activity and reduced customer transaction costs.

We generated strong financial growth in 2021, growing full year revenue and Adjusted EBITDA[1] by 7.5% and 11.4%, respectively. And net income attributable to Charter shareholders increased by 44% to $4.7 billion and free cash flow[1] grew by 23% year-over-year to $8.7 billion.

As we look forward to the rest of 2022, we remain focused on several strategic priorities and goals, including,

- Driving customer growth and penetration,
- Developing our products and network,
- Expanding and digitizing our customer self-service and self-care capabilities, and
- Executing our rural construction initiative.

Fundamental to our success is the delivery of products and services that are superior to what our competitors can offer. Delivering more speed to our Internet customers remains a key area of focus. In order to increase the capacity of our network for next generation products and services, we have developed a multi-faceted approach to our network evolution. That approach is comprised of a number of technologies that will deliver bi-directional multi-gigabit Internet speeds with the lowest latency, at the lowest cost and time to deploy. In 2022, we will begin a number of projects to deploy capacity enhancements in our service areas, which will allow us to comfortably offer symmetrical gigabit speeds and multi-gigabit speeds in the downstream.



1 Adjusted EBITDA and free cash flow are non-GAAP measures and are defined and reconciled to the most comparable GAAP measures starting on page F-49 of this document.

APPX644

Another critical piece of our long-term strategy is treating customer service as a product itself, and giving customers the flexibility to manage their Spectrum services and interactions with us, whenever and however they want. We continue to work on improving the quality and efficiency of our interactions with customers by expanding our customer self-service and self-care capabilities, and digitizing and modernizing our customer, field and network operations groups.

Our rural construction initiative also remains a key growth priority. Our multiyear, multibillion-dollar construction project will deliver gigabit high-speed broadband access to more than 1 million unserved rural customer locations across the country. Through the Rural Digital Opportunity Fund or RDOF, we will add over 100,000 miles of new network infrastructure over the next five years to our approximately 800,000 existing miles. Ultimately, our rural construction initiative is not only good for the millions of rural consumers that will finally have access to fast and reliable Internet, but it is also good for Charter and its shareholders. The expansion of our footprint will help us drive additional customer growth and financial returns.

Finally, we remain focused on driving customer growth, capturing market share and increasing penetration by offering high-quality products and service at attractive prices.

Our network allows us to deliver a unique fully converged wireline and mobile connectivity service package while saving customers hundreds, or even thousands, of dollars per year. And our share of household connectivity spend, including mobile and fixed broadband, is still very low. In fact, we only capture about 27%[1] of household spend on wireline and mobile connectivity within our footprint. There is a large opportunity for us to increase market share by saving customers money, and through our mobile offering, we are doing that.

So far, we have seen a very strong response to our converged mobile and fixed broadband offering, with 380,000 mobile line net additions in the fourth quarter—our strongest quarter for mobile line net additions yet. In fact, we ended the year with 3.6 million mobile customers and continue to gain mobile lines at a rapid pace because of the value in our bundled service offering.

As always, we are highly focused on the execution of our long-term strategic initiatives and goals, and continue to make investments that will enhance our customer growth and improve long-term financial performance. We remain very well positioned in the marketplace and our success will drive more EBITDA and free cash flow per customer and passing, creating value for Charter shareholders.



1 Source: S&P Global / Kagan and Charter estimates.

APPX645

In closing, I would like to highlight our recently announced management changes and promotions.

- On October 19, we announced that John Bickham has been appointed Vice Chairman, ahead of his previously announced retirement at the end of 2022. I have worked with John for three decades. And at every turn, his knowledge, leadership and steady hand have not only contributed greatly to the success of the companies we led, but made a profound impact on the growth of our industry. I am grateful that John will continue to serve Charter in this new capacity, as a strategic advisor to the executive team.

- We also recently announced that Chris Winfrey has been promoted to Chief Operating Officer. Over the past 11 years, Chris' influence on Charter has expanded far beyond that of a typical Chief Financial Officer. He has been actively involved in our business operations. His deep knowledge of our operations, combined with his previous operational experience in Europe, will serve us well as Charter's new Chief Operating Officer.

- As Chris moves to Chief Operating Officer, we have promoted Jessica Fischer, previously Executive Vice President of Finance, to Chief Financial Officer. Jessica's leadership and financial expertise have benefited Charter for many years, both in her roles at Charter and while a partner at EY, where she was a key advisor during our 2016 transactions. In her new role, Jessica will have an even greater impact on Charter's success.

- Finally, Rich DiGeronimo, our Chief Product and Technology Officer, adds oversight of network and software operations to his current responsibilities leading the product and technology organization. With expanded responsibility, Rich will both shape the customer experience and lead our network's critical evolution into the 10G future, delivering to our customers a superior broadband connectivity experience.

I would like to thank all of our employees for their dedication to our customers and to Charter. The hard work of Charter's over 93,000 employees has been remarkable. I would also like to thank all of our investors for their continued support.

Best Regards,

Thomas M. Rutledge
Chairman and Chief Executive Officer
Charter Communications



THE CHARTER FOOTPRINT

**Charter Communications, Inc.** (NASDAQ: CHTR) is a leading broadband connectivity company and cable operator serving more than 32 million customers in 41 states through its Spectrum brand. Over an advanced communications network, the company offers a full range of state-of-the-art residential and business services including Spectrum Internet®, TV, Mobile and Voice.

For small and medium-sized companies, Spectrum Business® delivers the same suite of broadband products and services coupled with special features and applications to enhance productivity, while for larger businesses and government entities, Spectrum Enterprise provides highly customized, fiber-based solutions. Spectrum Reach® delivers tailored advertising and production for the modern media landscape. The company also distributes award-winning news coverage, sports and high-quality original programming to its customers through Spectrum Networks and Spectrum Originals. More information about Charter can be found at Corporate.Charter.Com.

**APPX646**



**Charter Communications, Inc.**
400 Washington Blvd.
Stamford, CT 06902

**Spectrum.com**

©2022 Charter Communications. All rights
reserved. All trademarks remain the property
of their respective owners.

# EXHIBIT X

Case: 23-136      Document: 2-2      Page: 545      Filed: 06/16/2023

1/10/23, 1:13 PM    Case 2:22-cv-00125-JRG    Document 70-20    Filed 02/28/23    Page 2 of 4 PageID #:  1631
Charter Officially Opens New State-of-the-Art Corporate Headquarters in Stamford

SPECTRUM SITES



Charter COMMUNICATIONS    Company ⌄    Newsroom ⌄    Investors ⌄    Careers ⌄    Community Impact ⌄    Public Policy ⌄    🔍

PRESS RELEASE  |  JUNE 6, 2022

# Charter Officially Opens New State-of-the-Art Corporate Headquarters in Stamford

Connecticut Governor Ned Lamont and Stamford Mayor Caroline Simmons Joined Charter Executives to Cut the Ribbon on the New Facility

SHARE ARTICLE:

🅕 (https://www.facebook.com/sharer/sharer.php?u=https://corporate.charter.com/newsroom/charter-officially-opens-corporate-headquarters-in-stamford-ct)

🐦 (https://twitter.com/intent/tweet?url=https://corporate.charter.com/newsroom/charter-officially-opens-corporate-headquarters-in-stamford-ct&via=charternewsroom&text=Charter%20Officially%20Opens%20New%20State-of-the-Art%20Corporate%20Headquarters%20in%20Stamford)

✉ (mailto:?body=https://corporate.charter.com/new...officially-opens-corporate-headquarters-in-stamford-ct&subject=Charter%20Officially%20Opens...of-the-Art%20Corporate%20Headquarters%20in...)

**STAMFORD, Conn. –** Charter Communications, Inc. officially marked the opening of its new headquarters in downtown Stamford on Monday, June 6, with a ribbon-cutting ceremony attended by elected officials, including Connecticut Governor Ned Lamont and Stamford Mayor Caroline Simmons. Located in the city's revitalized Harbor Point neighborhood, Charter's new corporate campus provides the company's Stamford-based employees with an amenity-rich, commuter-friendly workspace with room for continued growth.

"Over the past 10 years we have been proud members of the Stamford community and have experienced tremendous growth," said Thomas M. Rutledge, Chairman and Chief Executive Officer for Charter. "Our Stamford headquarters has grown from a handful of employees in a small portion of a single floor to 1,700 employees in a two-building, 900,000 square-foot campus. This region provides access to a robust talent base, and at Charter we are committed to attracting and retaining highly-skilled employees who live and work in this area, and to contributing to the growth and success of this community."

"Charter is a leading Connecticut-based business, invested in the success of the state, Stamford and the many communities it serves across the country," said Connecticut Governor Ned Lamont. "The company's continued growth is a testament to its commitment to employees, customers and the communities in which they live and work."

"We are so thrilled and grateful to have Charter Communications in Stamford," Mayor Simmons said. "Charter has brought over 1,700 jobs and invested over $500 million in this headquarters, bringing economic prosperity to our city. Charter has also been an excellent corporate partner, contributing to philanthropic efforts including a five year commitment to funding job training programs within our Community Action Agency in the South End. We are so grateful and happy to see Charter's continued growth in Stamford."



*Charter CEO Tom Rutledge (second from left) and Vice Chairman John Bickham (third from left) were joined by Stamford Mayor Caroline Simmons (far left) and Connecticut Gov. Ned Lamont (far right) at the June 6 ribbon-cutting ceremony to celebrate Charter's new corporate headquarters.*

Charter has more than 93,000 employees nationwide, and the company is currently hiring for more than 150 positions at the new Stamford campus, including professional-level roles in business planning, corporate security, customer operations, facilities, field operations, finance, human resources, information technology, legal, marketing, network engineering and sales. Named by Forbes as one of America's Best Employers by State in 2021, Charter provides excellent wages, including a $20 minimum starting wage. The company offers comprehensive health benefits, and for the past nine years has absorbed the full annual cost increase of medical, dental and vision coverage, along with a market-leading retirement plan, education assistance and discounted services.

Charter's Stamford campus is conveniently situated to support employees commuting by car, bus or train from New York City and other areas of Connecticut and Westchester County. It has direct access to the Stamford train station platform, which offers Metro North and Amtrak Acela services, and is located just off Interstate 95. Other amenities include:

- A two-story food hall, three 24/7 self-serve markets; a coffee shop serving Starbucks© coffee and food, and a Pure Juice Bar with indoor and outdoor dining space.
- A free fitness center with complimentary group exercise classes, fitness assessments and individualized exercise programs.
- A health care center that is scheduled to opened in August that will provide employees in-building access to healthcare services.
- A conference center with 10 conference rooms, three huddle rooms, three phone rooms, a break room, and a training room that holds more than 100 people.
- A 250-seat auditorium set to open in August.
- An outdoor amphitheater scheduled to open in the fall.

More information about Stamford job openings is available at jobs.spectrum.com (https://jobs.spectrum.com/).

## About Charter

Charter Communications, Inc. (NASDAQ:CHTR) is a leading broadband connectivity company and cable operator serving more than 32 million customers in 41 states through its Spectrum brand. Over an advanced communications network, the company offers a full range of state-of-the-art residential and business services including Spectrum Internet®, TV, Mobile and Voice.

For small and medium-sized companies, Spectrum Business® delivers the same suite of broadband products and services coupled with special features and applications to enhance productivity, while for larger businesses and government entities, Spectrum Enterprise provides highly customized, fiber-based solutions. Spectrum Reach® delivers tailored advertising and production for the modern media landscape. The company also distributes award-winning news coverage, sports and high-quality original programming to its customers through Spectrum Networks and Spectrum Originals. More information about Charter can be found at corporate.charter.com (https://corporate.charter.com/).

## Media Contact

Leslie Byxbee

Leslie.Byxbee@charter.com (mailto:Leslie.Byxbee@charter.com)

## SHARE ARTICLE:

(https://www.facebook.com/sharer/sharer.php?u=https://corporate.charter.com/newsroom/charter-officially-opens-corporate-headquarters-in-stamford-ct)

(https://twitter.com/intent/tweet?url=https://corporate.charter.com/newsroom/charter-officially-opens-corporate-headquarters-in-stamford-ct&via=charternewsroom&text=Charter%20Officially%20Opens%20New%20State-of-the-Art%20Corporate%20Headquarters%20in%20Stamford)

(mailto:?body=https://corporate.charter.com/newsroom/charter-officially-opens-corporate-headquarters-in-stamford-ct&subject=Charter%20Officially%20Opens%20New%20State-of-the-Art%20Corporate%20Headquarters%20in)

## Related News

**PRESS RELEASE**

Charter Communications Reaches $20 Minimum Starting Wage Companywide



APPX650

1/10/23, 1:33 PM                        Charter Officially Opens Corporate Headquarters in Stamford | Charter



**PRESS RELEASE**

Charter Now Offering 200 Mbps Starting Speeds in All Markets in its 41-State Service Area

(https://twitter.com/charternewsroom)          (https://www.youtube.com/chartercommunications)

| Company | Newsroom | Investors | Careers | Community Impact | Public Policy | Spectrum Sites |
|---|---|---|---|---|---|---|
| About Charter (https://corporate.charter.com/about-charter) | Latest News (https://corporate.charter.com/newsroom) | Investor Home (https://ir.charter.com) | Job Search (http://jobs.spectrum.com) | About Community Impact (https://corporate.charter.com/community-impact) | Policy Home (https://policy.charter.com) | Spectrum Residential (https://spectrum.com) |
| Leadership (https://corporate.charter.com/leadership) | Media Library (https://corporate.charter.com/media-library/images) | Results & SEC Filings (https://ir.charter.com/financial-information/quarterly-results) | | Community Center Assist (https://corporate.charter.com/community-assist) | | Spectrum Business (https://business.spectrum |
| History (https://corporate.charter.com/history) | Media Contacts (https://corporate.charter.com/media-contacts) | Events & Webcasts (https://ir.charter.com/events-and-webcasts) | | Spectrum Digital Education (https://corporate.charter.com/digital-education) | | Spectrum Enterprise (https://enterprise.spectru |
| Diversity & Inclusion (https://corporate.charter.com/diversity-inclusion) | | Investor News (https://ir.charter.com/news-releases) | | Community Loan Fund (https://corporate.charter.com/community-investment-loan-fund) | | Spectrum Reach (https://spectrumreach.co |
| | | Corporate Governance (https://ir.charter.com/corporate-governance) | | Spectrum Networks (https://corporate.charter.com/spectrum-networks) | | Spectrum Account (https://www.spectrum.ne |
| | | Stock Information (https://ir.charter.com/stock-information/stock-quote) | | | | |
| | | Investor Resources (https://ir.charter.com/investor-resources) | | | | |
| | | ESG Report (https://corporate.charter.com/esg-report) | | | | |

(/)     © 2023 Charter Communications Inc.

Terms of Service(https://www.spectrum.com/policies/website-terms)     Your Privacy Rights(https://www.spectrum.com/policies/your-privacy-rights)
California Consumer Privacy Rights(https://www.spectrum.com/policies/california)     California Consumer Do Not Sell or Share My Personal Information(https://spectrum.com/policies/your-privacy-rights-opt-out)
California Consumer Limit the Use of My Sensitive Personal Information(https://www.spectrum.com/policies/your-privacy-rights-opt-out)     Site Map(/sitemap)

If you are a customer with disability, please contact us (https://www.spectrum.net/support/accessibility/talking-guide-information-and-support/) if you need assistance.

APPX651

CONFIDENTIAL MATERIAL OMITTED

# Exhibit Y to Plaintiff's Opposition to Defendant's Motion to Dismiss

# Dkt. 68-26 (Sealed Version)

# Dkt. 70-21 (Public Version)

# FILED UNDER SEAL

# (APPX652-657)

CONFIDENTIAL MATERIAL OMITTED

# Exhibit Z to Plaintiff's Opposition to Defendant's Motion to Dismiss

# Dkt. 68-27 (Sealed Version)

# Dkt. 70-21 (Public Version)

# FILED UNDER SEAL

# (APPX658-670)

CONFIDENTIAL MATERIAL OMITTED

# Exhibit AA to Plaintiff's Opposition to Defendant's Motion to Dismiss

# Dkt. 68-28 (Sealed Version)

# Dkt. 70-21 (Public Version)

# FILED UNDER SEAL

# (APPX671-693)

CONFIDENTIAL MATERIAL OMITTED

# Exhibit AB to Plaintiff's Opposition to Defendant's Motion to Dismiss

# Dkt. 68-29 (Sealed Version)

# Dkt. 70-21 (Public Version)

# FILED UNDER SEAL

# (APPX694-722)

# Exhibit AC



**Charter** (https://corporate.charter.com)
COMMUNICATIONS

Company ⌄    Newsroom ⌄    Investors ⌄    Careers ⌄    Community Impact ⌄    Public Policy ⌄

PUBLIC POLICY    (/)    Charter Policy Home    (/)    About Charter Policy    (/overview)    Resource Hub    (/resource-hub)    Policy News & Updates    (/news-updates)

< Resource Hub (/resource-hub)

# Our Employees

==Our diverse, highly skilled employees are our greatest resource== – and investing in their success helps us better serve our customers and build stronger connections in the communities we serve.



For our more than 100,000 employees, working at Charter is not just a job – it is a place to build a career.

## Charter's highly skilled and diverse workforce includes:

- Nearly 50% people of color

- Nearly 10% with a military affiliation

**APPX724**

Our Employees Earn Nearly 3x the Federal Minimum Wage



## Charter Employees Earn Nearly 3x the Federal Minimum Wage

Our workforce is key to our long-term success and we're proud to invest in them.

**APPX725**

Charter employees **earn at least $20 per hour – nearly 3X the federal minimum wage.**



At Charter, our commitment to our transitioning service members, veterans, Guard, Reserve members, the military spouse community, and their families is strong. In fact, nearly one in ten of Charter's employees has a military affiliation. We are investing in the military community, to help them build on skills and talents developed during their service and to translate them into meaningful careers throughout our company.

Learn More (/veterans)

APPX726



Our Diverse Workforce



## Spectrum Scholars

Spectrum Scholars is a two-year scholarship and professional development initiative to help support the needs and aspirations of underrepresented students through a combination of scholarships, mentorships, and opportunities to explore possible internships at Charter.

Learn More (/blog/spectrum-scholars)

## Related News: Our Employees

APPX727



**POWERED BY AMERICAN JOBS**

Investing in Our Greatest Resource – Our Highly-Skilled, Diverse Workforce

September 16, 2020

**VETERANS AND MILITARY FAMILIES**

Charter's Continuing Commitment to Veterans

While 2020 and the COVID-19 pandemic have changed a lot of things about our day-to-day life, Charter's commitment to our veterans and their families remains as strong as ever. As the nation pauses on Veterans Day to honor our veterans and those who continue to serve in the Guard or Reserves, Charter is proud to be helping veterans build careers in a growing and important field.

November 11, 2020

**EMPLOYEES**

To Our Employees: Thank You

The work of our employees during the COVID-19 pandemic will have a meaningful and lasting impact on the communities we serve. From processing new service orders, executing complex and time-sensitive installations, and ensuring our network can meet the demand, their dedication to our customers and company is nothing short of inspiring.

June 9, 2020

View All (/policy-categories/employees)

## Subscribe to Policy Updates

Email Address

Sign Up Now

I'm not a robot
reCAPTCHA
Privacy - Terms

## Follow Charter Policy

(https://twitter.com/CharterGov)          (http://www.facebook.com/CharterGov)

| Company | Newsroom | Investors | Careers | Community Impact | Public Policy | Spectrum Site |
|---|---|---|---|---|---|---|
| About Charter (https://corporate.charter.com/about-charter) | Latest News (https://corporate.charter.com/newsroom) | Investors Home (https://corporate.charter.com/investors) | Job Search (http://jobs.spectrum.com) | About Community Impact (https://corporate.charter.com/community-impact) | Charter Policy Home (https://policy.charter.com/) | Spectrum Reside |
| Leadership (https://corporate.charter.com/leadership) | Media Library (https://corporate.charter.com/media-library/logos) | Results & SEC Filings (https://ir.charter.com/financial-information/quarterly-results) | | Spectrum Community Assist (https://corporate.charter.com/community-assist) | About Charter Policy (https://policy.charter.com/overview) | Spectrum Busine (https://business. |
| History (https://corporate.charter.com/history) | Media Contacts (https://corporate.charter.com/media-contacts) | Events & Webcasts (https://ir.charter.com/events-and-webcasts) | | Spectrum Digital Education (https://corporate.charter.com/digital-education) | Resource Hub (https://policy.charter.com/resource-hub) | Spectrum Enterp (https://enterpri |
| Diversity & Inclusion (https://corporate.charter.com/diversity-inclusion) | | Investor News (https://ir.charter.com/news-releases) | | Community Loan Fund (https://corporate.charter.com/community-investment-loan-fund) | Policy News & Updates (https://policy.charter.com/news-updates) | Spectrum Reach (https://spectrum |
| | | Corporate Governance (https://corporate.charter.com/corporate- | | Spectrum Networks (https://corporate.charter.com/spectrum- | | Spectrum Accou (https://www.sp |
| | | | | | | Spectrum Origin (https://www.sp |

**APPX728**

governance)

networks)

Stock Information
(https://ir.charter.com/stock-
information/stock-quote)

Investor Resources
(https://ir.charter.com/investor-
resources)

ESG Report
(https://corporate.charter.com/esg-
report)

(https://corporate.charter.com)    © 2023 Charter Communications Inc.

Terms of Service(https://www.spectrum.com/policies/website-terms)

Your Privacy Rights(https://www.spectrum.com/policies/your-privacy-rights)

California Consumer Privacy Rights(https://www.spectrum.com/policies/california)

California Consumer Do Not Sell or Share My Personal Information(https://spectrum.com/policies/your-privacy-rights-opt-out)

California Consumer Limit the Use of My Sensitive Personal Information(https://spectrum.com/policies/your-privacy-rights-opt-out)

If you are a customer with disability, please contact us (https://www.spectrum.net/support/accessibility/talking-guide-information-and-support/) if you need assistance.

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

ENTROPIC COMMUNICATIONS, LLC,

     Plaintiff

        v.

CHARTER COMMUNICATIONS, INC.,

     Defendant.

Civil Action No. 2:22-cv-00125-JRG

**JURY TRIAL DEMANDED**

**DEFENDANT CHARTER COMMUNICATIONS, INC.'S REPLY IN FURTHER
SUPPORT OF ITS MOTION TO DISMISS THE SECOND AMENDED COMPLAINT
FOR IMPROPER VENUE PURSUANT TO FRCP 12(b)(3)**

**<u>TABLE OF CONTENTS</u>**

<u>**Page**</u>

I.      INTRODUCTION ...............................................................................................1

II.     ARGUMENT ......................................................................................................1

      A.      Entropic Cannot Meet the "Difficult" Standard to Establish a Lack of
            Corporate Separateness Between CCI and Its Subsidiaries ..................................1

            1.      CCI Never Exercised Improper Control Over Its Subsidiaries...................2

            2.      CCI's Subsidiaries Followed Corporate Formalities ..................................4

            3.      CCI's Subsidiaries Do Not Carry Out Business Activities In CCI's
               Name .........................................................................................................5

      B.      Venue is Improper as to CCI Because It Does Not Have Regular and
            Established Places of Business In This District ........................................................7

            1.      Spectrum, Not CCI, Is Associated With the Website and Buildings
               That Offer Spectrum Services in This District ...........................................7

            2.      CCI Has No Agents Conducting Business in the District ...........................7

            3.      CCI Has Not Ratified Any Place of Business In This District ...................9

III.    CONCLUSION..................................................................................................10

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Agis Software Development LLC v. Google LLC,*
    2022 WL 1511757 (E.D. Tex. May 12, 2022)......................................................10

*Andra Grp., LP v. Victoria's Secret Stores, LLC,*
    6 F.4th 1283 (Fed. Cir. 2021) ...............................................................5, 8, 9, 10

*Bd. Of Regents v. Medtronic PLC.,*
    No. 17-CV-0942, 2018 WL 4179080 (W.D. Tex. July 19, 2018)........................1, 5

*Bobby Goldstein Productions, Inc. v. Habeeb,*
    No. 21-CV-1924-G, 2022 WL 1642466 (N.D. Tex. May 24, 2022)........................9

*Charles v. Charles,*
    No. 21-CV-2061, 2022 WL 4747499 (S.D. Tex. Sept. 30, 2022) ...........................8

*E. Texas Med. Ctr. Reg'l Healthcare Sys. v. Slack,*
    916 F. Supp. 2d 719 (E.D. Tex. 2013) (Gilstrap, J.)...............................................8

*Entropic Communications, LLC v. DirecTV, LLC et al.,*
    No. 22-CV-0075, Dkt. 109, (E.D. Tex. Oct. 24, 2022) (Gilstrap, J.) ................7, 10

*Interactive Toybox, LLC v. The Walt Disney Co.,*
    No. 17-CV-1137, 2018 WL 5284625 (W.D. Tex. Oct. 24, 2018)...............1, 2, 5, 6

*IPVX Patent Holdings, Inc. v. Broadvox Holding Co., LLC,*
    No. 11-CV-0575, 2012 WL 13012617 (E.D. Tex. Sept. 26, 2012)........................2

*L.B. Benon Family Ltd. P'ship v. Wells Fargo Bank, N.A.,*
    SA-21-CA-01115, 2022 WL 16825204 (W.D. Tex. Nov. 7, 2022) ........................8

*MDSave, Inc. v. Sesame, Inc.,*
    No. 21-CV-01338, 2023 WL 353998 (W.D. Tex. Jan. 11, 2023) .........................10

*Montes v. Charter Comms., Inc.,*
    No. 21-CV-0489 (S.D. Tex.) ..................................................................................9

*Neria v. Dish Network L.L.C.,*
    No. 19-CV-00430, 2020 WL 3403074 (W.D. Tex. June 19, 2020) ........................8

*Parallel Network Licensing LLC v. Arrow Elecs., Inc.,*
    No. 21-CV-0714, 2022 WL 1597364 (E.D. Tex. May 19, 2022)...........................6

███████████████

*Soverain IP, LLC v. AT&T, Inc.*,
    No. 17-CV-0293, 2017 WL 5126158 (E.D. Tex. Oct. 31, 2017) .........................................1, 4

*United States ex rel. Reddell v. DynCorp Int'l, LLC*,
    No. 1:14-CV-86, 2019 WL 12875442 (E.D. Tex. Mar. 1, 2019) .............................................4

*United States v. Bestfoods*,
    524 U.S. 51 (1998).................................................................................................................4

■■■■■■■

## I.    INTRODUCTION

Entropic Communications, LLC ("Entropic") argues that venue is proper in this district because "the activities and employees of CCI's subsidiaries [are] imputed to" Charter Communications, Inc. ("CCI"). Dkt. 68 at 1. Entropic cannot meet the "difficult" imputation standard because CCI maintains all corporate formalities as a parent and manager of its subsidiary LLCs, including Spectrum Gulf Coast, LLC ("SGC"), a separate and distinct subsidiary that operates and leases or owns the properties in this district that are identified in the Second Amended Complaint ("SAC"). Opening Br., Dkt. 61 at 2-10. Entropic asks the Court to disregard CCI's corporate form based on the theories of "lack of separateness," "ratification," and "agency." Dkt. 68 at 3-4, 22-29. In doing so, Entropic blends these distinct legal theories, fails to set forth any legal standards applicable to the lack of separateness or ratification theories (*id.* at 4), and misrepresents facts to urge the Court to impute SGC's conduct to CCI. There is no evidence that would permit the Court to find a lack of corporate separateness, that CCI ratified any property in this district, or that an agency relationship exists between CCI and its subsidiaries (or employees of its subsidiary Charter Communications, LLC ("CC LLC")). This Court should therefore grant CCI's Motion.

## II.    ARGUMENT

### A.    Entropic Cannot Meet the "Difficult" Standard to Establish a Lack of Corporate Separateness Between CCI and Its Subsidiaries

"Except where corporate formalities are ignored and an alter ego relationship exists, the presence of a corporate relative in the district does not establish venue over another separate and distinct corporate relative." *Bd. Of Regents v. Medtronic PLC.*, No. 17-CV-0942, 2018 WL 4179080, at *2 (W.D. Tex. July 19, 2018). "There must be a plus factor, something beyond the subsidiary's mere presence within the bosom of the corporate family." *Interactive Toybox, LLC*

-1-

## APPX734

████████████████████████

*v. The Walt Disney Co.*, No. 17-CV-1137, 2018 WL 5284625, at *3 (W.D. Tex. Oct. 24, 2018). This is a "difficult standard" to meet, and "[s]ettled law always presumes that corporations exist as separate entities." *Soverain IP, LLC v. AT&T, Inc.*, No. 17-CV-0293, 2017 WL 5126158, at *1 (E.D. Tex. Oct. 31, 2017); *Interactive Toybox*, 2018 WL 5284625, at *3. Entropic contends, in effect, that an alter ego relationship exists because (1) CCI purportedly holds itself out as "One Charter"—a term created by Entropic, and (2) the various subsidiaries are "fiction[al,]" "shell LLCs," with "no independent existence." Dkt. 68 at 1-3, 5-15, 29 & 10 n.3-4. In determining whether corporate formalities have been ignored and an alter ego relationship exists, courts undertake a rigorous analysis. *See* Dkt. 61 at 17-18 (collecting cases). Entropic makes no effort to satisfy this standard.

### 1.    CCI Never Exercised Improper Control Over Its Subsidiaries

Entropic's principal argument is that CCI has "complete, direct control over each subsidiary" such that the "activities and employees of the subsidiaries are attributable to CCI" because CCI is the manager of the subsidiary LLCs. Dkt. 68 at 5-8. The fact that CCI was designated as a manager under LLC agreements does not convert the relationship between CCI, as manager, and the managed LLC into that of an alter ego. *See* Dkt. 61 at 7-9, 11-12, 14-15, 18. That is precisely how LLCs are designed to operate. *Id.* at 7-9, 18. Entropic has not cited any evidence that CCI was improperly appointed as manager of SGC (or any other subsidiary) or that CCI or any of its officers has acted beyond its authority as a "manager" as dictated by the relevant LLC agreements or pursuant to the Delaware LLC Act. *See* Dkt. 61 at 8, 18; *IPVX Patent Holdings, Inc. v. Broadvox Holding Co., LLC*, No. 11-CV-0575, 2012 WL 13012617, at *3 (E.D. Tex. Sept. 26, 2012) (rejecting argument that parent-defendant "must control [its subsidiary-LLC that conducts business in this district] because" the parent-defendant manages "its subsidiary"

**CONFIDENTIAL MATERIAL OMITTED**

████████████████████████████████

where there was "no evidence that the control exerted by [the parent-defendant] is greater than that 'normally associated with common ownership and directorship.'" (citation omitted)).

Entropic also asserts without basis that CCI "dictate[s] the allocation of Spectrum employees to its various subsidiaries." Dkt. 68 at 26. ███████████████████████

███████████████████████████████████████████████████████

███████████████████████████. Dkt. 61 at 4-7; Dkt. 61-4, Ex. 2, Proost Dep., 72:7-21; Dkt. 61-6, Ex. 4, Boglioli Dep., 36:12-16, 51:20-25 (██████████████████████████), 72:3-73:22, 75:12-76:14.  Next, Entropic argues that "CCI's department heads have the power to hire, fire, and direct the work of employees," but the very testimony it quotes explains that the "department heads" are "employees of Charter Communications, LLC" and that he is uncertain what "authority they have as officers of [CCI]." *See* Dkt. 68 at 12-13.  The same witness had already explained that CCI's officers or directors ***do not*** participate in the hiring and firing of any employees, including any employees in this district.  *See* Dkt. 61 at 14-15 (collecting testimony that CCI is not involved in the hiring and firing of any CC LLC employees); Dkt. 61-6 Ex. 4, Boglioli Dep., 47:8-48:24 (testifying that to the extent any CCI officers are involved in the hiring and firing of employees, which is "doubt[ful]," such conduct would be in their role with CC LLC, *not* with CCI).  In any event, Entropic does not even suggest any of this violates governing Delaware corporate law or the applicable agreements.

Finally, there is nothing improper about the fact that CCI, as manager, signed agreements on behalf of SGC (or other managed LLCs) because the SGC LLC Agreement ████████████ ███████████████████████████████.  *See* Dkt. 61-10, Ex. 8, SGC LLC Agmt., § 4(a)(iii).  Entropic does not argue that CCI acted beyond the scope of this provision by signing any document as manager of any subsidiary.  Further, it is a "well established principle" of

CONFIDENTIAL MATERIAL OMITTED

corporate law "that directors and officers holding positions with a parent and its subsidiary can and do 'change hats' to represent the two corporations separately, despite their common ownership." *United States v. Bestfoods*, 524 U.S. 51, 69 (1998); *United States ex rel. Reddell v. DynCorp Int'l, LLC*, No. 1:14-CV-86, 2019 WL 12875442, at *7 (E.D. Tex. Mar. 1, 2019) (same); Dkt. 68-2, Entropic's Ex. A, Proost Dep., 48:14-49:4 (███████████████████████████ ██████████████████████).

## 2.    CCI's Subsidiaries Followed Corporate Formalities

Although Entropic, like CCI's subsidiaries, is a Delaware LLC, it misunderstands the "corporate" and "legal formalit[ies]" required to form and maintain an LLC. *See* Dkt. 61 at 7-9 (explaining the purpose and formation of an LLC under the Delaware LLC Act); Dkt. 68-2, Entropic's Ex. A, Proost Dep., 46:1-18. For example, Entropic incorrectly suggests that an alter ego relationship exists because CCI's subsidiaries do not hold meetings and corporate records are maintained "under a single management system for all subsidiaries." Dkt. 68 at 13-14. The Delaware LLC Act does not require any annual or monthly member or manager meetings. Dkt. 61 at 8. Nothing requires CCI, as a parent entity, to have separate document management systems for each and every subsidiary. And, "even if a parent corporation controls a subsidiary's operations," which CCI does not, or if "venue-related discovery revealed an interdependence" between CCI and its subsidiaries, a "subsidiary's presence in a venue cannot be imputed to the parent absent disregard for corporate separateness," which Entropic fails to prove here. *Soverain IP, LLC*, 2017 WL 5126158, at 1 (citations omitted). In any event the corporate documents for each entity are "physically separated in different files" and CCI's records are maintained separate from its LLC subsidiaries.[1] Dkt. 61-4, Ex. 2, Proost Dep., 60:5-61:8; *see* Dkt. 61 at 10.

---

[1]    Entropic states that "CCI is listed as the custodian of nearly all the technical documents" produced by CCI in this case. Dkt. 68 at 9, 13; Dkt. 74 (Entropic's supplemental brief correcting

███████████████████

Entropic also relies on the fact that there is an overlap in officers or directors between CCI and its subsidiaries, and points to agreements signed by the same person in different capacities and on behalf of different entities as evidence of a purported lack of corporate separateness.  Dkt. 68 at 6-9, 11-13.  This argument fails to take into consideration that "[e]ven 100% stock ownership and commonality of officers and directors are not alone sufficient to establish an alter ego relationship between two corporations."  *Interactive Toybox*, 2018 WL 5284625, at *3.

### 3.     CCI's Subsidiaries Do Not Carry Out Business Activities In CCI's Name

Entropic contends that CCI holds itself out as Spectrum, but it has no answer to the fact that its subsidiaries' "use of the common or generic name [Spectrum] on the exterior of [the subsidiary's buildings], as well as the press release announcing the business," cannot support venue where, as here, the corporate formalities between related companies remain intact.  *Medtronic*, 2018 WL 4179080, at *2.  Entropic also relies on statements by CCI explaining the unremarkable fact that, through its subsidiaries, it offers services to the public under the Spectrum brand.  *See* Dkt. 68 at 14-15.  For example, Entropic relies on CCI's annual report which says "[w]e . . . serv[e] more than 32 million customers . . . through our Spectrum brand" and explains that "'Charter,' 'we,' 'us' and 'our' refer to Charter Communications, Inc. and its subsidiaries." Dkt. 68-12, Entropic's Ex. K at i & 1.  Courts and people alike understand that many services are provided through a corporation's subsidiaries.  *Andra Grp., LP v. Victoria's Secret Stores, LLC*, 6 F.4th 1283, 1288 (Fed. Cir. 2021) (the "use of 'we' does not convey that 'we' means" the parent, but" could "include the individual subsidary brands").

---

this statement).  That is not true, and Gregory Greene is the custodian of the document cited by Entropic.  *See* Dkt. 68 at 9 (citing Dkt. 68-29); *see* Brown Reply Declaration, ¶¶ 6-7.

Entropic also relies on web sites using the "www.spectrum.com" URL as evidence that there is only "One Charter." Dkt. 68 at 15. All this shows, however, is the fact that services are provided under the Spectrum brand, not "Charter Communications, Inc." or even "Charter," confirming the fact that CCI's subsidiaries do not hold themselves out as CCI.

Lastly, Entropic argues CCI "represents [] to the federal government" that "Charter is one enterprise and that CCI provides the accused products and services." Dkt. 68 at 16-18. In reality, Charter repeatedly explained that it provided these services through its subsidiaries. Dkt. 68 at 16-17 (citing Dkt. 68-15, Entropic's Ex. N (referring to CCI as "the ultimate controlling entity" and showing a partial corporate structure)); Dkt. 68 at 17 (quoting from CCI filing that refers to CCI "together with its controlled subsidiaries")[2]; Dkt. 68 at 18 (quoting from another CCI filing that states CCI provides services "through its operating subsidiaries").[3]

If CCI's generic statements concerning the services provided by its subsidiaries were sufficient to pierce the corporate veil, no major corporation in the United States would be able to function without a wholesale reorganization. *See Interactive Toybox*, 2018 WL 5284625, at *4 (rejecting alter ego theory where "evidence [did] not establish" that parent ignored "the corporate formalities" or exerted "such a level of control" based on public documents wherein the parent-

---

[2]     Entropic fails to provide the full quote for this filing, which also includes: "Charter admits that Charter Communications, Inc., together with its controlled subsidiaries, is a holding company whose principal asset is a controlling equity interest in Charter Communications Holdings, LLC, an indirect owner of Charter Communications Operating, LLC under which substantially all of the operations reside." *Compare* Dkt. 68 at 1, 17 *with* Ex. 13, ITC Submission, ¶ 15.

[3]     As for Entropic's reliance on CCI's pleadings in *Rockstar* or *Bear Creek Techs.*, *see* Dkt. 68 at 17-18, these are from 2014 and 2011, respectively, before CCI even owned any Time Warner Cable entities, including SGC. *See* https://ir.charter.com/news-releases/news-release-details/charter-communications-merge-time-warner-cable-and-acquire. And, "[v]enue is determined by the facts and situation as of the date suit is filed." *Parallel Network Licensing LLC v. Arrow Elecs., Inc.*, No. 21-CV-0714, 2022 WL 1597364, at *3 (E.D. Tex. May 19, 2022).

defendant stated, among other things, it is "home" to "a leading retail business," *i.e.*, the branded-store subsidiary).

**B.     Venue is Improper as to CCI Because It Does Not Have Regular and Established Places of Business In This District[4]**

**1.     Spectrum, Not CCI, Is Associated With the Website and Buildings That Offer Spectrum Services in This District**

CCI has no physical place of business in this district.  Thus, Entropic contends that CCI carries out its business in this district by imputing the presence of SGC to CCI.  *E.g.*, Dkt. 68 at 21-22 (arguing that "CCI has touted publicly" the services offered in Spectrum stores).  For the reasons stated above, those arguments should fail.  Entropic cites this Court's decision in *Entropic Communications, LLC v. DirecTV, LLC et al* ("*DirecTV*") to argue that CCI carries out business at the Spectrum stores in this district because each location displays the Spectrum logo and offers services under the Spectrum brand.  Dkt. 68 at 21-22 (citing *DirecTV*, No. 22-CV-0075, Dkt. 109, at 7 (E.D. Tex. Oct. 24, 2022) (Gilstrap, J.)).  CCI, however, does not own or lease any physical locations anywhere in Texas; those four locations are owned or leased and operated by SGC.  Dkt. 61 at 13.  And, unlike *DirecTV*, all of the evidence shows use of the Spectrum brand, and not any "Charter" or CCI-specific brand:  there are *no* locations in this district that bear the "Charter" name, and the *Spectrum* website (not the Charter website) identifies the *Spectrum* services that are offered at the *Spectrum* stores in this district.  *Cf. DirecTV*, at 7-8.

**2.     CCI Has No Agents Conducting Business in the District**

Entropic argues that CCI has a regular and established place of business based on an agency relationship and because CCI has purportedly "represented" that "when a customer walks into a ***Spectrum*** store or has a ***Spectrum*** technician install equipment at their home, that customer is

---

[4]     CCI denies that it committed any acts of infringement and focuses its arguments on Entropic's failure to establish that CCI has a regular and established place of business in the district.  *See* Dkt. 61 at 12 n.9.

**APPX740**

████████████████████████

interacting with an employee/agent of" CCI.  Dkt. 68 at 26 (emphases added); *id.* at 23-26.  Yet, Entropic cites no evidence for this statement and fails to explain how the Spectrum brand is synonymous with CCI, other than to ask that the Court pierce the corporate veil and find that CCI is the alter ego of its subsidiaries.  For the reasons above, the Court should reject that argument.[5]

As for the agency theory, Entropic contends that CCI has the "right to direct or control the employees' actions," and that CCI officers "can direct the work of the employees," because CCI is a designated manager under LLC agreements.[6]  Dkt. 68 at 23-24.  As explained, nothing in the record suggests that the relationship between CCI and SGC (or any other subsidiary) is anything other than that between a parent and subsidiary or a LLC manager and a managed LLC.  *See* § II.A, *supra*; *see* Dkt. 61 at 14-15; *E. Texas Med. Ctr. Reg'l Healthcare Sys. v. Slack*, 916 F. Supp. 2d 719, 722 (E.D. Tex. 2013) (Gilstrap, J.) (rejecting agency relationship "based merely on" a "corporate relationship"); *Charles v. Charles*, No. 21-CV-2061, 2022 WL 4747499, at *4 (S.D. Tex. Sept. 30, 2022) (same); *L.B. Benon Family Ltd. P'ship v. Wells Fargo Bank, N.A.*, SA-21-CA-01115, 2022 WL 16825204, at *4 (W.D. Tex. Nov. 7, 2022) (no agency relationship where there the parties shared the same office, CFO, and management team and a "contractual relationship" was the only supporting evidence).  Here, too, Entropic misrepresents that CCI or its officers, acting as CCI, hire and fire employees, which is "directly contradicted" by CCI's corporate representatives.  *See* § II.A, *supra*; Dkt. 61 at 14-15; *Andra Grp.*, 6 F.4th at 1288-89.

---

[5]      Entropic argues that the same facts in support of the first *Cray* factor to support the second *Cray* factor.  Dkt. 68 at 22-23.  As explained in CCI's opening brief and again above, the Court should reject this argument.

[6]      "Texas law does not presume agency and the party asserting agency has the burden of proving it."  *Neria v. Dish Network L.L.C.*, No. 19-CV-00430, 2020 WL 3403074, at *5 (W.D. Tex. June 19, 2020).

**CONFIDENTIAL MATERIAL OMITTED**

████████████████████████████

Entropic repeats its imputation arguments and relies on public documents to aver that CCI "manifested its consent that the employees act" on its behalf by "representing to the public that the employees work for CCI." Dkt. 68 at 24. Entropic does not cite any authority for the proposition that acknowledging the existence of employees who support the Spectrum brand is a manifestation "of consent" for CC LLC employees to act on CCI's behalf. *Bobby Goldstein Productions, Inc. v. Habeeb*, No. 21-CV-1924-G, 2022 WL 1642466, at *4 (N.D. Tex. May 24, 2022) (setting forth the two ways in which "manifestation of consent" may be demonstrated). In any event, as discussed, the documents cited by Entropic "are documents covering all of" the Spectrum brand; and any reference to "we" does not mean CCI "could include the individual subsidiary[ies]" providing services under the Spectrum brand[7] *Andra Grp.*, 6 F.4th at 1288.

Lastly, Entropic does not explain how "***Spectrum*** employees" consented "to act as the agents of CCI" or how CCI consented to have them act on its behalf by their signing an arbitration agreement or using a Spectrum website to apply for jobs. Dkt. 68 at 25 (emphasis added). Nor do the LinkedIn profiles matter, *id.* at 25-26, because Entropic does not contend that any of these individuals work or operate out of any property listed in the SAC, as is required under *Cray*.[8]

### 3.      CCI Has Not Ratified Any Place of Business In This District

_____

[7]      Entropic cites documents from wrongful death case to argue that CCI "acknowledged" that its employee Brian Anderson was an "agent." Dkt. 24-25 (citing *Montes v. Charter Comms., Inc.*, No. 21-CV-0489 (S.D. Tex.)). However, CCI did not "acknowledge" anything. The plaintiff alleged that Anderson was an "agent." *Montes*, No. 21-CV-0489 (S.D. Tex.), Dkt. 1-1 at ECF p. 11. CCI had no need to dispute that fact at the pleading stage and instead merely argued that the plaintiff "failed to plead facts establishing that Anderson was negligent" because as a purported agent he "did not owe [the plaintiff] an individual duty." *Id.*, Dkt. 1, ¶¶ 12-14. In any event, Entropic itself acknowledges that Anderson was employed by CC LLC, and not CCI. *See* Dkt. 68 at 25 n.14.

[8]      Entropic wrongly asserts, without evidence, that "CCI has given their employees no reason to believe they work for anyone but CCI." Dkt. 68 at 26. Employees receive paychecks or W-2 from different subsidiaries – not CCI. Dkt. 61-4, Ex. 2, Proost Dep., 83:17-84:23; *see e.g.*, Ex. 14 (████████████████████████████).

Relying on many of the same arguments, Entropic argues that CCI ratified the Spectrum store locations in this district because visitors to the Spectrum website or stores "believe that the **Spectrum**-branded stores and **Spectrum** services are provided by CCI." Dkt. 68 at 26-27 (emphases added). Entropic provides no support for this statement and cannot show that CCI ratified any store in this district because CCI has maintained the corporate forms and thus, the "shared use" of "Spectrum" "does not detract from the separateness of [its] business." *Andra Grp*, 6 F.4th at 1290. And, to analyze whether CCI ratified any stores in this district, which it has not, courts weigh many considerations, which Entropic does not address. *Id.* at 1289-90. Contrary to Entropic's suggestion (Dkt. 68. at 28-29), and discussed above, the formation and execution of an LLC agreement *alone* does not support the conclusion that CCI has ratified any Spectrum store as its own. Here, unlike in *DirecTV* or *Agis Software Development LLC v. Google LLC*, 2022 WL 1511757, at *9 (E.D. Tex. May 12, 2022), all of the job listings and advertisements here are offered under the Spectrum-brand and Spectrum is the "provider" of all services "in all interactions with" customers such that there was "never any suggestion that anyone other than [Spectrum] was providing the service." *MDSave, Inc. v. Sesame, Inc.*, No. 21-CV-01338, 2023 WL 353998, at *5 (W.D. Tex. Jan. 11, 2023) (distinguishing *Agis* and granting motion to dismiss for improper venue); *cf. Agis*, 2022 WL 1511757, at *18 (finding Google ratified location because "by [its] own admission, '[Customers] are not even aware of CTDI,'" its alleged agent); *cf. DirecTV*, at 10-11 (finding the defendant "adopted and ratified" locations based on the company's DISH-branded website offering DISH service packages and authorized retailers of DISH-branded products, among other DISH-branded information). The Court should therefore grant CCI's motion.

**III.    CONCLUSION**

For the reasons stated above, and for the reasons set forth in Defendant CCI's opening brief, the Court should grant Defendant's Motion to Dismiss the SAC.

███████████████████████

Dated: March 9, 2023               Respectfully submitted,

/s/ Deron R. Dacus
Deron R. Dacus
State Bar No. 00790553
The Dacus Firm, P.C.
821 ESE Loop 323, Suite 430
Tyler, TX 75701
Phone: (903) 705-1117
Fax: (903) 581-2543
Email: ddacus@dacusfirm.com

Daniel L. Reisner
David Benyacar
Elizabeth Long
Albert J. Boardman
Melissa Brown
Palak Mayani Parikh
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, New York, 10019-9710
Telephone: (212) 836-8000
Email: daniel.reisner@arnoldporter.com
Email: david.benyacar@arnoldporter.com
Email: elizabeth.long@arnoldporter.com
Email: albert.boardman@arnoldporter.com
Email: melissa.brown@arnoldporter.com
Email: palak.mayani@arnoldporter.com

***Attorneys for Defendant***
***Charter Communications, Inc.***

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the above and foregoing document has been served on all counsel of record via the Court's ECF system on March 9, 2023.

/s/ Deron R. Dacus
Deron R. Dacus

**CERTIFICATE OF AUTHORIZATION TO FILE UNDER SEAL**

Pursuant to Local Rule CV-5, the undersigned counsel hereby certifies that authorization for filing under seal has been previously granted by the Court in the Protective Order (Dkt. 36) entered in this case on August 10, 2022.

/s/ Deron R. Dacus
Deron R. Dacus

-12-

**APPX745**

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

ENTROPIC COMMUNICATIONS, LLC,

     Plaintiff,

       v.

CHARTER COMMUNICATIONS, INC.,

     Defendant.

Civil Action No. 2:22-cv-00125-JRG

**REPLY DECLARATION OF MELISSA A. BROWN IN FURTHER SUPPORT OF
CHARTER COMMUNICATIONS, INC.'S MOTION TO DISMISS THE SECOND
AMENDED COMPLAINT FOR IMPROPER VENUE PURSUANT TO FRCP 12(b)(3)**

CONFIDENTIAL MATERIAL OMITTED

████████████████████████

I, Melissa A. Brown, declare as follows:

1.      I am over 18 years of age and competent to make this declaration.  If called to testify as a witness, I could and would testify truthfully under oath to each of the statements in the declaration.  I make each statement below based on my personal knowledge or after investigation of the relevant information.

2.      I am an attorney at Arnold & Porter Kaye Scholer, LLP, counsel of record for Defendant, Charter Communications, Inc. ("Defendant" or "CCI").  I am licensed to practice law in the States of New York and New Jersey, and have been admitted *pro hac vice* to this Court.

3.      I make this Declaration based on my personal knowledge and in further support of CCI's Motion to Dismiss the Second Amended Complaint for Improper Venue Pursuant to Federal Rule of Civil Procedure 12(b)(3).

4.      Attached hereto as **Exhibit 13** is a true and correct copy of the submission to the United States International Trade Commission, Investigation No. 337-TA-1315, referenced by Plaintiff Entropic Communications, LLC ("Entropic") in its opposition brief (Dkt. 68) at 1, 3, 17.

5.      Attached hereto as **Exhibit 14** is a true and correct redacted copy of a pay stub reflecting ████████████████████████.

6.      CCI has not been designated or listed as a custodian of any document produced by Defendant CCI in this litigation.

7.      Gregory Greene is the custodian of the document that Entropic submitted as Exhibit AB (CHARTER_ENTROPIC00007936).  *See* Dkt. 68-29.

Executed on March 9, 2023 in New York, New York.

*/s/ Melissa A. Brown*
Melissa A. Brown

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the above and foregoing document has been

served on all counsel of record via the Court's ECF system on March 9, 2023.


*/s/ Melissa A. Brown*
Melissa A. Brown


**CERTIFICATE OF AUTHORIZATION TO FILE UNDER SEAL**

Pursuant to Local Rule CV-5, the undersigned counsel hereby certifies that authorization

for filing under seal has been previously granted by the Court in the Protective Order (Dkt. 36)

entered in this case on August 10, 2022.


*/s/ Melissa A. Brown*
Melissa A. Brown

# EXHIBIT 13

UNITED STATES INTERNATIONAL TRADE COMMISSION
WASHINGTON, DC

**Before the Honorable Cameron R. Elliot**
**Administrative Law Judge**

---

In the Matter of

**CERTAIN DIGITAL SET-TOP BOXES AND SYSTEMS AND SERVICES INCLUDING THE SAME**

**Investigation No. 337-TA-1315**

---

## RESPONDENTS CHARTER COMMUNICATIONS, INC., CHARTER COMMUNICATIONS OPERATING, LLC, CHARTER COMMUNICATIONS HOLDING COMPANY, LLC, AND SPECTRUM MANAGEMENT HOLDING COMPANY, LLC'S RESPONSE TO THE AMENDED COMPLAINT UNDER SECTION 337 OF THE TARIFF ACT OF 1930, AS AMENDED, AND TO THE NOTICE OF INVESTIGATION

Respondents Charter Communications, Inc., Charter Communications Operating, LLC, Charter Communications Holding Company, LLC, and Spectrum Management Holding Company, LLC (collectively "Charter"), pursuant to 19 C.F.R. § 210.13, respectfully submit this Response to the Complaint Under Section 337 of the Tariff Act of 1930, including pre-institution supplements to the Complaint dated April 27, 2022, May 3, 2022, May 10, 2022, and May 12, 2022 (the "Complaint") filed by Broadband iTV, Inc. ("BBiTV"), and the resulting Notice of Investigation (the "Notice of Investigation").

## RESPONSE TO COMPLAINT

Charter responds to the Complaint dated April 22, 2022, and entitled "Certain Digital Set-Top Boxes and Systems and Services Including Same," and its pre-institution supplements, in like-numbered paragraphs as follows. Certain headings are reproduced from the Complaint for the

sake of convenience but are not an admission of the content of the Complaint or the specific allegations therein.

## I.  INTRODUCTION

1.      Charter admits that BBiTV requested that the International Trade Commission institute an investigation based upon allegations of violations of Section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1337 ("Section 337").

2.      Charter admits that BBiTV brought this action seeking relief under Section 337 to prevent the alleged unlawful and unauthorized importation into the United States, the sale for importation into the United States, and the sale within the United States after importation, of certain set-top boxes, streaming set-top boxes, and systems and services containing the same (the "Accused Products").  Charter also admits that BBiTV has asserted certain claims from U.S. Patent No. 9,866,909 ("the '909 patent"); U.S. Patent No. 10,555,014 ("the '014 patent"); U.S. Patent No. 9,936,240 ("the '240 patent"); and U.S. Patent No. 11,277,669 ("the '669 patent") (collectively, the "Asserted Patents").  Charter denies all other allegations of this paragraph, including that it infringes any claim of the Asserted Patents and further denies that it has unlawfully or without authorization imported into the United States, sold for importation, or sold within the United States after importation any Accused Products.

3.      Charter denies all allegations of this paragraph, including that it infringes any claim of the Asserted Patents either literally or under the doctrine of equivalents.

4.      Paragraph 4 does not contain factual allegations requiring a response.  To the extent a response is nonetheless deemed to be required, Charter denies the allegations of this paragraph.

5.       Charter denies it imports into the United States, sells for importation into the United States, and/or sells in the United States after importation one or more Accused Products that infringe one or more Asserted Patents, either literally or under the doctrine of equivalents.

Charter lacks knowledge or information sufficient to form a belief as to the truth or the remaining allegations in paragraph 5, and on that basis, denies them.

6.      Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 6, and on that basis, denies them.

7.      Charter denies that is has committed unfair acts.  The remainder of paragraph 7 does not contain factual allegations requiring a response.  To the extent a response is nonetheless deemed to be required, Charter denies the allegations of this paragraph.

## II.      COMPLAINANT

8.      Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 8, and on that basis, denies them.

9.      Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 9, and on that basis, denies them.

10.     Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 10, and on that basis, denies them.

## III.     PROPOSED RESPONDENTS

### A.      Comcast

11.     Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 11, and on that basis, denies them.

12.     Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 12, and on that basis, denies them.

13.     Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 13, and on that basis, denies them.

14.     Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 14, and on that basis, denies them.

### B.      Charter

15.      Charter admits that Charter Communications, Inc. is a Delaware corporation with headquarters at 400 Washington Blvd., Stamford, Connecticut 06902.  Charter admits the other Charter Respondents are indirect subsidiaries of Charter Communications, Inc.  Charter admits that Charter Communications, Inc., together with its controlled subsidiaries, is a holding company whose principal asset is a controlling equity interest in Charter Communications Holdings, LLC, an indirect owner of Charter Communications Operating, LLC under which substantially all of the operations reside.  Charter admits that its Spectrum TV service is provided using set-top boxes provided to its customers.  Charter denies the remaining allegations in paragraph 15.

16.      Charter admits that Charter Communications Operating, LLC is a Delaware limited liability company with its principal place of business at 12405 Powerscourt Dr., St. Louis, Missouri 63131 and incorporates its response to paragraph 15.  Charter denies the remaining allegations in paragraph 16.

17.      Charter admits that Charter Communications Holding Company, LLC is a Delaware limited liability company with its principal place of business at 12405 Powerscourt Dr., St. Louis, Missouri 63131.  Charter admits that Charter Communications Holding Company, LLC provides management services for certain cable systems owned or operated by Charter's subsidiaries.  Charter denies the remaining allegations in paragraph 17.

18.      Charter admits that Spectrum Management Holding Company, LLC is a Delaware limited liability company with its principal place of business at 12405 Powerscourt Drive, St. Louis, Missouri 63131.  Charter admits that Spectrum Management Holding Company, LLC provides management services for certain cable systems owned or operated by Charter subsidiaries.  Charter denies the remaining allegations in paragraph 18.

19.     Charter admits that Charter Communications, Inc., Spectrum Management Holding Company, LLC and Charter Communications Holding Company, LLC provide management services for the cable systems owned or operated by their subsidiaries.  Charter denies the remaining allegations of paragraph 19.

20.     Charter admits that Charter Communications, Inc. (together with its controlled subsidiaries) is a broadband connectivity company and cable operator that provides television and other services to subscribers under the Spectrum brand and provides such services on a variety of platforms, including through digital set-top boxes which may include access to an interactive programming guide, video on demand, or pay-per-view services.  Charter denies the remaining allegations of paragraph 20 as stated.

21.     Charter denies the allegations of paragraph 21.

### C.     Altice

22.     Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 22, and on that basis, denies them.

23.     Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 23, and on that basis, denies them.

24.     Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 24, and on that basis, denies them.

25.     Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 25, and on that basis, denies them.

26.     Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 26, and on that basis, denies them.

## IV.    TECHNOLOGY AND PRODUCTS AT ISSUE

27.    Charter admits that the categories of products and/or activities BBiTV accused of infringing are "(i) imported set-top boxes, including streaming devices, for receiving television services and (ii) services and systems that incorporate the imported set-top boxes, and components of such systems, including servers, mobile streaming apps, content delivery networks, and ingestion tools." Charter lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 27, and on that basis, denies them.

28.    Charter denies the allegations of paragraph 28, including BBiTV's descriptions of the purported invention, and that the Asserted Patents disclosed any improvements over the prior art.

29.    Charter denies that it infringes the Asserted Patents through the provision of television services and the sale for importation into the United States, importation into the United States, and/or sale within the United States after importation of Accused Products.  Charter lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 29, and on that basis, denies them.

30.    Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 30, and on that basis, denies them.

31.    Charter admits it sells or leases set-top boxes 101H, 101T, 110A, 110H, 110T, 200H, 201H, 201T, 210A, 210H, 210T, DCX3200M/P3-Spectrum, DCX3220E-Spectrum, DCX3510-Spectrum, and DCX3520E-Spectrum set-top boxes.  The remainder of paragraph 31 does not contain factual allegations requiring a response.  To the extent a response is nonetheless deemed to be required, Charter denies the allegations of this paragraph.

32.    Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 32, and on that basis, denies them.

33.     Charter denies that it infringes the Asserted Patents.  The remainder of paragraph 33 does not contain factual allegations requiring a response.  To the extent a response is nonetheless deemed to be required, Charter denies the allegations of this paragraph.

## V.      ASSERTED PATENTS

### A.      U.S. Patent No. 9,866,909

#### 1.      Identification of the '909 patent and ownership by Complainant

34.     Charter admits that the '909 patent is entitled "Video-On-Demand Content Delivery System for Providing Video-On-Demand Services to TV Service Subscribers" and, on its face, indicates that it issued on January 9, 2018 and that Milton Diaz Perez is listed as the inventor.  Charter also admits that, on its face, the '909 patent indicates that it issued from application No. 15/582,155 and further indicates that application No. 15/582,155 is a continuation of application No. 15/190,954, filed on June 23, 2016, now U.S. Patent No. 9,641,896, which is a continuation of application No. 14/978,881, filed on Dec. 22, 2015, now U.S. Patent No. 9,386,340, which is a continuation of application No. 14/703, 597, filed on May 4, 2015, now U.S. Patent No. 9, 232, 275, which is a continuation of application No. 12/852,663, filed on Aug. 9, 2010, now U.S. Patent No. 9,078,016, which is a division of application No. 11/952,552, filed on Dec. 7, 2007, now U.S. Patent No. 7,774,819, which is a division of application No. 10/909,192, filed on Jul. 30, 2004, now U.S. Patent No. 7,590,997.  Charter lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 34 and, on that basis, denies them.

35.     Charter admits that BBiTV attached what purports to be a certified copy of the '909 patent, a certified copy of the prosecution history of the '909 patent, and a copy of the assignment

records for the '909 patent. Charter lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 35 and, on that basis, denies them.

### 2. Nontechnical description of the '909 patent

36. Charter denies the allegations in paragraph 36.

### 3. Foreign counterparts of the '909 patent

37. Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 37 and, on that basis, denies them.

### B. U.S. Patent No. 10,555,014

### 1. Identification of the '014 patent and ownership by Complainant

38. Charter admits that the '014 patent is entitled "System for Addressing On-Demand TV Program Content on TV Services Platform of a Digital TV Services Provider" and, on its face, indicates that it issued on February 4, 2020 and that Milton Diaz Perez is listed as the inventor. Charter also admits that, on its face, the '014 patent indicates that it issued from application No. 16/269,721 and further indicates that application No. 16/269,721 is a continuation application of application No. 16/023,875, filed on Jun. 29, 2018, now U.S. Patent No. 10,341,699, which is a continuation of application No. 15/251,865, filed on Aug. 30, 2016, now U.S. Patent No. 10,028,027, which is a continuation of application No. 14/827,113, filed on Aug. 14, 2015, now U.S. Patent No. 9,491,497, which is a continuation of application No. 12/632,745, filed on Dec. 7, 2009, now U.S. Patent No. 9,113,228, which is a division of application No. 11/685,188, filed on Mar. 12, 2007, now U.S. Patent No. 7,631,336, which is a continuation-in-part of application No. 10/909,192, filed on Jul. 30, 2004, now U.S. Patent No. 7,590,997. Charter lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 38 and, on that basis, denies them.

39. Charter admits that BBiTV purports to have attached a certified copy of the '014 patent, a certified copy of the prosecution history of the '014 patent, and a copy of the assignment records for the '014 patent. Charter lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 39 and, on that basis, denies them.

### 2. Nontechnical description of the '014 patent

40. Charter denies the allegations in paragraph 40.

### 3. Foreign counterparts of the '014 patent

41. Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 41 and, on that basis, denies them.

### C. U.S. Patent No. 9,936,240

### 1. Identification of the '240 patent and ownership by Complainant

42. Charter admits that the '240 patent is entitled "Dynamic Adjustment of Electronic Program Guide Displays Based on Viewer Preferences for Minimizing Navigation in VOD Program Selection" and, on its face, indicates that it issued on April 8, 2018 and that Milton Diaz Perez is listed as the inventor. Charter also admits that, on its face, the '240 patent indicates that it issued application No. 15/582,099 and further indicates that application No. 15/582,099 is a continuation application of application No. 15/002,011, filed on Jan. 20,2016, now Pat. No. 9,641,902, which is a continuation of application No. 12/869,534, filed on Aug. 26, 2010, now Pat. No. 9,344,765, which is a division of application No. 11/768,895, filed on Jun. 26, 2007, now Pat. No. 9,584,868. Charter lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 42 and, on that basis, denies them.

43. Charter admits that BBiTV purports to have attached a certified copy of the '240 patent, a copy of the prosecution history of the '240 patent, and a copy of the assignment records

for the '240 patent.  Charter lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 43 and, on that basis, denies them.

### 2.      Nontechnical description of the '240 patent

44.      Charter denies the allegations in paragraph 44.

### 3.      Foreign counterparts of the '240 patent

45.      Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 45 and, on that basis, denies them.

### D.      U.S. Patent No. 11,277,669

### 1.      Identification of the '669 patent and ownership by Complainant

46.      Charter admits that the '669 patent is entitled "Dynamic Adjustment of Electronic Program Guide Displays Based on Viewer Preferences for Minimizing Navigation in VOD Program Selection" and, on its face, indicates that it issued on  March 22, 2022 and that Milton Diaz Perez is listed as the inventor.  Charter also admits that, on its face, the '669 patent indicates that it issued from application No. 16/785,224 and further indicates that application No. 16/785,224 is a continuation application that claims the benefit of application No. 16/199,894, filed on Nov. 26, 2018, now Pat. No. 10,567,846, which is a continuation of application No. 15/894,262, filed on Feb. 12, 2018, now Pat. No. 10,149,015, which is a continuation of application No. 15/589,225, filed on May 8, 2017, now Pat. No. 9,894,419, which is a continuation of application No. 15/002,040, filed on Jan. 20, 2016, now Pat. No. 9,648,390, which is a continuation of application No. 13/831,042, filed on Mar. 14, 2013, now Pat. No. 9,247,308, which is a continuation of application No. 12/869,534, filed on Aug. 26, 2010, now Pat. No. 9,344,765, which is a division of application No. 11/768,895, filed on Jun. 26, 2007, now Pat. No. 9,584,868.  Charter

lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 46 and, on that basis, denies them.

47.     Charter admits that BBiTV purports to have attached a certified copy of the '669 patent, a certified copy of the prosecution history of the '669 patent, and a copy of the assignment records for the '669 patent.  Charter lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 47 and, on that basis, denies them.

### 2.     Nontechnical description of the '669 patent

48.     Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 48 and, on that basis, denies them.

### 3.     Foreign counterparts of the '669 patent

49.     Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 49 and, on that basis, denies them.

## VI.     LICENSES UNDER THE ASSERTED PATENTS

50.     Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 50 and, on that basis, denies them.

## VII.     SPECIFIC INSTANCES OF UNLAWFUL IMPORTATION AND SALE

51.     Charter denies the allegations of paragraph 51 as they concern Charter.  Charter lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 51 and, on that basis, denies them.

52.     Paragraph 52 does not contain factual allegations requiring a response. To the extent a response is nonetheless deemed to be required, Charter denies the allegations of paragraph 52.  Charter further incorporates by reference its responses with respect to paragraphs 62 through 68.

## A. Comcast's Importation

53.     Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 53 and, on that basis, denies them.

54.     Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 54 and, on that basis, denies them.

55.     Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 55 and, on that basis, denies them.

56.     Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 56 and, on that basis, denies them.

57.     Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 57 and, on that basis, denies them.

58.     Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 58 and, on that basis, denies them.

59.     Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 59 and, on that basis, denies them.

60.     Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 60 and, on that basis, denies them.

61.     Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 61 and, on that basis, denies them.

## B. Charter's Importation

62.     Charter admits that the Charter Accused Products are manufactured abroad and imported into the United States by original equipment manufacturers (OEMs) and that at least some of the Charter Accused Products are designed in part according to Charter specifications. Charter also admits that the Charter Accused Products are provided to its Spectrum TV service

customers.  Charter denies that it imports Charter Accused Products into the United States and denies all of the remaining allegations of paragraph 62.

63.     Charter admits that the Charter Accused Products include certain set-top boxes that are leased by Charter customers in the United States.  Charter denies the remaining allegations of paragraph 63.

64.     Charter admits that it charges subscribers for lost, damaged, and/or returned set-top boxes, including the Charter accused products.  Charter denies the remaining allegations of paragraph 64.

65.     Charter admits that Charter's television subscribers take possession of the Charter Accused Products when Charter leases its Accused Products to certain Spectrum TV subscribers, Charter denies the remaining allegations of paragraph 65.

66.      Charter admits that it sells and provides Spectrum TV services in the United States and, in certain situations, provides set-top boxes in conjunction with this service.  The remainder of the paragraph contains legal conclusions that do not require a response.  To the extent any further factual response is required, Charter denies the remaining allegations of paragraph 66.

67.     Charter admits that Exhibit 17 purports to be a list of Charter's Spectrum Equipment.  Charter admits its set-top boxes include the 101T model.   Charter denies the remaining allegations of paragraph 67.

68.     Charter admits that Exhibit 26 is an image of a label that says "Made in China," but Charter does not have sufficient knowledge of whether the label shown in Exhibit 26 is relevant to any Charter Accused Product in the United States and, on that basis, denies that it is.  Charter denies the remaining allegations in paragraph 68.

### C.    Altice's Importation

69.    Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 69 and, on that basis, denies them.

70.    Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 70 and, on that basis, denies them.

71.    Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 71 and, on that basis, denies them.

72.    Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 72 and, on that basis, denies them.

73.    Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 73 and, on that basis, denies them.

74.    Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 74 and, on that basis, denies them.

75.    Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 75 and, on that basis, denies them.

### VIII.   UNLAWFUL AND UNFAIR ACTS OF THE PROPOSED RESPONDENTS

76.    Charter denies that it infringes the Asserted Patents.  The remainder of paragraph 76 does not contain factual allegations requiring a response.  To the extent a response is nonetheless deemed to be required, Charter denies the allegations of paragraph 76.

77.    Charter denies that it infringes the Asserted Patents.  Charter denies that it "sell[s] cable TV services that include provision of a set-top box, but subscribers generally cannot select a specific set-top-box model from among all the set-top boxes that are currently deployed." Charter provides various cable TV services along with a set-top box to its customers and charges them fees.  With respect to the other respondents, Charter lacks knowledge or information

sufficient to form a belief as to the truth of the allegation that "respondents sell cable TV services that include provision of a set-top box, but subscribers generally cannot select a specific set-top-box model from among all the set-top boxes that are currently deployed." The remainder of paragraph 77 does not contain factual allegations requiring a response. To the extent a response is nonetheless deemed to be required, Charter denies the remaining allegations of paragraph 77.

### A. Comcast's Patent Infringement

78.     Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 78 and, on that basis, denies them.

### 1. Comcast's Infringement of the '909 patent

79.     Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 79 and, on that basis, denies them.

80.     Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 80 and, on that basis, denies them.

81.     Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 81 and, on that basis, denies them.

82.     Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 82 and, on that basis, denies them.

### 2. Comcast's Infringement of the '014 patent

83.     Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 83 and, on that basis, denies them.

84.     Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 84 and, on that basis, denies them.

85.     Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 85 and, on that basis, denies them.

86.     Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 86 and, on that basis, denies them.

### 3.     Comcast's Infringement of the '240 patent

87.     Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 87 and, on that basis, denies them.

88.     Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 88 and, on that basis, denies them.

89.     Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 89 and, on that basis, denies them.

90.     Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 90 and, on that basis, denies them.

91.     Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 91 and, on that basis, denies them.

### 4.     Comcast's Infringement of the '669 patent

92.     Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 92 and, on that basis, denies them.

93.     Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 93 and, on that basis, denies them.

94.     Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 94 and, on that basis, denies them.

95.     Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 95 and, on that basis, denies them.

96.     Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 96 and, on that basis, denies them.

### B. Charter's Patent Infringement

97.    Charter denies the allegations of paragraph 97.

#### 1. Charter's Infringement of the '909 patent

98.    Charter denies the allegations of paragraph 98.

99.    Charter admits that Ex. 40 states, on its face, "Tune your receiver to Channel 1 using your Spectrum remote (or hit the On Demand button). You'll be redirected to your On Demand menu to browse Movies, Primetime, Premiums and more. On Demand programming is accessible on all of your TVs connected to Spectrum TV service with Spectrum-issued digital equipment." Charter further admits that Ex 41 states, on its face, "lets Spectrum TV subscribers watch popular shows and movies at any time." Charter denies the remaining allegations of paragraph 99.

100.    Charter admits that Ex. 39.1 is a letter dated December 10, 2021 addressed to Thomas Rutledge, President of Charter Communications, Inc. Charter admits that Ex. 39.2 is a letter dated April 8, 2022 addressed to Kirill Abramov of Charter Communications, Inc. Charter denies the remaining allegations of paragraph 100.

101.    Charter denies the allegations of paragraph 101.

#### 2. Charter's Infringement of the '014 patent

102.    Charter denies the allegations of paragraph 102.

103.    Charter admits that Ex. 40 states, on its face, "Tune your receiver to Channel 1 using your Spectrum remote (or hit the On Demand button). You'll be redirected to your On Demand menu to browse Movies, Primetime, Premiums and more. On Demand programming is accessible on all of your TVs connected to Spectrum TV service with Spectrum-issued digital equipment." Charter further admits that Ex. 41 states, on its face, "lets Spectrum TV subscribers

watch popular shows and movies at any time." Charter denies the remaining allegations of paragraph 103.

104.     Charter admits that Ex. 39.1 is a letter dated December 21, 2021 addressed to Thomas Rutledge, President of Charter Communications, Inc. Charter admits that Ex. 39.2 is a letter dated April 8, 2022 addressed to Kirill Abramov of Charter Communications, Inc. Charter denies the remaining allegations of paragraph 104.

105.     Charter denies the allegations of paragraph 105.

### 3.     Charter's Infringement of the '240 patent

106.     Charter denies the allegations of paragraph 106.

107.     Charter admits that Ex. 42 states, on its face, that "The Spectrum TV app gives you more choices for watching your favorite programming at no extra charge. Watch live TV and On Demand programming, browse 14 days of guide listings, schedule recordings, get programming recommendations and more." Charter denies the remaining allegations of paragraph 107.

108.     Charter denies the allegations of paragraph 108.

109.     Charter denies the allegations of paragraph 109.

### 4.     Charter's Infringement of the '669 patent

110.     Charter denies the allegations of paragraph 110.

111.     Charter admits that Ex. 42, on its face, states "The Spectrum TV app gives you more choices for watching your favorite programming at no extra charge. Watch live TV and On Demand programming, browse 14 days of guide listings, schedule recordings, get programming recommendations and more." Charter denies the remaining allegations of paragraph 111.

112.     Charter denies the allegations of paragraph 112.

113.     Charter denies the allegations of paragraph 113.

### C.    Altice's Patent Infringement

114.    Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 114 and, on that basis, denies them.

#### 1.    Altice's Infringement of the '909 patent

115.    Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 115 and, on that basis, denies them.

116.    Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 116 and, on that basis, denies them.

117.    Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 117 and, on that basis, denies them.

118.    Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 118 and, on that basis, denies them.

#### 2.    Altice's Infringement of the '014 patent

119.    Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 119 and, on that basis, denies them.

120.    Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 120 and, on that basis, denies them.

121.    Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 121 and, on that basis, denies them.

122.    Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 122 and, on that basis, denies them.

#### 3.    Altice's Infringement of the '240 patent

123.    Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 123 and, on that basis, denies them.

124.    Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 124 and, on that basis, denies them.

125.    Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 125 and, on that basis, denies them.

126.    Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 126 and, on that basis, denies them.

**4.      Altice's Infringement of the '669 patent**

127.    Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 127 and, on that basis, denies them.

128.    Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 128 and, on that basis, denies them.

129.    Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 129 and, on that basis, denies them.

130.    Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 130 and, on that basis, denies them.

**IX.      CLASSIFICATION UNDER THE HARMONIZED TARIFF SCHEDULE**

131.    Charter denies the allegations of paragraph 131.

132.    Paragraph 132 does not contain factual allegations requiring a response.  To the extent a response is nonetheless deemed to be required, Charter denies the allegations of paragraph 132.

**X.      DOMESTIC INDUSTRY**

133.    Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 133 and, on that basis, denies them.

## A.    Technical Prong

134.    Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 134 and, on that basis, denies them.

135.    Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 135 and, on that basis, denies them.

136.    Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 136 and, on that basis, denies them.

137.    Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 137 and, on that basis, denies them.

138.    Charter admits that BBiTV attached to its complaint a claim chart that purports to apply an exemplary claim of the '909 patent to a purported Domestic Industry Product.  Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 138 and, on that basis, denies them.

139.    Charter admits that BBiTV attached to its complaint a claim chart that purports to apply claim 1 of the '909 patent to a purported Domestic Industry Product.  Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 139 and, on that basis, denies them.

140.    Charter admits that BBiTV attached to its complaint a claim chart that purports to apply claim 1 of the '014 patent to a purported Domestic Industry Product.  Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 140 and, on that basis, denies them.

141.    Charter admits that BBiTV attached to its complaint a claim chart that purports to apply claim 1 of the '240 patent to a purported Domestic Industry Product.   Charter lacks

knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 141 and, on that basis, denies them.

142.     Charter admits that BBiTV attached to its complaint a claim chart that purports to apply claim 1 of the '669 patent to a purported Domestic Industry Product.  Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 142 and, on that basis, denies them.

143.     Charter admits that BBiTV identified purported Domestic Industry Products that are purported to correspond to claims of the Asserted Patent.  Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 143 and, on that basis, denies them.

### B.     Economic Prong

144.     Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 144 and, on that basis, denies them.

145.     Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 145 and, on that basis, denies them.

146.     Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 146 and, on that basis, denies them.

### 1.     Domestic Activities Conducted with Respect to the Domestic Industry Products and to Exploit the Asserted Patents

147.     Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 147 and, on that basis, denies them.

148.     Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 148 and, on that basis, denies them.

149.    Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 149 and, on that basis, denies them.

150.    Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 150 and, on that basis, denies them.

151.    Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 151 and, on that basis, denies them.

152.    Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 152 and, on that basis, denies them.

153.    Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 153 and, on that basis, denies them.

154.    Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 154 and, on that basis, denies them.

155.    Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 155 and, on that basis, denies them.

156.    Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 156 and, on that basis, denies them.

### 2.    Domestic Investments Made with Respect to the Domestic Industry Products and to Exploit the Asserted Patents

#### a.    Significant Investments in Plant and Equipment

157.    Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 157 and, on that basis, denies them.

158.    Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 158 and, on that basis, denies them.

159.    Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 159 and, on that basis, denies them.

160.    Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 160 and, on that basis, denies them.

161.    Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 161 and, on that basis, denies them.

162.    Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 162 and, on that basis, denies them.

163.    Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 163 and, on that basis, denies them.

164.    Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 164 and, on that basis, denies them.

165.    Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 165 and, on that basis, denies them.

166.    Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 166 and, on that basis, denies them.

167.    Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 167 and, on that basis, denies them.

168.    Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 168 and, on that basis, denies them.

**b.    Employment of Labor and Capital**

169.    Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 169 and, on that basis, denies them.

**APPX773**

170.    Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 170 and, on that basis, denies them.

171.    Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 171 and, on that basis, denies them.

172.    Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 172 and, on that basis, denies them.

173.    Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 173 and, on that basis, denies them.

174.    Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 174 and, on that basis, denies them.

175.    Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 175 and, on that basis, denies them.

### c.    Investment in Research, Development, and Engineering to Exploit the Asserted Patents

176.    Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 176 and, on that basis, denies them.

177.    Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 177 and, on that basis, denies them.

178.    Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 178 and, on that basis, denies them.

179.    Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 179 and, on that basis, denies them.

## XI.    RELATED LITIGATION

180.    Paragraph 180 does not contain factual allegations requiring a response.  To the extent a response is nonetheless deemed to be required, Charter denies the allegations of paragraph 180.

181.    Charter admits the allegations in sub-paragraph b of paragraph 181 with respect to Time Warner Cable, Inc. and Oceanic Time Warner Cable, LLC.  Charter lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 181 and, on that basis, denies them.

## XII.    RELIEF REQUESTED

182.    Paragraph 182 does not contain factual allegations requiring a response.  To the extent a response is nonetheless deemed to be required, Charter denies the allegations of paragraph 182.

183.    Charter admits that paragraph 183 purports to describe the relief that BBiTV is seeking from the Commission.  Charter denies that BBiTV is entitled to any relief whatsoever against Charter in this Investigation, either as prayed for in its Complaint or otherwise.  Charter further denies that there is any violation of § 337 or that it has infringed any valid and enforceable claim of the Asserted Patents or otherwise engaged in allegedly unlawful activity as described in the Complaint.

### ADDITIONAL INFORMATION REQUIRED UNDER
### COMMISSION RULE 210.13(b)

In accordance with the requirements of 19 C.F.R. § 210.13(b), Charter states as follows:  Charter's statement pursuant to Rule 210.13(b) is attached hereto as Confidential Exhibit A.  By providing the information therein, Charter intends only to supply the data required by 19 C.F.R. § 210.13(b).  Charter specifically denies that any of the information or data supplied relates to or

supports any allegation of infringement against Charter or any unlawful act by Charter under 19 U.S.C. § 1337, or otherwise.

## XIII.   AFFIRMATIVE DEFENSES

Charter alleges and asserts the following defenses in response to the allegations in the Complaint.  Charter asserts the following defenses without regard to which party has the initial or ultimate burden of proof.  Charter notes that discovery in this Investigation is in its nascent stages, and Charter has not yet had sufficient time to collect and review all the information that may be relevant to its potential defenses.  Accordingly, Charter reserves the right to modify its defenses and/or raise additional defenses as discovery proceeds.

### FIRST AFFIRMATIVE DEFENSE
(Failure to State a Claim)

Complainants have failed to allege sufficient facts in the Complaint to state a claim against Respondents.

### SECOND AFFIRMATIVE DEFENSE
(Non-infringement)

Charter has not infringed and does not infringe, either directly or indirectly, literally or under the doctrine of equivalents, and has not induced the infringement of any valid and enforceable claim of the Asserted Patents. Charter has not otherwise committed any acts in violation of 35 U.S.C. § 271 or 19 U.S.C. § 1337.

### THIRD AFFIRMATIVE DEFENSE
(Invalidity)

Each of the claims of the Asserted Patents are invalid under 35 U.S.C. §§ 101, 102, 103, 112, and/or 256, or any judicially created doctrine of invalidity, including but not limited to obviousness-type double patenting, and for failure to comply with one or more of the requirements set forth in Section 37 of the Code of Federal Regulations.

## FOURTH AFFIRMATIVE DEFENSE
(Estoppel, Disclaimer, and Laches)

BBiTV's claims are barred in whole or in part by the doctrines of estoppel, prosecution laches, prosecution history estoppel, and/or prosecution disclaimer due to proceedings before, or admissions, amendments, arguments, concessions, and/or other representations made to the United States Patent and Trademark Office during the prosecution of the applications leading to the issuance of, or related to, the asserted patents.

## FIFTH AFFIRMATIVE DEFENSE
(Lack of Importation)

Charter does not violate Section 337 because it does not import into the United States, sell for importation, or sell in the United States after importation the Charter Accused Products.

With respect to the method claims in the Asserted Patents, BBiTV does not allege that the act of importation is an act that practices the steps of the asserted method claims. Thus, the importation of the accused set-top boxes and gateways does not directly infringe any of the patented methods.

BBiTV's allegations concerning the method claims in the Asserted Patents are directed at domestic use and operations by or for Charter. These acts by Charter are not a sufficient basis for a violation of 19 U.S.C. § 1337(a)(l)(B)(i), which requires the "importation" or "sale" of "articles that infringe" a U.S. patent.

## SIXTH AFFIRMATIVE DEFENSE
(Lack of Importation of Article that Infringes Any Patent)

Charter does not sell for importation into the United State, import, or sell with the United State after importation any article that infringes the asserted patents.

## SEVENTH AFFIRMATIVE DEFENSE
### (Remedy not in Public Interest)

BBiTV's requested relief is not in the public interest at least because it would negatively impact competitive conditions in the United States economy, the production of like or directly competitive articles in the United States, and United States consumers, and because there are strong policy reasons for denying BBiTV's requested relief.

## EIGHTH AFFIRMATIVE DEFENSE
### (Lack of Domestic Industry)

BBiTV has not adequately alleged or established the existence of a domestic industry for any of the Asserted Patents, as required by Section 337(a)(2) and defined by Section 337(a)(3). On information and belief, BBiTV will not be able to prove that a domestic industry relating to articles protected by any of the Asserted Patents exists or is in the process of being established. Specifically, on information and belief, BBiTV will not be able to satisfy either the economic prong or the technical prong of the domestic industry requirement in this Investigation.

## NINTH AFFIRMATIVE DEFENSE
### (Unclean Hands)

BBiTV's claims are barred by the doctrine of unclean hands. On information and belief, BBiTV has breached its confidentiality obligations by using confidential information of its licensees in violation of court orders and/or private agreements to support its claims in this investigation. This unconscionable act has immediate and necessary relation to the equity of BBiTV's claims, because but for BBiTV's misconduct, the Commission may not have instituted an investigation and, further, cannot find a violation of section 337 if BBiTV fails to prove that a domestic industry exists through the investments of its licensees. BBiTV's misconduct is material for the same reasons.

## TENTH AFFIRMATIVE DEFENSE
### (Other Defenses)

Charter provides notice that it intends to rely upon any additional defenses that become available or apparent during discovery and reserves the right to amend this response and to assert such additional defenses or, if appropriate, withdraw any of the above-delineated defenses as discovery proceeds.

## REQUEST FOR RELIEF

Respondents respectfully requests that the Commission issue an order:

1.    denying all relief requested in the Complaint;

2.    determining that Charter has not violated Section 337 of the Tariff Act of 1930, as amended;

3.    determining that Charter has not infringed any claim of the Asserted Patents;

4.    determining that the claims of the Asserted Patents are invalid;

5.    determining that no domestic industry exists for the Asserted Patents;

6.    determining that Complainants' claims are barred by Charter's affirmative defenses;

7.    dismissing the Complaint and terminating the present investigation with prejudice; and

8.    awarding such other and further relief to Charter as the Commission deems just and proper.

## RESPONSE TO THE NOTICE OF INVESTIGATION

Charter acknowledges that the Commission has instituted an investigation as set forth in the Commissions Notice of Investigation, dated May 24, 2022, and published in the Federal

Register on May 31, 2022, and that Charter is named as respondent therein. *See* 87 Fed. Reg. 32459 (May 31, 2022). Charter otherwise denies the existence of the predicates and requirements for liability under such an Investigation and/or under Section 337 and therefore denies the allegations therein.

Dated: June 21, 2022     Respectfully submitted,

*/s/ Philip W. Marsh*      

David S. Benyacar
Daniel L. Reisner
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019
Telephone: (212) 836-8000
Facsimile: (212) 836-8689

Dina M. Hayes
ARNOLD & PORTER KAYE SCHOLER LLP
70 West Madison Ave., Suite 4200
Chicago, IL 60602-4231
Telephone: (312) 583-2300
Facsimile: (312) 583-2360

Philip W. Marsh
Michael D.K. Nguyen
Joseph B. Palmieri
ARNOLD & PORTER KAYE SCHOLER LLP
3000 El Camino Real
Five Palo Alto Square, Suite 500
Palo Alto, CA 94306-3807
Telephone: (650) 319-4500
Facsimile: (650) 319-4700

*Counsel for Respondents*
*Charter Communications, Inc.,*
*Charter Communications Operating, LLC,*
*Charter Communications Holding Company, LLC,*
*and Spectrum Management Holding Company, LLC*

**APPX781**

## VERIFICATION

I, Daniel Boglioli, state that I am the Vice President and the Associate General Counsel for Charter Communications, and I am authorized to sign this verification on behalf of Respondents Charter Communications, Inc., Charter Communications Operating, LLC, Charter Communications Holding Company, LLC, and Spectrum Management Holding Company, LLC (collectively, "Charter"). I have reviewed Charter's Response to the Amended Complaint and Notice of Investigation and declare that, based upon a reasonable inquiry, the facts set forth in the Response, as they relate to Charter, are true and correct to the best of my knowledge, information and belief. The allegations and contentions in the Response have evidentiary support, or they are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery, to the best of my knowledge, information, or belief.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

_____June 21, 2022_____

Daniel Boglioli

Vice President, Associate General Counsel for Charter Communications

**CERTAIN DIGITAL SET-TOP BOXES AND SYSTEMS**     Inv. No. 337-TA-1315
**AND SERVICES INCLUDING THE SAME**

## CERTIFICATE OF SERVICE

I, Donna Baker, hereby certify that on June 21, 2022, a copy of the foregoing
**RESPONSE TO THE COMPLAINT AND NOTICE OF INVESTIGATION** was served
upon the following parties as indicated:

| | |
|---|---|
| The Honorable Lisa Barton<br>Secretary to the Commission<br>**U.S. International Trade Commission**<br>500 E Street, SW, Room 112<br>Washington, DC 20436 | ☐ Via U.S. Mail<br>☐ Via Hand Delivery<br>☐ Via Overnight Courier<br>☐ Via Electronic Mail<br>☒ Via Electronic Filing |
| *Administrative Law Judge* | |
| The Honorable Cameron Elliot<br>**U.S. International Trade Commission**<br>500 E Street, SW<br>Washington, DC 20436<br><br>Michael Turner<br>ALJ Attorney Advisor<br>**U.S. International Trade Commission**<br>500 E Street, SW<br>Washington, DC 20436<br>michael.turner@usitc.gov | ☐ Via U.S. Mail<br>☐ Via Hand Delivery<br>☐ Via Overnight Courier<br>☒ Via Electronic Mail |
| *Complainant Broadband iTV, Inc.* | |
| Paul M. Bartkowski<br>Thomas R. Burns<br>Emi Ito Ortiz<br>BARTKOWSKI PLLC<br>6803 Whittier Ave., Suite 200A<br>McLean, VA 22101<br>Telephone: (571) 533-3581<br>bbitv-337@bartkowskipllc.com<br><br>Robert F. Kramer<br>M. Elizabeth Day<br>David Alberti<br>Sal Lim<br>Russell S. Tonkovich<br>Marc Belloli<br>Robert C. Mattson<br>James P. Barabas<br>Jeremiah A. Armstrong | ☐ Via First Class Mail<br>☐ Via Hand Delivery<br>☐ Via Federal Express International<br>☒ Via Electronic Mail<br>bbitv-337@bartkowskipllc.com<br>kramerday-bbitv-itc@kramerday.com |

APPX783

| Aidan Brewster<br>Benjamin Brownlow<br>Ryan K. Dooley<br>Andrew G. Hamill<br>Zack Higgins<br>Hong S. Lin<br>Sven Raz<br>Robert Xie<br>KRAMER DAY ALBERTI LIM TONKOVICH &<br>BELLOLI LLP<br>577 Airport Blvd, Suite 250<br>Burlingame, CA. 94010<br>Tel: (650) 825.4300<br>kramerday-bbitv-itc@kramerday.com | |
|---|---|
| *Respondents Comcast Corp., Comcast Cable Communications, LLC,<br>and NBCUniversal Media, LLC* | |
| Ashok Ramani<br>David J. Lisson<br>Micah G. Block<br>Philip T. Sheng<br>DAVIS POLK & WARDWELL LLP<br>1600 El Camino Real<br>Menlo Park, CA 94025<br>Telephone: (650) 752-2000<br>Facsimile: (650) 752-2111<br>dpw.comcast.bbitv@davispolk.com<br><br>Bert C. Reiser<br>Michael A. David<br>LATHAM & WATKINS LLP<br>555 11th St. NW, Suite 1000<br>Washington, D.C. 20004-1304<br>Telephone: (202) 637-2200<br>Facsimile: (202) 637-2201<br>comcastbbitvitc.lwteam@lw.com | ☐ Via First Class Mail<br>☐ Via Hand Delivery<br>☐ Via Overnight Mail<br>☒ Via Electronic Mail<br>dpw.comcast.bbitv@davispolk.com<br>comcastbbitvitc.lwteam@lw.com |
| *Respondent Altice USA, Inc., CSC Holdings, LLC, Cablevision Systems Corp.* | |
| Jordan L. Coyle, Esq.<br>ORRICK, HERRINGTON & SUTCLIFFE LLP<br>Columbia Center<br>1152 15th Street, NW<br>Washington, DC 20005<br>Telephone: (202) 339-8400<br>Facsimile: (202) 339-8500<br>Email: Altice-1315-Service@orrick.com | ☐ Via First Class Mail<br>☐ Via Hand Delivery<br>☐ Via Overnight Mail<br>☒ Via Electronic Mail<br>• Altice-1315-Service@orrick.com |

**APPX784**

| Clement Seth Roberts, Esq. Will Melehani, Esq. Sarah Mullins, Esq. ORRICK, HERRINGTON & SUTCLIFFE LLP The Orrick Building 405 Howard Street San Francisco, CA 94105-2669 Telephone: (415) 773-5700 Facsimile: (415) 773-5759 Email: Altice-1315-Service@orrick.com<br><br>Alyssa Caridis, Esq. ORRICK, HERRINGTON & SUTCLIFFE LLP 777 South Figueroa Street, Suite 3200 Los Angeles, CA 90017-5855 Telephone: (213) 629-2020 Facsimile: (213) 612-2499 Email: Altice-1315-Service@orrick.com<br><br>Bas de Blank, Esq. ORRICK, HERRINGTON & SUTCLIFFE LLP 1000 Marsh Road Menlo Park, CA 94025-1015 Telephone: (650) 614-7400 Facsimile: (650) 614-7401 Email: Altice-1315-Service@orrick.com | |

/s/ Donna Baker
Donna Baker

CONFIDENTIAL MATERIAL OMITTED

# Exhibit 14 to Defendant's Reply Brief In Support of Motion to Dismiss

## Dkt. 65-3 (Sealed Version)

## Dkt. 79-3 (Public Version)

## FILED UNDER SEAL

## (APPX786-791)

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| ENTROPIC COMMUNICATIONS, LLC, | |
| Plaintiff | Civil Action No. 2:22-cv-00125-JRG |
| v. | **JURY TRIAL DEMANDED** |
| CHARTER COMMUNICATIONS, INC., | ▬▬▬▬▬▬▬ |
| Defendants. | |

**SUPPLEMENT TO PLAINTIFF'S OPPOSITION TO DEFENDANT'S
MOTION TO DISMISS THE SECOND AMENDED COMPLAINT FOR
IMPROPER VENUE PURSUANT TO FRCP 12(b)(3)**

In Entropic Communications, LLC's ("Entropic") Opposition to Defendant's Motion to Dismiss the Second Amended Complaint (Dkt. No. 68), Entropic stated that "CCI is listed as the custodian of nearly all the technical documents Charter has produced in this case" (Dkt. No. 68 at 9, 13), including a "Request for Quote" document for one of the accused set-top boxes (Exhibit AB). Entropic submits this supplement to clarify that factual statement.

For Charter's technical documents, the "Custodian" field displays "Charter Communications, Inc." At the time Entropic filed its opposition brief, it understood this field to be metadata original to Charter's production, meaning Entropic understood CCI to be the identified custodian in the metadata. Entropic has since learned that the "Custodian" field was actually coded by its e-discovery vendor during ingestion to reflect the source of the documents. CCI therefore is not "listed" as the custodian and that specific statement is inaccurate.

The remainder of the statement, however, remains correct. CCI is, in fact, the custodian of these documents, regardless of how they are coded. CCI—and not some allegedly separate subsidiary, which is not party to the case—produced the documents in response to CCI's discovery obligations. CCI's corporate representative also testified that it maintains all Charter corporate records under a single file management system for all subsidiaries. *See* Dkt. No. 68 at 13. Therefore, it is evident that these technical documents are CCI's records and CCI is the actual custodian.

Dated: March 6, 2023                    Respectfully submitted,

                                        */s/ James Shimota by permission Wesley Hill*
                                        James Shimota - LEAD ATTORNEY
                                        Jason Engel
                                        George Summerfield
                                        **K&L GATES LLP**
                                        70 W. Madison Street, Suite 3300

314813860.1

Chicago, IL 60602
Jim.shimota@klgates.com
Jason.engel@klgates.com
George.summerfield@klgates.com

Nicholas F. Lenning
**K&L GATES LLP**
925 Fourth Avenue, Suite 2900
Seattle, WA 98104-1158
nicholas.lenning@klgates.com

Darlene Ghavimi
Matthew Blair
**K&L GATES LLP**
2801 Via Fortuna
Suite #650
Austin, Texas 78746
Darlene.ghavimi@klgates.com
Matthew.blair@klgates.com

Wesley Hill
Texas Bar No. 24032294
Andrea Fair
Texas Bar No. 24078488
**WARD, SMITH & HILL, PLLC**
1507 Bill Owens Pkwy
Longview, TX 75604
Tel: (903) 757-6400
wh@wsfirm.com
andrea@wsfirm.com

**ATTORNEYS FOR PLAINTIFF
ENTROPIC COMMUNICATIONS, LLC**

314813860.1

# APPX794

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was filed electronically in compliance with Local Rule CV-5(a) and served via email on all counsel of record on this sixth day of March, 2023.

*/s/ Wesley Hill*
Wesley Hill

## CERTIFICATE OF AUTHORIZATION TO FILE UNDER SEAL

This is to certify that the above document should be filed under seal because it contains material designated by the parties as confidential pursuant to the Protective Order entered in this case (Dkt. 36).

*/s/ Wesley Hill*
Wesley Hill

**APPX795**

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

ENTROPIC COMMUNICATIONS, LLC,

      Plaintiff

      v.

CHARTER COMMUNICATIONS, INC.,

      Defendants.

Civil Action No. 2:22-cv-00125-JRG

**JURY TRIAL DEMANDED**

███████████

**PLAINTIFF'S SUR-REPLY IN FURTHER OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS THE SECOND AMENDED
COMPLAINT FOR IMPROPER VENUE PURSUANT TO FRCP 12(b)(3)**

**TABLE OF CONTENTS**

I.      Introduction .................................................................................................1

II.     Argument ....................................................................................................4

        A.  Charter misstates the law ...............................................................4

        B.  Charter has no response to the overwhelming evidence that CCI has ratified the
            Spectrum stores in the District..............................................................4

        C.  Charter's enterprise *does* lack corporate separateness .............................9

III.    Conclusion ..................................................................................................9

# TABLE OF AUTHORITIES

**Cases**                                                                                                    **Pages**

*Andra Group, LP v. Victoria's Secret Stores, LLC*, 6 F.4th 1283, 1289 (Fed. Cir. 2021) ..............4

*Bd. of Regents v. Medtronic PLC.*, 17-cv-0942-LY, 2018 WL 4179080 (W.D. Tex. July 19, 2018) ...................................................................................................................................4–5

*Celgene Corp. v. Mylan Pharms. Inc.*, 17 F.4th 1111 (Fed. Cir. 2021).........................................4

*Entropic Comm'cns, LLC v. DIRECTV, LLC*, Case No. 2:22-cv-75-JRG, 2022 WL 19076758 (E.D. Tex. Oct. 24, 2022)...............................................................................1, 5–6, 8–9

*In re Cray*, 871 F.3d 1355 (Fed. Cir. 2017) ..................................................................................8

*Optic153 LLC v. Thorlabs Inc.*, 6:19-CV-00667-ADA, 2020 WL 3403076 (W.D. Tex. June 19, 2020) ..........................................................................................................................9

*Soverain IP, LLC v. AT&T, Inc.*, 2:17-CV-00293-RWS, 2017 WL 5126158 (E.D. Tex. Oct. 31, 2017) ...........................................................................................................................4

## Other

*Montes v. Charter Communications, Inc.*, No. 7:21-cv-489, Dkt. No. 1, NOTICE OF REMOVAL (S.D. Tex. Dec. 20, 2021) ..................................................................................................6

## INTRODUCTION

Stripped of complexity, this motion should be decided on the Court's precedent. As Entropic addressed in its Opposition (Dkt. No. 68), this Court very recently addressed similar facts in *Entropic Comm'cns, LLC v. DIRECTV, LLC*, Case No. 2:22-cv-75-JRG, 2022 WL 19076758 (E.D. Tex. Oct. 24, 2022). There, DISH argued that the physical stores of its California subsidiary could not be considered places of business of the ultimate DISH parent. DISH made the same arguments Charter does here—about corporate formalities, which entity technically employed whom, and which entity, on paper, provided the services, etc. The Court rejected them. Here, the facts are even more compelling in favor of denying the motion to dismiss.

Charter has now had the chance in multiple briefs spanning thirty pages to explain why the Court's precedent does not apply. This is Charter's complete attempt to distinguish that opinion: "[U]nlike *DirecTV*, all of the evidence shows use of the Spectrum brand, and not any 'Charter' or CCI-specific brand: there are *no* locations in this district that bear the 'Charter' name, and the 'Spectrum' website (not the Charter website) identifies the *Spectrum* services that are offered at the *Spectrum* stores in this district." Dkt. No. 75, Charter Reply, at 7 (emphasis in original), 10 (same). That's it. Charter asserts the *DIRECTV* opinion is not dispositive here because DISH brands itself as DISH, whereas here Charter calls itself Spectrum. Charter of course does not explain why this would even matter—CCI owns the Spectrum brand and that name is plastered all over the physical locations, employees, and services in the District, establishing ratification. It's also a remarkable argument. In every other way Charter argues that only the formalities matter, except on the dispositive point of this precedent. Then, Charter adopts the opposite philosophy— only perception matters.

1

**APPX799**

Aside from being irrelevant, this argument is, like all Charter's others, directly contradicted

by the facts. Charter Communications, Inc. *is* "Spectrum." Here is the very first paragraph of CCI's

year 2022 SEC 10-K statement, in its entirety:

**Introduction**

We are a leading broadband connectivity company and cable operator serving more
than 32 million customers in 41 states through our ***Spectrum*** brand. Over an
advanced high-capacity, two-way telecommunications network, we offer a full
range of state-of-the-art residential and business services including ***Spectrum***
Internet®, TV, Mobile and Voice. For small and medium-sized companies,
***Spectrum*** Business® delivers the same suite of broadband products and services
coupled with special features and applications to enhance productivity, while for
larger businesses and government entities, ***Spectrum*** Enterprise™ provides highly
customized, fiber-based solution. ***Spectrum*** Reach® delivers tailored advertising
and production for the modern media landscape. We also distribute award-winning
news coverage and sports programming to our customers through ***Spectrum***
Networks.[1]

Moreover:

- The end of every CCI press release concludes with either an "About Spectrum"
  section ("***Spectrum*** is a suite of advanced communications services offered by
  Charter Communications, Inc. . . .") or an "About Charter" section ("Charter
  Communications, Inc. (NASDAQ:CHTR) is a leading broadband connectivity
  company and cable operator serving more than 32 million customers through
  its ***Spectrum*** brand").[2]

- Charter's Spectrum-labeled invoices tell customers to send their payments to
  "Charter Communications."[3]

Indeed, it is nearly impossible for a customer not to know that Spectrum is CCI, and CCI is

Spectrum. Anyone running an internet search is presented the equivalence immediately:

---

[1] Available at https://www.sec.gov/ix?doc=/Archives/edgar/data/1091667/000109166723000024/chtr-20221231.htm.
[2] *See, e.g.*, https://corporate.charter.com/newsroom/spectrum-network-designers-wanted-for-newly-expanded-center; https://corporate.charter.com/newsroom/2023-spectrum-community-center-assist-programs-at-new-locations; *see also* Dkt. No. 68, Entropic Opposition, at 14–16 (describing Charter's public statements about its Spectrum brand).
[3] https://www.spectrum.net/support/manage-account/understanding-your-statement-bill/.

**CONFIDENTIAL MATERIAL OMITTED**



In summary, Charter's apparent argument that the public does not understand that Spectrum = Charter and Charter = Spectrum borders upon the absurd.

Charter's position simply confirms everything Entropic has argued—there is one operating enterprise nationwide. The *entire* enterprise uses the brand "Spectrum." And as Entropic's Opposition made clear, the contrived lines Charter advances are drawn over the reality of Charter's business. ██████████████ the heads of divisions have enterprise wide authority, the employees are shuffled around the whole enterprise, the leases are signed by CCI, etc.

Charter's Reply is strangely focused on whether Charter broke any laws with all these paper contrivances. That is irrelevant. The point is, the regular and established places of business in this District *are* CCI's. CCI controls these locations, CCI has ratified these locations, CCI's employees staff these locations—CCI even signed the leases. This Court should deny the motion.

3

**APPX801**

## ARGUMENT

### A. Charter misstates the law.

Charter asserts that Entropic must prove "corporate formalities [were] ignored" because "a subsidiary's presence in a venue cannot be imputed to the parent absent disregard for corporate separateness." Charter Reply at 1, 4 (quoting *Bd. of Regents v. Medtronic PLC.*, 2018 WL 4179080, at *2 (W.D. Tex. July 19, 2018); *Soverain IP, LLC v. AT&T, Inc.*, 2017 WL 5126158, at *1 (E.D. Tex. Oct. 31, 2017)).

That is not the law. Indeed, the Federal Circuit has expressly rejected the idea that ratification requires a lack of corporate separateness. *Celgene Corp. v. Mylan Pharms. Inc.*, 17 F.4th 1111, 1127 (Fed. Cir. 2021) ("Of course, it might be that a parent corporation might specifically ratify a subsidiary's place of business, even if the two do maintain corporate separateness). Corporate separateness and ratification are two separate avenues for establishing venue between corporate relatives. *See Andra Group, LP v. Victoria's Secret Stores, LLC*, 6 F.4th 1283, 1289 (Fed. Cir. 2021).

### B. Charter has no response to the overwhelming evidence that CCI has ratified the Spectrum stores in the District.

Entropic's Opposition presented overwhelming evidence that CCI has ratified the Spectrum store locations. Just to name a few examples, Entropic uncovered evidence in venue discovery that 1) the Spectrum stores all use the same **Spectrum** logo, which the CCI website explains "is a suite of advanced broadband services offered by Charter Communications, Inc.," 2) the same website directs customers and prospective employees to the store locations in question, and 3) CCI actually signed the lease agreements on behalf of its subsidiary.

Charter dismisses all of this evidence with a curt response:

Entropic argues that CCI ratified the Spectrum store locations in this district because visitors to the Spectrum website or stores 'believe that the ***Spectrum-***

> branded stores and *Spectrum* services are provided by CCI.' Entropic provides no
> support for this statement and cannot show that CCI ratified any store in this district
> because CCI has maintained the corporate forms and thus, the 'shared use' of
> 'Spectrum' 'does not detract from the separateness of [its] business.'

Charter Reply at 10 (*citations omitted*). Once again, Charter tries to redirect the Court's attention

back to the corporate separateness issue, even though this is not necessary for Entropic's

ratification theory. Charter goes on to argue, "[c]ontrary to Entropic's suggestion . . . the formation

and execution of an LLC agreement *alone* does not support the conclusion that CCI has ratified

any Spectrum store as its own." Charter Reply at 10. But this grossly mischaracterizes Entropic's

Opposition. Nowhere does Entropic suggest that the mere existence of a parent-subsidiary

relationship, or even the existence of an LLC management agreement, is sufficient. CCI actually

controls the enterprise (through its authority expressly granted in corporate documents) and

actually signed the leases both for the physical store locations and for the equipment used to

provide the accused services. CCI has no response to this fact.

Nor can Charter muster a convincing response to the fact that its stores all use the same

Spectrum▸ logo. Charter attempts to liken this case to *Bd. of Regents v. Medtronic PLC*, No. 17-cv-

942, 2018 WL 4179080, at \*2 (W.D. Tex. July 19, 2018), which involved "the use of the common

or generic name Medtronic on the exterior of the building." As addressed in Entropic's Opposition,

however, the Spectrum stores do more than feature generic "Spectrum" signage. They use the

Spectrum▸ logo. *See* Dkt. No. 68, Entropic Opposition, at 21. Charter insists that this case is

distinguishable from *Entropic Comm'cns, LLC v. DirecTV, LLC* because the stores use "Spectrum"

branding instead of "Charter" branding. *See* Charter Reply at 7. But this is a distinction without

meaning, as addressed above. *See supra* at 1–3.

Because Charter has failed to explain why the result should differ here, this Court's

precedent should control. Just like the Dish defendants in *DirecTV*, CCI uses its national website

to advertise its services to customers within the District, direct customers to store locations within the District, and promote job openings at those store locations. *See* Entropic Opposition at 15–16, 26; *see also Entropic Comm'cns, LLC v. DirecTV, LLC*, 2022 WL 19076758 at \*5. And that is to say nothing of the other facts that were not present in the *DirecTV* case, including Charter's representations to the FCC and Federal Courts (Opposition at 16–18), as well as the evidence that CCI holds out the store employees as its own employees/agents (Opposition at 15–16) and signed the leases in the District (Opposition at 8–9). Charter likewise attempts to downplay these facts, but its arguments ring hollow.

For example, Entropic presented evidence that CCI had, in a previous employment dispute, acknowledged one of its managers as CCI's "agent," even though the manager was technically employed by Charter Communications, LLC. *See* Entropic Opposition at 24–25. Charter attempts to hand-wave this evidence by arguing that "CCI had no need to dispute that fact at the pleading stage." *See* Charter Reply at 9, n. 7. Even Charter seems to recognize the weakness of this argument, choosing to bury it in a footnote. Moreover, the case involved a wrongful death action, with Plaintiff attempting to hold CCI liable for the manager's actions. *See Montes v. Charter Communications, Inc.*, No. 7:21-cv-489, Dkt. No. 1, Notice of Removal (S.D. Tex. Dec. 20, 2021) (filed by Charter Communications, Inc.). As such, CCI absolutely had a reason to deny its agency relationship with the manager. But instead, it was CCI who called Mr. Anderson its "agent." See *id.* at ¶ 12 ("Plaintiff has failed to plead facts establishing that Anderson was negligent or grossly negligent because, **as Charter's agent**, he did not owe Ms. Trevino an individual duty") (*emphasis added*).

Entropic also presented evidence that CCI has actual authority over employment matters for its subsidiaries. *See* Entropic Opposition at 6, 23–24. Charter attempts to downplay this

APPX804

CONFIDENTIAL MATERIAL OMITTED

evidence, but in doing so misrepresents Entropic's position. According to Charter, "Entropic contends that CCI has the 'right to direct or control the employees' actions,' and that CCI officers 'can direct the work of the employees,' because CCI is a designated manager under LLC agreements." Charter Reply at 8. Again, Charter misses the point. It is not the simple fact that there is an LLC agreement in place between CCI and its subsidiaries; it is the fact that the express terms of that agreement authorize CCI to ███████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

See Entropic Opposition at 23.

     Moreover, ███████████████████████████████████████

████████████████████     See Proost Dep. Tr., Exhibit A to Entropic Opposition, at 85:15–16. Charter characterizes this testimony as confirmation that ██████████████████████

███████████     See Charter Reply at 3. However, the management agreement plainly gives management authority to CCI, not Charter Communications, LLC. Furthermore, it is unclear why CCI—a company that allegedly has no employees of its own—would need to have departments such as Human Resources and Field Operations. See CCI Officer List, Exhibit G to Entropic Opposition. Importantly, Charter never disputes that these officers have the power to direct or control the actions of the employees in their department; Charter simply disputes whether these officers have done so in fact, and whether, if they, they did it "in their capacity" as CC LLC employees, not CCI officers, whatever that means.

     Finally, Charter has no response to the evidence and testimony that its employees understand themselves to work for CCI. Charter's corporate representative testified that ████████

██████████████████████████████████████████████████     See

APPX805

CONFIDENTIAL MATERIAL OMITTED

Proost Dep. Tr., Exhibit A to Entropic Opposition, at 74:12–17. And this is consistent with the numerous Charter employees who list CCI as their employer on LinkedIn. *See* Entropic Opposition at 25–26. Charter dismisses this evidence, noting that "Entropic does not contend that any of these individuals work or operate out of any property listed in the SAC." Regardless, this evidence is emblematic of the relationship CCI holds with Charter employees nationwide. As noted above and in Entropic's Opposition, CCI uses the same national website to promote job openings at its Spectrum stores—just like the Dish defendants in *DirecTV*. *See* Entropic Opposition at 15–16, 26–27. There is no reason to believe that CCI's relationship with E.D. Texas employees is any different from its relationship with employees in other districts or even other states.

Charter dedicates a substantial portion of its Reply to the issue of whether CCI and its subsidiaries have maintained corporate separateness. But this misses the point. As this Court noted in *Entropic Comm'cns, LLC v. DirecTV, LLC*, the Court "need not pierce the corporate veil of [Defendant]'s organizational structure to find that [Defendant] holds the locations… out as its own." 2022 WL 19076758 at *5. Nor does venue hinge on whether CCI exercises *improper* control over its subsidiaries. *See* Charter Reply, at 2. The point of Entropic's Opposition is not that CCI overstepped its corporate bounds by signing the property and equipment leases, by ████ ██████████████ with its subsidiaries, or by using the CCI website to promote the store locations and associated job postings. Rather, the point is that CCI has given its employees and the public every reason to believe that CCI operates the stores and provides the accused services in the District. This is the very essence of what it means to "ratify" a location as Defendant's own. *See In re Cray*, 871 F.3d 1355, 1363–64 (Fed. Cir. 2017) ("Relevant considerations include whether the defendant owns or leases the place, or exercises other attributes of possession or control over the place").

**C. Charter's enterprise *does* lack corporate separateness.**

Even setting aside that Entropic need not show a lack of corporate separateness to prevail, that standard nonetheless has been met here. Charter profusely defends that its lawyers have dotted their i's and crossed their t's, and that no Delaware corporate laws have been broken. *See* Charter Reply at 2–4. That, again, is not what the law requires. The standard, which is relaxed for venue, instead requires only that "the corporations disregard their separateness and act as a single enterprise." *Optic153 LLC v. Thorlabs Inc.*, 6:19-CV-00667-ADA, 2020 WL 3403076, at *2 (W.D. Tex. June 19, 2020). Entropic has shown that in spades. *See* Entropic Opposition at 5–13. Regardless of what paperwork Charter submits to Delaware, or how it files its taxes, these corporate lines simply do not exist in Charter's actual business. That's what Charter tells the public and the government (Opposition at 14–17), and Charter has presented no evidence that its employees or officers are even aware of the different entities. Entropic, through the facts revealed in venue discovery, has more than carried its burden to show that Charter's business disregards corporate separateness and acts as a single business enterprise.

**CONCLUSION**

Charter's Reply brief fails to present any persuasive reason, factual or legal, why this Court should reach a different outcome from its decision in *DirecTV*. Not only are the same facts present here; venue discovery has confirmed that CCI expressly ratified the Spectrum stores when it signed the property leases on behalf of its subsidiary. For that and the other reasons stated above and in Entropic's Opposition brief, the Court should deny Defendant's Motion to Dismiss the Second Amended Complaint.

**APPX807**

Dated: March 23, 2023

Respectfully submitted,

*/s/ James Shimota by permission Wesley Hill*
James Shimota - LEAD ATTORNEY
Jason Engel
George Summerfield
**K&L GATES LLP**
70 W. Madison Street, Suite 3300
Chicago, IL 60602
Jim.shimota@klgates.com
Jason.engel@klgates.com
George.summerfield@klgates.com

Nicholas F. Lenning
**K&L GATES LLP**
925 Fourth Avenue, Suite 2900
Seattle, WA 98104-1158
nicholas.lenning@klgates.com

Darlene Ghavimi
Matthew Blair
**K&L GATES LLP**
2801 Via Fortuna
Suite #650
Austin, Texas 78746
Darlene.ghavimi@klgates.com
Matthew.blair@klgates.com

Wesley Hill
Texas Bar No. 24032294
Andrea Fair
Texas Bar No. 24078488
**WARD, SMITH & HILL, PLLC**
1507 Bill Owens Pkwy
Longview, TX 75604
Tel: (903) 757-6400
wh@wsfirm.com
andrea@wsfirm.com

**ATTORNEYS FOR PLAINTIFF**
**ENTROPIC COMMUNICATIONS, LLC**

314921797.3

**APPX808**

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing document was filed electronically in compliance with Local Rule CV-5(a) and served via email on all counsel of record on this twenty-third day of March, 2023.

/s/ Wesley Hill
Wesley Hill

**CERTIFICATE OF AUTHORIZATION TO FILE UNDER SEAL**

This is to certify that the above document should be filed under seal because it contains material designated by the parties as confidential pursuant to the Protective Order entered in this case (Dkt. 36).

/s/ Wesley Hill
Wesley Hill

314921797.3

**APPX809**

**U.S. District Court**
**Eastern District of TEXAS [LIVE] (Marshall)**
**CIVIL DOCKET FOR CASE #: 2:22–cv–00125–JRG**

Entropic Communications, LLC v. Charter Communications, Inc. et al
Assigned to: District Judge Rodney Gilstrap
Related Cases:  2:23–cv–00050–JRG
        2:23–cv–00051–JRG
        2:23–cv–00052–JRG
Cause: 35:271 Patent Infringement

Date Filed: 04/27/2022
Jury Demand: Plaintiff
Nature of Suit: 830 Patent
Jurisdiction: Federal Question

**Technical Advisor**

**David Keyzer**
*david@keyzerlaw.com*

**Plaintiff**

**Entropic Communications, LLC**                represented by   **Darlene Fae Ghavimi**
K&L Gates, LLP
2801 Via Fortuna
Ste 650
TX
Austin, TX 78746
512–482–6800
Email: Darlene.Ghavimi@klgates.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James A Shimota**
K&L Gates LLP – Chicago
70 West Madison Street
Suite 3100
Chicago, IL 60602
312–807–4299
Fax: 312–827–8000
Email: jim.shimota@klgates.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Andrea Leigh Fair**
Ward, Smith & Hill, PLLC
1507 Bill Owens Parkway
Longview, TX 75604
903–757–6400
Fax: 903–757–2323
Email: andrea@wsfirm.com
*ATTORNEY TO BE NOTICED*

**Connor James Meggs**
K&L Gates LLP
10100 Santa Monica Blvd.
8th Floor
Los Angeles, CA 90067
310–552–5031
Email: connor.meggs@klgates.com
*ATTORNEY TO BE NOTICED*

**Courtney Neufeld**
K&L Gates LLP
925 Fourth Ave.
Suite 2900

**APPX810**

Seattle, WA 98104
206–370–7836
Email: courtney.neufeld@klgates.com
*ATTORNEY TO BE NOTICED*

**George C Summerfield**
K & L Gates LLP – Chicago
70 W Madison Street
Suite 3300
Chicago, IL 60602
312–807–4376
Fax: 312–827–8000
Email: george.summerfield@klgates.com
*ATTORNEY TO BE NOTICED*

**Jason A Engel**
K&L Gates LLP – Chicago
70 West Madison Street
Suite 3100
Chicago, IL 60602
312–807–4236
Fax: 312–827–8000
Email: jason.engel@klgates.com
*ATTORNEY TO BE NOTICED*

**Katherine L. Allor**
K&L Gates LLP – Chicago
70 West Madison Street
Suite 3100
Chicago, IL 60602
312.372.1121
Fax: 312.827.8000
Email: katy.allor@klgates.com
*ATTORNEY TO BE NOTICED*

**Kenneth H. Bridges**
Bridges IP Consulting
2113 19th Ave S
Nashville, TN 37212
615–973–9478
Email: bridgesip@icloud.com
*ATTORNEY TO BE NOTICED*

**Matthew Alexander Blair**
K&L Gates
2801 Via Fortuna
Ste 650
Austin, TX 78746
512–482–6851
Email: matthew.blair@klgates.com
*ATTORNEY TO BE NOTICED*

**Nicholas F. Lenning**
K&L Gates LLP
925 Fourth Avenue
Suite 2900
Seattle, WA 98104–1158
206–623–7580
Fax: 206–623–7022
Email: nicholas.lenning@klgates.com
*ATTORNEY TO BE NOTICED*

**Peter E. Soskin**
K&L Gates LLP – San Francisco
Four Embarcadero Center

**APPX811**

Suite 1200
San Francisco, CA 94111
415–882–8046
Fax: 415–882–8220
Email: peter.soskin@klgates.com
*ATTORNEY TO BE NOTICED*

**Samuel Patrick Richey**
K&L Gates LLP
70 W. Madison St.
Suite 3100
Chicago, IL 60602
312–372–1121
Email: samuel.richey@klgates.com
*ATTORNEY TO BE NOTICED*

**Jack Wesley Hill**
Ward, Smith & Hill, PLLC
1507 Bill Owens Parkway
Longview, TX 75604
903–757–6400
Fax: 903–757–2323
Email: wh@wsfirm.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Charter Communications, Inc.**          represented by  **Daniel Reisner**
Arnold & Porter Kaye Scholer LLP
250 West 55th Street
New York, NY 10019
212–836–8132
Email: Daniel.Reisner@arnoldporter.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Albert John Boardman**
Arnold & Porter Kaye Scholer LLP
250 West 55th Street
New York, NY 10019–9710
212–836–8135
Email: Albert.Boardman@arnoldporter.com
*ATTORNEY TO BE NOTICED*

**Amy L DeWitt**
Arnold & Porter Kaye Scholer, LLP –
Wash DC
601 Massachusetts Avenue NW
Washington, DC 20001–3743
202–942–5823
Fax: 202–942–5999
Email: amy.dewitt@aporter.com
*ATTORNEY TO BE NOTICED*

**David S Benyacar**
Kaye Scholer – New York
425 Park Avenue
New York, NY 10022
212/836–7763
Fax: 212/836–6404
Email: David.Benyacar@arnoldporter.com
*ATTORNEY TO BE NOTICED*

**APPX812**

**Deron R Dacus**
The Dacus Firm, PC
821 ESE Loop 323
Suite 430
Tyler, TX 75701
903/705–1117
Fax: 903/581–2543
Email: ddacus@dacusfirm.com
*ATTORNEY TO BE NOTICED*

**Elizabeth Anne Long**
Arnold & Porter Kaye Scholer LLP
250 West 55th Street
New York, NY 10019–9710
212–836–8067
Email: elizabeth.long@arnoldporter.com
*ATTORNEY TO BE NOTICED*

**Melissa A. Brown**
Arnold & Porter Kaye Scholer LLP
250 West 55th Street
New York, NY 10019–9710
212–836–7981
Email: Melissa.Brown@arnoldporter.com
*ATTORNEY TO BE NOTICED*

**Palak Mayani Parikh**
Arnold & Porter Kaye Scholer LLP
250 West 55th Street
New York, NY 10019–9710
212–836–7243
Email: palak.mayani@arnoldporter.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Spectrum Advanced Services, LLC**          represented by    **Albert John Boardman**
*TERMINATED: 02/07/2023*                                      (See above for address)
                                                              *TERMINATED: 02/07/2023*
                                                              *ATTORNEY TO BE NOTICED*

                                                              **Daniel Reisner**
                                                              (See above for address)
                                                              *TERMINATED: 02/07/2023*
                                                              *ATTORNEY TO BE NOTICED*

                                                              **David S Benyacar**
                                                              (See above for address)
                                                              *TERMINATED: 02/07/2023*
                                                              *ATTORNEY TO BE NOTICED*

                                                              **Deron R Dacus**
                                                              (See above for address)
                                                              *TERMINATED: 02/07/2023*
                                                              *ATTORNEY TO BE NOTICED*

                                                              **Elizabeth Anne Long**
                                                              (See above for address)
                                                              *TERMINATED: 02/07/2023*
                                                              *ATTORNEY TO BE NOTICED*

                                                              **Melissa A. Brown**
                                                              (See above for address)
                                                              *TERMINATED: 02/07/2023*

**APPX813**

*ATTORNEY TO BE NOTICED*

**Palak Mayani Parikh**
(See above for address)
*TERMINATED: 02/07/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Spectrum Management Holding Company, LLC**
*TERMINATED: 02/07/2023*

represented by **Albert John Boardman**
(See above for address)
*TERMINATED: 02/07/2023*
*ATTORNEY TO BE NOTICED*

**Daniel Reisner**
(See above for address)
*TERMINATED: 02/07/2023*
*ATTORNEY TO BE NOTICED*

**David S Benyacar**
(See above for address)
*TERMINATED: 02/07/2023*
*ATTORNEY TO BE NOTICED*

**Deron R Dacus**
(See above for address)
*TERMINATED: 02/07/2023*
*ATTORNEY TO BE NOTICED*

**Elizabeth Anne Long**
(See above for address)
*TERMINATED: 02/07/2023*
*ATTORNEY TO BE NOTICED*

**Melissa A. Brown**
(See above for address)
*TERMINATED: 02/07/2023*
*ATTORNEY TO BE NOTICED*

**Palak Mayani Parikh**
(See above for address)
*TERMINATED: 02/07/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 04/27/2022 | 1 | COMPLAINT against Charter Communications, Inc., Spectrum Advanced Services, LLC, Spectrum Management Holding Company, LLC ( Filing fee $ 402 receipt number 0540–8892861.), filed by Entropic Communications, LLC. (Attachments: # 1 Civil Cover Sheet, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Exhibit G, # 9 Exhibit H, # 10 Exhibit I, # 11 Exhibit J, # 12 Exhibit K, # 13 Exhibit L)(Hill, Jack) (Entered: 04/27/2022) |
| 04/27/2022 | 2 | Notice of Filing of Patent/Trademark Form (AO 120). AO 120 mailed to the Director of the U.S. Patent and Trademark Office. (Hill, Jack) (Entered: 04/27/2022) |
| 04/27/2022 | 3 | CORPORATE DISCLOSURE STATEMENT filed by Entropic Communications, LLC identifying Corporate Parent Entropic Holdings, LLC for Entropic Communications, LLC. (Hill, Jack) (Entered: 04/27/2022) |
| 04/27/2022 | 4 | DEMAND for Trial by Jury by Entropic Communications, LLC. (Hill, Jack) (Entered: 04/27/2022) |

# APPX814

| 04/27/2022 | | Case assigned to District Judge Rodney Gilstrap. (ch, ) (Entered: 04/27/2022) |
|---|---|---|
| 04/27/2022 | | In accordance with the provisions of 28 USC Section 636(c), you are hereby notified that a U.S. Magistrate Judge of this district court is available to conduct any or all proceedings in this case including a jury or non–jury trial and to order the entry of a final judgment. The form Consent to Proceed Before Magistrate Judge is available on our website. All signed consent forms, excluding pro se parties, should be filed electronically using the event *Notice Regarding Consent to Proceed Before Magistrate Judge*. (ch, ) (Entered: 04/27/2022) |
| 04/27/2022 | 5 | SUMMONS Issued as to Charter Communications, Inc., Spectrum Advanced Services, LLC, Spectrum Management Holding Company, LLC. (Attachments: # 1 Summons(es), # 2 Summons(es))(ch, ) (Entered: 04/27/2022) |
| 05/09/2022 | 6 | SUMMONS Returned Executed by Entropic Communications, LLC. Charter Communications, Inc. served on 5/3/2022, answer due 5/24/2022. (Hill, Jack) (Entered: 05/09/2022) |
| 05/09/2022 | 7 | SUMMONS Returned Executed by Entropic Communications, LLC. Spectrum Advanced Services, LLC served on 5/3/2022, answer due 5/24/2022. (Hill, Jack) (Entered: 05/09/2022) |
| 05/09/2022 | 8 | SUMMONS Returned Executed by Entropic Communications, LLC. Spectrum Management Holding Company, LLC served on 5/3/2022, answer due 5/24/2022. (Hill, Jack) (Entered: 05/09/2022) |
| 05/18/2022 | 9 | NOTICE of Attorney Appearance by Andrea Leigh Fair on behalf of Entropic Communications, LLC (Fair, Andrea) (Entered: 05/18/2022) |
| 05/23/2022 | 10 | Defendant's Unopposed First Application for Extension of Time to Answer Complaint re Charter Communications, Inc., Spectrum Advanced Services, LLC, Spectrum Management Holding Company, LLC.( Dacus, Deron) (Entered: 05/23/2022) |
| 05/23/2022 | | Defendant's Unopposed First Application for Extension of Time to Answer Complaint is granted pursuant to Local Rule CV–12 for Spectrum Management Holding Company, LLC to 6/23/2022; Spectrum Advanced Services, LLC to 6/23/2022; Charter Communications, Inc. to 6/23/2022. 30 Days Granted for Deadline Extension.( nkl, ) (Entered: 05/23/2022) |
| 05/23/2022 | 11 | Defendant's Unopposed Second Application for Extension of Time to Answer Complaint re Charter Communications, Inc., Spectrum Advanced Services, LLC, Spectrum Management Holding Company, LLC.( Dacus, Deron) (Entered: 05/23/2022) |
| 05/23/2022 | | Defendant's Unopposed Second Application for Extension of Time to Answer Complaint is granted pursuant to Local Rule CV–12 for Spectrum Management Holding Company, LLC to 7/8/2022; Spectrum Advanced Services, LLC to 7/8/2022; Charter Communications, Inc. to 7/8/2022. 15 Days Granted for Deadline Extension.( nkl, ) (Entered: 05/23/2022) |
| 05/24/2022 | 12 | AMENDED COMPLAINT against Charter Communications, Inc., Spectrum Advanced Services, LLC, Spectrum Management Holding Company, LLC, filed by Entropic Communications, LLC. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M, # 14 Exhibit N)(Hill, Jack Wesley) (Entered: 05/24/2022) |
| 06/14/2022 | 13 | ORDER – Scheduling Conference set for 7/19/2022 10:00 AM before District Judge Rodney Gilstrap. Signed by District Judge Rodney Gilstrap on 6/14/2022. (ch, ) (Entered: 06/15/2022) |
| 07/06/2022 | 14 | NOTICE of Discovery Disclosure by Entropic Communications, LLC *(P.R. 3–1 and P.R. 3–2 Disclosures)* (Hill, Jack Wesley) (Entered: 07/06/2022) |
| 07/08/2022 | 15 | NOTICE of Attorney Appearance – Pro Hac Vice by Palak Mayani Parikh on behalf of Charter Communications, Inc., Spectrum Advanced Services, LLC, Spectrum Management Holding Company, LLC. Filing fee $ 100, Receipt #ATXEDC–9010087. (nkl, ) (Entered: 07/08/2022) |

| 07/08/2022 | 16 | NOTICE of Attorney Appearance – Pro Hac Vice by Albert John Boardman on behalf of All Defendants. Filing fee $ 100, receipt number ATXEDC–9010246. (Boardman, Albert) (Entered: 07/08/2022) |
|---|---|---|
| 07/08/2022 | 17 | NOTICE of Attorney Appearance – Pro Hac Vice by David S Benyacar on behalf of All Defendants. Filing fee $ 100, receipt number ATXEDC–9010286. (Benyacar, David) (Entered: 07/08/2022) |
| 07/08/2022 | 18 | MOTION to Dismiss *For Improper Venue Pursuant to FRCP 12(b)(3)* by Charter Communications, Inc., Spectrum Advanced Services, LLC, Spectrum Management Holding Company, LLC. (Attachments: # 1 Declaration – Armstrong, # 2 Declaration – Burdett, # 3 Declaration – Nelson, # 4 Declaration – Smith, # 5 Text of Proposed Order)(Dacus, Deron) (Entered: 07/08/2022) |
| 07/08/2022 | 19 | CORPORATE DISCLOSURE STATEMENT filed by Charter Communications, Inc., Spectrum Advanced Services, LLC, Spectrum Management Holding Company, LLC (Dacus, Deron) (Entered: 07/08/2022) |
| 07/08/2022 | 20 | NOTICE of Attorney Appearance – Pro Hac Vice by Daniel Reisner on behalf of All Defendants. Filing fee $ 100, receipt number ATXEDC–9010457. (Reisner, Daniel) (Entered: 07/08/2022) |
| 07/13/2022 | 21 | NOTICE of Attorney Appearance – Pro Hac Vice by James A Shimota on behalf of Entropic Communications, LLC. Filing fee $ 100, receipt number ATXEDC–9017573. (Shimota, James) (Entered: 07/13/2022) |
| 07/13/2022 | 22 | NOTICE of Attorney Appearance – Pro Hac Vice by Jason A Engel on behalf of Entropic Communications, LLC. Filing fee $ 100, receipt number ATXEDC–9017576. (Engel, Jason) (Entered: 07/13/2022) |
| 07/13/2022 | 23 | NOTICE of Attorney Appearance by George C Summerfield on behalf of Entropic Communications, LLC (Summerfield, George) (Entered: 07/13/2022) |
| 07/19/2022 | | Minute Entry for proceedings held before District Judge Rodney Gilstrap: Scheduling Conference held on 7/19/2022. Counsel for the parties appeared. Court asked whether they consented to trial before the U.S. Magistrate Judge. Court then gave counsel Claim Construction and Jury Selection/Trial dates. (Court Reporter Shawn McRoberts, RMR, CRR) (aeb) (Entered: 07/19/2022) |
| 07/22/2022 | 24 | Joint MOTION for Extension of Time to File Response/Reply as to 18 MOTION to Dismiss *For Improper Venue Pursuant to FRCP 12(b)(3) and for Limited Expedited Venue Discovery* by Entropic Communications, LLC. (Attachments: # 1 Text of Proposed Order)(Hill, Jack Wesley) (Entered: 07/22/2022) |
| 07/25/2022 | 25 | ORDER granting 24 Joint MOTION for Extension of Time to File Response/Reply as to 18 MOTION to Dismiss *For Improper Venue Pursuant to FRCP 12(b)(3) and for Limited Expedited Venue Discovery* ORDERED that the parties may conduct venue discovery subject to the agreements set forth in the Motion. (Dkt. No. 24 at 23.) It is ORDERED that the venue discoveryshall be completed by September 30, 2022 and the deadline for Entropics response to Charters Motionto Dismiss for Improper Venue (Dkt. No. 18) is extended until October 14, 2022. Signed by District Judge Rodney Gilstrap on 7/25/2022. (ch, ) (Entered: 07/25/2022) |
| 08/02/2022 | 26 | Unopposed MOTION for Extension of Time to File by Charter Communications, Inc., Spectrum Advanced Services, LLC, Spectrum Management Holding Company, LLC. (Attachments: # 1 Text of Proposed Order)(Dacus, Deron) (Entered: 08/02/2022) |
| 08/03/2022 | 27 | ORDER granting 26 Unopposed MOTION for Extension of Time to File Docket Control Order. Signed by District Judge Rodney Gilstrap on 8/3/2022. (ch, ) (Entered: 08/03/2022) |
| 08/05/2022 | 28 | NOTICE of Attorney Appearance – Pro Hac Vice by Nicholas F. Lenning on behalf of Entropic Communications, LLC. Filing fee $ 100, receipt number ATXEDC–9055865. (Lenning, Nicholas) (Entered: 08/05/2022) |
| 08/05/2022 | 29 | Agreed MOTION for Entry of Docket Control Order by Entropic Communications, LLC. (Attachments: # 1 Text of Proposed Order)(Hill, Jack Wesley) (Entered: 08/05/2022) |

**APPX816**

| 08/05/2022 | 30 | Agreed MOTION for Entry of Discovery Order by Entropic Communications, LLC. (Attachments: # 1 Text of Proposed Order)(Hill, Jack Wesley) (Entered: 08/05/2022) |
|---|---|---|
| 08/09/2022 | 31 | Unopposed MOTION for Extension of Time to File by Charter Communications, Inc., Spectrum Advanced Services, LLC, Spectrum Management Holding Company, LLC. (Attachments: # 1 Text of Proposed Order)(Dacus, Deron) (Entered: 08/09/2022) |
| 08/09/2022 | 32 | Agreed MOTION for Entry of Protective Order by Entropic Communications, LLC. (Attachments: # 1 Text of Proposed Order)(Hill, Jack Wesley) (Entered: 08/09/2022) |
| 08/10/2022 | 33 | ORDER granting 31 Motion for Extension of Time to File Disclosures. Signed by District Judge Rodney Gilstrap on 8/10/2022. (ch, ) (Entered: 08/10/2022) |
| 08/10/2022 | 34 | DISCOVERY ORDER granting 30 Agreed MOTION for Entry of Discovery Order. Signed by District Judge Rodney Gilstrap on 8/10/2022. (ch, ) (Entered: 08/10/2022) |
| 08/10/2022 | 35 | DOCKET CONTROL ORDER granting 29 Agreed MOTION for Entry of Docket Control Order. Pretrial Conference set for 10/30/2023 09:00 AM before District Judge Rodney Gilstrap., Amended Pleadings due by 3/28/2023., Jury Selection set for 12/4/2023 09:00AM before District Judge Rodney Gilstrap., Markman Hearing set for 6/13/2023 09:00 AM before District Judge Rodney Gilstrap., Motions due by 10/10/2023., Proposed Pretrial Order due by 10/23/2023.). Signed by District Judge Rodney Gilstrap on 8/10/2022. (ch, ) (Entered: 08/10/2022) |
| 08/10/2022 | 36 | STIPULATED PROTECTIVE ORDER. Signed by District Judge Rodney Gilstrap on 8/10/2022. (ch, ) (Entered: 08/10/2022) |
| 08/15/2022 | 37 | NOTICE by Charter Communications, Inc., Spectrum Advanced Services, LLC, Spectrum Management Holding Company, LLC *Notice of Compliance* (Dacus, Deron) (Entered: 08/15/2022) |
| 08/18/2022 | 38 | NOTICE of Discovery Disclosure by Entropic Communications, LLC *(Initial Disclosures)* (Hill, Jack Wesley) (Entered: 08/18/2022) |
| 08/30/2022 | 39 | Agreed MOTION Agreed Motion for Entry of First Amended Docket Control Order re 35 Order,,, Terminate Motions,,, Scheduling Order,, by Charter Communications, Inc., Spectrum Advanced Services, LLC, Spectrum Management Holding Company, LLC. (Attachments: # 1 Text of Proposed Order)(Dacus, Deron) (Entered: 08/30/2022) |
| 08/31/2022 | 40 | FIRST AMENDED DOCKET CONTROL ORDER granting 39 Agreed MOTION Agreed Motion for Entry of First Amended Docket Control Order re 35 Order. Signed by District Judge Rodney Gilstrap on 8/31/2022. (ch, ) (Entered: 09/01/2022) |
| 09/08/2022 | 41 | NOTICE by Charter Communications, Inc., Spectrum Advanced Services, LLC, Spectrum Management Holding Company, LLC *Notice of Compliance* (Dacus, Deron) (Entered: 09/08/2022) |
| 09/23/2022 | 42 | Unopposed MOTION for Extension of Time to File Response/Reply as to 18 MOTION to Dismiss *For Improper Venue Pursuant to FRCP 12(b)(3)* by Entropic Communications, LLC. (Attachments: # 1 Text of Proposed Order)(Hill, Jack Wesley) (Entered: 09/23/2022) |
| 09/26/2022 | 43 | ORDER granting 42 Unopposed MOTION for Extension of Time to File Response/Reply as to 18 MOTION to Dismiss *For Improper Venue Pursuant to FRCP 12(b)(3)* , 18 MOTION to Dismiss *For Improper Venue Pursuant to FRCP 12(b)(3)* Responses due by 11/11/2022. Signed by District Judge Rodney Gilstrap on 9/26/2022. (ch, ) (Entered: 09/27/2022) |
| 09/27/2022 | 44 | NOTICE of Attorney Appearance by Matthew Alexander Blair on behalf of Entropic Communications, LLC (Blair, Matthew) (Entered: 09/27/2022) |
| 09/28/2022 | 45 | NOTICE of Attorney Appearance by Darlene Fae Ghavimi on behalf of All Plaintiffs (Ghavimi, Darlene) (Entered: 09/28/2022) |
| 10/25/2022 | 46 | Unopposed MOTION for Extension of Time to File Response/Reply as to 18 MOTION to Dismiss *For Improper Venue Pursuant to FRCP 12(b)(3)* by Entropic Communications, LLC. (Attachments: # 1 Text of Proposed Order)(Hill, Jack Wesley) (Entered: 10/25/2022) |

# APPX817

| 10/31/2022 | 47 | ORDER granting 46 Unopposed MOTION for Extension of Time to File Response/Reply as to 18 MOTION to Dismiss *For Improper Venue Pursuant to FRCP 12(b)(3)* . Signed by District Judge Rodney Gilstrap on 10/31/2022. (ch, ) (Entered: 10/31/2022) |
|---|---|---|
| 12/02/2022 | 48 | Unopposed MOTION for Extension of Time to File Response/Reply as to 18 MOTION to Dismiss *For Improper Venue Pursuant to FRCP 12(b)(3)* by Entropic Communications, LLC. (Attachments: # 1 Text of Proposed Order)(Hill, Jack Wesley) (Entered: 12/02/2022) |
| 12/08/2022 | 49 | ORDER granting 48 Unopposed MOTION for Extension of Time to File Response/Reply as to 18 MOTION to Dismiss *For Improper Venue Pursuant to FRCP 12(b)(3)* , 18 MOTION to Dismiss *For Improper Venue Pursuant to FRCP 12(b)(3)* Responses due by 1/6/2023. Signed by District Judge Rodney Gilstrap on 12/8/2022. (ch, ) (Entered: 12/08/2022) |
| 01/04/2023 | 50 | NOTICE of Attorney Appearance by Elizabeth Anne Long on behalf of All Defendants (Long, Elizabeth) (Entered: 01/04/2023) |
| 01/04/2023 | 51 | Unopposed MOTION for Extension of Time to File Response/Reply as to 18 MOTION to Dismiss *For Improper Venue Pursuant to FRCP 12(b)(3)* by Entropic Communications, LLC. (Attachments: # 1 Text of Proposed Order)(Hill, Jack Wesley) (Entered: 01/04/2023) |
| 01/05/2023 | 52 | ORDER granting 51 Unopposed MOTION for Extension of Time to File Response/Reply as to 18 MOTION to Dismiss *For Improper Venue Pursuant to FRCP 12(b)(3). Extended to 1/10/2023. Signed by District Judge Rodney Gilstrap on 1/5/2023. (ch, ) (Entered: 01/05/2023)* |
| 01/10/2023 | 53 | AMENDED COMPLAINT *(Second)* against Charter Communications, Inc., filed by Entropic Communications, LLC. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M, # 14 Exhibit N)(Hill, Jack Wesley) (Entered: 01/10/2023) |
| 01/10/2023 | 54 | SEALED RESPONSE to Motion re 18 MOTION to Dismiss *For Improper Venue Pursuant to FRCP 12(b)(3)* filed by Entropic Communications, LLC. (Attachments: # 1 Declaration of M. Blair, # 2 Exhibit A to Blair Declaration, # 3 Exhibit B to Blair Declaration, # 4 Exhibit C to Blair Declaration, # 5 Exhibit D to Blair Declaration, # 6 Exhibit E to Blair Declaration, # 7 Exhibit F to Blair Declaration, # 8 Exhibit G to Blair Declaration, # 9 Exhibit H to Blair Declaration, # 10 Exhibit I to Blair Declaration, # 11 Exhibit J to Blair Declaration, # 12 Exhibit K to Blair Declaration, # 13 Exhibit L to Blair Declaration, # 14 Exhibit M to Blair Declaration, # 15 Exhibit N to Blair Declaration, # 16 Exhibit O to Blair Declaration, # 17 Exhibit P to Blair Declaration, # 18 Exhibit Q to Blair Declaration, # 19 Exhibit R to Blair Declaration, # 20 Exhibit S to Blair Declaration, # 21 Exhibit T to Blair Declaration, # 22 Exhibit U to Blair Declaration, # 23 Exhibit V to Blair Declaration, # 24 Exhibit W to Blair Declaration, # 25 Exhibit X to Blair Declaration, # 26 Exhibit Y to Blair Declaration, # 27 Text of Proposed Order proposed order)(Hill, Jack Wesley) (Entered: 01/10/2023) |
| 01/17/2023 | 55 | REPLY to Response to Motion re 18 MOTION to Dismiss *For Improper Venue Pursuant to FRCP 12(b)(3) filed by Charter Communications, Inc., Spectrum Advanced Services, LLC, Spectrum Management Holding Company, LLC*. (Long, Elizabeth) (Entered: 01/17/2023) |
| 01/18/2023 | 56 | REDACTION to 54 Sealed Response to Motion,,,, by Entropic Communications, LLC. (Attachments: # 1 Declaration of M. Blair, # 2 Exhibit A through E to Blair Declaration (Sealed in Entirety), # 3 Exhibit F to Blair Declaration, # 4 Exhibit G through H to Blair Declaration (Sealed in Entirety), # 5 Exhibit I to Blair Declaration, # 6 Exhibit J to Blair Declaration, # 7 Exhibit K to Blair Declaration, # 8 Exhibit L to Blair Declaration, # 9 Exhibit M to Blair Declaration, # 10 Exhibit N to Blair Declaration, # 11 Exhibit O to Blair Declaration, # 12 Exhibit P to Blair Declaration, # 13 Exhibit Q to Blair Declaration, # 14 Exhibit R to Blair Declaration, # 15 Exhibit S to Blair Declaration, # 16 Exhibit T to Blair Declaration, # 17 Exhibit U to Blair Declaration, # 18 Exhibit V to Blair Declaration, # 19 Exhibit W to Blair Declaration, # 20 Exhibit X to Blair Declaration, # 21 Exhibit Y to Blair Declaration (Sealed in Entirety), # 22 Text of Proposed Order proposed order)(Hill, Jack Wesley) (Entered: |

| | | |
|---|---|---|
| | | 01/18/2023) |
| 01/19/2023 | 57 | NOTICE of Attorney Appearance – Pro Hac Vice by Melissa A. Brown on behalf of All Defendants. Filing fee $ 100, receipt number ATXEDC–9315923. (Brown, Melissa) (Entered: 01/19/2023) |
| 01/23/2023 | 58 | Unopposed MOTION for Extension of Time to File Answer re 53 Amended Complaint, by Charter Communications, Inc.. (Attachments: # 1 Text of Proposed Order)(Dacus, Deron) (Entered: 01/23/2023) |
| 01/25/2023 | 59 | ORDER granting 58 Unopposed MOTION for Extension of Time to File Answer re 53 Amended Complaint. Charter Communications, Inc. answer due 1/30/2023.. Signed by District Judge Rodney Gilstrap on 1/25/2023. (ch, ) (Entered: 01/25/2023) |
| 01/27/2023 | 60 | NOTICE of Attorney Appearance – Pro Hac Vice by Kenneth H. Bridges on behalf of Entropic Communications, LLC. Filing fee $ 100, receipt number ATXEDC–9330960. (Bridges, Kenneth) (Entered: 01/27/2023) |
| 01/30/2023 | 61 | SEALED MOTION *to Dismiss* by Charter Communications, Inc.. (Attachments: # 1 Text of Proposed Order, # 2 Declaration, # 3 Exhibit 1, # 4 Exhibit 2, # 5 Exhibit 3, # 6 Exhibit 4, # 7 Exhibit 5, # 8 Exhibit 6, # 9 Exhibit 7, # 10 Exhibit 8, # 11 Exhibit 9, # 12 Exhibit 10, # 13 Exhibit 11, # 14 Exhibit 12)(Dacus, Deron) (Entered: 01/30/2023) |
| 02/06/2023 | 62 | REDACTION to 61 SEALED MOTION *to Dismiss* by Charter Communications, Inc.. (Attachments: # 1 Text of Proposed Order, # 2 Declaration, # 3 Exhibit 1, # 4 Exhibit 2, # 5 Exhibit 3, # 6 Exhibit 4, # 7 Exhibit 5, # 8 Exhibit 6, # 9 Exhibit 7–12)(Dacus, Deron) (Entered: 02/06/2023) |
| 02/06/2023 | 63 | STIPULATION of Dismissal by Charter Communications, Inc.. (Dacus, Deron) (Entered: 02/06/2023) |
| 02/06/2023 | 64 | Unopposed MOTION Motion to Amend Case Caption re 63 Stipulation of Dismissal by Charter Communications, Inc.. (Attachments: # 1 Text of Proposed Order)(Dacus, Deron) (Entered: 02/06/2023) |
| 02/07/2023 | 65 | ORDER re 63 Stipulation of Dismissal without prejudice as too Spectrum Advanced Services, LLC and Spectrum Management Holding Company, LLC. Signed by District Judge Rodney Gilstrap on 2/7/2023. (ch, ) (Entered: 02/07/2023) |
| 02/08/2023 | 66 | Unopposed MOTION for Extension of Time to File Response/Reply as to 61 SEALED MOTION *to Dismiss* by Entropic Communications, LLC. (Attachments: # 1 Text of Proposed Order)(Fair, Andrea) (Entered: 02/08/2023) |
| 02/10/2023 | 67 | ORDER granting 66 Unopposed MOTION for Extension of Time to File Response/Reply as to 61 SEALED MOTION *to Dismiss* , 61 SEALED MOTION *to Dismiss* Responses due by 2/20/2023. Signed by District Judge Rodney Gilstrap on 02/10/2023. (klc, ) (Entered: 02/10/2023) |
| 02/21/2023 | 68 | SEALED RESPONSE re 61 SEALED MOTION *to Dismiss* filed by Entropic Communications, LLC. (Attachments: # 1 Affidavit Declaration of M. Blair, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Exhibit G, # 9 Exhibit H, # 10 Exhibit I, # 11 Exhibit J, # 12 Exhibit K, # 13 Exhibit L, # 14 Exhibit M, # 15 Exhibit N, # 16 Exhibit O, # 17 Exhibit P, # 18 Exhibit Q, # 19 Exhibit R, # 20 Exhibit S, # 21 Exhibit T, # 22 Exhibit U, # 23 Exhibit V, # 24 Exhibit W, # 25 Exhibit X, # 26 Exhibit Y, # 27 Exhibit Z, # 28 Exhibit AA, # 29 Exhibit AB, # 30 Exhibit AC, # 31 Text of Proposed Order)(Hill, Jack Wesley) (Entered: 02/21/2023) |
| 02/27/2023 | 69 | Unopposed MOTION for Extension of Time to File by Charter Communications, Inc.. (Attachments: # 1 Text of Proposed Order) (Dacus, Deron) (Entered: 02/27/2023) |
| 02/28/2023 | 70 | REDACTION to 68 Sealed Response to Motion,, by Entropic Communications, LLC. (Attachments: # 1 Affidavit Declaration of M. Blair, # 2 Exhibit A–E, # 3 Exhibit F, # 4 Exhibit G–H, # 5 Exhibit I, # 6 Exhibit J, # 7 Exhibit K, # 8 Exhibit L, # 9 Exhibit M, # 10 Exhibit N, # 11 Exhibit O, # 12 Exhibit P, # 13 Exhibit Q, # 14 Exhibit R, # 15 Exhibit S, # 16 Exhibit T, # 17 Exhibit U, # 18 Exhibit V, # 19 Exhibit W, # 20 Exhibit X, # 21 Exhibit Y–AB, # 22 Exhibit AC, # 23 Text of Proposed Order)(Hill, |

| | | |
|---|---|---|
| | | Jack Wesley) (Entered: 02/28/2023) |
| 02/28/2023 | 71 | ORDER granting 69 Motion for Extension of Time to File Reply. Signed by District Judge Rodney Gilstrap on 2/28/2023. (ch, ) (Entered: 02/28/2023) |
| 02/28/2023 | 72 | Agreed MOTION to Amend/Correct 40 Order on Motion for Miscellaneous Relief by Entropic Communications, LLC. (Attachments: # 1 Text of Proposed Order)(Fair, Andrea) (Entered: 02/28/2023) |
| 03/02/2023 | 73 | SECOND AMENDED DOCKET CONTROL ORDER granting 72 Agreed MOTION to Amend/Correct 40 Order on Motion for Miscellaneous Relief. Signed by District Judge Rodney Gilstrap on 3/2/2023. (ch, ) (Entered: 03/02/2023) |
| 03/06/2023 | 74 | Sealed Document. SUPPLEMENT re 68 SEALED RESPONSE to Motion re 61 SEALED MOTION to Dismiss filed by Entropic Communications, LLC. (Hill, Jack Wesley) (Entered: 03/06/2023) |
| 03/09/2023 | 75 | SEALED REPLY to Response to Motion re 61 SEALED MOTION *to Dismiss* filed by Charter Communications, Inc.. (Attachments: # 1 Declaration, # 2 Exhibit 13, # 3 Exhibit 14)(Dacus, Deron) (Entered: 03/09/2023) |
| 03/13/2023 | 76 | REDACTION to 74 Sealed Document by Entropic Communications, LLC. (Hill, Jack Wesley) (Entered: 03/13/2023) |
| 03/13/2023 | 77 | Unopposed MOTION for Extension of Time to File Response/Reply as to 61 SEALED MOTION *to Dismiss (to File Sur−Reply)* by Entropic Communications, LLC. (Attachments: # 1 Text of Proposed Order)(Hill, Jack Wesley) (Entered: 03/13/2023) |
| 03/15/2023 | 78 | ORDER granting 77 Unopposed MOTION for Extension of Time to File Response/Reply as to 61 SEALED MOTION *to Dismiss (to File Sur−Reply)*, 61 SEALED MOTION *to Dismiss* Responses due by 3/23/2023. Signed by District Judge Rodney Gilstrap on 3/15/2023. (ch, ) (Entered: 03/16/2023) |
| 03/16/2023 | 79 | REDACTION to 75 Sealed Reply to Response to Motion *re 61 Motion to Dismiss filed* by Charter Communications, Inc.. (Attachments: # 1 Declaration, # 2 Exhibit 13, # 3 Exhibit 14)(Brown, Melissa) (Entered: 03/16/2023) |
| 03/23/2023 | 80 | SEALED SUR−REPLY to Reply to Response to Motion re 61 SEALED MOTION *to Dismiss* filed by Entropic Communications, LLC. (Hill, Jack Wesley) (Entered: 03/23/2023) |
| 03/29/2023 | 81 | NOTICE of Attorney Appearance − Pro Hac Vice by Katherine L. Allor on behalf of Entropic Communications, LLC. Filing fee $ 100, receipt number ATXEDC−9426592. (Allor, Katherine) (Entered: 03/29/2023) |
| 03/29/2023 | 82 | NOTICE of Attorney Appearance − Pro Hac Vice by Peter E. Soskin on behalf of Entropic Communications, LLC. Filing fee $ 100, receipt number ATXEDC−9426688. (Soskin, Peter) (Entered: 03/29/2023) |
| 04/03/2023 | 83 | REDACTION to 80 Sealed Sur−Reply to Reply to Response to Motion by Entropic Communications, LLC. (Hill, Jack Wesley) (Entered: 04/03/2023) |
| 04/04/2023 | 84 | Sealed Document. Joint Claim Construction and Pre−Hearing Statement (P.R. 4−3) (Shimota, James) (Entered: 04/04/2023) |
| 04/05/2023 | 85 | NOTICE by Charter Communications, Inc. *of Service of Expert Witness Disclosures Pursuant to PR 4−3(b)* (Dacus, Deron) (Entered: 04/05/2023) |
| 04/12/2023 | 86 | NOTICE of Attorney Appearance − Pro Hac Vice by Samuel Patrick Richey on behalf of Entropic Communications, LLC. Filing fee $ 100, receipt number ATXEDC−9448177. (Richey, Samuel) (Entered: 04/12/2023) |
| 04/14/2023 | 87 | ***WITHDRAWN PER ORDER #94*** SEALED MOTION *to Disqualify Cathleen Quigley* by Entropic Communications, LLC. (Attachments: # 1 Declaration of James Shimota, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Text of Proposed Order)(Shimota, James) Modified on 5/9/2023 (ch, ). (Entered: 04/14/2023) |

| 04/19/2023 | 88 | Agreed MOTION to Amend/Correct *Docket Control Order* by Entropic Communications, LLC. (Attachments: # 1 Text of Proposed Order)(Fair, Andrea) (Entered: 04/19/2023) |
|---|---|---|
| 04/20/2023 | 89 | AMENDED DOCKET CONTROL ORDER granting 88 Agreed MOTION to Amend/Correct Docket Control Order. Signed by District Judge Rodney Gilstrap on 4/20/2023. (ch, ) (Entered: 04/21/2023) |
| 04/27/2023 | 90 | Unopposed MOTION for Extension of Time to File Response/Reply as to 87 SEALED MOTION *to Disqualify Cathleen Quigley* by Charter Communications, Inc.. (Attachments: # 1 Text of Proposed Order)(Brown, Melissa) (Entered: 04/27/2023) |
| 05/05/2023 | 92 | Unopposed MOTION to Withdraw 87 SEALED MOTION *to Disqualify Cathleen Quigley* by Entropic Communications, LLC. (Attachments: # 1 Text of Proposed Order)(Hill, Jack Wesley) (Entered: 05/05/2023) |
| 05/05/2023 | 93 | ORDER granting 90 Unopposed MOTION for Extension of Time to File Response/Reply as to 87 SEALED MOTION *to Disqualify Cathleen Quigley* , 87 SEALED MOTION *to Disqualify Cathleen Quigley* Responses due by 5/5/2023. Signed by District Judge Rodney Gilstrap on 5/5/2023. (ch, ) (Entered: 05/08/2023) |
| 05/08/2023 | 94 | ORDER granting 92 Motion to Withdraw 87 SEALED MOTION *to Disqualify >. Signed by District Judge Rodney Gilstrap on 5/8/2023. (ch, ) (Entered: 05/09/2023)* |
| 05/09/2023 | 95 | NOTICE by Entropic Communications, LLC *of Compliance Regarding Technical Tutorial* (Fair, Andrea) (Entered: 05/09/2023) |
| 05/09/2023 | 96 | NOTICE of Attorney Appearance – Pro Hac Vice by Amy L DeWitt on behalf of Charter Communications, Inc.. Filing fee $ 100, receipt number ATXEDC–9490163. (DeWitt, Amy) (Entered: 05/09/2023) |
| 05/09/2023 | 97 | PLAINTIFF'S OPENING CLAIM CONSTRUCTION BRIEF filed by Entropic Communications, LLC. (Attachments: # 1 Exhibit 1 – U.S. Patent No. 8,223,775, # 2 Exhibit 2 – U.S. Patent No. 8,792,008, # 3 Exhibit 3 – U.S. Patent No. 9,825,826, # 4 Exhibit 4 – U.S. Patent No. 8,284,690, # 5 Exhibit 5 – U.S. Patent No. 9,210,362, # 6 Exhibit 6 – U.S. Patent No. 10,135,682, # 7 Exhibit 7 – Rebuttal Declaration of Richard A. Kramer, # 8 Exhibit 8 – Declaration of Dr. Kevin Almeroth, # 9 Exhibit 9 – Almeroth Condensed Deposition Transcript, # 10 Exhibit 10 – IEEE Dictionary, # 11 Exhibit 11 – Email from A. Boardman)(Fair, Andrea) (Entered: 05/09/2023) |
| 05/10/2023 | 98 | NOTICE by Charter Communications, Inc. – *Joint Notice of Redaction of Docket 91* – (Attachments: # 1 Exhibit 1 – Redacted Order, dated May 3, 2023 to the docket in 22–cv–125 (ED Tex))(Brown, Melissa) (Entered: 05/10/2023) |
| 05/11/2023 | 99 | Opposed MOTION TO CONSOLIDATE THIS ACTION WITH NO. 2:23–CV–00052–JRG AND TO AMEND THE CASE SCHEDULE by Charter Communications, Inc.. (Attachments: # 1 Ex 1 – Proposed Consolidated Order, # 2 Ex 2 – Claim Charts, # 3 Text of Proposed Order)(Reisner, Daniel) (Entered: 05/11/2023) |
| 05/11/2023 | 100 | ORDER – Court hereby appoints David Keyzer as the Courts technical advisor. Signed by District Judge Rodney Gilstrap on 5/11/2023. (ch, ) (Entered: 05/12/2023) |
| 05/17/2023 | 101 | Sealed Document. Defendant's Answer to Second Amended Complaint (Dacus, Deron) (Entered: 05/17/2023) |
| 05/17/2023 | 102 | NOTICE of Attorney Appearance – Pro Hac Vice by Courtney Neufeld on behalf of Entropic Communications, LLC. Filing fee $ 100, receipt number ATXEDC–9505527. (Neufeld, Courtney) (Entered: 05/17/2023) |
| 05/18/2023 | 103 | NOTICE of Attorney Appearance – Pro Hac Vice by Connor James Meggs on behalf of Entropic Communications, LLC. Filing fee $ 100, receipt number ATXEDC–9506343. (Meggs, Connor) (Entered: 05/18/2023) |
| 05/23/2023 | 104 | REPLY to 97 Claim Construction Brief,, *filed by Charter Communications, Inc..* (Attachments: # 1 Affidavit/Declaration of Albert Boardman in Support of Charter's Responsive Claim Construction Brief, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5)(Long, Elizabeth) (Entered: 05/23/2023) |

# APPX821

| 05/24/2023 | 105 | REDACTION to 101 Sealed Document *Answer* by Charter Communications, Inc.. (Long, Elizabeth) (Entered: 05/24/2023) |
|---|---|---|
| 05/25/2023 | 106 | **FILED IN ERROR PER ATTORNEY**<br><br>Unopposed MOTION for Extension of Time to File Response/Reply as to 99 Opposed MOTION TO CONSOLIDATE THIS ACTION WITH NO. 2:23–CV–00052–JRG AND TO AMEND THE CASE SCHEDULE by Entropic Communications, LLC. (Attachments: # 1 Proposed Order)(Hill, Jack Wesley) Modified on 5/25/2023 (nkl, ). (Entered: 05/25/2023) |
| 05/25/2023 | | **\*\*\*FILED IN ERROR PER ATTORNEY. Document # 106, Unopposed MOTION for Extension of Time to File Response/Reply. PLEASE IGNORE.\*\*\*** (nkl, ) (Entered: 05/25/2023) |
| 05/25/2023 | 107 | NOTICE by Charter Communications, Inc. *of its Designation of Daniel L. Reisner as Lead Counsel* (Long, Elizabeth) (Entered: 05/25/2023) |
| 05/26/2023 | 108 | Unopposed MOTION for Leave to Supplement Infringement Contentions by Entropic Communications, LLC. (Attachments: # 1 Proposed Order)(Fair, Andrea) (Entered: 05/26/2023) |
| 05/26/2023 | 109 | Unopposed MOTION for Extension of Time to File Response/Reply as to 99 Opposed MOTION TO CONSOLIDATE THIS ACTION WITH NO. 2:23–CV–00052–JRG AND TO AMEND THE CASE SCHEDULE by Entropic Communications, LLC. (Attachments: # 1 Proposed Order)(Hill, Jack Wesley) (Entered: 05/26/2023) |
| 05/30/2023 | 110 | PLAINTIFF'S REPLY CLAIM CONSTRUCTION BRIEF filed by Entropic Communications, LLC. (Attachments: # 1 Exhibit 12 – U.S. Patent Publication No. 2021/0337543, # 2 Exhibit 13 – Newtons Telecom Dictionary Excerpt, # 3 Exhibit 14 – Microsoft Computer Dictionary Excerpt, # 4 Exhibit 15 – Entropic's Technology Tutorial Slides)(Shimota, James) (Entered: 05/30/2023) |
| 05/31/2023 | 111 | ORDER Before the Court is Plaintiff's Unopposed Motion for Leave to Supplement Infringement Contentions filed by Entropic Communications LLC. (Dkt. No. 109 .) In the Motion, Entropic requests leave to supplement its infringement contentions. (Id. at 1.) Entropic served its supplemental infringement contentions on March 10, 2023. (Id.) The Motion is unopposed. (Id. at 1, 3) Having considered the Motion, and noting its unopposed nature, the Court finds that it should be and hereby is GRANTED. Accordingly, the Court ORDERS that Entropic is granted leave to supplement its infringement contentions as requested. Signed by District Judge Rodney Gilstrap on 5/30/2023. (psm) (Entered: 05/31/2023) |
| 05/31/2023 | 112 | ORDER Before the Court is the Unopposed Motion for Extension of Time to Respond to Charter's Motion to Consolidate filed by Plaintiff Entropic Communications, LLC. (Dkt. No. 109 .) In the Motion, Entropic requests an extension of time to file a response in opposition to Defendant Charter Communications, Inc.'s Motion to Consolidate and Amend the Case Schedule (Dkt. No. 99 ). (Id. at 1.) The requested extension would move the deadline for Entropic to file its opposition up to and including May 31, 2023. (Id.) The Motion is unopposed. (Id. at 1, 3.) Having considered the Motion, and noting its unopposed nature, the Court finds that it should be and hereby is GRANTED. Accordingly, the Court ORDERS that the deadline for Entropic to file a response to the Motion to Consolidate is extended up to and including May 31, 2023. Signed by District Judge Rodney Gilstrap on 5/30/2023. (psm) (Entered: 05/31/2023) |
| 05/31/2023 | 113 | RESPONSE in Opposition re 99 Opposed MOTION TO CONSOLIDATE THIS ACTION WITH NO. 2:23–CV–00052–JRG AND TO AMEND THE CASE SCHEDULE *filed by Entropic Communications, LLC*. (Attachments: # 1 Proposed Order Proposed Order)(Hill, Jack Wesley) (Entered: 05/31/2023) |
| 06/02/2023 | 114 | P.R. 4–5(d) Joint Claim Construction Chart by Charter Communications, Inc.. (Attachments: # 1 Exhibit A)(Long, Elizabeth) (Entered: 06/02/2023) |
| 06/06/2023 | 115 | Amended P.R. 4–5(d) Joint Claim Construction Chart by Charter Communications, Inc.. (Attachments: # 1 Exhibit A)(Long, Elizabeth) (Entered: 06/06/2023) |

# APPX822

| 06/08/2023 | 116 | REPLY to Response to Motion re 99 Opposed MOTION TO CONSOLIDATE THIS ACTION WITH NO. 2:23–CV–00052–JRG AND TO AMEND THE CASE SCHEDULE *filed by Charter Communications, Inc.*. (Attachments: # 1 Declaration of Daniel Reisner)(Brown, Melissa) (Entered: 06/08/2023) |
|---|---|---|

## <u>CERTIFICATE OF SERVICE</u>

I certify that on June 16, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit by using the appellate CM/ECF system.

I further certify that on June 16, 2023, I caused a copy of the foregoing to be served on the Clerk of the Court for the United States Court of Appeals for the Federal Circuit as well as to the following counsel of record and district court judge by Federal Express and by electronic mail at the following addresses:

Darlene F. Ghavimi
Matthew A. Blair
**K&L Gates, LLP**
2801 Via Fortuna, Suite 650
Austin, TX 78746
Tel.: (512) 482-6800
Darlene.Ghavimi@klgates.com
matthew.blair@klgates.com

James A Shimota
George C Summerfield
Jason A Engel
Katherine L. Allor
Samuel P. Richey
**K&L Gates, LLP**
70 West Madison Street, Suite 3100
Chicago, IL 60602
Tel.: (312) 807-4299
Fax: (312) 827-8000
jim.shimota@klgates.com
george.summerfield@klgates.com
jason.engel@klgates.com
katy.allor@klgates.com
samuel.richey@klgates.com

Connor J. Meggs
**K&L Gates, LLP**
10100 Santa Monica Blvd., 8th Floor
Los Angeles, CA 90067
Tel.: (310) 552-5031
connor.meggs@klgates.com

Peter E. Soskin
**K&L Gates, LLP**
Four Embarcadero Center, Suite 1200
San Francisco, CA 94111
Tel.: 415-882-8046
Fax: 415-882-8220
peter.soskin@klgates.com

Nicholas F. Lenning
Courtney Neufeld
**K&L Gates, LLP**
925 Fourth Ave., Suite 2900
Seattle, WA 98104
Tel.: (206) 623-7580
Fax: (206) 623-7022
nicholas.lenning@klgates.com
courtney.neufeld@klgates.com

Andrea Leigh Fair
Jack Wesley Hill
**Ward, Smith & Hill, PLLC**
1507 Bill Owens Parkway
Longview, TX 75604
Tel.: (903) 757-6400
Fax: (903) 757-2323
andrea@wsfirm.com
wh@wsfirm.com

Kenneth H. Bridges
**Bridges IP Consulting**
2113 19th Ave S
Nashville, TN 37212
Tel.: (615) 973-9478
bridgesip@icloud.com

*Counsel for Plaintiff-Respondent
Entropic Communications, LLC*

Hon. Rodney Gilstrap
U.S.D.C. – Eastern District of Texas
Sam B. Hall, Jr. Federal Building and United States Courthouse
100 East Houston Street
Marshall, Texas 75670
Tel.: (903) 935-3868
Fax: (903) 935-2295

Dated: June 16, 2023                                    */s/ Daniel Reisner*